# EXHIBIT 1

## IN THE DISTRICT COURT OF FRANKLIN COUNTY, KANSAS

THE HDD COMPANY, INC., an Oregon
Corporation,

              Plaintiff,

v.

MINNESOTA LIMITED, LLC., a Minnesota
Corporation,
**SERVE:**
**National Registered Agents, Inc. of KS**
**112 SW 7ᵗʰ Street, Suite 3C**
**Topeka, KS 66603**

SOUTHERN STAR CENTRAL GAS
PIPELINE, INC., a Delaware Corporation.
4700 Highway 56
Owensboro, KY 42301
**SERVE:**
**National Registered Agents, Inc. of KS**
**112 SW 7ᵗʰ Street, Suite 3C**
**Topeka, KS 66603**

RENE BURES and ANITA BURES
**SERVE:**
**Rene Bures**
**Anita Bures**
**31443 NW Meade Rd.**
**Richmond KS 66080**

RURAL WATER DISTRICT NO. 4
**SERVE:**
**Rural Water District No. 4**
**501 N. Olive St.**
**Garnett, KS 66032**

ANDERSON COUNTY, KANSAS
**SERVE:**
**County Clerk**
**100 E. 4ᵗʰ Ave.**
**Garnett, KS 66032**

JOHN T. RAYNE
**SERVE:**
**John T. Rayne**
**12 Overhill Drive**
**Paola, KS, 66071**

Case No.

Division No.

Petition Pursuant to K.S.A. Chapter 60

00165043.1

PATRICK ARTHUR RAYNE and KELLY
LEE RAYNE FAMILY TRUST under trust
agreement dated April 12, 2016
**SERVE:**
**Patrick Arthur Rayne, Co-Trustee**
**Kelly Lee Rayne, Co-Trustee**
**102 Crestview Dr.**
**Paola, KS 66071**

PICKERT FAMILY TRUST
**SERVE:**
**Keith J. Pickert, co-trustee**
**Mary J. Pickert, co-trustee**
**47890 Deer Trail Dr.**
**Canton Michigan 48187**

LYLE BLACK and CHERYL BLACK
**SERVE:**
**Lyle Black**
**Cheryl Black**
**3159 Neosho Rd.**
**Ottawa, KS 66067**

FARM CREDIT SERVICES, FLCA D/B/A
FRONTIER FARM CREDIT, FLCA
**SERVE: THE CORPORATION**
**COMPANY, INC.**
**112 S.W. 7TH STREET**

**TOPEKA, KS 66603**

AND

OSWEGO COAL COMPANY, INC.
**SERVE: Robert Caylor**
**Oswego Coal Company, Inc.**
**2476 Marshall Rd.**
**Ottawa, KS 66067**

        Defendants.

## PETITION

        Plaintiff The HDD Company, Inc., an Oregon Corporation ("HDD"), states the following

allegations and claims against Defendants Minnesota Limited, LLC, a Minnesota Corporation

("MNLTD"); Southern Star Central Gas Pipeline, Inc. ("Southern Star"), a Delaware Corporation; Rene and Anita Bures ("Bures"); Rural Water District No. 4 ("RWD4"); Anderson County, Kansas ("Anderson County"); John T. Rayne ("Rayne"); Patrick Arthur Rayne and Kelly Lee Rayne Family Trust under trust agreement dated April 12, 2016, Patrick Arthur Rayne and Kelly Lee Rayne, co-trustees ("Rayne Family Trust"); Pickert Family Trust, Keith J. Pickert and Mary J. Pickert, co-trustees ("Pickert Family Trust"); Lyle and Cheryl Black ("Black"); Farm Credit Services, FLCA d/b/a Frontier Farm Credit, FLCA ("Frontier"); and Oswego Coal Company, Inc. ("Oswego").

## THE PARTIES

1.      The HDD Company, Inc. is an Oregon Corporation authorized to do business in the state of Kansas, with its principal place of business at 4525 Serrano Parkway, Office Suite 210, El Dorado Hills, CA 95762.

2.      Defendant Minnesota Limited, LLC is a Minnesota Limited Liability Corporation authorized to do business in the state of Kansas, with its principal place of business at 18640 200th Street, PO Box 410, Big Lake, MN 55309.

3.      Defendant Southern Star Central Gas Pipeline, Inc. ("Southern Star") is a Delaware Corporation authorized to do business in the state of Kansas, with its principal place of business at 4700 Highway 56, Owensboro, Kentucky, 42301.   Upon information and belief, Defendant Southern Star is the successor in interest to several right of way interests on real property that is subject to a mechanic's lien filed by HDD: a right of way easement on the property located at 31443 NW Mead Rd., Richmond, KS 66080 as set forth at Book R. Mcl., Page 552 and amended at Book 114 Mcl., Page 118;  a right of way easement on the property located at 00000 NW Meade Rd., Garnett, KS 66032 and recorded at Book R Mcl., Page 543 and amended at Book 114 Mcl.,

Page 82; and a right of way easement located at Book W Mcl., Page 405 and amended at Book 114 Mcl., Page 82.

4.      Upon information and belief, Defendants Rene and Anita Bures are the owners of property located at 31443 NW Meade Rd., Richmond KS 66080 and can be served at that address.

5.      Upon information and belief, Rural Water District No. 4 is the holder of a right of way easement on the proeprty located at 31443 NW Meade Rd., Richmond KS 66080 and recorded at Book 1 Mcl., Page 286.  Further, upon information and belief, Rural Water District No. 4 is the holder of a right of way easement on the property located at 00000 NW Meade Rd., Garnett, KS 66032 recorded at Book Z Mcl., Page 433.  Rural Water District No. 4 can be served at 501 N. Olive St., Garnett, KS 66032.

6.      Upon information and belief, Anderson County is a political subdivision of the State of Kansas and is the holder of a right of way easement on the property located at 31443 NW Meade Rd., Richmond KS 66080.  Further, Anderson County is the holder of a right of way easement on the Property located at 00000 NW Meade Rd., Garnett KS 66032 and recorded at Book 69 Mcl., Page 35.  Anderson County can be served at 100 E. 4th Ave., Garnett, KS 66032.

7.      Upon information and belief, John T. Rayne is a co-owner of property located at 00000 NW Meade Road, Richmond, KS, 66080 and can be served at 12 Overhill Drive, Paola, KS, 66071.

8.      Upon information and belief, Defendant Patrick Arthur Rayne and Kelly Lee Rayne Family Trust under trust agreement dated April 12, 2016, Patrick Arthur Rayne and Kelly Lee Rayne co-trustees, is a co-owner of property located at 00000 NW Meade Road, Richmond, KS, 66080 and can be served at 102 Crestview Dr., Paola, KS 66071.

9.      Upon information and belief, Defendant Pickert Family Trust, Keith J. Pickert and Mary J. Pickert are co-trustees, is a co-owner of property located at 00000 NW Meade Road, Richmond, KS, 66080 and can be served at 47890 Deer Trail Dr., Canton Michigan 48187.

10.     Upon information and belief, Defendants Lyle and Cheryl Black are owners of the property located at 3062 Nebraska Rd., Ottawa, KS 66067, and can be served at 3159 Neosho Rd., Ottawa, KS 66067.

11.     Upon Information and belief, Defendant Farm Credit Services, FLCA d/b/a Frontier Farm Credit, FLCA is a lending association with its principal place of business in Manhattan, Kansas and the holder of a mortgage executed by Lyle and Cheryl Black and recorded June 10, 2014 at Book 544, Page 181 to secure the payment of an original principal indebtedness dated June 5, 2014 in the amount of $71,250.00. Frontier Farm Credit can be served through its registered agent The Corporation Company, Inc. at 112 S.W. 7th Street, Topeka, KS 66603.

12.     Upon information and belief, Defendant Oswego Coal Company, Inc. is a Kansas Corporation with its principal place of business in Ottawa Kansas, and is the owner of property located at 3125 Marshall Rd., Ottawa, KS 66067 and can be served throught its registered agent Robert Caylor at 2476 Marshall Rd., Ottawa, KS 66067.

## JURISDICTION AND VENUE

13.     Jurisdiction is proper in this Court, pursuant to K.S.A. § 60-308(b), in that defendant conducted business and entered into contracts in the state of Kansas and that the properties at issue are located in Kansas.

14.     Venue is proper in this Court pursuant to K.S.A. § 60-604 in that the agreement was to be performed in part in Franklin County, the pipeline project is located in Franklin County,

and the properties at issue are located in Kansas. *See* Subcontract Agreement attached as Exhibit 1 and incorporated by reference.

## FACTUAL ALLEGATIONS

15.     HDD is a leading supplier of Horizontal Directional Drilling services for the installation, replacement, and rehabilitaion of pipelines and utilities at vital crossings. HDD provides services throughout the nation.

16.     MNLTD is a pipeline transmission contractor doing business in many states.

17.     MNLTD entered into a contract with Southern Star to install 31.5 miles of 36" pipe through Franklin and Anderson County, Kansas, referred to as Project KS – C60266 ("Project" or "Pipeline Project").

18.     On January 9, 2020, HDD submitted a quote for directional drilling services and installation of the 36 inch steel pipeline at specific crossings for the Project. *See* Quote, Exhibit 2, included and incorporated within Subcontract Agreement, Exhibit 1.

19.     On January 17, 2020, HDD entered into an agreement with MNLTD to provide the HDD services quoted. The amount of the agreement was for $6,185,936.00. Exhibit 1.

20.     Per the Subcontract Agreement, payment was to be made through monthly progress payments "within seven (7) days after [MNLTD] receive each monthly payment from the project owner, but in no event later than 120 days from the date [MNLTD] received [HDD]'s invoice." A final payment was to be made within 30 days after MNLTD received HDD's final billing and HDD's work has been compelted and accepted. Exhibit 1.

21.     The Subcontract Agreement provided that HDD's compensation and time for completion would be equitably adjusted to account for any resulting delay and added costs due to differing site conditions. Exhibit 1.

22.     The Subcontract Agreement provided that "All work stoppages that arise through no fault of The HDD Company will be billed at $14,500 (no crew on site)." Exhibit 1.

23.     The Subcontract Agreeent required that MNLTD "[P]rovide and maintain suitable truck access to and from entry and exit locations" and "[P]rovide stable, level, matted and/or graveled work pads for each bore." Exhibit 1.

24.     Southern Star designed the pipe to be used, the method of installation, the location of the entry and exit points, and the diameter of the borehole for each horizontal directional drill.

25.     Within the Subcontract Agreement, HDD excluded all design responsibility: "The HDD Company and its personnel are not the Project Engineers. Therefore we exclude all design and engineering services unless any are specifically noted as included in this proposal. Any drilling plans or profiles that we submit to you will be based upon the design information in the contract documents and our experience as HDD contractors. Any plans or profiles we provide are recommendations only and are subject to review and approval by the project owner and/or its engineers." Exhibit 1.

26.     HDD's work on the project is complete.

27.     MNLTD has made payments in the amount of $3,115,029.19. The upaid balance of $ 2,471,266.81, as well as retainage withheld of $599,640.00, leaves a balance due and owing of $3,070,906.81.

28.     Due to no fault of HDD, delays occurred on the project. Delays were incurred due to weather, including lightning strikes, as well as insufficient site access for HDD equipment.

29.     As contemplated within the Subcontract Agreement, HDD incurred delay expenses of $159,868.58 as well as standby expenses of $500,975.00.

30.     Due to improper design of the bore and pipe, coating damage occurred.  Due to the coating damage, HDD was tasked with reinstalling the pipe.  The extra work and resulting delays due to extraction, and re-installation of the pipe resulted in additional costs to HDD of $1,600,392.89.

31.     Due to undisclosed differing site conditions, HDD incurred additional boring and delay expenses of $555,000.

32.     A total balance due and owing to HDD under the Subcontract Agreement, delays, extra work, and change orders from improper design and undisclosed differing site conditions is $5,887,143.28.

33.     Demand has been made on this unpaid balance.  MNLTD, without justification or excuse, has refused to make further payments on the amounts due.

## COUNT I – BREACH OF CONTRACT

34.     HDD hereby incorporates by reference the allegations contained in paragraphs 1 through 33 above as though fully set forth herein in their entirety.

35.     The Subcontract Agreement constitutes a valid, binding, and enforceable agreement.

36.     HDD performed on the Subcontract Agreement by providing the material and labor identified in the Agreement.

37.     MNTLD materially breached its duties and obligations under the agreement by failing to pay HDD amoutns due pursuant to the terms of the Agreement.

38.     Due to the breach of the Agreement by MNLTD, HDD has been harmed and is entitled to damages.

WHEREFORE, Plaintiff The HDD Company, Inc. prays this Court enter judgment against defendant Minnesota Limited, LLC for the amount due under the Subcontract Agreement, which is $5,887.143.28; prejudgment interest from and after October 9, 2020; post-judgment interest; and such other relief as the Court deems just in the circumstances.

## COUNT II – QUANTUM MERUIT

39.     In the alternative to its allegations of Breach of Contract (Count I), HDD asserts its quantum meruit claim as follows.

40.     HDD performed work under circumstances consistent with contract relations on the Pipeline Project that conferred a benefit upon MNLTD.

41.     At all relevant times, MNLTD knew or should have known that HDD was performing work on the Pipeline Project.

42.     MNLTD acquiesced and accepted the work which directly benefitted MNLTD.

43.     The fair and reasonable value of the work perofrmed under the Contract is $9,002,172.47.

44.     As of this date, HDD has been paid $3,115,029.19 for its work on the Project.

45.     HDD is still owed $5,887.143.28 for the work on the Project despite making demand for the same.

46.     MNLTD received and retained the benefit of $9,002,172.47 worth of work performed by HDD without paying for the same.

47.     As a direct result of MNLTD's failure to pay for the work on the Project, HDD has been damaged in the amount of $5,887,143.28.

48.     It would be inequitable and unjust for MNLTD to retain the benefit of the work provided by HDD without paying for the same.

WHEREFORE, HDD prays this Court for its judgment in favor of HDD and against MNLTD for damages recognizing the value of the benefit conferred to MNLTD in the amount of $5,887.143.28, and for any other and further relief that the Court deems just and proper under the circumstances.

## COUNT III UNJUST ENRICHMENT

49.     In the alternative to its claims for breach of contract and quantum meruit, HDD asserts its claim for unjust enrichment as follows.

50.     HDD performed work on the Pipeline Project that conferred a benefit upon MNLTD.

51.     At all relevant times, MNLTD knew or should have known that HDD was performing work on the Pipeline Project, and acquiesced and accepted the work which directly benefitted MNLTD.

52.     The fair and reasonable value of the work performed under the Contract is $9,002,172.47.

53.     As of this date, HDD has been paid $3,115,029.19 for its work on the Project.

54.     HDD is still owed $5,887.143.28 for the Work on the Project despite making demand for the same.

55.     MNLTD received and retained the benefit of $9,002,172.47 worth of work performed by HDD without paying for the same.

56.     As a direct result of MNLTD's failure to pay for the work on the Project, HDD has been damaged in the amount of $5,887,143.28.

57.     It would be inequitable and unjust for MNLTD to retain the benefit of the work provided by HDD without paying for the same.

WHEREFORE, HDD prays this Court for its judgment in favor of HDD and against MNLTD for damages recognizing the value of the benefit conferred to MNLTD in the amount of $5,887.143.28, and for any other and further relief that the Court deems just and proper under the circumstances.

## COUNT IV FORECLOSURE OF MECHANIC'S LIEN ON
## SOUTHERN STAR PIPELINE PROJECT (K.S.A. 55-208)

58.     HDD hereby incorporates by reference the allegations contained in paragraphs 1 through 33 above as though fully set forth herein in their entirety

59.     HDD seeks foreclosure of its lien on the Southern Star Pipeline Project purusant to Kansas law.

60.     HDD furnished work on the Pipeline Project beginning on or about January 17, 2020 and the work was furnished for, applied to, used and consumed in the Pipeline Project.

61.     HDD's work furnished for, applied to, used and consumed in the Pipeline Project is set out in the statement of account showing the amount still due and owing attached as Exhibits B-D of HDD's Pipeline Project Mechanic's Lien, and incorporated herein as Exhibits 3, 4, and 5.

62.     In spite of HDD's demand for payment, MNLTD failed and refused to pay the now oustanding balance of $5,887,143.28.

63.     On January 6, 2021, and within four months of the last date that HDD performed work on the Pipeline Project, HDD properly filed its mechanic's lien against the Pipeline Project with the Clerk of the District Court of Franklin County, Kansas, which has been designated Mechanic's Lien No. FR-2021-SL-000002 ("Pipeline Project Mechanic's Lien").  A true and accurate copy of HDD's Pipeline Project Mechanic's Lien is attached to this Petition as Exhibit 6.

64.     HDD fully complied with all statutory requirements under K.S.A. 55-208, et. Seq. when it filed its Pipeline Project Mechanic's Lien.

65.     After filing its Pipeline Project Mechanic's Lien, HDD filed a notice of the Lien in Anderson County, KS, attached hereto as Exhibit 7.

66.     HDD sent a copy of the Pipeline Project Mechanic's Lien to MNLTD and Southern Star via certified mail which were received on January 15, 2021.  Return receipts for the Mechanic's Lien are attached as Exhibit 8 and Exhibit 9.

67.      HDD notified all of the landowners of the Pipeline Project Mechanic's Lien. A copy of the return of service receipts are attached to this Petition as Exhibit 10 (Bures), 11 (Pickert Family Trust), 12 (Rayne), 13 (Rayne Family Trust), 14 (Oswego), and 15 (Black).

68.     This lawsuit to enforce HDD's Pipeline Project Mechanic's Lien was filed less than one year after the Mechanic's Lien was filed.

69.     The amounts claimed and prices stated in HDD's Pipeline Project Mechanic's Lien are the fair and reasonable value of the labor and materials HDD supplied or performed to improve the Pipeline as set for in HDD's Pipeline Project Mechanic's Lien Exhibits B and C, incorporated herein as Exhibits 3 and 4.

70.     All of the work described in HDD's Pipeline Project Mechanic's Lien was incorporated into and directy benefitted and improved the Pipeline Project.

71.     At the time it was filed, the Mechanic's Lien was a true and accurate account of HDD's work and demand of MNLTD, allowing a credit for all valid setoffs and itemizing the labor and materials supplied by HDD for the Pipeline Project.

72.     HDD has performed and complied with all conditions precedent to the creation and enforcement of its mechanic's lien, including service of its mechanic's lien on MNLTD and Southern Star.

73. HDD's lien on the Pipeline Project, being properly perfected under Kansas law, entitles HDD to foreclose said Pipeline interest installed on the Pipeline which is held for the debt contracted, the proceeds of which shall be used to satisfy the encumbrances on said Pipeline in the priority established by this Court.

74. All of the Work described in HDD's Lien was furnished to MNLTD on the faith and credit of HDD's lien rights against the Pipeline Project.

75. All of the Work described in HDD's lien directly benefitted and improved the Pipeline Project.

76. MNLTD was obligated, but failed to pay HDD for the work furnished to improve the Pipeline Project.

WHEREFORE, Plaintiff The HDD Company, Inc. prays this Court enter judgment foreclosing Mechanic's Lien FR-2021-SL-000002 in the principal amount of $5,887.143.28; prejudgment interest from and after October 9, 2020; post-judgment interest; its costs, for a special judgment and decree that HDD is adjudged to have a valid and existing mechanic's lien against the aforesaid Pipeline; that HDD's mechanics lien be adjudged and decreed to be prior and superior to any other lien or claim against said Pipeline; and such other relief as the Court deems just in the circumstances.

**COUNT V FORECLOSURE OF MECHANIC'S LIEN ON REAL PROPERTY LOCATED AT 31443 NW MEADE RD, RICHMOND KS 66080 AND 00000 NW MEADE RD., GARNETT, KS 66032 (K.S.A 60-1103**

77. HDD hereby incorporates by reference the allegations contained in paragraphs 1 through 33 above as though fully set forth herein in their entirety.

78. HDD seeks foreclosure of its lien on the properties located at 31443 NW Meade Rd., Richmond KS 66080 and 00000 NW Meade Rd., Garnett, KS 66032 purusant to Kansas law.

79. HDD furnished labor and materials for the Pipeline Project beginning on or about January 17, 2020.

80. HDD's work was furnished for, applied to, used and consumed in the Pipeline Project located on certain real property in Anderson County, Kansas at 31443 NW Meade Rd., Richmond KS 66080 and 00000 NW Meade Rd., Garnett, KS 66032 (the "real property"). The legal descriptions of the real property are set forth as Exhibit A to the Anderson County Mechanic's Lien filed by HDD as AN-2020-SL-000006, and incorporated herein as Exhibit 16.

81. HDD's work furnished for the Pipeline Project on the real property in Anderson County is set out in detail showing the prices charged therefore and the amount still due and owing, and are attached as Exhibit B and C to the Anderson County mechanic's lien filed by HDD as AN-2020-SL-000006, and incorporated herein as Exhibit 17 and 18.

82. In spite of HDD's demand for payment, MNLTD failed and refused to pay the now outstanding balance of $1,087,104.00 for work done on the Anderson County real property.

83. On January 6, 2020, and within five months of the last date that HDD performed work on the Project[1], HDD properly filed its mechanic's lien against the real property with the Clerk of the District Court of Anderson County, Kansas, which has been designated Mechanic's Lien No. AN-2020-SL-000006 (Anderson County Mechanic's Lien). A true and accurate copy of HDD's Anderson County Mechanic's Lien is attached to this Petition as Exhibit 19.

84. HDD fully complied with all statutory requirements under K.S.A. 60-1103, et. seq. when it filed its lien.

---

[1] In accordance with K.S.A. § 60-1103(c), HDD filed a Notice of Extension to File Lien on December 1, 2020 extending the time for HDD to file its mechanic's lien until February 8, 2021.

85. HDD sent a copy of the Mechanic's Lien to MNLTD and Southern Star via certified mail. A copy of the return receipts for the Lien are attached as Exhibit 8 (MNLTD) and Exhibit 9 (Southern Star).

86. HDD notified the landowners of the Mechanic's Lien via certified mail. A copy of the return receipts are attached to this Petition as Exhibit 10 (Bures), 11 (Pickert Family Trust), 12 (Rayne) and 13 (Rayne Family Trust).

87. HDD Notified the holders of a recorded interest in the real property of the Mechanic's Lien. A copy of the return receipts are attached to this Petition as Exhibit 20 (RWD4) and 21 (Anderson County).

88. This lawsuit to enforce HDD's Mechanic's Lien was filed less than one year after the Mechanic's Lien was filed.

89. The amounts claimed and prices stated in HDD's Anderson County Mechanic's Lien are the fair and reasonable value of the labor and materials HDD supplied or performed to improve the Pipeline Project as itemized and set for in HDD's Anderson County Mechanic's Lien.

90. All of the work described in HDD's Anderson County Mechanic's Lien was incorporated into and direcy benefitted and improved the Pipeline Project.

91. At the time it was filed, the Mechanic's Lien was a true and accurate account of HDDs work and demand of MNLTD for the work performed on the Anderson County real property, allowing a credit for all valid setoffs and itemizing the labor and materials supplied by HDD for the Pipeline Project.

92. HDD's Lien on the Property, being properly perfected under Kansas law, entitles HDD to foreclose said Anderson County real property interests, buildings, erections, improvements and plants erected or constructed, and all materials, fixtures, machinery and other

personal property furnished, placed or installed on the Anderson County real property which is held for the debt contracted, the proceeds of which shall be used to satisfy the encumbrances on said Anderson Coutny real property in the priority established by this Court.

93.     HDD satisfied all conditions precedent under Kansas' Mechanic's Lien statutes for filing and perfecting the Anderson County Mechanic's Lien.

94.     All of the Work described in HDD's Lien was furnished to MNLTD on the faith and credit of HDD's lien rights against the Anderson County real property.

95.     All of the Work described in HDD's lien directly benefitted and improved the Pipeline Project located on the Anderson County real property.

96.     MNLTD was obligated, but failed to pay HDD for the work furnished to improve the Pipeline Project located on the Anderson County real proeprty.

WHEREFORE, Plaintiff The HDD Company, Inc. prays this Court enter judgment foreclosing Mechanic's Lien AN-2020-SL-000006 in the principal amount of $1,087,104.00; prejudgment interest from and after the date payment became due at a statutory rate of 9% per year; post-judgment interest; its costs, for a special judgment and decree that HDD is adjudged to have a valid and existing mechanic's lien against the aforesaid real property; that HDD's mechanic's lien be adjudged and decreed to be prior and superior to any other lien or claim against said Pipeline; and such other relief as the Court deems just in the circumstances.

## COUNT V FORECLOSURE OF MECHANIC'S LIEN ON REAL PROPERTY LOCATED AT 3062 NEBRASKA RD., OTTAWA, KS 66067 and 3159 NEOSHO RD., OTTAWA, KS 66067 (K.S.A 60-1103)

97.     HDD hereby incorporates by reference the allegations contained in paragraphs 1 through 33 above as though fully set forth herein in their entirety.

98.     HDD seeks foreclosure of its lien on the properties located at 3062 Nebraska Rd., Ottawa, KS 66067 and 3159 Neosho Rd., Ottawa, KS 66067 purusant to Kansas law.

99.     HDD furnished labor and materials for the Pipeline Project beginning on or about January 17, 2020.

100.     HDD's work was furnished for, applied to, used and consumed in the Pipeline project located on certain real property in Franklin County, Kansas at 3062 Nebraska Rd., Ottawa, KS 66067 and 3159 Neosho Rd., Ottawa, KS 66067 (the "Franklin County real property"). The legal descriptions of the real property are set forth as Exhibit A to the Franklin County Meccanic's Lien filed by HDD as FR-2020-SL-000017, and incorporated herein as Exhibit 22.

101.     HDD's work furnished for the Pipeline Project on the real property in Franklin County is set out in detail and fully itemized showing the prices charged therefore and the amount still due and owing, and are attached as Exhibit B and C to the Franklin County Mechanic's Lien filed by HDD as FR-2020-SL-000017 ("Franklin County Mechanic's Lien"), and incorporated herein as Exhibit 23 and 24.

102.     In spite of HDD's demand for payment, MNLTD failed and refused to pay the now outstanding balance of $3,013,544.22 for work done on the Franklin County real property.

103.     On January 6, 2020, and within five months of the last date that HDD performed work on the Project[2], HDD properly filed its mechanic's lien against the Franklin County real property with the Clerk of the District Court of Franklin County, Kansas, which has been designated Mechanic's Lien No. FR-2020-SL-000017.  A true and accurate copy of HDD's Franklin County Mechanic's Lien is attached to this Petition as Exhibit 25.

---

[2] In accordance with K.S.A. § 60-1103(c), HDD filed a Notice of Extension to File Lien on December 1, 2020 extending the time for HDD to file its mechanic's lien until February 8, 2021.

104. HDD fully complied with all statutory requirements under K.S.A. 60-1103, et. seq. when it filed its lien.

105. HDD sent a copy of the Franklin County Mechanic's Lien to MNLTD and Southern Star via certified mail. Return receipts are attached as Exhibit 8 (MNLTD) and 9 (Southern Star).

106. HDD notified the landowners of the Franklin County Mechanic's Lien via certified mail. A copy of the return receipts are attached to this Petition as Exhibit 14 (Oswego Coal Company, Inc.) and 15 (Black).

107. HDD Notified Farm Credit Services, FLCA d/b/a Frontier Farm Credit, FLCA, the holders of a recorded interest in the Franklin County real property, of the Mechanic's Lien. A copy of the return receipts are attached to this Petition as Exhibit 26.

108. This lawsuit to enforce HDD's Franklin County Mechanic's Lien was filed less than one year after the Franklin County Mechanic's Lien was filed.

109. The amounts claimed and prices stated in HDD's Franklin County Mechanic's Lien are the fair and reasonable value of the labor and materials HDD supplied or performed to improve the Pipeline Project as itemized and set for in HDD's Mechanic's Lien.

110. All of the work described in HDD's Mechanic's Lien was incorporated into and directy benefitted and improved the Pipeline Project located on the Franklin County Real Property.

111. At the time it was filed, the Franklin County Mechanic's Lien was a true and accurate account of HDD's work and demand of MNLTD for the work performed on the Franklin County real property, allowing a credit for all valid setoffs and itemizing the labor and materials supplied by HDD for the Project.

112. HDD has performed and complied with all conditions precedent to the creation and enforcement of its mechanic's lien, including service of its Franklin County Mechanic's Lien on MNLTD and Southern Star.

113. HDD's Lien on the Franklin County real property, being properly perfected under Kansas law, entitles HDD to foreclose said Franklin County real property interests, buildings, erections, improvements and plants erected or constructed, and all materials, fixtures, machinery and other personal property furnished, placed or installed on the Franklin County real property which is held for the debt contracted, the proceeds of which shall be used to satisfy the encumbrances on said Franklin County real property in the priority established by this Court.

114. HDD satisfied all conditions precedent under Kansas' Mechanic's Lien statutes for filing and perfecting the Franklin County Mechanic's Lien.

115. All of the Work described in HDD's Franklin County Mechanic's Lien was furnished to MNLTD on the faith and credit of HDD's lien rights against the Franklin Coutny real property.

116. All of the Work described in HDD's lien directly benefitted and improved the Pipeline Project located on the Franklin County real proeprty.

117. MNLTD was obligated, but failed to pay HDD for the work furnished to improve the Pipeline Project located on the Franklin County real proeprty.

WHEREFORE, Plaintiff The HDD Company, Inc. prays this Court enter judgment foreclosing Mechanic's Lien FR-2020-SL-000017 in the principal amount of $3,013,544.22; prejudgment interest from and after the date payment became due at a statutory rate of 9% per year; post-judgment interest; its costs, for a special judgment and decree that HDD is adjudged to have a valid and existing mechanic's lien against the aforesaid real property; that HDD's

mechanic's lien be adjudged and decreed to be prior and superior to any other lien or claim against

said Pipeline; and such other relief as the Court deems just in the circumstances.

Respectfully submitted,

HUSCH BLACKWELL, LLP

/s/*David B. Raymond*

| David B. Raymond | KS #14004 |
| Michael J. Kelly | KS #25666 |

4801 Main Street, Suite 1000
Kansas City, Missouri 64112
(816) 983-8000 (Phone)
(816) 983-8080 (FAX)
david.raymond@huschblackwell.com
mike.kelly@huschblackwell.com

**ATTORNEYS FOR PLAINTIFF**

# Exhibit 1



**Subcontractor Agreement**
**No. SR1916169002**

This agreement is made at Big Lake, MN this day of ___January 17, 2020___.

**BETWEEN:**

Minnesota Limited, LLC (Contractor)
18640 200th Street – PO Box 410
Big Lake, MN 55309

**AND:**

THE HDD COMPANY(Subcontractor)
4525 SERRANO PARKWAY, OFFICE SUITE 210
EL DORADO HILLS, CA 95762

**RECITALS**

Contractor ("Minnesota Limited, LLC) has entered into a contract (the "Prime Contract") with Southern Star Central Gas Pipeline, Inc. ("Owner") to perform certain labor and furnish certain materials for completion of the construction project KS - C60206 Install 31.5 miles of 36" (the "Project"). Subcontractor desires to perform certain services and/or provide certain materials as a subcontractor of Contractor pursuant to the terms and conditions of the Prime Contract, and agrees to the terms and conditions of this Agreement.

**AGREEMENT**

In consideration of the mutual covenants contained herein, the parties agree as follows:

I.      Subcontractor agrees to supply all the materials and labor and pay all license fees, permits and expenses for the work located at __Various Sites__ (the "Site"). As full compensation for performance of this Agreement and subject to all applicable provisions of this Agreement, Contractor agrees to pay Subcontractor;
six million one-hundred eight-five thousand nine-hundred thirty six dollar($6,185,936.00          )

II.     **Contract Document**. Subcontractor's performance hereunder shall be subject to all terms and conditions contained in the Prime Contract and all drawings and/or specifications referred to therein (the "Contract Documents") except as such terms may be specifically amended by this Agreement, which includes HDD's Proposal, attached hereto and incorporated herein. Wherever the Contract Documents shall refer to the Contractor or its agents, the same shall be read to refer to the Subcontractor under this agreement. Subcontractor shall perform and coordinate its work hereunder in a manner necessary to assure the prompt and timely completion of the Project, time being of the essence to the

Page 1 of 14
SR1916169002



Agreement. At Subcontractor's request, a copy of the applicable Prime Contract Terms and Conditions will be supplied to Subcontractor.

Any terms and conditions proposed in Subcontractor's acceptance of or in any acknowledgement, invoice, or other form of Subcontractor that add to, vary from, or conflict with these terms hereby objected to. Any such proposed terms shall be void and these terms and conditions (1) shall constitute the complete and exclusive statement of the terms and conditions of the contract between the parties and (2) may be modified only by written instrument executed by the authorized representatives of both parties.

III.     **Insurance.** Subcontractor shall comply with the insurance requirements set forth in Exhibit A (attached).

IV.     **Additional Terms and Conditions**

A.     Subcontractor, not Contractor, assumes all the risk related to in performing its work under this Agreement, such as any injuries to Subcontractor, Subcontractor's workers, Facility employees and members of the public arising from the Subcontractors activities or use of tools and equipment, or from any other cause.

B.     Subcontractor will complete all work in a workmanlike and professional manner according to standard practices in the building trade, and in compliance with all building codes and other applicable laws. Subcontractor will warrant against defects in material and labor it supplies for the completion of the work. If subcontractor fails to perform under this Agreement, the party entitled to performance or the Contractor will have the right to hire other persons to correct the defective Work and hold Subcontractor liable for the costs thereof including costs, disbursements and reasonable attorneys' fees incurred in the enforcement of this provision.

C.     All Work will be done on a timely basis. The work to be performed under this contract shall be commenced as directed by Project Manager or Project Superintendent or Project Foreman and shall be substantially completed on or before ___as agreed upon and directed onsite_____. Time is of the essence.

D.     Subcontractor shall indemnify, defend and hold harmless Contractor as set forth in Section VII.

E.     No work shall be subcontracted or assigned by Subcontractor without the prior written approval of the Contractor.

F.     Environmental, Health and Safety. Subcontractor shall take all necessary precautions to keep the work site free from hazards that are likely to cause injury, illness, or death or damage to property. Subcontractor shall provide any Safety Data Sheets (SDS) for any hazardous chemicals provided pursuant to this contract. Contractor is a company that operates under a "Culture of Safety" with the goal of zero incidents, and expects its subcontractor to similarly emphasize the paramount importance of safe behavior. Failure to abide by Contractor's policies may result in immediate removal of Subcontractor from the premises and will be a breach of Subcontractor's obligations hereunder.



Contractor shall have the right, at its option, to conduct a complete audit of Subcontractor's documents and practices to verify Subcontractor's compliance with this Section.

G. Minnesota Limited has enacted a Subcontractor Management Program and Safety Requirements of which Subcontractor has received. Subcontractor shall follow and adhere to all aspects of said program and the terms and conditions of such program are incorporated herein.

H. Liens. To the fullest extent permitted by law, and the extent the Contractors has paid the Subcontractor, Subcontractor will at all times keep the Project, the Site and each part thereof free from any attachment, lien, claim of lien, or other encumbrance arising out of the Work and Subcontractor will indemnify, defend and hold Contractor harmless from and against all claims, losses, demands, causes of action or expenses (including attorneys' fees and other costs of defense incurred by Contractor in defending against the foregoing or in enforcing this indemnity and defense obligation) of whatever nature, arising by reason of any such lien, claim of lien, attachment or encumbrance. If any claim is filed to enforce any laborers, material men, mechanic's, or other similar lien arising out of or relating to the Work for which Contractor has paid the Subcontractor, Subcontractor will immediately cause such lien to be released and discharged and if Subcontractor fails to do so, then Contractor will have a right to pay all sums, including attorneys' fees and other costs and expenses incurred necessary to obtain such release and discharge, and hold Subcontractor liable for the amount thereof with the right to deduct all or a portion of such sum from accounts that may be due Subcontractor.

I. Default. In addition to the other remedies available under law; (a) if Subcontractor should fail or refuse, except in cases where extension of time is provided, to supply enough properly skilled workers or proper materials for the Work; or (b) if Subcontractor should fail to make payment to its subcontractors for material or labor which are due to its Subcontractors, or (c) if Subcontractor should fail to keep and comply with any of the terms and provisions of this Agreement, or (d) if Subcontractor should be adjudged bankrupt, file or suffer to be filed a petition for relief under the Bankruptcy Act, or make a general assignment for the benefit of the creditors; or (e) if a receiver should be appointed on account of Subcontractor's insolvency; or (f) if Subcontractor fails to pay its employees' wages, benefits or tax withholdings; then, in any such event, Contractor may without prejudice to any other right or remedy and after giving Subcontractor and its surety, if any, upon twenty-four hours written notice, terminate its obligation to Subcontractor under this Agreement and take possession of the Site and complete (or cause to be completed) the Work by whatever method Contractor may deem expedient. In such case Subcontractor will not be entitled to receive any further payment until the Work is completed. Upon completion of the Work, Contractor will pay to Subcontractor an amount equal to (x) the unpaid portion of the Subcontract Amount attributable to the Work performed up to the termination less (y) the amount by which (i) the costs incurred by Contractor to complete the Work, including, without limitation, costs for architectural, managerial and administrative services and reasonable attorneys' fees, if legal counsel is employed, exceed (ii) the portion of the Subcontract Amount attributable to the balance of the Work yet to be performed at the time of termination. If the amount calculated under part (y) in the preceding sentence exceeds the amount owing under part (x), the Subcontractor will pay the difference to Contractor. If the amount in part (x) exceeds the amount in part (y), Contractor will pay the difference to Subcontractor.



J.      Subcontractor is an independent Subcontractor and is not an employee or agent of the Contractor and neither Subcontractor nor anyone employed by Subcontractor will be deemed for any purpose to be the agent, employee, servant or representative of Contractor in the performance of the Work. Subcontractor acknowledges and agrees that Contractor will have no direction or control over the means, methods, procedures or manner of the Work performed by Subcontractor or any of its subcontractors, or any of their employees, vendors or suppliers.

K.      No changes shall be made in the work proposed or in the price unless those changes are agreed to in writing     by     both     Subcontractor     and     Contractor.     Travis     Gehr     and     /     or __James Redmond_____, shall be the Contractor's designated on site agent, If there is a dispute regarding whether the work is a change, Subcontractor may perform that work under protest and submit a claim to Contractor in accordance with this Agreement.

L.      Clean Up.  Subcontractor will at all times keep the site or facility safe and free from the accumulation of waste materials or rubbish caused by its operations or related to the Work. Upon completion of the Work and each portion thereof, Subcontractor will remove all rubbish and waste produced by its operations or Work hereunder from the facility as well as all of its tools, equipment, machinery and surplus materials no longer needed and leave the site or facility in a "broom clean" or equivalent condition and safe for Subcontractor's employees and subsequent subcontractors to perform their work, unless otherwise specified in writing. If Subcontractor fails to clean up, Contractor may do so after written notice to Subcontractor and the cost thereof will be charged to Subcontractor.

V      **Representations of Subcontractor.**  Subcontractor represents and warrants the following:

A.      Subcontractor has examined the Agreement ("Prime Contract") between Owner and Minnesota Limited (if requested by the Subcontractor prior to the execution of the work) and agrees to all provisions affecting Subcontractors performance, including but not limited to the representations, obligations and warranties made by Minnesota Limited to the Owner.

B.      Subcontractor has the requisite authority and ability to perform the subcontract without delay.

C.      Subcontractor will not assign, subcontract or otherwise delegate its responsibilities and obligation hereunder without the written consent of Contractor.

D.      Subcontractor shall examined the specifications, site conditions, drawings and requirements of the work with due diligence and its bid has taken into consideration all conditions and risks which are reasonably related to the performance of the work.

E.      Ethics; Conflict of Interest.  Subcontractor shall at all times during the performance of its obligations hereunder conform to sound ethical business practices in conformance with all applicable Laws and shall in its business practices promote the values of honesty, integrity, social responsibility, and human rights.  Subcontractor shall not offer to any member of Contractor (including employees thereof) any gifts, entertainment, or other favors beyond the common courtesy usually associated with business practices.  Subcontractor shall not pay any commissions or fees or grant any rebates or other



remuneration or monetary gratuity to any employee of Contractor. Subcontractor shall not grant any secret rebates nor pay any commissions or fees to any employee of Contractor.

F.   Invitees Prohibited. Subcontractor shall not, without prior written permission of Contractor, invite, permit entry or bring any Person onto the Contractor's Worksite or property who is not an employee of Subcontractor.

G.   Subcontractor will pay its employees promptly and maintain good labor relations. Subcontractor further represents that it has paid all union benefit contributions including fringe benefits. Subcontractor agrees that Contractor upon demand of the Labor Union, may withhold from any sums due Subcontractor and pay to the Administrator of the Plan any amounts owing and said payment shall be deducted from the invoice.

VI.   **Warranty**.

A.   Subcontractor warrants to the Contractor and Owner that all materials and equipment furnished under this Agreement will be new unless otherwise specified in writing, and that all work will be of good quality, free from faults and defects and in conformance with any Purchase Order and attachments thereto, including any specifications stipulated therein. All Work not so conforming to these standards may be considered defective, and the Subcontractor shall promptly repair and make good, after notice by the Contractor and Owner and without cost to the Contractor and Owner, any damages, defects or faults resulting from imperfect or defective Work done or materials furnished by the Subcontractor. The Subcontractor warrants that all labor, materials and equipment furnished under this Agreement shall be covered by warranty for a period of at least two (2) years (or during a longer period if required by the specifications and stipulated therein) from the date of acceptance of the completed Work by the Owner.

B.   Where material or equipment furnished by the Subcontractor is covered by a manufacturer's warranty or guarantee or other special warranty or guarantee the Subcontractor shall provide such warranty and provide additional or extended warranty or guarantees to the Contractor for its labor, materials and equipment to confirm to paragraph A above.

VII.   **Indemnification**. To the fullest extent permitted by law, the Subcontractor shall indemnify the Owner, Contractor and the agents and employees of any of them from and against claims, damages, losses and expenses, arising out of or in connection with, or resulting from the negliegent performance of the Subcontractor's work, the Subcontractor's subcontractors work, or anyone directly or indirectly employed by them but only to the extent caused by acts or omissions by either or any of them. In addition thereto, Subcontractor indemnifies Owner, Contractor and the agents and employees of any of them for expenses including attorney's fees and costs, incurred in responding to and defending against any claim or in enforcing this provision.

VIII.   **Payment**. Subcontractor shall invoice Minnesota Limited no later than 30 days after date of service. Contractor agrees to pay Subcontractor all supp. due. less  10  % retainage (if applicable) hereunder within



thirty (30) days from the date the invoice is received. However, it is a condition precedent to payment that if Owner withholds payments for that portion of any work performed by Subcontractor, then Minnesota Limited is only obligated to pay Subcontractor after receiving payment from the Owner. In such event payment will be made within ten (10) days. Contractor reserves the right to withhold such sums as may be necessary to pay expenses, including costs and attorney's fees, caused by, or related to, Subcontractor's breach of Agreement. Final payment of retainage will occur ten (10) days after final payment for Subcontractor's work is received and when lien waivers and job completion affidavit are executed.

IX.     **Maintaining Records / Audit.** For a period of five (5) years from final acceptance of Subcontractor's work, Subcontractor shall maintain all job records and shall, upon reasonable notice by Contractor, but no later than 10 business days, make such records available for inspection by Contractor or Owner. Contractor or Owner or their representatives may audit said records. If the results of the audit show an overpayment, Subcontractor shall reimburse the overpayment together with interest of 1% per month. If the audit shows an overpayment more than one thousand dollars ($1,000), Subcontractor shall also reimburse Contractor or Company for the cost of the audit.

X.      **Interpretations and Enforcement.** The Agreement and contract documentation contains the parties entire understanding with regard to the subject hereof and shall not be modified except by a writing signed by both parties; provided, however, that Subcontractor shall be bound by changes in the Contract Documents agreed to between the Contractor and Owner, but only if Contractor has timely notified Subcontractor of such changes.. The interpretation and enforcement of this Agreement shall be governed by the laws of the state in which the work hereunder is to be performed or that specified in the Prime Contract if different than the state where the work is to be performed. If any provision hereof is deemed unenforceable, the remainder of the Agreement shall be enforced as though such provision were not a part hereof.

XI.     **Assignment.** Subcontractor shall not assign or subcontract this Agreement or any portion thereof or of any money due or which may become due hereunder without the prior written consent of Contractor. Notwithstanding anything to the contrary contained herein, Contractor may assign this Agreement without the consent of Subcontractor.

XII.    **Confidentiality of Agreement.** The Subcontractor agrees that all terms and conditions contained herein or in any other document(s) referencing the Project shall remain confidential. Said terms shall not be disclosed without the express written consent of the Contractor.
Minnesota Limited is required to protect all technical information supplied by the Owner. Subcontractor agrees that this Section is its written assurance that all such information, including but not limited to: drawings, diagrams, surveys, specifications, locations, and geophysical (GPS) coordinates of the work, will be kept confidential, protected, and will not be disclosed to third parties without obtaining Minnesota Limited's written consent unless ordered to do so by a court of law or arbitrator.. Breach of is provision will subject Subcontractor to all remedies awarded to Contractor and Owner including injunctive relief. Subcontractor agrees to pay all of Contractors and Owners attorney's fees in enforcing this provision.



XII.    **Notice.** Unless otherwise provided herein, any notice provided for herein will be in writing and delivered to the parties (a) in person, (b) by facsimile transmission (with the original and a copy of the facsimile confirmation following in the United States mail), (c) by overnight delivery service, or (d) by certified mail, return receipt requested. Notice will go to the address first shown herein for the respective party to whom notice is given or to such other address as may be designated by either party by written notice given pursuant hereto.

XIV.    **Governing Law/Venue/Attorney Fees.** This Agreement shall be construed and interpreted in accordance with the laws of the State of Minnesota, including, without limitation, matters of construction, validity, enforcement, and interpretation. The parties agree that venue for any dispute under this Agreement shall be in the District Court of Hennepin County, Minnesota. In the event any enforcement effort is initiated by Contractor against Subcontractor for default of this Agreement, Subcontractor shall be liable to Contractor for any and all costs of collection, including but not limited to, reasonable attorneys' and professional fees, court costs, traveling and lodging expenses, costs of investigation and defense, accrued interest, and any other reasonable expenses incurred by Contractor in initiating such efforts.

Signed the day and year first written above.


CONTRACTOR:  **Minnesota Limited, LLC.**

By: _____

Its: _____Pvesident_____
                 Title



SUBCONTRACTOR: THE HDD COMPANY

By: _____

Its: ____Vice President_____
                 Title



## EXHIBIT A
## Insurance

Prior to commencing Work, Subcontractor shall, at its sole expense, procure and maintain insurance of the types, and in the form and amounts described below from insurer(s) authorized to transact business in the state where Work or operations will be performed by Subcontractor. Such insurance and required coverage in forms acceptable to General Contractor shall be placed with admitted insurers that maintain an A.M. Best's rating of not less than A- VII, unless otherwise approved by the General Contractor. The insurance requirements described below shall be maintained uninterrupted for the duration of the Project, including any warranty periods, and shall protect Subcontractor, and others for whom and/or to whom Subcontractor may be liable, for liabilities in connection with work performed by or on behalf of Subcontractor, its agents, representatives, employees or subcontractors.

### Insurance Requirements:

1. **Commercial General and Umbrella Liability Insurance**. Subcontractor shall maintain commercial general liability ("CGL") and, if necessary, commercial umbrella insurance, with a limit of not less than $ 2,000,000.00 per occurrence, bodily injury or property damage liability; $ 2,000,000.00 per offense, personal and advertising injury liability; $ 5,000,000.00 products-completed operations aggregate; and $ 5,000,000.00 general aggregate applicable to claims other than products-completed operations. To the extent that Subcontractor's CGL and any commercial umbrella insurance are subject to aggregate limits, the policy shall be endorsed so as to apply such aggregate limits separately to the Project.

Coverage afforded under Subcontractor's CGL and any commercial umbrella insurance shall be provided on an occurrence basis and shall be subject to the terms of the *Insurance Services Office ("ISO") Commercial General Liability Coverage Form CG 0001*, or a substitute form providing coverage at least as broad as the ISO form specified. There shall be no limitations or exclusions of coverage beyond those contained in the standard coverage form and coverage shall include liability arising from premises, operations, independent contractors, products-completed operations including construction defect, contractual liability or personal injury and advertising injury.

General Contractor, its officers, directors and employees and Project Owner(s) shall be included as additional insureds under Subcontractor's CGL, and any commercial umbrella insurance, with respect to liabilities arising out of both the ongoing and completed operations of Subcontractor. Such additional insured coverage shall be subject to the terms of ISO additional insured endorsement forms CG 2010 (ongoing operations) and form CG 2037 (products-completed operations), or substitute form(s) providing equivalent coverage. The edition date of the ISO endorsements required should be chosen based on the recipient's risk transfer objectives. The table below summarizes the options and major differences between the edition dates.

| Endorsement(s) | ISO Edition Date | Comments |
|---|---|---|
| CG 2010 | 11/85 Edition | Broadest Insuring Agreement - "liability arising out of" the Subcontractor's work - both ongoing |



**MINNESOTA LIMITED**
AN HYEROS COMPANY

|  |  | operations and completed operations coverage provided by one endorsement. |
|---|---|---|
| CG 2010/CG2037 | 10/01 Edition | Same Insuring Agreement as 11/85 with ongoing operations and completed operations coverage provided by separate endorsements. |
| CG 2010/CG2037 | 07/04 Edition | More narrow Insuring Agreement - "caused in whole or in party by. . . .acts or omissions" of the Subcontractor. |
| CG2010/CG2037 | 04/13 Edition | Same Insuring Agreement as 07/04, but limits coverage to "extent permitted by law" and "not be broader than that which you are required by the contract or agreement to provide." |

Note: Recommended Additional Insured endorsement for states other than Minnesota may vary and Willis should be consulted. States including but not limited to IL, TX, & CA involve unique risk transfer considerations.

Additional insured coverage afforded by Subcontractors CGL, and any commercial umbrella insurance, shall be primary and non-contributing with respect to any insurance or self-insurance available to General Contractor or Project Owner. Such primary and non-contributory insurance shall be subject to the terms of ISO form CG 2001 (Primary and Noncontributory - Other Insurance Condition) or its equivalent. Any other insurance or self-insurance maintained by General Contractor or Project owner shall be excess of, and non-contributory with, the coverage afforded by Subcontractors CGL and commercial umbrella insurance, if any.

In addition to procuring and maintaining CGL, and any commercial umbrella insurance, for the duration of the contract, Subcontractor agrees to continue to procure and maintain the products-completed operations liability insurance coverage for a minimum of __two__ ( 2 ) year(s) after the date that the Work is substantially complete. All terms and conditions of such coverage shall be maintained during this completed operations period, including the required coverage limits and the requirement to provide General Contractor and Project Owner with coverage as an additional insured for completed operations.

2.      **Commercial Automobile and Umbrella Liability Insurance**. Subcontractor shall maintain automobile liability and, if necessary, commercial umbrella insurance, with a limit of not less than $ __2,000,000.00__ each accident. Such insurance shall cover liability for bodily injury and property damage arising from the use or operation of any auto, including those owned, hired or otherwise operated or used by or on behalf of Subcontractor. The coverage shall be subject to the terms of ISO *Business Auto Coverage Form CA 0001* (1990 edition or later), or a substitute form providing equivalent coverage.

3.      **Workers' Compensation and Employers Liability Insurance**. Subcontractor shall maintain workers' compensation coverage providing statutory benefits. Subcontractor shall additionally maintain employers liability insurance, and if necessary, commercial umbrella insurance, with a limit of not less than: $1,000,000, bodily injury by accident – each accident; $1,000,000, bodily injury by disease-policy limit; and $1,000,000, bodily injury by disease each employee. Workers' Compensation coverage must extend to every



**MINNESOTA LIMITED**
AN MKROE COMPANY

employee, including owners/officers of a closely held corporation and/or individuals operating as a sole proprietorship or partnership. <u>Workers' Compensation must provide coverage in the state where the Project is located</u>.

Where applicable, evidence of coverage shall be required for U.S. Longshore and Harbor Workers Compensation, Maritime coverage, Federal Employer's Liability Act and other unique exposures requiring endorsement of coverage.

4. <u>Contractors Pollution Liability Insurance</u>. Required only if Subcontractor's scope of services include the remediation, treatment, storage or disposal of waste or hazardous materials on or about the project site, as determined by General Contractor. If required, Subcontractor shall maintain Contractors Pollution Liability coverage with a limit of not less than $ _____n/a_____ per occurrence, $ _____n/a_____ annual aggregate. Coverage shall apply to the scope of work as described under the Contract including transportation and shall include coverage for bodily injury; property damage, including loss of use of damaged property or property that has not been physically injured; clean-up costs; mold; defense and investigative costs. Subcontractor shall maintain Completed Operations coverage for _____n/a_____ years following final acceptance of the project or termination of the Contract.

If the scope of services in the contract require the Subcontractor to provide professional services associated with arranging for, or brokering of, hazardous material or construction and demolition (C&D) wastes off the job site, Subcontractor must amend the Contractors Pollution Liability policy to include coverage to address this scope of work. If any of the aforementioned insurance policies are written on a claims made basis, the Contractor warrants that continuous coverage will be maintained, or an extended discovery period will be exercised, for a period of three years beginning from the time the work under this contract is completed.

5. <u>Pollution (Environmental) Liability Insurance</u>. Required only if Subcontractor's scope of services involves disposal of waste or hazardous materials off-site, as determined by General Contractor. If required, Subcontractor shall maintain pollution (environmental) liability coverage with a limit of not less than: $ _____n/a_____ per incident, $ _____n/a_____ policy aggregate for hazardous waste disposal services, and $ _____n/a_____ per incident, $ _____n/a_____ for all other disposal facilities. Such coverage shall include clean-up costs, defense costs and products and completed operations.

If the scope of services in the contract requires the disposal of any hazardous materials or construction and demolition (C&D) wastes off the job site, Subcontractor must also obtain evidence that the Disposal Site Operator maintains Pollution Legal Liability Insurance with coverage for: a. bodily injury, sickness, disease, mental anguish or shock sustained by any person, including death; b. property damage including physical injury to or destruction of tangible property including the resulting loss of use thereof, clean-up costs, and the loss of use of tangible property that has not been physically injured or destroyed; c. defense including costs, charges and expenses incurred in the investigation, adjustment or defense of claims for such compensatory damages. d. pollution conditions on, at, under or emanating from any disposal site, location or facility, used by or on behalf of the disposal facility of any waste or waste materials relating to the performance of the work.



MINNESOTA LIMITED
AN HYDROS COMPANY

The Disposal Site Operator's Pollution Liability Policy will apply to losses arising from the facility that is accepting the waste under the contract. Minimum limits of Insurance for this policy shall be $_____ n/a _____ each incident / $_____ n/a _____ policy aggregate.

Claims-made coverage is permitted, provided the policy retroactive date is continuously maintained prior to the commencement date of the agreement, and coverage is continuously maintained during all periods in which Subcontractor accepts or treats waste generated from General Contractor's projects and for a period of *one (1)* year thereafter.

6. **Professional Liability Insurance.** Required only if Subcontractor's scope of services include architectural, engineering, professional consulting or construction management, as determined by General Contractor. If required, Subcontractor shall maintain professional liability coverage with a limit of not less than $_____ n/a _____ each wrongful act, $_____ n/a _____ policy aggregate.

Coverage shall include liability arising from the errors, omissions or acts of the Subcontractor or any entity for which the Subcontractor is legally responsible in the providing of professional services under the Contract. Throughout the term the Contract, the PL/E&O policy shall include full prior acts coverage. Coverage shall be continuously maintained during the term of this Agreement and for a period of x years following final acceptance of the Project or termination of the Contract.

Coverage shall not include any exclusion or other limitations related to:
- Scope of the professional services
- Delays in project completion and cost overruns
- Who is authorized to notify the carrier of a claim or potential claim
- Mold, fungus, asbestos, pollutants or other hazardous substances

Claims-made coverage is permitted, provided the policy retroactive date is continuously maintained prior to the commencement date of this agreement, and coverage is continuously maintained during all periods in which Subcontractor performs professional services for General Contractor, and for an additional period of *one (1)* year after termination of this agreement or the last date such services are performed, whichever comes later. If Subcontractor's scope of work includes environmental engineering or consulting, the terms of coverage shall not exclude environmental professional services.

7. **Watercraft Liability Insurance.** If watercraft of any kind is used by the CONTRACTOR or Subcontractor, including: (i) bodily injury; (ii) property damage; and (iii) passenger liability.

    a. Limit of Liability: Combined Single Limit (Bodily Injury and Property Damage), $1,000,000 each occurrence;

    b. Protection and Indemnity Insurance to include Jones Act crew coverage (or at least Maritime Employer's Liability; MEL), collision, tower's liability and wreck removal coverage, on a form providing



coverage no less extensive than that afforded in the P & I SP-23 form (revised 1/58), including a pollution buy-back endorsement.

8.   **Aircraft Liability Insurance.**  If aircraft of any kind is used by the CONTRACTOR or Subcontractor, including: (i) bodily injury; (ii) property damage; and (iii) passenger liability.

    a.   Limit of Liability:  Combined Single Limit (Bodily Injury and Property Damage and Passenger Liability), including hull physical damage insurance for the full replacement cost of each aircraft used  in the work.  Such Aircraft Liability and Hull Coverage shall include a waiver of subrogation against General Contractor and all others required by this Agreement to be additional insureds. $ ____n/a____ per seat; $____n/a____ per occurrence.

### Additional Provisions:

1.   **Deductibles and Self-Insured Retentions.**  The funding of deductibles and self-insured retentions maintained by Subcontractor shall be the sole responsibility of Subcontractor, including any amounts applicable to deductibles or self-insured retentions applicable to claims involving the General Contractor or Owner as an additional insured. Any self-insured retentions in excess of $____n/a____ must be declared to and approved by the General Contractor.

2.   **Primary / Non-Contributing.**  Subcontractor's required insurance coverage shall be primary insurance, and any insurance or self-insurance maintained by the General Contractor or Project Owner shall be excess of and noncontributory with Subcontractor's insurance.

3.   **Severability of Interest.**  Except with respect to the limits of insurance, Subcontractor's required insurance shall apply separately to each insured or additional insured.

4.   **Waiver of Subrogation.**  Subcontractor agrees to waive all rights of subrogation against the General Contractor, Project Owner and Project Architect, and shall cause each of its subcontractors to waive all rights of subrogation against the General Contractor, Project Owner and Project Architect, their agents and employees, as respects loss, damage, claims, suits or demands, howsoever caused:

    a.   To real or personal property, vehicles, equipment, tools, etc. owned, leased or used by Subcontractor or Subcontractor's employees, agents or sub-subcontractors; and

    b.   To the extent such loss, damage, claims, suits or demands are, or should be, afforded coverage by the Subcontractor's required insurance or any other insurance (except professional liability to which this requirement does not apply) maintained by the Subcontractor. This waiver shall C1PPIY to all first party property, equipment, vehicle and workers' compensation claims (unless prohibited under applicable state statutes), and all third party liability claims.  This waiver shall apply to all deductibles, retentions or self-insured layers applicable to the required or any other insurance (except professional liability to which this requirement does not apply) maintained by the Subcontractor.  If necessary, Subcontractor agrees to endorse the required insurance policies to permit waivers of subrogation in



**MINNESOTA LIMITED**
AN HYERGE COMPANY

favor of General Contractor, Project Owner and Project Architect as required hereunder. Subcontractor further agrees to hold harmless and indemnify General Contractor, Project Owner and Project Architect for any loss or expense incurred as a result of Subcontractor's failure to obtain such waivers of subrogation from the insurers.

5. **Notice of Cancellation / Material Change / Nonrenewal**. Subcontractor's insurance policies must contain a provision or endorsement that the coverage afforded will not be canceled, materially changed or renewal refused until at least 30 days prior Written Notice has been given to General Contractor and to each other additional insured to whom a certificate of insurance has been issued; provided, however, that a ten (10) day prior notice requirement may apply in the event of cancellation due to nonpayment of premium.

6. **Verification of Coverage**. Prior to commencing Work, Subcontractor shall furnish General Contractor with certificate(s) of insurance executed by a duly authorized representative of each insurer, as evidence of compliance with the insurance requirements set forth above. Such certificates of insurance shall be accompanied by copies of endorsements evidencing coverage afforded to General Contractor and Project Owner as additional insured, and endorsements reflecting insurer's concurrence with Subcontractor's waiver of subrogation rights against General Contractor, Project Owner and Project Architect. Renewal certificates are to be provided to the General Contractor prior to the expiration of the required insurance policies.
Certified copies of policies, including all policy endorsements, shall be furnished by Subcontractor within 15 days of written request by General Contractor.

The certificate(s) of insurance shall be subject to approval of General Contractor, but failure of General Contractor to request such certificate or other evidence of Subcontractor compliance with insurance requirements, or failure of General Contractor to identify deficiencies from evidence that is provided, shall in no way limit or relieve Subcontractor of its obligations to maintain such insurance.

7. **Sub-Subcontractors**. No work shall be sublet to any Sub-subcontractor without first obtaining the General Contractor's written permission. All Sub-subcontractors, once approved by the General Contractor, are subject to the same insurance requirements as Subcontractor. Subcontractor shall cause each Sub-subcontractor employed by Subcontractor to purchase and maintain such insurance. Upon request, Subcontractor shall furnish General Contractor with copies of certificates of insurance evidencing coverage for each Sub-subcontractor

Subcontractor shall voluntarily provide workers compensation coverage for proprietors, partners or others not statutorily required to maintain workers' compensation insurance.

8. **Leased Employees**. Use of leased employees by Subcontractor is expressly prohibited without General Contractor's written permission. If permitted by General Contractor, Subcontractor shall:

    a. Provide General Contractor with a complete copy of its Agreement with the Leasing Company;



b.    Require that Leasing Company provide workers' compensation, employers liability and commercial general liability with coverage limits in amounts no less than Subcontractor insurance requirements for the same coverages.

c.    Require that Leasing Company provide Alternate Employer Endorsement naming General Contractor as alternate employer on Leasing Company's workers' compensation policy.

d.    Require that Leasing Company add General Contractor as an additional insured on its commercial general liability insurance policy, with primary/non-contributory wording.

e.    Require that Leasing Company provide waiver of subrogation in favor of General Contractor on both Leasing Company's workers' compensation and commercial general liability insurance policies.

f.    Provide General Contractor with a copy of the Leasing Company's certificate of insurance, with endorsements, evidencing the required coverage.

ii    **No Representation of Coverage Adequacy.**  In specifying minimum Subcontractor insurance requirements, General Contractor does not represent that such insurance is adequate to protect Subcontractor for loss, damage or liability arising from its work. Subcontractor is solely responsible to inform itself of types or amounts of insurance it may need beyond these requirements to protect itself.

The insurance requirements set forth in minimum amounts shall not be construed to relieve Subcontractor for liability in excess of such coverage, nor shall it preclude General Contractor from taking such other actions as is available to it under any other provision of the Subcontract. To the extent Subcontractor maintains insurance greater than these minimum requirements, Subcontractor agrees that such insurance shall be applicable to any of Subcontractor's liability obligations hereunder.

Any acceptance of certificates of insurance by General Contractor shall in no way limit or relieve Subcontractor of its duties and responsibilities under this Subcontract, including the duty to indemnify and hold harmless General Contractor.

10.    **Compliance.**  Failure of Subcontractor to maintain the required insurance shall constitute a default under this Subcontract and, at General Contractor's option, shall allow General Contractor to terminate this Subcontract for cause, withhold payment and/or purchase the required insurance at Subcontractor's expense.

11.    **Cross-Liability Coverage/Non-Standard Restrictive Endorsements.**  All liability policies shall include cross liability coverage and a standard ISO separation of insureds provision, or its equivalent. No liability policy shall include or be endorsed to include any non-standard provisions restricting coverage for the named insured or the persons/entities required to be named as additional insureds under this Agreement, including but not limited to cross liability coverage exclusions or limitations.



**THE HDD COMPANY**

EL DORADO HILLS OFFICE Suite 210
4520 Serrano Parkway, El Dorado Hills, CA USA 95762

MAIN 530.621.3705 | CROSSINGGROUP.COM

January 9, 2020

**Minnesota Limited**
18640 200th St, PO Box 410
Big Lake, MN 55309

ATTN: Amy Skuza

RE:  Southern Star Lines DT and DS Replacement Project
     Directionally drill and install approximately 6,052 feet of 36-inch steel pipeline in
     Anderson and Franklin Counties, KS.

The HDD Company is pleased to submit the following bid quote:

1.  **Responsibilities of The HDD Company**
    1.1.   Provide all required insurance certificates.
    1.2.   Provide any written submittals and qualifications required.
    1.3.   Provide 2 (two) drill rig(s) with sufficient capabilities to install the crossings, a
           closed-loop mud system, mud pumps, vacuum trucks, dump trucks, steering
           system, and all drill spread support equipment necessary.
    1.4.   Provide all required union labor for the drilling operations.
    1.5.   Provide preliminary drill profiles for each crossing.
    1.6.   Provide final as-built drawings.
    1.7.   Provide and haul water for drilling operations.
    1.8.   Provide water storage for the duration of drilling operations.
    1.9.   Provide all required pulling heads.
    1.10.  Leave the entry areas clean, free of debris, and to a rough grade.
    1.11.  Provide bonding at 1%, which is not included in the bid pricing below.

2.  **Responsibilities of THE CONTRACTOR**
    2.1.   Stake and survey the entry and exit points for each bore, with correct stations
           and elevations.
    2.2.   Provide all permitting to undertake the project.
    2.3.   Provide and maintain suitable truck access to and from entry and exit locations.
    2.4.   Provide stable, level, matted and/or graveled work pads for each bore.
    2.5.   Provide all BMPs around each bore's entry and exit locations. The HDD
           Company will maintain these items.
    2.6.   Provide, string, weld, and test all 36-inch pipe for each bore.

*Going to Greater Lengths™*

2.7. Provide all plans, equipment, and manpower to handle pipe during pullback operations.

2.8. Perform all final tie-ins.

2.9. Provide all settlement monitoring, if required.

2.10. Provide all final site restorations.

2.11. Provide all field surveys to document existing conditions for the HDD installations, including but not limited to pictures, videos, field notes, etc.

## 3. Pricing (Lump Sum)

| | | |
|---|---|---|
| 3.1. | HDD Cedar Creek 2,106' X 36" pipe: | **$1,280,448.00** |
| 3.2. | HDD Pottawapomie Creek 1,788' X 36" pipe: | **$1,087,104.00** |
| 3.3. | HDD Flint Hill 2,158' X 36" pipe: | **$1,312,064.00** |
| 3.4. | Mobilization per rig spread: | **$50,000.00** |

## 4. Clarifications

4.1. Additional footage due to no fault of The HDD Company, will be billed at $608.00/LF.

4.2. This proposal is based upon the drawings, specifications, and geotechnical information provided to us on or before **7 June 2019**.

4.3. If any revised or additional drawings, specifications, geotechnical information, or permits are provided to us after the bid submission date, The HDD Company reserves the right to modify the proposal to account for any added costs and/or additional time associated with the change(s).

4.4. The HDD Company's bid proposal is conditional upon reaching an agreement upon mutually acceptable contract terms. This bid proposal will be attached to and forms a part of the contract between The HDD Company and THE CONTRACTOR.

4.5. Item 3.3 above includes the hauling and disposal of all **non-contaminated** drilled solids and excess drilling fluids.

4.6. The pricing above is contingent upon a site visit.

## 5. Exclusions

5.1. The HDD Company and its personnel are not the Project Engineers. Therefore, we exclude all design and engineering services unless any are specifically noted as included in this proposal. Any drilling plans or profiles that we submit to you will be based upon the design information in the contract documents and our experience as HDD contractors. Any plans or profiles we provide are recommendations only and are subject to review and approval by the project owner and/or its engineers.

5.2. All permits, including federal, State and local environmental permits, the SWPPP permit and any associated SWPPP plans, any right-of-way (ROW) agreement or easements, and all access necessary for us to perform our work shall be provided by others. If our operations are delayed or otherwise impacted by any delays or problems with permits, SWPPP plans, ROW agreements, easements or access arrangements our compensation and time for completion will be equitably adjusted.

6. **Terms and Conditions**
    6.1.   Schedule
        6.1.1.   This proposal is based upon performance under a reasonable and mutually agreed-to project schedule in so far as that schedule applies to our work. The approved project baseline schedule and all monthly updates must be provided to us on a regular and timely basis to keep us apprised of schedule changes which may impact the timing and efficiency of our work. We will not be liable for any delays caused by others or by factors beyond our reasonable control.

    6.2.   Indemnification
        6.2.1.   We will indemnify you and/or the project owner for personal injury or property damage claims to the extent of our own negligence. Our proposal excludes any obligation to indemnify you for your own negligence or to indemnify any other party for that party's own negligence or to indemnify any design professional.

    6.3.   Payment
        6.3.1.   Monthly progress payments will be made to The HDD Company within (7) seven days after you receive each monthly payment from the project owner, but in no event later than 120 days from the date you received your invoice.
        6.3.2.   We will receive our final payment within 30 days after you receive our final billing and our work has been completed and accepted. Acceptance will not be unreasonably withheld or delayed. If you dispute any portion of any billing, you will promptly notify us in writing of the nature of the dispute and you will pay the undisputed portion of the billing without delay. If any undisputed amounts are past due for more than 10 days, we reserve the right to stop work until all payments are brought current. We will provide lien releases in accordance with applicable state statutes or regulations. We will keep the project free of liens from out subcontractors, suppliers and other vendors provided we have been paid by you for the work covered by any such liens.

    6.4.   Extra/Force Account Work:
        6.4.1.   If we are directed to perform any work on a force account or time and material basis, the rates for our labor and equipment will be as stated in our proposal, or if no rates are included with this proposal, as stated in our then current standard labor and equipment rate schedule. If we are directed to standby or suspend work while other operations occur, or delays or other problems are resolved, or if we are required to standby due to events or circumstances beyond our control, the standby time for our labor and equipment will be paid as stated in this proposal.

    6.5.   Differing Site Conditions

6.5.1     If the conditions we encounter in the performance of our work differ materially from those indicated in the contract documents, boring logs, geotechnical reports or other information furnished to us prior to bid, or from those ordinarily encountered and generally recognized as inherent in the type of work provided for in our proposal, then our compensation and time for completion will be equitably adjusted to account for any resulting delay and added costs.

7. **Delays and Work Stoppages:**

7.1.     All work stoppages that arise through no fault of The HDD Company will be billed at **$14,500** (no crew on site).

The HDD Company appreciates the opportunity to furnish you this quote and looks forward to working with you. Should any of the information presented above need further clarification, please do not hesitate to contact us.

Sincerely,
**The HDD Company**


Jeremy King
Vice President

Going to Greater Lengths™



17 January 2020

**Minnesota Limited**
18640 200th St, PO Box 410
Big Lake, MN 55309

ATTN: Brad Cordes

RE:     Southern Star Lines DT and DS Replacement Project
        Directionally drill and install approximately 4540 feet of 36-inch steel pipeline road
        crossings in Anderson and Franklin Counties, KS.

The HDD Company is pleased to submit the following bid quote:

**1.      Responsibilities of The HDD Company**
   1.1.    Provide all required insurance certificates.
   1.2.    Provide any written submittals and qualifications required.
   1.3.    Provide drill rig(s) with sufficient capabilities to install the crossings, a closed-
           loop mud system, mud pumps, vacuum trucks, dump trucks, steering system,
           and all drill spread support equipment necessary.
   1.4.    Provide all required union labor for the drilling operations.
   1.5.    Provide final as-built drawings.
   1.6.    Provide and haul water for drilling operations.
   1.7.    Provide water storage for the duration of drilling operations.
   1.8.    Provide all required pulling heads.
   1.9.    Leave the entry areas clean, free of debris, and to a rough grade.
   1.10.   Provide bonding at 1%, which is not included in the bid pricing below.

**2.      Responsibilities of THE CONTRACTOR**
   2.1.    Stake and survey the entry and exit points for each bore, with correct stations
           and elevations.
   2.2.    Provide all permitting to undertake the project.
   2.3.    Provide and maintain suitable truck access to and from entry and exit locations.
   2.4.    Provide stable, level, matted and/or graveled work pads for each bore.
   2.5.    Provide bore pits and shore if needed.
   2.6.    Provide all BMPs around each bore's entry and exit locations. The HDD
           Company will maintain these items.
   2.7.    Provide, string, weld, and test all 36-inch pipe for each bore.
   2.8.    Furnish support crew for road crossings, including excavators and manpower.

*Going to Greater Lengths™*

    2.9.   Provide all plans, equipment, and manpower to handle pipe during pullback operations.

    2.10.  Perform all final tie-ins.

    2.11.  Dispose of cuttings.

    2.12.  Provide all settlement monitoring, if required.

    2.13.  Provide all final site restorations.

    2.14.  Provide all field surveys to document existing conditions for the HDD installations, including but not limited to pictures, videos, field notes, etc.

## 3. Pricing

| | | |
|---|---|---|
| 3.1. | 4540' X 36" pipe: | $508.00/ft |
| 3.2. | Mobilization per rig spread: | $50,000.00 |

## 4. Clarifications

    4.1.  This proposal is based upon the drawings, specifications, and geotechnical information provided to us on or before **17 January 2020.**

    4.2.  If any revised or additional drawings, specifications, geotechnical information, or permits are provided to us after the bid submission date, The HDD Company reserves the right to modify the proposal to account for any added costs and/or additional time associated with the change(s).

    4.3.  The HDD Company's bid proposal is conditional upon reaching an agreement upon mutually acceptable contract terms. This bid proposal will be attached to and forms a part of the contract between The HDD Company and THE CONTRACTOR.

    4.4.  The pricing above is contingent upon a site visit.

## 5. Exclusions

    5.1.  The HDD Company and its personnel are not engineers. Therefore, we exclude all design and engineering services unless any are specifically noted as included in this proposal. Any drilling plans or profiles that we submit to you will be based upon the design information in the contract documents and our experience as HDD contractors. Any plans or profiles we provide are recommendations only and are subject to review and approval by the project owner and/or its engineers.

    5.2.  All permits, including federal, State and local environmental permits, the SWPPP permit and any associated SWPPP plans, any right-of-way (ROW) agreement or easements, and all access necessary for us to perform our work shall be provided by others. If our operations are delayed or otherwise impacted by any delays or problems with permits, SWPPP plans, ROW agreements, easements or access arrangements our compensation and time for completion will be equitably adjusted.

## 6. Terms and Conditions

    6.1.  Schedule

        6.1.1.  This proposal is based upon performance under a reasonable and mutually agreed-to project schedule in so far as that schedule applies to our work. The approved project baseline schedule and all monthly updates must be provided to us on a regular and timely basis to keep

us apprised of schedule changes which may impact the timing and efficiency of our work. We will not be liable for any delays caused by others or by factors beyond our reasonable control.

6.2    Indemnification

    6.2.1.    We will indemnify you and/or the project owner for personal injury or property damage claims to the extent of our own negligence. Our proposal excludes any obligation to indemnify you for your own negligence or to indemnify any other party for that party's own negligence or to indemnify any design professional.

6.3.    Payment

    6.3.1.    Monthly progress payments will be made to The HDD Company within (7) seven days after you receive each monthly payment from the project owner, but in no event later than 120 days from the date you received your invoice.

    6.3.2.    We will receive our final payment within 30 days after you receive our final billing and our work has been completed and accepted. Acceptance will not be unreasonably withheld or delayed. If you dispute any portion of any billing, you will promptly notify us in writing of the nature of the dispute and you will pay the undisputed portion of the billing without delay. If any undisputed amounts are past due for more than 10 days, we reserve the right to stop work until all payments are brought current. We will provide lien releases in accordance with applicable state statutes or regulations. We will keep the project free of liens from out subcontractors, suppliers and other vendors provided we have been paid by you for the work covered by any such liens.

6.4.    Extra/Force Account Work:

    6.4.1.    If we are directed to perform any work on a force account or time and material basis, the rates for our labor and equipment will be as stated in our proposal, or if no rates are included with this proposal, as stated in our then current standard labor and equipment rate schedule. If we are directed to standby or suspend work while other operations occur, or delays or other problems are resolved, or if we are required to standby due to events or circumstances beyond our control, the standby time for our labor and equipment will be paid as stated in this proposal.

6.5.    Differing Site Conditions

    6.5.1.    If the conditions we encounter in the performance of our work differ materially from those indicated in the contract documents, boring logs, geotechnical reports or other information furnished to us prior to bid, or from those ordinarily encountered and generally recognized as inherent in the type of work provided for in our proposal, then our compensation and time for completion will be equitably adjusted to account for any resulting delay and added costs.

Going to Greater Lengths"

7. **Delays and Work Stoppages:**

    7.1.    All work stoppages that arise through no fault of The HDD Company will be billed at $14,500 (no crew on site).

The HDD Company appreciates the opportunity to furnish you this quote and looks forward to working with you. Should any of the information presented above need further clarification, please do not hesitate to contact us.

Sincerely,
**The HDD Company**


Jeremy King

# Exhibit 2



EL DORADO HILLS OFFICE Suite 210
4521 Serrano Parkway, El Dorado Hills, CA USA 95762

MAIN 530.621.5705 | CROSSINGGROUP.COM

January 9, 2020

**Minnesota Limited**
18640 200th St, PO Box 410
Big Lake, MN 55309

ATTN: Amy Skuza

RE:    Southern Star Lines DT and DS Replacement Project
        Directionally drill and install approximately 6,052 feet of 36-inch steel pipeline in
        Anderson and Franklin Counties, KS.

The HDD Company is pleased to submit the following bid quote:

1. **Responsibilities of The HDD Company**
   1.1.    Provide all required insurance certificates.
   1.2.    Provide any written submittals and qualifications required.
   1.3.    Provide 2 (two) drill rig(s) with sufficient capabilities to install the crossings, a
           closed-loop mud system, mud pumps, vacuum trucks, dump trucks, steering
           system, and all drill spread support equipment necessary.
   1.4.    Provide all required union labor for the drilling operations.
   1.5.    Provide preliminary drill profiles for each crossing.
   1.6.    Provide final as-built drawings.
   1.7.    Provide and haul water for drilling operations.
   1.8.    Provide water storage for the duration of drilling operations.
   1.9.    Provide all required pulling heads.
   1.10.  Leave the entry areas clean, free of debris, and to a rough grade.
   1.11.  Provide bonding at 1%, which is not included in the bid pricing below.

2. **Responsibilities of THE CONTRACTOR**
   2.1.    Stake and survey the entry and exit points for each bore, with correct stations
           and elevations.
   2.2.    Provide all permitting to undertake the project.
   2.3.    Provide and maintain suitable truck access to and from entry and exit locations.
   2.4.    Provide stable, level, matted and/or graveled work pads for each bore.
   2.5.    Provide all BMPs around each bore's entry and exit locations. The HDD
           Company will maintain these items.
   2.6.    Provide, string, weld, and test all 36-inch pipe for each bore.

*Going to Greater Lengths™*

2.7. Provide all plans, equipment, and manpower to handle pipe during pullback operations.
2.8. Perform all final tie-ins.
2.9. Provide all settlement monitoring, if required.
2.10. Provide all final site restorations.
2.11. Provide all field surveys to document existing conditions for the HDD installations, including but not limited to pictures, videos, field notes, etc.

3. **Pricing (Lump Sum)**

| | | |
|---|---|---|
| 3.1. | HDD Cedar Creek 2,106' X 36" pipe: | **$1,280,448.00** |
| 3.2. | HDD Pottawapomie Creek 1,788' X 36" pipe: | **$1,087,104.00** |
| 3.3. | HDD Flint Hill 2,158' X 36" pipe: | **$1,312,064.00** |
| 3.4. | Mobilization per rig spread: | **$50,000.00** |

4. **Clarifications**
4.1. Additional footage due to no fault of The HDD Company, will be billed at $608.00/LF.
4.2. This proposal is based upon the drawings, specifications, and geotechnical information provided to us on or before **7 June 2019.**
4.3. If any revised or additional drawings, specifications, geotechnical information, or permits are provided to us after the bid submission date, The HDD Company reserves the right to modify the proposal to account for any added costs and/or additional time associated with the change(s).
4.4. The HDD Company's bid proposal is conditional upon reaching an agreement upon mutually acceptable contract terms. This bid proposal will be attached to and forms a part of the contract between The HDD Company and THE CONTRACTOR.
4.5. Item 3.3 above includes the hauling and disposal of all **non-contaminated** drilled solids and excess drilling fluids.
4.6. The pricing above is contingent upon a site visit.

5. **Exclusions**
5.1. The HDD Company and its personnel are not the Project Engineers. Therefore, we exclude all design and engineering services unless any are specifically noted as included in this proposal. Any drilling plans or profiles that we submit to you will be based upon the design information in the contract documents and our experience as HDD contractors. Any plans or profiles we provide are recommendations only and are subject to review and approval by the project owner and/or its engineers.
5.2. All permits, including federal, State and local environmental permits, the SWPPP permit and any associated SWPPP plans, any right-of-way (ROW) agreement or easements, and all access necessary for us to perform our work shall be provided by others. If our operations are delayed or otherwise impacted by any delays or problems with permits, SWPPP plans, ROW agreements, easements or access arrangements our compensation and time for completion will be equitably adjusted.

6.  **Terms and Conditions**

  6.1.  Schedule

    6.1.1.  This proposal is based upon performance under a reasonable and mutually agreed-to project schedule in so far as that schedule applies to our work. The approved project baseline schedule and all monthly updates must be provided to us on a regular and timely basis to keep us apprised of schedule changes which may impact the timing and efficiency of our work. We will not be liable for any delays caused by others or by factors beyond our reasonable control.

  6.2.  Indemnification

    6.2.1.  We will indemnify you and/or the project owner for personal injury or property damage claims to the extent of our own negligence. Our proposal excludes any obligation to indemnify you for your own negligence or to indemnify any other party for that party's own negligence or to indemnify any design professional.

  6.3.  Payment

    6.3.1.  Monthly progress payments will be made to The HDD Company within (7) seven days after you receive each monthly payment from the project owner, but in no event later than 120 days from the date you received your invoice.

    6.3.2.  We will receive our final payment within 30 days after you receive our final billing and our work has been completed and accepted. Acceptance will not be unreasonably withheld or delayed. If you dispute any portion of any billing, you will promptly notify us in writing of the nature of the dispute and you will pay the undisputed portion of the billing without delay. If any undisputed amounts are past due for more than 10 days, we reserve the right to stop work until all payments are brought current. We will provide lien releases in accordance with applicable state statutes or regulations. We will keep the project free of liens from out subcontractors, suppliers and other vendors provided we have been paid by you for the work covered by any such liens.

  6.4.  Extra/Force Account Work:

    6.4.1.  If we are directed to perform any work on a force account or time and material basis, the rates for our labor and equipment will be as stated in our proposal, or if no rates are included with this proposal, as stated in our then current standard labor and equipment rate schedule. If we are directed to standby or suspend work while other operations occur, or delays or other problems are resolved, or if we are required to standby due to events or circumstances beyond our control, the standby time for our labor and equipment will be paid as stated in this proposal.

  6.5.  Differing Site Conditions

Going to Greater Lengths™

6.5.1     If the conditions we encounter in the performance of our work differ materially from those indicated in the contract documents, boring logs, geotechnical reports or other information furnished to us prior to bid, or from those ordinarily encountered and generally recognized as inherent in the type of work provided for in our proposal, then our compensation and time for completion will be equitably adjusted to account for any resulting delay and added costs.

7.     **Delays and Work Stoppages:**

    7.1.     All work stoppages that arise through no fault of The HDD Company will be billed at **$14,500** (no crew on site).

The HDD Company appreciates the opportunity to furnish you this quote and looks forward to working with you. Should any of the information presented above need further clarification, please do not hesitate to contact us.

Sincerely,
**The HDD Company**

Jeremy King
Vice President

Going to Greater Lengths™



17 January 2020

**Minnesota Limited**
18640 200th St, PO Box 410
Big Lake, MN 55309

ATTN: Brad Cordes

RE:   Southern Star Lines DT and DS Replacement Project
Directionally drill and install approximately 4540 feet of 36-inch steel pipeline road
crossings in Anderson and Franklin Counties, KS.

The HDD Company is pleased to submit the following bid quote:

1. **Responsibilities of The HDD Company**
   1.1.   Provide all required insurance certificates.
   1.2.   Provide any written submittals and qualifications required.
   1.3.   Provide drill rig(s) with sufficient capabilities to install the crossings, a closed-loop mud system, mud pumps, vacuum trucks, dump trucks, steering system, and all drill spread support equipment necessary.
   1.4.   Provide all required union labor for the drilling operations.
   1.5.   Provide final as-built drawings.
   1.6.   Provide and haul water for drilling operations.
   1.7.   Provide water storage for the duration of drilling operations.
   1.8.   Provide all required pulling heads.
   1.9.   Leave the entry areas clean, free of debris, and to a rough grade.
   1.10.   Provide bonding at 1%, which is not included in the bid pricing below.

2. **Responsibilities of THE CONTRACTOR**
   2.1.   Stake and survey the entry and exit points for each bore, with correct stations and elevations.
   2.2.   Provide all permitting to undertake the project.
   2.3.   Provide and maintain suitable truck access to and from entry and exit locations.
   2.4.   Provide stable, level, matted and/or graveled work pads for each bore.
   2.5.   Provide bore pits and shore if needed.
   2.6.   Provide all BMPs around each bore's entry and exit locations. The HDD Company will maintain these items.
   2.7.   Provide, string, weld, and test all 36-inch pipe for each bore.
   2.8.   Furnish support crew for road crossings, including excavators and manpower.

2.9.  Provide all plans, equipment, and manpower to handle pipe during pullback operations.

2.10. Perform all final tie-ins.

2.11. Dispose of cuttings.

2.12. Provide all settlement monitoring, if required.

2.13. Provide all final site restorations.

2.14. Provide all field surveys to document existing conditions for the HDD installations, including but not limited to pictures, videos, field notes, etc.

3. **Pricing**

3.1.  4540' X 36" pipe:                          **$508.00/ft**

3.2.  Mobilization per rig spread:               **$50,000.00**

4. **Clarifications**

4.1.  This proposal is based upon the drawings, specifications, and geotechnical information provided to us on or before **17 January 2020.**

4.2.  If any revised or additional drawings, specifications, geotechnical information, or permits are provided to us after the bid submission date, The HDD Company reserves the right to modify the proposal to account for any added costs and/or additional time associated with the change(s).

4.3.  The HDD Company's bid proposal is conditional upon reaching an agreement upon mutually acceptable contract terms. This bid proposal will be attached to and forms a part of the contract between The HDD Company and THE CONTRACTOR.

4.4.  The pricing above is contingent upon a site visit.

5. **Exclusions**

5.1.  The HDD Company and its personnel are not engineers. Therefore, we exclude all design and engineering services unless any are specifically noted as included in this proposal. Any drilling plans or profiles that we submit to you will be based upon the design information in the contract documents and our experience as HDD contractors. Any plans or profiles we provide are recommendations only and are subject to review and approval by the project owner and/or its engineers.

5.2.  All permits, including federal, State and local environmental permits, the SWPPP permit and any associated SWPPP plans, any right-of-way (ROW) agreement or easements, and all access necessary for us to perform our work shall be provided by others. If our operations are delayed or otherwise impacted by any delays or problems with permits, SWPPP plans, ROW agreements, easements or access arrangements our compensation and time for completion will be equitably adjusted.

6. **Terms and Conditions**

6.1.  Schedule

6.1.1.  This proposal is based upon performance under a reasonable and mutually agreed-to project schedule in so far as that schedule applies to our work. The approved project baseline schedule and all monthly updates must be provided to us on a regular and timely basis to keep

us apprised of schedule changes which may impact the timing and efficiency of our work. We will not be liable for any delays caused by others or by factors beyond our reasonable control.

6.2    Indemnification

     6.2.1.    We will indemnify you and/or the project owner for personal injury or property damage claims to the extent of our own negligence. Our proposal excludes any obligation to indemnify you for your own negligence or to indemnify any other party for that party's own negligence or to indemnify any design professional.

6.3.    Payment

     6.3.1.    Monthly progress payments will be made to The HDD Company within (7) seven days after you receive each monthly payment from the project owner, but in no event later than 120 days from the date you received your invoice.

     6.3.2.    We will receive our final payment within 30 days after you receive our final billing and our work has been completed and accepted. Acceptance will not be unreasonably withheld or delayed. If you dispute any portion of any billing, you will promptly notify us in writing of the nature of the dispute and you will pay the undisputed portion of the billing without delay. If any undisputed amounts are past due for more than 10 days, we reserve the right to stop work until all payments are brought current. We will provide lien releases in accordance with applicable state statutes or regulations. We will keep the project free of liens from out subcontractors, suppliers and other vendors provided we have been paid by you for the work covered by any such liens.

6.4.    Extra/Force Account Work:

     6.4.1.    If we are directed to perform any work on a force account or time and material basis, the rates for our labor and equipment will be as stated in our proposal, or if no rates are included with this proposal, as stated in our then current standard labor and equipment rate schedule. If we are directed to standby or suspend work while other operations occur, or delays or other problems are resolved, or if we are required to standby due to events or circumstances beyond our control, the standby time for our labor and equipment will be paid as stated in this proposal.

6.5.    Differing Site Conditions

     6.5.1.    If the conditions we encounter in the performance of our work differ materially from those indicated in the contract documents, boring logs, geotechnical reports or other information furnished to us prior to bid, or from those ordinarily encountered and generally recognized as inherent in the type of work provided for in our proposal, then our compensation and time for completion will be equitably adjusted to account for any resulting delay and added costs.

Going to Greater Lengths"

7.    **Delays and Work Stoppages:**

     7.1.    All work stoppages that arise through no fault of The HDD Company will be billed at **$14,500** (no crew on site).

The HDD Company appreciates the opportunity to furnish you this quote and looks forward to working with you. Should any of the information presented above need further clarification, please do not hesitate to contact us.

Sincerely,
**The HDD Company**

Jeremy King

Going to Greater Lengths™

# Exhibit 3

| PROJECT NAME: | | |
|---|---|---|
| PROJECT NO.: | Southern Star Line DT & DS Replacement | |


THE HDD COMPANY
Horizontal Directional Drilling

**EXTRA WORK SHEET REPORT**
**INTERNAL - OFFICE**

| CLIENT/OWNER : | Minnesota Limited - Southern Star | DATE: | |
|---|---|---|---|
| WORK PRFM'D. BY: | The HDD Company, Inc. | EXTRA WRK. SHT. NO. | Cedar Creek |
| DESCPTN. OF WORK : | Access and weather delays | | |
| 0 | | | |
| 0 | | | |
| 0 | | | |

## A – EQUIPMENT

| EQUIP. NO. | Company Owned Equipment | | HRS. | RATE/HR. | TOTAL/DAY |
|---|---|---|---|---|---|
| 1 | Drilling Rig HDD Rig 3 | | 30,00 | $ 205,56 | $ 6.166,80 |
| 1 | Mud Tank / Solids Control Unit | | 30,00 | $ 111,96 | $ 3.358,80 |
| 1 | Sump Pit/Trash Pump | | 30,00 | $ 8,29 | $ 248,70 |
| 1 | Mud Pumping Units | | 30,00 | $ 60,94 | $ 1.828,20 |
| 2 | Tool Van and tools | | 30,00 | $ 17,55 | $ 1.053,00 |
| 0 | Dump Truck A=17 TRUN 2AXL | | | | $ - |
| 2 | Vac. Truck A-17 TRUN 2AXL | | 30,00 | $ 45,75 | $ 2.745,00 |
| 7 | Misc. Trailers | | 30,00 | $ 1,79 | $ 375,90 |
| 0 | Haul Trucks | | 30,00 | $ 34,13 | |
| 1 | 6 3/4" Non Mag Drill Collars w/Jet Assembly | | 30,00 | $ 6,83 | $ 204,90 |
| 168 | Drill Pipe (5+1/2 FH) | | 30,00 | $ 0,53 | $ 2.671,20 |
| 2 | Misc. X-Subs and Rack (All X Subs for Spread) | | 30,00 | $ 5,20 | $ 312,00 |
| 0 | Sonde and Housing | | | | $ - |
| | Steering Tool (North Referencing w/Tru-Gyde) | | | | |
| 48 | Rollers | | 30,00 | $ 1,50 | $ 2.160,00 |
| 2 | Ford F-250 T&TT 06-12 | | 30,00 | $ 5,04 | $ 302,40 |
| 0 | Ford F-450 T&TT 20-28 | | | | $ - |
| 0 | Ford F-350 T&TT 20-28 | | | | |
| 0 | KW & Crane Truck | | | | |
| 0 | Hammer | | 30,00 | $ 41,93 | |
| 1 | 300 Amp Welder | | 30,00 | $ 9,49 | $ 284,70 |
| 1 | 1/2 Ton Truck | | 30,00 | $ 32,48 | $ 974,40 |
| 1 | 60" Casing | | 30,00 | $ 3,25 | $ 97,50 |
| 0 | Mud Bins | | | | $ - |

| | Rental Equipment | | | | |
|---|---|---|---|---|---|
| 1 | 10K Reach Forklift | S.T. | 30,00 | $ 51,29 | $ 1.538,70 |
| | | O.T. | | | $ - |
| 2 | 225 Excavator | S.T. | 30,00 | $ 91,59 | $ 5.495,40 |
| | | O.T. | | | $ - |
| 2 | Portable toilets | S.T. | 30,00 | $ 1,50 | $ 90,00 |
| | | O.T. | | | $ - |
| 0 | Multiquip 20KW Generator | S.T. | | | $ - |
| | | O.T. | | | $ - |
| 1 | Frac Tank | S.T. | 30,00 | $ 7,32 | $ 219,60 |
| | | O.T. | | | $ - |
| 1 | Trash Bin | S.T. | 30,00 | $ 4,97 | $ 149,10 |
| | | O.T. | | | $ - |
| 1 | 500 Amp Welder | S.T. | 30,00 | $ 9,49 | $ 284,70 |
| | | O.T. | | | $ - |
| 2 | Light Tower | S.T. | 30,00 | $ 7,61 | $ 456,60 |
| | | O.T. | | | $ - |
| 1 | 175 KW Generator | S.T. | 30,00 | $ 71,36 | $ 2.140,80 |
| | | O.T. | | | $ - |
| 1 | 6" Diesel Trash Pump | S.T. | 30,00 | $ 23,60 | $ 708,00 |
| | | O.T. | | | $ - |
| 1 | HTI Mud Motor | S.T. | 30,00 | $ 42,50 | $ 1.275,00 |
| | | O.T. | | | $ - |
| | | S.T. | | | $ - |
| | | O.T. | | | $ - |
| | | S.T. | | | $ - |
| | | O.T. | | | $ - |
| | | S.T. | | | $ - |
| | | O.T. | | | $ - |
| | | S.T. | | | $ - |
| | | O.T. | | | $ - |
| | | S.T. | | | $ - |
| | | O.T. | | | $ - |
| | | S.T. | | | $ - |
| | | O.T. | | | $ - |
| | | S.T. | | | $ - |
| | | O.T. | | | $ - |
| | COMPANY OWNED EQUIPMENT | | | | 22.783,50 |
| | RENTAL EQUIPMENT W/ 15% Markup | | | | 14.211,59 |
| | A- EQUIPMENT SUB - TOTAL COST | | | | $ 36.995,09 |
| | 0,00 | % Sales Tx, Rental Equip. | | | |

## B – MATERIALS

| MATERIALS DESCRIPTION | QTY. USED | UNIT $ | TOTAL |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| | B-MATERIALS SUB-TOTAL COST | | $ - |
| | 0,00 % Sales Tax | | |
| | 15 % ADDED M, U, $ | | |
| | SUB-TOTAL A + B w/Tax | | $ 36.995,09 |

## C – SUBCONTRACT / WORK DONE BY SPECIALISTS/THIRD PARTY SERVICES

| Work Description | Individual / Company | Unit | RATE | TOTAL $ |
|---|---|---|---|---|
| | | | | $ - |
| | | | | $ - |
| | | | | $ - |
| | COST OF SUBS - C | | | $ - |
| | 15 % MARK-UP(Subcontractor) | | | $ |
| | TOTAL COST A + B + C (Including Mark-Up) | | | $ 36.995,09 |

## D – LABOR

| NO. | D - LABOR | | HRS. | BASE RATE w/FRING'S. | SUB TOTAL | Per Diem Totals | TOTAL |
|---|---|---|---|---|---|---|---|
| 1 | Ben Bethany (Day Rate) | REG. | 3,00 | $1.016,84 | $3.050,52 | $120,00 | $3.170,52 |
| | | O.T. | 0 | | $0,00 | | $0,00 |
| | | D.T. | | | $0,00 | | $0,00 |
| 2 | James Ravenscraft | REG. | 30,00 | $44,66 | $1.339,80 | $300,00 | $1.639,80 |
| | | O.T. | | | $0,00 | | $0,00 |
| | | D.T. | | | $0,00 | | $0,00 |
| 3 | Jeremy Acres | REG. | 30,00 | $46,20 | $1.386,00 | $315,00 | $1.701,00 |
| | | O.T. | | | $0,00 | | $0,00 |
| | | D.T. | | | $0,00 | | $0,00 |
| 4 | Mark Horton | REG. | 30,00 | $59,79 | $1.793,70 | $345,00 | $2.138,70 |
| | | O.T. | | | $0,00 | | $0,00 |
| | | D.T. | | | $0,00 | | $0,00 |
| 5 | Steven Davis | REG. | 30,00 | $59,79 | $1.793,70 | $315,00 | $2.108,70 |
| | | O.T. | | | $0,00 | | $0,00 |
| | | D.T. | | | $0,00 | | $0,00 |
| 6 | Roger Reeter | REG. | 30,00 | $59,79 | $1.793,70 | $315,00 | $2.108,70 |
| | | O.T. | | | $0,00 | | $0,00 |
| | | D.T. | | | $0,00 | | $0,00 |
| 7 | Bruce Cooper | REG. | 30,00 | $44,53 | $1.335,90 | $315,00 | $1.650,90 |
| | | O.T. | | | $0,00 | | $0,00 |
| | | D.T. | | | $0,00 | | $0,00 |
| 8 | | REG. | 0,00 | | $0,00 | | $0,00 |
| | | O.T. | 0,00 | | $0,00 | | $0,00 |
| | | D.T. | | | $0,00 | | $0,00 |
| 9 | | REG. | 0,00 | | $0,00 | | $0,00 |
| | | O.T. | 0,00 | | $0,00 | | $0,00 |
| | | D.T. | | | $0,00 | | $0,00 |
| 10 | | REG. | 0,00 | | $0,00 | | $0,00 |
| | | O.T. | 0,00 | | $0,00 | | $0,00 |
| | | D.T. | | | $0,00 | | $0,00 |
| 11 | | REG. | 0,00 | | $0,00 | | $0,00 |
| | | O.T. | 0,00 | | $0,00 | | $0,00 |
| | | D.T. | | | $0,00 | | $0,00 |
| 12 | | REG. | 0,00 | | $0,00 | | $0,00 |
| | | O.T. | 0,00 | | $0,00 | | $0,00 |
| | | D.T. | | | $0,00 | | $0,00 |
| 13 | | REG. | 0,00 | | $0,00 | | $0,00 |
| | | O.T. | 0,00 | | $0,00 | | $0,00 |
| | | D.T. | | | $0,00 | | $0,00 |
| | D - LABOR SUB-TOTAL | | | | | | 14.518,32 |
| | 15 % Labor Surcharge | | | | | | $ 2.177,75 |
| | SUBTOTAL | | | | | | $ 16.696,07 |
| | 15 % MARKUP ON LABOR | | | | | | $ 2.504,41 |

## E – MISCELLANEOUS ITEMS

| MBSC. DESCRIPTIONS | QTY. | Unit $ | EX. AMOUNT |
|---|---|---|---|
| Hotel | | | |
| | 6 | $ 58,00 | $ 348,00 |
| | 9 | $ 68,00 | $ 612,00 |
| Subsistance | 0 | | $ - |
| Misc. Items | | | |
| 0 | | 0 | $ - |
| 0 | | 0 | $ - |
| 0 | | 0 | $ - |
| 0 | | 0 | $ - |
| 0 | | 0 | $ - |
| 0 | | 0 | $ - |
| | E- MISCELLANEOUS ITEMS SUB TOTAL | | $ 960,00 |
| | 5 % Sales/City/Room Tax | | $ 48,00 |
| | 15 % ADDED MARK-UP | | $ 144,00 |
| | 0 % Tax on Misc. Items | | 0 |
| | SUB TOTAL - E | | $ 1.152,00 |

## TOTALS

| | | |
|---|---|---|
| TOTAL COST A+B+C (Equipment /Material /Sub-Contractors) | | $ 36.995,09 |
| TOTAL COST - D (Labor) | | $ 19.200,48 |
| TOTAL COST - E (Miscellaneous Items) | | $ 1.152,00 |
| SUB-TOTAL | | $ 57.347,56 |
| 2,5 % BOND & INSURANCE | | $ 1.433,69 |
| **TOTAL COST THIS SHEET** | | **$ 58.781,25** |

| TIME | CLIENT DIRECTIVES AND COMMENTS |
|---|---|
| 0:00 | (See Daily Work Report) |
| 0:00 | |
| 0:00 | |
| 0:00 | |
| 0:00 | |
| 0:00 | |
| 0:00 | |
| 0:00 | |
| 0:00 | |
| 0:00 | |
| 0:00 | |
| 0:00 | |
| 0:00 | |
| 0:00 | |
| 0:00 | |
| 0:00 | |
| 0:00 | |
| 0:00 | |
| 0:00 | |
| 0:00 | |
| 0:00 | |
| 0:00 | |
| 0:00 | |

# Exhibit 4


The HDD Company
Horizontal Directional Drilling

**EXTRA WORK SHEET REPORT**
**INTERNAL - OFFICE**

| CLIENT/OWNER : | Minnesota Limited - Southern Star | DATE: | |
| WORK PRFM'D. BY: | The HDD Company, Inc. | EXTRA WRK. SHT. NO. | Cedar Creek HDD |
| DESCPTN. OF WORK: | Access and weather delays | | |
| 0 | | | |
| 0 | | | |
| 0 | | | |

## A - EQUIPMENT

| EQUIP. NO. | Company Owned Equipment | HRS. | RATE/HR. | TOTAL/DAY |
|---|---|---|---|---|
| 1 | Drilling Rig HDD Rig 7 - Vermeer 750 | 32.50 | $ 205.56 | $ 6,680.70 |
| 1 | Mud Tank / Solids Control Unit | 32.50 | $ 111.96 | $ 3,638.70 |
| 1 | Sump Pit/Trash Pump | 32.50 | $ 8.29 | $ 269.43 |
| 1 | Mud Pumping Units | 32.50 | $ 60.94 | $ 1,980.55 |
| 2 | Tool Van and tools | 32.50 | $ 17.55 | $ 1,140.75 |
| 0 | Drilling Rig A-17  TRUN 2AXL | | | $ - |
| 3 | Vac. Truck A-17 TRUN 2AXL | 32.50 | $ 45.75 | $ 4,460.63 |
| 10 | Misc. Trailers | 32.50 | $ 1.79 | $ 581.75 |
| 1 | Haul Trucks | 32.50 | $ 34.13 | $ 1,109.23 |
| 1 | 6 3/4" Non Mag Drill Collars w/Jet Assembly | 32.50 | $ 6.83 | $ 221.98 |
| 168 | Drill Pipe (5-1/2 FH) | 32.50 | $ 0.53 | $ 2,893.80 |
| 2 | Misc. X-Subs and Rack (All X Subs for Spread) | 32.50 | $ 5.20 | $ 338.00 |
| 0 | Sonde and Housing | | | $ - |
| 0 | Steering Tool (North Referencing w/Tru-Gyde) | | | |
| 48 | Rollers | 32.50 | $ 1.50 | $ 2,340.00 |
| 3 | Ford F-250 T&TT 06-12 | 32.50 | $ 5.04 | $ 491.40 |
| 0 | Ford F-450 TT 20-28 | | | $ - |
| 0 | Ford F-350 TT 20-28 | | | $ - |
| 0 | KW & Crane Truck | | | $ - |
| 1 | Hammer | 32.50 | $ 41.93 | $ 1,362.73 |
| 1 | 300 Amp Welder | 32.50 | $ 9.49 | $ 308.43 |
| 1 | 1/2 Ton Truck | 32.50 | $ 32.48 | $ 1,055.60 |
| 1 | 60" Casing | 32.50 | $ 3.25 | $ 105.63 |
| 0 | Mud Bins | | | $ - |

| | Rental Equipment | | | |
|---|---|---|---|---|
| 1 | 10K Reach Forklift | S.T. 32.50 | $ 51.29 | $ 1,666.93 |
| | | O.T. | | $ - |
| 2 | 225 Excavator | S.T. 32.50 | $ 91.59 | $ 5,953.35 |
| | | O.T. | | $ - |
| 2 | Portable toilets | S.T. 32.50 | $ 1.50 | $ 97.50 |
| | | O.T. | | $ - |
| 0 | Multiquip 20kW Generator | S.T. | | $ - |
| | | O.T. | | $ - |
| 3 | Frac Tank | S.T. 32.50 | $ 7.32 | $ 713.70 |
| | | O.T. | | $ - |
| 1 | Trash Bin | S.T. 32.50 | $ 4.97 | $ 161.53 |
| | | O.T. | | $ - |
| 1 | 500 Amp Welder | S.T. 32.50 | $ 9.49 | $ 308.43 |
| | | O.T. | | $ - |
| 2 | Light Tower | S.T. 32.50 | $ 7.61 | $ 494.65 |
| | | O.T. | | $ - |
| 1 | 175 KW Generator | S.T. 32.50 | $ 71.36 | $ 2,319.20 |
| | | O.T. | | $ - |
| 1 | 6" Diesel Trash Pump | S.T. 32.50 | $ 23.60 | $ 767.00 |
| | | O.T. | | $ - |
| 1 | HTI Mud Motor | S.T. 32.50 | $ 42.50 | $ 1,381.25 |
| | | O.T. | | $ - |
| | | S.T. | | $ - |
| | | S.T. | | $ - |
| | | O.T. | | $ - |
| | | S.T. | | $ - |
| | | S.T. | | $ - |
| | | O.T. | | $ - |
| | | S.T. | | $ - |
| | | S.T. | | $ - |
| | | O.T. | | $ - |
| | | S.T. | | $ - |
| | | S.T. | | $ - |
| | | O.T. | | $ - |
| | | S.T. | | $ - |
| | | O.T. | | $ - |
| | | O.T. | | $ - |

| COMPANY OWNED EQUIPMENT | | 28,979.28 |
|---|---|---|
| RENTAL EQUIPMENT W/ 15% Markup | | 15,943.05 |
| A- EQUIPMENT SUB - TOTAL COST | | $ 44,922.33 |
| 0.00 | % Sales Tx. Rental Equip. | |

## B - MATERIALS

| MATERIALS DESCRIPTION | QTY. USED | UNIT $ | TOTAL |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| B-MATERIALS  SUB-TOTAL COST | | | $ - |
| 0.00 | % Sales Tax | | $ - |
| 15 | % ADDED M. U. B | | $ - |
| SUB-TOTAL A + B w/Tax | | | $ 44,922.33 |

## C - SUBCONTRACT / WORK DONE BY SPECIALISTS/THIRD PARTY SERVICES

| Work Description | Individual / Company | Unit | RATE | TOTAL $ |
|---|---|---|---|---|
| Roller Damage | Minnesota Limited | 8.00 | $ 2,900.00 | $ 23,200.00 |
| | | | | $ - |
| | | | | $ - |
| | | COST OF SUB$ - C | | $ 23,200.00 |
| 15 % MARK-UP(Subcontractor) | | | | $ 3,480.00 |
| | | $ | | $ 26,680.00 |
| TOTAL COST A + B + C (Including Mark-Up) | | | | $ 71,602.33 |

| NO. | D - LABOR | | HRS. | BASE RATE w/FRING'S. | SUB TOTAL | Per Diem Totals | TOTAL |
|---|---|---|---|---|---|---|---|
| 1 | Chris Crough (Day Rate) | REG. | 3.00 | $1,016.84 | $3,050.52 | $120.00 | $3,170.52 |
| | | O.T. | 0 | | $0.00 | | $0.00 |
| | | D.T. | 0 | | $0.00 | | $0.00 |
| 2 | Randy Foster (Day Rate) | REG. | 3.00 | $968.88 | $2,906.64 | $300.00 | $3,206.64 |
| | | O.T. | | | $0.00 | | $0.00 |
| | | D.T. | | | $0.00 | | $0.00 |
| 3 | Harold Shoemaker (Day | REG. | 0.00 | | $0.00 | $0.00 | $0.00 |
| | | O.T. | | | $0.00 | | $0.00 |
| | | D.T. | | | $0.00 | | $0.00 |
| 4 | Justin Potter | REG. | 32.50 | $59.79 | $1,943.18 | $345.00 | $2,288.18 |
| | | O.T. | | $80.65 | $0.00 | | $0.00 |
| | | D.T. | | | $0.00 | | $0.00 |
| 5 | Brandon Morris | REG. | 32.50 | $39.83 | $1,294.48 | $315.00 | $1,609.48 |
| | | O.T. | 0.00 | $54.42 | $0.00 | | $0.00 |
| | | D.T. | | | $0.00 | | $0.00 |
| 6 | David Jones | REG. | 32.50 | $42.86 | $1,392.95 | $315.00 | $1,707.95 |
| | | O.T. | | $58.96 | $0.00 | | $0.00 |
| | | D.T. | | | $0.00 | | $0.00 |
| 7 | Brandon Sammet | REG. | 32.50 | $59.79 | $1,943.18 | $315.00 | $2,258.18 |
| | | O.T. | | $80.65 | $0.00 | | $0.00 |
| | | D.T. | | | $0.00 | | $0.00 |
| 8 | Roger Reeter | REG. | 32.50 | $59.79 | $1,943.18 | $300.00 | $2,243.18 |
| | | O.T. | | $69.49 | $0.00 | | $0.00 |
| | | D.T. | | | $0.00 | | $0.00 |
| 9 | Augustin Zepeda | REG. | 32.50 | $36.83 | $1,196.98 | $315.00 | $1,511.98 |
| | | O.T. | | $69.49 | $0.00 | | $0.00 |
| | | D.T. | | | $0.00 | | $0.00 |
| 10 | Johnny Hatfield | REG. | 32.50 | $43.49 | $1,413.43 | $150.00 | $1,563.43 |
| | | O.T. | | $59.91 | $0.00 | | $0.00 |
| | | D.T. | | | $0.00 | | $0.00 |
| 11 | | REG. | 0.00 | | $0.00 | | $0.00 |
| | | O.T. | 0.00 | | $0.00 | | $0.00 |
| | | D.T. | | | $0.00 | | $0.00 |
| 12 | | REG. | 0.00 | | $0.00 | | $0.00 |
| | | O.T. | 0.00 | | $0.00 | | $0.00 |
| | | D.T. | | | $0.00 | | $0.00 |
| 13 | | REG. | 0.00 | | $0.00 | | $0.00 |
| | | O.T. | 0.00 | | $0.00 | | $0.00 |
| | | D.T. | | | $0.00 | | $0.00 |
| | | | | D - LABOR SUB-TOTAL | $ | | 19,559.51 |
| 15 % Labor Surcharge | | | | | $ | | 2,933.93 |
| SUBTOTAL | | | | | $ | | 22,493.44 |
| 15 % MARKUP ON LABOR | | | | | $ | | 3,374.02 |

## E - MISCELLANEOUS ITEMS

| MISC. DESCRIPTIONS | QTY. | Unit $ | EX. AMOUNT |
|---|---|---|---|
| Hotel | | | |
| | 6 | $ 58.00 | $ 348.00 |
| | 9 | $ 68.00 | $ 612.00 |
| Subsistance | 0 | | $ - |
| Misc. Items | | | |
| 0 | 0 | | $ - |
| 0 | 0 | | $ - |
| 0 | 0 | | $ - |
| 0 | 0 | | $ - |
| 0 | 0 | | $ - |
| 0 | 0 | | $ - |
| E- MISCELLANEOUS ITEMS SUB TOTAL | | | $ 960.00 |
| 5 % Sales/City/Room Tax | | | $ 48.00 |
| 15 % ADDED MARK-UP | | | $ 144.00 |
| 0 % Tax on Misc. Items | | | 0 |
| SUB TOTAL - E | | | $ 1,152.00 |

## TOTALS

| TOTAL COST  A+B+C (Equipment /Material /Sub-Contractors) | $ 71,602.33 |
|---|---|
| TOTAL COST - D  (Labor) | $ 25,867.45 |
| TOTAL COST - E  (Miscellaneous Items) | $ 1,152.00 |
| SUB-TOTAL | $ 98,621.78 |
| 2.5 % BOND & INSURANCE | $ 2,465.54 |
| TOTAL COST THIS SHEET | $ 101,087.33 |

| TIME | CLIENT DIRECTIVES AND COMMENTS |
|---|---|
| 0:00 | (See Daily Work Report) |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |

# Exhibit 5



| Project Details | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| From | The Tunneling Company USA, LLC. | Job No. | TUS20011 | RCO No. | 003 | Rev | | 0 |
| RCO Title | Delays Due to Contractor | | | Date | August 31, 2020 | | | |
| Owner | The HDD Company | | Attention | Jeremy King | | | | |

| **Description Of Requested Change Details** |
|---|

| Required by:     September 14, 2020 |
|---|

**Change Description**

Throughout the project, The Tunneling Company USA has experienced significant delays as a result of the contractor. These delays consist of (but not limited to);

- Dewatering the excavations
- Assisting with pit construction
- Waiting for pit completion
- Welding delays
- Safety shut downs
- Approvals

A detailed breakdown of these delays are attached.

**Change Costs:**

Total charges as a result of these delays is $500,975.

A detailed breakdown of these delays are attached.

All applicable taxes will be added at time of invoice



| Impact Details |
|---|
| **Reason for Change**:    Delays Due to Contractor |

| Additional Information |
|---|
| Click here to enter text. |

| Reference Or Attachments | | | | |
|---|---|---|---|---|
| Attach | Refer | Document No | Rev | Description |
| ☐ | ◆ | Timesheets | | Daily Timesheets for these delays are available upon request |
| ☐ | ☐ | | | |
| ☐ | ☐ | | | |

| Response |
|---|
| <span style="color:red">Client Use:</span> |

| Approval Details© |
|---|

| **Submitted by    (Originator)** | <span style="color:red">Client Use:</span> |
|---|---|
| Print Name:    Nick Hyde | Change Authorized:    Yes |
| Print Title:    Project Manager | Print Name:          Jeremy King |
| Date:    August-31-2020 | Print Title:          Vice President |
| Signature: | Date: |
| | Signature:  ✕ |

| Date: | Crossing Name | Planned Activity Hours | Unplanned Activity Hours | Non- Billable Hours | Contract Refereance Term | Description |
|---|---|---|---|---|---|---|
| 19-Mar-20 | HWY 31 | | 8 | | 7.1 | Pick up supplies and wait to offload last load of augers. ML still pumping water off of site and will start digging the pit tomorrow (Standby time). |
| 24-Mar-20 | HWY 31 | 4.5 | 7 | | 7.1 | Crew assisted with pit construction. By 1pm crew started placing mats and rails but had to remove them at EI's direction to place plastic under them to contain any spills. Mats and rails installed and boring machine brought over to site. Ready to start in the morning. |
| 16-Apr-20 | RD 1100 | 4 | 7.5 | | 7.1 | Set all gear around site and wait for pit completion (Standby time). |
| 17-Apr-20 | RD 1100 | | 11 | | 7.1 | Pit not ready (Standby time). |
| 27-Apr-20 | RD 1500 | | 10 | | 7.1 | Pit not ready (Standby time). |
| 2-May-20 | RD 1500 | 4.5 | 5.5 | | 7.1 | Completed casing install by 12pm. Exit pit no complete. ML work on exit pit for remainder of shift (Standby time). Daily Install 40'. Total Install 85'. |
| 18-May-20 | Clarke RD | 10 | 1 | | 7.1 | Confirm elevation and start welding casing. Unload excavators. Start setting equipment and engineer confirmed the setup is too low. Move equipment so grade can be adjusted. Daily Install 0'. Total Install 0'. |
| 19-May-20 | Clarke RD | 6.5 | 5.5 | | 7.1 | Fixed elevation of pit, set equipment and started drilling. Pit grade not excavated corectly. |
| 20-May-20 | Clarke RD | 10 | 1 | | 7.1 | Stanby time waiting for excavator in the morning |
| 26-May-20 | Allen RD | 9 | 3 | | 7.1 | Spent 3hrs pumping pit and standby for fixing excavation cave-in. Continued install. Daily Install 20'. Total Install 26'. |
| 28-May-20 | RD 2150 | 3 | 7 | | 7.1 | Continued install till 10:30 when project got shut down due to a safety stand down (standby time). Daily Install 6'. Total Install 51'. |
| 28-May-20 | Allen RD | 3 | 7 | | 7.1 | Continued install till 10:30 when project got shut down due to a safety stand down (standby time). Daily Install 13'. Total Install 80'. |
| 29-May-20 | Allen RD | 8 | 4 | | 7.1 | Help ML dewater pit (Standby time). Complete casing install. Daily Install 40'. Total Install 120'. |
| 1-Jun-20 | RD 2150 | 8 | 2 | | 7.1 | Arrived on site an had to pump out pit (standby time). Set boring machine and continued product pipe installation until complete. Daily Install 120' (product pipe). Total Install 120' (product pipe). |
| 8-Jun-20 | Jackson RD | | 6 | 6 | 7.1 | Still waiting for pit to be completed. Repaired Equipment for half the day |
| 9-Jun-20 | Jackson RD | | 6 | 6 | 7.1 | Still waiting for pit to be completed. Repaired Equipment for half the day |
| 10-Jun-20 | Jackson RD | | 12 | | 7.1 | Still waiting for pit to be completed. Daily Install 0'. Total Install 0'. |
| 11-Jun-20 | Jackson RD | | 12 | | 7.1 | Still waiting for pit to be completed. Daily Install 0'. Total Install 0'. |
| 18-Jun-20 | Hamilton RD | | 10 | | 7.1 | Pit not ready. Daily Install 0'. Total Install 0'. |
| 19-Jun-20 | Hamilton RD | | 10 | | 7.1 | Pit not ready. Daily Install 0'. Total Install 0'. |
| 20-Jun-20 | Hamilton RD | | 10 | | 7.1 | Pit not ready. Daily Install 0'. Total Install 0'. |
| 26-Jun-20 | Missouri RD | 3.5 | 6.5 | | 7.1 | Completed the exit pit and welders cut off the SBU. Waited on approval to push product pipe from 11:30 to end of shift (standby time). Daily Install 0'. Total Install 185'. |
| 2-Jul-20 | Rock Ridge RD | | 10 | | 7.1 | Site not ready. Standby time. |
| 6-Jul-20 | Rock Ridge RD | | 10 | | 7.1 | Waiting on pit. |
| 8-Jul-20 | Nebraska RD | 7 | 4 | | 7.1 | Augered out casing. Wait for ML to complete exit pit (standby time). First product pipe welded. Daily Install 0' (product pipe). Total Install 0' (product pipe). |

| Date | | | | | | Notes |
|---|---|---|---|---|---|---|
| 8-Jul-20 | John Brown RD | 5 | 5 | | 7.1 | Finish moving equipment to site. Pit not complete (standby time). Daily Install 0'. Total Install 0'. |
| 9-Jul-20 | John Brown RD | | 10 | | 7.1 | Pit not complete. Standby time. Daily Install 0'. Total Install 0'. |
| 13-Jul-20 | John Brown RD | 7 | 3 | | 7.1 | Prepared to stuff augers and set casing. Pit shut down due to safety concerns with the shoring (Standby time). Daily Install 0'. Total Install 0'. |
| 14-Jul-20 | John Brown RD | 8 | 2 | | 7.1 | Installed another trench box. 2h delay (Standby time). Start installing casing. Daily install 18'. Total install 18'. |
| 15-Jul-20 | John Brown RD | 8 | 2 | | 7.1 | Continue installing casing all shift. 2h delay because welders refused to rebevel pipe. Welders welded the casing on crooked (Standby time. Pipe would not fit in the machine. Daily Install 37'. Total Install 55'. |
| 16-Jul-20 | John Brown RD | 5 | 5 | | 7.1 | Redo weld from yesterday. 5h delay (standby time). Continue boring. Daily Install 16'. Total Install 50'. |
| 22-Jul-20 | Lavette Terrace RD | 11 | 1 | | 7.1 | Delayed start by 1 hour because crew had to remove debris from road surface (Standby time). Start drilling by 8am. Daily Install 10.5'. Total Install 90.5'. |
| 22-Jul-20 | John Brown RD | 7 | 3 | | 7.1 | Delayed start due to pit flooded. Unsafe to work (Standby time). Cut of SBU head and weld product pipe to casing. Daily Install 0' (product pipe). Total Install 0' (product pipe). |
| 22-Jul-20 | Kingman RD | 6 | 4 | | 7.1 | Unable to get casing from other sites due to rain yesterday (Standby time). Had to move equipment because ML was using dynamite to open ditch. Prep casing for install. Daily install 0'. Total Install ???. |
| 23-Jul-20 | Lavette Terrace RD | 10 | 2 | | 7.1 | Completed casing install and augering. Wait for 2hrs for welders. Weld first product pipe to casing. Daily Install 0' (product pipe). Total Install 0' (product pipe). |
| 23-Jul-20 | John Brown RD | 6 | 4 | | 7.1 | Waiting for welders and coaters for 4hrs (Standby time). Install product pipe for remainder of day. |
| 23-Jul-20 | Kingman RD | 9 | 3 | | 7.1 | Wait for 3hrs for welders (Standby time). Continue drilling. Daily Install 15'. Total install 80'. |
| 24-Jul-20 | Kingman RD | 5 | 5 | | 7.1 | Finished casing install. Waited for welders for rest of shift (Standby time). Daily Install 10'. Total install 90'. |
| 29-Jul-20 | Marshall RD | 5 | 5 | | 7.1 | Move equipment from John Brown to Marshall. Pit not ready (Standby time). Daily Install 0'. Total Install 0'. |
| 30-Jul-20 | Marshall RD | 6.5 | 6.5 | 1.5 | 7.1 | Pit not ready (Standby time). Shift cancelled at 1:30 due to rain. Daily Install 0'. Total Install 0'. |
| 31-Jul-20 | Marshall RD | 10 | 10 | | 7.1 | Minn LTD started excavating launch pit on north side of Marshall Rd. Not ready for us |
| 31-Jul-20 | John Brown RD | | 10 | | 7.1 | Tool box with all crews. Marshall rd is on hold till Minnesota decides what side they want to drill from. Set to collar in casing at lebbett had issues with casing length will collaring first thing tomorrow morning. |
| 1-Aug-20 | Marshall RD | 8 | 8 | | 7.1 | Minn LTD started excavating launch pit on north side of Marshall Rd. Not ready for us (Standby time). |
| 3-Aug-20 | Marshall RD | 4 | 8 | | 7.1 | Waiting for pit to be dug (Standby time). |
| 4-Aug-20 | Marshall RD | 9.5 | 2.5 | | 7.1 | Had to continuously stop and give our excavator to blasting crew, being shut down for blasting (Standby time). |
| 4-Aug-20 | Labette Terrace RD | 6.5 | 3.5 | | 7.1 | Waiting for welders, 10-12 and 12:30-2pm (Standby time). |
| 8-Aug-20 | Neosho Rd | 9 | 1 | | 7.1 | Waited for Minn Ltd. For an hour to come unload product pipe (Standby time). |
| 12-Aug-20 | Missouri RD | 10 | 10 | | 7.1 | Pit full of water, on standby all day |
| 13-Aug-20 | Missouri RD | 2 | 8 | | 7.1 | Dewater bore pit and wait for second excavator to set up equipment (Standby time). |
| 14-Aug-20 | Missouri RD | 9.5 | 0.5 | | 7.1 | Dewater Pit (Standby time). |

| Date | Location | | | Terms & Conditions | Description |
|---|---|---|---|---|---|
| 17-Aug-20 | Missouri RD | 7.5 | 2.5 | 7.1 | Wait for welders (Standby time). |
| 20-Aug-20 | Marshall RD | 8 | 4 | 7.1 | Had to wait on fuel truck to get out of the way, had to shut down multiple times for mat truck to get through, waited on welders (Standby time). |
| 20-Aug-20 | 1650 RD | 6 | 4 | 7.1 | Pumped water out of exit pit at 1650 Rd from 12:30 to 4:30 (Standby time). |
| 21-Aug-20 | Marshall RD | 9 | 3 | 7.1 | Waited on welders 9:50AM-1PM (Standby time). |
| 21-Aug-20 | 1650 RD | | 10 | 7.1 | Pumped water out of exit pit at 1650 Rd from 12:30 to 4:30 (Standby time). |
| 24-Aug-20 | 1650 RD | | 12 | 7.1 | Waiting for Minn. Ltd to move the boring machine to site while tunneling crew dewatering 1650 pits (Standby time). |
| 27-Aug-20 | 1650 RD | | 12 | 7.1 | Nigth shift scheduled but no operator from Minn. Ltd. showed up (Standby time). |

345.5

### Summary

| | Hours | Rate / HR | | Amount |
|---|---|---|---|---|
| | 345.5 | $ | 1,450.00 | $ 500,975.00 |

Total Change Amount   $500,975.00

## IN THE DISTRICT COURT OF FRANKLIN COUNTY, KANSAS

THE HDD COMPANY, INC., an Oregon
Corporation,

                Plaintiff,

v.

MINNESOTA LIMITED, LLC., a Minnesota
Corporation,
**SERVE:**
**National Registered Agents, Inc. of KS**
**112 SW 7th Street, Suite 3C**
**Topeka, KS 66603**

SOUTHERN STAR CENTRAL GAS
PIPELINE, INC., a Delaware Corporation.
4700 Highway 56
Owensboro, KY 42301
**SERVE:**
**National Registered Agents, Inc. of KS**
**112 SW 7th Street, Suite 3C**
**Topeka, KS 66603**

RENE BURES and ANITA BURES
**SERVE:**
**Rene Bures**
**Anita Bures**
**31443 NW Meade Rd.**
**Richmond KS 66080**

RURAL WATER DISTRICT NO. 4
**SERVE:**
**Rural Water District No. 4**
**501 N. Olive St.**
**Garnett, KS 66032**

ANDERSON COUNTY, KANSAS
**SERVE:**
**County Clerk**
**100 E. 4th Ave.**
**Garnett, KS 66032**

JOHN T. RAYNE
**SERVE:**
**John T. Rayne**
**12 Overhill Drive**
**Paola, KS, 66071**

Case No. FR-2021-CV-000016

Petition Pursuant to K.S.A. Chapter 60

PATRICK ARTHUR RAYNE and KELLY
LEE RAYNE FAMILY TRUST under trust
agreement dated April 12, 2016
**SERVE:**
**Patrick Arthur Rayne, Co-Trustee**
**Kelly Lee Rayne, Co-Trustee**
**102 Crestview Dr.**
**Paola, KS 66071**

PICKERT FAMILY TRUST
**SERVE:**
**Keith J. Pickert, co-trustee**
**Mary J. Pickert, co-trustee**
**47890 Deer Trail Dr.**
**Canton Michigan 48187**

LYLE BLACK and CHERYL BLACK
**SERVE:**
**Lyle Black**
**Cheryl Black**
**3159 Neosho Rd.**
**Ottawa, KS 66067**

FARM CREDIT SERVICES, FLCA D/B/A
FRONTIER FARM CREDIT, FLCA
**SERVE: THE CORPORATION**
**COMPANY, INC.**
**112 S.W. 7TH STREET**

**TOPEKA, KS 66603**

AND

OSWEGO COAL COMPANY, INC.
**SERVE: Robert Caylor**
**Oswego Coal Company, Inc.**
**2476 Marshall Rd.**
**Ottawa, KS 66067**

Defendants.

## FILING OF ADDITIONAL EXHIBITS TO PETITION

Plaintiff The HDD Company, Inc., an Oregon Corporation ("HDD"), filed its original

Petition and initial exhibits, the remainder of which exceeded the file size limitations for

2

electronic filing.  Plaintiff attaches herewith Exhibit 6 of 26 as an additional exhibit.  Exhibits 7 through 26 will be included in subsequent filings.

Respectfully submitted,

HUSCH BLACKWELL, LLP

/s/*David B. Raymond*
_____

| David B. Raymond | KS #14004 |
| Michael J. Kelly | KS #25666 |

4801 Main Street, Suite 1000
Kansas City, Missouri 64112
(816) 983-8000 (Phone)
(816) 983-8080 (FAX)
david.raymond@huschblackwell.com
mike.kelly@huschblackwell.com

**ATTORNEYS FOR PLAINTIFF**

HB: 4818-1326-6654.1

# Exhibit 6

Mechanic's Lien No. _____

## STATEMENT FOR MECHANIC'S LIEN

### (K.S.A. §55-208)

| | |
|---|---|
| **AMOUNT OF CLAIM:** | **$5,887.143.28** (exclusive of interest) |

| | |
|---|---|
| **NAME OF LANDOWNERS:**<br>Jobsite and Mailing Address: | **Rene and Anita Bures**<br>31443 NW Meade Rd., Richmond, KS 66080 |
| | **John T. Rayne; Patrick Arthur Rayne and Kelly Lee Rayne Family Trust Under Trust Agreement date April 12, 2016; and Keith J. Pickert and Mary J. Pickert, co-trustee of the Pickert Family Trust u/a/d March 12, 2016** |
| Jobsite Address: | 00000 NW Meade Rd., Garnett, KS 66032 |
| Mailing Address: | John Rayne: 12 Overhill Dr., Paola, KS 66071 |
| | Patrick Arthur Rayne and Kelly Lee Rayne Family Trust: 102 Crestview Dr, Paola KS 66071 |
| | Keith J. Pickert and Mary J. Pickert, co-trustee of the Pickert Family Trust: 47890 Deer Trail Dr Canton, MI 48187 |
| | **Black, Lyle D.; Black, Cheryl K.** |
| Jobsite Address: | 3062 Nebraska Rd., Ottawa, KS 66067 |
| Mailing Address: | 3159 Neosho Rd., Ottawa, KS 66067-8879 |
| Mortgage Holder: | Frontier Farm Credit, FLCA<br>1270 N. 300 Rd.<br>PO Box 858<br>Baldwin City, KS, 66006 |
| | **Oswego Coal Company, Inc.** |
| Jobsite Address: | 3125 Marshall Rd., Ottawa, KS 66067 |
| Mailing Address: | PO Box 368, Ottawa, KS 66067-0368 |

NAME OF PIPELINE OWNER: Southern Star Central Gas Pipeline, Inc., a Delaware
Corporation.
4700 Highway 56
Owensboro, KY 42301

Registered Agent
The Corporation Company, Inc.
112 SW 7th Street Suite 3C
Topeka, KS 66603

NAME OF CONTRACTOR: Minnesota Limited, LLC., a Minnesota Limited
Liability Corporation
18640 200th Street – PO Box 410
Big Lake, MN 55309

Registered Agent
National Registered Agents, Inc. of KS
112 SW 7th Street Suite 3C
Topeka, KS 66603

NAME OF LIEN CLAIMANT: The HDD Company, Inc., an Oregon Corporation.
4525 Serrano Parkway, Office Suite 210
El Dorado Hills, CA 95762

Registered Agent
CT Corporation System
112 SW 7th Street, Suite 3C
Topeka, KS 66603

DESCRIPTION OF
PROPERTY:
ATTACHED HERETO AS **EXHIBIT A** AND
INCORPORATED HEREIN BY THIS REFERENCE,
Southern Star Central Gas Pipeline Project C60266 – 31.5
miles of 36" Pipeline – Line DPA and Launcher and
Receiver located on property commonly known as 31443
NW Meade Rd., Richmond, KS 66080; 00000 NW Meade
Rd., Garnett, KS 66032; 3062 Nebraska Rd, Ottawa, KS
66067 and 3125 Marshall Rd., Ottawa, KS 66067 (the
"Property")

The undersigned, The HDD Company, Inc. ("Lien Claimant"), a subcontractor pursuant to
K.S.A. §55-208, claims a lien upon the Southern Star Central Gas Pipeline ("Pipeline"), on account
of furnishing labor, equipment, and materials for the construction and/or completion of the
Southern Star Central Gas Pipeline Project C60266 ("Project") located in and through Anderson
County, Kansas. The pipeline and the land are described in **Exhibit A**, attached hereto and
incorporated herein by reference. The labor, equipment, and materials supplied by Lien Claimant

were used and consumed in the construction of said Pipeline. Lien Claimant supplied labor, equipment, and materials to the Project as a subcontractor under agreement with Minnesota Limited, L.L.C., the original contractor ("Contractor"), which in turn was under agreement with Southern Star Central Gas Pipeline, Inc., the owner of the Project ("Project Owner").

The aforesaid claim, a reasonably itemized statement of which is attached to this lien statement (**Exhibit B**) and copies of documentation (**Exhibit C**) substantiating the labor, equipment, and materials supplied to the Project Owner by Lien Claimant for improvements upon the Property, is filed in order that it may constitute a lien upon the above-described Pipeline, and every other right, title, and interest in said Pipeline. The amount claimed as owing is FIVE MILLION EIGHT HUNDRED EIGHTY-SEVEN THOUSAND, ONE HUNDRED FORTY-THREE DOLLARS and 28/100 ($5,887,143.28), exclusive of interest.

Lien Claimant last supplied labor, materials, and/or equipment within four (4) months of the date of this lien statement.

WITNESS the hand of said Lien Claimant this 5th day of Jan 2020.

ON BEHALF OF: **The HDD Company, Inc.,** Lien Claimant

By: _____
Jeremy King
Vice President
The HDD Company, Inc.

## VERIFICATION

STATE OF CALIFORNIA )
) ss.
COUNTY OF *El Dorado* )

Jeremy King, of lawful age, being first duly sworn upon his oath, that he is the Vice President and duly authorized representative of The HDD Company, Inc. and is duly authorized to make this verification on its behalf; and does verify under penalty of perjury that the above and foregoing statement is true and correct based on his personal knowledge, and is a just and true account of the demand of and the amount due Lien Claimant.

ON BEHALF OF: **The HDD Company, Inc.,** Lien Claimant

By: _____
Jeremy King
Vice President
The HDD Company, Inc.

STATE OF CALIFORNIA )
) ss.
COUNTY OF )

On this _____ day of _____, 2020, before me appeared Jeremy King, to me personally known, who being by me duly sworn did say that he is the Vice President and duly authorized representative of The HDD Company, Inc., and that he acknowledged that his execution of the foregoing instrument is on behalf of said company.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal in the County and State aforesaid, the day and year first above written.

_____
Notary Public

_____
Printed Name

My Commission Expires:

_____

# ALL-PURPOSE
# CERTIFICATE OF ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the
identity of the individual who signed the document to which this certificate
is attached, and not the truthfulness, accuracy, or validity of that document.

State of California )

County of El Dorado )

On January 5, 2021 before me, Wendy Brooke Notary Public
<sub>(Here enter name and title of the officer)</sub>

personally appeared, Jeremy King
who proved to me on the basis of satisfactory evidence to be the person(s) whose
name(s) is/are subscribed to the within instrument and acknowledged to me that
he/she/they executed the same in his/her/their authorized capacity(ies), and that by
his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of
which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that
the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

*[Seal:]* WENDY BROOKE
COMM. #2319236
Notary Public - California
El Dorado County
Comm. Expires Feb 11, 2024

*[Signature]*
Signature (Seal)

## ADDITIONAL OPTIONAL INFORMATION

DESCRIPTION OF THE ATTACHED DOCUMENT

Statement for Mechanic's Lien
<sub>(Title or description of attached document)</sub>

<sub>(Title or description of attached document continued)</sub>

Number of Pages _____ Document Date _____

CAPACITY CLAIMED BY THE SIGNER
- ☐ Individual (s)
- ☐ Corporate Officer

  _____
  (Title)
- ☐ Partner(s)
- ☐ Attorney-in-Fact
- ☐ Trustee(s)
- ☐ Other _____

## INSTRUCTIONS FOR COMPLETING THIS FORM

*This form complies with current California statutes regarding notary wording and, if needed, should be completed and attached to the document. Acknowledgments from other states may be completed for documents being sent to that state so long as the wording does not require the California notary to violate California notary law.*

- State and County information must be the State and County where the document signer(s) personally appeared before the notary public for acknowledgment.
- Date of notarization must be the date that the signer(s) personally appeared which must also be the same date the acknowledgment is completed.
- The notary public must print his or her name as it appears within his or her commission followed by a comma and then your title (notary public).
- Print the name(s) of document signer(s) who personally appear at the time of notarization.
- Indicate the correct singular or plural forms by crossing off incorrect forms (i.e. he/she/they, is /are ) or circling the correct forms. Failure to correctly indicate this information may lead to rejection of document recording.
- The notary seal impression must be clear and photographically reproducible. Impression must not cover text or lines. If seal impression smudges, re-seal if a sufficient area permits, otherwise complete a different acknowledgment form.
- Signature of the notary public must match the signature on file with the office of the county clerk.
  - ❖ Additional information is not required but could help to ensure this acknowledgment is not misused or attached to a different document.
  - ❖ Indicate title or type of attached document, number of pages and date.
  - ❖ Indicate the capacity claimed by the signer. If the claimed capacity is a corporate officer, indicate the title (i.e. CEO, CFO, Secretary).
- Securely attach this document to the signed document with a staple.

EXHIBIT A

Pipeline: Southern Star Central Gas Pipeline Project C60266 – 31.5 miles of 36" Pipeline – Line
DPA and Launcher and Receiver

31443 NW Meade Rd., Richmond, KS 66080
The South Half (S½) of the Northeast Quarter (NE¼) of Section Thirty-four (34), Township
Nineteen (19), Range Nineteen (19) AND the Southeast Quarter (SE¼) of Section Thirty-four
(34), Township Nineteen (19), Range Nineteen (19), excepting that part of the last described
quarter section lying South of the center of Pottawatomie Creek, and EXCEPT One acre of land
situated in the N. E. 1/4 of Section 34 and the S. E. 1/4 of Section 34 all in Township 19 S.,
Range 19 E., Anderson County, Kansas and being more particularly described as follows:
Commencing at the S. E. corner of the N. E. 1/4 of Section 34, Township 19 S., Range 19 E.,
Anderson County, Kansas; thence N. 0°01'46" E. along the East line of said N. E. 1/4 a distance
of 58.87 ft. to a point; thence N. 89°31'34" W. a distance of 235.50 ft. to a point; thence S.
0°01'46" W. a distance of 61.88 ft. to a point on the N. Line of the S. E. 1/4 Section 34,
Township 19 S., Range 19 E; thence continuing S. 0°0146" W., a distance of 123.09 ft. to a
point; thence S. 89°31'34" E., a distance of 235.50 ft. to a point on the East line of said S. E. 1/4;
thence N. 0°01'46" E. along said East line a distance of 126.10 ft. to the POINT OF
BEGINNING.

00000 NW Meade Rd., Garnett, KS 66032
The Northeast Quarter (NE¼), except 1.52 acres in the northeast corner north of Pottawatomie
River, of Section 3, Township 20 South, Range 19 East of the 6th P.M., Anderson County,
Kansas.

3125 Marshall Rd., Ottawa, KS 66067
All that part of the Southwest Quarter of Section 5, Township 17 South, Range 20 East, in
Franklin County, Kansas, being more particularly described as follows: Commencing at the
Southwest corner of the Southwest Quarter of said Section 5; thence North 87° 40' 17" East,
along the South line of the Southwest Quarter of said Section 5, a distance of 70.01 feet to
the point of beginning; thence North 03° 14' 35" West, along a line 70.00 feet East of and
parallel with the West line of the Southwest Quarter of said Section 5, a distance of 1647.63
feet; thence North 60° 00' 55" East, a distance of 1074.78 feet; thence South 01° 52' 54" East,
a distance of 2146.36 feet to a point on the South line of the Southwest Quarter of said
Section 5; thence South 87° 40' 17" West, along the South line of the Southwest Quarter of
said Section 5, a distance of 908.94 feet to the point of beginning, Franklin County, Kansas.

3062 Nebraska Rd., Ottawa, KS 66067:
The East 1/4 of the Southeast 1/4 of the Northeast 1/4 of Sec. 6, Twp. 17 S., Rng. 20 E., subject
to any part thereof in roads, all in Franklin County, Kansas.
AND
Beginning at the Northwest corner of the Northwest Quarter of Section 5, Township 17 South,
Range 20 East of the 6th P.M., thence South 02° 59' 16" East 680.67feet on the West line of the

Northwest Quarter of said Section 5 to an existing 1/2" iron bar and the true point of beginning of New Tract 2; thence North 88° 18' 09" East 1327.15 feet to the East line of the Northwest Quarter of the Northwest Quarter of said Section 5, being marked with a 1/2" iron bar; thence South 03° 06' 08" East 613.78 feet to the Southeast corner of said Northwest Quarter of the Northwest Quarter of said Section 5, being marked with a 1/2" iron bar; thence South 03° 06' 08" East 659.24 feet to the Southeast corner of the North Half of the Southwest Quarter of the Northwest Quarter of said Section 5, being marked with a 1/2" iron bar; thence South 88° 26' 25" West 1329.76 feet to the Southwest corner of the North Half of the Southwest Quarter of the Northwest Quarter of said Section 5, being marked with an existing 1/2" iron bar; thence North 02° 59' 16" West 661.16 feet to the Southwest corner of the Northwest Quarter of the Northwest Quarter of said Section 5, being marked with an existing 1/2" iron bar; thence North 02° 59' 16" West 608.61 feet to the point of beginning, all in Franklin County, Kansas.

EXHIBIT B

Statement of Account

| | |
|---|---|
| Amount Due Per Agreement: | $6,185,936.00 |
| Delay Expenses: | $159,868.58 |
| Standby Expenses: | $500,975.00 |
| Extraction and Re-Installation | $1,600,392.89 |
| Differing Site Condition Costs | $555,000.00 |
| Retainage Withheld: | $599,640.00 |
| Less Payments Made: | $3,115,029.19 |
| Total Amounts Due and Owing: | $5,887,143.28 |

EXHIBIT C

C1: Subcontract Agreement
C2: Delay Summaries
C3: Standby Expense Summary
C4: Day Shift and Night Shift Summaries
C5: Addendum 4

(Attached hereto)

# EXHIBIT A



**MINNESOTA LIMITED**
AN NVERSE COMPANY

<center>

**Subcontractor Agreement**
No. SR1916169002

</center>

This agreement is made at Big Lake, MN this day of ___January 17, 2020___ .

**BETWEEN:**

Minnesota Limited, LLC (Contractor)
18640 200ᵗʰ Street – PO Box 410
Big Lake, MN 55309

**AND:**

THE HDD COMPANY(Subcontractor)
4525 SERRANO PARKWAY, OFFICE SUITE 210
EL DORADO HILLS, CA 95762

**RECITALS**

Contractor ("Minnesota Limited, LLC) has entered into a contract (the "Prime Contract") with Southern Star Central Gas Pipeline, Inc. ("Owner") to perform certain labor and furnish certain materials for completion of the construction project KS - C60206 Install 31.5 miles of 36" (the "Project"). Subcontractor desires to perform certain services and/or provide certain materials as a subcontractor of Contractor pursuant to the terms and conditions of the Prime Contract and agrees to the terms and conditions of this Agreement.

**AGREEMENT**

In consideration of the mutual covenants contained herein, the parties agree as follows:

I.  Subcontractor agrees to supply all the materials and labor and pay all license fees, permits and expenses for the work located at __Various Sites__ (the "Site"). As full compensation for performance of this Agreement and subject to all applicable provisions of this Agreement, Contractor agrees to pay Subcontractor:
six million one-hundred eight-five thousand nine-hundred thirty six dollars ($6,185,936.00_____ )

II.  **Contract Document.** Subcontractor's performance hereunder shall be subject to all terms and conditions contained in the Prime Contract and all drawings and/or specifications referred to therein (the "Contract Documents") except as such terms may be specifically amended by this Agreement, which includes HDD's Proposal, attached hereto and incorporated herein. Wherever the Contract Documents shall refer to the Contractor or its agents, the same shall be read to refer to the Subcontractor under this agreement. Subcontractor shall perform and coordinate its work hereunder in a manner necessary to assure the prompt and timely completion of the Project, time being of the essence to the

</center>



Agreement. At Subcontractor's request, a copy of the applicable Prime Contract Terms and Conditions will be supplied to Subcontractor.

Any terms and conditions proposed in Subcontractor's acceptance of or in any acknowledgement, invoice, or other form of Subcontractor that add to, vary from, or conflict with these terms hereby objected to. Any such proposed terms shall be void and these terms and conditions (1) shall constitute the complete and exclusive statement of the terms and conditions of the contract between the parties and (2) may be modified only by written instrument executed by the authorized representatives of both parties.

III.    Insurance.  Subcontractor shall comply with the insurance requirements set forth in Exhibit A (attached).

IV.    Additional Terms and Conditions

    A.  Subcontractor, not Contractor, assumes all the risk related to in performing its work under this Agreement, such as any injuries to Subcontractor, Subcontractor's workers, Facility employees and members of the public arising from the Subcontractors activities or use of tools and equipment, or from any other cause.

    B.  Subcontractor will complete all work in a workmanlike and professional manner according to standard practices in the building trade, and in compliance with all building codes and other applicable laws. Subcontractor will warrant against defects in material and labor it supplies for the completion of the work. If subcontractor fails to perform under this Agreement, the party entitled to performance or the Contractor will have the right to hire other persons to correct the defective Work and hold Subcontractor liable for the costs thereof including costs, disbursements and reasonable attorneys' fees incurred in the enforcement of this provision.

    C.  All Work will be done on a timely basis. The work to be performed under this contract shall be commenced as directed by Project Manager or Project Superintendent or Project Foreman and shall be substantially completed on or before   as agreed upon and directed onsite                     .  Time is of the essence.

    D.  Subcontractor shall indemnify, defend and hold harmless Contractor as set forth in Section VII.

    E.  No work shall be subcontracted or assigned by Subcontractor without the prior written approval of the Contractor.

    F.  Environmental, Health and Safety. Subcontractor shall take all necessary precautions to keep the work site free from hazards that are likely to cause injury, illness, or death or damage to property. Subcontractor shall provide any Safety Data Sheets (SDS) for any hazardous chemicals provided pursuant to this contract. Contractor is a company that operates under a "Culture of Safety" with the goal of zero incidents, and expects its subcontractor to similarly emphasize the paramount importance of safe behavior. Failure to abide by Contractor's policies may result in immediate removal of Subcontractor from the premises and will be a breach of Subcontractor's obligations hereunder.



Contractor shall have the right, at its option, to conduct a complete audit of Subcontractor's documents and practices to verify Subcontractor's compliance with this Section.

G.  Minnesota Limited has enacted a Subcontractor Management Program and Safety Requirements of which Subcontractor has received. Subcontractor shall follow and adhere to all aspects of said program and the terms and conditions of such program are incorporated herein.

H.  Liens. To the fullest extent permitted by law, and the extent the Contractors has paid the Subcontractor, Subcontractor will at all times keep the Project, the Site and each part thereof free from any attachment, lien, claim of lien, or other encumbrance arising out of the Work and Subcontractor will indemnify, defend and hold Contractor harmless from and against all claims, losses, demands, causes of action or expenses (including attorneys' fees and other costs of defense incurred by Contractor in defending against the foregoing or in enforcing this indemnity and defense obligation) of whatever nature, arising by reason of any such lien, claim of lien, attachment or encumbrance. If any claim is filed to enforce any laborers, material men, mechanic's, or other similar lien arising out of or relating to the Work for which Contractor has paid the Subcontractor, Subcontractor will immediately cause such lien to be released and discharged and if Subcontractor fails to do so, then Contractor will have a right to pay all sums, including attorneys' fees and other costs and expenses incurred necessary to obtain such release and discharge, and hold Subcontractor liable for the amount thereof with the right to deduct all or a portion of such sum from accounts that may be due Subcontractor.

I.  Default. In addition to the other remedies available under law: (a) if Subcontractor should fail or refuse, except in cases where extension of time is provided, to supply enough properly skilled workers or proper materials for the Work; or (b) if Subcontractor should fail to make payment to its subcontractors for material or labor which are due to its Subcontractors, or (c) if Subcontractor should fail to keep and comply with any of the terms and provisions of this Agreement, or (d) if Subcontractor should be adjudged bankrupt, file or suffer to be filed a petition for relief under the Bankruptcy Act, or make a general assignment for the benefit of the creditors; or (e) if a receiver should be appointed on account of Subcontractor's insolvency; or (f) if Subcontractor fails to pay its employees' wages, benefits or tax withholdings; then, in any such event, Contractor may without prejudice to any other right or remedy and after giving Subcontractor and its surety, if any, upon twenty-four hours written notice, terminate its obligation to Subcontractor under this Agreement and take possession of the Site and complete (or cause to be completed) the Work by whatever method Contractor may deem expedient. In such case Subcontractor will not be entitled to receive any further payment until the Work is completed. Upon completion of the Work, Contractor will pay to Subcontractor an amount equal to (x) the unpaid portion of the Subcontract Amount attributable to the Work performed up to the termination less (y) the amount by which (i) the costs incurred by Contractor to complete the Work, including, without limitation, costs for architectural, managerial and administrative services and reasonable attorneys' fees, if legal counsel is employed, exceed (ii) the portion of the Subcontract Amount attributable to the balance of the Work yet to be performed at the time of termination. If the amount calculated under part (y) in the preceding sentence exceeds the amount owing under part (x), the Subcontractor will pay the difference to Contractor. If the amount in part (x) exceeds the amount in part (y), Contractor will pay the difference to Subcontractor.



J.     Subcontractor is an independent Subcontractor and is not an employee or agent of the Contractor and neither Subcontractor nor anyone employed by Subcontractor will be deemed for any purpose to be the agent, employee, servant or representative of Contractor in the performance of the Work. Subcontractor acknowledges and agrees that Contractor will have no direction or control over the means, methods, procedures or manner of the Work performed by Subcontractor or any of its subcontractors, or any of their employees, vendors or suppliers.

K.     No changes shall be made in the work proposed or in the price unless those changes are agreed to in writing by both Subcontractor and Contractor. Travis Gehr and / or __James Redmond_____, shall be the Contractor's designated on site agent, If there is a dispute regarding whether the work is a change, Subcontractor may perform that work under protest and submit a claim to Contractor in accordance with this Agreement.

L.     Clean Up.  Subcontractor will at all times keep the site or facility safe and free from the accumulation of waste materials or rubbish caused by its operations or related to the Work. Upon completion of the Work and each portion thereof, Subcontractor will remove all rubbish and waste produced by its operations or Work hereunder from the facility as well as all of its tools, equipment, machinery and surplus materials no longer needed and leave the site or facility in a "broom clean" or equivalent condition and safe for Subcontractor's employees and subsequent subcontractors to perform their work, unless otherwise specified in writing. If Subcontractor fails to clean up, Contractor may do so after written notice to Subcontractor and the cost thereof will be charged to Subcontractor.

V    **Representations of Subcontractor.**  Subcontractor represents and warrants the following:

A.     Subcontractor has examined the Agreement ("Prime Contract") between Owner and Minnesota Limited (if requested by the Subcontractor prior to the execution of the work) and agrees to all provisions affecting Subcontractors performance, including but not limited to the representations, obligations and warranties made by Minnesota Limited to the Owner.

B.     Subcontractor has the requisite authority and ability to perform the subcontract without delay.

C.     Subcontractor will not assign, subcontract or otherwise delegate its responsibilities and obligation hereunder without the written consent of Contractor.

D.     Subcontractor shall examined the specifications, site conditions, drawings and requirements of the work with due diligence and its bid has taken into consideration all conditions and risks which are reasonably related to the performance of the work.

E.     Ethics; Conflict of Interest.  Subcontractor shall at all times during the performance of its obligations hereunder conform to sound ethical business practices in conformance with all applicable Laws and shall in its business practices promote the values of honesty, integrity, social responsibility, and human rights.  Subcontractor shall not offer to any member of Contractor (including employees thereof) any gifts, entertainment, or other favors beyond the common courtesy usually associated with business practices.  Subcontractor shall not pay any commissions or fees or grant any rebates or other



remuneration or monetary gratuity to any employee of Contractor. Subcontractor shall not grant any secret rebates nor pay any commissions or fees to any employee of Contractor.

F.    Invitees Prohibited. Subcontractor shall not, without prior written permission of Contractor, invite, permit entry or bring any Person onto the Contractor's Worksite or property who is not an employee of Subcontractor

G.    Subcontractor will pay its employees promptly and maintain good labor relations. Subcontractor further represents that it has paid all union benefit contributions including fringe benefits. Subcontractor agrees that Contractor upon demand of the Labor Union, may withhold from any sums due Subcontractor and pay to the Administrator of the Plan any amounts owing and said payment shall be deducted from the invoice.

VI.    Warranty.

A.    Subcontractor warrants to the Contractor and Owner that all materials and equipment furnished under this Agreement will be new unless otherwise specified in writing, and that all work will be of good quality, free from faults and defects and in conformance with any Purchase Order and attachments thereto, including any specifications stipulated therein. All Work not so conforming to these standards may be considered defective, and the Subcontractor shall promptly repair and make good, after notice by the Contractor and Owner and without cost to the Contractor and Owner, any damages, defects or faults resulting from imperfect or defective Work done or materials furnished by the Subcontractor. The Subcontractor warrants that all labor, materials and equipment furnished under this Agreement shall be covered by warranty for a period of at least two (2) years (or during a longer period if required by the specifications and stipulated therein) from the date of acceptance of the completed Work by the Owner.

B.    Where material or equipment furnished by the Subcontractor is covered by a manufacturer's warranty or guarantee or other special warranty or guarantee the Subcontractor shall provide such warranty and provide additional or extended warranty or guarantees to the Contractor for its labor, materials and equipment to confirm to paragraph A above.

VII.    Indemnification. To the fullest extent permitted by law, the Subcontractor shall indemnify the Owner, Contractor and the agents and employees of any of them from and against claims, damages, losses and expenses, arising out of or in connection with, or resulting from the negligent performance of the Subcontractor's work, the Subcontractor's subcontractors work, or anyone directly or indirectly employed by them but only to the extent caused by acts or omissions by either or any of them. In addition thereto, Subcontractor indemnifies Owner, Contractor and the agents and employees of any of them for expenses including attorney's fees and costs, incurred in responding to and defending against any claim or in enforcing this provision.

VIII.    Payment. Subcontractor shall invoice Minnesota Limited no later than 30 days after date of service Contractor agrees to pay Subcontractor all sums due less ____10____% retainage (if applicable) hereunder within

SR1916169O02



thirty (30) days from the date the invoice is received. However, it is a condition precedent to payment that if Owner withholds payments for that portion of any work performed by Subcontractor, then Minnesota Limited is only obligated to pay Subcontractor after receiving payment from the Owner. In such event payment will be made within ten (10) days. Contractor reserves the right to withhold such sums as may be necessary to pay expenses, including costs and attorney's fees, caused by, or related to, Subcontractor's breach of Agreement. Final payment of retainage will occur ten (10) days after final payment for Subcontractor's work is received and when lien waivers and job completion affidavit are executed.

IX.    **Maintaining Records / Audit.** For a period of five (5) years from final acceptance of Subcontractor's work, Subcontractor shall maintain all job records and shall, upon reasonable notice by Contractor, but no later than 10 business days, make such records available for inspection by Contractor or Owner. Contractor or Owner or their representatives may audit said records. If the results of the audit show an overpayment, Subcontractor shall reimburse the overpayment together with interest of 1% per month. If the audit shows an overpayment more than one thousand dollars ($1,000), Subcontractor shall also reimburse Contractor or Company for the cost of the audit.

X.    **Interpretations and Enforcement.** The Agreement and contract documentation contains the parties entire understanding with regard to the subject hereof and shall not be modified except by a writing signed by both parties; provided, however, that Subcontractor shall be bound by changes in the Contract Documents agreed to between the Contractor and Owner, but only if Contractor has timely notified Subcontractor of such changes. The interpretation and enforcement of this Agreement shall be governed by the laws of the state in which the work hereunder is to be performed or that specified in the Prime Contract if different than the state where the work is to be performed. If any provision hereof is deemed unenforceable, the remainder of the Agreement shall be enforced as though such provision were not a part hereof.

XI.    **Assignment.** Subcontractor shall not assign or subcontract this Agreement or any portion thereof or of any money due or which may become due hereunder without the prior written consent of Contractor. Notwithstanding anything to the contrary contained herein, Contractor may assign this Agreement without the consent of Subcontractor.

XII.    **Confidentiality of Agreement.** The Subcontractor agrees that all terms and conditions contained herein or in any other document(s) referencing the Project shall remain confidential. Said terms shall not be disclosed without the express written consent of the Contractor.

Minnesota Limited is required to protect all technical information supplied by the Owner. Subcontractor agrees that this Section is its written assurance that all such information, including but not limited to: drawings, diagrams, surveys, specifications, locations, and geophysical (GPS) coordinates of the work, will be kept confidential, protected, and will not be disclosed to third parties without obtaining Minnesota Limited's written consent unless ordered to do so by a court of law or arbitrator.. Breach of is provision will subject Subcontractor to all remedies awarded to Contractor and Owner including injunctive relief. Subcontractor agrees to pay all of Contractors and Owners attorney's fees in enforcing this provision.



XII.    **Notice.** Unless otherwise provided herein, any notice provided for herein will be in writing and delivered to the parties (a) in person, (b) by facsimile transmission (with the original and a copy of the facsimile confirmation following in the United States mail), (c) by overnight delivery service, or (d) by certified mail, return receipt requested. Notice will go to the address first shown herein for the respective party to whom notice is given or to such other address as may be designated by either party by written notice given pursuant hereto.

XIV.    **Governing Law/Venue/Attorney Fees.** This Agreement shall be construed and interpreted in accordance with the laws of the State of Minnesota, including, without limitation, matters of construction, validity, enforcement, and interpretation. The parties agree that venue for any dispute under this Agreement shall be in the District Court of Hennepin County, Minnesota. In the event any enforcement effort is initiated by Contractor against Subcontractor for default of this Agreement, Subcontractor shall be liable to Contractor for any and all costs of collection, including but not limited to, reasonable attorneys' and professional fees, court costs, traveling and lodging expenses, costs of investigation and defense, accrued interest, and any other reasonable expenses incurred by Contractor in initiating such efforts.

Signed the day and year first written above.


CONTRACTOR:  Minnesota Limited, LLC.

By: _____

Its: _____
            Title


SUBCONTRACTOR: THE HDD COMPANY

By: _____

Its:  _Vice President_____
            Title



## EXHIBIT A
### Insurance

Prior to commencing Work, Subcontractor shall, at its sole expense, procure and maintain insurance of the types, and in the form and amounts described below from insurer(s) authorized to transact business in the state where Work or operations will be performed by Subcontractor. Such insurance and required coverage in forms acceptable to General Contractor shall be placed with admitted insurers that maintain an A.M. Best's rating of not less than A- VII, unless otherwise approved by the General Contractor. The insurance requirements described below shall be maintained uninterrupted for the duration of the Project, including any warranty periods, and shall protect Subcontractor, and others for whom and/or to whom Subcontractor may be liable, for liabilities in connection with work performed by or on behalf of Subcontractor, its agents, representatives, employees or subcontractors.

### Insurance Requirements:

1.      **Commercial General and Umbrella Liability Insurance.** Subcontractor shall maintain commercial general liability ("CGL") and, if necessary, commercial umbrella insurance, with a limit of not less than $ 2,000,000.00 _____ per occurrence, bodily injury or property damage liability; $ 2,000,000.00 _____ per offense, personal and advertising injury liability; $___5,000,000.00_____ products-completed operations aggregate; and $___5,000,000.00_____ general aggregate applicable to claims other than products-completed operations.    To the extent that Subcontractor's CGL and any commercial umbrella insurance are subject to aggregate limits, the policy shall be endorsed so as to apply such aggregate limits separately to the Project.

Coverage afforded under Subcontractor's CGL and any commercial umbrella insurance shall be provided on an occurrence basis and shall be subject to the terms of the *Insurance Services Office ("ISO") Commercial General Liability Coverage Form CG 0001*, or a substitute form providing coverage at least as broad as the ISO form specified. There shall be no limitations or exclusions of coverage beyond those contained in the standard coverage form and coverage shall include liability arising from premises, operations, independent contractors, products-completed operations including construction defect, contractual liability or personal injury and advertising injury.

General Contractor, its officers, directors and employees and Project Owner(s) shall be included as additional insureds under Subcontractor's CGL, and any commercial umbrella insurance, with respect to liabilities arising out of both the ongoing and completed operations of Subcontractor. Such additional insured coverage shall be subject to the terms of ISO additional insured endorsement forms CG 2010 (ongoing operations) and form CG 2037 (products-completed operations), or substitute form(s) providing equivalent coverage. The edition date of the ISO endorsements required should be chosen based on the recipient's risk transfer objectives. The table below summarizes the options and major differences between the edition dates.

| Endorsement(s) | ISO Edition Date | Comments |
|---|---|---|
| CG 2010 | 11/85 Edition | Broadest Insuring Agreement - "liability arising out of" the Subcontractor's work – both ongoing |



| | | operations and completed operations coverage provided by one endorsement. |
|---|---|---|
| CG 2010/CG2037 | 10/01 Edition | Same Insuring Agreement as 11/85 with ongoing operations and completed operations coverage provided by separate endorsements. |
| CG 2010/CG2037 | 07/04 Edition | More narrow Insuring Agreement – "caused in whole or in party by. . . .acts or omissions" of the Subcontractor. |
| CG2010/CG2037 | 04/13 Edition | Same Insuring Agreement as 07/04, but limits coverage to "extent permitted by law" and "not be broader than that which you are required by the contract or agreement to provide." |

Note: Recommended Additional Insured endorsement for states other than Minnesota may vary and Willis should be consulted. States including but not limited to IL, TX, & CA involve unique risk transfer considerations.

Additional insured coverage afforded by Subcontractors CGL, and any commercial umbrella insurance, shall be primary and non-contributing with respect to any insurance or self-insurance available to General Contractor or Project Owner. Such primary and non-contributory insurance shall be subject to the terms of ISO form CG 2001 (Primary and Noncontributory - Other Insurance Condition) or its equivalent. Any other insurance or self-insurance maintained by General Contractor or Project owner shall be excess of, and non-contributory with, the coverage afforded by Subcontractors CGL and commercial umbrella insurance, if any.

In addition to procuring and maintaining CGL, and any commercial umbrella insurance, for the duration of the contract, Subcontractor agrees to continue to procure and maintain the products-completed operations liability insurance coverage for a minimum of __two__ ( _2_ ) year(s) after the date that the Work is substantially complete. All terms and conditions of such coverage shall be maintained during this completed operations period, including the required coverage limits and the requirement to provide General Contractor and Project Owner with coverage as an additional insured for completed operations.

2. **Commercial Automobile and Umbrella Liability Insurance.** Subcontractor shall maintain automobile liability and, if necessary, commercial umbrella insurance, with a limit of not less than $ _2,000,000.00_ each accident. Such insurance shall cover liability for bodily injury and property damage arising from the use or operation of any auto, including those owned, hired or otherwise operated or used by or on behalf of Subcontractor. The coverage shall be subject to the terms of ISO *Business Auto Coverage Form CA 0001* (1990 edition or later), or a substitute form providing equivalent coverage.

3. **Workers' Compensation and Employers Liability Insurance.** Subcontractor shall maintain workers' compensation coverage providing statutory benefits. Subcontractor shall additionally maintain employers liability insurance, and if necessary, commercial umbrella insurance, with a limit of not less than: $1,000,000, bodily injury by accident – each accident; $1,000,000, bodily injury by disease-policy limit; and $1,000,000, bodily injury by disease each employee. Workers' Compensation coverage must extend to every



employee, including owners/officers of a closely held corporation and/or individuals operating as a sole proprietorship or partnership. <u>Workers' Compensation must provide coverage in the state where the Project is located</u>.

Where applicable, evidence of coverage shall be required for U.S. Longshore and Harbor Workers Compensation, Maritime coverage, Federal Employer's Liability Act and other unique exposures requiring endorsement of coverage.

4. **Contractors Pollution Liability Insurance**. Required only if Subcontractor's scope of services include the remediation, treatment, storage or disposal of waste or hazardous materials on or about the project site, as determined by General Contractor. If required, Subcontractor shall maintain Contractors Pollution Liability coverage with a limit of not less than $ _____ n/a _____ per occurrence, $ _____ n/a _____ annual aggregate. Coverage shall apply to the scope of work as described under the Contract including transportation and shall include coverage for bodily injury; property damage, including loss of use of damaged property or property that has not been physically injured; clean-up costs; mold; defense and investigative costs. Subcontractor shall maintain Completed Operations coverage for _____ n/a _____ years following final acceptance of the project or termination of the Contract.

If the scope of services in the contract require the Subcontractor to provide professional services associated with arranging for, or brokering of, hazardous material or construction and demolition (C&D) wastes off the job site, Subcontractor must amend the Contractors Pollution Liability policy to include coverage to address this scope of work. If any of the aforementioned insurance policies are written on a claims made basis, the Contractor warrants that continuous coverage will be maintained, or an extended discovery period will be exercised, for a period of three years beginning from the time the work under this contract is completed.

5. **Pollution (Environmental) Liability Insurance**. Required only if Subcontractor's scope of services involves disposal of waste or hazardous materials off-site, as determined by General Contractor. If required, Subcontractor shall maintain pollution (environmental) liability coverage with a limit of not less than: $ _____ n/a _____ per incident, $ _____ n/a _____ policy aggregate for hazardous waste disposal services, and $ _____ n/a _____ per incident, $ _____ n/a _____ for all other disposal facilities. Such coverage shall include clean-up costs, defense costs and products and completed operations.

If the scope of services in the contract requires the disposal of any hazardous materials or construction and demolition (C&D) wastes off the job site, Subcontractor must also obtain evidence that the Disposal Site Operator maintains Pollution Legal Liability Insurance with coverage for: a. bodily injury, sickness, disease, mental anguish or shock sustained by any person, including death; b. property damage including physical injury to or destruction of tangible property including the resulting loss of use thereof, clean-up costs, and the loss of use of tangible property that has not been physically injured or destroyed; c. defense including costs, charges and expenses incurred in the investigation, adjustment or defense of claims for such compensatory damages. d. pollution conditions on, at, under or emanating from any disposal site, location or facility, used by or on behalf of the disposal facility of any waste or waste materials relating to the performance of the work.



The Disposal Site Operator's Pollution Liability Policy will apply to losses arising from the facility that is accepting the waste under the contract. Minimum limits of Insurance for this policy shall be $_____n/a_____ each incident / $_____n/a_____ policy aggregate.

Claims-made coverage is permitted, provided the policy retroactive date is continuously maintained prior to the commencement date of the agreement, and coverage is continuously maintained during all periods in which Subcontractor accepts or treats waste generated from General Contractor's projects and for a period of one (1) year thereafter.

6.      **Professional Liability Insurance**. Required only if Subcontractor's scope of services include architectural, engineering, professional consulting or construction management, as determined by General Contractor. If required, Subcontractor shall maintain professional liability coverage with a limit of not less than $_____n/a_____ each wrongful act, $_____n/a_____ policy aggregate.

Coverage shall include liability arising from the errors, omissions or acts of the Subcontractor or any entity for which the Subcontractor is legally responsible in the providing of professional services under the Contract. Throughout the term the Contract, the PL/E&O policy shall include full prior acts coverage. Coverage shall be continuously maintained during the term of this Agreement and for a period of x years following final acceptance of the Project or termination of the Contract.

Coverage shall not include any exclusion or other limitations related to:
- Scope of the professional services
- Delays in project completion and cost overruns
- Who is authorized to notify the carrier of a claim or potential claim
- Mold, fungus, asbestos, pollutants or other hazardous substances

Claims-made coverage is permitted, provided the policy retroactive date is continuously maintained prior to the commencement date of this agreement, and coverage is continuously maintained during all periods in which Subcontractor performs professional services for General Contractor, and for an additional period of one (1) year after termination of this agreement or the last date such services are performed, whichever comes later. If Subcontractor's scope of work includes environmental engineering or consulting, the terms of coverage shall not exclude environmental professional services.

7.      **Watercraft Liability Insurance**. If watercraft of any kind is used by the CONTRACTOR or Subcontractor, including: (i) bodily injury; (ii) property damage; and (iii) passenger liability.

     a.     Limit of Liability: Combined Single Limit (Bodily Injury and Property Damage), $1,000,000 each occurrence;

     b.     Protection and Indemnity Insurance to include Jones Act crew coverage (or at least Maritime Employer's Liability: MEL), collision, tower's liability and wreck removal coverage, on a form providing



coverage no less extensive than that afforded in the P & I SP-23 form (revised 1/56), including a pollution buy-back endorsement.

8. **Aircraft Liability Insurance.** If aircraft of any kind is used by the CONTRACTOR or Subcontractor, including: (i) bodily injury; (ii) property damage; and (iii) passenger liability.

    a. Limit of Liability: Combined Single Limit (Bodily Injury and Property Damage and Passenger Liability), including hull physical damage insurance for the full replacement cost of each aircraft used in the work. Such Aircraft Liability and Hull Coverage shall include a waiver of subrogation against General Contractor and all others required by this Agreement to be additional insureds. $ ___n/a___ per seat; $ ___n/a___ per occurrence

### Additional Provisions:

1. **Deductibles and Self-Insured Retentions.** The funding of deductibles and self-insured retentions maintained by Subcontractor shall be the sole responsibility of Subcontractor, including any amounts applicable to deductibles or self-insured retentions applicable to claims involving the General Contractor or Owner as an additional insured. Any self-insured retentions in excess of $ ___n/a___ must be declared to and approved by the General Contractor.

2. **Primary / Non-Contributing.** Subcontractor's required insurance coverage shall be primary insurance, and any insurance or self-insurance maintained by the General Contractor or Project Owner shall be excess of and noncontributory with Subcontractor's insurance.

3. **Severability of Interest.** Except with respect to the limits of insurance, Subcontractor's required insurance shall apply separately to each insured or additional insured.

4. **Waiver of Subrogation.** Subcontractor agrees to waive all rights of subrogation against the General Contractor, Project Owner and Project Architect, and shall cause each of its subcontractors to waive all rights of subrogation against the General Contractor, Project Owner and Project Architect, their agents and employees, as respects loss, damage, claims, suits or demands, howsoever caused:

    a. To real or personal property, vehicles, equipment, tools, etc. owned, leased or used by Subcontractor or Subcontractor's employees, agents or sub-subcontractors; and

    b. To the extent such loss, damage, claims, suits or demands are, or should be, afforded coverage by the Subcontractor's required insurance or any other insurance (except professional liability to which this requirement does not apply) maintained by the Subcontractor. This waiver shall C1PPIY to all first party property, equipment, vehicle and workers' compensation claims (unless prohibited under applicable state statutes), and all third party liability claims. This waiver shall apply to all deductibles, retentions or self-insured layers applicable to the required or any other insurance (except professional liability to which this requirement does not apply) maintained by the Subcontractor. If necessary, Subcontractor agrees to endorse the required insurance policies to permit waivers of subrogation in



favor of General Contractor, Project Owner and Project Architect as required hereunder. Subcontractor further agrees to hold harmless and indemnify General Contractor, Project Owner and Project Architect for any loss or expense incurred as a result of Subcontractor's failure to obtain such waivers of subrogation from the insurers.

5.	**Notice of Cancellation / Material Change / Nonrenewal.** Subcontractor's insurance policies must contain a provision or endorsement that the coverage afforded will not be canceled, materially changed or renewal refused until at least 30 days prior Written Notice has been given to General Contractor and to each other additional insured to whom a certificate of insurance has been issued; provided, however, that a ten (10) day prior notice requirement may apply in the event of cancellation due to nonpayment of premium.

6.	**Verification of Coverage.** Prior to commencing Work, Subcontractor shall furnish General Contractor with certificate(s) of insurance executed by a duly authorized representative of each insurer, as evidence of compliance with the insurance requirements set forth above  Such certificates of insurance shall be accompanied by copies of endorsements evidencing coverage afforded to General Contractor and Project Owner as additional insured, and endorsements reflecting insurer's concurrence with Subcontractor's waiver of subrogation rights against General Contractor, Project Owner and Project Architect.  Renewal certificates are to be provided to the General Contractor prior to the expiration of the required insurance policies.
Certified copies of policies, including all policy endorsements, shall be furnished by Subcontractor within 15 days of written request by General Contractor.

The certificate(s) of insurance shall be subject to approval of General Contractor, but failure of General Contractor to request such certificate or other evidence of Subcontractor compliance with insurance requirements, or failure of General Contractor to identify deficiencies from evidence that is provided, shall in no way limit or relieve Subcontractor of its obligations to maintain such insurance.

7.	**Sub-Subcontractors.** No work shall be sublet to any Sub-subcontractor without first obtaining the General Contractor's written permission. All Sub-subcontractors, once approved by the General Contractor, are subject to the same insurance requirements as Subcontractor.  Subcontractor shall cause each Sub-subcontractor employed by Subcontractor to purchase and maintain such insurance.  Upon request, Subcontractor shall furnish General Contractor with copies of certificates of insurance evidencing coverage for each Sub-subcontractor.

Subcontractor shall voluntarily provide workers compensation coverage for proprietors, partners or others not statutorily required to maintain workers' compensation insurance.

8.	**Leased Employees.** Use of leased employees by Subcontractor is expressly prohibited without General Contractor's written permission.  If permitted by General Contractor, Subcontractor shall:

	a.	Provide General Contractor with a complete copy of its Agreement with the Leasing Company;



b.    Require that Leasing Company provide workers' compensation, employers liability and commercial general liability with coverage limits in amounts no less than Subcontractor insurance requirements for the same coverages.

c.    Require that Leasing Company provide Alternate Employer Endorsement naming General Contractor as alternate employer on Leasing Company's workers' compensation policy.

d.    Require that Leasing Company add General Contractor as an additional insured on its commercial general liability insurance policy, with primary/non-contributory wording.

e.    Require that Leasing Company provide waiver of subrogation in favor of General Contractor on both Leasing Company's workers' compensation and commercial general liability insurance policies.

f.    Provide General Contractor with a copy of the Leasing Company's certificate of insurance, with endorsements, evidencing the required coverage.

9.    **No Representation of Coverage Adequacy.**  In specifying minimum Subcontractor insurance requirements, General Contractor does not represent that such insurance is adequate to protect Subcontractor for loss, damage or liability arising from its work.  Subcontractor is solely responsible to inform itself of types or amounts of insurance it may need beyond these requirements to protect itself.

The insurance requirements set forth in minimum amounts shall not be construed to relieve Subcontractor for liability in excess of such coverage, nor shall it preclude General Contractor from taking such other actions as is available to it under any other provision of the Subcontract.  To the extent Subcontractor maintains insurance greater than these minimum requirements, Subcontractor agrees that such insurance shall be applicable to any of Subcontractor's liability obligations hereunder.

Any acceptance of certificates of insurance by General Contractor shall in no way limit or relieve Subcontractor of its duties and responsibilities under this Subcontract, including the duty to indemnify and hold harmless General Contractor.

10.    **Compliance.**  Failure of Subcontractor to maintain the required insurance shall constitute a default under this Subcontract and, at General Contractor's option, shall allow General Contractor to terminate this Subcontract for cause, withhold payment and/or purchase the required insurance at Subcontractor's expense.

11.    **Cross-Liability Coverage/Non-Standard Restrictive Endorsements.**    All liability policies shall include cross liability coverage and a standard ISO separation of insureds provision, or its equivalent.  No liability policy shall include or be endorsed to include any non-standard provisions restricting coverage for the named insured or the persons/entities required to be named as additional insureds under this Agreement, including but not limited to cross liability coverage exclusions or limitations.



January 9, 2020

**Minnesota Limited**
18640 200th St, PO Box 410
Big Lake, MN 55309

ATTN: Amy Skuza

RE:   Southern Star Lines DT and DS Replacement Project
      Directionally drill and install approximately 6,052 feet of 36-inch steel pipeline in
      Anderson and Franklin Counties, KS.

The HDD Company is pleased to submit the following bid quote:

1.   **Responsibilities of The HDD Company**
     1.1.   Provide all required insurance certificates.
     1.2.   Provide any written submittals and qualifications required.
     1.3.   Provide 2 (two) drill rig(s) with sufficient capabilities to install the crossings, a
            closed-loop mud system, mud pumps, vacuum trucks, dump trucks, steering
            system, and all drill spread support equipment necessary.
     1.4.   Provide all required union labor for the drilling operations.
     1.5.   Provide preliminary drill profiles for each crossing.
     1.6.   Provide final as-built drawings.
     1.7.   Provide and haul water for drilling operations.
     1.8.   Provide water storage for the duration of drilling operations.
     1.9.   Provide all required pulling heads.
     1.10.  Leave the entry areas clean, free of debris, and to a rough grade.
     1.11.  Provide bonding at 1%, which is not included in the bid pricing below.

2.   **Responsibilities of THE CONTRACTOR**
     2.1.   Stake and survey the entry and exit points for each bore, with correct stations
            and elevations.
     2.2.   Provide all permitting to undertake the project.
     2.3.   Provide and maintain suitable truck access to and from entry and exit locations.
     2.4.   Provide stable, level, matted and/or graveled work pads for each bore.
     2.5.   Provide all BMPs around each bore's entry and exit locations. The HDD
            Company will maintain these items.
     2.6.   Provide, string, weld, and test all 36-inch pipe for each bore.

*Going to Greater Lengths™*

2.7. Provide all plans, equipment, and manpower to handle pipe during pullback operations.

2.8. Perform all final tie-ins.

2.9. Provide all settlement monitoring, if required.

2.10. Provide all final site restorations.

2.11. Provide all field surveys to document existing conditions for the HDD installations, including but not limited to pictures, videos, field notes, etc.

## 3. Pricing (Lump Sum)

| | | |
|---|---|---|
| 3.1. | HDD Cedar Creek 2,106' X 36" pipe: | **$1,280,448.00** |
| 3.2. | HDD Pottawapomie Creek 1,788' X 36" pipe: | **$1,087,104.00** |
| 3.3. | HDD Flint Hill 2,158' X 36" pipe: | **$1,312,064.00** |
| 3.4. | Mobilization per rig spread: | **$50,000.00** |

## 4. Clarifications

4.1. Additional footage due to no fault of The HDD Company, will be billed at $608.00/LF.

4.2. This proposal is based upon the drawings, specifications, and geotechnical information provided to us on or before **7 June 2019**.

4.3. If any revised or additional drawings, specifications, geotechnical information, or permits are provided to us after the bid submission date, The HDD Company reserves the right to modify the proposal to account for any added costs and/or additional time associated with the change(s).

4.4. The HDD Company's bid proposal is conditional upon reaching an agreement upon mutually acceptable contract terms. This bid proposal will be attached to and forms a part of the contract between The HDD Company and THE CONTRACTOR.

4.5. Item 3.3 above includes the hauling and disposal of all **non-contaminated** drilled solids and excess drilling fluids.

4.6. The pricing above is contingent upon a site visit.

## 5. Exclusions

5.1. The HDD Company and its personnel are not the Project Engineers. Therefore, we exclude all design and engineering services unless any are specifically noted as included in this proposal. Any drilling plans or profiles that we submit to you will be based upon the design information in the contract documents and our experience as HDD contractors. Any plans or profiles we provide are recommendations only and are subject to review and approval by the project owner and/or its engineers.

5.2. All permits, including federal, State and local environmental permits, the SWPPP permit and any associated SWPPP plans, any right-of-way (ROW) agreement or easements, and all access necessary for us to perform our work shall be provided by others. If our operations are delayed or otherwise impacted by any delays or problems with permits, SWPPP plans, ROW agreements, easements or access arrangements our compensation and time for completion will be equitably adjusted.

6. **Terms and Conditions**
   6.1. Schedule
      6.1.1. This proposal is based upon performance under a reasonable and mutually agreed-to project schedule in so far as that schedule applies to our work. The approved project baseline schedule and all monthly updates must be provided to us on a regular and timely basis to keep us apprised of schedule changes which may impact the timing and efficiency of our work. We will not be liable for any delays caused by others or by factors beyond our reasonable control.
   6.2. Indemnification
      6.2.1. We will indemnify you and/or the project owner for personal injury or property damage claims to the extent of our own negligence. Our proposal excludes any obligation to indemnify you for your own negligence or to indemnify any other party for that party's own negligence or to indemnify any design professional.
   6.3. Payment
      6.3.1. Monthly progress payments will be made to The HDD Company within (7) seven days after you receive each monthly payment from the project owner, but in no event later than 120 days from the date you received your invoice.
      6.3.2. We will receive our final payment within 30 days after you receive our final billing and our work has been completed and accepted. Acceptance will not be unreasonably withheld or delayed. If you dispute any portion of any billing, you will promptly notify us in writing of the nature of the dispute and you will pay the undisputed portion of the billing without delay. If any undisputed amounts are past due for more than 10 days, we reserve the right to stop work until all payments are brought current. We will provide lien releases in accordance with applicable state statutes or regulations. We will keep the project free of liens from out subcontractors, suppliers and other vendors provided we have been paid by you for the work covered by any such liens.
   6.4. Extra/Force Account Work:
      6.4.1. If we are directed to perform any work on a force account or time and material basis, the rates for our labor and equipment will be as stated in our proposal, or if no rates are included with this proposal, as stated in our then current standard labor and equipment rate schedule. If we are directed to standby or suspend work while other operations occur, or delays or other problems are resolved, or if we are required to standby due to events or circumstances beyond our control, the standby time for our labor and equipment will be paid as stated in this proposal.
   6.5. Differing Site Conditions

6.5.1. If the conditions we encounter in the performance of our work differ materially from those indicated in the contract documents, boring logs, geotechnical reports or other information furnished to us prior to bid, or from those ordinarily encountered and generally recognized as inherent in the type of work provided for in our proposal, then our compensation and time for completion will be equitably adjusted to account for any resulting delay and added costs.

7. **Delays and Work Stoppages:**

  7.1 All work stoppages that arise through no fault of The HDD Company will be billed at **$14,500** (no crew on site).

The HDD Company appreciates the opportunity to furnish you this quote and looks forward to working with you. Should any of the information presented above need further clarification, please do not hesitate to contact us.

Sincerely,
**The HDD Company**


Jeremy King
Vice President



17 January 2020

**Minnesota Limited**
18640 200ᵗʰ St, PO Box 410
Big Lake, MN 55309

ATTN: Brad Cordes

RE:    Southern Star Lines DT and DS Replacement Project
       Directionally drill and install approximately 4540 feet of 36-inch steel pipeline road
       crossings in Anderson and Franklin Counties, KS.

The HDD Company is pleased to submit the following bid quote:

1.   **Responsibilities of The HDD Company**
     1.1.   Provide all required insurance certificates.
     1.2.   Provide any written submittals and qualifications required.
     1.3.   Provide drill rig(s) with sufficient capabilities to install the crossings, a closed-
            loop mud system, mud pumps, vacuum trucks, dump trucks, steering system,
            and all drill spread support equipment necessary.
     1.4.   Provide all required union labor for the drilling operations.
     1.5.   Provide final as-built drawings.
     1.6.   Provide and haul water for drilling operations.
     1.7.   Provide water storage for the duration of drilling operations.
     1.8.   Provide all required pulling heads.
     1.9.   Leave the entry areas clean, free of debris, and to a rough grade.
     1.10.  Provide bonding at 1%, which is not included in the bid pricing below.

2.   **Responsibilities of THE CONTRACTOR**
     2.1.   Stake and survey the entry and exit points for each bore, with correct stations
            and elevations.
     2.2.   Provide all permitting to undertake the project.
     2.3.   Provide and maintain suitable truck access to and from entry and exit locations.
     2.4.   Provide stable, level, matted and/or graveled work pads for each bore.
     2.5.   Provide bore pits and shore if needed.
     2.6.   Provide all BMPs around each bore's entry and exit locations. The HDD
            Company will maintain these items.
     2.7.   Provide, string, weld, and test all 36-inch pipe for each bore.
     2.8.   Furnish support crew for road crossings, including excavators and manpower.

*Going to Greater Lengths"*

2.9. Provide all plans, equipment, and manpower to handle pipe during pullback operations.
2.10. Perform all final tie-ins.
2.11. Dispose of cuttings.
2.12. Provide all settlement monitoring, if required.
2.13. Provide all final site restorations.
2.14. Provide all field surveys to document existing conditions for the HDD installations, including but not limited to pictures, videos, field notes, etc.

3. **Pricing**

| 3.1. | 4540' X 36" pipe: | $508.00/ft |
| 3.2. | Mobilization per rig spread: | $50,000.00 |

4. **Clarifications**
    4.1. This proposal is based upon the drawings, specifications, and geotechnical information provided to us on or before **17 January 2020.**
    4.2. If any revised or additional drawings, specifications, geotechnical information, or permits are provided to us after the bid submission date, The HDD Company reserves the right to modify the proposal to account for any added costs and/or additional time associated with the change(s).
    4.3. The HDD Company's bid proposal is conditional upon reaching an agreement upon mutually acceptable contract terms. This bid proposal will be attached to and forms a part of the contract between The HDD Company and THE CONTRACTOR.
    4.4. The pricing above is contingent upon a site visit.

5. **Exclusions**
    5.1. The HDD Company and its personnel are not engineers. Therefore, we exclude all design and engineering services unless any are specifically noted as included in this proposal. Any drilling plans or profiles that we submit to you will be based upon the design information in the contract documents and our experience as HDD contractors. Any plans or profiles we provide are recommendations only and are subject to review and approval by the project owner and/or its engineers.
    5.2. All permits, including federal, State and local environmental permits, the SWPPP permit and any associated SWPPP plans, any right-of-way (ROW) agreement or easements, and all access necessary for us to perform our work shall be provided by others. If our operations are delayed or otherwise impacted by any delays or problems with permits, SWPPP plans, ROW agreements, easements or access arrangements our compensation and time for completion will be equitably adjusted.

6. **Terms and Conditions**
    6.1. Schedule
        6.1.1. This proposal is based upon performance under a reasonable and mutually agreed-to project schedule in so far as that schedule applies to our work. The approved project baseline schedule and all monthly updates must be provided to us on a regular and timely basis to keep

*Going to Greater Lengths*"

us apprised of schedule changes which may impact the timing and efficiency of our work. We will not be liable for any delays caused by others or by factors beyond our reasonable control.

6.2    Indemnification

    6.2.1.    We will indemnify you and/or the project owner for personal injury or property damage claims to the extent of our own negligence. Our proposal excludes any obligation to indemnify you for your own negligence or to indemnify any other party for that party's own negligence or to indemnify any design professional.

6.3    Payment

    6.3.1.    Monthly progress payments will be made to The HDD Company within (7) seven days after you receive each monthly payment from the project owner, but in no event later than 120 days from the date you received your invoice.

    6.3.2.    We will receive our final payment within 30 days after you receive our final billing and our work has been completed and accepted. Acceptance will not be unreasonably withheld or delayed. If you dispute any portion of any billing, you will promptly notify us in writing of the nature of the dispute and you will pay the undisputed portion of the billing without delay. If any undisputed amounts are past due for more than 10 days, we reserve the right to stop work until all payments are brought current. We will provide lien releases in accordance with applicable state statutes or regulations. We will keep the project free of liens from out subcontractors, suppliers and other vendors provided we have been paid by you for the work covered by any such liens.

6.4.    Extra/Force Account Work:

    6.4.1.    If we are directed to perform any work on a force account or time and material basis, the rates for our labor and equipment will be as stated in our proposal, or if no rates are included with this proposal, as stated in our then current standard labor and equipment rate schedule. If we are directed to standby or suspend work while other operations occur, or delays or other problems are resolved, or if we are required to standby due to events or circumstances beyond our control, the standby time for our labor and equipment will be paid as stated in this proposal.

6.5.    Differing Site Conditions

    6.5.1.    If the conditions we encounter in the performance of our work differ materially from those indicated in the contract documents, boring logs, geotechnical reports or other information furnished to us prior to bid, or from those ordinarily encountered and generally recognized as inherent in the type of work provided for in our proposal, then our compensation and time for completion will be equitably adjusted to account for any resulting delay and added costs.

7.  **Delays and Work Stoppages:**

   7.1.  All work stoppages that arise through no fault of The HDD Company will be billed at $14,500 (no crew on site).

The HDD Company appreciates the opportunity to furnish you this quote and looks forward to working with you.  Should any of the information presented above need further clarification, please do not hesitate to contact us.

Sincerely,
**The HDD Company**


Jeremy King

# EXHIBIT B

| PROJECT NAME: | | |
|---|---|---|
| PROJECT NO.: | Southern Star Line DT & DS Replacement | |



Horizontal Directional Drilling

**EXTRA WORK SHEET REPORT
INTERNAL - OFFICE**

| CLIENT/OWNER : | Minnesota Limited - Southern Star | DATE: | |
|---|---|---|---|
| WORK PRFM'D. BY: | The HDD Company, Inc. | EXTRA WRK. SHT. NO. | Cedar Creek |
| DESCPTN. OF WORK | Access and weather delays | | |
| | 0 | | |
| | 0 | | |
| | 0 | | |

## A – EQUIPMENT

| EQUIP. NO. | Company Owned Equipment | HRS. | RATE/HR. | TOTAL/DAY |
|---|---|---|---|---|
| 1 | Drilling Rig HDD Rig 3 | 30,00 | $ 205,56 | $ 6.166,80 |
| 1 | Mud Tank / Solids Control Unit | 30,00 | $ 111,96 | $ 3.358,80 |
| 1 | Sump Pit/Trash Pump | 30,00 | $ 8,29 | $ 248,70 |
| 1 | Mud Pumping Units | 30,00 | $ 60,94 | $ 1.828,20 |
| 2 | Tool Van and tools | 30,00 | $ 17,55 | $ 1.053,00 |
| 0 | Dump Truck A=17 TRUN 2AXL | | | $ - |
| 2 | Vac. Truck A-17 TRUN 2AXL | 30,00 | $ 45,75 | $ 2.745,00 |
| 7 | Misc, Trailers | 30,00 | $ 1,79 | $ 375,90 |
| 0 | Haul Trucks | 30,00 | $ 34,13 | |
| 1 | 6 3/4" Non Mag Drill Collars w/Jet Assembly | 30,00 | $ 6,83 | $ 204,90 |
| 168 | Drill Pipe (5+1/2 FH) | 30,00 | $ 0,53 | $ 2.671,20 |
| 2 | Misc, X-Subs and Rack (All X Subs for Spread) | 30,00 | $ 5,20 | $ 312,00 |
| 0 | Sonde and Housing | | | |
| 0 | Steering Tool (North Referencing w/Tru-Gyde) | | | |
| 48 | Rollers | 30,00 | $ 1,50 | $ 2.160,00 |
| 2 | Ford F-250 T&TT 06-12 | 30,00 | $ 5,04 | $ 302,40 |
| 0 | Ford F-450 T&TT 20-28 | | | |
| 0 | Ford F-350 T&TT 20-28 | | | |
| 0 | KW & Crane Truck | | | |
| 0 | Hammer | 30,00 | $ 41,93 | |
| 1 | 300 Amp Welder | 30,00 | $ 9,49 | $ 284,70 |
| 1 | 1/2 Ton Truck | 30,00 | $ 32,48 | $ 974,40 |
| 1 | 60" Casing | 30,00 | $ 3,25 | $ 97,50 |
| 0 | Mud Bins | | | |

| | Rental Equipment | | | | |
|---|---|---|---|---|---|
| 1 | 10K Reach Forklift | S.T. | 30,00 | $ 51,29 | $ 1.538,70 |
| | | O.T. | | | $ - |
| 2 | 225 Excavator | S.T. | 30,00 | $ 91,59 | $ 5.495,40 |
| | | O.T. | | | $ - |
| 2 | Portable toilets | S.T. | 30,00 | $ 1,50 | $ 90,00 |
| | | O.T. | | | $ - |
| 0 | Multiquip 20KW Generator | S.T. | | | $ - |
| | | O.T. | | | $ - |
| 1 | Frac Tank | S.T. | 30,00 | $ 7,32 | $ 219,60 |
| | | O.T. | | | $ - |
| 1 | Trash Bin | S.T. | 30,00 | $ 4,97 | $ 149,10 |
| | | O.T. | | | $ - |
| 1 | 500 Amp Welder | S.T. | 30,00 | $ 9,49 | $ 284,70 |
| | | O.T. | | | $ - |
| 2 | Light Tower | S.T. | 30,00 | $ 7,61 | $ 456,60 |
| | | O.T. | | | $ - |
| 1 | 175 KW Generator | S.T. | 30,00 | $ 71,36 | $ 2.140,80 |
| | | O.T. | | | $ - |
| 1 | 6" Diesel Trash Pump | S.T. | 30,00 | $ 23,60 | $ 708,00 |
| | | O.T. | | | $ - |
| 1 | HTI Mud Motor | S.T. | 30,00 | $ 42,50 | $ 1.275,00 |
| | | O.T. | | | $ - |
| | | S.T. | | | $ - |
| | | O.T. | | | $ - |
| | | S.T. | | | $ - |
| | | O.T. | | | $ - |
| | | S.T. | | | $ - |
| | | O.T. | | | $ - |
| | | S.T. | | | $ - |
| | | O.T. | | | $ - |
| | | S.T. | | | $ - |
| | | O.T. | | | $ - |
| | | S.T. | | | $ - |
| | | O.T. | | | $ - |
| | | S.T. | | | $ - |
| | | O.T. | | | $ - |
| | COMPANY OWNED EQUIPMENT | | | 22.783,50 |
| | RENTAL EQUIPMENT (W/ 15% Markup) | | | 14.211,59 |
| | A= EQUIPMENT SUB – TOTAL COST | | | $ 36.995,09 |
| | 0,00 % Sales Tx, Rental Equip. | | | |

## B – MATERIALS

| MATERIALS DESCRIPTION | QTY. USED | UNIT $ | TOTAL |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| | B-MATERIALS SUB-TOTAL COST | | $ - |
| | 0,00 % Sales Tax | | $ - |
| 15 | % ADDED M, U, B | | $ - |
| | SUB-TOTAL A + B w/Tax | | $ 36.995,09 |

## C – SUBCONTRACT / WORK DONE BY SPECIALISTS/THIRD PARTY SERVICES

| Work Description | Individual / Company | Unit | RATE | TOTAL $ |
|---|---|---|---|---|
| | | | | $ - |
| | | | | $ - |
| | | | | $ - |
| | COST OF SUBS - C | | | $ - |
| | 15 % MARK-UP(Subcontractor) | | $ | $ - |
| | TOTAL COST A + B + C (Including Mark-Up) | | | $ 36.995,09 |

## D – LABOR

| NO. | D – LABOR | | HRS. | BASE RATE w/FRNG'S. | SUB TOTAL | Per Diem Totals | TOTAL |
|---|---|---|---|---|---|---|---|
| 1 | Ben Bethany (Day Rate) | REG. | 3,00 | $1.016,84 | $3.050,52 | $120,00 | $3.170,52 |
| | | O.T. | 0 | | $0,00 | | $0,00 |
| | | D.T. | | | $0,00 | | $0,00 |
| 2 | James Ravenscraft | REG. | 30,00 | $44,66 | $1.339,80 | $300,00 | $1.639,80 |
| | | O.T. | | | $0,00 | | $0,00 |
| | | D.T. | | | $0,00 | | $0,00 |
| 3 | Jeremy Acres | REG. | 30,00 | $46,20 | $1.386,00 | $315,00 | $1.701,00 |
| | | O.T. | | | $0,00 | | $0,00 |
| | | D.T. | | | $0,00 | | $0,00 |
| 4 | Mark Horton | REG. | 30,00 | $59,79 | $1.793,70 | $345,00 | $2.138,70 |
| | | O.T. | 0,00 | | $0,00 | | $0,00 |
| | | D.T. | | | $0,00 | | $0,00 |
| 5 | Steven Davis | REG. | 30,00 | $59,79 | $1.793,70 | $315,00 | $2.108,70 |
| | | O.T. | 0,00 | | $0,00 | | $0,00 |
| | | D.T. | | | $0,00 | | $0,00 |
| 6 | Roger Reeter | REG. | 30,00 | $59,79 | $1.793,70 | $315,00 | $2.108,70 |
| | | O.T. | | | $0,00 | | $0,00 |
| | | D.T. | | | $0,00 | | $0,00 |
| 7 | Bruce Cooper | REG. | 30,00 | $44,53 | $1.335,90 | $315,00 | $1.650,90 |
| | | O.T. | 0,00 | | $0,00 | | $0,00 |
| | | D.T. | | | $0,00 | | $0,00 |
| 8 | | REG. | 0,00 | | $0,00 | | $0,00 |
| | | O.T. | 0,00 | | $0,00 | | $0,00 |
| | | D.T. | | | $0,00 | | $0,00 |
| 9 | | REG. | 0,00 | | $0,00 | | $0,00 |
| | | O.T. | 0,00 | | $0,00 | | $0,00 |
| | | D.T. | | | $0,00 | | $0,00 |
| 10 | | REG. | 0,00 | | $0,00 | | $0,00 |
| | | O.T. | 0,00 | | $0,00 | | $0,00 |
| | | D.T. | | | $0,00 | | $0,00 |
| 11 | | REG. | 0,00 | | $0,00 | | $0,00 |
| | | O.T. | 0,00 | | $0,00 | | $0,00 |
| | | D.T. | | | $0,00 | | $0,00 |
| 12 | | REG. | 0,00 | | $0,00 | | $0,00 |
| | | O.T. | 0,00 | | $0,00 | | $0,00 |
| | | D.T. | | | $0,00 | | $0,00 |
| 13 | | REG. | 0,00 | | $0,00 | | $0,00 |
| | | O.T. | 0,00 | | $0,00 | | $0,00 |
| | | D.T. | | | $0,00 | | $0,00 |
| | | | | D – LABOR SUB-TOTAL | $ 14.518,32 | | |
| | 15 % Labor Surcharge | | | | $ 2.177,75 | | |
| | | | | SUBTOTAL | $ 16.696,07 | | |
| | 15 % MARKUP ON LABOR | | | | $ 2.504,41 | | |

## E – MISCELLANEOUS ITEMS

| MBSC. DESCRIPTIONS | QTY. | Unit $ | EX. AMOUNT |
|---|---|---|---|
| Hotel | 6 | $ 58,00 | $ 348,00 |
| | 9 | $ 68,00 | $ 612,00 |
| Subsistance | 0 | | $ - |
| Misc. Items | | | |
| 0 | 0 | | $ - |
| 0 | 0 | | $ - |
| 0 | 0 | | $ - |
| 0 | 0 | | $ - |
| 0 | 0 | | $ - |
| 0 | 0 | | $ - |
| | E- MISCELLANEOUS ITEMS SUB TOTAL | | $ 960,00 |
| 5 % Sales/City/Room Tax | | | $ 48,00 |
| 15 % ADDED MARK-UP | | | $ 144,00 |
| 0 % Tax on Misc. Items | | | 0 |
| | SUB TOTAL - E | | $ 1.152,00 |

## TOTALS

| TOTAL COST  A+B+C (Equipment /Material /Sub-Contractors) | $ 36.995,09 |
|---|---|
| TOTAL COST = D  (Labor) | $ 19.200,48 |
| TOTAL COST - E  (Miscellaneous Items) | $ 1.152,00 |
| SUB-TOTAL | $ 57.347,56 |
| 2,5 % BOND & INSURANCE | $ 1.433,69 |
| **TOTAL COST THIS SHEET** | **$ 58.781,25** |

| TIME | CLIENT DIRECTIVES AND COMMENTS |
|---|---|
| 0:00 | (See Daily Work Report) |
| 0:00 | |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |

# EXHIBIT C

| PROJECT NAME: | | | | |
|---|---|---|---|---|
| PROJECT NO.: | Southern Star Line DT & DS Replacement | | EXTRA WORK SHEET REPORT INTERNAL - OFFICE | |



**THE HDD COMPANY**
Horizontal Directional Drilling

| CLIENT/OWNER : | Minnesota Limited - Southern Star | DATE: | |
|---|---|---|---|
| WORK PRFM'D. BY: | The HDD Company, Inc. | EXTRA WRK. SHT. NO. | Cedar Creek HDD |
| DESCPTN. OF WORK : | Access and weather delays | | |
| 0 | | | |
| 0 | | | |
| 0 | | | |

## A - EQUIPMENT

| EQUIP. NO. | Company Owned Equipment | HRS. | RATE/HR. | TOTAL/DAY |
|---|---|---|---|---|
| 1 | Drilling Rig HDD Rig 7 - Vermeer 750 | 32.50 | $ 205.56 | $ 6,680.70 |
| 1 | Mud Tank / Solids Control Unit | 32.50 | $ 111.96 | $ 3,638.70 |
| 1 | Sump Pit/Trash Pump | 32.50 | $ 8.29 | $ 269.43 |
| 1 | Mud Pumping Units | 32.50 | $ 60.94 | $ 1,980.55 |
| 2 | Tool Van and tools | 32.50 | $ 17.55 | $ 1,140.75 |
| 0 | Dump Truck A-17 TRUN 2AXL | | | $ - |
| 3 | Vac. Truck A-17 TRUN 2AXL | 32.50 | $ 45.75 | $ 4,460.63 |
| 10 | Misc. Trailers | 32.50 | $ 1.79 | $ 581.75 |
| 1 | Haul Trucks | 32.50 | $ 34.13 | $ 1,109.23 |
| 1 | 6 3/4" Non Mag Drill Collars w/Jet Assembly | 32.50 | $ 6.83 | $ 221.98 |
| 168 | Drill Pipe (5-1/2 FH) | 32.50 | $ 0.53 | $ 2,893.80 |
| 2 | Misc. X-Subs and Rack (All X Subs for Spread) | 32.50 | $ 5.20 | $ 338.00 |
| 0 | Sonde and Housing | | | $ - |
| 0 | Steering Tool (North Referencing w/Tru-Gyde) | | | |
| 48 | Rollers | 32.50 | $ 1.50 | $ 2,340.00 |
| 3 | Ford F-250 T&TT 06-12 | 32.50 | $ 5.04 | $ 491.40 |
| 0 | Ford F-450 TT 20-28 | | | $ - |
| 0 | Ford F-350 TT 20-28 | | | $ - |
| 0 | KW & Crane Truck | | | $ - |
| 1 | Hammer | 32.50 | $ 41.93 | $ 1,362.73 |
| 1 | 300 Amp Welder | 32.50 | $ 9.49 | $ 308.43 |
| 1 | 1/2 Ton Truck | 32.50 | $ 32.48 | $ 1,055.60 |
| 1 | 60" Casing | 32.50 | $ 3.25 | $ 105.63 |
| 0 | Mud Bins | | | |

| EQUIP. NO. | Rental Equipment | | RATE/HR. | TOTAL/DAY |
|---|---|---|---|---|
| 1 | 10K Reach Forklift | S.T. 32.50 | $ 51.29 | $ 1,666.93 |
| | | O.T. | | $ - |
| 2 | 225 Excavator | S.T. 32.50 | $ 91.59 | $ 5,953.35 |
| | | O.T. | | $ - |
| 2 | Portable toilets | S.T. 32.50 | $ 1.50 | $ 97.50 |
| | | O.T. | | $ - |
| 0 | Multiquip 20kW Generator | S.T. | | $ - |
| | | O.T. | | $ - |
| 3 | Frac Tank | S.T. 32.50 | $ 7.32 | $ 713.70 |
| | | O.T. | | $ - |
| 1 | Trash Bin | S.T. 32.50 | $ 4.97 | $ 161.53 |
| | | O.T. | | $ - |
| 1 | 500 Amp Welder | S.T. 32.50 | $ 9.49 | $ 308.43 |
| | | O.T. | | $ - |
| 2 | Light Tower | S.T. 32.50 | $ 7.61 | $ 494.65 |
| | | O.T. | | $ - |
| 1 | 175 KW Generator | S.T. 32.50 | $ 71.36 | $ 2,319.20 |
| | | O.T. | | $ - |
| 1 | 6" Diesel Trash Pump | S.T. 32.50 | $ 23.60 | $ 767.00 |
| | | O.T. | | $ - |
| 1 | HTI Mud Motor | S.T. 32.50 | $ 42.50 | $ 1,381.25 |
| | | S.T. | | $ - |
| | | S.T. | | $ - |
| | | S.T. | | $ - |
| | | O.T. | | $ - |
| | | O.T. | | $ - |
| | | S.T. | | $ - |
| | | S.T. | | $ - |
| | | O.T. | | $ - |
| | | S.T. | | $ - |
| | | S.T. | | $ - |
| | | O.T. | | $ - |
| | | O.T. | | $ - |

| | | | |
|---|---|---|---|
| | COMPANY OWNED EQUIPMENT | | 28,979.28 |
| | RENTAL EQUIPMENT W/ 15% Markup | | 15,943.05 |
| | A- EQUIPMENT SUB - TOTAL COST | | $ 44,922.33 |
| | 0.00 % Sales Tx. Rental Equip. | | |

## B - MATERIALS

| MATERIALS DESCRIPTION | QTY. USED | UNIT $ | TOTAL |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| | B-MATERIALS SUB-TOTAL COST | | $ - |
| | 0.00 % Sales Tax | | $ - |
| | 15 % ADDED M. U. B | | $ - |
| | SUB-TOTAL A + B w/Tax | | $ 44,922.33 |

## C - SUBCONTRACT / WORK DONE BY SPECIALISTS/THIRD PARTY SERVICES

| Work Description | Individual / Company | Unit | RATE | TOTAL $ |
|---|---|---|---|---|
| Roller Damage | Minnesota Limited | 8.00 | $ 2,900.00 | $ 23,200.00 |
| | | | | $ - |
| | | | | $ - |
| | | | | $ - |
| | COST OF SUBS - C | | | $ 23,200.00 |
| | 15 % MARK-UP(Subcontractor) | | | $ 3,480.00 |
| | | $ | | $ 26,680.00 |
| | TOTAL COST A + B + C (Including Mark-Up) | | | $ 71,602.33 |

| NO. | D - LABOR | | HRS. | BASE RATE w/FRING'S. | SUB TOTAL | Per Diem Totals | TOTAL |
|---|---|---|---|---|---|---|---|
| 1 | Chris Crough (Day Rate) | REG. | 3.00 | $1,016.84 | $3,050.52 | $120.00 | $3,170.52 |
| | | O.T. | 0 | | $0.00 | | $0.00 |
| | | D.T. | 0 | | $0.00 | | $0.00 |
| 2 | Randy Foster (Day Rate) | REG. | 3.00 | $968.88 | $2,906.64 | $300.00 | $3,206.64 |
| | | O.T. | 0 | | $0.00 | | $0.00 |
| | | D.T. | | | $0.00 | | $0.00 |
| 3 | Harold Shoemaker (Day Rate) | REG. | 0.00 | | $0.00 | $0.00 | $0.00 |
| | | O.T. | | | $0.00 | | $0.00 |
| | | D.T. | | | $0.00 | | $0.00 |
| 4 | Justin Potter | REG. | 32.50 | $59.79 | $1,943.18 | $345.00 | $2,288.18 |
| | | O.T. | 0.00 | $80.65 | $0.00 | | $0.00 |
| | | D.T. | | | $0.00 | | $0.00 |
| 5 | Brandon Morris | REG. | 32.50 | $39.83 | $1,294.48 | $315.00 | $1,609.48 |
| | | O.T. | 0.00 | $54.42 | $0.00 | | $0.00 |
| | | D.T. | | | $0.00 | | $0.00 |
| 6 | David Jones | REG. | 32.50 | $42.86 | $1,392.95 | $315.00 | $1,707.95 |
| | | O.T. | 0.00 | $58.96 | $0.00 | | $0.00 |
| | | D.T. | | | $0.00 | | $0.00 |
| 7 | Brandon Sammet | REG. | 32.50 | $59.79 | $1,943.18 | $315.00 | $2,258.18 |
| | | O.T. | 0.00 | $80.65 | $0.00 | | $0.00 |
| | | D.T. | | | $0.00 | | $0.00 |
| 8 | Roger Reeter | REG. | 32.50 | $59.79 | $1,943.18 | $300.00 | $2,243.18 |
| | | O.T. | 0.00 | $80.65 | $0.00 | | $0.00 |
| | | D.T. | | | $0.00 | | $0.00 |
| 9 | Augustin Zepeda | REG. | 32.50 | $36.83 | $1,196.98 | $315.00 | $1,511.98 |
| | | O.T. | 0.00 | $69.49 | $0.00 | | $0.00 |
| | | D.T. | | | $0.00 | | $0.00 |
| 10 | Johnny Hatfield | REG. | 32.50 | $43.49 | $1,413.43 | $150.00 | $1,563.43 |
| | | O.T. | 0.00 | $59.91 | $0.00 | | $0.00 |
| | | D.T. | | | $0.00 | | $0.00 |
| 11 | | REG. | | | $0.00 | | $0.00 |
| | | O.T. | 0.00 | | $0.00 | | $0.00 |
| | | D.T. | | | $0.00 | | $0.00 |
| 12 | | REG. | | | $0.00 | | $0.00 |
| | | O.T. | 0.00 | | $0.00 | | $0.00 |
| | | D.T. | | | $0.00 | | $0.00 |
| 13 | | REG. | | | $0.00 | | $0.00 |
| | | O.T. | 0.00 | | $0.00 | | $0.00 |
| | | D.T. | | | $0.00 | | $0.00 |
| | | | | | D - LABOR SUB-TOTAL | $ | 19,559.51 |
| | 15 % Labor Surcharge | | | | | $ | 2,933.93 |
| | | | | | SUBTOTAL | $ | 22,493.44 |
| | 15 % MARKUP ON LABOR | | | | | $ | 3,374.02 |

## E - MISCELLANEOUS ITEMS

| MISC. DESCRIPTIONS | QTY. | Unit $ | EX. AMOUNT |
|---|---|---|---|
| Hotel | | | |
| | 6 | $ 58.00 | $ 348.00 |
| | 9 | $ 68.00 | $ 612.00 |
| Subsistance | 0 | | $ - |
| Misc. Items | | | |
| 0 | 0 | | $ - |
| 0 | 0 | | $ - |
| 0 | 0 | | $ - |
| 0 | 0 | | $ - |
| 0 | 0 | | $ - |
| 0 | 0 | | $ - |
| E- MISCELLANEOUS ITEMS SUB TOTAL | | | $ 960.00 |
| 5 % Sales/City/Room Tax | | | $ 48.00 |
| 15 % ADDED MARK-UP | | | $ 144.00 |
| 0 % Tax on Misc. Items | | | 0 |
| | SUB TOTAL - E | | $ 1,152.00 |

## TOTALS

| | | |
|---|---|---|
| TOTAL COST A+B+C (Equipment /Material /Sub-Contractors) | $ | 71,602.33 |
| TOTAL COST - D (Labor) | $ | 25,867.46 |
| TOTAL COST - E (Miscellaneous Items) | $ | 1,152.00 |
| SUB-TOTAL | $ | 98,621.78 |
| 2.5 % BOND & INSURANCE | $ | 2,465.54 |
| TOTAL COST THIS SHEET | $ | 101,087.33 |

| TIME | CLIENT DIRECTIVES AND COMMENTS |
|---|---|
| 0:00 | (See Daily Work Report) |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |

# EXHIBIT D



| Project Details | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| From | The Tunneling Company USA, LLC. | Job No. | TUS20011 | RCO No. | 003 | Rev | | 0 |
| RCO Title | Delays Due to Contractor | | | Date | August 31, 2020 | | | |
| Owner | The HDD Company | | Attention | Jeremy King | | | | |

| **Description Of Requested Change Details** |
|---|

Required by:    September 14, 2020

**Change Description**

Throughout the project, The Tunneling Company USA has experienced significant delays as a result of the contractor. These delays consist of (but not limited to);

- Dewatering the excavations
- Assisting with pit construction
- Waiting for pit completion
- Welding delays
- Safety shut downs
- Approvals

A detailed breakdown of these delays are attached.

**Change Costs:**

Total charges as a result of these delays is $500,975.

A detailed breakdown of these delays are attached.

All applicable taxes will be added at time of invoice



| Impact Details | | | | |
|---|---|---|---|---|
| **Reason for Change**: Delays Due to Contractor | | | | |
| Additional Information | | | | |
| Click here to enter text. | | | | |
| Reference Or Attachments | | | | |
| Attach | Refer | Document No | Rev | Description |
| ☐ | ◆ | Timesheets | | Daily Timesheets for these delays are available upon request |
| ☐ | ☐ | | | |
| ☐ | ☐ | | | |
| Response | | | | |
| <span style="color:red">Client Use:</span> | | | | |

| Approval Details© | |
|---|---|
| **Submitted by    (Originator)** | <span style="color:red">Client Use:</span> |
| Print Name:    Nick Hyde | Change Authorized:    Yes |
| Print Title:    Project Manager | Print Name:        Jeremy King |
| Date:    August-31-2020 | Print Title:        Vice President |
| Signature: | Date: |
| | Signature: |
| | ✕ |

| Project: | Minnesota Limited - Kansas | | | | | |
|---|---|---|---|---|---|---|
| Date: | Crossing Name | Planned Activity Hours | Unplanned Activity Hours | Non-Billable Hours | Contract Reference Term | Description |
| 19-Mar-20 | HWY 31 | | 8 | | 7.1 | Pick up supplies and wait to offload last load of augers. ML still pumping water off of site and will start digging the pit tomorrow (Standby time). |
| 24-Mar-20 | HWY 31 | 4.5 | 7 | | 7.1 | Crew assisted with pit construction. By 1pm crew started placing mats and rails but had to remove them at EI's direction to place plastic under them to contain any spills. Mats and rails installed and boring machine brought over to site. Ready to start in the morning. |
| 16-Apr-20 | RD 1100 | 4 | 7.5 | | 7.1 | Set all gear around site and wait for pit completion (Standby time). |
| 17-Apr-20 | RD 1100 | | 11 | | 7.1 | Pit not ready (Standby time). |
| 27-Apr-20 | RD 1500 | | 10 | | 7.1 | Pit not ready (Standby time). |
| 2-May-20 | RD 1500 | 4.5 | 5.5 | | 7.1 | Completed casing install by 12pm. Exit pit no complete. ML work on exit pit for remainder of shift (Standby time). Daily Install 40'. Total Install 85'. |
| 18-May-20 | Clarke RD | 10 | 1 | | 7.1 | Confirm elevation and start welding casing. Unload excavators. Start setting equipment and engineer confirmed the setup is too low. Move equipment so grade can be adjusted. Daily Install 0'. Total Install 0'. |
| 19-May-20 | Clarke RD | 6.5 | 5.5 | | 7.1 | Fixed elevation of pit, set equipment and started drilling. Pit grade not excavated corectly. |
| 20-May-20 | Clarke RD | 10 | 1 | | 7.1 | Stanby time waiting for excavator in the morning |
| 26-May-20 | Allen RD | 9 | 3 | | 7.1 | Spent 3hrs pumping pit and standby for fixing excavation cave-in. Continued install. Daily Install 20'. Total Install 26'. |
| 28-May-20 | RD 2150 | 3 | 7 | | 7.1 | Continued install till 10:30 when project got shut down due to a safety stand down (standby time). Daily Install 6'. Total Install 51'. |
| 28-May-20 | Allen RD | 3 | 7 | | 7.1 | Continued install till 10:30 when project got shut down due to a safety stand down (standby time). Daily Install 13'. Total Install 80'. |
| 29-May-20 | Allen RD | 8 | 4 | | 7.1 | Help ML dewater pit (Standby time). Complete casing install. Daily Install 40'. Total Install 120'. |
| 1-Jun-20 | RD 2150 | 8 | 2 | | 7.1 | Arrived on site an had to pump out pit (standby time). Set boring machine and continued product pipe installation until complete. Daily Install 120' (product pipe). Total Install 120' (product pipe). |
| 8-Jun-20 | Jackson RD | | 6 | 6 | 7.1 | Still waiting for pit to be completed. Repaired Equipment for half the day |
| 9-Jun-20 | Jackson RD | | 6 | 6 | 7.1 | Still waiting for pit to be completed. Repaired Equipment for half the day |
| 10-Jun-20 | Jackson RD | | 12 | | 7.1 | Still waiting for pit to be completed. Daily Install 0'. Total Install 0'. |
| 11-Jun-20 | Jackson RD | | 12 | | 7.1 | Still waiting for pit to be completed. Daily Install 0'. Total Install 0'. |
| 18-Jun-20 | Hamilton RD | | 10 | | 7.1 | Pit not ready . Daily Install 0'. Total Install 0'. |
| 19-Jun-20 | Hamilton RD | | 10 | | 7.1 | Pit not ready . Daily Install 0'. Total Install 0'. |
| 20-Jun-20 | Hamilton RD | | 10 | | 7.1 | Pit not ready . Daily Install 0'. Total Install 0'. |
| 26-Jun-20 | Missouri RD | 3.5 | 6.5 | | 7.1 | Completed the exit pit and welders cut off the SBU. Waited on approval to push product pipe from 11:30 to end of shift (standby time). Daily Install 0'. Total Install 185'. |
| 2-Jul-20 | Rock Ridge RD | | 10 | | 7.1 | Site not ready. Standby time. |
| 6-Jul-20 | Rock Ridge RD | | 10 | | 7.1 | Waiting on pit. |
| 8-Jul-20 | Nebraska RD | 7 | 4 | | 7.1 | Augered out casing. Wait for ML to complete exit pit (standby time). First product pipe welded. Daily Install 0' (product pipe). Total Install 0' (product pipe). |

| Date | Name | | | | | Notes |
|---|---|---|---|---|---|---|
| 8-Jul-20 | John Brown RD | 5 | 5 | | 7.1 | Finish moving equipment to site. Pit not complete (standby time). Daily Install 0'. Total Install 0'. |
| 9-Jul-20 | John Brown RD | 10 | 10 | | 7.1 | Pit not complete. Standby time. Daily Install 0'. Total Intall 0' |
| 13-Jul-20 | John Brown RD | 7 | 3 | | 7.1 | Prepared to stuff augers and set casing. Pit shut down due to safety concerns with the shoring (Standby time). Daily Install 0'. Total Install 0'. |
| 14-Jul-20 | John Brown RD | 8 | 2 | | 7.1 | Installed another trench box. 2h delay (Standby time). Start installing casing. Daily install 18'. Total install 18'. |
| 15-Jul-20 | John Brown RD | 8 | 2 | | 7.1 | Continue installing casing all shift. 2h delay because welders refused to rebevel pipe. Welders welded the casing on crooked (Standby time. Pipe would not fit in the machine. Daily Install 37'. Total Install 55'. |
| 16-Jul-20 | John Brown RD | 5 | 5 | | 7.1 | Redo weld from yesterday. 5h delay (standby time). Continue boring. Daily Install 16'. Total Install 50'. |
| 22-Jul-20 | Lavette Terrace RD | 11 | 1 | | 7.1 | Delayed start by 1 hour because crew had to remove debris from road surface (Standby time). Start drilling by 8am. Daily Install 10.5'. Total Install 90.5'. |
| 22-Jul-20 | John Brown RD | 7 | 3 | | 7.1 | Delayed start due to pit flooded. Unsafe to work (Standby time). Cut of SBU head and weld product pipe to casing. Daily Install 0' (product pipe). Total Install 0' (product pipe). |
| 22-Jul-20 | John Brown RD | 6 | 4 | | 7.1 | Unable to get casing from other sites due to rain yesterday (Standby time). Had to move equipment because ML was using dynamite to open ditch. Prep casing for install. Daily install 0'. Total Install ???. |
| 23-Jul-20 | Kingman RD | 10 | 2 | | 7.1 | Completed casing install and augering. Wait for 2hrs for welders. Weld first product pipe to casing. Daily Install 0' (product pipe). Total Install 0' (product pipe). |
| 23-Jul-20 | Lavette Terrace RD | 6 | 4 | | 7.1 | Waiting for welders and coaters for 4hrs (Standby time). Install product pipe for remainder of day. |
| 23-Jul-20 | John Brown RD | 9 | 3 | | 7.1 | Wait for 3hrs for welders (Standby time). Continue drilling. Daily Install 15'. Total install 80'. |
| 24-Jul-20 | Kingman RD | 5 | 5 | | 7.1 | Finished casing install. Waited for welders for rest of shift (Standby time). Daily Install 10'. Total install 90'. |
| 29-Jul-20 | Kingman RD | 5 | 5 | | 7.1 | Move equipment from John Brown to Marshall. Pit not ready (Standby time). Daily Install 0'. Total Install 0'. |
| 30-Jul-20 | Marshall RD | 6.5 | 6.5 | 1.5 | 7.1 | Pit not ready (Standby time). Shift cancelled at 1:30 due to rain. Daily Install 0'. Total Install 0'. |
| 31-Jul-20 | Marshall RD | 10 | 10 | | 7.1 | Minn LTD started excavating launch pit on north side of Marshall Rd. Not ready for us |
| 31-Jul-20 | John Brown RD | | 10 | | 7.1 | Tool box with all crews. Marshall rd is on hold till Minnesota decides what side they want to drill from. Set to collar in casing at lebbett had issues with casing length will collaring first thing tomorrow morning. |
| 1-Aug-20 | Marshall RD | 8 | 8 | | 7.1 | Minn LTD started excavating launch pit on north side of Marshall Rd. Not ready for us (Standby time). |
| 3-Aug-20 | Marshall RD | 4 | 8 | | 7.1 | Waiting for pit to be dug (Standby time). |
| 4-Aug-20 | Marshall RD | 9.5 | 2.5 | | 7.1 | Had to continuously stop and give our excavator to blasting crew, being shut down for blasting (Standby time). |
| 4-Aug-20 | Labette Terrace RD | 6.5 | 3.5 | | 7.1 | Waiting for welders, 10-12 and 12:30-2pm (Standby time). |
| 8-Aug-20 | Neosho Rd | 9 | 1 | | 7.1 | Waited for Minn Ltd. For an hour to come unload product pipe (Standby time). |
| 12-Aug-20 | Missouri RD | 10 | 10 | | 7.1 | Pit full of water, on standby all day |
| 13-Aug-20 | Missouri RD | 2 | 8 | | 7.1 | Dewater bore pit and wait for second excavator to set up equipment (Standby time). |
| 14-Aug-20 | Missouri RD | 9.5 | 0.5 | | 7.1 | Dewater Pit (Standby time). |

| Date | Location | | | Terms & Conditions | |
|---|---|---|---|---|---|
| 17-Aug-20 | Missouri RD | 7.5 | 2.5 | 7.1 | Wait for welders (Standby time). |
| 20-Aug-20 | Marshall RD | 8 | 4 | 7.1 | Had to wait on fuel truck to get out of the way, had to shut down multiple times for mat truck to get through, waited on welders (Standby time). |
| 20-Aug-20 | 1650 RD | 6 | 4 | 7.1 | Pumped water out of exit pit at 1650 Rd from 12:30 to 4:30 (Standby time). |
| 21-Aug-20 | Marshall RD | 9 | 3 | 7.1 | Waited on welders 9:50AM-1PM (Standby time). |
| 21-Aug-20 | 1650 RD | | 10 | 7.1 | Pumped water out of exit pit at 1650 Rd from 12:30 to 4:30 (Standby time). |
| 24-Aug-20 | 1650 RD | | 12 | 7.1 | Waiting for Minn. Ltd to move the boring machine to site while tunneling crew dewatering 1650 pits (Standby time). |
| 27-Aug-20 | 1650 RD | | 12 | | Nigth shift scheduled but no operator from Minn. Ltd. showed up (Standby time). |

345.5

Summary

| Terms & Conditions | Hours | Rate / HR | Amount |
|---|---|---|---|
| 7.1 | 345.5 | $ 1,450.00 | $ 500,975.00 |

Total Change Amount   $500,975.00

# EXHIBIT E


CLIENT/OWNER: Minnesota Limited - Southern Star   DATE: _____
WORK PRFM'D. BY: The HDD Company, Inc.   EXTRA WRK. SHT. NO.: Day Shift
DESCPTN. OF WORK: Time spent reinstalling 36" pipeline, Multiple days from 6/22/20 - 7/15/20 and 8/22/20 - 9/9/20
0
0
0

## A - EQUIPMENT

| EQUIP. NO. | Company Owned Equipment | HRS. | RATE/HR. | TOTAL/DAY |
|---|---|---|---|---|
| 1 | Drilling Rig HDD Rig 7 - Vermeer 750 | 408.00 | $205.56 | $83,868.48 |
| 1 | Mud Tank / Solids Control Unit | 408.00 | $111.96 | $45,679.68 |
| 1 | Sump Pit/Trash Pump | 408.00 | $8.29 | $3,382.32 |
| 1 | Mud Pumping Units | 408.00 | $60.94 | $24,863.52 |
| 2 | Tool Van and tools | 408.00 | $17.55 | $14,320.80 |
| 0 | Dump Truck A=17 TRUN 2AXL | | | |
| 3 | Vac. Truck A-17 TRUN 2AXL | 408.00 | $45.75 | $55,998.00 |
| 10 | Misc. Trailers | 408.00 | $1.79 | $7,303.20 |
| 1 | Haul Trucks | 408.00 | $34.13 | $13,925.04 |
| 1 | 6 3/4" Non Mag Drill Collars w/Jet Assembly | 408.00 | $6.83 | $2,786.64 |
| 168 | Drill Pipe (5+1/2 FH) | 408.00 | $0.53 | $36,328.32 |
| 2 | Misc. X-Subs and Rack (All X Subs for Spread) | 408.00 | $5.20 | $4,243.20 |
| 0 | Sonde and Housing | | | |
| 0 | Steering Tool (North Referencing w/Tru-Gyde) | | | |
| 48 | Rollers | 408.00 | $1.50 | $29,376.00 |
| 3 | Ford F-250 T&TT 06-12 | 408.00 | $5.04 | $6,168.96 |
| 0 | Ford F-450 T&TT 20-28 | | | |
| 0 | Ford F-250 T&TT 20-28 | | | |
| 0 | KW & Crane Truck | | | |
| 1 | Hammer | 408.00 | $41.93 | $17,107.44 |
| 1 | 300 Amp Welder | 408.00 | $9.49 | $3,871.92 |
| 1 | 1/2 Ton Truck | 408.00 | $32.48 | $13,251.84 |
| 1 | 60" Casing | 408.00 | $3.25 | $1,326.00 |
| 0 | Mud Bins | | | |

### Rental Equipment

| EQUIP. NO. | Description | | HRS. | RATE/HR. | TOTAL/DAY |
|---|---|---|---|---|---|
| 1 | 10K Reach Forklift | S.T. | 408.00 | $51.29 | $20,926.32 |
| 2 | 225 Excavator | S.T. | 408.00 | $91.59 | $74,737.44 |
| 2 | Portable toilets | S.T. | 408.00 | $1.50 | $1,224.00 |
| 0 | Multiquip 20kW Generator | S.T. | | | |
| 3 | Frac Tank | S.T. | 408.00 | $7.32 | $8,959.68 |
| 1 | Trash Bin | S.T. | 408.00 | $4.97 | $2,027.76 |
| 1 | 500 Amp Welder | S.T. | 408.00 | $9.49 | $3,871.92 |
| 2 | Light Tower | S.T. | 408.00 | $7.61 | $6,209.76 |
| 1 | 175 KW Generator | S.T. | 408.00 | $71.36 | $29,114.88 |
| 1 | 6" Diesel Trash Pump | S.T. | 408.00 | $23.60 | $9,628.80 |
| 1 | HTI Mud Motor | S.T. | 408.00 | $42.50 | $17,340.00 |

| | | |
|---|---|---|
| COMPANY OWNED EQUIPMENT | | 363,801.36 |
| RENTAL EQUIPMENT W/ 15% Markup | | 200,146.64 |
| A= EQUIPMENT SUB - TOTAL COST | | $563,948.00 |
| 0.00 | % Sales Tx, Rental Equip. | |

## B - MATERIALS

| MATERIALS DESCRIPTION | QTY. USED | UNIT $ | TOTAL |
|---|---|---|---|
| Bentonite | 86.00 | $9.50 | $817.00 |
| Cement | 54.00 | $9.50 | $513.00 |
| Shaker Screens | 6.00 | $135.00 | $810.00 |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| B-MATERIALS SUB-TOTAL COST | | | $2,140.00 |
| 0.00 % Sales Tax | | | |
| 15 % ADDED M, U, & | | | $321.00 |
| SUB-TOTAL A + B w/Tax | | | $566,409.00 |

## C - SUBCONTRACT / WORK DONE BY SPECIALISTS/THIRD PARTY SERVICES

| Work Description | Individual / Company | Unit | RATE | TOTAL $ |
|---|---|---|---|---|
| Coating and Corrosion Expert | Lake Superior Consultants | 1.00 | $19,702.53 | $19,702.53 |
| Vac Trucks | Hurricane Services | 1.00 | $39,415.00 | $39,415.00 |
| Disposal Charges | Anderson County Landfill | 1.00 | $18,103.40 | $18,103.40 |
| 0 | | 0 | | $ - |
| 0 | | 0 | | $ - |
| COST OF SUBS - C | | | | $77,220.93 |
| 15 % MARK-UP (Subcontractor) | | | | $11,583.14 |
| | | | * | $88,804.07 |
| TOTAL COST A + B + C (Including Mark-Up) | | | | $655,213.07 |

## D - LABOR

| NO. | D - LABOR | | HRS. | BASE RATE w/FRNG'S. | SUB TOTAL | Per Diem Totals | TOTAL |
|---|---|---|---|---|---|---|---|
| 1 | Chris Crough (Day Rate) | REG. | 33.00 | $1,016.84 | $33,555.72 | $1,320.00 | $34,875.72 |
| | | O.T. | 0 | | $0.00 | | $0.00 |
| | | D.T. | 0 | | $0.00 | | $0.00 |
| 2 | Randy Foster (Day Rate) | REG. | 17.00 | $968.88 | $16,470.96 | $1,700.00 | $18,170.96 |
| | | O.T. | | | $0.00 | | $0.00 |
| | | D.T. | | | $0.00 | | $0.00 |
| 3 | Harold Shoemaker (Day...) | REG. | 17.00 | $755.00 | $12,835.00 | $1,785.00 | $14,620.00 |
| | | O.T. | | | $0.00 | | $0.00 |
| | | D.T. | | | $0.00 | | $0.00 |
| 4 | Justin Potter | REG. | 104.00 | $59.79 | $6,218.16 | $1,495.00 | $7,713.16 |
| | | O.T. | 52.00 | $80.65 | $4,193.80 | | $4,193.80 |
| | | D.T. | | | $0.00 | | $0.00 |
| 5 | Brandon Morris | REG. | 112.00 | $39.83 | $4,460.96 | | $5,720.96 |
| | | O.T. | 52.00 | $54.42 | $2,829.58 | | $2,829.58 |
| | | D.T. | | | $0.00 | | $0.00 |
| 6 | David Jones | REG. | 248.00 | $42.86 | $10,629.28 | $3,255.00 | $13,884.28 |
| | | O.T. | 125.00 | $58.96 | $7,370.00 | | $7,370.00 |
| | | D.T. | | | $0.00 | | $0.00 |
| 7 | Brandon Sammet | REG. | 184.00 | $59.79 | $11,001.36 | $2,415.00 | $13,416.36 |
| | | O.T. | 97.00 | $80.65 | $7,823.05 | | $7,823.05 |
| | | D.T. | | | $0.00 | | $0.00 |
| 8 | Roger Reeter | REG. | 112.00 | $59.79 | $6,696.48 | $1,400.00 | $8,096.48 |
| | | O.T. | 66.00 | $80.65 | $5,322.90 | | $5,322.90 |
| | | D.T. | | | $0.00 | | $0.00 |
| 9 | Augustin Zepeda | REG. | 128.00 | $36.83 | $4,714.24 | $1,680.00 | $6,394.24 |
| | | O.T. | 69.00 | $69.49 | $4,794.81 | | $4,794.81 |
| | | D.T. | | | $0.00 | | $0.00 |
| 10 | Johnny Hatfield | REG. | 128.00 | $43.49 | $5,566.72 | $800.00 | $6,366.72 |
| | | O.T. | 69.00 | $59.91 | $4,133.45 | | $4,133.45 |
| | | D.T. | | | $0.00 | | $0.00 |
| 11 | Stephen Davis | REG. | 224.00 | $43.49 | $9,741.76 | $1,120.00 | $10,861.76 |
| | | O.T. | 112.00 | $59.91 | $6,709.36 | | $6,709.36 |
| | | D.T. | | | $0.00 | | $0.00 |
| 12 | Bruce Cooper | REG. | 224.00 | $44.53 | $9,974.72 | $1,120.00 | $11,094.72 |
| | | O.T. | 109.00 | $60.70 | $6,615.76 | | $6,615.76 |
| | | D.T. | | | $0.00 | | $0.00 |
| 13 | Juan Miguel Suarzes | REG. | 101.00 | $36.83 | $3,719.83 | $650.00 | $4,369.83 |
| | | O.T. | 48.00 | $49.92 | $2,395.92 | | $2,395.92 |
| | | D.T. | | | | | $0.00 |

| | |
|---|---|
| D - LABOR SUB-TOTAL | $207,773.81 |
| 15 % Labor Surcharge | $31,166.07 |
| SUBTOTAL | $238,939.88 |
| 15 % MARKUP ON LABOR | $35,840.98 |

## E - MISCELLANEOUS ITEMS

| MBSC. DESCRIPTIONS | QTY. | Unit $ | EX. AMOUNT |
|---|---|---|---|
| Hotel | 96 | $58.00 | $5,568.00 |
| | 155 | $68.00 | $10,540.00 |
| Subsistance | 0 | | $ - |
| Misc. Items | 0 | | $ - |
| 0 | 0 | | $ - |
| 0 | 0 | | $ - |
| 0 | 0 | | $ - |
| 0 | 0 | | $ - |
| 0 | 0 | | $ - |
| E- MISCELLANEOUS ITEMS SUB TOTAL | | | $16,108.00 |
| 5 % Sales/City/Room Tax | | | $805.40 |
| 15 % ADDED MARK-UP | | | $2,416.20 |
| 0 % Tax on Misc. Items | | | $ - |
| SUB TOTAL - E | | | $19,329.60 |

## TOTALS

| | |
|---|---|
| TOTAL COST A+B+C (Equipment /Material /Sub-Contractors) | $655,213.07 |
| TOTAL COST = D (Labor) | $274,780.86 |
| TOTAL COST = E (Miscellaneous Items) | $19,329.60 |
| SUB-TOTAL | $949,323.54 |
| 2.5 % BOND & INSURANCE | $23,733.09 |
| TOTAL COST THIS SHEET | $973,056.63 |

## CLIENT DIRECTIVES AND COMMENTS

| TIME | CLIENT DIRECTIVES AND COMMENTS |
|---|---|
| 0:00 | (See Daily Work Report) |
| 0:00 | |
| 0:00 | |
| 0:00 | |
| 0:00 | |
| 0:00 | |

# EXHIBIT F

**PROJECT NAME:**

**PROJECT NO.:** Southern Star Line DT & DS Replacement

Horizontal Directional Drilling

**CLIENT/OWNER:** Minnesota Limited – Southern Star   **DATE:**

**WORK PRFM'D. BY:** The HDD Company, Inc.   **EXTRA WRK. SHT. NO.:** Night Shift

**DESCPT'N. OF WORK:** Time spent reinstalling 36" pipeline, Multiple days from 6/22/20 + 7/15/20 and 8/22/20 + 9/9/20

0
0
0

## A – EQUIPMENT

| EQUIP. NO. | Company Owned Equipment | HRS. | RATE/HR. | TOTAL/DAY |
|---|---|---|---|---|
| 1 | Drilling Rig HDD Rig 7 - Vermeer 750 | 300,00 | $ 205,56 | $ 61.668,00 |
| 1 | Mud Tank / Solids Control Unit | 300,00 | $ 111,96 | $ 33.588,00 |
| 1 | Sump Pit/Trash Pump | 300,00 | $ 8,29 | $ 2.487,00 |
| 1 | Mud Pumping Units | 300,00 | $ 60,94 | $ 18.282,00 |
| 2 | Tool Van and tools | 300,00 | $ 17,55 | $ 10.530,00 |
| 0 | Dump Truck A-17 TRUN 2AXL | | | |
| 3 | Vac. Truck A-17 TRUN 2AXL | 300,00 | $ 45,75 | $ 41.175,00 |
| 10 | Misc. Trailers | 300,00 | $ 1,79 | $ 5.370,00 |
| 1 | Haul Trucks | 300,00 | $ 34,13 | $ 10.239,00 |
| 1 | 6 3/4" Non Mag Drill Collars or Jet Assembly | 300,00 | $ 6,83 | $ 2.049,00 |
| 168 | Drill Pipe (5-1/2 FH) | 300,00 | $ 0,53 | $ 26.712,00 |
| 2 | Misc. X-Subs and Rack (All X Subs for Spread) | 300,00 | $ 5,20 | $ 3.120,00 |
| 0 | Sonde and Housing | | | |
| | Steering Tool (North Referencing or Tru-Gyde) | | | |
| 48 | Rollers | 300,00 | $ 1,50 | $ 21.600,00 |
| 3 | Ford F-250 T&TT 06-12 | 300,00 | $ 7,50 | $ 6.750,00 |
| 0 | Ford F-450 T&TT 20-28 | | | |
| 0 | Ford F-350 T&TT 20-28 | | | |
| 0 | KW & Crane Truck | | | |
| 1 | Hammer | 300,00 | $ 41,93 | $ 12.579,00 |
| 1 | 300 Amp Welder | 300,00 | $ 9,49 | $ 2.847,00 |
| 1 | 1/2 Ton Truck | 300,00 | $ 32,48 | $ 9.744,00 |
| 1 | 60" Casing | 300,00 | | $ - |
| 0 | Mud Bins | | | |

| | Rental Equipment | | | |
|---|---|---|---|---|
| 1 | 10K Reach Forklift | S.T. / O.T. | 300,00 | $ 51,29 | $ 15.387,00 |
| 1 | 225 Excavator | S.T. / O.T. | 300,00 | $ 91,89 | $ 54.954,00 |
| 2 | Portable toilets | S.T. / O.T. | 300,00 | $ 1,50 | $ 900,00 |
| 0 | Multiquip 20kW Generator | S.T. / O.T. | | | $ - |
| 3 | Frac Tank | S.T. / O.T. | 300,00 | $ 7,32 | $ 6.588,00 |
| 1 | Trash Bin | S.T. / O.T. | 300,00 | $ 4,97 | $ 1.491,00 |
| 1 | 500 Amp Welder | S.T. / O.T. | 300,00 | $ 9,49 | $ 2.847,00 |
| 2 | Light Tower | S.T. / O.T. | 300,00 | $ 7,61 | $ 4.566,00 |
| 1 | 175 KW Generator | S.T. / O.T. | 300,00 | $ 71,36 | $ 21.408,00 |
| 1 | 6" Diesel Trash Pump | S.T. / O.T. | 300,00 | $ 23,60 | $ 7.080,00 |
| 1 | HTI Mud Motor | S.T. / O.T. | 300,00 | $ 42,50 | $ 12.750,00 |

| COMPANY OWNED EQUIPMENT | | | | $ 268.740,00 |
| RENTAL EQUIPMENT W/ 15% Markup | | | | $ 147.166,65 |
| A=EQUIPMENT SUB=TOTAL COST | | | | $ 415.906,65 |
| 0,00 % Sales Tx, Rental Equip. | | | | $ - |

## B – MATERIALS

| | MATERIALS DESCRIPTION | QTY. USED | UNIT $ | TOTAL |
|---|---|---|---|---|
| 0 | | | $ - | $ - |
| 0 | | | $ - | $ - |
| 0 | | | $ - | $ - |
| 0 | | | $ - | $ - |
| 0 | | | $ - | $ - |
| 0 | | | $ - | $ - |
| 0 | | | $ - | $ - |
| 0 | | | $ - | $ - |
| 0 | | | $ - | $ - |

| B=MATERIALS SUB-TOTAL COST | | $ - |
| 0,00 % Sales Tax | | $ - |
| 10 % ADDED M, U, B | | $ - |
| SUB=TOTAL A + B w/Tax | | $ 415.906,65 |

## C – SUBCONTRACT / WORK DONE BY SPECIALISTS/THIRD PARTY SERVICES

| Work Description | Individual / Company | Unit | RATE | TOTAL $ |
|---|---|---|---|---|
| | | | | $ - |

| COST OF SUBS - C | | $ - |
| 15 % MARK-UP(Subcontractor) | | $ - |
| TOTAL COST A - B - C (including Mark-Up) | | $ 415.906,65 |

## D – LABOR

| NO. | | HRS. | BASE RATE w/FRINGE % | SUB TOTAL | Per Diem Totals | TOTAL |
|---|---|---|---|---|---|---|
| 1 | Sharon Posey (Day Re) REG. | 33,00 | $755,00 | $24.915,00 | $2.700,00 | $27.645,00 |
| | O.T. | 0 | | $0,00 | | $0,00 |
| | D.T. | | | $0,00 | | $0,00 |
| 2 | Jacob Hoffman REG. | 131,00 | $59,79 | $7.832,49 | $2.380,00 | $10.212,49 |
| | O.T. | 69,00 | $80,65 | $5.564,85 | | $5.564,85 |
| | D.T. | | | $0,00 | | $0,00 |
| 3 | Westin Colgrove REG. | 96,00 | $59,79 | $5.739,84 | $1.260,00 | $6.999,84 |
| | O.T. | 68,00 | $80,65 | $5.484,20 | | $5.484,20 |
| | D.T. | | | $0,00 | | $0,00 |
| 4 | Dustin Anderson REG. | 195,00 | $48,20 | $9.399,00 | $1.920,00 | $11.319,00 |
| | O.T. | 90,00 | $66,20 | $6.090,40 | | $6.090,40 |
| | D.T. | | | $0,00 | | $0,00 |
| 5 | Jeromie Acres REG. | 164,00 | $46,20 | $7.576,80 | $1.680,00 | $9.256,80 |
| | O.T. | 96,00 | $63,20 | $6.067,20 | | $6.067,20 |
| | D.T. | | | $0,00 | | $0,00 |
| 6 | Abraham Berrospe REG. | 159,00 | $36,63 | $5.855,97 | $960,00 | $6.815,97 |
| | O.T. | 95,00 | $49,92 | $4.741,83 | | $4.741,83 |
| | D.T. | | | $0,00 | | $0,00 |
| 7 | Larry Roseboro REG. | 76,00 | $59,79 | $4.723,41 | $500,00 | $5.223,41 |
| | O.T. | 35,00 | $80,65 | $2.822,75 | | $2.822,75 |
| | D.T. | | | $0,00 | | $0,00 |
| 8 | Dusty Cline REG. | 24,00 | $59,79 | $1.434,96 | $315,00 | $1.749,96 |
| | O.T. | 12,00 | $80,65 | $967,80 | | $967,80 |
| | D.T. | | | $0,00 | | $0,00 |
| 9 | Taylor Crowley REG. | 56,00 | $36,83 | $2.062,48 | $350,00 | $2.412,48 |
| | O.T. | 40,00 | $52,66 | $2.106,40 | | $2.106,40 |
| | D.T. | | | $0,00 | | $0,00 |
| 10 | Jim Rubick REG. | 123,00 | $59,79 | $7.354,17 | $1.575,00 | $8.929,17 |
| | O.T. | 65,00 | $80,65 | $5.242,25 | | $5.242,25 |
| | D.T. | | | $0,00 | | $0,00 |
| 11 | Barion Snowten REG. | 60,00 | $38,66 | $3.092,80 | $1.725,00 | $4.817,80 |
| | O.T. | 60,00 | $52,66 | $3.159,60 | | $3.159,60 |
| | D.T. | | | $0,00 | | $0,00 |
| 12 | Kenny Densmore REG. | 80,00 | $59,79 | $4.783,20 | $1.050,00 | $5.833,20 |
| | O.T. | 60,00 | $80,65 | $4.839,00 | | $4.839,00 |
| | D.T. | | | $0,00 | | $0,00 |

| | | D=LABOR SUB-TOTAL | $ 148.301,50 |
| 15 % Labor Surcharge | | | $ 22.245,22 |
| | SUBTOTAL | | $ 170.546,72 |
| 15 % MARKUP ON LABOR | | | $ 25.582,01 |

## E – MISCELLANEOUS ITEMS

| MISC. DESCRIPTIONS | QTY. | Unit $ | EX. AMOUNT |
|---|---|---|---|
| **Hotel** | | | |
| | | $ 58,00 | $ - |
| | | $ 68,00 | $ - |
| **Subsistance** | 0 | | $ - |
| **Misc. Items** | | | |
| 0 | 0 | | $ - |
| 0 | 0 | | $ - |
| 0 | 0 | | $ - |
| 0 | 0 | | $ - |
| 0 | 0 | | $ - |

| E=MISCELLANEOUS ITEMS SUB TOTAL | | $ - |
| 0 % Sales/City/Room Tax | | $ - |
| 15 % ADDED MARK-UP | | $ - |
| 0 % Tax on Misc. Items | | $ 0 |
| SUB TOTAL - E | | $ - |

## TOTALS

| TIME | CLIENT DIRECTIVES AND COMMENTS |
|---|---|
| 0:00 | (See Daily Work Report) |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |

| TOTAL COST A+B+C (Equipment ,Material ,SubContractors) | | $ 415.906,65 |
| TOTAL COST + D (Labor) | | $ 196.128,73 |
| TOTAL COST + E (Miscellaneous items) | | $ - |
| | SU | $ 612.035,38 |
| 2,6 % BOND & INSURANCE | | $ 15.300,88 |
| TOTAL COST THIS SHEET | $ 627.336,26 |

THE HDD COMPANY:

(Signature)

DATE: _____

CLIENT (Signature)

DATE: _____

# EXHIBIT G



Addendum #4
Subcontract Agreement
SR1916169002

The following addition is made to the Subcontract Agreement with HHD Company:

- Per the attached documents for a total of $555,000.00

*This cannot be invoiced for until all drills are pulled and bores are installed*

Any additional state and local taxes incurred will be charged accordingly.

Minnesota Limited:

_____

HDD Company

_____

# Exhibit 7

**IN THE DISTRICT COURT OF ANDERSON COUNTY, KANSAS**

<u>**NOTICE OF MECHANICS' LIEN FILING**</u>

COMES NOW The HDD Company, Inc., an Oregon Corporation, and submits Notice

that it has filed its Mechanics' Lien pursuant to K.S.A. § 55-208 in Franklin County, KS, Lien

No. FR-2021-SL-000002, a file-stamped copy of which is attached as Exhibit A hereto, upon

pipeline which was partially performed in Anderson County, KS.

Respectfully submitted,

HUSCH BLACKWELL, LLP

<u>/s/ *Michael J. Kelly*</u>
Michael J. Kelly        KS #25666
4801 Main Street, Suite 1000
Kansas City, Missouri 64112
(816) 983-8000 (Phone)
(816) 983-8080 (FAX)
mike.kelly@huschblackwell.com

**ATTORNEYS FOR THE HDD COMPANY, INC.**

ELECTRONICALLY FILED
2021 Jan 06 PM 4:35
CLERK OF THE FRANKLIN COUNTY
IN THE DISTRICT COURT OF FRANKLIN COUNTY, KANSAS
CASE NUMBER:  FR-2021-SL-000002
PII COMPLIANT

**EXHIBIT A**

Mechanic's Lien No. _____

## STATEMENT FOR MECHANIC'S LIEN

### (K.S.A. §55-208)

**AMOUNT OF CLAIM:**     $5,887.143.28 (exclusive of interest)

**NAME OF LANDOWNERS:**    **Rene and Anita Bures**
Jobsite and Mailing Address:    31443 NW Meade Rd., Richmond, KS 66080

**John T. Rayne; Patrick Arthur Rayne and Kelly Lee Rayne Family Trust Under Trust Agreement date April 12, 2016; and Keith J. Pickert and Mary J. Pickert, co-trustee of the Pickert Family Trust u/a/d March 12, 2016**

Jobsite Address:    00000 NW Meade Rd., Garnett, KS 66032

Mailing Address:    John Rayne: 12 Overhill Dr., Paola, KS 66071

Patrick Arthur Rayne and Kelly Lee Rayne Family Trust: 102 Crestview Dr, Paola KS 66071

Keith J. Pickert and Mary J. Pickert, co-trustee of the Pickert Family Trust: 47890 Deer Trail Dr Canton, MI 48187

**Black, Lyle D.; Black, Cheryl K.**
Jobsite Address:    3062 Nebraska Rd., Ottawa, KS 66067

Mailing Address:    3159 Neosho Rd., Ottawa, KS 66067-8879

Mortgage Holder:    Frontier Farm Credit, FLCA
1270 N. 300 Rd.
PO Box 858
Baldwin City, KS, 66006

**Oswego Coal Company, Inc.**
Jobsite Address:    3125 Marshall Rd., Ottawa, KS 66067

Mailing Address:    PO Box 368, Ottawa, KS 66067-0368

NAME OF PIPELINE OWNER: Southern Star Central Gas Pipeline, Inc., a Delaware
Corporation.
4700 Highway 56
Owensboro, KY 42301

Registered Agent
The Corporation Company, Inc.
112 SW 7th Street Suite 3C
Topeka, KS 66603

NAME OF CONTRACTOR: Minnesota Limited, LLC., a Minnesota Limited
Liability Corporation
18640 200th Street – PO Box 410
Big Lake, MN 55309

Registered Agent
National Registered Agents, Inc. of KS
112 SW 7th Street Suite 3C
Topeka, KS 66603

NAME OF LIEN CLAIMANT: The HDD Company, Inc., an Oregon Corporation
4525 Serrano Parkway, Office Suite 210
El Dorado Hills, CA 95762

Registered Agent
CT Corporation System
112 SW 7th Street, Suite 3C
Topeka, KS 66603

DESCRIPTION OF       ATTACHED HERETO AS **EXHIBIT A** AND
PROPERTY:            INCORPORATED HEREIN BY THIS REFERENCE,
Southern Star Central Gas Pipeline Project C60266 – 31.5
miles of 36" Pipeline – Line DPA and Launcher and
Receiver located on property commonly known as 31443
NW Meade Rd., Richmond, KS 66080; 00000 NW Meade
Rd., Garnett, KS 66032; 3062 Nebraska Rd, Ottawa, KS
66067 and 3125 Marshall Rd., Ottawa, KS 66067 (the
"Property")

The undersigned, The HDD Company, Inc. ("Lien Claimant"), a subcontractor pursuant to
K.S.A. §55-208, claims a lien upon the Southern Star Central Gas Pipeline ("Pipeline"), on account
of furnishing labor, equipment, and materials for the construction and/or completion of the
Southern Star Central Gas Pipeline Project C60266 ("Project") located in and through Anderson
County, Kansas. The pipeline and the land are described in **Exhibit A**, attached hereto and
incorporated herein by reference. The labor, equipment, and materials supplied by Lien Claimant

were used and consumed in the construction of said Pipeline.  Lien Claimant supplied labor, equipment, and materials to the Project as a subcontractor under agreement with Minnesota Limited, L.L.C., the original contractor ("Contractor"), which in turn was under agreement with Southern Star Central Gas Pipeline, Inc., the owner of the Project ("Project Owner").

The aforesaid claim, a reasonably itemized statement of which is attached to this lien statement (**Exhibit B**) and copies of documentation (**Exhibit C**) substantiating the labor, equipment, and materials supplied to the Project Owner by Lien Claimant for improvements upon the Property, is filed in order that it may constitute a lien upon the above-described Pipeline, and every other right, title, and interest in said Pipeline.  The amount claimed as owing is FIVE MILLION EIGHT HUNDRED EIGHTY-SEVEN THOUSAND, ONE HUNDRED FORTY-THREE DOLLARS and 28/100 ($5,887,143.28), exclusive of interest.

Lien Claimant last supplied labor, materials, and/or equipment within four (4) months of the date of this lien statement.

WITNESS the hand of said Lien Claimant this 5th day of ___Jan___ 2020.

ON BEHALF OF:  **The HDD Company, Inc.**, Lien Claimant

By: _____
    Jeremy King
    Vice President
    The HDD Company, Inc.

## VERIFICATION

STATE OF CALIFORNIA )
                               ) ss.
COUNTY OF *El Dorado* )

    Jeremy King, of lawful age, being first duly sworn upon his oath, that he is the Vice President and duly authorized representative of The HDD Company, Inc. and is duly authorized to make this verification on its behalf; and does verify under penalty of perjury that the above and foregoing statement is true and correct based on his personal knowledge, and is a just and true account of the demand of and the amount due Lien Claimant.

ON BEHALF OF: **The HDD Company, Inc.,** Lien Claimant

By: _____
          Jeremy King
          Vice President
          The HDD Company, Inc.


STATE OF CALIFORNIA )
                               ) ss.
COUNTY OF )

    On this ____ day of _____, 2020, before me appeared Jeremy King, to me personally known, who being by me duly sworn did say that he is the Vice President and duly authorized representative of The HDD Company, Inc., and that he acknowledged that his execution of the foregoing instrument is on behalf of said company.

    IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal in the County and State aforesaid, the day and year first above written.


_____
Notary Public

_____
Printed Name

My Commission Expires:

_____

# ALL-PURPOSE
# CERTIFICATE OF ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California )

County of El Dorado )

On January 5, 2021 before me, Wendy Brooke Notary Public
(Here enters name and title of the officer)

personally appeared, Jeremy King
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

*[signature: Wendy Brooke]*
Signature _____ (Seal)

> WENDY BROOKE
> COMM. #2319236
> Notary Public - California
> El Dorado County
> Comm. Expires Feb 11, 2024

## ADDITIONAL OPTIONAL INFORMATION

DESCRIPTION OF THE ATTACHED DOCUMENT

Statement for Mechanic's Lien
(Title or description of attached document)

_____
(Title or description of attached document continued)

Number of Pages _____ Document Date _____

CAPACITY CLAIMED BY THE SIGNER
☐ Individual (s)
☐ Corporate Officer
_____
(Title)
☐ Partner(s)
☐ Attorney-in-Fact
☐ Trustee(s)
☐ Other _____

### INSTRUCTIONS FOR COMPLETING THIS FORM

This form complies with current California statutes regarding notary wording and, if needed, should be completed and attached to the document. Acknowledgments from other states may be completed for documents being sent to that state so long as the wording does not require the California notary to violate California notary law.

- State and County information must be the State and County where the document signer(s) personally appeared before the notary public for acknowledgment.
- Date of notarization must be the date that the signer(s) personally appeared which must also be the same date the acknowledgment is completed.
- The notary public must print his or her name as it appears within his or her commission followed by a comma and then your title (notary public).
- Print the name(s) of document signer(s) who personally appear at the time of notarization.
- Indicate the correct singular or plural forms by crossing off incorrect forms (i.e. he/she/they, is /are ) or circling the correct forms. Failure to correctly indicate this information may lead to rejection of document recording.
- The notary seal impression must be clear and photographically reproducible. Impression must not cover text or lines. If seal impression smudges, re-seal if a sufficient area permits, otherwise complete a different acknowledgment form.
- Signature of the notary public must match the signature on file with the office of the county clerk.
  - ❖ Additional information is not required but could help to ensure this acknowledgment is not misused or attached to a different document.
  - ❖ Indicate title or type of attached document, number of pages and date.
  - ❖ Indicate the capacity claimed by the signer. If the claimed capacity is a corporate officer, indicate the title (i.e. CEO, CFO, Secretary).
- Securely attach this document to the signed document with a staple.

EXHIBIT A

Pipeline: Southern Star Central Gas Pipeline Project C60266 – 31.5 miles of 36" Pipeline – Line
DPA and Launcher and Receiver

31443 NW Meade Rd., Richmond, KS 66080
The South Half (S½) of the Northeast Quarter (NE¼) of Section Thirty-four (34), Township
Nineteen (19), Range Nineteen (19) AND the Southeast Quarter (SE¼) of Section Thirty-four
(34), Township Nineteen (19), Range Nineteen (19), excepting that part of the last described
quarter section lying South of the center of Pottawatomie Creek, and EXCEPT One acre of land
situated in the N. E. 1/4 of Section 34 and the S. E. 1/4 of Section 34 all in Township 19 S.,
Range 19 E., Anderson County, Kansas and being more particularly described as follows:
Commencing at the S. E. corner of the N. E. 1/4 of Section 34, Township 19 S., Range 19 E.,
Anderson County, Kansas; thence N. 0°01'46" E. along the East line of said N. E. 1/4 a distance
of 58.87 ft. to a point; thence N. 89°31'34" W. a distance of 235.50 ft. to a point; thence S.
0°01'46" W. a distance of 61.88 ft. to a point on the N. Line of the S. E. 1/4 Section 34,
Township 19 S., Range 19 E; thence continuing S. 0°0146" W., a distance of 123.09 ft. to a
point; thence S. 89°31'34" E., a distance of 235.50 ft. to a point on the East line of said S. E. 1/4;
thence N. 0°01'46" E. along said East line a distance of 126.10 ft. to the POINT OF
BEGINNING.

00000 NW Meade Rd., Garnett, KS 66032
The Northeast Quarter (NE¼), except 1.52 acres in the northeast corner north of Pottawatomie
River, of Section 3, Township 20 South, Range 19 East of the 6th P.M., Anderson County,
Kansas.

3125 Marshall Rd., Ottawa, KS 66067
All that part of the Southwest Quarter of Section 5, Township 17 South, Range 20 East, in
Franklin County, Kansas, being more particularly described as follows: Commencing at the
Southwest corner of the Southwest Quarter of said Section 5; thence North 87° 40' 17" East,
along the South line of the Southwest Quarter of said Section 5, a distance of 70.01 feet to
the point of beginning; thence North 03° 14' 35" West, along a line 70.00 feet East of and
parallel with the West line of the Southwest Quarter of said Section 5, a distance of 1647.63
feet; thence North 60° 00' 55" East, a distance of 1074.78 feet; thence South 01° 52' 54" East,
a distance of 2146.36 feet to a point on the South line of the Southwest Quarter of said
Section 5; thence South 87° 40' 17" West, along the South line of the Southwest Quarter of
said Section 5, a distance of 908.94 feet to the point of beginning, Franklin County, Kansas.

3062 Nebraska Rd., Ottawa, KS 66067:
The East 1/4 of the Southeast 1/4 of the Northeast 1/4 of Sec. 6, Twp. 17 S., Rng. 20 E., subject
to any part thereof in roads, all in Franklin County, Kansas.
AND
Beginning at the Northwest corner of the Northwest Quarter of Section 5, Township 17 South,
Range 20 East of the 6th P.M., thence South 02° 59' 16" East 680.67feet on the West line of the

Northwest Quarter of said Section 5 to an existing 1/2" iron bar and the true point of beginning of New Tract 2; thence North 88° 18' 09" East 1327.15 feet to the East line of the Northwest Quarter of the Northwest Quarter of said Section 5, being marked with a 1/2" iron bar; thence South 03° 06' 08" East 613.78 feet to the Southeast corner of said Northwest Quarter of the Northwest Quarter of said Section 5, being marked with a 1/2" iron bar; thence South 03° 06' 08" East 659.24 feet to the Southeast corner of the North Half of the Southwest Quarter of the Northwest Quarter of said Section 5, being marked with a 1/2" iron bar; thence South 88° 26' 25" West 1329.76 feet to the Southwest corner of the North Half of the Southwest Quarter of the Northwest Quarter of said Section 5, being marked with an existing 1/2" iron bar; thence North 02° 59' 16" West 661.16 feet to the Southwest corner of the Northwest Quarter of the Northwest Quarter of said Section 5, being marked with an existing 1/2" iron bar; thence North 02° 59' 16" West 608.61 feet to the point of beginning, all in Franklin County, Kansas.

EXHIBIT B

Statement of Account

| | |
|---|---|
| Amount Due Per Agreement: | $6,185,936.00 |
| Delay Expenses: | $159,868.58 |
| Standby Expenses: | $500,975.00 |
| Extraction and Re-Installation | $1,600,392.89 |
| Differing Site Condition Costs | $555,000.00 |
| Retainage Withheld: | $599,640.00 |
| Less Payments Made: | $3,115,029.19 |
| Total Amounts Due and Owing: | $5,887,143.28 |

# EXHIBIT C

C1: Subcontract Agreement
C2: Delay Summaries
C3: Standby Expense Summary
C4: Day Shift and Night Shift Summaries
C5: Addendum 4

(Attached hereto)

# EXHIBIT A



**Subcontractor Agreement**
**No. SR1916169002**

This agreement is made at Big Lake, MN this day of __ January 17, 2020 ___

**BETWEEN:**

Minnesota Limited, LLC (Contractor)
18640 200ᵗʰ Street – PO Box 410
Big Lake, MN 55309

**AND:**

THE HDD COMPANY(Subcontractor)
4525 SERRANO PARKWAY, OFFICE SUITE 210
EL DORADO HILLS, CA 95762

**RECITALS**

Contractor ("Minnesota Limited, LLC) has entered into a contract (the "Prime Contract") with Southern Star Central Gas Pipeline, Inc. ("Owner") to perform certain labor and furnish certain materials for completion of the construction project KS - C60266 Install 31.5 miles of 36" (the "Project"). Subcontractor desires to perform certain services and/or provide certain materials as a subcontractor of Contractor pursuant to the terms and conditions of the Prime Contract, and agrees to the terms and conditions of this Agreement.

**AGREEMENT**

In consideration of the mutual covenants contained herein, the parties agree as follows:

I.     Subcontractor agrees to supply all the materials and labor and pay all license fees, permits and expenses for the work located at __Various Sites_____ (the "Site"). As full compensation for performance of this Agreement and subject to all applicable provisions of this Agreement, Contractor agrees to pay Subcontractor:
        six million one-hundred eight-five thousand nine-hundred thirty six dollars($6185936.00            )

II.     **Contract Document.** Subcontractor's performance hereunder shall be subject to all terms and conditions contained in the Prime Contract and all drawings and/or specifications referred to therein (the "Contract Documents") except as such terms may be specifically amended by this Agreement, which includes HDD's Proposal, attached hereto and incorporated herein. Wherever the Contract Documents shall refer to the Contractor or its agents, the same shall be read to refer to the Subcontractor under this agreement. Subcontractor shall perform and coordinate its work hereunder in a manner necessary to assure the prompt and timely completion of the Project, time being of the essence to the



Agreement. At Subcontractor's request, a copy of the applicable Prime Contract Terms and Conditions will be supplied to Subcontractor.

Any terms and conditions proposed in Subcontractor's acceptance of or in any acknowledgement, invoice, or other form of Subcontractor that add to, vary from, or conflict with these terms hereby objected to. Any such proposed terms shall be void and these terms and conditions (1) shall constitute the complete and exclusive statement of the terms and conditions of the contract between the parties and (2) may be modified only by written instrument executed by the authorized representatives of both parties.

III.     Insurance. Subcontractor shall comply with the insurance requirements set forth in Exhibit A (attached).

IV.     Additional Terms and Conditions

    A.  Subcontractor, not Contractor, assumes all the risk related to in performing its work under this Agreement, such as any injuries to Subcontractor, Subcontractor's workers, Facility employees and members of the public arising from the Subcontractors activities or use of tools and equipment, or from any other cause.

    B.  Subcontractor will complete all work in a workmanlike and professional manner according to standard practices in the building trade, and in compliance with all building codes and other applicable laws. Subcontractor will warrant against defects in material and labor it supplies for the completion of the work. If subcontractor fails to perform under this Agreement, the party entitled to performance or the Contractor will have the right to hire other persons to correct the defective Work and hold Subcontractor liable for the costs thereof including costs, disbursements and reasonable attorneys' fees incurred in the enforcement of this provision.

    C.  All Work will be done on a timely basis. The work to be performed under this contract shall be commenced as directed by Project Manager or Project Superintendent or Project Foreman and shall be substantially completed on or before _as agreed upon and directed onsite_____. Time is of the essence.

    D.  Subcontractor shall indemnify, defend and hold harmless Contractor as set forth in Section VII.

    E.  No work shall be subcontracted or assigned by Subcontractor without the prior written approval of the Contractor.

    F.  Environmental, Health and Safety. Subcontractor shall take all necessary precautions to keep the work site free from hazards that are likely to cause injury, illness, or death or damage to property. Subcontractor shall provide any Safety Data Sheets (SDS) for any hazardous chemicals provided pursuant to this contract. Contractor is a company that operates under a "Culture of Safety" with the goal of zero incidents, and expects its subcontractor to similarly emphasize the paramount importance of safe behavior. Failure to abide by Contractor's policies may result in immediate removal of Subcontractor from the premises and will be a breach of Subcontractor's obligations hereunder.



Contractor shall have the right, at its option, to conduct a complete audit of Subcontractor's documents and practices to verify Subcontractor's compliance with this Section.

G. Minnesota Limited has enacted a Subcontractor Management Program and Safety Requirements of which Subcontractor has received. Subcontractor shall follow and adhere to all aspects of said program and the terms and conditions of such program are incorporated herein.

H. Liens. To the fullest extent permitted by law, and the extent the Contractors has paid the Subcontractor, Subcontractor will at all times keep the Project, the Site and each part thereof free from any attachment, lien, claim of lien, or other encumbrance arising out of the Work and Subcontractor will indemnify, defend and hold Contractor harmless from and against all claims, losses, demands, causes of action or expenses (including attorneys' fees and other costs of defense incurred by Contractor in defending against the foregoing or in enforcing this indemnity and defense obligation) of whatever nature, arising by reason of any such lien, claim of lien, attachment or encumbrance. If any claim is filed to enforce any laborers, material men, mechanic's, or other similar lien arising out of or relating to the Work for which Contractor has paid the Subcontractor, Subcontractor will immediately cause such lien to be released and discharged and if Subcontractor fails to do so, then Contractor will have a right to pay all sums, including attorneys' fees and other costs and expenses incurred necessary to obtain such release and discharge, and hold Subcontractor liable for the amount thereof with the right to deduct all or a portion of such sum from accounts that may be due Subcontractor.

I. Default. In addition to the other remedies available under law: (a) if Subcontractor should fail or refuse, except in cases where extension of time is provided, to supply enough properly skilled workers or proper materials for the Work; or (b) if Subcontractor should fail to make payment to its subcontractors for material or labor which are due to its Subcontractors, or (c) if Subcontractor should fail to keep and comply with any of the terms and provisions of this Agreement, or (d) if Subcontractor should be adjudged bankrupt, file or suffer to be filed a petition for relief under the Bankruptcy Act, or make a general assignment for the benefit of the creditors; or (e) if a receiver should be appointed on account of Subcontractor's insolvency; or (f) if Subcontractor fails to pay its employees' wages, benefits or tax withholdings; then, in any such event, Contractor may without prejudice to any other right or remedy and after giving Subcontractor and its surety, if any, upon twenty-four hours written notice, terminate its obligation to Subcontractor under this Agreement and take possession of the Site and complete (or cause to be completed) the Work by whatever method Contractor may deem expedient. In such case Subcontractor will not be entitled to receive any further payment until the Work is completed. Upon completion of the Work, Contractor will pay to Subcontractor an amount equal to (x) the unpaid portion of the Subcontract Amount attributable to the Work performed up to the termination less (y) the amount by which (i) the costs incurred by Contractor to complete the Work, including, without limitation, costs for architectural, managerial and administrative services and reasonable attorneys' fees, if legal counsel is employed, exceed (ii) the portion of the Subcontract Amount attributable to the balance of the Work yet to be performed at the time of termination. If the amount calculated under part (y) in the preceding sentence exceeds the amount owing under part (x), the Subcontractor will pay the difference to Contractor. If the amount in part (x) exceeds the amount in part (y), Contractor will pay such balance to Subcontractor.



J.      Subcontractor is an independent Subcontractor and is not an employee or agent of the Contractor and neither Subcontractor nor anyone employed by Subcontractor will be deemed for any purpose to be the agent, employee, servant or representative of Contractor in the performance of the Work. Subcontractor acknowledges and agrees that Contractor will have no direction or control over the means, methods, procedures or manner of the Work performed by Subcontractor or any of its subcontractors, or any of their employees, vendors or suppliers.

K.      No changes shall be made in the work proposed or in the price unless those changes are agreed to in writing by both Subcontractor and Contractor.      Travis Gehr and / or _____James Redmond_____, shall be the Contractor's designated on site agent, if there is a dispute regarding whether the work is a change, Subcontractor may perform that work under protest and submit a claim to Contractor in accordance with this Agreement.

L.      Clean Up. Subcontractor will at all times keep the site or facility safe and free from the accumulation of waste materials or rubbish caused by its operations or related to the Work. Upon completion of the Work and each portion thereof, Subcontractor will remove all rubbish and waste produced by its operations or Work hereunder from the facility as well as all of its tools, equipment, machinery and surplus materials no longer needed and leave the site or facility in a "broom clean" or equivalent condition and safe for Subcontractor's employees and subsequent subcontractors to perform their work, unless otherwise specified in writing. If Subcontractor fails to clean up, Contractor may do so after written notice to Subcontractor and the cost thereof will be charged to Subcontractor.

V.    **Representations of Subcontractor.** Subcontractor represents and warrants the following:

A.      Subcontractor has examined the Agreement ("Prime Contract") between Owner and Minnesota Limited (if requested by the Subcontractor prior to the execution of the work) and agrees to all provisions affecting Subcontractors performance, including but not limited to the representations, obligations and warranties made by Minnesota Limited to the Owner.

B.      Subcontractor has the requisite authority and ability to perform the subcontract without delay.

C.      Subcontractor will not assign, subcontract or otherwise delegate its responsibilities and obligation hereunder without the written consent of Contractor.

D.      Subcontractor shall examined the specifications, site conditions, drawings and requirements of the work with due diligence and its bid has taken into consideration all conditions and risks which are reasonably related to the performance of the work.

E.      Ethics; Conflict of Interest. Subcontractor shall at all times during the performance of its obligations hereunder conform to sound ethical business practices in conformance with all applicable Laws and shall in its business practices promote the values of honesty, integrity, social responsibility, and human rights. Subcontractor shall not offer to any member of Contractor (including employees thereof) any gifts, entertainment, or other favors beyond the common courtesy usually associated with business practices. Subcontractor shall not pay any commissions or fees or grant any rebates or other



remuneration or monetary gratuity to any employee of Contractor. Subcontractor shall not grant any secret rebates nor pay any commissions or fees to any employee of Contractor.

F.   Invitees Prohibited. Subcontractor shall not, without prior written permission of Contractor, invite, permit entry or bring any Person onto the Contractor's Worksite or property who is not an employee of Subcontractor.

G.   Subcontractor will pay its employees promptly and maintain good labor relations. Subcontractor further represents that it has paid all union benefit contributions including fringe benefits. Subcontractor agrees that Contractor upon demand of the Labor Union, may withhold from any sums due Subcontractor and pay to the Administrator of the Plan any amounts owing and said payment shall be deducted from the invoice.

## VI.   Warranty.

A.   Subcontractor warrants to the Contractor and Owner that all materials and equipment furnished under this Agreement will be new unless otherwise specified in writing, and that all work will be of good quality, free from faults and defects and in conformance with any Purchase Order and attachments thereto, including any specifications stipulated therein. All Work not so conforming to these standards may be considered defective, and the Subcontractor shall promptly repair and make good, after notice by the Contractor and Owner and without cost to the Contractor and Owner, any damages, defects or faults resulting from imperfect or defective Work done or materials furnished by the Subcontractor. The Subcontractor warrants that all labor, materials and equipment furnished under this Agreement shall be covered by warranty for a period of at least two (2) years (or during a longer period if required by the specifications and stipulated therein) from the date of acceptance of the completed Work by the Owner.

B.   Where material or equipment furnished by the Subcontractor is covered by a manufacturer's warranty or guarantee or other special warranty or guarantee the Subcontractor shall provide such warranty and provide additional or extended warranty or guarantees to the Contractor for its labor, materials and equipment to confirm to paragraph A above.

VII.   Indemnification. To the fullest extent permitted by law, the Subcontractor shall indemnify the Owner, Contractor and the agents and employees of any of them from and against claims, damages, losses and expenses, arising out of or in connection with, or resulting from the negligent performance of the Subcontractor's work, the Subcontractor's subcontractors work, or anyone directly or indirectly employed by them but only to the extent caused by acts or omissions by either or any of them. In addition thereto, Subcontractor indemnifies Owner, Contractor and the agents and employees of any of them for expenses including attorney's fees and costs, incurred in responding to and defending against any claim or in enforcing this provision.

VIII.   Payment. Subcontractor shall invoice Minnesota Limited no later than 30 days after date of service. Contractor agrees to pay Subcontractor all sums due less ___10___ % retainage (if applicable) hereunder within

SR1916169002



thirty (30) days from the date the invoice is received. However, it is a condition precedent to payment that if Owner withholds payments for that portion of any work performed by Subcontractor, then Minnesota Limited is only obligated to pay Subcontractor after receiving payment from the Owner. In such event payment will be made within ten (10) days. Contractor reserves the right to withhold such sums as may be necessary to pay expenses, including costs and attorney's fees, caused by, or related to, Subcontractor's breach of Agreement. Final payment of retainage will occur ten (10) days after final payment for Subcontractor's work is received and when lien waivers and job completion affidavit are executed.

IX.     **Maintaining Records / Audit.** For a period of five (5) years from final acceptance of Subcontractor's work, Subcontractor shall maintain all job records and shall, upon reasonable notice by Contractor, but no later than 10 business days, make such records available for inspection by Contractor or Owner. Contractor or Owner or their representatives may audit said records. If the results of the audit show an overpayment, Subcontractor shall reimburse the overpayment together with interest of 1% per month. If the audit shows an overpayment more than one thousand dollars ($1,000), Subcontractor shall also reimburse Contractor or Company for the cost of the audit.

X.      **Interpretations and Enforcement.** The Agreement and contract documentation contains the parties entire understanding with regard to the subject hereof and shall not be modified except by a writing signed by both parties; provided, however, that Subcontractor shall be bound by changes in the Contract Documents agreed to between the Contractor and Owner, but only if Contractor has timely notified Subcontractor of such changes.. The interpretation and enforcement of this Agreement shall be governed by the laws of the state in which the work hereunder is to be performed or that specified in the Prime Contract if different than the state where the work is to be performed. If any provision hereof is deemed unenforceable, the remainder of the Agreement shall be enforced as though such provision were not a part hereof.

    XI.     **Assignment.** Subcontractor shall not assign or subcontract this Agreement or any portion thereof or of any money due or which may become due hereunder without the prior written consent of Contractor. Notwithstanding anything to the contrary contained herein, Contractor may assign this Agreement without the consent of Subcontractor.

    XII.    **Confidentiality of Agreement.** The Subcontractor agrees that all terms and conditions contained herein or in any other document(s) referencing the Project shall remain confidential. Said terms shall not be disclosed without the express written consent of the Contractor.
    Minnesota Limited is required to protect all technical information supplied by the Owner. Subcontractor agrees that this Section is its written assurance that all such information, including but not limited to: drawings, diagrams, surveys, specifications, locations, and geophysical (GPS) coordinates of the work, will be kept confidential, protected, and will not be disclosed to third parties without obtaining Minnesota Limited's written consent unless information ordered to do so by a court of law or arbitrator.. Breach of is provision will subject Subcontractor to all remedies awarded to Contractor and Owner including injunctive relief. Subcontractor agrees to pay all of Contractors and Owners attorney's fees in enforcing this provision.



XII.    **Notice**. Unless otherwise provided herein, any notice provided for herein will be in writing and delivered to the parties (a) in person, (b) by facsimile transmission (with the original and a copy of the facsimile confirmation following in the United States mail), (c) by overnight delivery service, or (d) by certified mail, return receipt requested. Notice will go to the address first shown herein for the respective party to whom notice is given or to such other address as may be designated by either party by written notice given pursuant hereto.

XIV.    **Governing Law/Venue/Attorney Fees.** This Agreement shall be construed and interpreted in accordance with the laws of the State of Minnesota, including, without limitation, matters of construction, validity, enforcement, and interpretation. The parties agree that venue for any dispute under this Agreement shall be in the District Court of Hennepin County, Minnesota. In the event any enforcement effort is initiated by Contractor against Subcontractor for default of this Agreement, Subcontractor shall be liable to Contractor for any and all costs of collection, including but not limited to, reasonable attorneys' and professional fees, court costs, traveling and lodging expenses, costs of investigation and defense, accrued interest, and any other reasonable expenses incurred by Contractor in initiating such efforts.

Signed the day and year first written above.

CONTRACTOR:  **Minnesota Limited, LLC.**

By: _____

Its: _____President_____
            Title

SUBCONTRACTOR: THE HDD COMPANY

By: _____

Its: _____Vice President_____
            Title

Page 7 of 14
SR1916169002



## EXHIBIT A
### Insurance

Prior to commencing Work, Subcontractor shall, at its sole expense, procure and maintain Insurance of the types, and in the form and amounts described below from insurer(s) authorized to transact business in the state where Work or operations will be performed by Subcontractor. Such insurance and required coverage in forms acceptable to General Contractor shall be placed with admitted insurers that maintain an A.M. Best's rating of not less than A- VII, unless otherwise approved by the General Contractor. The insurance requirements described below shall be maintained uninterrupted for the duration of the Project, including any warranty periods, and shall protect Subcontractor, and others for whom and/or to whom Subcontractor may be liable, for liabilities in connection with work performed by or on behalf of Subcontractor, its agents, representatives, employees or subcontractors.

### Insurance Requirements:

1      **Commercial General and Umbrella Liability Insurance**. Subcontractor shall maintain commercial general liability ("CGL") and, if necessary, commercial umbrella insurance, with a limit of not less than $ 2,000,000.00 per occurrence, bodily injury or property damage liability; $ 2,000,000.00 per offense, personal and advertising injury liability; $ 5,000,000.00 products-completed operations aggregate; and $ 5,000,000.00 general aggregate applicable to claims other than products-completed operations. To the extent that Subcontractor's CGL and any commercial umbrella insurance are subject to aggregate limits, the policy shall be endorsed so as to apply such aggregate limits separately to the Project.

Coverage afforded under Subcontractor's CGL and any commercial umbrella insurance shall be provided on an occurrence basis and shall be subject to the terms of the *Insurance Services Office ("ISO") Commercial General Liability Coverage Form CG 0001*, or a substitute form providing coverage at least as broad as the ISO form specified. There shall be no limitations or exclusions of coverage beyond those contained in the standard coverage form and coverage shall include liability arising from premises, operations, independent contractors, products-completed operations including construction defect, contractual liability or personal injury and advertising injury.

General Contractor, its officers, directors and employees and Project Owner(s) shall be included as additional insureds under Subcontractor's CGL, and any commercial umbrella insurance, with respect to liabilities arising out of both the ongoing and completed operations of Subcontractor. Such additional insured coverage shall be subject to the terms of ISO additional insured endorsement forms CG 2010 (ongoing operations) and form CG 2037 (products-completed operations), or substitute form(s) providing equivalent coverage. The edition date of the ISO endorsements required should be chosen based on the recipient's risk transfer objectives. The table below summarizes the options and major differences between the edition dates.

| Endorsement(s) | ISO Edition Date | Comments |
|---|---|---|
| CG 2010 | 11/85 Edition | Broadest Insuring Agreement – "liability arising out of" the Subcontractor's work – both ongoing |



| | | operations and completed operations coverage provided by one endorsement. |
|---|---|---|
| CG 2010/CG2037 | 10/01 Edition | Same Insuring Agreement as 11/85 with ongoing operations and completed operations coverage provided by separate endorsements. |
| CG 2010/CG2037 | 07/04 Edition | More narrow Insuring Agreement – "caused in whole or in party by. . . . acts or omissions" of the Subcontractor. |
| CG2010/CG2037 | 04/13 Edition | Same Insuring Agreement as 07/04, but limits coverage to "extent permitted by law" and "not be broader than that which you are required by the contract or agreement to provide." |

Note: Recommended Additional Insured endorsement for states other than Minnesota may vary and Willis should be consulted. States including but not limited to IL, TX, & CA involve unique risk transfer considerations.

Additional insured coverage afforded by Subcontractors CGL and any commercial umbrella insurance, shall be primary and non-contributing with respect to any insurance or self-insurance available to General Contractor or Project Owner. Such primary and non-contributory insurance shall be subject to the terms of ISO form CG 2001 (Primary and Noncontributory – Other Insurance Condition) or its equivalent. Any other insurance or self-insurance maintained by General Contractor or Project owner shall be excess of, and non-contributory with, the coverage afforded by Subcontractors CGL and commercial umbrella insurance, if any.

In addition to procuring and maintaining CGL, and any commercial umbrella insurance, for the duration of the contract, Subcontractor agrees to continue to procure and maintain the products-completed operations liability insurance coverage for a minimum of __two__ ( 2 ) year(s) after the date that the Work is substantially complete. All terms and conditions of such coverage shall be maintained during this completed operations period, including the required coverage limits and the requirement to provide General Contractor and Project Owner with coverage as an additional insured for completed operations.

2.      **Commercial Automobile and Umbrella Liability Insurance.**    Subcontractor shall maintain automobile liability and, if necessary, commercial umbrella insurance, with a limit of not less than $  2,000,000.00          each accident. Such insurance shall cover liability for bodily injury and property damage arising from the use or operation of any auto, including those owned, hired or otherwise operated or used by or on behalf of Subcontractor. The coverage shall be subject to the terms of ISO *Business Auto Coverage Form CA 0001* (1990 edition or later), or a substitute form providing equivalent coverage.

3.      **Workers' Compensation and Employers Liability Insurance.**    Subcontractor shall maintain workers' compensation coverage providing statutory benefits.  Subcontractor shall additionally maintain employers liability insurance, and if necessary, commercial umbrella insurance, with a limit of not less than: $1,000,000, bodily injury by accident – each accident; $1,000,000, bodily injury by disease policy limit; and $1,000,000, bodily injury by disease each employee. Workers' Compensation coverage must extend to every



employee, including owners/officers of a closely held corporation and/or individuals operating as a sole proprietorship or partnership. **Workers' Compensation must provide coverage in the state where the Project is located.**

Where applicable, evidence of coverage shall be required for U.S. Longshore and Harbor Workers Compensation, Maritime coverage, Federal Employer's Liability Act and other unique exposures requiring endorsement of coverage.

4.      **Contractors Pollution Liability Insurance.** Required only if Subcontractor's scope of services include the remediation, treatment, storage or disposal of waste or hazardous materials on or about the project site, as determined by General Contractor. If required, Subcontractor shall maintain Contractors Pollution Liability coverage with a limit of not less than $_____n/a_____ per occurrence, $_____n/a_____ annual aggregate. Coverage shall apply to the scope of work as described under the Contract including transportation and shall include coverage for bodily injury; property damage, including loss of use of damaged property or property that has not been physically injured; clean-up costs; mold; defense and investigative costs. Subcontractor shall maintain Completed Operations coverage for _____n/a_____ years following final acceptance of the project or termination of the Contract.

If the scope of services in the contract require the Subcontractor to provide professional services associated with arranging for, or brokering of, hazardous material or construction and demolition (C&D) wastes off the job site, Subcontractor must amend the Contractors Pollution Liability policy to include coverage to address this scope of work. If any of the aforementioned insurance policies are written on a claims made basis, the Contractor warrants that continuous coverage will be maintained, or an extended discovery period will be exercised, for a period of three years beginning from the time the work under this contract is completed.

5.      **Pollution (Environmental) Liability Insurance.** Required only if Subcontractor's scope of services involves disposal of waste or hazardous materials off-site, as determined by General Contractor. If required, Subcontractor shall maintain pollution (environmental) liability coverage with a limit of not less than: $_____n/a_____ per incident, $_____n/a_____ policy aggregate for hazardous waste disposal services; and $_____n/a_____ per incident, $_____n/a_____ for all other disposal facilities. Such coverage shall include clean-up costs, defense costs and products and completed operations.

If the scope of services in the contract requires the disposal of any hazardous materials or construction and demolition (C&D) wastes off the job site, Subcontractor must also obtain evidence that the Disposal Site Operator maintains Pollution Legal Liability Insurance with coverage for: a. bodily injury, sickness, disease, mental anguish or shock sustained by any person, including death; b. property damage including physical injury to or destruction of tangible property including the resulting loss of use thereof, clean-up costs, and the loss of use of tangible property that has not been physically injured or destroyed; c. defense including costs, charges and expenses incurred in the investigation, adjustment or defense of claims for such compensatory damages. d. pollution conditions on, at, under or emanating from any disposal site, location or facility, used by or on behalf of the disposal facility of any waste or waste materials relating to the performance of the work.



The Disposal Site Operator's Pollution Liability Policy will apply to losses arising from the facility that is accepting the waste under the contract. Minimum limits of Insurance for this policy shall be $_____ n/a _____ each incident / $ _____ n/a _____ policy aggregate.

Claims-made coverage is permitted, provided the policy retroactive date is continuously maintained prior to the commencement date of the agreement, and coverage is continuously maintained during all periods in which Subcontractor accepts or treats waste generated from General Contractor's projects and for a period of *one (1) year* thereafter.

6.     **Professional Liability Insurance.**   Required only if Subcontractor's scope of services include architectural, engineering, professional consulting or construction management, as determined by General Contractor. If required, Subcontractor shall maintain professional liability coverage with a limit of not less than $_____ n/a _____ each wrongful act, $ _____ n/a _____ policy aggregate.

Coverage shall include liability arising from the errors, omissions or acts of the Subcontractor or any entity for which the Subcontractor is legally responsible in the providing of professional services under the Contract. Throughout the term the Contract, the PL/E&O policy shall include full prior acts coverage. Coverage shall be continuously maintained during the term of this Agreement and for a period of x years following final acceptance of the Project or termination of the Contract.

Coverage shall not include any exclusion or other limitations related to:
- Scope of the professional services
- Delays in project completion and cost overruns
- Who is authorized to notify the carrier of a claim or potential claim
- Mold, fungus, asbestos, pollutants or other hazardous substances

Claims-made coverage is permitted, provided the policy retroactive date is continuously maintained prior to the commencement date of this agreement, and coverage is continuously maintained during all periods in which Subcontractor performs professional services for General Contractor, and for an additional period of *one (1) year* after termination of this agreement or the last date such services are performed, whichever comes later. If Subcontractor's scope of work includes environmental engineering or consulting, the terms of coverage shall not exclude environmental professional services.

7.     **Watercraft Liability Insurance.**   If watercraft of any kind is used by the CONTRACTOR or Subcontractor, including: (i) bodily injury; (ii) property damage; and (iii) passenger liability.

   a.     Limit of Liability: Combined Single Limit (Bodily Injury and Property Damage), $1,000,000 each occurrence;

   b.     Protection and Indemnity Insurance to include Jones Act crew coverage (or at least Maritime Employer's Liability: MEL), collision, tower's liability and wreck removal coverage, on a form providing



coverage no less extensive than that afforded in the P & I SP-23 form (revised 1/56), including a pollution buy-back endorsement.

8.      **Aircraft Liability Insurance**. If aircraft of any kind is used by the CONTRACTOR or Subcontractor, including: (i) bodily injury; (ii) property damage; and (iii) passenger liability.

      a.      Limit of Liability: Combined Single Limit (Bodily Injury and Property Damage and Passenger Liability), including hull physical damage insurance for the full replacement cost of each aircraft used   in the work. Such Aircraft Liability and Hull Coverage shall include a waiver of subrogation against General Contractor and all others required by this Agreement to be additional insureds. $ ___n/a___ per seat; $ ___n/a___ per occurrence

**Additional Provisions:**

1.      **Deductibles and Self-Insured Retentions**. The funding of deductibles and self-insured retentions maintained by Subcontractor shall be the sole responsibility of Subcontractor, including any amounts applicable to deductibles or self-insured retentions applicable to claims involving the General Contractor or Owner as an additional insured. Any self-insured retentions in excess of $ ___n/a___ must be declared to and approved by the General Contractor.

2.      **Primary / Non-Contributing**. Subcontractor's required insurance coverage shall be primary insurance, and any insurance or self-insurance maintained by the General Contractor or Project Owner shall be excess of and noncontributory with Subcontractor's insurance.

3.      **Severability of Interest**. Except with respect to the limits of insurance, Subcontractor's required insurance shall apply separately to each insured or additional insured.

4.      **Waiver of Subrogation**. Subcontractor agrees to waive all rights of subrogation against the General Contractor, Project Owner and Project Architect, and shall cause each of its subcontractors to waive all rights of subrogation against the General Contractor, Project Owner and Project Architect, their agents and employees, as respects loss, damage, claims, suits or demands, howsoever caused:

      a.      To real or personal property, vehicles, equipment, tools, etc. owned, leased or used by Subcontractor or Subcontractor's employees, agents or sub-subcontractors; and

      b.      To the extent such loss, damage, claims, suits or demands are, or should be, afforded coverage by the Subcontractor's required insurance or any other insurance (except professional liability to which this requirement does not apply) maintained by the Subcontractor. This waiver shall C1PPIY to all first party property, equipment, vehicle and workers' compensation claims (unless prohibited under applicable state statutes), and all third party liability claims. This waiver shall apply to all deductibles, retentions or self-insured layers applicable to the required or any other insurance (except professional liability to which this requirement does not apply) maintained by the Subcontractor. If necessary, Subcontractor agrees to endorse the required insurance policies to permit waivers of subrogation in



favor of General Contractor, Project Owner and Project Architect as required hereunder. Subcontractor further agrees to hold harmless and indemnify General Contractor, Project Owner and Project Architect for any loss or expense incurred as a result of Subcontractor's failure to obtain such waivers of subrogation from the insurers.

5.      **Notice of Cancellation / Material Change / Nonrenewal.**  Subcontractor's insurance policies must contain a provision or endorsement that the coverage afforded will not be canceled, materially changed or renewal refused until at least 30 days prior Written Notice has been given to General Contractor and to each other additional insured to whom a certificate of insurance has been issued; provided, however, that a ten (10) day prior notice requirement may apply in the event of cancellation due to nonpayment of premium.

6.      **Verification of Coverage.**  Prior to commencing Work, Subcontractor shall furnish General Contractor with certificate(s) of insurance executed by a duly authorized representative of each insurer, as evidence of compliance with the insurance requirements set forth above.  Such certificates of insurance shall be accompanied by copies of endorsements evidencing coverage afforded to General Contractor and Project Owner as additional insured, and endorsements reflecting insurer's concurrence with Subcontractor's waiver of subrogation rights against General Contractor, Project Owner and Project Architect.  Renewal certificates are to be provided to the General Contractor prior to the expiration of the required insurance policies.
Certified copies of policies, including all policy endorsements, shall be furnished by Subcontractor within 15 days of written request by General Contractor.

The certificate(s) of insurance shall be subject to approval of General Contractor, but failure of General Contractor to request such certificate or other evidence of Subcontractor compliance with insurance requirements, or failure of General Contractor to identify deficiencies from evidence that is provided, shall in no way limit or relieve Subcontractor of its obligations to maintain such insurance.

7.      **Sub-Subcontractors.**  No work shall be sublet to any Sub-subcontractor without first obtaining the General Contractor's written permission.  All Sub-subcontractors, once approved by the General Contractor, are subject to the same insurance requirements as Subcontractor.  Subcontractor shall cause each Sub-subcontractor employed by Subcontractor to purchase and maintain such insurance.  Upon request, Subcontractor shall furnish General Contractor with copies of certificates of insurance evidencing coverage for each Sub-subcontractor.

Subcontractor shall voluntarily provide workers compensation coverage for proprietors, partners or others not statutorily required to maintain workers' compensation insurance.

8.      **Leased Employees.**  Use of leased employees by Subcontractor is expressly prohibited without General Contractor's written permission.  If permitted by General Contractor, Subcontractor shall:

        a.      Provide General Contractor with a complete copy of its Agreement with the Leasing Company;



**MINNESOTA LIMITED**
AN MHEROE COMPANY

b.    Require that Leasing Company provide workers' compensation, employers liability and commercial general liability with coverage limits in amounts no less than Subcontractor insurance requirements for the same coverages.

c.    Require that Leasing Company provide Alternate Employer Endorsement naming General Contractor as alternate employer on Leasing Company's workers' compensation policy.

d.    Require that Leasing Company add General Contractor as an additional insured on its commercial general liability insurance policy, with primary/non-contributory wording.

e.    Require that Leasing Company provide waiver of subrogation in favor of General Contractor on both Leasing Company's workers' compensation and commercial general liability insurance policies.

f.    Provide General Contractor with a copy of the Leasing Company's certificate of insurance, with endorsements, evidencing the required coverage.

9.    **No Representation of Coverage Adequacy.** In specifying minimum Subcontractor insurance requirements, General Contractor does not represent that such insurance is adequate to protect Subcontractor for loss, damage or liability arising from its work. Subcontractor is solely responsible to inform itself of types or amounts of insurance it may need beyond these requirements to protect itself.

The insurance requirements set forth in minimum amounts shall not be construed to relieve Subcontractor for liability in excess of such coverage, nor shall it preclude General Contractor from taking such other actions as is available to it under any other provision of the Subcontract. To the extent Subcontractor maintains insurance greater than these minimum requirements, Subcontractor agrees that such insurance shall be applicable to any of Subcontractor's liability obligations hereunder.

Any acceptance of certificates of insurance by General Contractor shall in no way limit or relieve Subcontractor of its duties and responsibilities under this Subcontract, including the duty to indemnify and hold harmless General Contractor.

10.    **Compliance.** Failure of Subcontractor to maintain the required insurance shall constitute a default under this Subcontract and, at General Contractor's option, shall allow General Contractor to terminate this Subcontract for cause, withhold payment and/or purchase the required insurance at Subcontractor's expense.

11.    **Cross-Liability Coverage/Non-Standard Restrictive Endorsements.** All liability policies shall include cross liability coverage and a standard ISO separation of insureds provision, or its equivalent. No liability policy shall include or be endorsed to include any non-standard provisions restricting coverage for the named insured or the persons/entities required to be named as additional insureds under this Agreement, including but not limited to cross liability coverage exclusions or limitations.



EL DORADO HILLS | OFFICE Suite 210 |
4535 Serrano Parkway | El Dorado Hills | CA USA 95762 |

MAIN 530 676 5705 | CROSSINGGROUP.COM

January 9, 2020

**Minnesota Limited**
18640 200th St, PO Box 410
Big Lake, MN 55309

ATTN: Amy Skuza

RE: Southern Star Lines DT and DS Replacement Project
Directionally drill and install approximately 6,052 feet of 36-inch steel pipeline in
Anderson and Franklin Counties, KS.

The HDD Company is pleased to submit the following bid quote:

1. **Responsibilities of The HDD Company**
   1.1.  Provide all required insurance certificates.
   1.2.  Provide any written submittals and qualifications required.
   1.3.  Provide 2 (two) drill rig(s) with sufficient capabilities to install the crossings, a
         closed-loop mud system, mud pumps, vacuum trucks, dump trucks, steering
         system, and all drill spread support equipment necessary.
   1.4.  Provide all required union labor for the drilling operations.
   1.5.  Provide preliminary drill profiles for each crossing.
   1.6.  Provide final as-built drawings.
   1.7.  Provide and haul water for drilling operations.
   1.8.  Provide water storage for the duration of drilling operations.
   1.9.  Provide all required pulling heads.
   1.10. Leave the entry areas clean, free of debris, and to a rough grade.
   1.11. Provide bonding at 1%, which is not included in the bid pricing below.

2. **Responsibilities of THE CONTRACTOR**
   2.1.  Stake and survey the entry and exit points for each bore, with correct stations
         and elevations.
   2.2.  Provide all permitting to undertake the project.
   2.3.  Provide and maintain suitable truck access to and from entry and exit locations.
   2.4.  Provide stable, level, matted and/or graveled work pads for each bore.
   2.5.  Provide all BMPs around each bore's entry and exit locations. The HDD
         Company will maintain these items.
   2.6.  Provide, string, weld, and test all 36-inch pipe for each bore.

Going to Greater Lengths℠

2.7.   Provide all plans, equipment, and manpower to handle pipe during pullback operations.
2.8.   Perform all final tie-ins.
2.9.   Provide all settlement monitoring, if required.
2.10.  Provide all final site restorations.
2.11.  Provide all field surveys to document existing conditions for the HDD installations, including but not limited to pictures, videos, field notes, etc.

## 3. Pricing (Lump Sum)

| | | |
|---|---|---|
| 3.1. | HDD Cedar Creek 2,106' X 36" pipe: | **$1,280,448.00** |
| 3.2. | HDD Pottawapomie Creek 1,788' X 36" pipe: | **$1,087,104.00** |
| 3.3. | HDD Flint Hill 2,158' X 36" pipe: | **$1,312,064.00** |
| 3.4. | Mobilization per rig spread: | **$50,000.00** |

## 4. Clarifications

4.1.   Additional footage due to no fault of The HDD Company, will be billed at $608.00/LF.
4.2.   This proposal is based upon the drawings, specifications, and geotechnical information provided to us on or before **7 June 2019.**
4.3.   If any revised or additional drawings, specifications, geotechnical information, or permits are provided to us after the bid submission date, The HDD Company reserves the right to modify the proposal to account for any added costs and/or additional time associated with the change(s).
4.4.   The HDD Company's bid proposal is conditional upon reaching an agreement upon mutually acceptable contract terms. This bid proposal will be attached to and forms a part of the contract between The HDD Company and THE CONTRACTOR.
4.5.   Item 3.3 above includes the hauling and disposal of all **non-contaminated** drilled solids and excess drilling fluids.
4.6.   The pricing above is contingent upon a site visit.

## 5. Exclusions

5.1.   The HDD Company and its personnel are not the Project Engineers. Therefore, we exclude all design and engineering services unless any are specifically noted as included in this proposal. Any drilling plans or profiles that we submit to you will be based upon the design information in the contract documents and our experience as HDD contractors. Any plans or profiles we provide are recommendations only and are subject to review and approval by the project owner and/or its engineers.
5.2.   All permits, including federal, State and local environmental permits, the SWPPP permit and any associated SWPPP plans, any right-of-way (ROW) agreement or easements, and all access necessary for us to perform our work shall be provided by others. If our operations are delayed or otherwise impacted by any delays or problems with permits, SWPPP plans, ROW agreements, easements or access arrangements our compensation and time for completion will be equitably adjusted.

6. **Terms and Conditions**

    6.1    Schedule

        6.1.1.    This proposal is based upon performance under a reasonable and mutually agreed-to project schedule in so far as that schedule applies to our work. The approved project baseline schedule and all monthly updates must be provided to us on a regular and timely basis to keep us apprised of schedule changes which may impact the timing and efficiency of our work. We will not be liable for any delays caused by others or by factors beyond our reasonable control.

    6.2.    Indemnification

        6.2.1.    We will indemnify you and/or the project owner for personal injury or property damage claims to the extent of our own negligence. Our proposal excludes any obligation to indemnify you for your own negligence or to indemnify any other party for that party's own negligence or to indemnify any design professional.

    6.3.    Payment

        6.3.1.    Monthly progress payments will be made to The HDD Company within (7) seven days after you receive each monthly payment from the project owner, but in no event later than 120 days from the date you received your invoice.

        6.3.2.    We will receive our final payment within 30 days after you receive our final billing and our work has been completed and accepted. Acceptance will not be unreasonably withheld or delayed. If you dispute any portion of any billing, you will promptly notify us in writing of the nature of the dispute and you will pay the undisputed portion of the billing without delay. If any undisputed amounts are past due for more than 10 days, we reserve the right to stop work until all payments are brought current. We will provide lien releases in accordance with applicable state statutes or regulations. We will keep the project free of liens from out subcontractors, suppliers and other vendors provided we have been paid by you for the work covered by any such liens.

    6.4.    Extra/Force Account Work:

        6.4.1.    If we are directed to perform any work on a force account or time and material basis, the rates for our labor and equipment will be as stated in our proposal, or if no rates are included with this proposal, as stated in our then current standard labor and equipment rate schedule. If we are directed to standby or suspend work while other operations occur, or delays or other problems are resolved, or if we are required to standby due to events or circumstances beyond our control, the standby time for our labor and equipment will be paid as stated in this proposal.

    6.5.    Differing Site Conditions

> 6.5.1. If the conditions we encounter in the performance of our work differ materially from those indicated in the contract documents, boring logs, geotechnical reports or other information furnished to us prior to bid, or from those ordinarily encountered and generally recognized as inherent in the type of work provided for in our proposal, then our compensation and time for completion will be equitably adjusted to account for any resulting delay and added costs.

7. **Delays and Work Stoppages:**
   7.1. All work stoppages that arise through no fault of The HDD Company will be billed at **$14,500** (no crew on site).

The HDD Company appreciates the opportunity to furnish you this quote and looks forward to working with you. Should any of the information presented above need further clarification, please do not hesitate to contact us.

Sincerely,
**The HDD Company**

Jeremy King
Vice President

Going to Greater Lengths™



**THE HDD COMPANY**

EL DORADO HILLS | OFFICE Suite 310,
4328 Serrano Parkway, El Dorado Hills, CA USA 95762

MAIN 530 676 5705 | CROSSINGGROUP.COM

17 January 2020

**Minnesota Limited**
18640 200ᵗʰ St, PO Box 410
Big Lake, MN 55309

ATTN: Brad Cordes

RE:     Southern Star Lines DT and DS Replacement Project
        Directionally drill and install approximately 4540 feet of 36-inch steel pipeline road
        crossings in Anderson and Franklin Counties, KS.

The HDD Company is pleased to submit the following bid quote:

**1.     Responsibilities of The HDD Company**
    1.1.     Provide all required insurance certificates.
    1.2.     Provide any written submittals and qualifications required.
    1.3.     Provide drill rig(s) with sufficient capabilities to install the crossings, a closed-
             loop mud system, mud pumps, vacuum trucks, dump trucks, steering system,
             and all drill spread support equipment necessary.
    1.4.     Provide all required union labor for the drilling operations.
    1.5.     Provide final as-built drawings.
    1.6.     Provide and haul water for drilling operations.
    1.7.     Provide water storage for the duration of drilling operations.
    1.8.     Provide all required pulling heads.
    1.9.     Leave the entry areas clean, free of debris, and to a rough grade.
    1.10.    Provide bonding at 1%, which is not included in the bid pricing below.

**2.     Responsibilities of THE CONTRACTOR**
    2.1.     Stake and survey the entry and exit points for each bore, with correct stations
             and elevations.
    2.2.     Provide all permitting to undertake the project.
    2.3.     Provide and maintain suitable truck access to and from entry and exit locations.
    2.4.     Provide stable, level, matted and/or graveled work pads for each bore.
    2.5.     Provide bore pits and shore if needed.
    2.6.     Provide all BMPs around each bore's entry and exit locations. The HDD
             Company will maintain these items.
    2.7.     Provide, string, weld, and test all 36-inch pipe for each bore.
    2.8.     Furnish support crew for road crossings, including excavators and manpower.

Going to Greater Lengths℠

2.9. Provide all plans, equipment, and manpower to handle pipe during pullback operations.

2.10. Perform all final tie-ins.

2.11. Dispose of cuttings.

2.12. Provide all settlement monitoring, if required.

2.13. Provide all final site restorations.

2.14. Provide all field surveys to document existing conditions for the HDD installations, including but not limited to pictures, videos, field notes, etc.

3. **Pricing**

| | | |
|---|---|---|
| 3.1. | 4540' X 36" pipe: | **$508.00/ft** |
| 3.2. | Mobilization per rig spread: | **$50,000.00** |

4. **Clarifications**

4.1. This proposal is based upon the drawings, specifications, and geotechnical information provided to us on or before **17 January 2020.**

4.2. If any revised or additional drawings, specifications, geotechnical information, or permits are provided to us after the bid submission date, The HDD Company reserves the right to modify the proposal to account for any added costs and/or additional time associated with the change(s).

4.3. The HDD Company's bid proposal is conditional upon reaching an agreement upon mutually acceptable contract terms. This bid proposal will be attached to and forms a part of the contract between The HDD Company and THE CONTRACTOR.

4.4. The pricing above is contingent upon a site visit.

5. **Exclusions**

5.1. The HDD Company and its personnel are not engineers. Therefore, we exclude all design and engineering services unless any are specifically noted as included in this proposal. Any drilling plans or profiles that we submit to you will be based upon the design information in the contract documents and our experience as HDD contractors. Any plans or profiles we provide are recommendations only and are subject to review and approval by the project owner and/or its engineers.

5.2. All permits, including federal, State and local environmental permits, the SWPPP permit and any associated SWPPP plans, any right-of-way (ROW) agreement or easements, and all access necessary for us to perform our work shall be provided by others. If our operations are delayed or otherwise impacted by any delays or problems with permits, SWPPP plans, ROW agreements, easements or access arrangements our compensation and time for completion will be equitably adjusted.

6. **Terms and Conditions**

6.1. Schedule

6.1.1. This proposal is based upon performance under a reasonable and mutually agreed-to project schedule in so far as that schedule applies to our work. The approved project baseline schedule and all monthly updates must be provided to us on a regular and timely basis to keep

Going to Greater Lengths"

      us apprised of schedule changes which may impact the timing and efficiency of our work. We will not be liable for any delays caused by others or by factors beyond our reasonable control.

6.2. Indemnification

    6.2.1. We will indemnify you and/or the project owner for personal injury or property damage claims to the extent of our own negligence. Our proposal excludes any obligation to indemnify you for your own negligence or to indemnify any other party for that party's own negligence or to indemnify any design professional.

6.3. Payment

    6.3.1. Monthly progress payments will be made to The HDD Company within (7) seven days after you receive each monthly payment from the project owner, but in no event later than 120 days from the date you received your invoice.

    6.3.2. We will receive our final payment within 30 days after you receive our final billing and our work has been completed and accepted. Acceptance will not be unreasonably withheld or delayed. If you dispute any portion of any billing, you will promptly notify us in writing of the nature of the dispute and you will pay the undisputed portion of the billing without delay. If any undisputed amounts are past due for more than 10 days, we reserve the right to stop work until all payments are brought current. We will provide lien releases in accordance with applicable state statutes or regulations. We will keep the project free of liens from out subcontractors, suppliers and other vendors provided we have been paid by you for the work covered by any such liens.

6.4. Extra/Force Account Work:

    6.4.1. If we are directed to perform any work on a force account or time and material basis, the rates for our labor and equipment will be as stated in our proposal, or if no rates are included with this proposal, as stated in our then current standard labor and equipment rate schedule. If we are directed to standby or suspend work while other operations occur, or delays or other problems are resolved, or if we are required to standby due to events or circumstances beyond our control, the standby time for our labor and equipment will be paid as stated in this proposal.

6.5. Differing Site Conditions

    6.5.1. If the conditions we encounter in the performance of our work differ materially from those indicated in the contract documents, boring logs, geotechnical reports or other information furnished to us prior to bid, or from those ordinarily encountered and generally recognized as inherent in the type of work provided for in our proposal, then our compensation and time for completion will be equitably adjusted to account for any resulting delay and added costs.

7.  **Delays and Work Stoppages:**

    7.1.   All work stoppages that arise through no fault of The HDD Company will be billed at **$14,500** (no crew on site).

The HDD Company appreciates the opportunity to furnish you this quote and looks forward to working with you. Should any of the information presented above need further clarification, please do not hesitate to contact us.

Sincerely,
**The HDD Company**

Jeremy King

# EXHIBIT B

| PROJECT NAME: | | | |
|---|---|---|---|
| PROJECT NO.: | Southern Star Line DT & DS Replacement | | |



Horizontal Directional Drilling

**EXTRA WORK SHEET REPORT**
**INTERNAL - OFFICE**

| CLIENT/OWNER: | Minnesota Limited - Southern Star | DATE: | |
|---|---|---|---|
| WORK PRFM'D. BY: | The HDD Company, Inc. | EXTRA WRK. SHT. NO.: | Cedar Creek |
| DESCPTN. OF WORK: | Access and weather delays | | |
| 0 | | | |
| 0 | | | |
| 0 | | | |

## A – EQUIPMENT

| EQUIP. NO. | Company Owned Equipment | HRS. | RATE/HR. | TOTAL/DAY |
|---|---|---|---|---|
| 1 | Drilling Rig HDD Rig 3 | 30.00 | $ 205.56 | $ 6,166.80 |
| 1 | Mud Tank / Solids Control Unit | 30.00 | $ 111.96 | $ 3,358.80 |
| 1 | Sump Pit/Trash Pump | 30.00 | $ 8.29 | $ 248.70 |
| 1 | Mud Pumping Units | 30.00 | $ 60.94 | $ 1,828.20 |
| 2 | Tool Van and tools | 30.00 | $ 17.55 | $ 1,053.00 |
| 0 | Dump Truck A=17  TRUN 2AXL | | | |
| 2 | Vac. Truck A=17 TRUN 2AXL | 30.00 | $ 45.75 | $ 2,745.00 |
| 7 | Misc. Trailers | 30.00 | $ 1.79 | $ 375.90 |
| 0 | Haul Trucks | 30.00 | $ 34.13 | |
| 1 | 6 3/4" Non Mag Drill Collars w/Jet Assembly | 30.00 | $ 6.83 | $ 204.90 |
| 168 | Drill Pipe (5-1/2 FH) | 30.00 | $ 0.53 | $ 2,671.20 |
| 2 | Misc. X-Subs and Rack (All X Subs for Spread) | 30.00 | $ 5.20 | $ 312.00 |
| 0 | Sonde and Housing | | | |
| 0 | Steering Tool (North Referencing w/Tru-Gyde) | | | |
| 48 | Rollers | 30.00 | $ 1.50 | $ 2,160.00 |
| 2 | Ford F-250 T&TT 06-12 | 30.00 | $ 5.04 | $ 302.40 |
| 0 | Ford F-450 T&TT 20-28 | | | |
| 0 | Ford F-350 T&TT 20-28 | | | |
| 0 | KW & Crane Truck | | | |
| 0 | Hammer | 30.00 | $ 41.93 | |
| 1 | 300 Amp Welder | 30.00 | $ 9.49 | $ 284.70 |
| 1 | 1/2 Ton Truck | 30.00 | $ 32.48 | $ 974.40 |
| 1 | 60" Casing | 30.00 | $ 3.25 | $ 97.50 |
| 0 | Mud Bins | | | |

### Rental Equipment

| EQUIP. NO. | Rental Equipment | | HRS. | RATE/HR. | TOTAL/DAY |
|---|---|---|---|---|---|
| 1 | 10K Reach Forklift | S.T. | 30.00 | $ 51.29 | $ 1,538.70 |
| | | O.T. | | | $ - |
| 2 | 225 Excavator | S.T. | 30.00 | $ 91.59 | $ 5,495.40 |
| | | O.T. | | | $ - |
| 2 | Portable toilets | S.T. | 30.00 | $ 1.50 | $ 90.00 |
| | | O.T. | | | $ - |
| 0 | Multiquip 20kW Generator | S.T. | | | $ - |
| | | O.T. | | | $ - |
| 1 | Frac Tank | S.T. | 30.00 | $ 7.32 | $ 219.60 |
| | | O.T. | | | $ - |
| 1 | Trash Bin | S.T. | 30.00 | $ 4.97 | $ 149.10 |
| | | O.T. | | | $ - |
| 1 | 500 Amp Welder | S.T. | 30.00 | $ 9.49 | $ 284.70 |
| | | O.T. | | | $ - |
| 2 | Light Tower | S.T. | 30.00 | $ 7.61 | $ 456.60 |
| | | O.T. | | | $ - |
| 1 | 175 KW Generator | S.T. | 30.00 | $ 71.36 | $ 2,140.80 |
| | | O.T. | | | $ - |
| 1 | 6" Diesel Trash Pump | S.T. | 30.00 | $ 23.60 | $ 708.00 |
| | | O.T. | | | $ - |
| 1 | HTI Mud Motor | S.T. | 30.00 | $ 42.50 | $ 1,275.00 |
| | | O.T. | | | $ - |

| | | | |
|---|---|---|---|
| COMPANY OWNED EQUIPMENT | | | 22,783.50 |
| RENTAL EQUIPMENT W/ 15% Markup | | | 14,211.59 |
| A- EQUIPMENT SUB -TOTAL COST | | | $ 36,995.09 |
| 0.00 % Sales Tx. Rental Equip. | | | |

## B - MATERIALS

| MATERIALS DESCRIPTION | QTY. USED | UNIT $ | TOTAL |
|---|---|---|---|
| | | $ - | $ - |
| | | $ - | $ - |
| | | $ - | $ - |
| | | $ - | $ - |
| | | $ - | $ - |
| | | $ - | $ - |
| | | $ - | $ - |
| | | $ - | $ - |
| B-MATERIALS  SUB-TOTAL COST | | | $ - |
| 0.00 % Sales Tax | | | |
| 15 % ADDED M, L, B | | | |
| SUB-TOTAL A + B w/Tax | | | $ 36,995.09 |

## C – SUBCONTRACT / WORK DONE BY SPECIALISTS/THIRD PARTY SERVICES

| Work Description | Individual / Company | Unit | RATE | TOTAL $ |
|---|---|---|---|---|
| | | | | $ - |
| | | | | $ - |
| | | | | $ - |
| | | COST OF SUBS - C | | $ - |
| | 15 % MARK-UP(Subcontractor) | | | $ - |
| | | | | $ - |
| TOTAL COST A + B + C (Including Mark-Up) | | | | $ 36,995.09 |

## D – LABOR

| NO. | D - LABOR | HRS. | BASE RATE w/FRING'S. | SUB TOTAL | Per Diem Totals | TOTAL |
|---|---|---|---|---|---|---|
| 1 | Ben Bethany (Day Rate) | REG. 3.00 | $1,016.84 | $3,050.52 | $120.00 | $3,170.52 |
| | | O.T. 0 | | $0.00 | | |
| | | D.T. 0 | | $0.00 | | |
| 2 | James Ravenscraft | REG. 30.00 | $44.66 | $1,339.80 | $300.00 | $1,639.80 |
| | | O.T. | | $0.00 | | |
| | | D.T. | | $0.00 | | |
| 3 | Jeremy Acres | REG. 30.00 | $46.20 | $1,386.00 | $315.00 | $1,701.00 |
| | | O.T. | | $0.00 | | |
| | | D.T. | | $0.00 | | |
| 4 | Mark Horton | REG. 30.00 | $59.79 | $1,793.70 | $345.00 | $2,138.70 |
| | | O.T. | | $0.00 | | |
| | | D.T. | | $0.00 | | |
| 5 | Steven Davis | REG. 30.00 | $59.79 | $1,793.70 | $315.00 | $2,108.70 |
| | | O.T. | | $0.00 | | |
| | | D.T. | | $0.00 | | |
| 6 | Roger Reeter | REG. 30.00 | $59.79 | $1,793.70 | $315.00 | $2,108.70 |
| | | O.T. | | $0.00 | | |
| | | D.T. | | $0.00 | | |
| 7 | Bruce Cooper | REG. 30.00 | $44.53 | $1,335.90 | $315.00 | $1,650.90 |
| | | O.T. | | $0.00 | | |
| | | D.T. | | $0.00 | | |
| 8 | | REG. 0.00 | | $0.00 | | $0.00 |
| | | O.T. 0.00 | | $0.00 | | |
| | | D.T. 0.00 | | $0.00 | | |
| 9 | | REG. 0.00 | | $0.00 | | $0.00 |
| | | O.T. 0.00 | | $0.00 | | |
| | | D.T. 0.00 | | $0.00 | | |
| 10 | | REG. 0.00 | | $0.00 | | $0.00 |
| | | O.T. 0.00 | | $0.00 | | |
| | | D.T. 0.00 | | $0.00 | | |
| 11 | | REG. 0.00 | | $0.00 | | $0.00 |
| | | O.T. 0.00 | | $0.00 | | |
| | | D.T. 0.00 | | $0.00 | | |
| 12 | | REG. 0.00 | | $0.00 | | $0.00 |
| | | O.T. 0.00 | | $0.00 | | |
| | | D.T. 0.00 | | $0.00 | | |
| 13 | | REG. 0.00 | | $0.00 | | $0.00 |
| | | O.T. 0.00 | | $0.00 | | |
| | | D.T. 0.00 | | $0.00 | | |
| | 15 % Labor Surcharge | | D - LABOR SUB-TOTAL | | | $ 14,518.32 |
| | 15 % Labor Surcharge | | | | | $ 2,177.75 |
| | | | SUBTOTAL | | | $ 16,696.07 |
| | 15 % MARKUP ON LABOR | | | | | $ 2,504.41 |

## E - MISCELLANEOUS ITEMS

| MBC, DESCRIPTIONS | QTY. | Unit $ | EX. AMOUNT |
|---|---|---|---|
| Hotel | 6 | $ 58.00 | $ 348.00 |
| | 9 | $ 68.00 | $ 612.00 |
| Subsistance | 0 | | $ - |
| Misc. Items | | | |
| 0 | | 0 | $ - |
| 0 | | 0 | $ - |
| 0 | | 0 | $ - |
| 0 | | 0 | $ - |
| 0 | | 0 | $ - |
| E- MISCELLANEOUS ITEMS SUB TOTAL | | | $ 960.00 |
| 5 % Sales/City/Room Tax | | | 48.00 |
| 15 % ADDED MARK-UP | | | 144.00 |
| 0 % Tax on Misc. Items | | | 0 |
| SUB TOTAL - E | | | $ 1,152.00 |

## TOTALS

| | |
|---|---|
| TOTAL COST  A+B+C (Equipment /Material /Sub-Contractors) | $ 36,995.09 |
| TOTAL COST + D  (Labor) | $ 19,200.48 |
| TOTAL COST - E  (Miscellaneous Items) | $ 1,152.00 |
| SUB-TOTAL | $ 57,347.56 |
| 2.5 % BOND & INSURANCE | $ 1,433.69 |
| TOTAL COST THIS SHEET | $ 58,781.25 |

| TIME | CLIENT DIRECTIVES AND COMMENTS |
|---|---|
| 0:00 | (See Daily Work Report) |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |

# EXHIBIT C

| PROJECT NAME: | | |
|---|---|---|
| PROJECT NO.: | Southern Star Line DT & DS Replacement | |


Horizontal Directional Drilling

**EXTRA WORK SHEET REPORT**
**INTERNAL – OFFICE**

| | | | |
|---|---|---|---|
| CLIENT/OWNER: | Minnesota Limited – Southern Star | DATE: | |
| WORK PRFM'D. BY: | The HDD Company, Inc. | EXTRA WRK. SHT. NO. | Cedar Creek HDD |
| DESCPTN. OF WORK: | Access and weather delays | | |
| 0 | | | |
| 0 | | | |
| 0 | | | |

## A – EQUIPMENT

| EQUIP. NO. | Company Owned Equipment | HRS. | RATE/HR. | TOTAL/DAY |
|---|---|---|---|---|
| 1 | Drilling Rig HDD Rig 7 – Vermeer 750 | 32,50 | $ 205,56 | $ 6,680,70 |
| 1 | Mud Tank / Solids Control Unit | 32,50 | $ 111,96 | $ 3,638,70 |
| 1 | Sump Pit/Trash Pump | 32,50 | $ 8,29 | $ 269,43 |
| 1 | Mud Pumping Units | 32,50 | $ 60,94 | $ 1,980,55 |
| 2 | Tool Van and tools | 32,50 | $ 17,55 | $ 1,140,75 |
| 0 | Dump Truck A–17  TRUN 2AXL | | | |
| 3 | Vac. Truck A–17 TRUN 2AXL | 32,50 | $ 45,75 | $ 4,460,63 |
| 10 | Misc. Trailers | 32,50 | $ 1,79 | $ 581,75 |
| 1 | Haul Trucks | 32,50 | $ 34,13 | $ 1,109,23 |
| 1 | 6 3/4" Non Mag Drill Collars w/Jet Assembly | 32,50 | $ 6,83 | $ 221,98 |
| 168 | Drill Pipe (5-1/2 FH) | 32,50 | $ 0,53 | $ 2,893,80 |
| 2 | Misc. X–Subs and Rack (All X Subs for Spread) | 32,50 | $ 5,20 | $ 338,00 |
| 0 | Sonde and Housing | | | |
| 0 | Steering Tool (North Referencing w/Tru–Gyde) | | | |
| 48 | Rollers | 32,50 | $ 1,50 | $ 2,340,00 |
| 3 | Ford F-250 T&TT 06-12 | 32,50 | $ 5,04 | $ 491,40 |
| 0 | Ford F-450 T&TT 20-28 | | | |
| 0 | Ford F-350 T&TT 20-28 | | | |
| 0 | KW & Crane Truck | | | |
| 1 | Hammer | 32,50 | $ 41,93 | $ 1,362,73 |
| 1 | 300 Amp Welder | 32,50 | $ 9,49 | $ 308,43 |
| 1 | 1/2 Ton Truck | 32,50 | $ 32,48 | $ 1,055,60 |
| 1 | 60" Casing | 32,50 | $ 3,25 | $ 105,63 |
| 0 | Mud Bins | | | |

### Rental Equipment

| EQUIP. NO. | Rental Equipment | | HRS. | RATE/HR. | TOTAL/DAY |
|---|---|---|---|---|---|
| 1 | 10K Reach Forklift | S.T. | 32,50 | $ 51,29 | $ 1,666,93 |
| | | O.T. | | | $ - |
| 2 | 225 Excavator | O.T. | 32,50 | $ 91,59 | $ 5,953,35 |
| | | O.T. | | | $ - |
| 2 | Portable toilets | S.T. | 32,50 | $ 1,50 | $ 97,50 |
| | | O.T. | | | $ - |
| 0 | Multiquip 20KW Generator | S.T. | | | $ - |
| | | O.T. | | | $ - |
| 3 | Frac Tank | S.T. | 32,50 | $ 7,32 | $ 713,70 |
| | | O.T. | | | $ - |
| 1 | Trash Bin | S.T. | 32,50 | $ 4,97 | $ 161,53 |
| | | O.T. | | | $ - |
| 1 | 500 Amp Welder | S.T. | 32,50 | $ 9,49 | $ 308,43 |
| | | O.T. | | | $ - |
| 2 | Light Tower | S.T. | 32,50 | $ 7,61 | $ 494,65 |
| | | O.T. | | | $ - |
| 1 | 175 KW Generator | S.T. | 32,50 | $ 71,36 | $ 2,319,20 |
| | | O.T. | | | $ - |
| 1 | 6" Diesel Trash Pump | S.T. | 32,50 | $ 23,60 | $ 767,00 |
| | | O.T. | | | $ - |
| 1 | HTI Mud Motor | S.T. | 32,50 | $ 42,50 | $ 1,381,25 |
| | | S.T. | | | $ - |
| | | O.T. | | | $ - |
| | | O.T. | | | $ - |
| | | O.T. | | | $ - |
| | | S.T. | | | $ - |
| | | S.T. | | | $ - |
| | | O.T. | | | $ - |
| | | O.T. | | | $ - |
| | | S.T. | | | $ - |
| | | O.T. | | | $ - |

| | | | |
|---|---|---|---|
| COMPANY OWNED EQUIPMENT | | $ 28,979,28 |
| RENTAL EQUIPMENT W/ 15% Markup | | $ 15,943,05 |
| A– EQUIPMENT SUB - TOTAL COST | | $ 44,922,33 |
| 0,00 | % Sales Tx. Rental Equip. | | |

## B - MATERIALS

| | MATERIALS DESCRIPTION | QTY. USED | UNIT $ | TOTAL |
|---|---|---|---|---|
| 0 | | | $ - | $ - |
| 0 | | | $ - | $ - |
| 0 | | | $ - | $ - |
| 0 | | | $ - | $ - |
| 0 | | | $ - | $ - |
| 0 | | | $ - | $ - |
| 0 | | | $ - | $ - |
| 0 | | | $ - | $ - |
| 0 | | | $ - | $ - |

| | | | |
|---|---|---|---|
| B-MATERIALS  SUB-TOTAL COST | | $ - |
| 0,00 | % Sales Tax | | $ - |
| 15 | % ADDED M. U. % | | $ - |
| SUB-TOTAL A + B w/Tax | | $ 44,922,33 |

## C – SUBCONTRACT / WORK DONE BY SPECIALISTS/THIRD PARTY SERVICES

| Work Description | Individual / Company | Unit | RATE | TOTAL $ |
|---|---|---|---|---|
| Roller Damage | Minnesota Limited | 8,00 | $ 2.900,00 | $ 23,200,00 |
| | | | | $ - |
| | | | | $ - |
| | | | | $ - |
| | | COST OF SUBS - C | | $ 23,200,00 |
| | 15 % MARKUP(Subcontractor) | | | $ 3,480,00 |
| | | $ | | $ 26,680,00 |
| | TOTAL COST A + B + C (Including Mark-up) | | | $ 71,602,33 |

### D – LABOR

| NO. | D - LABOR | | HRS. | BASE RATE w/FRING'S. | SUB TOTAL | Per Diem Totals | TOTAL |
|---|---|---|---|---|---|---|---|
| 1 | Chris Crough (Day Rate) | REG. | 3,00 | $1,916,84 | $3,050,52 | $120,00 | $3,170,52 |
| | | O.T. | 0 | | $0,00 | | $0,00 |
| | | D.T. | | | $0,00 | | $0,00 |
| 2 | Randy Foster (Day Rate) | REG. | 3,00 | $968,88 | $2,906,64 | $300,00 | $3,206,64 |
| | | O.T. | | | $0,00 | | $0,00 |
| | | D.T. | | | $0,00 | | $0,00 |
| 3 | Harold Shoemaker (Day | REG. | 0,00 | | $0,00 | $0,00 | $0,00 |
| | | O.T. | | | $0,00 | | $0,00 |
| | | D.T. | | | $0,00 | | $0,00 |
| 4 | Justin Potter | REG. | 32,50 | $59,79 | $1,943,18 | $345,00 | $2,288,18 |
| | | O.T. | 0,00 | $80,65 | $0,00 | | $0,00 |
| | | D.T. | | | $0,00 | | $0,00 |
| 5 | Brandon Morris | REG. | 32,50 | $39,83 | $1,294,48 | $315,00 | $1,609,48 |
| | | O.T. | 0,00 | $54,42 | $0,00 | | $0,00 |
| | | D.T. | | | $0,00 | | $0,00 |
| 6 | David Jones | REG. | 32,50 | $42,86 | $1,392,95 | $315,00 | $1,707,95 |
| | | O.T. | 0,00 | $58,96 | $0,00 | | $0,00 |
| | | D.T. | | | $0,00 | | $0,00 |
| 7 | Brandon Sammet | REG. | 32,50 | $59,79 | $1,943,18 | $315,00 | $2,258,18 |
| | | O.T. | 0,00 | $80,65 | $0,00 | | $0,00 |
| | | D.T. | | | $0,00 | | $0,00 |
| 8 | Roger Reeter | REG. | 32,50 | $59,79 | $1,943,18 | $300,00 | $2,243,18 |
| | | O.T. | 0,00 | $80,65 | $0,00 | | $0,00 |
| | | D.T. | | | $0,00 | | $0,00 |
| 9 | Augustin Zepeda | REG. | 32,50 | $36,83 | $1,196,98 | $315,00 | $1,511,98 |
| | | O.T. | 0,00 | $69,49 | $0,00 | | $0,00 |
| | | D.T. | | | $0,00 | | $0,00 |
| 10 | Johnny Hatfield | REG. | 32,50 | $43,49 | $1,413,43 | $150,00 | $1,563,43 |
| | | O.T. | 0,00 | $59,91 | $0,00 | | $0,00 |
| | | D.T. | | | $0,00 | | $0,00 |
| 11 | | REG. | 0,00 | | $0,00 | | $0,00 |
| | | O.T. | 0,00 | | $0,00 | | $0,00 |
| | | D.T. | | | $0,00 | | $0,00 |
| 12 | | REG. | 0,00 | | $0,00 | | $0,00 |
| | | O.T. | 0,00 | | $0,00 | | $0,00 |
| | | D.T. | | | $0,00 | | $0,00 |
| 13 | | REG. | 0,00 | | $0,00 | | $0,00 |
| | | O.T. | 0,00 | | $0,00 | | $0,00 |
| | | D.T. | | | $0,00 | | $0,00 |

| | | | |
|---|---|---|---|
| | | D – LABOR SUB-TOTAL $ | 19,559,51 |
| 15 % Labor Surcharge | | | $ 2,933,93 |
| SUBTOTAL | | | 22,493,44 |
| 15 % MARKUP ON LABOR | | | $ 3,374,02 |

## E – MISCELLANEOUS ITEMS

| MISC. DESCRIPTIONS | QTY. | Unit $ | EX. AMOUNT |
|---|---|---|---|
| Hotel | | | |
| | 6 | $ 58,00 | $ 348,00 |
| | 9 | $ 68,00 | $ 612,00 |
| Subsistance | 0 | | $ - |
| Misc. Items | 0 | | $ - |
| 0 | | 0 | $ - |
| 0 | | 0 | $ - |
| 0 | | 0 | $ - |
| 0 | | 0 | $ - |
| 0 | | 0 | $ - |

| | | | |
|---|---|---|---|
| E- MISCELLANEOUS ITEMS SUB TOTAL | | | $ 960,00 |
| 5 % Sales/City/Room Tax | | | $ 48,00 |
| 15 % ADDED MARK-UP | | | $ 144,00 |
| 0 % Tax on Misc. Items | | | 0 |
| SUB TOTAL - E | | | $ 1,152,00 |

## TOTALS

| | | |
|---|---|---|
| TOTAL COST A+B+C (Equipment /Material /Sub-Contractors) | | $ 71,602,33 |
| TOTAL COST + D (Labor) | | $ 25,867,45 |
| TOTAL COST + E (Miscellaneous Items) | | $ 1,152,00 |
| SUB-TOTAL | | $ 98,621,78 |
| 2,5 % BOND & INSURANCE | | $ 2,465,54 |
| TOTAL COST THIS SHEET | | $ 101,087,33 |

| TIME | CLIENT DIRECTIVES AND COMMENTS |
|---|---|
| 0:00 | (See Daily Work Report) |
| 0:00 | |
| 0:00 | |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |

# EXHIBIT D



| Project Details | | | | | | | |
|---|---|---|---|---|---|---|---|
| From | The Tunneling Company USA, LLC. | Job No. | TUS20011 | RCO No. | 003 | Rev | 0 |
| RCO Title | Delays Due to Contractor | | | Date | August 31, 2020 | | |
| Owner | The HDD Company | | Attention | Jeremy King | | | |

| **Description Of Requested Change Details** |
|---|

Required by:    September 14, 2020

**Change Description**

Throughout the project, The Tunneling Company USA has experienced significant delays as a result of the contractor. These delays consist of (but not limited to);

- Dewatering the excavations
- Assisting with pit construction
- Waiting for pit completion
- Welding delays
- Safety shut downs
- Approvals

A detailed breakdown of these delays are attached.

**Change Costs:**

Total charges as a result of these delays is $500,975.

A detailed breakdown of these delays are attached.

All applicable taxes will be added at time of invoice



| Impact Details | | | | |
|---|---|---|---|---|
| **Reason for Change**:     Delays Due to Contractor | | | | |
| Additional Information | | | | |
| Click here to enter text. | | | | |
| Reference Or Attachments | | | | |
| Attach | Refer | Document No | Rev | Description |
| ☐ | ◆ | Timesheets | | Daily Timesheets for these delays are available upon request |
| ☐ | ☐ | | | |
| ☐ | ☐ | | | |
| Response | | | | |
| <span style="color:red">Client Use:</span> | | | | |
| Approval Details© | | | | |

| Submitted by     (Originator) | Client Use: |
|---|---|
| Print Name:     Nick Hyde | Change Authorized:     Yes |
| Print Title:       Project Manager | Print Name:                Jeremy King |
| Date:              August-31-2020 | Print Title:                Vice President |
| Signature: | Date: |
| | Signature: |
| | ✕ |

| Project: | Minnesota Limited - Kansas | | | | | |
|---|---|---|---|---|---|---|
| Date: | Crossing Name | Planned Activity Hours | Unplanned Activity Hours | Non- Billable Hours | Contract Reference Term | Description |
| 19-Mar-20 | HWY 31 | | 8 | | 7.1 | Pick up supplies and wait to offload last load of augers. ML still pumping water off of site and will start digging the pit tomorrow (Standby time). |
| 24-Mar-20 | HWY 31 | 4.5 | 7 | | 7.1 | Crew assisted with pit construction. By 1pm crew started placing mats and rails but had to remove them at EI's direction to place plastic under them to contain any spills. Mats and rails installed and boring machine brought over to site. Ready to start in the morning. |
| 16-Apr-20 | RD 1100 | 4 | 7.5 | | 7.1 | Set all gear around site and wait for pit completion (Standby time). |
| 17-Apr-20 | RD 1100 | | 11 | | 7.1 | Pit not ready (Standby time). |
| 27-Apr-20 | RD 1500 | | 10 | | 7.1 | Pit not ready (Standby time). |
| 2-May-20 | RD 1500 | 4.5 | 5.5 | | 7.1 | Completed casing install by 12pm. Exit pit no complete. ML work on exit pit for remainder of shift (Standby time). Daily Install 40'. Total Install 85'. |
| 18-May-20 | Clarke RD | 10 | 1 | | 7.1 | Confirm elevation and start welding casing. Unload excavators. Start setting equipment and engineer confirmed the setup is too low. Move equipment so grade can be adjusted. Daily Install 0'. Total Install 0'. |
| 19-May-20 | Clarke RD | 6.5 | 5.5 | | 7.1 | Fixed elevation of pit, set equipment and started drilling. Pit grade not excavated corectly. |
| 20-May-20 | Clarke RD | 10 | 1 | | 7.1 | Stanby time waiting for excavator in the morning |
| 26-May-20 | Allen RD | 9 | 3 | | 7.1 | Spent 3hrs pumping pit and standby for fixing excavation cave-in. Continued install. Daily Install 20'. Total Install 26'. |
| 28-May-20 | RD 2150 | 3 | 7 | | 7.1 | Continued install till 10:30 when project got shut down due to a safety stand down (standby time). Daily Install 6'. Total Install 51'. |
| 28-May-20 | Allen RD | 3 | 7 | | 7.1 | Continued install till 10:30 when project got shut down due to a safety stand down (standby time). Daily Install 13'. Total Install 80'. |
| 29-May-20 | Allen RD | 8 | 4 | | 7.1 | Help ML dewater pit (Standby time). Complete casing install. Daily Install 40'. Total Install 120'. |
| 1-Jun-20 | RD 2150 | 8 | 2 | | 7.1 | Arrived on site an had to pump out pit (standby time). Set boring machine and continued product pipe installation until complete. Daily Install 120' (product pipe). Total Install 120' (product pipe). |
| 8-Jun-20 | Jackson RD | | 6 | 6 | 7.1 | Still waiting for pit to be completed. Repaired Equipment for half the day |
| 9-Jun-20 | Jackson RD | | 6 | 6 | 7.1 | Still waiting for pit to be completed. Repaired Equipment for half the day |
| 10-Jun-20 | Jackson RD | | 12 | | 7.1 | Still waiting for pit to be completed. Daily Install 0'. Total Install 0'. |
| 11-Jun-20 | Jackson RD | | 12 | | 7.1 | Still waiting for pit to be completed. Daily Install 0'. Total Install 0'. |
| 18-Jun-20 | Hamilton RD | | 10 | | 7.1 | Pit not ready. Daily Install 0'. Total Install 0'. |
| 19-Jun-20 | Hamilton RD | | 10 | | 7.1 | Pit not ready. Daily Install 0'. Total Install 0'. |
| 20-Jun-20 | Hamilton RD | | 10 | | 7.1 | Pit not ready. Daily Install 0'. Total Install 0'. |
| 26-Jun-20 | Missouri RD | 3.5 | 6.5 | | 7.1 | Completed the exit pit and welders cut off the SBU. Waited on approval to push product pipe from 11:30 to end of shift (standby time). Daily Install 0'. Total Install 185'. |
| 2-Jul-20 | Rock Ridge RD | | 10 | | 7.1 | Site not ready. Standby time. |
| 6-Jul-20 | Rock Ridge RD | | 10 | | 7.1 | Waiting on pit. |
| 8-Jul-20 | Nebraska RD | 7 | 4 | | 7.1 | Augered out casing. Wait for ML to complete exit pit (standby time). First product pipe welded. Daily Install 0' (product pipe). Total Install 0' (product pipe). |

| Date | Location | | | | | Notes |
|---|---|---|---|---|---|---|
| 8-Jul-20 | John Brown RD | 5 | 5 | | 7.1 | Finish moving equipment to site. Pit not complete (standby time). Daily Install 0'. Total Install 0'. |
| 9-Jul-20 | John Brown RD | | 10 | | 7.1 | Pit not complete. Standby time. Daily Install 0'. Total Intall 0'. |
| 13-Jul-20 | John Brown RD | 7 | 3 | | 7.1 | Prepared to stuff augers and set casing. Pit shut down due to safety concerns with the shoring (Standby time). Daily Install 0'. Total Install 0'. |
| 14-Jul-20 | John Brown RD | 8 | 2 | | 7.1 | Installed another trench box. 2h delay (Standby time). Start installing casing. Daily Install 18'. Total Install 18'. |
| 15-Jul-20 | John Brown RD | 8 | 2 | | 7.1 | Continue installing casing all shift. 2h delay because welders refused to rebevel pipe. Welders welded the casing on crooked (Standby time. Pipe would not fit in the machine. Daily Install 37'. Total Install 55'. |
| 16-Jul-20 | John Brown RD | 5 | 5 | | 7.1 | Redo weld from yesterday. 5h delay (standby time). Continue boring. Daily Install 16'. Total Install 50'. |
| 22-Jul-20 | Lavette Terrace RD | 11 | 1 | | 7.1 | Delayed start by 1 hour because crew had to remove debris from road surface (Standby time). Start drilling by 8am. Daily Install 10.5'. Total Install 90.5'. |
| 22-Jul-20 | John Brown RD | 7 | 3 | | 7.1 | Delayed start due to pit flooded. Unsafe to work (Standby time). Cut of SBU head and weld product pipe to casing. Daily Install 0' (product pipe). Total Install 0' (product pipe). |
| 22-Jul-20 | John Brown RD | 6 | 4 | | 7.1 | Unable to get casing from other sites due to rain yesterday (Standby time). Had to move equipment because ML was using dynamite to open ditch. Prep casing for install. Daily install 0'. Total Install ???'. |
| 23-Jul-20 | Kingman RD | 10 | 2 | | 7.1 | Completed casing install and augering. Wait for 2hrs for welders. Weld first product pipe to casing. Daily Install 0' (product pipe). Total Install 0' (product pipe). |
| 23-Jul-20 | Lavette Terrace RD | 6 | 4 | | 7.1 | Waiting for welders and coaters for 4hrs (Standby time). Install product pipe for remainder of day. |
| 23-Jul-20 | John Brown RD | 9 | 3 | | 7.1 | Wait for 3hrs for welders (Standby time). Continue drilling. Daily Install 15'. Total Install 80'. |
| 24-Jul-20 | Kingman RD | 5 | 5 | | 7.1 | Finished casing install. Waited for welders for rest of shift (Standby time). Daily Install 10'. Total Install 90'. |
| 29-Jul-20 | Marshall RD | 5 | 5 | | 7.1 | Move equipment from John Brown to Marshall. Pit not ready (Standby time). Daily Install 0'. Total Install 0'. |
| 30-Jul-20 | Marshall RD | 6.5 | 6.5 | 1.5 | 7.1 | Pit not ready (Standby time). Shift cancelled at 1:30 due to rain. Daily Install 0'. Total Install 0'. |
| 31-Jul-20 | Marshall RD | | 10 | | 7.1 | Minn LTD started excavating launch pit on north side of Marshall Rd. Not ready for us |
| 31-Jul-20 | John Brown RD | | 10 | | 7.1 | Tool box with all crews. Marshall rd is on hold till Minnesota decides what side they want to drill from. Set to collar in casing at lebbett had issues with casing length will collaring first thing tomorrow morning. |
| 1-Aug-20 | Marshall RD | | 8 | | 7.1 | Minn LTD started excavating launch pit on north side of Marshall Rd. Not ready for us (Standby time). |
| 3-Aug-20 | Marshall RD | 4 | 8 | | 7.1 | Waiting for pit to be dug (Standby time). |
| 4-Aug-20 | Marshall RD | 9.5 | 2.5 | | 7.1 | Had to continuously stop and give our excavator to blasting crew, being shut down for blasting (Standby time). |
| 4-Aug-20 | Labette Terrace RD | 6.5 | 3.5 | | 7.1 | Waiting for welders, 10-12 and 12:30-2pm (Standby time). |
| 8-Aug-20 | Neosho Rd | 9 | 1 | | 7.1 | Waited for Minn Ltd. For an hour to come unload product pipe (Standby time). |
| 12-Aug-20 | Missouri RD | | 10 | | 7.1 | Pit full of water, on standby all day |
| 13-Aug-20 | Missouri RD | 2 | 8 | | 7.1 | Dewater bore pit and wait for second excavator to set up equipment (Standby time). |
| 14-Aug-20 | Missouri RD | 9.5 | 0.5 | | 7.1 | Dewater Pit (Standby time). |

| Date | Location | | | | | Terms & Conditions |
|---|---|---|---|---|---|---|
| 17-Aug-20 | Missouri RD | 7.5 | 2.5 | | 7.1 | Wait for welders (Standby time). |
| 20-Aug-20 | Marshall RD | 8 | 4 | | 7.1 | Had to wait on fuel truck to get out of the way, had to shut down multiple times for mat truck to get through, waited on welders (Standby time). |
| 20-Aug-20 | 1650 RD | 6 | 4 | | 7.1 | Pumped water out of exit pit at 1650 Rd from 12:30 to 4:30 (Standby time). |
| 21-Aug-20 | Marshall RD | 9 | 3 | | 7.1 | Waited on welders 9:50AM-1PM (Standby time). |
| 21-Aug-20 | 1650 RD | 10 | 10 | | 7.1 | Pumped water out of exit pit at 1650 Rd from 12:30 to 4:30 (Standby time). |
| 24-Aug-20 | 1650 RD | | 12 | | 7.1 | Waiting for Minn. Ltd to move the boring machine to site while tunneling crew dewatering 1650 pits (Standby time). |
| 27-Aug-20 | 1650 RD | | 12 | | 7.1 | Nigth shift scheduled but no operator from Minn. Ltd. showed up (Standby time). |

Terms & Conditions 7.1

345.5

**Summary**

| | Hours | Rate / HR | Amount |
|---|---|---|---|
| | 345.5 | $ 1,450.00 | $ 500,975.00 |

Total Change Amount $500,975.00

# EXHIBIT E


| CLIENT/OWNER : | Minnesota Limited - Southern Star | DATE: | |
| WORK PRFM'D, BY: | The HDD Company, Inc. | EXTRA WRK. SHT. NO. | Day Shift |
| DESCPTN. OF WORK : | Time spent reinstalling 36" pipeline, Multiple days from 6/22/20 - 7/15/20 and 8/22/20 - 9/9/20 | | |

## A - EQUIPMENT

| EQUIP. NO. | Company Owned Equipment | HRS. | RATE/HR. | TOTAL/DAY |
|---|---|---|---|---|
| 1 | Drilling Rig HDD Rig 7 - Vermeer 750 | 408,00 | $ 205,56 | $ 83.868,48 |
| 1 | Mud Tank / Solids Control Unit | 408,00 | $ 111,96 | $ 45.679,68 |
| 1 | Sump Pit/Trash Pump | 408,00 | $ 8,29 | $ 3.382,32 |
| 1 | Mud Pumping Units | 408,00 | $ 60,94 | 24.863,52 |
| 2 | Tool Van and tools | 408,00 | $ 17,55 | $ 14.320,80 |
| 0 | Dump Truck A=17  TRUN 2AXL | | | $ - |
| 3 | Vac. Truck A=17 TRUN 2AXL | 408,00 | $ 45,75 | $ 55.998,00 |
| 10 | Misc. Trailers | 408,00 | $ 1,79 | $ 7.303,20 |
| 1 | Haul Trucks | 408,00 | $ 34,13 | 13.925,04 |
| 1 | 6 3/4" Non Mag Drill Collars w/Jet Assembly | 408,00 | $ 6,83 | $ 2.786,64 |
| 168 | Drill Pipe (5-1/2 FH) | 408,00 | $ 0,53 | 36.328,32 |
| 2 | Misc. X-Subs and Rack (All X Subs for Spread) | 408,00 | $ 5,20 | $ 4.243,20 |
| 0 | Sonde and Housing | | | |
| | Steering Tool (North Referencing w/Tru-Gyde) | | | |
| 48 | Rollers | 408,00 | $ 1,50 | $ 29.376,00 |
| 3 | Ford F-250 T&TT 06-12 | 408,00 | $ 5,04 | $ 6.168,96 |
| 0 | Ford F-450 T&TT 20-28 | | | $ - |
| 0 | Ford F-350 T&TT 20=28 | | | |
| 0 | KW & Crane Truck | | | |
| 1 | Hammer | 408,00 | $ 41,93 | $ 17.107,44 |
| 1 | 300 Amp Welder | 408,00 | $ 9,49 | $ 3.871,92 |
| 1 | 1/2 Ton Truck | 408,00 | $ 32,48 | $ 13.251,84 |
| 1 | 60" Casing | 408,00 | $ 3,25 | $ 1.326,00 |
| 0 | Mud Bins | | | |

| | Rental Equipment | | | | |
|---|---|---|---|---|---|
| 1 | 10K Reach Forklift | S.T. | 408,00 | $ 51,29 | $ 20.926,32 |
| 2 | 225 Excavator | S.T. | 408,00 | $ 91,59 | $ 74.737,44 |
| | | O.T. | | | $ - |
| 2 | Portable toilets | S.T. | 408,00 | $ 1,50 | $ 1.224,00 |
| 0 | Multiquip 20kW Generator | S.T. | | | $ - |
| | | O.T. | | | $ - |
| 3 | Frac Tank | S.T. | 408,00 | $ 7,32 | $ 8.959,68 |
| 1 | Trash Bin | S.T. | 408,00 | $ 4,97 | $ 2.027,76 |
| | | O.T. | | | $ - |
| 1 | 500 Amp Welder | S.T. | 408,00 | $ 9,49 | $ 3.871,92 |
| | | O.T. | | | $ - |
| 2 | Light Tower | S.T. | 408,00 | $ 7,61 | $ 6.209,76 |
| | | O.T. | | | $ - |
| 1 | 175 KW Generator | S.T. | 408,00 | $ 71,36 | 29.114,88 |
| 1 | 6" Diesel Trash Pump | S.T. | 408,00 | $ 23,60 | $ 9.628,80 |
| 1 | HTI Mud Motor | S.T. | 408,00 | $ 42,50 | $ 17.340,00 |
| | | S.T. | | | $ - |
| | | S.T. | | | $ - |
| | | O.T. | | | $ - |
| | | S.T. | | | $ - |
| | | S.T. | | | $ - |
| | | O.T. | | | $ - |
| | | S.T. | | | $ - |
| | | O.T. | | | $ - |
| | | O.T. | | | $ - |
| | | O.T. | | | $ - |

| | | | |
|---|---|---|---|
| COMPANY OWNED EQUIPMENT | | | $ 363.801,36 |
| RENTAL EQUIPMENT W/ 15% Markup | | | 200.146,64 |
| A- EQUIPMENT SUB - TOTAL COST | | | $ 563.948,00 |
| 0,00 | % Sales Tx. Rental Equip. | | |

## B - MATERIALS

| MATERIALS DESCRIPTION | QTY. USED | UNIT $ | TOTAL |
|---|---|---|---|
| Bentonite | 86,00 | $ 9,50 | $ 817,00 |
| Cement | 54,00 | $ 9,50 | $ 513,00 |
| Shaker Screens | 6,00 | $ 135,00 | $ 810,00 |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| B-MATERIALS SUB-TOTAL COST | | | $ 2.140,00 |
| 0,00 | % Sales Tax | | |
| 15 | % ADDED M. U. S | | $ 321,00 |
| SUB-TOTAL A + B w/Tax | | | $ 566.409,00 |

## C – SUBCONTRACT / WORK DONE BY SPECIALISTS/THIRD PARTY SERVICES

| Work Description | Individual / Company | Unit | RATE | TOTAL $ |
|---|---|---|---|---|
| Coating and Corrosion Expert | Lake Superior Consultants | 1,00 | $ 19.702,53 | $ 19.702,53 |
| Vac Trucks | Hurricane Services | 1,00 | $ 39.415,00 | $ 39.415,00 |
| Disposal Charges | Anderson County Landfill | 1,00 | $ 18.103,40 | $ 18.103,40 |
| 0 | | 0 | 0,00 | $ - |
| 0 | | 0 | 0,00 | $ - |
| | COST OF SUBS - C | | | $ 77.220,93 |
| 15 % MARKUP (Subcontractor) | | | | $ 11.583,14 |
| | | | $ | $ 88.804,07 |
| TOTAL COST A + B + C (Including Mark-Up) | | | | $ 655.213,07 |

## D – LABOR

| NO. | D - LABOR | HRS. | BASE RATE w/FRING'S. | SUB TOTAL | Per Diem Totals | TOTAL |
|---|---|---|---|---|---|---|
| 1 | Chris Crough (Day Rate) | REG. 33,00 | $1,016,84 | $33.555,72 | $1.320,00 | $34.875,72 |
| | | O.T. 0 | | $0,00 | | |
| | | D.T. | | $0,00 | | |
| 2 | Randy Foster (Day Rate) | REG. 17,00 | $968,88 | $16.470,96 | $1.700,00 | $18.170,96 |
| | | O.T. | | $0,00 | | |
| | | D.T. | | $0,00 | | |
| 3 | Harold Shoemaker (Day | REG. 17,00 | $755,00 | $12.835,00 | $1.785,00 | $14.620,00 |
| | | O.T. | | $0,00 | | |
| | | D.T. | | $0,00 | | |
| 4 | Justin Potter | REG. 104,00 | $59,79 | $6.218,16 | $1.495,00 | $7.713,16 |
| | | O.T. 52,00 | $80,65 | $4.193,80 | | $4.193,80 |
| | | D.T. | | $0,00 | | |
| 5 | Brandon Morris | REG. 112,00 | $36,83 | $4.460,96 | $1.260,00 | $5.720,96 |
| | | O.T. 52,00 | $55,42 | $2.829,58 | | $2.829,58 |
| | | D.T. | | $0,00 | | |
| 6 | David Jones | REG. 248,00 | $42,86 | $10.629,28 | $3.255,00 | $13.884,28 |
| | | O.T. 125,00 | $58,96 | $7.370,00 | | $7.370,00 |
| | | D.T. | | $0,00 | | |
| 7 | Brandon Sammet | REG. 194,00 | $59,79 | $11.001,36 | $2.415,00 | $13.416,36 |
| | | O.T. 97,00 | $80,65 | $7.823,05 | | $7.823,05 |
| | | D.T. | | $0,00 | | |
| 8 | Roger Reeter | REG. 112,00 | $59,79 | $6.696,48 | $1.400,00 | $8.096,48 |
| | | O.T. 66,00 | $80,65 | $5.322,90 | | $5.322,90 |
| | | D.T. | | $0,00 | | |
| 9 | Augustin Zepeda | REG. 128,00 | $36,83 | $4.714,24 | $1.680,00 | $6.394,24 |
| | | O.T. 69,00 | $69,49 | $4.794,81 | | $4.794,81 |
| | | D.T. | | $0,00 | | |
| 10 | Johnny Hatfeild | REG. 128,00 | $43,49 | $5.566,72 | $800,00 | $6.366,72 |
| | | O.T. 68,00 | $59,91 | $4.133,45 | | $4.133,45 |
| | | D.T. | | $0,00 | | |
| 11 | Stephen Davis | REG. 224,00 | $43,49 | $9.741,76 | $1.120,00 | $10.861,76 |
| | | O.T. 112,00 | $59,91 | $6.709,36 | | $6.709,36 |
| | | D.T. | | $0,00 | | |
| 12 | Bruce Cooper | REG. 224,00 | $44,53 | $9.974,72 | $1.120,00 | $11.094,72 |
| | | O.T. 109,00 | $60,70 | $6.615,76 | | $6.615,76 |
| | | D.T. | | $0,00 | | |
| 13 | Juan Miguel Suarzes | REG. 101,00 | $36,83 | $3.719,83 | $650,00 | $4.369,83 |
| | | O.T. 48,00 | $49,92 | $2.395,92 | | $2.395,92 |
| | | D.T. | | $0,00 | | |
| | D - LABOR SUB-TOTAL | | | | $ 207.773,81 |
| 15 % Labor Surcharge | | | | SUBTOTAL | $ 31.166,07 |
| | | | | SUBTOTAL | $ 238.939,88 |
| 15 % MARKUP ON LABOR | | | | | $ 35.840,98 |

## E – MISCELLANEOUS ITEMS

| MBC, DESCRIPTIONS | QTY. | Unit $ | EX. AMOUNT |
|---|---|---|---|
| Hotel | | | |
| | 96 | $ 58,00 | $ 5.568,00 |
| | 155 | $ 68,00 | $ 10.540,00 |
| Subsistance | | | $ - |
| Misc. Items | | | |
| 0 | 0 | $ - | $ - |
| 0 | 0 | | $ - |
| 0 | 0 | | $ - |
| 0 | 0 | | $ - |
| 0 | 0 | | $ - |
| E- MISCELLANEOUS ITEMS SUB TOTAL | | | $ 16.108,00 |
| 5 % Sales/City/Room Tax | | | 805,40 |
| 15 % ADDED MARK-UP | | | $ 2.416,20 |
| 0 % Tax on Misc. Items | | | $ - |
| SUB TOTAL - E | | | $ 19.329,60 |

## TOTALS

| | | |
|---|---|---|
| TOTAL COST A+B+C (Equipment /Material /Sub-Contractors) | | $ 655.213,07 |
| TOTAL COST + D  (Labor) | | $ 274.780,86 |
| TOTAL COST - E  (Miscellaneous Items) | | $ 19.329,60 |
| | SUB-TOTAL | $ 949.323,53 |
| 2,5 % BOND & INSURANCE | | $ 23.733,09 |
| TOTAL COST THIS SHEET | | $ 973.056,63 |

| TIME | CLIENT DIRECTIVES AND COMMENTS |
|---|---|
| 0.00 | (See Daily Work Report) |
| 0.00 | |
| 0.00 | |
| 0.00 | |
| 0.00 | |
| 0.00 | |
| 0.00 | |
| 0.00 | |
| 0.00 | |
| 0.00 | |
| 0.00 | |
| 0.00 | |
| 0.00 | |
| 0.00 | |
| 0.00 | |
| 0.00 | |
| 0.00 | |

# EXHIBIT F

| PROJECT NAME: | | | | | | |
|---|---|---|---|---|---|---|
| PROJECT NO.: | Southern Star Line DT & DS Replacement | THE HDD COMPANY Horizontal Directional Drilling | **EXTRA WORK SHEET REPORT INTERNAL – OFFICE** | | | |

CLIENT/OWNER : Minnesota Limited – Southern Star
DATE: _____

WORK PRFM'D. BY: The HDD Company, Inc.
EXTRA WRK. SHT. NO.: _____ Night Shift

DESCPT'N. OF WORK: Time spent reinstalling 36" pipeline, Multiple days from 6/22/20 – 7/15/20 and 8/22/20 – 9/9/20

| EQUIP. NO. | A – EQUIPMENT | | | | |
|---|---|---|---|---|---|
| | **Company Owned Equipment** | HRS. | RATE/HR. | TOTAL/DAY | |
| 1 | Drilling Rig HDD Rig 7 – Vermeer 750 | 300.00 | $ 205.56 | $ 61,668.00 | |
| 1 | Mud Tank / Solids Control Unit | 300.00 | $ 111.96 | $ 33,588.00 | |
| 1 | Sump Pit/Trash Pump | 300.00 | $ 8.29 | $ 2,487.00 | |
| 1 | Mud Pumping Units | 300.00 | $ 60.94 | $ 18,282.00 | |
| 2 | Tool Van and tools | 300.00 | $ 17.55 | $ 10,530.00 | |
| 0 | Dump Truck A-17 TRUN 2AXL | | | | |
| 3 | Vac. Truck A-17 TRUN 2AXL | 300.00 | $ 45.75 | $ 41,175.00 | |
| 10 | Misc. Trailers | 300.00 | $ 1.79 | $ 5,370.00 | |
| 1 | Haul Trucks | 300.00 | $ 34.13 | $ 10,239.00 | |
| 1 | 6 3/4" Non Mag Drill Collars w/Jet Assembly | 300.00 | $ 6.83 | $ 2,049.00 | |
| 168 | Drill Pipe (5-1/2 FH) | 300.00 | $ 0.53 | $ 26,712.00 | |
| 2 | Misc. X-Subs and Rack (All X Subs for Spread) | 300.00 | $ 5.20 | $ 3,120.00 | |
| 0 | Sonde and Housing | | | | |
| | Steering Tool (North Referencing w/Tru-Gyde) | | | | |
| 48 | Rollers | 300.00 | $ 1.50 | $ 21,600.00 | |
| 3 | Ford F-250 T&TT 06-12 | 300.00 | $ 7.50 | $ 6,750.00 | |
| 0 | Ford F-450 T&TT 20-28 | | | | |
| 0 | Ford F-350 T&TT 20-28 | | | | |
| 0 | KW & Crane Truck | | | | |
| 1 | Hammer | 300.00 | $ 41.93 | $ 12,579.00 | |
| 1 | 300 Amp Welder | 300.00 | $ 9.49 | $ 2,847.00 | |
| 1 | 1/2 Ton Truck | 300.00 | $ 32.48 | $ 9,744.00 | |
| 1 | 60' Casing | 300.00 | | $ - | |
| 0 | Mud Bins | | | | |

| | **Rental Equipment** | | | | |
|---|---|---|---|---|---|
| 1 | 10K Reach Forklift | O.T. 300.00 | $ 51.29 | $ 15,387.00 | |
| 2 | 225 Excavator | O.T. 300.00 | $ 91.59 | $ 54,954.00 | |
| 2 | Portable toilets | O.T. 300.00 | $ 1.50 | $ 900.00 | |
| 0 | Multiquip 20KW Generator | O.T. | | $ - | |
| 3 | Frac Tank | O.T. 300.00 | $ 7.32 | $ 6,588.00 | |
| 1 | Trash Bin | O.T. 300.00 | $ 4.97 | $ 1,491.00 | |
| 1 | 500 Amp Welder | O.T. 300.00 | $ 9.49 | $ 2,847.00 | |
| 2 | Light Tower | O.T. 300.00 | $ 7.61 | $ 4,566.00 | |
| 1 | 175 KW Generator | O.T. 300.00 | $ 71.36 | $ 21,408.00 | |
| 1 | 6" Diesel Trash Pump | O.T. 300.00 | $ 23.60 | $ 7,080.00 | |
| 1 | HTI Mud Motor | O.T. 300.00 | $ 42.50 | $ 12,750.00 | |

| | | | | |
|---|---|---|---|---|
| | COMPANY OWNED EQUIPMENT | | | $ 268,740.00 |
| | RENTAL EQUIPMENT W/ 15% Markup | | | $ 147,166.65 |
| | A– EQUIPMENT SUB – TOTAL COST | | | $ 415,906.65 |
| | 0.00 % Sales Tx. Rental Equip. | | | $ - |

| B – MATERIALS | | QTY. USED | UNIT $ | TOTAL |
|---|---|---|---|---|
| | **MATERIALS DESCRIPTION** | | | |
| 0 | | | $ - | $ - |
| 0 | | | $ - | $ - |
| 0 | | | $ - | $ - |
| 0 | | | $ - | $ - |
| 0 | | | $ - | $ - |
| 0 | | | $ - | $ - |
| 0 | | | $ - | $ - |
| | B–MATERIALS SUB–TOTAL COST | | $ - | $ - |
| | 0.00 % Sales Tax | | | $ - |
| | 10 % ADDED M, LL, B | | | $ - |
| | SUB–TOTAL A + B w/Tax | | | $ 415,906.65 |

| C – SUBCONTRACT / WORK DONE BY SPECIALISTS/THIRD PARTY SERVICES | | | | | |
|---|---|---|---|---|---|
| Work Description | Individual / Company | Unit | RATE | TOTAL $ | |
| | | | | $ - | |
| | COST OF SUBS– C | | | $ - | |
| | 15 % MARK-UP(Subcontractor) | | | $ - | |
| | | | | $ - | |
| TOTAL COST A + B + C (Including Mark-Up) | | | | $ 415,906.65 | |

| NO. | D – LABOR | HRS. | BASE RATE w/FRING'S. | SUB TOTAL | Per Diem Totals | TOTAL |
|---|---|---|---|---|---|---|
| 1 | Shavon Posey (Day Rate) | REG. 33.00 | $755.00 | $24,915.00 | $2,730.00 | $27,645.00 |
| | | O.T. 0 | | $0.00 | | $0.00 |
| | | O.T. 0 | | $0.00 | | $0.00 |
| 2 | Jacob Hoffman | REG. 131.00 | $59.79 | $7,832.49 | $2,380.00 | $10,212.49 |
| | | O.T. 69.00 | $80.65 | $5,564.85 | | $5,564.85 |
| | | O.T. | | $0.00 | | $0.00 |
| 3 | Westin Colgrove | REG. 96.00 | $59.79 | $5,739.84 | $1,260.00 | $6,999.84 |
| | | O.T. 69.00 | $80.65 | $5,484.20 | | $5,484.20 |
| | | O.T. | | $0.00 | | $0.00 |
| 4 | Dustin Anderson | REG. 195.00 | $48.20 | $9,399.00 | $1,920.00 | $11,319.00 |
| | | O.T. 92.00 | $66.20 | $6,090.40 | | $6,090.40 |
| | | O.T. | | $0.00 | | $0.00 |
| 5 | Jeromie Acres | REG. 164.00 | $48.20 | $7,576.80 | $1,680.00 | $9,256.80 |
| | | O.T. 96.00 | $63.20 | $6,067.20 | | $6,067.20 |
| | | O.T. | | $0.00 | | $0.00 |
| 6 | Abraham Berrospe | REG. 159.00 | $36.83 | $5,855.97 | $960.00 | $6,815.97 |
| | | O.T. 95.00 | $49.92 | $4,741.93 | | $4,741.93 |
| | | O.T. | | $0.00 | | $0.00 |
| 7 | Larry Roseboro | REG. 79.00 | $59.79 | $4,723.41 | $500.00 | $5,223.41 |
| | | O.T. 35.00 | $80.65 | $2,822.75 | | $2,822.75 |
| | | O.T. | | $0.00 | | $0.00 |
| 8 | Dusty Cline | REG. 24.00 | $59.79 | $1,434.96 | $315.00 | $1,749.96 |
| | | O.T. 12.00 | $80.65 | $967.80 | | $967.80 |
| | | O.T. | | $0.00 | | $0.00 |
| 9 | Taylor Crosley | REG. 35.00 | $59.79 | $2,092.48 | $350.00 | $2,412.48 |
| | | O.T. 40.00 | $52.66 | $2,106.40 | | $2,106.40 |
| | | O.T. | | $0.00 | | $0.00 |
| 10 | Jim Rubick | REG. 123.00 | $59.79 | $7,354.17 | $1,575.00 | $8,929.17 |
| | | O.T. 65.00 | $80.65 | $5,242.25 | | $5,242.25 |
| | | O.T. | | $0.00 | | $0.00 |
| 11 | Barton Snowten | REG. 67.00 | $38.66 | $3,092.80 | $1,725.00 | $4,817.80 |
| | | O.T. 60.00 | $52.66 | $3,159.60 | | $3,159.60 |
| | | O.T. | | $0.00 | | $0.00 |
| 12 | Kenny Densmore | REG. 80.00 | $59.79 | $4,783.20 | $1,050.00 | $5,833.20 |
| | | O.T. 60.00 | $80.65 | $4,839.00 | | $4,839.00 |
| | | O.T. | | $0.00 | | $0.00 |
| | D– LABOR SUB–TOTAL | | | | | $ 148,301.63 |
| | 15 % Labor Surcharge | | | | | $ 22,245.22 |
| | SUBTOTAL | | | | | $ 170,546.72 |
| | 15 % MARKUP ON LABOR | | | | | $ 25,582.01 |

| E – MISCELLANEOUS ITEMS | | QTY. | Unit $ | EX. AMOUNT |
|---|---|---|---|---|
| MISC. DESCRIPTIONS | | | | |
| Hotel | | | $ 58.00 | $ - |
| | | | $ 68.00 | $ - |
| Subsistance | | 0 | | $ - |
| Misc. Items | | | | |
| 0 | | 0 | | $ - |
| 0 | | 0 | | $ - |
| 0 | | 0 | | $ - |
| 0 | | 0 | | $ - |
| 0 | | 0 | | $ - |
| 0 | | 0 | | $ - |
| E–MISCELLANEOUS ITEMS SUB TOTAL | | | | $ - |
| 0 % Sales/City/Room Tax | | | | $ - |
| 15 % ADDED MARK-UP | | | | $ - |
| 0 % Tax on Misc. Items | | | | $ - |
| SUB TOTAL – E | | | | $ - |

| TOTALS | | | | |
|---|---|---|---|---|
| TOTAL COST A+B+C (Equipment /Material /Sub=Contractors) | | | | $ 415,906.65 |
| TOTAL COST = D (Labor) | | | | $ 196,128.73 |
| TOTAL COST = E (Miscellaneous Items) | | | | $ - |
| | | | SU | $ 612,035.38 |
| 2.5 % BOND & INSURANCE | | | | $ 15,300.88 |
| TOTAL COST THIS SHEET | | | | $ 627,336.26 |

| TIME | CLIENT DIRECTIVES AND COMMENTS |
|---|---|
| 0.00 | (See Daily Work Report) |
| 0.00 | |
| 0.00 | |
| 0.00 | |

THE HDD COMPANY:

DATE: _____ (Signature) _____

CLIENT _____ (Signature)

DATE: _____

# EXHIBIT G



Addendum #4
Subcontract Agreement
SR1916169002

The following addition is made to the Subcontract Agreement with HHD Company:

- Per the attached documents for a total of $555,000.00

  *This cannot be invoiced for until all drills are pulled and bores are installed*

Any additional state and local taxes incurred will be charged accordingly.

Minnesota Limited:

_____

HDD Company

_____

# Exhibit 8

USPS TRACKING #



9590 9402 6142 0209 2513 07

**United States**
**Postal Service**

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

* Sender: Please print your name, address, and ZIP+4® in this box*

**HUSCH BLACKWELL**
4801 Main Street, Suite 1000
Kansas City, MO  64112

M· Moxy

**SENDER: COMPLETE THIS SECTION**

■ Complete items 1, 2, and 3.
■ Print your name and address on the reverse so that we can return the card to you.
■ Attach this card to the back of the mailpiece, or on the front if space permits.

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _____  ☐ Agent
                    ☐ Addressee

B. Received by (Printed Name)    C. Date of Delivery
MELINDA FORGE

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:        ☐ No

1. Article Addressed to:

**Minnesota Limited, LLC.**
c/o National Registered Agents, Inc. of KS
112 SW 7th Street Suite 3C
Topeka, KS 66603

9590 9402 6142 0209 2513 07

2. Article Number (Transfer from service label)
91 7199 9991 7037 1995 7442

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☒ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
   ....ited Delivery

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☒ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2015 PSN 7530-02-000-9053          Domestic Return Receipt

# Exhibit 9

USPS TRACKING #




First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

9590 9402 6142 0209 2513 14

**United States
Postal Service**

* Sender: Please print your name, address, and ZIP+4® in this box*

# HUSCH BLACKWELL

4801 Main Street, Suite 1000
Kansas City, MO  64112

*m · Moody*

:-255150

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

**Southern Star Central Gas Pipeline, Inc.**
c/o The Corporation Company, Inc.
112 SW 7th Street Suite 3C
Topeka, KS 66603

9590 9402 6142 0209 2513 14

2. Article Number (Transfer from service label)
9489 0090 0027 6303 9140 40

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _____  ☐ Agent
                          ☐ Addressee
B. Received by (Printed Name)        C. Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:        ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☒ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ ___ cted Delivery

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☒ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2015 PSN 7530-02-000-9053                     Domestic Return Receipt

# Exhibit 10

USPS TRACKING #
KANSAS CITY 640

5590 9402 6142 0209 2613 21

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

**United States**
**Postal Service**

* Sender: Please print your name, address, and ZIP+4® in this box®

# HUSCH BLACKWELL
4801 Main Street, Suite 1000
Kansas City, MO  64112





**SENDER:** *COMPLETE THIS SECTION*

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

**Rene and Anita Bures**
31443 NW Meade Rd.
Richmond, KS 66080

‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖
9590 9402 6142 0209 2513 21

2. Article Number *(Transfer from service label)*

9489 0090 0027 6303 9142 48

*COMPLETE THIS SECTION ON DELIVERY*

A. Signature
X JGRR671 C77
☐ Agent
☐ Addressee

B. Received by *(Printed Name)*
Roseur Buros

C. Date of Delivery
1/11/202

D. Is delivery address different from item 1?  ☐ Yes
If YES, enter delivery address below:  ☒ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☒ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☒ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

stricted Delivery

PS Form 3811, July 2015 PSN 7530-02-000-9053

Domestic Return Receipt

# Exhibit 11

USPS TRACKING #

METROPLEX MT 480

16 JUN 2021 PM 3 L

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

9590 9402 6142 0209 2513 38

United States
Postal Service

* Sender: Please print your name, address, and ZIP+4® in this box*

**HUSCH BLACKWELL**
4801 Main Street, Suite 1000
Kansas City, MO 64112

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Keith J. Pickert and Mary J. Pickert, co-trustee of the Pickert Family Trust
47890 Deer Trail Dr.
Canton, MI 48187

9590 9402 6142 0209 2513 38

2. Article Number (Transfer from service label)

9489 0090 0027 6303 9142 31

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X _____  ☐ Agent
                            ☐ Addressee

B. Received by (Printed Name)    C. Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:         ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☒ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
   cted Delivery

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☒ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2015 PSN 7530-02-000-9053                    Domestic Return Receipt

# Exhibit 12

USPS TRACKING #

9590 9402 6142 0209 2513 52

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

United States
Postal Service

• Sender: Please print your name, address, and ZIP+4® in this box•



**HUSCH BLACKWELL**
4801 Main Street, Suite 1000
Kansas City, MO  64112

**SENDER: COMPLETE THIS SECTION**

- ■ Complete items 1, 2, and 3.
- ■ Print your name and address on the reverse so that we can return the card to you.
- ■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

John Rayne
12 Overhill Dr.
Paola, KS 66071

9590 9402 6142 0209 2513 52

2. Article Number *(Transfer from service label)*

9489 0090 0027 6303 9142 24

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X
☐ Agent
☐ Addressee

B. Received by *(Printed Name)*    C. Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:       ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☑ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ ...cted Delivery

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☒ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2015 PSN 7530-02-000-9053          Domestic Return Receipt

# Exhibit 13

USPS TRACKING #




9590 9402 6142 0209 2513 45

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

United States
Postal Service

• Sender: Please print your name, address, and ZIP+4® in this box•

# HUSCH BLACKWELL

4801 Main Street, Suite 1000
Kansas City, MO  64112

| SENDER: *COMPLETE THIS SECTION* | COMPLETE THIS SECTION ON DELIVERY |
|---|---|
| ■ Complete items 1, 2, and 3.<br>■ Print your name and address on the reverse so that we can return the card to you.<br>■ Attach this card to the back of the mailpiece, or on the front if space permits. | A. Signature<br>X        ☐ Agent<br>       ☐ Addressee<br>B. Received by *(Printed Name)*    C. Date of Delivery |
| 1. Article Addressed to:<br><br>Patrick Arthur Rayne and Kelly Lee<br>Rayne Family Trust<br>102 Crestview Dr.<br>Paola KS 66071 | D. Is delivery address different from item 1? ☐ Yes<br>   If YES, enter delivery address below:   ☐ No |

9590 9402 6142 0209 2513 45

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☒ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
              tricted Delivery

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

2. Article Number *(Transfer from service label)*

9489 0090 0027 6303 9142 55

PS Form 3811, July 2015 PSN 7530-02-000-9053            Domestic Return Receipt

# Exhibit 14

USPS TRACKING #

KANSAS CITY MO

MAR 2020 PM 4 L

9590 9402 6142 0209 2511 30

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

**United States**
**Postal Service**

• Sender: Please print your name, address, and ZIP+4® in this box®

**HUSCH BLACKWELL**
4801 Main Street, Suite 1000
Kansas City, MO  64112

Moody C/m 550367-1

**SENDER: COMPLETE THIS SECTION**

- ■ Complete items 1, 2, and 3.
- ■ Print your name and address on the reverse so that we can return the card to you.
- ■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Oswego Coal Company, Inc.
Resident Agent: Robert Caylor
2476 Marshall Road
Ottawa, KS 66067

9590 9402 6142 0209 2511 30

2. Article Number *(Transfer from service label)*

9 0090 0027 6303 9140 19

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X _Freeda Caylor_
☐ Agent
☐ Addressee

B. Received by *(Printed Name)*
Claudia Cayla
C. Date of Delivery
01/11/21

D. Is delivery address different from item 1? ☐ Yes
   If YES, enter delivery address below: ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☑ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (over $500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2015 PSN 7530-02-000-9053
Domestic Return Receipt

# Exhibit 15

USPS TRACKING #

9590 9402 6142 0209 2511 54

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

**United States**
**Postal Service**

* Sender: Please print your name, address, and ZIP+4® in this box•

# HUSCH BLACKWELL

4801 Main Street, Suite 1000
Kansas City, MO 64112

Moody c/m 550367-1



112-255150                                                                 89

**SENDER: COMPLETE THIS SECTION**

- ■ Complete items 1, 2, and 3.
- ■ Print your name and address on the reverse so that we can return the card to you.
- ■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

3lack, Lyle D.; Cheryl K.
3159 Neosho Rd.
Ottawa, KS 66067-8879



9590 9402 6142 0209 2511 54

2. Article Number *(Transfer from service label)*

0090 0027 6303 9140 33

PS Form 3811, July 2015 PSN 7530-02-000-9053

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X  C-19 RB et2          ☐ Agent
                        ☐ Addressee

B. Received by *(Printed Name)*     C. Date of Delivery
                                    1/11/21

D. Is delivery address different from item 1?   ☐ Yes
   If YES, enter delivery address below:         ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☒ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (over $500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

Domestic Return Receipt

# Exhibit 16

EXHIBIT A

31443 NW Meade Rd., Richmond, KS 66080

The South Half (S½) of the Northeast Quarter (NE¼) of Section Thirty-four (34), Township
Nineteen (19), Range Nineteen (19) AND the Southeast Quarter (SE¼) of Section Thirty-four
(34), Township Nineteen (19), Range Nineteen (19), excepting that part of the last described
quarter section lying South of the center of Pottawatomie Creek, and EXCEPT One acre of land
situated in the N. E. 1/4 of Section 34 and the S. E. 1/4 of Section 34 all in Township 19 S.,
Range 19 E., Anderson County, Kansas and being more particularly described as follows:
Commencing at the S. E. corner of the N. E. 1/4 of Section 34, Township 19 S., Range 19 E.,
Anderson County, Kansas; thence N. 0°01'46" E. along the East line of said N. E. 1/4 a distance
of 58.87 ft. to a point; thence N. 89°31'34" W. a distance of 235.50 ft. to a point; thence S.
0°01'46" W. a distance of 61.88 ft. to a point on the N. Line of the S. E. 1/4 Section 34,
Township 19 S., Range 19 E; thence continuing S. 0°0146" W., a distance of 123.09 ft. to a
point; thence S. 89°31'34" E., a distance of 235.50 ft. to a point on the East line of said S. E. 1/4;
thence N. 0°01'46" E. along said East line a distance of 126.10 ft. to the POINT OF
BEGINNING.

00000 NW Meade Rd., Garnett, KS 66032

The Northeast Quarter (NE¼), except 1.52 acres in the northeast corner north of Pottawatomie
River, of Section 3, Township 20 South, Range 19 East of the 6th P.M., Anderson County,
Kansas.

# Exhibit 17

# EXHIBIT B

## Statement of Account

| | |
|---|---|
| Contract Value Unpaid | $ 978,393.60 |
| Retainage Withheld | $ 108,710.40 |
| Total | **$ 1,087,104.00** |

# Exhibit 18

# EXHIBIT C

C1: Subcontract Agreement
C2: Invoices

(Attached hereto)



**MINNESOTA LIMITED**
AN MVERDE COMPANY

Subcontractor Agreement
No. SR1916169002

This agreement is made at Big Lake, MN this day of ___January 17, 2020___ .

BETWEEN:

Minnesota Limited, LLC (Contractor)
18640 200th Street – PO Box 410
Big Lake, MN 55309

AND:

THE HDD COMPANY(Subcontractor)
4525 SERRANO PARKWAY, OFFICE SUITE 210
EL DORADO HILLS, CA 95762

RECITALS

Contractor ("Minnesota Limited, LLC) has entered into a contract (the "Prime Contract") with Southern Star Central Gas Pipeline, Inc. ("Owner") to perform certain labor and furnish certain materials for completion of the construction project KS - C60206 Install 31.5 miles of 36" (the "Project"). Subcontractor desires to perform certain services and/or provide certain materials as a subcontractor of Contractor pursuant to the terms and conditions of the Prime Contract and agrees to the terms and conditions of this Agreement.

AGREEMENT

In consideration of the mutual covenants contained herein, the parties agree as follows:

I.  Subcontractor agrees to supply all the materials and labor and pay all license fees, permits and expenses for the work located at __Various Sites__ (the "Site"). As full compensation for performance of this Agreement and subject to all applicable provisions of this Agreement, Contractor agrees to pay Subcontractor:
    six million one-hundred eight-five thousand nine-hundred thirty six dollars($6,185,936.00_____ )

II.  **Contract Document.** Subcontractor's performance hereunder shall be subject to all terms and conditions contained in the Prime Contract and all drawings and/or specifications referred to therein (the "Contract Documents") except as such terms may be specifically amended by this Agreement, which includes HDD's Proposal, attached hereto and incorporated herein. Wherever the Contract Documents shall refer to the Contractor or its agents, the same shall be read to refer to the Subcontractor under this agreement. Subcontractor shall perform and coordinate its work hereunder in a manner necessary to assure the prompt and timely completion of the Project, time being of the essence to the



Agreement. At Subcontractor's request, a copy of the applicable Prime Contract Terms and Conditions will be supplied to Subcontractor.

Any terms and conditions proposed in Subcontractor's acceptance of or in any acknowledgement, invoice, or other form of Subcontractor that add to, vary from, or conflict with these terms hereby objected to. Any such proposed terms shall be void and these terms and conditions (1) shall constitute the complete and exclusive statement of the terms and conditions of the contract between the parties and (2) may be modified only by written instrument executed by the authorized representatives of both parties.

III.   **Insurance.** Subcontractor shall comply with the insurance requirements set forth in Exhibit A (attached).

IV.   **Additional Terms and Conditions**

A. Subcontractor, not Contractor, assumes all the risk related to in performing its work under this Agreement, such as any injuries to Subcontractor, Subcontractor's workers, Facility employees and members of the public arising from the Subcontractors activities or use of tools and equipment, or from any other cause.

B.   Subcontractor will complete all work in a workmanlike and professional manner according to standard practices in the building trade, and in compliance with all building codes and other applicable laws. Subcontractor will warrant against defects in material and labor it supplies for the completion of the work. If subcontractor fails to perform under this Agreement, the party entitled to performance or the Contractor will have the right to hire other persons to correct the defective Work and hold Subcontractor liable for the costs thereof including costs, disbursements and reasonable attorneys' fees incurred in the enforcement of this provision.

C.   All Work will be done on a timely basis. The work to be performed under this contract shall be commenced as directed by Project Manager or Project Superintendent or Project Foreman and shall be substantially completed on or before ___as agreed upon and directed onsite___. Time is of the essence.

D.   Subcontractor shall indemnify, defend and hold harmless Contractor as set forth in Section VII.

E.   No work shall be subcontracted or assigned by Subcontractor without the prior written approval of the Contractor.

F.   Environmental, Health and Safety. Subcontractor shall take all necessary precautions to keep the work site free from hazards that are likely to cause injury, illness, or death or damage to property. Subcontractor shall provide any Safety Data Sheets (SDS) for any hazardous chemicals provided pursuant to this contract. Contractor is a company that operates under a "Culture of Safety" with the goal of zero incidents, and expects its subcontractor to similarly emphasize the paramount importance of safe behavior. Failure to abide by Contractor's policies may result in immediate removal of Subcontractor from the premises and will be a breach of Subcontractor's obligations hereunder.



Contractor shall have the right, at its option, to conduct a complete audit of Subcontractor's documents and practices to verify Subcontractor's compliance with this Section.

G.     Minnesota Limited has enacted a Subcontractor Management Program and Safety Requirements of which Subcontractor has received. Subcontractor shall follow and adhere to all aspects of said program and the terms and conditions of such program are incorporated herein.

H.     Liens. To the fullest extent permitted by law, and the extent the Contractors has paid the Subcontractor, Subcontractor will at all times keep the Project, the Site and each part thereof free from any attachment, lien, claim of lien, or other encumbrance arising out of the Work and Subcontractor will indemnify, defend and hold Contractor harmless from and against all claims, losses, demands, causes of action or expenses (including attorneys' fees and other costs of defense incurred by Contractor in defending against the foregoing or in enforcing this indemnity and defense obligation) of whatever nature, arising by reason of any such lien, claim of lien, attachment or encumbrance. If any claim is filed to enforce any laborers, material men, mechanic's, or other similar lien arising out of or relating to the Work for which Contractor has paid the Subcontractor, Subcontractor will immediately cause such lien to be released and discharged and if Subcontractor fails to do so, then Contractor will have a right to pay all sums, including attorneys' fees and other costs and expenses incurred necessary to obtain such release and discharge, and hold Subcontractor liable for the amount thereof with the right to deduct all or a portion of such sum from accounts that may be due Subcontractor.

I.     Default. In addition to the other remedies available under law: (a) if Subcontractor should fail or refuse, except in cases where extension of time is provided, to supply enough properly skilled workers or proper materials for the Work; or (b) if Subcontractor should fail to make payment to its subcontractors for material or labor which are due to its Subcontractors, or (c) if Subcontractor should fail to keep and comply with any of the terms and provisions of this Agreement, or (d) if Subcontractor should be adjudged bankrupt, file or suffer to be filed a petition for relief under the Bankruptcy Act, or make a general assignment for the benefit of the creditors; or (e) if a receiver should be appointed on account of Subcontractor's insolvency; or (f) if Subcontractor fails to pay its employees' wages, benefits or tax withholdings; then, in any such event, Contractor may without prejudice to any other right or remedy and after giving Subcontractor and its surety, if any, upon twenty-four hours written notice, terminate its obligation to Subcontractor under this Agreement and take possession of the Site and complete (or cause to be completed) the Work by whatever method Contractor may deem expedient. In such case Subcontractor will not be entitled to receive any further payment until the Work is completed. Upon completion of the Work, Contractor will pay to Subcontractor an amount equal to (x) the unpaid portion of the Subcontract Amount attributable to the Work performed up to the termination less (y) the amount by which (i) the costs incurred by Contractor to complete the Work, including, without limitation, costs for architectural, managerial and administrative services and reasonable attorneys' fees, if legal counsel is employed, exceed (ii) the portion of the Subcontract Amount attributable to the balance of the Work yet to be performed at the time of termination. If the amount calculated under part (y) in the preceding sentence exceeds the amount owing under part (x), the Subcontractor will pay the difference to Contractor. If the amount in part (x) exceeds the amount in part (y), Contractor will pay the difference to Subcontractor.



J.    Subcontractor is an Independent Subcontractor and is not an employee or agent of the Contractor and neither Subcontractor nor anyone employed by Subcontractor will be deemed for any purpose to be the agent, employee, servant or representative of Contractor in the performance of the Work. Subcontractor acknowledges and agrees that Contractor will have no direction or control over the means, methods, procedures or manner of the Work performed by Subcontractor or any of its subcontractors, or any of their employees, vendors or suppliers.

K.    No changes shall be made in the work proposed or in the price unless those changes are agreed to in writing by both Subcontractor and Contractor. Travis Gehr and / or __James Redmond_____, shall be the Contractor's designated on site agent, If there is a dispute regarding whether the work is a change, Subcontractor may perform that work under protest and submit a claim to Contractor in accordance with this Agreement.

L.    Clean Up. Subcontractor will at all times keep the site or facility safe and free from the accumulation of waste materials or rubbish caused by its operations or related to the Work. Upon completion of the Work and each portion thereof, Subcontractor will remove all rubbish and waste produced by its operations or Work hereunder from the facility as well as all of its tools, equipment, machinery and surplus materials no longer needed and leave the site or facility in a "broom clean" or equivalent condition and safe for Subcontractor's employees and subsequent subcontractors to perform their work, unless otherwise specified in writing. If Subcontractor fails to clean up, Contractor may do so after written notice to Subcontractor and the cost thereof will be charged to Subcontractor.

V.   **Representations of Subcontractor.** Subcontractor represents and warrants the following:

A.    Subcontractor has examined the Agreement ("Prime Contract") between Owner and Minnesota Limited (if requested by the Subcontractor prior to the execution of the work) and agrees to all provisions affecting Subcontractors performance, including but not limited to the representations, obligations and warranties made by Minnesota Limited to the Owner.

B.    Subcontractor has the requisite authority and ability to perform the subcontract without delay.

C.    Subcontractor will not assign, subcontract or otherwise delegate its responsibilities and obligation hereunder without the written consent of Contractor.

D.    Subcontractor shall examined the specifications, site conditions, drawings and requirements of the work with due diligence and its bid has taken into consideration all conditions and risks which are reasonably related to the performance of the work.

E.    Ethics; Conflict of Interest. Subcontractor shall at all times during the performance of its obligations hereunder conform to sound ethical business practices in conformance with all applicable Laws and shall in its business practices promote the values of honesty, integrity, social responsibility, and human rights. Subcontractor shall not offer to any member of Contractor (including employees thereof) any gifts, entertainment, or other favors beyond the common courtesy usually associated with business practices. Subcontractor shall not pay any commissions or fees or grant any rebates or other



remuneration or monetary gratuity to any employee of Contractor. Subcontractor shall not grant any secret rebates nor pay any commissions or fees to any employee of Contractor.

F.    Invitees Prohibited. Subcontractor shall not, without prior written permission of Contractor, invite, permit entry or bring any Person onto the Contractor's Worksite or property who is not an employee of Subcontractor

G.    Subcontractor will pay its employees promptly and maintain good labor relations. Subcontractor further represents that it has paid all union benefit contributions including fringe benefits. Subcontractor agrees that Contractor upon demand of the Labor Union, may withhold from any sums due Subcontractor and pay to the Administrator of the Plan any amounts owing and said payment shall be deducted from the invoice.

## VI.    Warranty.

A.    Subcontractor warrants to the Contractor and Owner that all materials and equipment furnished under this Agreement will be new unless otherwise specified in writing, and that all work will be of good quality, free from faults and defects and in conformance with any Purchase Order and attachments thereto, including any specifications stipulated therein. All Work not so conforming to these standards may be considered defective, and the Subcontractor shall promptly repair and make good, after notice by the Contractor and Owner and without cost to the Contractor and Owner, any damages, defects or faults resulting from imperfect or defective Work done or materials furnished by the Subcontractor. The Subcontractor warrants that all labor, materials and equipment furnished under this Agreement shall be covered by warranty for a period of at least two (2) years (or during a longer period if required by the specifications and stipulated therein) from the date of acceptance of the completed Work by the Owner.

B.    Where material or equipment furnished by the Subcontractor is covered by a manufacturer's warranty or guarantee or other special warranty or guarantee the Subcontractor shall provide such warranty and provide additional or extended warranty or guarantees to the Contractor for its labor, materials and equipment to confirm to paragraph A above.

VII.    Indemnification.    To the fullest extent permitted by law, the Subcontractor shall indemnify the Owner, Contractor and the agents and employees of any of them from and against claims, damages, losses and expenses, arising out of or in connection with, or resulting from the negligent performance of the Subcontractor's work, the Subcontractor's subcontractors work, or anyone directly or indirectly employed by them but only to the extent caused by acts or omissions by either or any of them. In addition thereto, Subcontractor indemnifies Owner, Contractor and the agents and employees of any of them for expenses including attorney's fees and costs, incurred in responding to and defending against any claim or in enforcing this provision.

VIII.    Payment. Subcontractor shall invoice Minnesota Limited no later than 30 days after date of service Contractor agrees to pay Subcontractor all sums due less    10    % retainage (if applicable) hereunder within



thirty (30) days from the date the invoice is received. However, it is a condition precedent to payment that if Owner withholds payments for that portion of any work performed by Subcontractor, then Minnesota Limited is only obligated to pay Subcontractor after receiving payment from the Owner. In such event payment will be made within ten (10) days. Contractor reserves the right to withhold such sums as may be necessary to pay expenses, including costs and attorney's fees, caused by, or related to, Subcontractor's breach of Agreement. Final payment of retainage will occur ten (10) days after final payment for Subcontractor's work is received and when lien waivers and job completion affidavit are executed.

IX.  **Maintaining Records / Audit.** For a period of five (5) years from final acceptance of Subcontractor's work, Subcontractor shall maintain all job records and shall, upon reasonable notice by Contractor, but no later than 10 business days, make such records available for inspection by Contractor or Owner. Contractor or Owner or their representatives may audit said records. If the results of the audit show an overpayment, Subcontractor shall reimburse the overpayment together with interest of 1% per month. If the audit shows an overpayment more than one thousand dollars ($1,000), Subcontractor shall also reimburse Contractor or Company for the cost of the audit.

X.   **Interpretations and Enforcement.** The Agreement and contract documentation contains the parties entire understanding with regard to the subject hereof and shall not be modified except by a writing signed by both parties; provided, however, that Subcontractor shall be bound by changes in the Contract Documents agreed to between the Contractor and Owner, but only if Contractor has timely notified Subcontractor of such changes.. The interpretation and enforcement of this Agreement shall be governed by the laws of the state in which the work hereunder is to be performed or that specified in the Prime Contract if different than the state where the work is to be performed. If any provision hereof is deemed unenforceable, the remainder of the Agreement shall be enforced as though such provision were not a part hereof.

XI.  **Assignment.** Subcontractor shall not assign or subcontract this Agreement or any portion thereof or of any money due or which may become due hereunder without the prior written consent of Contractor. Notwithstanding anything to the contrary contained herein, Contractor may assign this Agreement without the consent of Subcontractor.

XII. **Confidentiality of Agreement.** The Subcontractor agrees that all terms and conditions contained herein or in any other document(s) referencing the Project shall remain confidential. Said terms shall not be disclosed without the express written consent of the Contractor.

Minnesota Limited is required to protect all technical information supplied by the Owner. Subcontractor agrees that this Section is its written assurance that all such information, including but not limited to: drawings, diagrams, surveys, specifications, locations, and geophysical (GPS) coordinates of the work, will be kept confidential, protected, and will not be disclosed to third parties without obtaining Minnesota Limited's written consent unless ordered to do so by a court of law or arbitrator.. Breach of is provision will subject Subcontractor to all remedies awarded to Contractor and Owner including injunctive relief. Subcontractor agrees to pay all of Contractors and Owners attorney's fees in enforcing this provision.



MINNESOTA
LIMITED
AN HVERUE COMPANY

XII.     **Notice**. Unless otherwise provided herein, any notice provided for herein will be in writing and
         delivered to the parties (a) in person, (b) by facsimile transmission (with the original and a copy of the
         facsimile confirmation following in the United States mail), (c) by overnight delivery service, or (d) by
         certified mail, return receipt requested. Notice will go to the address first shown herein for the
         respective party to whom notice is given or to such other address as may be designated by either
         party by written notice given pursuant hereto.

XIV.     **Governing Law/Venue/Attorney Fees.** This Agreement shall be construed and interpreted in
         accordance with the laws of the State of Minnesota, including, without limitation, matters of
         construction, validity, enforcement, and interpretation. The parties agree that venue for any dispute
         under this Agreement shall be in the District Court of Hennepin County, Minnesota. In the event any
         enforcement effort is initiated by Contractor against Subcontractor for default of this Agreement,
         Subcontractor shall be liable to Contractor for any and all costs of collection, including but not limited
         to, reasonable attorneys' and professional fees, court costs, traveling and lodging expenses, costs of
         investigation and defense, accrued interest, and any other reasonable expenses incurred by
         Contractor in initiating such efforts.

Signed the day and year first written above.


CONTRACTOR:  Minnesota Limited, LLC.

By: _____

Its: _____
                    Title



SUBCONTRACTOR: THE HDD COMPANY

By: _____

Its: _____Vice President_____
                    Title



## EXHIBIT A
### Insurance

Prior to commencing Work, Subcontractor shall, at its sole expense, procure and maintain insurance of the types, and in the form and amounts described below from insurer(s) authorized to transact business in the state where Work or operations will be performed by Subcontractor. Such insurance and required coverage in forms acceptable to General Contractor shall be placed with admitted insurers that maintain an A.M. Best's rating of not less than A- VII, unless otherwise approved by the General Contractor. The insurance requirements described below shall be maintained uninterrupted for the duration of the Project, including any warranty periods, and shall protect Subcontractor, and others for whom and/or to whom Subcontractor may be liable, for liabilities in connection with work performed by or on behalf of Subcontractor, its agents, representatives, employees or subcontractors.

### Insurance Requirements:

1.      **Commercial General and Umbrella Liability Insurance.** Subcontractor shall maintain commercial general liability ("CGL") and, if necessary, commercial umbrella insurance, with a limit of not less than $ 2,000,000.00          per occurrence, bodily injury or property damage liability; $  2,000,000.00          per offense, personal and advertising injury liability; $   5,000,000.00                           products-completed operations aggregate; and $   5,000,000.00                          general aggregate applicable to claims other than products-completed operations.    To the extent that Subcontractor's CGL and any commercial umbrella insurance are subject to aggregate limits, the policy shall be endorsed so as to apply such aggregate limits separately to the Project.

Coverage afforded under Subcontractor's CGL and any commercial umbrella insurance shall be provided on an occurrence basis and shall be subject to the terms of the *Insurance Services Office ("ISO") Commercial General Liability Coverage Form CG 0001*, or a substitute form providing coverage at least as broad as the ISO form specified. There shall be no limitations or exclusions of coverage beyond those contained in the standard coverage form and coverage shall include liability arising from premises, operations, independent contractors, products-completed operations including construction defect, contractual liability or personal injury and advertising injury.

General Contractor, its officers, directors and employees and Project Owner(s) shall be included as additional insureds under Subcontractor's CGL, and any commercial umbrella insurance, with respect to liabilities arising out of both the ongoing and completed operations of Subcontractor. Such additional insured coverage shall be subject to the terms of ISO additional insured endorsement forms CG 2010 (ongoing operations) and form CG 2037 (products-completed operations), or substitute form(s) providing equivalent coverage. The edition date of the ISO endorsements required should be chosen based on the recipient's risk transfer objectives. The table below summarizes the options and major differences between the edition dates.

| Endorsement(s) | ISO Edition Date | Comments |
|---|---|---|
| CG 2010 | 11/85 Edition | Broadest Insuring Agreement - "liability arising out of" the Subcontractor's work – both ongoing |



| | | operations and completed operations coverage provided by one endorsement. |
|---|---|---|
| CG 2010/CG2037 | 10/01 Edition | Same Insuring Agreement as 11/85 with ongoing operations and completed operations coverage provided by separate endorsements. |
| CG 2010/CG2037 | 07/04 Edition | More narrow Insuring Agreement – "caused in whole or in party by. . . .acts or omissions" of the Subcontractor. |
| CG2010/CG2037 | 04/13 Edition | Same Insuring Agreement as 07/04, but limits coverage to "extent permitted by law" and "not be broader than that which you are required by the contract or agreement to provide." |

Note: Recommended Additional Insured endorsement for states other than Minnesota may vary and Willis should be consulted. States including but not limited to IL, TX, & CA involve unique risk transfer considerations.

Additional insured coverage afforded by Subcontractors CGL, and any commercial umbrella insurance, shall be primary and non-contributing with respect to any insurance or self-insurance available to General Contractor or Project Owner. Such primary and non-contributory insurance shall be subject to the terms of ISO form CG 2001 (Primary and Noncontributory - Other Insurance Condition) or its equivalent. Any other insurance or self-insurance maintained by General Contractor or Project owner shall be excess of, and non-contributory with, the coverage afforded by Subcontractors CGL and commercial umbrella insurance, if any.

In addition to procuring and maintaining CGL, and any commercial umbrella insurance, for the duration of the contract, Subcontractor agrees to continue to procure and maintain the products-completed operations liability insurance coverage for a minimum of __two__ ( 2 ) year(s) after the date that the Work is substantially complete. All terms and conditions of such coverage shall be maintained during this completed operations period, including the required coverage limits and the requirement to provide General Contractor and Project Owner with coverage as an additional insured for completed operations.

2.      **Commercial Automobile and Umbrella Liability Insurance.**  Subcontractor shall maintain automobile liability and, if necessary, commercial umbrella insurance, with a limit of not less than $ _2,000,000.00_ each accident. Such insurance shall cover liability for bodily injury and property damage arising from the use or operation of any auto, including those owned, hired or otherwise operated or used by or on behalf of Subcontractor. The coverage shall be subject to the terms of ISO *Business Auto Coverage Form CA 0001* (1990 edition or later), or a substitute form providing equivalent coverage.

3.      **Workers' Compensation and Employers Liability Insurance.**  Subcontractor shall maintain workers' compensation coverage providing statutory benefits. Subcontractor shall additionally maintain employers liability insurance, and if necessary, commercial umbrella insurance, with a limit of not less than: $1,000,000, bodily injury by accident – each accident; $1,000,000, bodily injury by disease-policy limit; and $1,000,000, bodily injury by disease each employee. Workers' Compensation coverage must extend to every



employee, including owners/officers of a closely held corporation and/or individuals operating as a sole proprietorship or partnership. <u>Workers' Compensation must provide coverage in the state where the Project is located</u>.

Where applicable, evidence of coverage shall be required for U.S. Longshore and Harbor Workers Compensation, Maritime coverage, Federal Employer's Liability Act and other unique exposures requiring endorsement of coverage.

4. **Contractors Pollution Liability Insurance**. Required only if Subcontractor's scope of services include the remediation, treatment, storage or disposal of waste or hazardous materials on or about the project site, as determined by General Contractor. If required, Subcontractor shall maintain Contractors Pollution Liability coverage with a limit of not less than $_____n/a_____ per occurrence, $_____n/a_____ annual aggregate. Coverage shall apply to the scope of work as described under the Contract including transportation and shall include coverage for bodily injury; property damage, including loss of use of damaged property or property that has not been physically injured; clean-up costs; mold; defense and investigative costs. Subcontractor shall maintain Completed Operations coverage for _____n/a_____ years following final acceptance of the project or termination of the Contract.

If the scope of services in the contract require the Subcontractor to provide professional services associated with arranging for, or brokering of, hazardous material or construction and demolition (C&D) wastes off the job site, Subcontractor must amend the Contractors Pollution Liability policy to include coverage to address this scope of work. If any of the aforementioned insurance policies are written on a claims made basis, the Contractor warrants that continuous coverage will be maintained, or an extended discovery period will be exercised, for a period of three years beginning from the time the work under this contract is completed.

5. **Pollution (Environmental) Liability Insurance**. Required only if Subcontractor's scope of services involves disposal of waste or hazardous materials off-site, as determined by General Contractor. If required, Subcontractor shall maintain pollution (environmental) liability coverage with a limit of not less than: $_____n/a_____ per incident, $_____n/a_____ policy aggregate for hazardous waste disposal services, and $_____n/a_____ per incident, $_____n/a_____ for all other disposal facilities. Such coverage shall include clean-up costs, defense costs and products and completed operations.

If the scope of services in the contract requires the disposal of any hazardous materials or construction and demolition (C&D) wastes off the job site, Subcontractor must also obtain evidence that the Disposal Site Operator maintains Pollution Legal Liability Insurance with coverage for: a. bodily injury, sickness, disease, mental anguish or shock sustained by any person, including death; b. property damage including physical injury to or destruction of tangible property including the resulting loss of use thereof, clean-up costs, and the loss of use of tangible property that has not been physically injured or destroyed; c. defense including costs, charges and expenses incurred in the investigation, adjustment or defense of claims for such compensatory damages. d. pollution conditions on, at, under or emanating from any disposal site, location or facility, used by or on behalf of the disposal facility of any waste or waste materials relating to the performance of the work.



The Disposal Site Operator's Pollution Liability Policy will apply to losses arising from the facility that is accepting the waste under the contract. Minimum limits of Insurance for this policy shall be $_____ n/a _____ each incident / $_____ n/a _____ policy aggregate.

Claims-made coverage is permitted, provided the policy retroactive date is continuously maintained prior to the commencement date of the agreement, and coverage is continuously maintained during all periods in which Subcontractor accepts or treats waste generated from General Contractor's projects and for a period of one (1) year thereafter.

6.     **Professional Liability Insurance.** Required only if Subcontractor's scope of services include architectural, engineering, professional consulting or construction management, as determined by General Contractor. If required, Subcontractor shall maintain professional liability coverage with a limit of not less than $_____ n/a _____ each wrongful act, $_____ n/a _____ policy aggregate.

Coverage shall include liability arising from the errors, omissions or acts of the Subcontractor or any entity for which the Subcontractor is legally responsible in the providing of professional services under the Contract. Throughout the term the Contract, the PL/E&O policy shall include full prior acts coverage. Coverage shall be continuously maintained during the term of this Agreement and for a period of x years following final acceptance of the Project or termination of the Contract.

Coverage shall not include any exclusion or other limitations related to:
- Scope of the professional services
- Delays in project completion and cost overruns
- Who is authorized to notify the carrier of a claim or potential claim
- Mold, fungus, asbestos, pollutants or other hazardous substances

Claims-made coverage is permitted, provided the policy retroactive date is continuously maintained prior to the commencement date of this agreement, and coverage is continuously maintained during all periods in which Subcontractor performs professional services for General Contractor, and for an additional period of one (1) year after termination of this agreement or the last date such services are performed, whichever comes later. If Subcontractor's scope of work includes environmental engineering or consulting, the terms of coverage shall not exclude environmental professional services.

7.     **Watercraft Liability Insurance.** If watercraft of any kind is used by the CONTRACTOR or Subcontractor, including: (i) bodily injury; (ii) property damage; and (iii) passenger liability.

    a.     Limit of Liability: Combined Single Limit (Bodily Injury and Property Damage), $1,000,000 each occurrence;

    b.     Protection and Indemnity Insurance to include Jones Act crew coverage (or at least Maritime Employer's Liability; MEL), collision, tower's liability and wreck removal coverage, on a form providing



coverage no less extensive than that afforded in the P & I SP-23 form (revised 1/58), including a pollution buy-back endorsement.

8.    **Aircraft Liability Insurance**. If aircraft of any kind is used by the CONTRACTOR or Subcontractor, including: (i) bodily injury; (ii) property damage; and (iii) passenger liability.

    a.    Limit of Liability: Combined Single Limit (Bodily Injury and Property Damage and Passenger Liability), including hull physical damage insurance for the full replacement cost of each aircraft used    in the work. Such Aircraft Liability and Hull Coverage shall include a waiver of subrogation against General Contractor and all others required by this Agreement to be additional insureds. $ ___n/a___ per seat; $ ___n/a___ per occurrence

### Additional Provisions:

1.    **Deductibles and Self-Insured Retentions**. The funding of deductibles and self-insured retentions maintained by Subcontractor shall be the sole responsibility of Subcontractor, including any amounts applicable to deductibles or self-insured retentions applicable to claims involving the General Contractor or Owner as an additional insured. Any self-insured retentions in excess of $ ___n/a___ must be declared to and approved by the General Contractor.

2.    **Primary / Non-Contributing**. Subcontractor's required insurance coverage shall be primary insurance, and any insurance or self-insurance maintained by the General Contractor or Project Owner shall be excess of and noncontributory with Subcontractor's insurance.

3.    **Severability of Interest**. Except with respect to the limits of insurance, Subcontractor's required insurance shall apply separately to each insured or additional insured.

4.    **Waiver of Subrogation**. Subcontractor agrees to waive all rights of subrogation against the General Contractor, Project Owner and Project Architect, and shall cause each of its subcontractors to waive all rights of subrogation against the General Contractor, Project Owner and Project Architect, their agents and employees, as respects loss, damage, claims, suits or demands, howsoever caused:

    a.    To real or personal property, vehicles, equipment, tools, etc. owned, leased or used by Subcontractor or Subcontractor's employees, agents or sub-subcontractors; and

    b.    To the extent such loss, damage, claims, suits or demands are, or should be, afforded coverage by the Subcontractor's required insurance or any other insurance (except professional liability to which this requirement does not apply) maintained by the Subcontractor. This waiver shall C1PPIY to all first party property, equipment, vehicle and workers' compensation claims (unless prohibited under applicable state statutes), and all third party liability claims. This waiver shall apply to all deductibles, retentions or self-insured layers applicable to the required or any other insurance (except professional liability to which this requirement does not apply) maintained by the Subcontractor. If necessary, Subcontractor agrees to endorse the required insurance policies to permit waivers of subrogation in



favor of General Contractor, Project Owner and Project Architect as required hereunder. Subcontractor further agrees to hold harmless and indemnify General Contractor, Project Owner and Project Architect for any loss or expense incurred as a result of Subcontractor's failure to obtain such waivers of subrogation from the insurers.

5.      **Notice of Cancellation / Material Change / Nonrenewal**. Subcontractor's insurance policies must contain a provision or endorsement that the coverage afforded will not be canceled, materially changed or renewal refused until at least 30 days prior Written Notice has been given to General Contractor and to each other additional insured to whom a certificate of insurance has been issued; provided, however, that a ten (10) day prior notice requirement may apply in the event of cancellation due to nonpayment of premium.

6.      **Verification of Coverage**. Prior to commencing Work, Subcontractor shall furnish General Contractor with certificate(s) of insurance executed by a duly authorized representative of each insurer, as evidence of compliance with the insurance requirements set forth above   Such certificates of insurance shall be accompanied by copies of endorsements evidencing coverage afforded to General Contractor and Project Owner as additional insured, and endorsements reflecting insurer's concurrence with Subcontractor's waiver of subrogation rights against General Contractor, Project Owner and Project Architect.   Renewal certificates are to be provided to the General Contractor prior to the expiration of the required insurance policies.
Certified copies of policies, including all policy endorsements, shall be furnished by Subcontractor within 15 days of written request by General Contractor.

The certificate(s) of insurance shall be subject to approval of General Contractor, but failure of General Contractor to request such certificate or other evidence of Subcontractor compliance with insurance requirements, or failure of General Contractor to identify deficiencies from evidence that is provided, shall in no way limit or relieve Subcontractor of its obligations to maintain such insurance

7.      **Sub-Subcontractors**. No work shall be sublet to any Sub-subcontractor without first obtaining the General Contractor's written permission. All Sub-subcontractors, once approved by the General Contractor, are subject to the same insurance requirements as Subcontractor.  Subcontractor shall cause each Sub-subcontractor employed by Subcontractor to purchase and maintain such insurance.   Upon request, Subcontractor shall furnish General Contractor with copies of certificates of insurance evidencing coverage for each Sub-subcontractor

Subcontractor shall voluntarily provide workers compensation coverage for proprietors, partners or others not statutorily required to maintain workers' compensation insurance.

8.      **Leased Employees**.  Use of leased employees by Subcontractor is expressly prohibited without General Contractor's written permission.  If permitted by General Contractor, Subcontractor shall

        a.      Provide General Contractor with a complete copy of its Agreement with the Leasing Company;



b.     Require that Leasing Company provide workers' compensation, employers liability and commercial general liability with coverage limits in amounts no less than Subcontractor insurance requirements for the same coverages.

c.     Require that Leasing Company provide Alternate Employer Endorsement naming General Contractor as alternate employer on Leasing Company's workers' compensation policy.

d.     Require that Leasing Company add General Contractor as an additional insured on its commercial general liability insurance policy, with primary/non-contributory wording.

e.     Require that Leasing Company provide waiver of subrogation in favor of General Contractor on both Leasing Company's workers' compensation and commercial general liability insurance policies.

f.     Provide General Contractor with a copy of the Leasing Company's certificate of insurance, with endorsements, evidencing the required coverage.

9.     **No Representation of Coverage Adequacy.**  In specifying minimum Subcontractor insurance requirements, General Contractor does not represent that such insurance is adequate to protect Subcontractor for loss, damage or liability arising from its work.  Subcontractor is solely responsible to inform itself of types or amounts of insurance it may need beyond these requirements to protect itself.

The insurance requirements set forth in minimum amounts shall not be construed to relieve Subcontractor for liability in excess of such coverage, nor shall it preclude General Contractor from taking such other actions as is available to it under any other provision of the Subcontract.  To the extent Subcontractor maintains insurance greater than these minimum requirements, Subcontractor agrees that such insurance shall be applicable to any of Subcontractor's liability obligations hereunder.

Any acceptance of certificates of insurance by General Contractor shall in no way limit or relieve Subcontractor of its duties and responsibilities under this Subcontract, including the duty to indemnify and hold harmless General Contractor.

10.     **Compliance.**  Failure of Subcontractor to maintain the required insurance shall constitute a default under this Subcontract and, at General Contractor's option, shall allow General Contractor to terminate this Subcontract for cause, withhold payment and/or purchase the required insurance at Subcontractor's expense.

11.     **Cross-Liability Coverage/Non-Standard Restrictive Endorsements.**  All liability policies shall include cross liability coverage and a standard ISO separation of insureds provision, or its equivalent.  No liability policy shall include or be endorsed to include any non-standard provisions restricting coverage for the named insured or the persons/entities required to be named as additional insureds under this Agreement, including but not limited to cross liability coverage exclusions or limitations



EL DORADO HILLS | OFFICE Suite 210
4535 Saluano Parkway, El Dorado Hills, CA USA 95762

MAIN 530 672 6705 | CROSSINGGROUP.COM

January 9, 2020

**Minnesota Limited**
18640 200th St, PO Box 410
Big Lake, MN 55309

ATTN: Amy Skuza

RE:   Southern Star Lines DT and DS Replacement Project
      Directionally drill and install approximately 6,052 feet of 36-inch steel pipeline in
      Anderson and Franklin Counties, KS.

The HDD Company is pleased to submit the following bid quote:

1.    **Responsibilities of The HDD Company**
      1.1.   Provide all required insurance certificates.
      1.2.   Provide any written submittals and qualifications required.
      1.3.   Provide 2 (two) drill rig(s) with sufficient capabilities to install the crossings, a
             closed-loop mud system, mud pumps, vacuum trucks, dump trucks, steering
             system, and all drill spread support equipment necessary.
      1.4.   Provide all required union labor for the drilling operations.
      1.5.   Provide preliminary drill profiles for each crossing.
      1.6.   Provide final as-built drawings.
      1.7.   Provide and haul water for drilling operations.
      1.8.   Provide water storage for the duration of drilling operations.
      1.9.   Provide all required pulling heads.
      1.10.  Leave the entry areas clean, free of debris, and to a rough grade.
      1.11.  Provide bonding at 1%, which is not included in the bid pricing below.

2.    **Responsibilities of THE CONTRACTOR**
      2.1.   Stake and survey the entry and exit points for each bore, with correct stations
             and elevations.
      2.2.   Provide all permitting to undertake the project.
      2.3.   Provide and maintain suitable truck access to and from entry and exit locations.
      2.4.   Provide stable, level, matted and/or graveled work pads for each bore.
      2.5.   Provide all BMPs around each bore's entry and exit locations. The HDD
             Company will maintain these items.
      2.6.   Provide, string, weld, and test all 36-inch pipe for each bore.

2.7. Provide all plans, equipment, and manpower to handle pipe during pullback operations.

2.8. Perform all final tie-ins.

2.9. Provide all settlement monitoring, if required.

2.10. Provide all final site restorations.

2.11. Provide all field surveys to document existing conditions for the HDD installations, including but not limited to pictures, videos, field notes, etc.

## 3. Pricing (Lump Sum)

| | | |
|---|---|---|
| 3.1. | HDD Cedar Creek 2,106' X 36" pipe: | **$1,280,448.00** |
| 3.2. | HDD Pottawapomie Creek 1,788' X 36" pipe: | **$1,087,104.00** |
| 3.3. | HDD Flint Hill 2,158' X 36" pipe: | **$1,312,064.00** |
| 3.4. | Mobilization per rig spread: | **$50,000.00** |

## 4. Clarifications

4.1. Additional footage due to no fault of The HDD Company, will be billed at $608.00/LF.

4.2. This proposal is based upon the drawings, specifications, and geotechnical information provided to us on or before **7 June 2019.**

4.3. If any revised or additional drawings, specifications, geotechnical information, or permits are provided to us after the bid submission date, The HDD Company reserves the right to modify the proposal to account for any added costs and/or additional time associated with the change(s).

4.4. The HDD Company's bid proposal is conditional upon reaching an agreement upon mutually acceptable contract terms. This bid proposal will be attached to and forms a part of the contract between The HDD Company and THE CONTRACTOR.

4.5. Item 3.3 above includes the hauling and disposal of all **non-contaminated** drilled solids and excess drilling fluids.

4.6. The pricing above is contingent upon a site visit.

## 5. Exclusions

5.1. The HDD Company and its personnel are not the Project Engineers. Therefore, we exclude all design and engineering services unless any are specifically noted as included in this proposal. Any drilling plans or profiles that we submit to you will be based upon the design information in the contract documents and our experience as HDD contractors. Any plans or profiles we provide are recommendations only and are subject to review and approval by the project owner and/or its engineers.

5.2. All permits, including federal, State and local environmental permits, the SWPPP permit and any associated SWPPP plans, any right-of-way (ROW) agreement or easements, and all access necessary for us to perform our work shall be provided by others. If our operations are delayed or otherwise impacted by any delays or problems with permits, SWPPP plans, ROW agreements, easements or access arrangements our compensation and time for completion will be equitably adjusted.

6. **Terms and Conditions**
   6.1. Schedule
      6.1.1. This proposal is based upon performance under a reasonable and mutually agreed-to project schedule in so far as that schedule applies to our work. The approved project baseline schedule and all monthly updates must be provided to us on a regular and timely basis to keep us apprised of schedule changes which may impact the timing and efficiency of our work. We will not be liable for any delays caused by others or by factors beyond our reasonable control.
   6.2. Indemnification
      6.2.1. We will indemnify you and/or the project owner for personal injury or property damage claims to the extent of our own negligence. Our proposal excludes any obligation to indemnify you for your own negligence or to indemnify any other party for that party's own negligence or to indemnify any design professional.
   6.3. Payment
      6.3.1. Monthly progress payments will be made to The HDD Company within (7) seven days after you receive each monthly payment from the project owner, but in no event later than 120 days from the date you received your invoice.
      6.3.2. We will receive our final payment within 30 days after you receive our final billing and our work has been completed and accepted. Acceptance will not be unreasonably withheld or delayed. If you dispute any portion of any billing, you will promptly notify us in writing of the nature of the dispute and you will pay the undisputed portion of the billing without delay. If any undisputed amounts are past due for more than 10 days, we reserve the right to stop work until all payments are brought current. We will provide lien releases in accordance with applicable state statutes or regulations. We will keep the project free of liens from out subcontractors, suppliers and other vendors provided we have been paid by you for the work covered by any such liens.
   6.4. Extra/Force Account Work:
      6.4.1. If we are directed to perform any work on a force account or time and material basis, the rates for our labor and equipment will be as stated in our proposal, or if no rates are included with this proposal, as stated in our then current standard labor and equipment rate schedule. If we are directed to standby or suspend work while other operations occur, or delays or other problems are resolved, or if we are required to standby due to events or circumstances beyond our control, the standby time for our labor and equipment will be paid as stated in this proposal.
   6.5. Differing Site Conditions

*Going to Greater Lengths*™

6.5.1. If the conditions we encounter in the performance of our work differ materially from those indicated in the contract documents, boring logs, geotechnical reports or other information furnished to us prior to bid, or from those ordinarily encountered and generally recognized as inherent in the type of work provided for in our proposal, then our compensation and time for completion will be equitably adjusted to account for any resulting delay and added costs.

7. **Delays and Work Stoppages:**

7.1 All work stoppages that arise through no fault of The HDD Company will be billed at **$14,500** (no crew on site).

The HDD Company appreciates the opportunity to furnish you this quote and looks forward to working with you. Should any of the information presented above need further clarification, please do not hesitate to contact us.

Sincerely,
**The HDD Company**

Jeremy King
Vice President



EL DORADO HILLS | OFFICE Suite 210,
4925 Serrano Parkway, El Dorado Hills, CA USA 95762

MAIN 530.676.9705 | CROSSINGGROUP.COM

17 January 2020

**Minnesota Limited**
18640 200th St, PO Box 410
Big Lake, MN 55309

ATTN: Brad Cordes

RE:     Southern Star Lines DT and DS Replacement Project
        Directionally drill and install approximately 4540 feet of 36-inch steel pipeline road
        crossings in Anderson and Franklin Counties, KS.

The HDD Company is pleased to submit the following bid quote:

1.    **Responsibilities of The HDD Company**
      1.1.    Provide all required insurance certificates.
      1.2.    Provide any written submittals and qualifications required.
      1.3.    Provide drill rig(s) with sufficient capabilities to install the crossings, a closed-
              loop mud system, mud pumps, vacuum trucks, dump trucks, steering system,
              and all drill spread support equipment necessary.
      1.4.    Provide all required union labor for the drilling operations.
      1.5.    Provide final as-built drawings.
      1.6.    Provide and haul water for drilling operations.
      1.7.    Provide water storage for the duration of drilling operations.
      1.8.    Provide all required pulling heads.
      1.9.    Leave the entry areas clean, free of debris, and to a rough grade.
      1.10.   Provide bonding at 1%, which is not included in the bid pricing below.

2.    **Responsibilities of THE CONTRACTOR**
      2.1.    Stake and survey the entry and exit points for each bore, with correct stations
              and elevations.
      2.2.    Provide all permitting to undertake the project.
      2.3.    Provide and maintain suitable truck access to and from entry and exit locations.
      2.4.    Provide stable, level, matted and/or graveled work pads for each bore.
      2.5.    Provide bore pits and shore if needed.
      2.6.    Provide all BMPs around each bore's entry and exit locations. The HDD
              Company will maintain these items.
      2.7.    Provide, string, weld, and test all 36-inch pipe for each bore.
      2.8.    Furnish support crew for road crossings, including excavators and manpower.

*Going to Greater Lengths*®

2.9. Provide all plans, equipment, and manpower to handle pipe during pullback operations.

2.10. Perform all final tie-ins.

2.11. Dispose of cuttings.

2.12. Provide all settlement monitoring, if required.

2.13. Provide all final site restorations.

2.14. Provide all field surveys to document existing conditions for the HDD installations, including but not limited to pictures, videos, field notes, etc.

3. **Pricing**

| | | |
|---|---|---|
| 3.1. | 4540' X 36" pipe: | **$508.00/ft** |
| 3.2. | Mobilization per rig spread: | **$50,000.00** |

4. **Clarifications**

4.1. This proposal is based upon the drawings, specifications, and geotechnical information provided to us on or before **17 January 2020.**

4.2. If any revised or additional drawings, specifications, geotechnical information, or permits are provided to us after the bid submission date, The HDD Company reserves the right to modify the proposal to account for any added costs and/or additional time associated with the change(s).

4.3. The HDD Company's bid proposal is conditional upon reaching an agreement upon mutually acceptable contract terms. This bid proposal will be attached to and forms a part of the contract between The HDD Company and THE CONTRACTOR.

4.4. The pricing above is contingent upon a site visit.

5. **Exclusions**

5.1. The HDD Company and its personnel are not engineers. Therefore, we exclude all design and engineering services unless any are specifically noted as included in this proposal. Any drilling plans or profiles that we submit to you will be based upon the design information in the contract documents and our experience as HDD contractors. Any plans or profiles we provide are recommendations only and are subject to review and approval by the project owner and/or its engineers.

5.2. All permits, including federal, State and local environmental permits, the SWPPP permit and any associated SWPPP plans, any right-of-way (ROW) agreement or easements, and all access necessary for us to perform our work shall be provided by others. If our operations are delayed or otherwise impacted by any delays or problems with permits, SWPPP plans, ROW agreements, easements or access arrangements our compensation and time for completion will be equitably adjusted.

6. **Terms and Conditions**

6.1. Schedule

6.1.1. This proposal is based upon performance under a reasonable and mutually agreed-to project schedule in so far as that schedule applies to our work. The approved project baseline schedule and all monthly updates must be provided to us on a regular and timely basis to keep

us apprised of schedule changes which may impact the timing and efficiency of our work. We will not be liable for any delays caused by others or by factors beyond our reasonable control.

6.2 Indemnification

6.2.1. We will indemnify you and/or the project owner for personal injury or property damage claims to the extent of our own negligence. Our proposal excludes any obligation to indemnify you for your own negligence or to indemnify any other party for that party's own negligence or to indemnify any design professional.

6.3 Payment

6.3.1. Monthly progress payments will be made to The HDD Company within (7) seven days after you receive each monthly payment from the project owner, but in no event later than 120 days from the date you received your invoice.

6.3.2. We will receive our final payment within 30 days after you receive our final billing and our work has been completed and accepted. Acceptance will not be unreasonably withheld or delayed. If you dispute any portion of any billing, you will promptly notify us in writing of the nature of the dispute and you will pay the undisputed portion of the billing without delay. If any undisputed amounts are past due for more than 10 days, we reserve the right to stop work until all payments are brought current. We will provide lien releases in accordance with applicable state statutes or regulations. We will keep the project free of liens from out subcontractors, suppliers and other vendors provided we have been paid by you for the work covered by any such liens.

6.4. Extra/Force Account Work:

6.4.1. If we are directed to perform any work on a force account or time and material basis, the rates for our labor and equipment will be as stated in our proposal, or if no rates are included with this proposal, as stated in our then current standard labor and equipment rate schedule. If we are directed to standby or suspend work while other operations occur, or delays or other problems are resolved, or if we are required to standby due to events or circumstances beyond our control, the standby time for our labor and equipment will be paid as stated in this proposal.

6.5. Differing Site Conditions

6.5.1. If the conditions we encounter in the performance of our work differ materially from those indicated in the contract documents, boring logs, geotechnical reports or other information furnished to us prior to bid, or from those ordinarily encountered and generally recognized as inherent in the type of work provided for in our proposal, then our compensation and time for completion will be equitably adjusted to account for any resulting delay and added costs.

Going to Greater Lengths"

7.  **Delays and Work Stoppages:**

    7.1.  All work stoppages that arise through no fault of The HDD Company will be billed at $14,500 (no crew on site).

The HDD Company appreciates the opportunity to furnish you this quote and looks forward to working with you. Should any of the information presented above need further clarification, please do not hesitate to contact us.

Sincerely,
**The HDD Company**

Jeremy King

# The HDD Company, Inc.

4525 Serrano Pkwy #210
El Dorado Hills, CA  95762
(530) 676-5705  Fax (530) 676-3605

# Invoice

| DATE | INVOICE # |
|------|-----------|
| 8/24/2020 | 20-345-14 |

| BILL TO |
|---------|
| MINNESOTA LIMITED<br>PO BOX  410<br>BIG LAKE, MN  5530934 |

| P.O. NO. | TERMS | JOB NO. |
|----------|-------|---------|
| 1916169002 | Net 30 | 20-345-14 |

| SERVICE DAY | DESCRIPTION | QTY/FT | RATE | AMOUNT |
|-------------|-------------|--------|------|--------|
| 8/24/2020 | Completion of HDD  -  Pottawapomie Creek Bore   1788' of 36" Pipe | | 1,087,104.00 | 1,087,104.00 |
| 8/24/2020 | LESS 10% RETENTION | 1,087,104 | -0.10 | -108,710.40 |
| | Subcontract Agreement No. SR1916169002<br>Southern Star Central Gas Pipeline  Project C-60266 | | | |

| Thank you for your business. | Total | $978,393.60 |
|------------------------------|-------|-------------|

# Exhibit 19

**IN THE DISTRICT COURT OF ANDERSON COUNTY, KANSAS**

Mechanic's Lien No. _____

<u>STATEMENT FOR MECHANIC'S LIEN</u>

(K.S.A. § 60-1103)

| | |
|---|---|
| **AMOUNT OF CLAIM:** | **$1,087,104.00.** (exclusive of interest) |
| **NAME OF LANDOWNERS:**<br>Jobsite and Mailing Address: | **Rene and Anita Bures**<br>31443 NW Meade Rd., Richmond, KS 66080 |
| | **John T. Rayne; Patrick Arthur Rayne and Kelly Lee Rayne Family Trust Under Trust Agreement date April 12, 2016; and Keith J. Pickert and Mary J. Pickert, co-trustee of the Pickert Family Trust u/a/d March 12, 2016** |
| Jobsite Address: | 00000 NW Meade Rd., Garnett, KS 66032 |
| Mailing Address: | John Rayne: 12 Overhill Dr., Paola, KS 66071 |
| | Patrick Arthur Rayne and Kelly Lee Rayne Family Trust: 102 Crestview Dr, Paola KS 66071 |
| | Keith J. Pickert and Mary J. Pickert, co-trustee of the Pickert Family Trust: 47890 Deer Trail Dr Canton, MI 48187 |
| **NAME OF PROJECT OWNER:** | **Southern Star Central Gas Pipeline, Inc., a Delaware Corporation.**<br>4700 Highway 56<br>Owensboro, KY 42301 |
| | <u>Registered Agent</u><br>The Corporation Company, Inc.<br>112 SW 7th Street Suite 3C<br>Topeka, KS 66603 |
| **NAME OF CONTRACTOR:** | **Minnesota Limited, LLC., a Minnesota Limited Liability Corporation**<br>18640 200th Street – PO Box 410<br>Big Lake, MN 55309 |
| | <u>Registered Agent</u><br>National Registered Agents, Inc. of KS<br>112 SW 7th Street Suite 3C |

HDD 60-1103 Lien Notice - Anderson County 4846-6694-3443 v 1

Topeka, KS 66603

**NAME OF LIEN CLAIMANT:**  **The HDD Company, Inc., an Oregon Corporation.**
4525 Serrano Parkway, Office Suite 210
El Dorado Hills, CA 95762

Registered Agent
CT Corporation System
112 SW 7th Street, Suite 3C
Topeka, KS 66603

**DESCRIPTION OF**  ATTACHED HERETO AS **EXHIBIT A** AND
**PROPERTY:**  INCORPORATED HEREIN BY THIS REFERENCE,
commonly known as 31443 NW Meade Rd., Richmond,
KS 66080 and 00000 NW Meade Rd., Garnett, KS 66032
(the "Property")

The undersigned, The HDD Company, Inc. ("Lien Claimant"), a subcontractor pursuant to K.S.A. § 1103, claims a lien upon the Property and all other personal property furnished, placed or installed on the Property, on account of furnishing labor, equipment, and materials for the construction and/or completion of the Southern Star Central Gas Pipeline Project C60266 ("Project") located on said Property and the buildings, erections, improvements and plants erected or constructed, and all materials, fixtures, engines, boilers, pumps, belting, pulleys, shafting, machinery and other personal property furnished, placed or installed on the Property, on account of furnishing labor, equipment, and materials for the construction and/or completion of the Project located at the Property, legally described in **Exhibit A**, attached hereto and incorporated herein by reference. The labor, equipment, and materials supplied by Lien Claimant were used and consumed in the construction of said Project on the Property. Lien Claimant supplied labor, equipment, and materials to the Project as a supplier under agreement with Minnesota Limited, L.L.C., the original contractor ("Contractor"), which in turn was under agreement with Southern Star Central Gas Pipeline, Inc., the owner of the Project ("Project Owner").

The aforesaid claim, a reasonably itemized statement of which is attached to this lien statement (**Exhibit B**) and copies of invoices (**Exhibit C**) substantiating the labor, equipment, and materials supplied to the Project Owner by Lien Claimant for improvements upon the Property, is filed in order that it may constitute a lien upon the above-described Property, and every other right, title, and interest in said real Property. The amount claimed as owing is ONE MILLION EIGHTY-SEVEN THOUSAND, ONE HUNDRED FOUR DOLLARS and 00/100 ($1,087,104.00), exclusive of interest.

Lien Claimant last supplied labor, materials, and/or equipment within five (5) months of the date of this lien statement after properly filing a notice of lien extension on December 1, 2020 (**Exhibit D**).

WITNESS the hand of said Lien Claimant this 5th day of January 2021.

ON BEHALF OF:  **The HDD Company, Inc.,** Lien Claimant

By: _____
    Jeremy King
    Vice President
    The HDD Company, Inc.

## VERIFICATION

STATE OF CALIFORNIA )
                    ) ss.
COUNTY OF *El Porado* )

Jeremy King, of lawful age, being first duly sworn upon his oath, that he is the Vice President and duly authorized representative of The HDD Company, Inc. and is duly authorized to make this verification on its behalf; and does verify under penalty of perjury that the above and foregoing statement is true and correct based on his personal knowledge, and is a just and true account of the demand of and the amount due Lien Claimant.

ON BEHALF OF: **The HDD Company, Inc.**, Lien Claimant

By: _____
    Jeremy King
    Vice President
    The HDD Company, Inc.

STATE OF CALIFORNIA )
                    ) ss.
COUNTY OF           )

On this ____ day of January, 2021, before me appeared Jeremy King, to me personally known, who being by me duly sworn did say that he is the Vice President and duly authorized representative of The HDD Company, Inc., and that he acknowledged that his execution of the foregoing instrument is on behalf of said company.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal in the County and State aforesaid, the day and year first above written.

_____
Notary Public

_____
Printed Name

My Commission Expires:

_____

# ALL- PURPOSE
# CERTIFICATE OF ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California )

County of El Dorado )

On January 5, 2021 before me, Wendy Brooke Notary Public .

(Here insert name and title of the officer)

personally appeared, Jeremy King ,
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_Wendy Brooke_
Signature                                    (Seal)

WENDY BROOKE
COMM. #2319236
Notary Public - California
El Dorado County
Comm. Expires Feb 11, 2024

---

## ADDITIONAL OPTIONAL INFORMATION

DESCRIPTION OF THE ATTACHED DOCUMENT

Statement for Mechanic's Lien
(Title or description of attached document)

(Title or description of attached document continued)

Number of Pages _____ Document Date _____

### CAPACITY CLAIMED BY THE SIGNER
- ☐ Individual (s)
- ☐ Corporate Officer

  _____
  (Title)
- ☐ Partner(s)
- ☐ Attorney-In-Fact
- ☐ Trustee(s)
- ☐ Other _____

## INSTRUCTIONS FOR COMPLETING THIS FORM

*This form complies with current California statutes regarding notary wording and, if needed, should be completed and attached to the document. Acknowledgments from other states may be completed for documents being sent to that state so long as the wording does not require the California notary to violate California notary law.*

- State and County information must be the State and County where the document signer(s) personally appeared before the notary public for acknowledgment.
- Date of notarization must be the date that the signer(s) personally appeared which must also be the same date the acknowledgment is completed.
- The notary public must print his or her name as it appears within his or her commission followed by a comma and then your title (notary public).
- Print the name(s) of document signer(s) who personally appear at the time of notarization.
- Indicate the correct singular or plural forms by crossing off incorrect forms (i.e. he/she/they- is /are ) or circling the correct forms. Failure to correctly indicate this information may lead to rejection of document recording.
- The notary seal impression must be clear and photographically reproducible. Impression must not cover text or lines. If seal impression smudges, re-seal if a sufficient area permits, otherwise complete a different acknowledgment form.
- Signature of the notary public must match the signature on file with the office of the county clerk.
  - ❖ Additional information is not required but could help to ensure this acknowledgment is not misused or attached to a different document.
  - ❖ Indicate title or type of attached document, number of pages and date.
  - ❖ Indicate the capacity claimed by the signer. If the claimed capacity is a corporate officer, indicate the title (i.e. CEO, CFO, Secretary).
- Securely attach this document to the signed document with a staple.

EXHIBIT A

31443 NW Meade Rd., Richmond, KS 66080

The South Half (S½) of the Northeast Quarter (NE¼) of Section Thirty-four (34), Township Nineteen (19), Range Nineteen (19) AND the Southeast Quarter (SE¼) of Section Thirty-four (34), Township Nineteen (19), Range Nineteen (19), excepting that part of the last described quarter section lying South of the center of Pottawatomie Creek, and EXCEPT One acre of land situated in the N. E. 1/4 of Section 34 and the S. E. 1/4 of Section 34 all in Township 19 S., Range 19 E., Anderson County, Kansas and being more particularly described as follows: Commencing at the S. E. corner of the N. E. 1/4 of Section 34, Township 19 S., Range 19 E., Anderson County, Kansas; thence N. 0°01'46" E. along the East line of said N. E. 1/4 a distance of 58.87 ft. to a point; thence N. 89°31'34" W. a distance of 235.50 ft. to a point; thence S. 0°01'46" W. a distance of 61.88 ft. to a point on the N. Line of the S. E. 1/4 Section 34, Township 19 S., Range 19 E; thence continuing S. 0°0146" W., a distance of 123.09 ft. to a point; thence S. 89°31'34" E., a distance of 235.50 ft. to a point on the East line of said S. E. 1/4; thence N. 0°01'46" E. along said East line a distance of 126.10 ft. to the POINT OF BEGINNING.

00000 NW Meade Rd., Garnett, KS 66032

The Northeast Quarter (NE¼), except 1.52 acres in the northeast corner north of Pottawatomie River, of Section 3, Township 20 South, Range 19 East of the 6th P.M., Anderson County, Kansas.

## Statement of Account

| | |
|---|---|
| Contract Value Unpaid | $ 978,393.60 |
| Retainage Withheld | $ 108,710.40 |
| Total | **$ 1,087,104.00** |

# EXHIBIT C

C1: Subcontract Agreement
C2: Invoices

(Attached hereto)



**MINNESOTA LIMITED**
AN NVERGE COMPANY

<div align="center">

**Subcontractor Agreement**
No. SR1916169002

</div>

This agreement is made at Big Lake, MN this day of ___January 17, 2020___.

BETWEEN:

Minnesota Limited, LLC (Contractor)
18640 200th Street – PO Box 410
Big Lake, MN 55309

AND:

THE HDD COMPANY(Subcontractor)
4525 SERRANO PARKWAY, OFFICE SUITE 210
EL DORADO HILLS, CA 95762

RECITALS

Contractor ("Minnesota Limited, LLC) has entered into a contract (the "Prime Contract") with Southern Star Central Gas Pipeline, Inc. ("Owner") to perform certain labor and furnish certain materials for completion of the construction project KS - C60206 Install 31.5 miles of 36" (the "Project"). Subcontractor desires to perform certain services and/or provide certain materials as a subcontractor of Contractor pursuant to the terms and conditions of the Prime Contract and agrees to the terms and conditions of this Agreement.

AGREEMENT

In consideration of the mutual covenants contained herein, the parties agree as follows:

I.    Subcontractor agrees to supply all the materials and labor and pay all license fees, permits and expenses for the work located at __Various Sites__ (the "Site"). As full compensation for performance of this Agreement and subject to all applicable provisions of this Agreement, Contractor agrees to pay Subcontractor:
six million one-hundred eight-five thousand nine-hundred thirty six dollars ($6,185,936.00             )

II.    **Contract Document**. Subcontractor's performance hereunder shall be subject to all terms and conditions contained in the Prime Contract and all drawings and/or specifications referred to therein (the "Contract Documents") except as such terms may be specifically amended by this Agreement, which includes HDD's Proposal, attached hereto and incorporated herein. Wherever the Contract Documents shall refer to the Contractor or its agents, the same shall be read to refer to the Subcontractor under this agreement. Subcontractor shall perform and coordinate its work hereunder in a manner necessary to assure the prompt and timely completion of the Project, time being of the essence to the



Agreement. At Subcontractor's request, a copy of the applicable Prime Contract Terms and Conditions will be supplied to Subcontractor.

Any terms and conditions proposed in Subcontractor's acceptance of or in any acknowledgement, invoice, or other form of Subcontractor that add to, vary from, or conflict with these terms hereby objected to. Any such proposed terms shall be void and these terms and conditions (1) shall constitute the complete and exclusive statement of the terms and conditions of the contract between the parties and (2) may be modified only by written instrument executed by the authorized representatives of both parties.

III.    **Insurance.** Subcontractor shall comply with the insurance requirements set forth in Exhibit A (attached).

IV.    **Additional Terms and Conditions**

   A.   Subcontractor, not Contractor, assumes all the risk related to in performing its work under this Agreement, such as any injuries to Subcontractor, Subcontractor's workers, Facility employees and members of the public arising from the Subcontractors activities or use of tools and equipment, or from any other cause.

   B.   Subcontractor will complete all work in a workmanlike and professional manner according to standard practices in the building trade, and in compliance with all building codes and other applicable laws. Subcontractor will warrant against defects in material and labor it supplies for the completion of the work. If subcontractor fails to perform under this Agreement, the party entitled to performance or the Contractor will have the right to hire other persons to correct the defective Work and hold Subcontractor liable for the costs thereof including costs, disbursements and reasonable attorneys' fees incurred in the enforcement of this provision.

   C.   All Work will be done on a timely basis. The work to be performed under this contract shall be commenced as directed by Project Manager or Project Superintendent or Project Foreman and shall be substantially completed on or before ___as agreed upon and directed onsite_____. Time is of the essence.

   D.   Subcontractor shall indemnify, defend and hold harmless Contractor as set forth in Section VII.

   E.   No work shall be subcontracted or assigned by Subcontractor without the prior written approval of the Contractor.

   F.   Environmental, Health and Safety. Subcontractor shall take all necessary precautions to keep the work site free from hazards that are likely to cause injury, illness, or death or damage to property. Subcontractor shall provide any Safety Data Sheets (SDS) for any hazardous chemicals provided pursuant to this contract. Contractor is a company that operates under a "Culture of Safety" with the goal of zero incidents, and expects its subcontractor to similarly emphasize the paramount importance of safe behavior. Failure to abide by Contractor's policies may result in immediate removal of Subcontractor from the premises and will be a breach of Subcontractor's obligations hereunder.



Contractor shall have the right, at its option, to conduct a complete audit of Subcontractor's documents and practices to verify Subcontractor's compliance with this Section.

G.   Minnesota Limited has enacted a Subcontractor Management Program and Safety Requirements of which Subcontractor has received. Subcontractor shall follow and adhere to all aspects of said program and the terms and conditions of such program are incorporated herein.

H.   Liens. To the fullest extent permitted by law, and the extent the Contractors has paid the Subcontractor, Subcontractor will at all times keep the Project, the Site and each part thereof free from any attachment, lien, claim of lien, or other encumbrance arising out of the Work and Subcontractor will indemnify, defend and hold Contractor harmless from and against all claims, losses, demands, causes of action or expenses (including attorneys' fees and other costs of defense incurred by Contractor in defending against the foregoing or in enforcing this indemnity and defense obligation) of whatever nature, arising by reason of any such lien, claim of lien, attachment or encumbrance. If any claim is filed to enforce any laborers, material men, mechanic's, or other similar lien arising out of or relating to the Work for which Contractor has paid the Subcontractor, Subcontractor will immediately cause such lien to be released and discharged and if Subcontractor fails to do so, then Contractor will have a right to pay all sums, including attorneys' fees and other costs and expenses incurred necessary to obtain such release and discharge, and hold Subcontractor liable for the amount thereof with the right to deduct all or a portion of such sum from accounts that may be due Subcontractor.

I.   Default. In addition to the other remedies available under law; (a) if Subcontractor should fail or refuse, except in cases where extension of time is provided, to supply enough properly skilled workers or proper materials for the Work; or (b) if Subcontractor should fail to make payment to its subcontractors for material or labor which are due to its Subcontractors, or (c) if Subcontractor should fail to keep and comply with any of the terms and provisions of this Agreement, or (d) if Subcontractor should be adjudged bankrupt, file or suffer to be filed a petition for relief under the Bankruptcy Act, or make a general assignment for the benefit of the creditors; or (e) if a receiver should be appointed on account of Subcontractor's insolvency; or (f) if Subcontractor fails to pay its employees' wages, benefits or tax withholdings; then, in any such event, Contractor may without prejudice to any other right or remedy and after giving Subcontractor and its surety, if any, upon twenty-four hours written notice, terminate its obligation to Subcontractor under this Agreement and take possession of the Site and complete (or cause to be completed) the Work by whatever method Contractor may deem expedient. In such case Subcontractor will not be entitled to receive any further payment until the Work is completed. Upon completion of the Work, Contractor will pay to Subcontractor an amount equal to (x) the unpaid portion of the Subcontract Amount attributable to the Work performed up to the termination less (y) the amount by which (i) the costs incurred by Contractor to complete the Work, including, without limitation, costs for architectural, managerial and administrative services and reasonable attorneys' fees, if legal counsel is employed, exceed (ii) the portion of the Subcontract Amount attributable to the balance of the Work yet to be performed at the time of termination. If the amount calculated under part (y) in the preceding sentence exceeds the amount owing under part (x), the Subcontractor will pay the difference to Contractor. If the amount in part (x) exceeds the amount in part (y), Contractor will pay the difference to Subcontractor.



**MINNESOTA LIMITED**
AN RIVERDE COMPANY

J.     Subcontractor is an Independent Subcontractor and is not an employee or agent of the Contractor and neither Subcontractor nor anyone employed by Subcontractor will be deemed for any purpose to be the agent, employee, servant or representative of Contractor in the performance of the Work. Subcontractor acknowledges and agrees that Contractor will have no direction or control over the means, methods, procedures or manner of the Work performed by Subcontractor or any of its subcontractors, or any of their employees, vendors or suppliers.

K.     No changes shall be made in the work proposed or in the price unless those changes are agreed to in writing by both Subcontractor and Contractor. Travis Gehr and / or __James Redmond_____, shall be the Contractor's designated on-site agent, If there is a dispute regarding whether the work is a change, Subcontractor may perform that work under protest and submit a claim to Contractor in accordance with this Agreement.

L.     Clean Up. Subcontractor will at all times keep the site or facility safe and free from the accumulation of waste materials or rubbish caused by its operations or related to the Work. Upon completion of the Work and each portion thereof, Subcontractor will remove all rubbish and waste produced by its operations or Work hereunder from the facility as well as all of its tools, equipment, machinery and surplus materials no longer needed and leave the site or facility in a "broom clean" or equivalent condition and safe for Subcontractor's employees and subsequent subcontractors to perform their work, unless otherwise specified in writing. If Subcontractor fails to clean up, Contractor may do so after written notice to Subcontractor and the cost thereof will be charged to Subcontractor.

V     **Representations of Subcontractor.** Subcontractor represents and warrants the following:

A.     Subcontractor has examined the Agreement ("Prime Contract") between Owner and Minnesota Limited (if requested by the Subcontractor prior to the execution of the work) and agrees to all provisions affecting Subcontractors performance, including but not limited to the representations, obligations and warranties made by Minnesota Limited to the Owner.

B.     Subcontractor has the requisite authority and ability to perform the subcontract without delay.

C.     Subcontractor will not assign, subcontract or otherwise delegate its responsibilities and obligation hereunder without the written consent of Contractor.

D.     Subcontractor shall examined the specifications, site conditions, drawings and requirements of the work with due diligence and its bid has taken into consideration all conditions and risks which are reasonably related to the performance of the work.

E.     Ethics; Conflict of Interest. Subcontractor shall at all times during the performance of its obligations hereunder conform to sound ethical business practices in conformance with all applicable Laws and shall in its business practices promote the values of honesty, integrity, social responsibility, and human rights. Subcontractor shall not offer to any member of Contractor (including employees thereof) any gifts, entertainment, or other favors beyond the common courtesy usually associated with business practices. Subcontractor shall not pay any commissions or fees or grant any rebates or other



remuneration or monetary gratuity to any employee of Contractor. Subcontractor shall not grant any secret rebates nor pay any commissions or fees to any employee of Contractor.

F.  Invitees Prohibited. Subcontractor shall not, without prior written permission of Contractor, invite, permit entry or bring any Person onto the Contractor's Worksite or property who is not an employee of Subcontractor

G.  Subcontractor will pay its employees promptly and maintain good labor relations. Subcontractor further represents that it has paid all union benefit contributions including fringe benefits. Subcontractor agrees that Contractor upon demand of the Labor Union, may withhold from any sums due Subcontractor and pay to the Administrator of the Plan any amounts owing and said payment shall be deducted from the invoice.

## VI.  Warranty.

A.  Subcontractor warrants to the Contractor and Owner that all materials and equipment furnished under this Agreement will be new unless otherwise specified in writing, and that all work will be of good quality, free from faults and defects and in conformance with any Purchase Order and attachments thereto, including any specifications stipulated therein. All Work not so conforming to these standards may be considered defective, and the Subcontractor shall promptly repair and make good, after notice by the Contractor and Owner and without cost to the Contractor and Owner, any damages, defects or faults resulting from imperfect or defective Work done or materials furnished by the Subcontractor. The Subcontractor warrants that all labor, materials and equipment furnished under this Agreement shall be covered by warranty for a period of at least two (2) years (or during a longer period if required by the specifications and stipulated therein) from the date of acceptance of the completed Work by the Owner.

B.  Where material or equipment furnished by the Subcontractor is covered by a manufacturer's warranty or guarantee or other special warranty or guarantee the Subcontractor shall provide such warranty and provide additional or extended warranty or guarantees to the Contractor for its labor, materials and equipment to confirm to paragraph A above.

VII.  **Indemnification.** To the fullest extent permitted by law, the Subcontractor shall indemnify the Owner, Contractor and the agents and employees of any of them from and against claims, damages, losses and expenses, arising out of or in connection with, or resulting from the negligent performance of the Subcontractor's work, the Subcontractor's subcontractors work, or anyone directly or indirectly employed by them but only to the extent caused by acts or omissions by either or any of them. In addition thereto, Subcontractor indemnifies Owner, Contractor and the agents and employees of any of them for expenses including attorney's fees and costs, incurred in responding to and defending against any claim or in enforcing this provision.

VIII.  **Payment.** Subcontractor shall invoice Minnesota Limited no later than 30 days after date of service Contractor agrees to pay Subcontractor all sums due less ___10___ % retainage (if applicable) hereunder within

SR1916169O02



thirty (30) days from the date the invoice is received. However, it is a condition precedent to payment that if Owner withholds payments for that portion of any work performed by Subcontractor, then Minnesota Limited is only obligated to pay Subcontractor after receiving payment from the Owner. In such event payment will be made within ten (10) days. Contractor reserves the right to withhold such sums as may be necessary to pay expenses, including costs and attorney's fees, caused by, or related to, Subcontractor's breach of Agreement. Final payment of retainage will occur ten (10) days after final payment for Subcontractor's work is received and when lien waivers and job completion affidavit are executed.

IX.    **Maintaining Records / Audit.** For a period of five (5) years from final acceptance of Subcontractor's work, Subcontractor shall maintain all job records and shall, upon reasonable notice by Contractor, but no later than 10 business days, make such records available for inspection by Contractor or Owner. Contractor or Owner or their representatives may audit said records. If the results of the audit show an overpayment, Subcontractor shall reimburse the overpayment together with interest of 1% per month. If the audit shows an overpayment more than one thousand dollars ($1,000), Subcontractor shall also reimburse Contractor or Company for the cost of the audit.

X.    **Interpretations and Enforcement.** The Agreement and contract documentation contains the parties entire understanding with regard to the subject hereof and shall not be modified except by a writing signed by both parties; provided, however, that Subcontractor shall be bound by changes in the Contract Documents agreed to between the Contractor and Owner, but only if Contractor has timely notified Subcontractor of such changes.. The interpretation and enforcement of this Agreement shall be governed by the laws of the state in which the work hereunder is to be performed or that specified in the Prime Contract if different than the state where the work is to be performed. If any provision hereof is deemed unenforceable, the remainder of the Agreement shall be enforced as though such provision were not a part hereof.

XI.    **Assignment.** Subcontractor shall not assign or subcontract this Agreement or any portion thereof or of any money due or which may become due hereunder without the prior written consent of Contractor. Notwithstanding anything to the contrary contained herein, Contractor may assign this Agreement without the consent of Subcontractor.

XII.    **Confidentiality of Agreement.** The Subcontractor agrees that all terms and conditions contained herein or in any other document(s) referencing the Project shall remain confidential. Said terms shall not be disclosed without the express written consent of the Contractor.

Minnesota Limited is required to protect all technical information supplied by the Owner. Subcontractor agrees that this Section is its written assurance that all such information, including but not limited to: drawings, diagrams, surveys, specifications, locations, and geophysical (GPS) coordinates of the work, will be kept confidential, protected, and will not be disclosed to third parties without obtaining Minnesota Limited's written consent, unless ordered to do so by a court of law or arbitrator.. Breach of is provision will subject Subcontractor to all remedies awarded to Contractor and Owner including injunctive relief. Subcontractor agrees to pay all of Contractors and Owners attorney's fees in enforcing this provision.



**MINNESOTA LIMITED**
AN NVERUE COMPANY

XII.     **Notice.** Unless otherwise provided herein, any notice provided for herein will be in writing and delivered to the parties (a) in person, (b) by facsimile transmission (with the original and a copy of the facsimile confirmation following in the United States mail), (c) by overnight delivery service, or (d) by certified mail, return receipt requested. Notice will go to the address first shown herein for the respective party to whom notice is given or to such other address as may be designated by either party by written notice given pursuant hereto.

XIV.     **Governing Law/Venue/Attorney Fees.** This Agreement shall be construed and interpreted in accordance with the laws of the State of Minnesota, including, without limitation, matters of construction, validity, enforcement, and interpretation. The parties agree that venue for any dispute under this Agreement shall be in the District Court of Hennepin County, Minnesota. In the event any enforcement effort is initiated by Contractor against Subcontractor for default of this Agreement, Subcontractor shall be liable to Contractor for any and all costs of collection, including but not limited to, reasonable attorneys' and professional fees, court costs, traveling and lodging expenses, costs of investigation and defense, accrued interest, and any other reasonable expenses incurred by Contractor in initiating such efforts.

Signed the day and year first written above.


CONTRACTOR:  Minnesota Limited, LLC.

By: _____

Its: _____
              Title


SUBCONTRACTOR: THE HDD COMPANY

By: _____

Its: ___Vice President___
              Title



**MINNESOTA LIMITED**
AN MYERUS COMPANY

<center>

**EXHIBIT A**
**Insurance**

</center>

Prior to commencing Work, Subcontractor shall, at its sole expense, procure and maintain insurance of the types, and in the form and amounts described below from insurer(s) authorized to transact business in the state where Work or operations will be performed by Subcontractor. Such insurance and required coverage in forms acceptable to General Contractor shall be placed with admitted insurers that maintain an A.M. Best's rating of not less than A- VII, unless otherwise approved by the General Contractor. The insurance requirements described below shall be maintained uninterrupted for the duration of the Project, including any warranty periods, and shall protect Subcontractor, and others for whom and/or to whom Subcontractor may be liable, for liabilities in connection with work performed by or on behalf of Subcontractor, its agents, representatives, employees or subcontractors.

**Insurance Requirements:**

1.      **Commercial General and Umbrella Liability Insurance.** Subcontractor shall maintain commercial general liability ("CGL") and, if necessary, commercial umbrella insurance, with a limit of not less than $_2,000,000.00_____ per occurrence, bodily injury or property damage liability; $_2,000,000.00_____ per offense, personal and advertising injury liability; $___5,000,000.00_____ products-completed operations aggregate; and $___5,000,000.00_____ general aggregate applicable to claims other than products-completed operations. To the extent that Subcontractor's CGL and any commercial umbrella insurance are subject to aggregate limits, the policy shall be endorsed so as to apply such aggregate limits separately to the Project.

Coverage afforded under Subcontractor's CGL and any commercial umbrella insurance shall be provided on an occurrence basis and shall be subject to the terms of the *Insurance Services Office ("ISO") Commercial General Liability Coverage Form CG 0001*, or a substitute form providing coverage at least as broad as the ISO form specified. There shall be no limitations or exclusions of coverage beyond those contained in the standard coverage form and coverage shall include liability arising from premises, operations, independent contractors, products-completed operations including construction defect, contractual liability or personal injury and advertising injury.

General Contractor, its officers, directors and employees and Project Owner(s) shall be included as additional insureds under Subcontractor's CGL, and any commercial umbrella insurance, with respect to liabilities arising out of both the ongoing and completed operations of Subcontractor. Such additional insured coverage shall be subject to the terms of ISO additional insured endorsement forms CG 2010 (ongoing operations) and form CG 2037 (products-completed operations), or substitute form(s) providing equivalent coverage. The edition date of the ISO endorsements required should be chosen based on the recipient's risk transfer objectives. The table below summarizes the options and major differences between the edition dates.

| Endorsement(s) | ISO Edition Date | Comments |
|---|---|---|
| CG 2010 | 11/85 Edition | Broadest Insuring Agreement - "liability arising out of" the Subcontractor's work – both ongoing |


**MINNESOTA LIMITED**
AN HYBROS COMPANY

| | | operations and completed operations coverage provided by one endorsement. |
|---|---|---|
| CG 2010/CG2037 | 10/01 Edition | Same Insuring Agreement as 11/85 with ongoing operations and completed operations coverage provided by separate endorsements. |
| CG 2010/CG2037 | 07/04 Edition | More narrow Insuring Agreement – "caused in whole or in party by. . . .acts or omissions" of the Subcontractor. |
| CG2010/CG2037 | 04/13 Edition | Same Insuring Agreement as 07/04, but limits coverage to "extent permitted by law" and "not be broader than that which you are required by the contract or agreement to provide." |

Note: Recommended Additional Insured endorsement for states other than Minnesota may vary and Willis should be consulted. States including but not limited to IL, TX, & CA involve unique risk transfer considerations.

Additional insured coverage afforded by Subcontractors CGL, and any commercial umbrella insurance, shall be primary and non-contributing with respect to any insurance or self-insurance available to General Contractor or Project Owner. Such primary and non-contributory insurance shall be subject to the terms of ISO form CG 2001 (Primary and Noncontributory – Other Insurance Condition) or its equivalent. Any other insurance or self-insurance maintained by General Contractor or Project owner shall be excess of, and non-contributory with, the coverage afforded by Subcontractors CGL and commercial umbrella insurance, if any.

In addition to procuring and maintaining CGL, and any commercial umbrella insurance, for the duration of the contract, Subcontractor agrees to continue to procure and maintain the products-completed operations liability insurance coverage for a minimum of __two__ ( _2_ ) year(s) after the date that the Work is substantially complete. All terms and conditions of such coverage shall be maintained during this completed operations period, including the required coverage limits and the requirement to provide General Contractor and Project Owner with coverage as an additional insured for completed operations.

2.      **Commercial Automobile and Umbrella Liability Insurance.** Subcontractor shall maintain automobile liability and, if necessary, commercial umbrella insurance, with a limit of not less than $ _2,000,000.00_ each accident. Such insurance shall cover liability for bodily injury and property damage arising from the use or operation of any auto, including those owned, hired or otherwise operated or used by or on behalf of Subcontractor. The coverage shall be subject to the terms of ISO *Business Auto Coverage Form CA 0001* (1990 edition or later), or a substitute form providing equivalent coverage.

3.      **Workers' Compensation and Employers Liability Insurance.** Subcontractor shall maintain workers' compensation coverage providing statutory benefits. Subcontractor shall additionally maintain employers liability insurance, and if necessary, commercial umbrella insurance, with a limit of not less than: $1,000,000, bodily injury by accident – each accident; $1,000,000, bodily injury by disease-policy limit; and $1,000,000, bodily injury by disease each employee. Workers' Compensation coverage must extend to every



employee, including owners/officers of a closely held corporation and/or individuals operating as a sole proprietorship or partnership. Workers' Compensation must provide coverage in the state where the Project is located.

Where applicable, evidence of coverage shall be required for U.S. Longshore and Harbor Workers Compensation, Maritime coverage, Federal Employer's Liability Act and other unique exposures requiring endorsement of coverage.

4. Contractors Pollution Liability Insurance. Required only if Subcontractor's scope of services include the remediation, treatment, storage or disposal of waste or hazardous materials on or about the project site, as determined by General Contractor. If required, Subcontractor shall maintain Contractors Pollution Liability coverage with a limit of not less than $_____n/a_____ per occurrence, $_____n/a_____ annual aggregate. Coverage shall apply to the scope of work as described under the Contract including transportation and shall include coverage for bodily injury; property damage, including loss of use of damaged property or property that has not been physically injured; clean-up costs; mold; defense and investigative costs. Subcontractor shall maintain Completed Operations coverage for _____n/a_____ years following final acceptance of the project or termination of the Contract.

If the scope of services in the contract require the Subcontractor to provide professional services associated with arranging for, or brokering of, hazardous material or construction and demolition (C&D) wastes off the job site, Subcontractor must amend the Contractors Pollution Liability policy to include coverage to address this scope of work. If any of the aforementioned insurance policies are written on a claims made basis, the Contractor warrants that continuous coverage will be maintained, or an extended discovery period will be exercised, for a period of three years beginning from the time the work under this contract is completed.

5. Pollution (Environmental) Liability Insurance. Required only if Subcontractor's scope of services involves disposal of waste or hazardous materials off-site, as determined by General Contractor. If required, Subcontractor shall maintain pollution (environmental) liability coverage with a limit of not less than: $_____n/a_____ per incident, $_____n/a_____ policy aggregate for hazardous waste disposal services, and $_____n/a_____ per incident, $_____n/a_____ for all other disposal facilities. Such coverage shall include clean-up costs, defense costs and products and completed operations.

If the scope of services in the contract requires the disposal of any hazardous materials or construction and demolition (C&D) wastes off the job site, Subcontractor must also obtain evidence that the Disposal Site Operator maintains Pollution Legal Liability Insurance with coverage for: a. bodily injury, sickness, disease, mental anguish or shock sustained by any person, including death; b. property damage including physical injury to or destruction of tangible property including the resulting loss of use thereof, clean-up costs, and the loss of use of tangible property that has not been physically injured or destroyed; c. defense including costs, charges and expenses incurred in the investigation, adjustment or defense of claims for such compensatory damages. d. pollution conditions on, at, under or emanating from any disposal site, location or facility, used by or on behalf of the disposal facility of any waste or waste materials relating to the performance of the work.



The Disposal Site Operator's Pollution Liability Policy will apply to losses arising from the facility that is accepting the waste under the contract. Minimum limits of Insurance for this policy shall be $_____n/a_____ each incident / $_____n/a_____ policy aggregate.

Claims-made coverage is permitted, provided the policy retroactive date is continuously maintained prior to the commencement date of the agreement, and coverage is continuously maintained during all periods in which Subcontractor accepts or treats waste generated from General Contractor's projects and for a period of one (1) year thereafter.

6.      **Professional Liability Insurance.** Required only if Subcontractor's scope of services include architectural, engineering, professional consulting or construction management, as determined by General Contractor. If required, Subcontractor shall maintain professional liability coverage with a limit of not less than $_____n/a_____ each wrongful act, $_____n/a_____ policy aggregate.

Coverage shall include liability arising from the errors, omissions or acts of the Subcontractor or any entity for which the Subcontractor is legally responsible in the providing of professional services under the Contract. Throughout the term the Contract, the PL/E&O policy shall include full prior acts coverage. Coverage shall be continuously maintained during the term of this Agreement and for a period of x years following final acceptance of the Project or termination of the Contract.

Coverage shall not include any exclusion or other limitations related to:
- Scope of the professional services
- Delays in project completion and cost overruns
- Who is authorized to notify the carrier of a claim or potential claim
- Mold, fungus, asbestos, pollutants or other hazardous substances

Claims-made coverage is permitted, provided the policy retroactive date is continuously maintained prior to the commencement date of this agreement, and coverage is continuously maintained during all periods in which Subcontractor performs professional services for General Contractor, and for an additional period of one (1) year after termination of this agreement or the last date such services are performed, whichever comes later. If Subcontractor's scope of work includes environmental engineering or consulting, the terms of coverage shall not exclude environmental professional services.

7.      **Watercraft Liability Insurance.** If watercraft of any kind is used by the CONTRACTOR or Subcontractor, including: (i) bodily injury; (ii) property damage; and (iii) passenger liability.

        a.      Limit of Liability: Combined Single Limit (Bodily Injury and Property Damage), $1,000,000 each occurrence;
        b.      Protection and Indemnity Insurance to include Jones Act crew coverage (or at least Maritime Employer's Liability: MEL), collision, tower's liability and wreck removal coverage, on a form providing



coverage no less extensive than that afforded in the P & I SP-23 form (revised 1/56), including a pollution buy-back endorsement.

8.    **Aircraft Liability Insurance.** If aircraft of any kind is used by the CONTRACTOR or Subcontractor, including: (i) bodily injury; (ii) property damage; and (iii) passenger liability.

    a.    Limit of Liability: Combined Single Limit (Bodily Injury and Property Damage and Passenger Liability), including hull physical damage insurance for the full replacement cost of each aircraft used in the work. Such Aircraft Liability and Hull Coverage shall include a waiver of subrogation against General Contractor and all others required by this Agreement to be additional insureds. $ __n/a__ per seat; $ __n/a__ per occurrence.

## Additional Provisions:

1.    **Deductibles and Self-Insured Retentions.** The funding of deductibles and self-insured retentions maintained by Subcontractor shall be the sole responsibility of Subcontractor, including any amounts applicable to deductibles or self-insured retentions applicable to claims involving the General Contractor or Owner as an additional insured. Any self-insured retentions in excess of $ __n/a__ must be declared to and approved by the General Contractor.

2.    **Primary / Non-Contributing.** Subcontractor's required insurance coverage shall be primary insurance, and any insurance or self-insurance maintained by the General Contractor or Project Owner shall be excess of and noncontributory with Subcontractor's insurance.

3.    **Severability of Interest.** Except with respect to the limits of insurance, Subcontractor's required insurance shall apply separately to each insured or additional insured.

4.    **Waiver of Subrogation.** Subcontractor agrees to waive all rights of subrogation against the General Contractor, Project Owner and Project Architect, and shall cause each of its subcontractors to waive all rights of subrogation against the General Contractor, Project Owner and Project Architect, their agents and employees, as respects loss, damage, claims, suits or demands, howsoever caused:

    a.    To real or personal property, vehicles, equipment, tools, etc. owned, leased or used by Subcontractor or Subcontractor's employees, agents or sub-subcontractors; and

    b.    To the extent such loss, damage, claims, suits or demands are, or should be, afforded coverage by the Subcontractor's required insurance or any other insurance (except professional liability to which this requirement does not apply) maintained by the Subcontractor. This waiver shall C1PPIY to all first party property, equipment, vehicle and workers' compensation claims (unless prohibited under applicable state statutes), and all third party liability claims. This waiver shall apply to all deductibles, retentions or self-insured layers applicable to the required or any other insurance (except professional liability to which this requirement does not apply) maintained by the Subcontractor. If necessary, Subcontractor agrees to endorse the required insurance policies to permit waivers of subrogation in



favor of General Contractor, Project Owner and Project Architect as required hereunder. Subcontractor further agrees to hold harmless and indemnify General Contractor, Project Owner and Project Architect for any loss or expense incurred as a result of Subcontractor's failure to obtain such waivers of subrogation from the insurers.

5.  **Notice of Cancellation / Material Change / Nonrenewal.** Subcontractor's insurance policies must contain a provision or endorsement that the coverage afforded will not be canceled, materially changed or renewal refused until at least 30 days prior Written Notice has been given to General Contractor and to each other additional insured to whom a certificate of insurance has been issued; provided, however, that a ten (10) day prior notice requirement may apply in the event of cancellation due to nonpayment of premium.

6.  **Verification of Coverage.** Prior to commencing Work, Subcontractor shall furnish General Contractor with certificate(s) of insurance executed by a duly authorized representative of each insurer, as evidence of compliance with the insurance requirements set forth above   Such certificates of insurance shall be accompanied by copies of endorsements evidencing coverage afforded to General Contractor and Project Owner as additional insured, and endorsements reflecting insurer's concurrence with Subcontractor's waiver of subrogation rights against General Contractor, Project Owner and Project Architect.   Renewal certificates are to be provided to the General Contractor prior to the expiration of the required insurance policies.
Certified copies of policies, including all policy endorsements, shall be furnished by Subcontractor within 15 days of written request by General Contractor.

The certificate(s) of insurance shall be subject to approval of General Contractor, but failure of General Contractor to request such certificate or other evidence of Subcontractor compliance with insurance requirements, or failure of General Contractor to identify deficiencies from evidence that is provided, shall in no way limit or relieve Subcontractor of its obligations to maintain such insurance.

7.  **Sub-Subcontractors.** No work shall be sublet to any Sub-subcontractor without first obtaining the General Contractor's written permission. All Sub-subcontractors, once approved by the General Contractor, are subject to the same insurance requirements as Subcontractor.   Subcontractor shall cause each Sub-subcontractor employed by Subcontractor to purchase and maintain such insurance.   Upon request, Subcontractor shall furnish General Contractor with copies of certificates of insurance evidencing coverage for each Sub-subcontractor

Subcontractor shall voluntarily provide workers compensation coverage for proprietors, partners or others not statutorily required to maintain workers' compensation insurance.

8.  **Leased Employees.** Use of leased employees by Subcontractor is expressly prohibited without General Contractor's written permission. If permitted by General Contractor, Subcontractor shall:

    a.    Provide General Contractor with a complete copy of its Agreement with the Leasing Company;



b.     Require that Leasing Company provide workers' compensation, employers liability and commercial general liability with coverage limits in amounts no less than Subcontractor insurance requirements for the same coverages.

c.     Require that Leasing Company provide Alternate Employer Endorsement naming General Contractor as alternate employer on Leasing Company's workers' compensation policy.

d.     Require that Leasing Company add General Contractor as an additional insured on its commercial general liability insurance policy, with primary/non-contributory wording.

e.     Require that Leasing Company provide waiver of subrogation in favor of General Contractor on both Leasing Company's workers' compensation and commercial general liability insurance policies.

f.     Provide General Contractor with a copy of the Leasing Company's certificate of insurance, with endorsements, evidencing the required coverage.

9.     **No Representation of Coverage Adequacy.**  In specifying minimum Subcontractor insurance requirements, General Contractor does not represent that such insurance is adequate to protect Subcontractor for loss, damage or liability arising from its work.  Subcontractor is solely responsible to inform itself of types or amounts of insurance it may need beyond these requirements to protect itself.

The insurance requirements set forth in minimum amounts shall not be construed to relieve Subcontractor for liability in excess of such coverage, nor shall it preclude General Contractor from taking such other actions as is available to it under any other provision of the Subcontract.  To the extent Subcontractor maintains insurance greater than these minimum requirements, Subcontractor agrees that such insurance shall be applicable to any of Subcontractor's liability obligations hereunder.

Any acceptance of certificates of insurance by General Contractor shall in no way limit or relieve Subcontractor of its duties and responsibilities under this Subcontract, including the duty to indemnify and hold harmless General Contractor.

10.     **Compliance.**  Failure of Subcontractor to maintain the required insurance shall constitute a default under this Subcontract and, at General Contractor's option, shall allow General Contractor to terminate this Subcontract for cause, withhold payment and/or purchase the required insurance at Subcontractor's expense.

11.     **Cross-Liability Coverage/Non-Standard Restrictive Endorsements.**  All liability policies shall include cross liability coverage and a standard ISO separation of insureds provision, or its equivalent.  No liability policy shall include or be endorsed to include any non-standard provisions restricting coverage for the named insured or the persons/entities required to be named as additional insureds under this Agreement, including but not limited to cross liability coverage exclusions or limitations.



THE
HDD
COMPANY

EL DORADO HILLS | OFFICE Suite 210
4505 Sonoma Parkway, El Dorado Hills, CA USA 95762

MAIN 530 677 5705 | CROSSINGGROUP.COM

January 9, 2020

**Minnesota Limited**
18640 200ᵗʰ St, PO Box 410
Big Lake, MN 55309

ATTN: Amy Skuza

RE:  Southern Star Lines DT and DS Replacement Project
     Directionally drill and install approximately 6,052 feet of 36-inch steel pipeline in
     Anderson and Franklin Counties, KS.

The HDD Company is pleased to submit the following bid quote:

1.   **Responsibilities of The HDD Company**
     1.1.   Provide all required insurance certificates.
     1.2.   Provide any written submittals and qualifications required.
     1.3.   Provide 2 (two) drill rig(s) with sufficient capabilities to install the crossings, a
            closed-loop mud system, mud pumps, vacuum trucks, dump trucks, steering
            system, and all drill spread support equipment necessary.
     1.4.   Provide all required union labor for the drilling operations.
     1.5.   Provide preliminary drill profiles for each crossing.
     1.6.   Provide final as-built drawings.
     1.7.   Provide and haul water for drilling operations.
     1.8.   Provide water storage for the duration of drilling operations.
     1.9.   Provide all required pulling heads.
     1.10.  Leave the entry areas clean, free of debris, and to a rough grade.
     1.11.  Provide bonding at 1%, which is not included in the bid pricing below.

2.   **Responsibilities of THE CONTRACTOR**
     2.1.   Stake and survey the entry and exit points for each bore, with correct stations
            and elevations.
     2.2.   Provide all permitting to undertake the project.
     2.3.   Provide and maintain suitable truck access to and from entry and exit locations.
     2.4.   Provide stable, level, matted and/or graveled work pads for each bore.
     2.5.   Provide all BMPs around each bore's entry and exit locations. The HDD
            Company will maintain these items.
     2.6.   Provide, string, weld, and test all 36-inch pipe for each bore.

2.7. Provide all plans, equipment, and manpower to handle pipe during pullback operations.

2.8. Perform all final tie-ins.

2.9. Provide all settlement monitoring, if required.

2.10. Provide all final site restorations.

2.11. Provide all field surveys to document existing conditions for the HDD installations, including but not limited to pictures, videos, field notes, etc.

## 3. Pricing (Lump Sum)

| | | |
|---|---|---|
| 3.1. | HDD Cedar Creek 2,106' X 36" pipe: | $1,280,448.00 |
| 3.2. | HDD Pottawapomie Creek 1,788' X 36" pipe: | $1,087,104.00 |
| 3.3. | HDD Flint Hill 2,158' X 36" pipe: | $1,312,064.00 |
| 3.4. | Mobilization per rig spread: | $50,000.00 |

## 4. Clarifications

4.1. Additional footage due to no fault of The HDD Company, will be billed at $608.00/LF.

4.2. This proposal is based upon the drawings, specifications, and geotechnical information provided to us on or before **7 June 2019.**

4.3. If any revised or additional drawings, specifications, geotechnical information, or permits are provided to us after the bid submission date, The HDD Company reserves the right to modify the proposal to account for any added costs and/or additional time associated with the change(s).

4.4. The HDD Company's bid proposal is conditional upon reaching an agreement upon mutually acceptable contract terms. This bid proposal will be attached to and forms a part of the contract between The HDD Company and THE CONTRACTOR.

4.5. Item 3.3 above includes the hauling and disposal of all **non-contaminated** drilled solids and excess drilling fluids.

4.6. The pricing above is contingent upon a site visit.

## 5. Exclusions

5.1. The HDD Company and its personnel are not the Project Engineers. Therefore, we exclude all design and engineering services unless any are specifically noted as included in this proposal. Any drilling plans or profiles that we submit to you will be based upon the design information in the contract documents and our experience as HDD contractors. Any plans or profiles we provide are recommendations only and are subject to review and approval by the project owner and/or its engineers.

5.2. All permits, including federal, State and local environmental permits, the SWPPP permit and any associated SWPPP plans, any right-of-way (ROW) agreement or easements, and all access necessary for us to perform our work shall be provided by others. If our operations are delayed or otherwise impacted by any delays or problems with permits, SWPPP plans, ROW agreements, easements or access arrangements our compensation and time for completion will be equitably adjusted.

6. **Terms and Conditions**
    6.1. Schedule
        6.1.1. This proposal is based upon performance under a reasonable and mutually agreed-to project schedule in so far as that schedule applies to our work. The approved project baseline schedule and all monthly updates must be provided to us on a regular and timely basis to keep us apprised of schedule changes which may impact the timing and efficiency of our work. We will not be liable for any delays caused by others or by factors beyond our reasonable control.

    6.2. Indemnification
        6.2.1. We will indemnify you and/or the project owner for personal injury or property damage claims to the extent of our own negligence. Our proposal excludes any obligation to indemnify you for your own negligence or to indemnify any other party for that party's own negligence or to indemnify any design professional.

    6.3. Payment
        6.3.1. Monthly progress payments will be made to The HDD Company within (7) seven days after you receive each monthly payment from the project owner, but in no event later than 120 days from the date you received your invoice.
        6.3.2. We will receive our final payment within 30 days after you receive our final billing and our work has been completed and accepted. Acceptance will not be unreasonably withheld or delayed. If you dispute any portion of any billing, you will promptly notify us in writing of the nature of the dispute and you will pay the undisputed portion of the billing without delay. If any undisputed amounts are past due for more than 10 days, we reserve the right to stop work until all payments are brought current. We will provide lien releases in accordance with applicable state statutes or regulations. We will keep the project free of liens from out subcontractors, suppliers and other vendors provided we have been paid by you for the work covered by any such liens.

    6.4. Extra/Force Account Work:
        6.4.1. If we are directed to perform any work on a force account or time and material basis, the rates for our labor and equipment will be as stated in our proposal, or if no rates are included with this proposal, as stated in our then current standard labor and equipment rate schedule. If we are directed to standby or suspend work while other operations occur, or delays or other problems are resolved, or if we are required to standby due to events or circumstances beyond our control, the standby time for our labor and equipment will be paid as stated in this proposal.

    6.5. Differing Site Conditions

6.5.1. If the conditions we encounter in the performance of our work differ materially from those indicated in the contract documents, boring logs, geotechnical reports or other information furnished to us prior to bid, or from those ordinarily encountered and generally recognized as inherent in the type of work provided for in our proposal, then our compensation and time for completion will be equitably adjusted to account for any resulting delay and added costs.

7. **Delays and Work Stoppages:**
   7.1 All work stoppages that arise through no fault of The HDD Company will be billed at **$14,500** (no crew on site).

The HDD Company appreciates the opportunity to furnish you this quote and looks forward to working with you. Should any of the information presented above need further clarification, please do not hesitate to contact us.

Sincerely,
**The HDD Company**


Jeremy King
Vice President



EL DORADO HILLS | OFFICE Suite 210,
4925 Serrano Parkway, El Dorado Hills, CA USA 95762

MAIN 530 676 9705 | CROSSINGGROUP.COM

17 January 2020

**Minnesota Limited**
18640 200th St, PO Box 410
Big Lake, MN 55309

ATTN: Brad Cordes

RE:     Southern Star Lines DT and DS Replacement Project
        Directionally drill and install approximately 4540 feet of 36-inch steel pipeline road
        crossings in Anderson and Franklin Counties, KS.

The HDD Company is pleased to submit the following bid quote:

1.     **Responsibilities of The HDD Company**
       1.1.    Provide all required insurance certificates.
       1.2.    Provide any written submittals and qualifications required.
       1.3.    Provide drill rig(s) with sufficient capabilities to install the crossings, a closed-
               loop mud system, mud pumps, vacuum trucks, dump trucks, steering system,
               and all drill spread support equipment necessary.
       1.4.    Provide all required union labor for the drilling operations.
       1.5.    Provide final as-built drawings.
       1.6.    Provide and haul water for drilling operations.
       1.7.    Provide water storage for the duration of drilling operations.
       1.8.    Provide all required pulling heads.
       1.9.    Leave the entry areas clean, free of debris, and to a rough grade.
       1.10.   Provide bonding at 1%, which is not included in the bid pricing below.

2.     **Responsibilities of THE CONTRACTOR**
       2.1.    Stake and survey the entry and exit points for each bore, with correct stations
               and elevations.
       2.2.    Provide all permitting to undertake the project.
       2.3.    Provide and maintain suitable truck access to and from entry and exit locations.
       2.4.    Provide stable, level, matted and/or graveled work pads for each bore.
       2.5.    Provide bore pits and shore if needed.
       2.6.    Provide all BMPs around each bore's entry and exit locations. The HDD
               Company will maintain these items.
       2.7.    Provide, string, weld, and test all 36-inch pipe for each bore.
       2.8.    Furnish support crew for road crossings, including excavators and manpower.

*Going to Greater Lengths*®

    2.9.    Provide all plans, equipment, and manpower to handle pipe during pullback operations.

    2.10.   Perform all final tie-ins.

    2.11.   Dispose of cuttings.

    2.12.   Provide all settlement monitoring, if required.

    2.13.   Provide all final site restorations.

    2.14.   Provide all field surveys to document existing conditions for the HDD installations, including but not limited to pictures, videos, field notes, etc.

## 3.    Pricing

| | | |
|---|---|---|
| 3.1. | 4540' X 36" pipe: | **$508.00/ft** |
| 3.2. | Mobilization per rig spread: | **$50,000.00** |

## 4.    Clarifications

    4.1.    This proposal is based upon the drawings, specifications, and geotechnical information provided to us on or before **17 January 2020.**

    4.2.    If any revised or additional drawings, specifications, geotechnical information, or permits are provided to us after the bid submission date, The HDD Company reserves the right to modify the proposal to account for any added costs and/or additional time associated with the change(s).

    4.3.    The HDD Company's bid proposal is conditional upon reaching an agreement upon mutually acceptable contract terms. This bid proposal will be attached to and forms a part of the contract between The HDD Company and THE CONTRACTOR.

    4.4.    The pricing above is contingent upon a site visit.

## 5.    Exclusions

    5.1.    The HDD Company and its personnel are not engineers. Therefore, we exclude all design and engineering services unless any are specifically noted as included in this proposal. Any drilling plans or profiles that we submit to you will be based upon the design information in the contract documents and our experience as HDD contractors. Any plans or profiles we provide are recommendations only and are subject to review and approval by the project owner and/or its engineers.

    5.2.    All permits, including federal, State and local environmental permits, the SWPPP permit and any associated SWPPP plans, any right-of-way (ROW) agreement or easements, and all access necessary for us to perform our work shall be provided by others. If our operations are delayed or otherwise impacted by any delays or problems with permits, SWPPP plans, ROW agreements, easements or access arrangements our compensation and time for completion will be equitably adjusted.

## 6.    Terms and Conditions

    6.1.    Schedule

        6.1.1.    This proposal is based upon performance under a reasonable and mutually agreed-to project schedule in so far as that schedule applies to our work. The approved project baseline schedule and all monthly updates must be provided to us on a regular and timely basis to keep

*Going to Greater Lengths™*

us apprised of schedule changes which may impact the timing and efficiency of our work. We will not be liable for any delays caused by others or by factors beyond our reasonable control.

6.2    Indemnification

    6.2.1.    We will indemnify you and/or the project owner for personal injury or property damage claims to the extent of our own negligence. Our proposal excludes any obligation to indemnify you for your own negligence or to indemnify any other party for that party's own negligence or to indemnify any design professional.

6.3    Payment

    6.3.1.    Monthly progress payments will be made to The HDD Company within (7) seven days after you receive each monthly payment from the project owner, but in no event later than 120 days from the date you received your invoice.

    6.3.2.    We will receive our final payment within 30 days after you receive our final billing and our work has been completed and accepted. Acceptance will not be unreasonably withheld or delayed. If you dispute any portion of any billing, you will promptly notify us in writing of the nature of the dispute and you will pay the undisputed portion of the billing without delay. If any undisputed amounts are past due for more than 10 days, we reserve the right to stop work until all payments are brought current. We will provide lien releases in accordance with applicable state statutes or regulations. We will keep the project free of liens from out subcontractors, suppliers and other vendors provided we have been paid by you for the work covered by any such liens.

6.4.    Extra/Force Account Work:

    6.4.1.    If we are directed to perform any work on a force account or time and material basis, the rates for our labor and equipment will be as stated in our proposal, or if no rates are included with this proposal, as stated in our then current standard labor and equipment rate schedule. If we are directed to standby or suspend work while other operations occur, or delays or other problems are resolved, or if we are required to standby due to events or circumstances beyond our control, the standby time for our labor and equipment will be paid as stated in this proposal.

6.5.    Differing Site Conditions

    6.5.1.    If the conditions we encounter in the performance of our work differ materially from those indicated in the contract documents, boring logs, geotechnical reports or other information furnished to us prior to bid, or from those ordinarily encountered and generally recognized as inherent in the type of work provided for in our proposal, then our compensation and time for completion will be equitably adjusted to account for any resulting delay and added costs.

7.  **Delays and Work Stoppages:**
    7.1.  All work stoppages that arise through no fault of The HDD Company will be billed at $14,500 (no crew on site).

The HDD Company appreciates the opportunity to furnish you this quote and looks forward to working with you. Should any of the information presented above need further clarification, please do not hesitate to contact us.

Sincerely,
**The HDD Company**


Jeremy King

# The HDD Company, Inc.

4525 Serrano Pkwy #210
El Dorado Hills, CA  95762
(530) 676-5705  Fax (530) 676-3605

# Invoice

| DATE | INVOICE # |
|------|-----------|
| 8/24/2020 | 20-345-14 |

| BILL TO |
|---------|
| MINNESOTA LIMITED<br>PO BOX  410<br>BIG LAKE, MN  5530934 |

| P.O. NO. | TERMS | JOB NO. |
|----------|-------|---------|
| 1916169002 | Net 30 | 20-345-14 |

| SERVICE DAY | DESCRIPTION | QTY/FT | RATE | AMOUNT |
|-------------|-------------|--------|------|--------|
| 8/24/2020 | Completion of HDD  -  Pottawapomie Creek Bore   1788' of 36" Pipe | | 1,087,104.00 | 1,087,104.00 |
| 8/24/2020 | LESS 10% RETENTION | 1,087,104 | -0.10 | -108,710.40 |
| | Subcontract Agreement No. SR1916169002<br>Southern Star Central Gas Pipeline  Project C-60266 | | | |

| Thank you for your business. | **Total** | **$978,393.60** |
|------------------------------|-----------|-----------------|

# Exhibit 20



USPS TRACKING #

9590 9402 6142 0209 2512 84

PM 5 L

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

United States
Postal Service

• Sender: Please print your name, address, and ZIP+4® in this box•

**HUSCH BLACKWELL**
4801 Main Street, Suite 1000
Kansas City, MO 64112

MiKE KEIIy 550367-1

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Anderson RWD 4
501 N. Olive St.
Garnett, KS 66032-1840

9590 9402 6142 0209 2512 84

2. Article Number (Transfer from service label)
9489 0090 0027 6303 9140 57

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X  K E

☐ Agent
☐ Addressee

B. Received by (Printed Name)
GC R+1 C-19

C. Date of Delivery
1-15-21

D. Is delivery address different from item 1?  ☐ Yes
If YES, enter delivery address below:  ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☑ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
icted Delivery

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☑ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2015 PSN 7530-02-000-9053

Domestic Return Receipt

# Exhibit 21

USPS TRACKING#



9590 9402 6142 0209 2512 91

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

**United States
Postal Service**

* Sender: Please print your name, address, and ZIP+4® in this box•

# HUSCH BLACKWELL

4801 Main Street, Suite 1000
Kansas City, MO  64112

*Mike Kelly 550367-1*

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Anderson County
c/o Anderson County Clerk –
Julie Wettstein
100 East 4th Ave.
Garnett, KS 66032

9590 9402 6142 0209 2512 91

2. Article Number (Transfer from service label)

9489 0090 0027 6303 9140 64

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _____  ☐ Agent   ☐ Addressee

B. Received by (Printed Name)    C. Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:         ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☒ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ ...icted Delivery

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☒ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2015 PSN 7530-02-000-9053          Domestic Return Receipt

# Exhibit 22

EXHIBIT A

3125 Marshall Rd., Ottawa, KS 66067
All that part of the Southwest Quarter of Section 5, Township 17 South, Range 20 East, in Franklin County, Kansas, being more particularly described as follows: Commencing at the Southwest corner of the Southwest Quarter of said Section 5; thence North 87° 40' 17" East, along the South line of the Southwest Quarter of said Section 5, a distance of 70.01 feet to the point of beginning; thence North 03° 14' 35" West, along a line 70.00 feet East of and parallel with the West line of the Southwest Quarter of said Section 5, a distance of 1647.63 feet; thence North 60° 00' 55" East, a distance of 1074.78 feet; thence South 01° 52' 54" East, a distance of 2146.36 feet to a point on the South line of the Southwest Quarter of said Section 5; thence South 87° 40' 17" West, along the South line of the Southwest Quarter of said Section 5, a distance of 908.94 feet to the point of beginning, Franklin County, Kansas.

3062 Nebraska Rd., Ottawa, KS 66067:
The East 1/4 of the Southeast 1/4 of the Northeast 1/4 of Sec. 6, Twp. 17 S., Rng. 20 E., subject to any part thereof in roads, all in Franklin County, Kansas.
AND
Beginning at the Northwest corner of the Northwest Quarter of Section 5, Township 17 South, Range 20 East of the 6th P.M., thence South 02° 59' 16" East 680.67feet on the West line of the Northwest Quarter of said Section 5 to an existing 1/2" iron bar and the true point of beginning of New Tract 2; thence North 88° 18' 09" East 1327.15 feet to the East line of the Northwest Quarter of the Northwest Quarter of said Section 5, being marked with a 1/2" iron bar; thence South 03° 06' 08" East 613.78 feet to the Southeast corner of said Northwest Quarter of the Northwest Quarter of said Section 5, being marked with a 1/2" iron bar; thence South 03° 06' 08" East 659.24 feet to the Southeast corner of the North Half of the Southwest Quarter of the Northwest Quarter of said Section 5, being marked with a 1/2" iron bar; thence South 88° 26' 25" West 1329.76 feet to the Southwest corner of the North Half of the Southwest Quarter of the Northwest Quarter of said Section 5, being marked with an existing 1/2" iron bar; thence North 02° 59' 16" West 661.16 feet to the Southwest corner of the Northwest Quarter of the Northwest Quarter of said Section 5, being marked with an existing 1/2" iron bar; thence North 02° 59' 16" West 608.61 feet to the point of beginning, all in Franklin County, Kansas.

# Exhibit 23

## EXHIBIT B

### Statement of Account

| | |
|---|---|
| Contract Value Unpaid | $ 1,180,857.60 |
| Retainage Withheld | $ 131,206.40 |
| Access Delay Expenses | $ 101,087.33 |
| Unpaid Change Orders | $1,600,392.89 |
| Total | $3,013,544.22 |

# Exhibit 24

EXHIBIT C

C1: Subcontract Agreement
C2: Invoices
C3: Delay Summaries
C4: Day Shift and Night Shift Summaries (Unpaid Change Orders)

(Attached hereto)



MINNESOTA
LIMITED
AN HVERGE COMPANY

Subcontractor Agreement
No. SR1916169002

This agreement is made at Big Lake, MN this day of __ January 17, 2020 __.

BETWEEN:

Minnesota Limited, LLC (Contractor)
18640 200ᵗʰ Street – PO Box 410
Big Lake, MN 55309

AND:

THE HDD COMPANY(Subcontractor)
4525 SERRANO PARKWAY, OFFICE SUITE 210
EL DORADO HILLS, CA 95762

RECITALS

Contractor ("Minnesota Limited, LLC) has entered into a contract (the "Prime Contract") with Southern Star Central Gas Pipeline, Inc. ("Owner") to perform certain labor and furnish certain materials for completion of the construction project KS - C60266 Install 31.5 miles of 36" (the "Project"). Subcontractor desires to perform certain services and/or provide certain materials as a subcontractor of Contractor pursuant to the terms and conditions of the Prime Contract, and agrees to the terms and conditions of this Agreement.

AGREEMENT

In consideration of the mutual covenants contained herein, the parties agree as follows:

I.  Subcontractor agrees to supply all the materials and labor and pay all license fees, permits and expenses for the work located at __ Various Sites __ (the "Site"). As full compensation for performance of this Agreement and subject to all applicable provisions of this Agreement, Contractor agrees to pay Subcontractor:
    six million one-hundred eight-five thousand nine-hundred thirty six dollars ($6,185,936.00 )

II. **Contract Document**. Subcontractor's performance hereunder shall be subject to all terms and conditions contained in the Prime Contract and all drawings and/or specifications referred to therein (the "Contract Documents") except as such terms may be specifically amended by this Agreement, which includes HDD's Proposal, attached hereto and incorporated herein. Wherever the Contract Documents shall refer to the Contractor or its agents, the same shall be read to refer to the Subcontractor under this agreement. Subcontractor shall perform and coordinate its work hereunder in a manner necessary to assure the prompt and timely completion of the Project, time being of the essence to the



Agreement. At Subcontractor's request, a copy of the applicable Prime Contract Terms and Conditions will be supplied to Subcontractor.

Any terms and conditions proposed in Subcontractor's acceptance of or in any acknowledgement, invoice, or other form of Subcontractor that add to, vary from, or conflict with these terms hereby objected to. Any such proposed terms shall be void and these terms and conditions (1) shall constitute the complete and exclusive statement of the terms and conditions of the contract between the parties and (2) may be modified only by written instrument executed by the authorized representatives of both parties.

III.     **Insurance**. Subcontractor shall comply with the insurance requirements set forth in Exhibit A (attached).

IV.     **Additional Terms and Conditions**

    A.   Subcontractor, not Contractor, assumes all the risk related to in performing its work under this Agreement, such as any injuries to Subcontractor, Subcontractor's workers, Facility employees and members of the public arising from the Subcontractors activities or use of tools and equipment, or from any other cause.

    B.   Subcontractor will complete all work in a workmanlike and professional manner according to standard practices in the building trade, and in compliance with all building codes and other applicable laws. Subcontractor will warrant against defects in material and labor it supplies for the completion of the work. If subcontractor fails to perform under this Agreement, the party entitled to performance or the Contractor will have the right to hire other persons to correct the defective Work and hold Subcontractor liable for the costs thereof including costs, disbursements and reasonable attorneys' fees incurred in the enforcement of this provision.

    C.   All Work will be done on a timely basis. The work to be performed under this contract shall be commenced as directed by Project Manager or Project Superintendent or Project Foreman and shall be substantially completed on or before _as agreed upon and directed onsite_____. Time is of the essence.

    D.   Subcontractor shall indemnify, defend and hold harmless Contractor as set forth in Section VII.

    E.   No work shall be subcontracted or assigned by Subcontractor without the prior written approval of the Contractor.

    F.   Environmental, Health and Safety. Subcontractor shall take all necessary precautions to keep the work site free from hazards that are likely to cause injury, illness, or death or damage to property. Subcontractor shall provide any Safety Data Sheets (SDS) for any hazardous chemicals provided pursuant to this contract. Contractor is a company that operates under a "Culture of Safety" with the goal of zero incidents, and expects its subcontractor to similarly emphasize the paramount importance of safe behavior. Failure to abide by Contractor's policies may result in immediate removal of Subcontractor from the premises and will be a breach of Subcontractor's obligations hereunder.



Contractor shall have the right, at its option, to conduct a complete audit of Subcontractor's documents and practices to verify Subcontractor's compliance with this Section.

G.  Minnesota Limited has enacted a Subcontractor Management Program and Safety Requirements of which Subcontractor has received. Subcontractor shall follow and adhere to all aspects of said program and the terms and conditions of such program are incorporated herein.

H.  Liens. To the fullest extent permitted by law, and the extent the Contractors has paid the Subcontractor, Subcontractor will at all times keep the Project, the Site and each part thereof free from any attachment, lien, claim of lien, or other encumbrance arising out of the Work and Subcontractor will indemnify, defend and hold Contractor harmless from and against all claims, losses, demands, causes of action or expenses (including attorneys' fees and other costs of defense incurred by Contractor in defending against the foregoing or in enforcing this indemnity and defense obligation) of whatever nature, arising by reason of any such lien, claim of lien, attachment or encumbrance. If any claim is filed to enforce any laborers, material men, mechanic's, or other similar lien arising out of or relating to the Work for which Contractor has paid the Subcontractor, Subcontractor will immediately cause such lien to be released and discharged and if Subcontractor fails to do so, then Contractor will have a right to pay all sums, including attorneys' fees and other costs and expenses incurred necessary to obtain such release and discharge, and hold Subcontractor liable for the amount thereof with the right to deduct all or a portion of such sum from accounts that may be due Subcontractor.

I.  Default. In addition to the other remedies available under law: (a) if Subcontractor should fail or refuse, except in cases where extension of time is provided, to supply enough properly skilled workers or proper materials for the Work; or (b) if Subcontractor should fail to make payment to its subcontractors for material or labor which are due to its Subcontractors, or (c) if Subcontractor should fail to keep and comply with any of the terms and provisions of this Agreement, or (d) if Subcontractor should be adjudged bankrupt, file or suffer to be filed a petition for relief under the Bankruptcy Act, or make a general assignment for the benefit of the creditors; or (e) if a receiver should be appointed on account of Subcontractor's insolvency; or (f) if Subcontractor fails to pay its employees' wages, benefits or tax withholdings; then, in any such event, Contractor may without prejudice to any other right or remedy and after giving Subcontractor and its surety, if any, upon twenty-four hours written notice, terminate its obligation to Subcontractor under this Agreement and take possession of the Site and complete (or cause to be completed) the Work by whatever method Contractor may deem expedient. In such case Subcontractor will not be entitled to receive any further payment until the Work is completed. Upon completion of the Work, Contractor will pay to Subcontractor an amount equal to (x) the unpaid portion of the Subcontract Amount attributable to the Work performed up to the termination less (y) the amount by which (i) the costs incurred by Contractor to complete the Work, including, without limitation, costs for architectural, managerial and administrative services and reasonable attorneys' fees, if legal counsel is employed, exceed (ii) the portion of the Subcontract Amount attributable to the balance of the Work yet to be performed at the time of termination. If the amount calculated under part (y) in the preceding sentence exceeds the amount owing under part (x), the Subcontractor will pay the difference to Contractor. If the amount in part (x) exceeds the amount in part (y), Contractor will pay the difference to Subcontractor.



J.    Subcontractor is an independent Subcontractor and is not an employee or agent of the Contractor and neither Subcontractor nor anyone employed by Subcontractor will be deemed for any purpose to be the agent, employee, servant or representative of Contractor in the performance of the Work. Subcontractor acknowledges and agrees that Contractor will have no direction or control over the means, methods, procedures or manner of the Work performed by Subcontractor or any of its subcontractors, or any of their employees, vendors or suppliers.

K.    No changes shall be made in the work proposed or in the price unless those changes are agreed to in writing by both Subcontractor and Contractor. Travis Gehr and / or ___James Redmond_____, shall be the Contractor's designated on site agent, if there is a dispute regarding whether the work is a change, Subcontractor may perform that work under protest and submit a claim to Contractor in accordance with this Agreement.

L.    Clean Up.  Subcontractor will at all times keep the site or facility safe and free from the accumulation of waste materials or rubbish caused by its operations or related to the Work. Upon completion of the Work and each portion thereof, Subcontractor will remove all rubbish and waste produced by its operations or Work hereunder from the facility as well as all of its tools, equipment, machinery and surplus materials no longer needed and leave the site or facility in a "broom clean" or equivalent condition and safe for Subcontractor's employees and subsequent subcontractors to perform their work, unless otherwise specified in writing. If Subcontractor fails to clean up, Contractor may do so after written notice to Subcontractor and the cost thereof will be charged to Subcontractor.

V.    **Representations of Subcontractor**.  Subcontractor represents and warrants the following:

A.    Subcontractor has examined the Agreement ("Prime Contract") between Owner and Minnesota Limited (if requested by the Subcontractor prior to the execution of the work) and agrees to all provisions affecting Subcontractors performance, including but not limited to the representations, obligations and warranties made by Minnesota Limited to the Owner.

B.    Subcontractor has the requisite authority and ability to perform the subcontract without delay.

C.    Subcontractor will not assign, subcontract or otherwise delegate its responsibilities and obligation hereunder without the written consent of Contractor.

D.    Subcontractor shall examined the specifications, site conditions, drawings and requirements of the work with due diligence and its bid has taken into consideration all conditions and risks which are reasonably related to the performance of the work.

E.    Ethics; Conflict of Interest.  Subcontractor shall at all times during the performance of its obligations hereunder conform to sound ethical business practices in conformance with all applicable Laws and shall in its business practices promote the values of honesty, integrity, social responsibility, and human rights.  Subcontractor shall not offer to any member of Contractor (including employees thereof) any gifts, entertainment, or other favors beyond the common courtesy usually associated with business practices.  Subcontractor shall not pay any commissions or fees or grant any rebates or other



remuneration or monetary gratuity to any employee of Contractor. Subcontractor shall not grant any secret rebates nor pay any commissions or fees to any employee of Contractor.

F.   Invitees Prohibited. Subcontractor shall not, without prior written permission of Contractor, invite, permit entry or bring any Person onto the Contractor's Worksite or property who is not an employee of Subcontractor.

G.   Subcontractor will pay its employees promptly and maintain good labor relations. Subcontractor further represents that it has paid all union benefit contributions including fringe benefits. Subcontractor agrees that Contractor upon demand of the Labor Union, may withhold from any sums due Subcontractor and pay to the Administrator of the Plan any amounts owing and said payment shall be deducted from the invoice.

VI.   **Warranty**.

A.   Subcontractor warrants to the Contractor and Owner that all materials and equipment furnished under this Agreement will be new unless otherwise specified in writing, and that all work will be of good quality, free from faults and defects and in conformance with any Purchase Order and attachments thereto, including any specifications stipulated therein. All Work not so conforming to these standards may be considered defective, and the Subcontractor shall promptly repair and make good, after notice by the Contractor and Owner and without cost to the Contractor and Owner, any damages, defects or faults resulting from imperfect or defective Work done or materials furnished by the Subcontractor. The Subcontractor warrants that all labor, materials and equipment furnished under this Agreement shall be covered by warranty for a period of at least two (2) years (or during a longer period if required by the specifications and stipulated therein) from the date of acceptance of the completed Work by the Owner.

B.   Where material or equipment furnished by the Subcontractor is covered by a manufacturer's warranty or guarantee or other special warranty or guarantee the Subcontractor shall provide such warranty and provide additional or extended warranty or guarantees to the Contractor for its labor, materials and equipment to confirm to paragraph A above.

VII.   **Indemnification**.   To the fullest extent permitted by law, the Subcontractor shall indemnify the Owner, Contractor and the agents and employees of any of them from and against claims, damages, losses and expenses, arising out of or in connection with, or resulting from the negligent performance of the Subcontractor's work, the Subcontractor's subcontractors work, or anyone directly or indirectly employed by them but only to the extent caused by acts or omissions by either or any of them. In addition thereto, Subcontractor indemnifies Owner, Contractor and the agents and employees of any of them for expenses including attorney's fees and costs, incurred in responding to and defending against any claim or in enforcing this provision.

VIII.   **Payment**. Subcontractor shall invoice Minnesota Limited no later than 30 days after date of service. Contractor agrees to pay Subcontractor all sums due less   10   % retainage (if applicable) hereunder within



thirty (30) days from the date the invoice is received. However, it is a condition precedent to payment that if Owner withholds payments for that portion of any work performed by Subcontractor, then Minnesota Limited is only obligated to pay Subcontractor after receiving payment from the Owner. In such event payment will be made within ten (10) days. Contractor reserves the right to withhold such sums as may be necessary to pay expenses, including costs and attomey's fees, caused by, or related to, Subcontractor's breach of Agreement. Final payment of retainage will occur ten (10) days after final payment for Subcontractor's work is received and when lien waivers and job completion affidavit are executed.

IX.     **Maintaining Records / Audit.** For a period of five (5) years from final acceptance of Subcontractor's work, Subcontractor shall maintain all job records and shall, upon reasonable notice by Contractor, but no later than 10 business days, make such records available for inspection by Contractor or Owner. Contractor or Owner or their representatives may audit said records. If the results of the audit show an overpayment, Subcontractor shall reimburse the overpayment ~~together with interest of 1% per month. If the audit shows an overpayment more than one thousand dollars ($1,000), Subcontractor shall also reimburse Contractor or Company for the cost of the audit.~~

X.      **Interpretations and Enforcement.** The Agreement and contract documentation contains the parties entire understanding with regard to the subject hereof and shall not be modified except by a writing signed by both parties; provided, however, that Subcontractor shall be bound by changes in the Contract Documents agreed to between the Contractor and Owner, but only if Contractor has timely notified Subcontractor of such changes.. The interpretation and enforcement of this Agreement shall be governed by the laws of the state in which the work hereunder is to be performed or that specified in the Prime Contract if different than the state where the work is to be performed. If any provision hereof is deemed unenforceable, the remainder of the Agreement shall be enforced as though such provision were not a part hereof.

XI.     **Assignment.** Subcontractor shall not assign or subcontract this Agreement or any portion thereof or of any money due or which may become due hereunder without the prior written consent of Contractor. Notwithstanding anything to the contrary contained herein, Contractor may assign this Agreement without the consent of Subcontractor.

XII.    **Confidentiality of Agreement.** The Subcontractor agrees that all terms and conditions contained herein or in any other document(s) referencing the Project shall remain confidential. Said terms shall not be disclosed without the express written consent of the Contractor.

Minnesota Limited is required to protect all technical information supplied by the Owner. Subcontractor agrees that this Section is its written assurance that all such information, including but not limited to: drawings, diagrams, surveys, specifications, locations, and geophysical (GPS) coordinates of the work, will be kept confidential, protected, and will not be disclosed to third parties without obtaining Minnesota Limited's written consent unless ordered to do so by a court of law or arbitrator.. Breach of is provision will subject Subcontractor to all remedies awarded to Contractor and Owner including injunctive relief. Subcontractor agrees to pay all of Contractors and Owners attorney's fees in enforcing this provision.



**MINNESOTA LIMITED**
AN MVERGE COMPANY

XII.    **Notice.** Unless otherwise provided herein, any notice provided for herein will be in writing and delivered to the parties (a) in person, (b) by facsimile transmission (with the original and a copy of the facsimile confirmation following in the United States mail), (c) by overnight delivery service, or (d) by certified mail, return receipt requested. Notice will go to the address first shown herein for the respective party to whom notice is given or to such other address as may be designated by either party by written notice given pursuant hereto.

XIV.    **Governing Law/Venue/Attorney Fees.** This Agreement shall be construed and interpreted in accordance with the laws of the State of Minnesota, including, without limitation, matters of construction, validity, enforcement, and interpretation. The parties agree that venue for any dispute under this Agreement shall be in the District Court of Hennepin County, Minnesota. In the event any enforcement effort is initiated by Contractor against Subcontractor for default of this Agreement, ~~Subcontractor shall be liable to Contractor for any and all costs of collection, including but not limited to, reasonable attorneys' and professional fees, court costs, traveling and lodging expenses, costs of investigation and defense, accrued interest, and any other reasonable expenses incurred by Contractor in initiating such efforts.~~

Signed the day and year first written above.

CONTRACTOR: **Minnesota Limited, LLC.**

By: _____

Its: ___Vresident___
        Title

SUBCONTRACTOR: THE HDD COMPANY

By: _____

Its: ___Vice President___
        Title



## EXHIBIT A
### Insurance

Prior to commencing Work, Subcontractor shall, at its sole expense, procure and maintain insurance of the types, and in the form and amounts described below from insurer(s) authorized to transact business in the state where Work or operations will be performed by Subcontractor. Such insurance and required coverage in forms acceptable to General Contractor shall be placed with admitted insurers that maintain an A.M. Best's rating of not less than A- VII, unless otherwise approved by the General Contractor. The insurance requirements described below shall be maintained uninterrupted for the duration of the Project, including any warranty periods, and shall protect Subcontractor, and others for whom and/or to whom Subcontractor may be liable, for liabilities in connection with work performed by or on behalf of Subcontractor, its agents, representatives, employees or subcontractors.

### Insurance Requirements:

1.    **Commercial General and Umbrella Liability Insurance.** Subcontractor shall maintain commercial general liability ("CGL") and, if necessary, commercial umbrella insurance, with a limit of not less than $\underline{2,000,000.00}$ per occurrence, bodily injury or property damage liability; $\underline{2,000,000.00}$ per offense, personal and advertising injury liability; $\underline{5,000,000.00}$ products-completed operations aggregate; and $\underline{5,000,000.00}$ general aggregate applicable to claims other than products-completed operations. To the extent that Subcontractor's CGL and any commercial umbrella insurance are subject to aggregate limits, the policy shall be endorsed so as to apply such aggregate limits separately to the Project.

Coverage afforded under Subcontractor's CGL and any commercial umbrella insurance shall be provided on an occurrence basis and shall be subject to the terms of the *Insurance Services Office ("ISO") Commercial General Liability Coverage Form CG 0001*, or a substitute form providing coverage at least as broad as the ISO form specified. There shall be no limitations or exclusions of coverage beyond those contained in the standard coverage form and coverage shall include liability arising from premises, operations, independent contractors, products-completed operations including construction defect, contractual liability or personal injury and advertising injury.

General Contractor, its officers, directors and employees and Project Owner(s) shall be included as additional insureds under Subcontractor's CGL, and any commercial umbrella insurance, with respect to liabilities arising out of both the ongoing and completed operations of Subcontractor. Such additional insured coverage shall be subject to the terms of ISO additional insured endorsement forms CG 2010 (ongoing operations) and form CG 2037 (products-completed operations), or substitute form(s) providing equivalent coverage. The edition date of the ISO endorsements required should be chosen based on the recipient's risk transfer objectives. The table below summarizes the options and major differences between the edition dates.

| Endorsement(s) | ISO Edition Date | Comments |
|---|---|---|
| CG 2010 | 11/85 Edition | Broadest Insuring Agreement - "liability arising out of" the Subcontractor's work - both ongoing |



| | | operations and completed operations coverage provided by one endorsement. |
|---|---|---|
| CG 2010/CG2037 | 10/01 Edition | Same Insuring Agreement as 11/85 with ongoing operations and completed operations coverage provided by separate endorsements. |
| CG 2010/CG2037 | 07/04 Edition | More narrow Insuring Agreement – "caused in whole or in party by. . . .acts or omissions" of the Subcontractor. |
| CG2010/CG2037 | 04/13 Edition | Same Insuring Agreement as 07/04, but limits coverage to "extent permitted by law" and "not be broader than that which you are required by the contract or agreement to provide." |

Note: Recommended Additional Insured endorsement for states other than Minnesota may vary and Willis should be consulted. States including but not limited to IL, TX, & CA involve unique risk transfer considerations.

Additional insured coverage afforded by Subcontractors CGL, and any commercial umbrella insurance, shall be primary and non-contributing with respect to any insurance or self-insurance available to General Contractor or Project Owner. Such primary and non-contributory insurance shall be subject to the terms of ISO form CG 2001 (Primary and Noncontributory - Other Insurance Condition) or its equivalent. Any other insurance or self-insurance maintained by General Contractor or Project owner shall be excess of, and non-contributory with, the coverage afforded by Subcontractors CGL and commercial umbrella insurance, if any.

In addition to procuring and maintaining CGL, and any commercial umbrella insurance, for the duration of the contract, Subcontractor agrees to continue to procure and maintain the products-completed operations liability insurance coverage for a minimum of __two__ ( 2 ) year(s) after the date that the Work is substantially complete. All terms and conditions of such coverage shall be maintained during this completed operations period, including the required coverage limits and the requirement to provide General Contractor and Project Owner with coverage as an additional insured for completed operations.

2.     **Commercial Automobile and Umbrella Liability Insurance**.     Subcontractor shall maintain automobile liability and, if necessary, commercial umbrella insurance, with a limit of not less than $__2,000,000.00__ each accident. Such insurance shall cover liability for bodily injury and property damage arising from the use or operation of any auto, including those owned, hired or otherwise operated or used by or on behalf of Subcontractor. The coverage shall be subject to the terms of ISO *Business Auto Coverage Form CA 0001* (1990 edition or later), or a substitute form providing equivalent coverage.

3.     **Workers' Compensation and Employers Liability Insurance**.     Subcontractor shall maintain workers' compensation coverage providing statutory benefits. Subcontractor shall additionally maintain employers liability insurance, and if necessary, commercial umbrella insurance, with a limit of not less than: $1,000,000, bodily injury by accident – each accident; $1,000,000, bodily injury by disease-policy limit; and $1,000,000, bodily injury by disease each employee. Workers' Compensation coverage must extend to every



employee, including owners/officers of a closely held corporation and/or individuals operating as a sole proprietorship or partnership. **Workers' Compensation must provide coverage in the state where the Project is located**.

Where applicable, evidence of coverage shall be required for U.S. Longshore and Harbor Workers Compensation, Maritime coverage, Federal Employer's Liability Act and other unique exposures requiring endorsement of coverage.

4. **Contractors Pollution Liability Insurance**. Required only if Subcontractor's scope of services include the remediation, treatment, storage or disposal of waste or hazardous materials on or about the project site, as determined by General Contractor. If required, Subcontractor shall maintain Contractors Pollution Liability coverage with a limit of not less than $_____n/a_____ per occurrence, $_____n/a_____ annual aggregate. Coverage shall apply to the scope of work as described under the Contract including transportation and shall include coverage for bodily injury; property damage, including loss of use of damaged property or property that has not been physically injured; clean-up costs; mold; defense and investigative costs. Subcontractor shall maintain Completed Operations coverage for _____n/a_____ years following final acceptance of the project or termination of the Contract.

If the scope of services in the contract require the Subcontractor to provide professional services associated with arranging for, or brokering of, hazardous material or construction and demolition (C&D) wastes off the job site, Subcontractor must amend the Contractors Pollution Liability policy to include coverage to address this scope of work. If any of the aforementioned insurance policies are written on a claims made basis, the Contractor warrants that continuous coverage will be maintained, or an extended discovery period will be exercised, for a period of three years beginning from the time the work under this contract is completed.

5. **Pollution (Environmental) Liability Insurance**. Required only if Subcontractor's scope of services involves disposal of waste or hazardous materials off-site, as determined by General Contractor. If required, Subcontractor shall maintain pollution (environmental) liability coverage with a limit of not less than: $_____n/a_____ per incident, $_____n/a_____ policy aggregate for hazardous waste disposal services, and $_____n/a_____ per incident, $_____n/a_____ for all other disposal facilities. Such coverage shall include clean-up costs, defense costs and products and completed operations.

If the scope of services in the contract requires the disposal of any hazardous materials or construction and demolition (C&D) wastes off the job site, Subcontractor must also obtain evidence that the Disposal Site Operator maintains Pollution Legal Liability Insurance with coverage for; a. bodily injury, sickness, disease, mental anguish or shock sustained by any person, including death; b. property damage including physical injury to or destruction of tangible property including the resulting loss of use thereof, clean-up costs, and the loss of use of tangible property that has not been physically injured or destroyed; c. defense including costs, charges and expenses incurred in the investigation, adjustment or defense of claims for such compensatory damages. d. pollution conditions on, at, under or emanating from any disposal site, location or facility, used by or on behalf of the disposal facility of any waste or waste materials relating to the performance of the work.



The Disposal Site Operator's Pollution Liability Policy will apply to losses arising from the facility that is accepting the waste under the contract. Minimum limits of insurance for this policy shall be $_____n/a_____ each incident / $_____n/a_____ policy aggregate.

Claims-made coverage is permitted, provided the policy retroactive date is continuously maintained prior to the commencement date of the agreement, and coverage is continuously maintained during all periods in which Subcontractor accepts or treats waste generated from General Contractor's projects and for a period of *one (1)* year thereafter.

6.      **Professional Liability Insurance.**   Required only if Subcontractor's scope of services include architectural, engineering, professional consulting or construction management, as determined by General Contractor. If required, Subcontractor shall maintain professional liability coverage with a limit of not less than $_____n/a_____ each wrongful act, $_____n/a_____ policy aggregate.

Coverage shall include liability arising from the errors, omissions or acts of the Subcontractor or any entity for which the Subcontractor is legally responsible in the providing of professional services under the Contract. Throughout the term the Contract, the PL/E&O policy shall include full prior acts coverage. Coverage shall be continuously maintained during the term of this Agreement and for a period of x years following final acceptance of the Project or termination of the Contract.

Coverage shall not include any exclusion or other limitations related to:
*   Scope of the professional services
*   Delays in project completion and cost overruns
*   Who is authorized to notify the carrier of a claim or potential claim
*   Mold, fungus, asbestos, pollutants or other hazardous substances

Claims-made coverage is permitted, provided the policy retroactive date is continuously maintained prior to the commencement date of this agreement, and coverage is continuously maintained during all periods in which Subcontractor performs professional services for General Contractor, and for an additional period of *one (1)* year after termination of this agreement or the last date such services are performed, whichever comes later. If Subcontractor's scope of work includes environmental engineering or consulting, the terms of coverage shall not exclude environmental professional services.

7.      **Watercraft Liability Insurance.**   If watercraft of any kind is used by the CONTRACTOR or Subcontractor, including: (i) bodily injury; (ii) property damage; and (iii) passenger liability.

        a.      Limit of Liability: Combined Single Limit (Bodily Injury and Property Damage), $1,000,000 each occurrence;
        b.      Protection and Indemnity Insurance to include Jones Act crew coverage (or at least Maritime Employer's Liability: MEL), collision, tower's liability and wreck removal coverage, on a form providing



coverage no less extensive than that afforded in the P & I SP-23 form (revised 1/56), including a pollution buy-back endorsement.

8.      **Aircraft Liability Insurance**. If aircraft of any kind is used by the CONTRACTOR or Subcontractor, including: (i) bodily injury; (ii) property damage; and (iii) passenger liability.

      a.      Limit of Liability: Combined Single Limit (Bodily Injury and Property Damage and Passenger Liability), including hull physical damage insurance for the full replacement cost of each aircraft used    in the work.  Such Aircraft Liability and Hull Coverage shall include a waiver of subrogation against General Contractor and all others required by this Agreement to be additional insureds. $ ___n/a___ per seat; $___n/a___ per occurrence.

**Additional Provisions:**

1.      **Deductibles and Self-Insured Retentions**. The funding of deductibles and self-insured retentions maintained by Subcontractor shall be the sole responsibility of Subcontractor, including any amounts applicable to deductibles or self-insured retentions applicable to claims involving the General Contractor or Owner as an additional insured. Any self-insured retentions in excess of $___n/a___ must be declared to and approved by the General Contractor.

2.      **Primary / Non-Contributing**.  Subcontractor's required insurance coverage shall be primary insurance, and any insurance or self-insurance maintained by the General Contractor or Project Owner shall be excess of and noncontributory with Subcontractor's insurance.

3.      **Severability of Interest**. Except with respect to the limits of insurance, Subcontractor's required insurance shall apply separately to each insured or additional insured.

4.      **Waiver of Subrogation**. Subcontractor agrees to waive all rights of subrogation against the General Contractor, Project Owner and Project Architect, and shall cause each of its subcontractors to waive all rights of subrogation against the General Contractor, Project Owner and Project Architect, their agents and employees, as respects loss, damage, claims, suits or demands, howsoever caused:

      a.   To real or personal property, vehicles, equipment, tools, etc. owned, leased or used by Subcontractor or Subcontractor's employees, agents or sub-subcontractors; and

      b.   To the extent such loss, damage, claims, suits or demands are, or should be, afforded coverage by the Subcontractor's required insurance or any other insurance (except professional liability to which this requirement does not apply) maintained by the Subcontractor. This waiver shall C1PPIY to all first party property, equipment, vehicle and workers' compensation claims (unless prohibited under applicable state statutes), and all third party liability claims. This waiver shall apply to all deductibles, retentions or self-insured layers applicable to the required or any other insurance (except professional liability to which this requirement does not apply) maintained by the Subcontractor. If necessary, Subcontractor agrees to endorse the required insurance policies to permit waivers of subrogation in



favor of General Contractor, Project Owner and Project Architect as required hereunder. Subcontractor further agrees to hold harmless and indemnify General Contractor, Project Owner and Project Architect for any loss or expense incurred as a result of Subcontractor's failure to obtain such waivers of subrogation from the insurers.

5. **Notice of Cancellation / Material Change / Nonrenewal**. Subcontractor's insurance policies must contain a provision or endorsement that the coverage afforded will not be canceled, materially changed or renewal refused until at least 30 days prior Written Notice has been given to General Contractor and to each other additional insured to whom a certificate of insurance has been issued; provided, however, that a ten (10) day prior notice requirement may apply in the event of cancellation due to nonpayment of premium.

6. **Verification of Coverage**. Prior to commencing Work, Subcontractor shall furnish General Contractor with certificate(s) of insurance executed by a duly authorized representative of each insurer, as evidence of compliance with the insurance requirements set forth above. Such certificates of insurance shall be accompanied by copies of endorsements evidencing coverage afforded to General Contractor and Project Owner as additional insured, and endorsements reflecting insurer's concurrence with Subcontractor's waiver of subrogation rights against General Contractor, Project Owner and Project Architect. Renewal certificates are to be provided to the General Contractor prior to the expiration of the required insurance policies.
Certified copies of policies, including all policy endorsements, shall be furnished by Subcontractor within 15 days of written request by General Contractor.

The certificate(s) of insurance shall be subject to approval of General Contractor, but failure of General Contractor to request such certificate or other evidence of Subcontractor compliance with insurance requirements, or failure of General Contractor to identify deficiencies from evidence that is provided, shall in no way limit or relieve Subcontractor of its obligations to maintain such insurance.

7. **Sub-Subcontractors**. No work shall be sublet to any Sub-subcontractor without first obtaining the General Contractor's written permission. All Sub-subcontractors, once approved by the General Contractor, are subject to the same insurance requirements as Subcontractor. Subcontractor shall cause each Sub-subcontractor employed by Subcontractor to purchase and maintain such insurance. Upon request, Subcontractor shall furnish General Contractor with copies of certificates of insurance evidencing coverage for each Sub-subcontractor.

Subcontractor shall voluntarily provide workers compensation coverage for proprietors, partners or others not statutorily required to maintain workers' compensation insurance.

8. **Leased Employees**. Use of leased employees by Subcontractor is expressly prohibited without General Contractor's written permission. If permitted by General Contractor, Subcontractor shall:

    a.      Provide General Contractor with a complete copy of its Agreement with the Leasing Company;



MINNESOTA LIMITED
AN MVERGE COMPANY

b.      Require that Leasing Company provide workers' compensation, employers liability and commercial general liability with coverage limits in amounts no less than Subcontractor insurance requirements for the same coverages.

c.      Require that Leasing Company provide Alternate Employer Endorsement naming General Contractor as alternate employer on Leasing Company's workers' compensation policy.

d.      Require that Leasing Company add General Contractor as an additional insured on its commercial general liability insurance policy, with primary/non-contributory wording.

e.      Require that Leasing Company provide waiver of subrogation in favor of General Contractor on both Leasing Company's workers' compensation and commercial general liability insurance policies.

f.      Provide General Contractor with a copy of the Leasing Company's certificate of insurance, with endorsements, evidencing the required coverage.

9.      **No Representation of Coverage Adequacy.** In specifying minimum Subcontractor insurance requirements, General Contractor does not represent that such insurance is adequate to protect Subcontractor for loss, damage or liability arising from its work. Subcontractor is solely responsible to inform itself of types or amounts of insurance it may need beyond these requirements to protect itself.

The insurance requirements set forth in minimum amounts shall not be construed to relieve Subcontractor for liability in excess of such coverage, nor shall it preclude General Contractor from taking such other actions as is available to it under any other provision of the Subcontract. To the extent Subcontractor maintains insurance greater than these minimum requirements, Subcontractor agrees that such insurance shall be applicable to any of Subcontractor's liability obligations hereunder.

Any acceptance of certificates of insurance by General Contractor shall in no way limit or relieve Subcontractor of its duties and responsibilities under this Subcontract, including the duty to indemnify and hold harmless General Contractor.

10.      **Compliance.** Failure of Subcontractor to maintain the required insurance shall constitute a default under this Subcontract and, at General Contractor's option, shall allow General Contractor to terminate this Subcontract for cause, withhold payment and/or purchase the required insurance at Subcontractor's expense.

11.      **Cross-Liability Coverage/Non-Standard Restrictive Endorsements.** All liability policies shall include cross liability coverage and a standard ISO separation of insureds provision, or its equivalent. No liability policy shall include or be endorsed to include any non-standard provisions restricting coverage for the named insured or the persons/entities required to be named as additional insureds under this Agreement, including but not limited to cross liability coverage exclusions or limitations.



**THE HDD COMPANY**

EL DORADO HILLS | OFFICE Suite 310
4526 Serrano Parkway, El Dorado Hills, CA USA 95762

MAIN 530 676 5700 | CROSSINGGROUP.COM

January 9, 2020

**Minnesota Limited**
18640 200th St, PO Box 410
Big Lake, MN 55309

ATTN: Amy Skuza

RE:     Southern Star Lines DT and DS Replacement Project
        Directionally drill and install approximately 6,052 feet of 36-inch steel pipeline in
        Anderson and Franklin Counties, KS.

The HDD Company is pleased to submit the following bid quote:

1.   **Responsibilities of The HDD Company**
     1.1.   Provide all required insurance certificates.
     1.2.   Provide any written submittals and qualifications required.
     1.3.   Provide 2 (two) drill rig(s) with sufficient capabilities to install the crossings, a
            closed-loop mud system, mud pumps, vacuum trucks, dump trucks, steering
            system, and all drill spread support equipment necessary.
     1.4.   Provide all required union labor for the drilling operations.
     1.5.   Provide preliminary drill profiles for each crossing.
     1.6.   Provide final as-built drawings.
     1.7.   Provide and haul water for drilling operations.
     1.8.   Provide water storage for the duration of drilling operations.
     1.9.   Provide all required pulling heads.
     1.10.  Leave the entry areas clean, free of debris, and to a rough grade.
     1.11.  Provide bonding at 1%, which is not included in the bid pricing below.

2.   **Responsibilities of THE CONTRACTOR**
     2.1.   Stake and survey the entry and exit points for each bore, with correct stations
            and elevations.
     2.2.   Provide all permitting to undertake the project.
     2.3.   Provide and maintain suitable truck access to and from entry and exit locations.
     2.4.   Provide stable, level, matted and/or graveled work pads for each bore.
     2.5.   Provide all BMPs around each bore's entry and exit locations. The HDD
            Company will maintain these items.
     2.6.   Provide, string, weld, and test all 36-inch pipe for each bore.

Going to Greater Lengths™

2.7. Provide all plans, equipment, and manpower to handle pipe during pullback operations.
2.8. Perform all final tie-ins.
2.9. Provide all settlement monitoring, if required.
2.10. Provide all final site restorations.
2.11. Provide all field surveys to document existing conditions for the HDD installations, including but not limited to pictures, videos, field notes, etc.

## 3. Pricing (Lump Sum)

| | | |
|---|---|---|
| 3.1. | HDD Cedar Creek 2,106' X 36" pipe: | $1,280,448.00 |
| 3.2. | HDD Pottawapomie Creek 1,788' X 36" pipe: | $1,087,104.00 |
| 3.3. | HDD Flint Hill 2,158' X 36" pipe: | $1,312,064.00 |
| 3.4. | Mobilization per rig spread: | $50,000.00 |

## 4. Clarifications

4.1. Additional footage due to no fault of The HDD Company, will be billed at $608.00/LF.
4.2. This proposal is based upon the drawings, specifications, and geotechnical information provided to us on or before **7 June 2019.**
4.3. If any revised or additional drawings, specifications, geotechnical information, or permits are provided to us after the bid submission date, The HDD Company reserves the right to modify the proposal to account for any added costs and/or additional time associated with the change(s).
4.4. The HDD Company's bid proposal is conditional upon reaching an agreement upon mutually acceptable contract terms. This bid proposal will be attached to and forms a part of the contract between The HDD Company and THE CONTRACTOR.
4.5. Item 3.3 above includes the hauling and disposal of all **non-contaminated** drilled solids and excess drilling fluids.
4.6. The pricing above is contingent upon a site visit.

## 5. Exclusions

5.1. The HDD Company and its personnel are not the Project Engineers. Therefore, we exclude all design and engineering services unless any are specifically noted as included in this proposal. Any drilling plans or profiles that we submit to you will be based upon the design information in the contract documents and our experience as HDD contractors. Any plans or profiles we provide are recommendations only and are subject to review and approval by the project owner and/or its engineers.
5.2. All permits, including federal, State and local environmental permits, the SWPPP permit and any associated SWPPP plans, any right-of-way (ROW) agreement or easements, and all access necessary for us to perform our work shall be provided by others. If our operations are delayed or otherwise impacted by any delays or problems with permits, SWPPP plans, ROW agreements, easements or access arrangements our compensation and time for completion will be equitably adjusted.

Going to Greater Lengths™

6. **Terms and Conditions**
   6.1. Schedule
      6.1.1. This proposal is based upon performance under a reasonable and mutually agreed-to project schedule in so far as that schedule applies to our work. The approved project baseline schedule and all monthly updates must be provided to us on a regular and timely basis to keep us apprised of schedule changes which may impact the timing and efficiency of our work. We will not be liable for any delays caused by others or by factors beyond our reasonable control.
   6.2. Indemnification
      6.2.1. We will indemnify you and/or the project owner for personal injury or property damage claims to the extent of our own negligence. Our proposal excludes any obligation to indemnify you for your own negligence or to indemnify any other party for that party's own negligence or to indemnify any design professional.
   6.3. Payment
      6.3.1. Monthly progress payments will be made to The HDD Company within (7) seven days after you receive each monthly payment from the project owner, but in no event later than 120 days from the date you received your invoice.
      6.3.2. We will receive our final payment within 30 days after you receive our final billing and our work has been completed and accepted. Acceptance will not be unreasonably withheld or delayed. If you dispute any portion of any billing, you will promptly notify us in writing of the nature of the dispute and you will pay the undisputed portion of the billing without delay. If any undisputed amounts are past due for more than 10 days, we reserve the right to stop work until all payments are brought current. We will provide lien releases in accordance with applicable state statutes or regulations. We will keep the project free of liens from out subcontractors, suppliers and other vendors provided we have been paid by you for the work covered by any such liens.
   6.4. Extra/Force Account Work:
      6.4.1. If we are directed to perform any work on a force account or time and material basis, the rates for our labor and equipment will be as stated in our proposal, or if no rates are included with this proposal, as stated in our then current standard labor and equipment rate schedule. If we are directed to standby or suspend work while other operations occur, or delays or other problems are resolved, or if we are required to standby due to events or circumstances beyond our control, the standby time for our labor and equipment will be paid as stated in this proposal.
   6.5. Differing Site Conditions

6.5.1. If the conditions we encounter in the performance of our work differ materially from those indicated in the contract documents, boring logs, geotechnical reports or other information furnished to us prior to bid, or from those ordinarily encountered and generally recognized as inherent in the type of work provided for in our proposal, then our compensation and time for completion will be equitably adjusted to account for any resulting delay and added costs.

7. **Delays and Work Stoppages:**

7.1. All work stoppages that arise through no fault of The HDD Company will be billed at **$14,500** (no crew on site).

The HDD Company appreciates the opportunity to furnish you this quote and looks forward to working with you. Should any of the information presented above need further clarification, please do not hesitate to contact us.

Sincerely,
**The HDD Company**

Jeremy King
Vice President

Going to Greater Lengths™



THE HDD COMPANY

EL DORADO HILLS | OFFICE Suite 210
4525 Serrano Parkway, El Dorado Hills, CA USA 95762

MAIN 530 676 5705 | CROSSINGGROUP.COM

17 January 2020

**Minnesota Limited**
18640 200th St, PO Box 410
Big Lake, MN 55309

ATTN: Brad Cordes

RE:    Southern Star Lines DT and DS Replacement Project
       Directionally drill and install approximately 4540 feet of 36-inch steel pipeline road
       crossings in Anderson and Franklin Counties, KS.

The HDD Company is pleased to submit the following bid quote:

1. **Responsibilities of The HDD Company**
   1.1. Provide all required insurance certificates.
   1.2. Provide any written submittals and qualifications required.
   1.3. Provide drill rig(s) with sufficient capabilities to install the crossings, a closed-loop mud system, mud pumps, vacuum trucks, dump trucks, steering system, and all drill spread support equipment necessary.
   1.4. Provide all required union labor for the drilling operations.
   1.5. Provide final as-built drawings.
   1.6. Provide and haul water for drilling operations.
   1.7. Provide water storage for the duration of drilling operations.
   1.8. Provide all required pulling heads.
   1.9. Leave the entry areas clean, free of debris, and to a rough grade.
   1.10. Provide bonding at 1%, which is not included in the bid pricing below.

2. **Responsibilities of THE CONTRACTOR**
   2.1. Stake and survey the entry and exit points for each bore, with correct stations and elevations.
   2.2. Provide all permitting to undertake the project.
   2.3. Provide and maintain suitable truck access to and from entry and exit locations.
   2.4. Provide stable, level, matted and/or graveled work pads for each bore.
   2.5. Provide bore pits and shore if needed.
   2.6. Provide all BMPs around each bore's entry and exit locations. The HDD Company will maintain these items.
   2.7. Provide, string, weld, and test all 36-inch pipe for each bore.
   2.8. Furnish support crew for road crossings, including excavators and manpower.

Going to Greater Lengths™

2.9. Provide all plans, equipment, and manpower to handle pipe during pullback operations.
2.10. Perform all final tie-ins.
2.11. Dispose of cuttings.
2.12. Provide all settlement monitoring, if required.
2.13. Provide all final site restorations.
2.14. Provide all field surveys to document existing conditions for the HDD installations, including but not limited to pictures, videos, field notes, etc.

3. **Pricing**

| | | |
|---|---|---|
| 3.1. | 4540' X 36" pipe: | **$508.00/ft** |
| 3.2. | Mobilization per rig spread: | **$50,000.00** |

4. **Clarifications**
   4.1. This proposal is based upon the drawings, specifications, and geotechnical information provided to us on or before **17 January 2020.**
   4.2. If any revised or additional drawings, specifications, geotechnical information, or permits are provided to us after the bid submission date, The HDD Company reserves the right to modify the proposal to account for any added costs and/or additional time associated with the change(s).
   4.3. The HDD Company's bid proposal is conditional upon reaching an agreement upon mutually acceptable contract terms. This bid proposal will be attached to and forms a part of the contract between The HDD Company and THE CONTRACTOR.
   4.4. The pricing above is contingent upon a site visit.

5. **Exclusions**
   5.1. The HDD Company and its personnel are not engineers. Therefore, we exclude all design and engineering services unless any are specifically noted as included in this proposal. Any drilling plans or profiles that we submit to you will be based upon the design information in the contract documents and our experience as HDD contractors. Any plans or profiles we provide are recommendations only and are subject to review and approval by the project owner and/or its engineers.
   5.2. All permits, including federal, State and local environmental permits, the SWPPP permit and any associated SWPPP plans, any right-of-way (ROW) agreement or easements, and all access necessary for us to perform our work shall be provided by others. If our operations are delayed or otherwise impacted by any delays or problems with permits, SWPPP plans, ROW agreements, easements or access arrangements our compensation and time for completion will be equitably adjusted.

6. **Terms and Conditions**
   6.1. Schedule
      6.1.1. This proposal is based upon performance under a reasonable and mutually agreed-to project schedule in so far as that schedule applies to our work. The approved project baseline schedule and all monthly updates must be provided to us on a regular and timely basis to keep

Going to Greater Lengths™

> us apprised of schedule changes which may impact the timing and efficiency of our work. We will not be liable for any delays caused by others or by factors beyond our reasonable control.

6.2. Indemnification

    6.2.1. We will indemnify you and/or the project owner for personal injury or property damage claims to the extent of our own negligence. Our proposal excludes any obligation to indemnify you for your own negligence or to indemnify any other party for that party's own negligence or to indemnify any design professional.

6.3. Payment

    6.3.1. Monthly progress payments will be made to The HDD Company within (7) seven days after you receive each monthly payment from the project owner, but in no event later than 120 days from the date you received your invoice.

    6.3.2. We will receive our final payment within 30 days after you receive our final billing and our work has been completed and accepted. Acceptance will not be unreasonably withheld or delayed. If you dispute any portion of any billing, you will promptly notify us in writing of the nature of the dispute and you will pay the undisputed portion of the billing without delay. If any undisputed amounts are past due for more than 10 days, we reserve the right to stop work until all payments are brought current. We will provide lien releases in accordance with applicable state statutes or regulations. We will keep the project free of liens from out subcontractors, suppliers and other vendors provided we have been paid by you for the work covered by any such liens.

6.4. Extra/Force Account Work:

    6.4.1. If we are directed to perform any work on a force account or time and material basis, the rates for our labor and equipment will be as stated in our proposal, or if no rates are included with this proposal, as stated in our then current standard labor and equipment rate schedule. If we are directed to standby or suspend work while other operations occur, or delays or other problems are resolved, or if we are required to standby due to events or circumstances beyond our control, the standby time for our labor and equipment will be paid as stated in this proposal.

6.5. Differing Site Conditions

    6.5.1. If the conditions we encounter in the performance of our work differ materially from those indicated in the contract documents, boring logs, geotechnical reports or other information furnished to us prior to bid, or from those ordinarily encountered and generally recognized as inherent in the type of work provided for in our proposal, then our compensation and time for completion will be equitably adjusted to account for any resulting delay and added costs.

Going to Greater Lengths™

7.  **Delays and Work Stoppages:**
    7.1. All work stoppages that arise through no fault of The HDD Company will be billed at **$14,500** (no crew on site).

The HDD Company appreciates the opportunity to furnish you this quote and looks forward to working with you. Should any of the information presented above need further clarification, please do not hesitate to contact us.

Sincerely,
**The HDD Company**

Jeremy King

# The HDD Company, Inc.

4525 Serrano Pkwy #210
El Dorado Hills, CA  95762
(530) 676-5705  Fax (530) 676-3605

# Invoice

| DATE | INVOICE # |
|------|-----------|
| 7/10/2020 | 20-345-10 |

| BILL TO |
|---------|
| MINNESOTA LIMITED<br>PO BOX  410<br>BIG LAKE, MN  5530934 |

| P.O. NO. | TERMS | JOB NO. |
|----------|-------|---------|
| 1916169002 | Net 30 | 20-345-10 |

| SERVICE DAY | DESCRIPTION | QTY/FT | RATE | AMOUNT |
|-------------|-------------|--------|------|--------|
| 7/10/2020 | Completion of bore Flint Hill | | 1,312,064.00 | 1,312,064.00 |
| 7/10/2020 | LESS 10% RETENTION | 1,312,064 | -0.10 | -131,206.40 |
| | Subcontract Agreement No. SR1916169002<br>Southern Star Central Gas Pipeline  Project C-60266 | | | |

| Thank you for your business. | **Total** | $1,180,857.60 |
|------------------------------|-----------|---------------|

| PROJECT NAME: | | |
|---|---|---|
| PROJECT NO.: | Southern Star Line DT & DS Replacement | |



Horizontal Directional Drilling

<div style="border:1px solid red">

**EXTRA WORK SHEET REPORT**
**INTERNAL - OFFICE**

</div>

| CLIENT/OWNER: | Minnesota Limited - Southern Star | DATE: | |
|---|---|---|---|
| WORK PRFM'D. BY: | The HDD Company, Inc. | EXTRA WRK. SHT. NO. | Cedar Creek HDD |
| DESCPTN. OF WORK: | Access and weather delays | | |
| 0 | | | |
| 0 | | | |
| 0 | | | |

## A – EQUIPMENT

| EQUIP. NO. | Company Owned Equipment | HRS. | RATE/HR. | TOTAL/DAY |
|---|---|---|---|---|
| 1 | Drilling Rig HDD Rig 7 - Vermeer 750 | 32,50 | $ 205,56 | $ 6.680,70 |
| 1 | Mud Tank / Solids Control Unit | 32,50 | $ 111,96 | $ 3.638,70 |
| 1 | Sump Pit/Trash Pump | 32,50 | $ 8,29 | $ 269,43 |
| 1 | Mud Pumping Units | 32,50 | $ 60,94 | $ 1.980,55 |
| 2 | Tool Van and tools | 32,50 | $ 17,55 | $ 1.140,75 |
| 0 | Dump Truck A-17 TRUN 2AXL | | | $ - |
| 3 | Vac. Truck A-17 TRUN 2AXL | 32,50 | $ 45,75 | $ 4.460,63 |
| 10 | Misc. Trailers | 32,50 | $ 1,79 | $ 581,75 |
| 1 | Haul Trucks | 32,50 | $ 34,13 | $ 1.109,23 |
| 1 | 6 3/4" Non Mag Drill Collars w/Jet Assembly | 32,50 | $ 6,83 | $ 221,98 |
| 168 | Drill Pipe (5-1/2 FH) | 32,50 | $ 0,53 | $ 2.893,80 |
| 2 | Misc. X-Subs and Rack (All X Subs for Spread) | 32,50 | $ 5,20 | $ 338,00 |
| 0 | Sonde and Housing | | | |
| 0 | Steering Tool (North Referencing w/Tru-Gyde) | | | |
| 48 | Rollers | 32,50 | $ 1,50 | $ 2.340,00 |
| 3 | Ford F-250 T&TT 06-12 | 32,50 | $ 5,04 | $ 491,40 |
| 0 | Ford F-450 T&TT 20-28 | | | $ - |
| 0 | Ford F-350 T&TT 20-28 | | | $ - |
| 0 | KW & Crane Truck | | | |
| 1 | Hammer | 32,50 | $ 41,93 | $ 1.362,73 |
| 1 | 300 Amp Welder | 32,50 | $ 9,49 | $ 308,43 |
| 1 | 1/2 Ton Truck | 32,50 | $ 32,48 | $ 1.055,60 |
| 1 | 60" Casing | 32,50 | $ 3,25 | $ 105,63 |
| 0 | Mud Bins | | | |

| | Rental Equipment | | | |
|---|---|---|---|---|
| 1 | 10K Reach Forklift | S.T. 32,50 | $ 51,29 | $ 1.666,93 |
| | | O.T. | | $ - |
| 2 | 225 Excavator | S.T. 32,50 | $ 91,59 | $ 5.953,35 |
| | | O.T. | | $ - |
| 2 | Portable toilets | S.T. 32,50 | $ 1,50 | $ 97,50 |
| | | O.T. | | $ - |
| 0 | Multiquip 20kW Generator | S.T. | | $ - |
| | | O.T. | | $ - |
| 3 | Frac Tank | S.T. 32,50 | $ 7,32 | $ 713,70 |
| | | O.T. | | $ - |
| 1 | Trash Bin | S.T. 32,50 | $ 4,97 | $ 161,53 |
| | | O.T. | | $ - |
| 1 | 500 Amp Welder | S.T. 32,50 | $ 9,49 | $ 308,43 |
| | | O.T. | | $ - |
| 2 | Light Tower | S.T. 32,50 | $ 7,61 | $ 494,65 |
| | | O.T. | | $ - |
| 1 | 175 KW Generator | S.T. 32,50 | $ 71,36 | $ 2.319,20 |
| | | O.T. | | $ - |
| 1 | 6" Diesel Trash Pump | S.T. 32,50 | $ 23,60 | $ 767,00 |
| | | O.T. | | $ - |
| 1 | HTI Mud Motor | S.T. 32,50 | $ 42,50 | $ 1.381,25 |
| | | S.T. | | $ - |
| | | O.T. | | $ - |
| | | S.T. | | $ - |
| | | O.T. | | $ - |
| | | S.T. | | $ - |
| | | O.T. | | $ - |
| | | S.T. | | $ - |
| | | O.T. | | $ - |
| | | S.T. | | $ - |
| | | O.T. | | $ - |
| | | S.T. | | $ - |
| | | O.T. | | $ - |

| | | |
|---|---|---|
| COMPANY OWNED EQUIPMENT | | $ 28.979,28 |
| RENTAL EQUIPMENT W/ 15% Markup | | $ 15.943,05 |
| A- EQUIPMENT SUB -TOTAL COST | | $ 44.922,33 |
| 0,00 % Sales Tx. Rental Equip. | | |

## B – MATERIALS

| MATERIALS DESCRIPTION | QTY. USED | UNIT $ | TOTAL |
|---|---|---|---|
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |

| | | |
|---|---|---|
| B-MATERIALS SUB-TOTAL COST | | $ - |
| 0,00 % Sales Tax | | |
| 15 % ADDED M.U. B | | $ - |
| SUB-TOTAL A + B w/Tax | | $ 44.922,33 |

## C – SUBCONTRACT / WORK DONE BY SPECIALISTS/THIRD PARTY SERVICES

| Work Description | Individual / Company | Unit | RATE | TOTAL $ |
|---|---|---|---|---|
| Roller Damage | Minnesota Limited | 8,00 | $ 2.900,00 | $ 23.200,00 |
| | | | | $ - |
| | | | | $ - |
| | | | | $ - |
| | COST OF SUBS - C | | | $ 23.200,00 |
| | 15 % MARKUP(Subcontractor) | | | $ 3.480,00 |
| | $ | | | $ 26.680,00 |
| TOTAL COST A + B + C (Including Mark-Up) | | | | $ 71.602,33 |

## D – LABOR

| NO. | D - LABOR | | HRS. | BASE RATE | w/FRING'S. | SUB TOTAL | Per Diem Totals | TOTAL |
|---|---|---|---|---|---|---|---|---|
| 1 | Chris Crough (Day Rate) | REG. | 3,00 | $1,916,84 | $3,050,52 | $120,00 | | $3,170,52 |
| | | O.T. | 0 | | $0,00 | | | $0,00 |
| | | D.T. | 0 | | $0,00 | | | $0,00 |
| 2 | Randy Foster (Day Rate) | REG. | 3,00 | $968,88 | $2,906,64 | $300,00 | | $3,206,64 |
| | | O.T. | | | $0,00 | | | $0,00 |
| | | D.T. | | | $0,00 | | | $0,00 |
| 3 | Harold Shoemaker (Day | REG. | 0,00 | | $0,00 | $0,00 | | $0,00 |
| | | O.T. | | | $0,00 | | | $0,00 |
| | | D.T. | | | $0,00 | | | $0,00 |
| 4 | Justin Poter | REG. | 32,50 | $59,79 | $1,943,18 | $345,00 | | $2,288,18 |
| | | O.T. | 0,00 | $80,65 | $0,00 | | | $0,00 |
| | | D.T. | | | $0,00 | | | $0,00 |
| 5 | Brandon Morris | REG. | 32,50 | $39,83 | $1,294,48 | $315,00 | | $1,609,48 |
| | | O.T. | 0,00 | $54,42 | $0,00 | | | $0,00 |
| | | D.T. | | | $0,00 | | | $0,00 |
| 6 | David Jones | REG. | 32,50 | $42,86 | $1,392,95 | $315,00 | | $1,707,95 |
| | | O.T. | 0,00 | $58,96 | $0,00 | | | $0,00 |
| | | D.T. | | | $0,00 | | | $0,00 |
| 7 | Brandon Sammet | REG. | 32,50 | $59,79 | $1,943,18 | $315,00 | | $2,258,18 |
| | | O.T. | 0,00 | $80,65 | $0,00 | | | $0,00 |
| | | D.T. | | | $0,00 | | | $0,00 |
| 8 | Roger Reeter | REG. | 32,50 | $59,79 | $1,943,18 | $300,00 | | $2,243,18 |
| | | O.T. | 0,00 | $80,65 | $0,00 | | | $0,00 |
| | | D.T. | | | $0,00 | | | $0,00 |
| 9 | Augustin Zepeda | REG. | 32,50 | $36,83 | $1,196,98 | $315,00 | | $1,511,98 |
| | | O.T. | 0,00 | $69,49 | $0,00 | | | $0,00 |
| | | D.T. | | | $0,00 | | | $0,00 |
| 10 | Johnny Hatfield | REG. | 32,50 | $43,49 | $1,413,43 | $150,00 | | $1,563,43 |
| | | O.T. | 0,00 | $59,91 | $0,00 | | | $0,00 |
| | | D.T. | | | $0,00 | | | $0,00 |
| 11 | | REG. | 0,00 | | $0,00 | | | $0,00 |
| | | O.T. | 0,00 | | $0,00 | | | $0,00 |
| | | D.T. | | | $0,00 | | | $0,00 |
| 12 | | REG. | 0,00 | | $0,00 | | | $0,00 |
| | | O.T. | 0,00 | | $0,00 | | | $0,00 |
| | | D.T. | | | $0,00 | | | $0,00 |
| 13 | | REG. | 0,00 | | $0,00 | | | $0,00 |
| | | O.T. | 0,00 | | $0,00 | | | $0,00 |
| | | D.T. | | | $0,00 | | | $0,00 |

| | | |
|---|---|---|
| D - LABOR SUB-TOTAL | | $ 19.559,51 |
| 15 % Labor Surcharge | | $ 2.933,93 |
| SUBTOTAL | | $ 22.493,44 |
| 15 % MARKUP ON LABOR | | $ 3.374,02 |

## E – MISCELLANEOUS ITEMS

| MISC. DESCRIPTIONS | QTY. | Unit $ | EX. AMOUNT |
|---|---|---|---|
| Hotel | | | |
| | 6 | $ 58,00 | $ 348,00 |
| | 9 | $ 68,00 | $ 612,00 |
| Subsistance | | | $ - |
| Misc. Items | | | |
| 0 | 0 | | $ - |
| 0 | 0 | | $ - |
| 0 | 0 | | $ - |
| 0 | 0 | | $ - |
| 0 | 0 | | $ - |

| | | |
|---|---|---|
| E- MISCELLANEOUS ITEMS SUB TOTAL | | $ 960,00 |
| 5 % Sales/City/Room Tax | | $ 48,00 |
| 15 % ADDED MARK-UP | | $ 144,00 |
| 0 % Tax on Misc. Items | | 0 |
| SUB TOTAL - E | | $ 1.152,00 |

## TOTALS

| | | |
|---|---|---|
| TOTAL COST A+B+C (Equipment /Material/Sub-Contractors) | | $ 71.602,33 |
| TOTAL COST + D (Labor) | | $ 25.867,45 |
| TOTAL COST - E (Miscellaneous Items) | | $ 1.152,00 |
| SUB-TOTAL | | $ 98.621,78 |
| 2,5 % BOND & INSURANCE | | $ 2.465,54 |
| **TOTAL COST THIS SHEET** | | **$ 101.087,33** |

| TIME | CLIENT DIRECTIVES AND COMMENTS |
|---|---|
| 0:00 | (See Daily Work Report) |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |

| PROJECT NAME: | | | |
|---|---|---|---|
| PROJECT NO.: | Southern Star Line DT & DS Replacement | | |



Horizontal Directional Drilling

**EXTRA WORK SHEET REPORT**
**INTERNAL - OFFICE**

| CLIENT/OWNER : | Minnesota Limited - Southern Star | DATE: | |
|---|---|---|---|
| WORK PRFM'D. BY: | The HDD Company, Inc. | EXTRA WRK. SHT. NO. | Day Shift |
| DESCPTN. OF WORK : | Time spent reinstalling 36" pipeline, Multiple days from 6/22/20 - 7/15/20 and 8/22/20 - 9/9/20 | | |
| | 0 | | |
| | 0 | | |
| | 0 | | |

## A - EQUIPMENT

| EQUIP. NO. | Company Owned Equipment | HRS. | RATE/HR. | TOTAL/DAY |
|---|---|---|---|---|
| 1 | Drilling Rig HDD Rig 7 - Vermeer 750 | 408,00 | $ 205,56 | $ 83.868,48 |
| 1 | Mud Tank / Solids Control Unit | 408,00 | $ 111,96 | $ 45.679,68 |
| 1 | Sump Pit/Trash Pump | 408,00 | $ 8,29 | $ 3.382,32 |
| 1 | Mud Pumping Units | 408,00 | $ 60,94 | $ 24.863,52 |
| 2 | Tool Van and tools | 408,00 | $ 17,55 | $ 14.320,80 |
| 0 | Dump Truck A-17 TRUN 2AXL | | | $ - |
| 3 | Vac. Truck A-17 TRUN 2AXL | 408,00 | $ 45,75 | $ 55.998,00 |
| 10 | Misc. Trailers | 408,00 | $ 1,79 | $ 7.303,20 |
| 1 | Haul Trucks | 408,00 | $ 34,13 | $ 13.925,04 |
| 1 | 6 3/4" Non Mag Drill Collars w/Jet Assembly | 408,00 | $ 6,83 | $ 2.786,64 |
| 168 | Drill Pipe (5-1/2 FH) | 408,00 | $ 0,53 | $ 36.328,32 |
| 2 | Misc. X-Subs and Rack (All X Subs for Spread) | 408,00 | $ 5,20 | $ 4.243,20 |
| 0 | Sonde and Housing | | | $ - |
| | Steering Tool (North Referencing w/Tru-Gyde) | | | |
| 48 | Rollers | 408,00 | $ 1,50 | $ 29.376,00 |
| 3 | Ford F-250 T&TT 06-12 | 408,00 | $ 5,04 | $ 6.168,96 |
| 0 | Ford F-450 TLT 20-28 | | | $ - |
| 0 | Ford F-350 TLT 20-28 | | | $ - |
| 0 | KW & Crane Truck | | | $ - |
| 1 | Hammer | 408,00 | $ 41,93 | $ 17.107,44 |
| 1 | 300 Amp Welder | 408,00 | $ 9,49 | $ 3.871,92 |
| 1 | 1/2 Ton Truck | 408,00 | $ 32,48 | $ 13.251,84 |
| 1 | 60" Casing | 408,00 | $ 3,25 | $ 1.326,00 |
| 0 | Mud Bins | | | $ - |

| | Rental Equipment | | | |
|---|---|---|---|---|
| 1 | 10K Reach Forklift | S.T. | 408,00 | $ 51,29 | $ 20.926,32 |
| | | O.T. | | | $ - |
| 2 | 225 Excavator | S.T. | 408,00 | $ 91,59 | $ 74.737,44 |
| | | O.T. | | | $ - |
| 2 | Portable toilets | S.T. | 408,00 | $ 1,50 | $ 1.224,00 |
| | | O.T. | | | $ - |
| 0 | Multiquip 20kW Generator | S.T. | | | $ - |
| | | O.T. | | | $ - |
| 3 | Frac Tank | S.T. | 408,00 | $ 7,32 | $ 8.959,68 |
| | | O.T. | | | $ - |
| 1 | Trash Bin | S.T. | 408,00 | $ 4,97 | $ 2.027,76 |
| | | O.T. | | | $ - |
| 1 | 500 Amp Welder | S.T. | 408,00 | $ 9,49 | $ 3.871,92 |
| | | O.T. | | | $ - |
| 2 | Light Tower | S.T. | 408,00 | $ 7,61 | $ 6.209,76 |
| | | O.T. | | | $ - |
| 1 | 175 KW Generator | S.T. | 408,00 | $ 71,36 | $ 29.114,88 |
| | | O.T. | | | $ - |
| 1 | 6" Diesel Trash Pump | S.T. | 408,00 | $ 23,60 | $ 9.628,80 |
| | | O.T. | | | $ - |
| 1 | HTII Mud Motor | S.T. | 408,00 | $ 42,50 | $ 17.340,00 |
| | | O.T. | | | $ - |
| | | S.T. | | | $ - |
| | | O.T. | | | $ - |
| | | S.T. | | | $ - |
| | | O.T. | | | $ - |
| | | S.T. | | | $ - |
| | | O.T. | | | $ - |
| | | S.T. | | | $ - |
| | | O.T. | | | $ - |
| | | S.T. | | | $ - |
| | | O.T. | | | $ - |
| | | S.T. | | | $ - |
| | | O.T. | | | $ - |
| | | S.T. | | | $ - |
| | | O.T. | | | $ - |
| | | S.T. | | | $ - |
| | | O.T. | | | $ - |
| | COMPANY OWNED EQUIPMENT | | | $ 363.801,36 |
| | RENTAL EQUIPMENT W/ 15% Markup | | | $ 200.146,64 |
| | A- EQUIPMENT SUB - TOTAL COST | | | $ 563.948,00 |
| | 0,00 % Sales Tx, Rental Equip. | | | |

## B - MATERIALS

| MATERIALS DESCRIPTION | QTY. USED | UNIT $ | TOTAL |
|---|---|---|---|
| Bentonite | 86,00 | $ 9,50 | $ 817,00 |
| Cement | 54,00 | $ 9,50 | $ 513,00 |
| Shaker Screens | 6,00 | $ 135,00 | $ 810,00 |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| | B-MATERIALS SUB-TOTAL COST | | $ 2.140,00 |
| | 0,00 % Sales Tax | | |
| | 15 % ADDED M.U. | | $ 321,00 |
| | SUB-TOTAL A + B w/Tax | | $ 566.409,00 |

## C – SUBCONTRACT / WORK DONE BY SPECIALISTS/THIRD PARTY SERVICES

| Work Description | Individual / Company | Unit | RATE | TOTAL $ |
|---|---|---|---|---|
| Coating and Corrosion Expert | Lake Superior Consultants | 1,00 | $ 19.702,53 | $ 19.702,53 |
| Vac Trucks | Hurricane Services | 1,00 | $ 39.415,00 | $ 39.415,00 |
| Disposal Charges | Anderson County Landfill | 1,00 | $ 18.103,40 | $ 18.103,40 |
| 0 | | 0 | 0,00 | $ - |
| 0 | | 0 | 0,00 | $ - |
| | | COST OF SUBS = C | | $ 77.220,93 |
| | 15 % MARKUP(Subcontractor) | | | $ 11.583,14 |
| | | | $ | $ 88.804,07 |
| | TOTAL COST A + B + C (Including Mark-Up) | | | $ 655.213,07 |

## D – LABOR

| NO. | D – LABOR | HRS. | BASE RATE | w/FRING'S. | SUB TOTAL | Per Diem Totals | TOTAL |
|---|---|---|---|---|---|---|---|
| 1 | Chris Crough (Day Rate) | REG. | 33,00 | $1.016,84 | $33.555,72 | $1.320,00 | $34.875,72 |
| | | O.T. | 0 | | $0,00 | | $0,00 |
| | | D.T. | 0 | | $0,00 | | $0,00 |
| 2 | Randy Foster (Day Rate) | REG. | 17,00 | $968,88 | $16.470,96 | $1.700,00 | $18.170,96 |
| | | O.T. | | | $0,00 | | $0,00 |
| | | D.T. | | | $0,00 | | $0,00 |
| 3 | Harold Shoemaker (Day | REG. | 17,00 | $755,00 | $12.835,00 | $1.785,00 | $14.620,00 |
| | | O.T. | | | $0,00 | | $0,00 |
| | | D.T. | | | $0,00 | | $0,00 |
| 4 | Justin Potier | REG. | 104,00 | $59,79 | $6.218,16 | $1.495,00 | $7.713,16 |
| | | O.T. | 52,00 | $80,65 | $4.193,80 | | $4.193,80 |
| | | D.T. | | | $0,00 | | $0,00 |
| 5 | Brandon Morris | REG. | 112,00 | $39,83 | $4.460,96 | $1.260,00 | $5.720,96 |
| | | O.T. | 52,00 | $54,42 | $2.829,58 | | $2.829,58 |
| | | D.T. | | | $0,00 | | $0,00 |
| 6 | David Jones | REG. | 248,00 | $42,86 | $10.629,28 | $3.255,00 | $13.884,28 |
| | | O.T. | 125,00 | $58,96 | $7.370,00 | | $7.370,00 |
| | | D.T. | | | $0,00 | | $0,00 |
| 7 | Brandon Sammet | REG. | 184,00 | $59,79 | $11.001,36 | $2.415,00 | $13.416,36 |
| | | O.T. | 97,00 | $80,65 | $7.823,05 | | $7.823,05 |
| | | D.T. | | | $0,00 | | $0,00 |
| 8 | Roger Reeter | REG. | 112,00 | $59,79 | $6.696,48 | $1.400,00 | $8.096,48 |
| | | O.T. | 66,00 | $80,65 | $5.322,90 | | $5.322,90 |
| | | D.T. | | | $0,00 | | $0,00 |
| 9 | Augustin Zepeda | REG. | 128,00 | $36,83 | $4.714,24 | $1.680,00 | $6.394,24 |
| | | O.T. | 69,00 | $69,49 | $4.794,81 | | $4.794,81 |
| | | D.T. | | | $0,00 | | $0,00 |
| 10 | Johnny Hatfield | REG. | 128,00 | $43,49 | $5.566,72 | $800,00 | $6.366,72 |
| | | O.T. | 69,00 | $59,91 | $4.133,45 | | $4.133,45 |
| | | D.T. | | | $0,00 | | $0,00 |
| 11 | Stephen Davis | REG. | 224,00 | $43,49 | $9.741,76 | $1.120,00 | $10.861,76 |
| | | O.T. | 112,00 | $59,91 | $6.709,36 | | $6.709,36 |
| | | D.T. | | | $0,00 | | $0,00 |
| 12 | Bruce Cooper | REG. | 224,00 | $44,53 | $9.974,72 | $1.120,00 | $11.094,72 |
| | | O.T. | 109,00 | $60,70 | $6.615,76 | | $6.615,76 |
| | | D.T. | | | $0,00 | | $0,00 |
| 13 | Juan Miguel Suarzes | REG. | 101,00 | $36,83 | $3.719,83 | $650,00 | $4.369,83 |
| | | O.T. | 48,00 | $49,92 | $2.395,92 | | $2.395,92 |
| | | D.T. | | | $0,00 | | $0,00 |
| | 15 % Labor Surcharge | | | | D – LABOR SUB-TOTAL | | $ 207.773,81 |
| | | | | SUBTOTAL | | | $ 31.166,07 |
| | | | | | | | $ 238.939,88 |
| | 15 % MARKUP ON LABOR | | | | | | $ 35.840,98 |

## E – MISCELLANEOUS ITEMS

| MISC. DESCRIPTIONS | | QTY. | Unit $ | EX. AMOUNT |
|---|---|---|---|---|
| Hotel | | | | |
| | | 96 | $ 58,00 | $ 5.568,00 |
| | | 155 | $ 68,00 | $ 10.540,00 |
| Subsistance | | | | $ - |
| Misc. Items | | | | $ - |
| 0 | | 0 | | $ - |
| 0 | | 0 | | $ - |
| 0 | | 0 | | $ - |
| 0 | | 0 | | $ - |
| 0 | | 0 | | $ - |
| 0 | | 0 | | $ - |
| E- MISCELLANEOUS ITEMS SUB TOTAL | | | | $ 16.108,00 |
| 5 % Sales/City/Room Tax | | | | $ 805,40 |
| 15 % ADDED MARK-UP | | | | $ 2.416,20 |
| 15 % Tax on Misc. Items | | | | $ - |
| SUB TOTAL - E | | | | $ 19.329,60 |

## TOTALS

| | |
|---|---|
| TOTAL COST A+B+C (Equipment /Material/Sub-Contractors) | $ 655.213,07 |
| TOTAL COST = D (Labor) | $ 274.780,86 |
| TOTAL COST = E (Miscellaneous Items) | $ 19.329,60 |
| SUB-TOTAL | $ 949.323,53 |
| 2,5 % BOND & INSURANCE | $ 23.733,09 |
| TOTAL COST THIS SHEET | $ 973.056,63 |

| TIME | CLIENT DIRECTIVES AND COMMENTS |
|---|---|
| 0:00 | (See Daily Work Report) |
| 0:00 | |
| 0:00 | |
| 0:00 | |
| 0:00 | |
| 0:00 | |
| 0:00 | |
| 0:00 | |
| 0:00 | |
| 0:00 | |
| 0:00 | |
| 0:00 | |
| 0:00 | |
| 0:00 | |
| 0:00 | |
| 0:00 | |
| 0:00 | |
| 0:00 | |
| 0:00 | |
| 0:00 | |
| 0:00 | |
| 0:00 | |
| 0:00 | |

**PROJECT NAME:**

**PROJECT NO.:** Southern Star Line DT & DS Replacement



Horizontal Directional Drilling

| EXTRA WORK SHEET REPORT |
|---|
| INTERNAL - OFFICE |

**CLIENT/OWNER :** Minnesota Limited - Southern Star    **DATE:**

**WORK PRFM'D. BY:** The HDD Company, Inc.    **EXTRA WRK. SHT. NO.:** Night Shift

**DESCPT'N. OF WORK:** Time spent reinstalling 36" pipeline, Multiple days from 6/22/20 - 7/15/20 and 8/22/20 - 9/9/20

0
0
0

---

## A - EQUIPMENT

| EQUIP. NO. | Company Owned Equipment | HRS. | RATE/HR. | TOTAL/DAY |
|---|---|---|---|---|
| 1 | Drilling Rig HDD Rig 7 - Vermeer 750 | 300.00 | $ 205.56 | $ 61,668.00 |
| 1 | Mud Tank / Solids Control Unit | 300.00 | $ 111.96 | $ 33,588.00 |
| 1 | Sump Pit/Trash Pump | 300.00 | $ 8.29 | $ 2,487.00 |
| 1 | Mud Pumping Units | 300.00 | $ 60.94 | $ 18,282.00 |
| 2 | Tool Van and tools | 300.00 | $ 17.55 | $ 10,530.00 |
| 0 | Dump Truck A-17 TRUN 2AXL | | | |
| 3 | Vac. Truck A-17 TRUN 2AXL | 300.00 | $ 45.75 | $ 41,175.00 |
| 10 | Misc. Trailers | 300.00 | $ 1.79 | $ 5,370.00 |
| 1 | Haul Trucks | 300.00 | $ 34.13 | $ 10,239.00 |
| 1 | 6 3/4" Non Mag Drill Collars w/Jet Assembly | 300.00 | $ 6.83 | $ 2,049.00 |
| 168 | Drill Pipe (5-1/2 FH) | 300.00 | $ 0.53 | $ 26,712.00 |
| 2 | Misc. X-Subs and Rack (All X Subs for Spread) | 300.00 | $ 5.20 | $ 3,120.00 |
| 0 | Sonde and Housing | | | |
| | Steering Tool (North Referencing w/Tru-Gyde) | | | |
| 48 | Rollers | 300.00 | $ 1.50 | $ 21,600.00 |
| 3 | Ford F-250 T&TT 06-12 | 300.00 | $ 7.50 | $ 6,750.00 |
| 0 | Ford F450 T&TT 20-28 | | | $ - |
| 0 | Ford F-350 T&TT 20-28 | | | $ - |
| 0 | KW & Crane Truck | | | $ - |
| 1 | Hammer | 300.00 | $ 41.93 | $ 12,579.00 |
| 1 | 300 Amp Welder | 300.00 | $ 9.49 | $ 2,847.00 |
| 1 | 1/2 Ton Truck | 300.00 | $ 32.48 | $ 9,744.00 |
| 1 | 60' Casing | 300.00 | | $ - |
| 0 | Mud Bins | | | $ - |

| | Rental Equipment | | | |
|---|---|---|---|---|
| 1 | 10K Reach Forklift | S.T 300.00 / O.T | $ 51.29 | $ 13,387.00 |
| 2 | 225 Excavator | S.T 300.00 / O.T | $ 91.59 | $ 54,954.00 |
| 2 | Portable toilets | S.T 300.00 / O.T | $ 1.50 | $ 900.00 |
| 0 | Multiquip 20KW Generator | S.T / O.T | | $ - |
| 3 | Frac Tank | S.T 300.00 / O.T | $ 7.32 | $ 6,588.00 |
| 1 | Trash Bin | S.T 300.00 / O.T | $ 4.97 | $ 1,491.00 |
| 1 | 500 Amp Welder | S.T 300.00 / O.T | $ 9.49 | $ 2,847.00 |
| 2 | Light Tower | S.T 300.00 / O.T | $ 7.61 | $ 4,566.00 |
| 1 | 175 KW Generator | S.T 300.00 / O.T | $ 71.36 | $ 21,408.00 |
| 1 | 6" Diesel Trash Pump | S.T 300.00 / O.T | $ 23.60 | $ 7,080.00 |
| 1 | HTI Mud Motor | S.T 300.00 / O.T | $ 42.50 | $ 12,750.00 |
| | | S.T / O.T | | $ - |
| | | S.T / O.T | | $ - |
| | | S.T / O.T | | $ - |
| | | S.T / O.T | | $ - |
| | | S.T / O.T | | $ - |
| | | S.T / O.T | | $ - |
| | | S.T / O.T | | $ - |
| | | S.T / O.T | | $ - |
| | | S.T / O.T | | $ - |
| | | S.T / O.T | | $ - |

| | | | |
|---|---|---|---|
| COMPANY OWNED EQUIPMENT | | | $ 268,740.00 |
| RENTAL EQUIPMENT W/ 15% Markup | | | $ 147,166.65 |
| A= EQUIPMENT SUB - TOTAL COST | | | $ 415,906.65 |
| 0.00 % Sales Tx, Rental Equip. | | | |

## B - MATERIALS

| MATERIALS DESCRIPTION | QTY. USED | UNIT $ | TOTAL |
|---|---|---|---|
| 0 | | | |
| 0 | | | |
| 0 | | | |
| 0 | | | |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| B=MATERIALS SUB-TOTAL COST | | $ - | $ - |
| 0.00 % Sales Tax | | | |
| 10 % ADDED M. U. B | | | |
| SUB-TOTAL = A + B w/Tax | | $ | $ 415,906.65 |

---

## C - SUBCONTRACT / WORK DONE BY SPECIALISTS/THIRD PARTY SERVICES

| Work Description | Individual / Company | Unit | RATE | TOTAL $ |
|---|---|---|---|---|
| | | | $ | $ - |
| COST OF SUBS = C | | | | $ - |
| 15 % MARKUP(Subcontractor) | | | | $ - |
| | | | $ | $ - |
| TOTAL COST A + B + C (Including Mark-Up) | | | | $ 415,906.65 |

## D - LABOR

| NO. | | HRS. | BASE RATE w/FRING'S. | SUB TOTAL | Per Diem Totals | TOTAL |
|---|---|---|---|---|---|---|
| 1 | Shawn Posey (Day Rate) | REG. 33.00 | $755.00 | $24,915.00 | $2,730.00 | $27,645.00 |
| | | O.T 0 | | $0.00 | | $0.00 |
| | | D.T | | | | $0.00 |
| 2 | Jacob Hoffman | REG. 131.00 | $59.79 | $7,832.49 | $2,380.00 | $10,212.49 |
| | | O.T 69.00 | $80.65 | $5,564.85 | | $5,564.85 |
| | | D.T | | $0.00 | | $0.00 |
| 3 | Westin Colgrove | REG. 96.00 | $59.79 | $5,739.84 | $1,260.00 | $6,999.84 |
| | | O.T 68.00 | $80.65 | $5,484.20 | | $5,484.20 |
| | | D.T | | $0.00 | | $0.00 |
| 4 | Dustin Anderson | REG. 156.00 | $48.20 | $9,399.00 | $1,920.00 | $11,319.00 |
| | | O.T 92.00 | $66.20 | $6,090.40 | | $6,090.40 |
| | | D.T | | $0.00 | | $0.00 |
| 5 | Jeromie Acres | REG. 164.00 | $46.20 | $7,576.80 | $1,680.00 | $9,256.80 |
| | | O.T 96.00 | $63.20 | $6,067.20 | | $6,067.20 |
| | | D.T | | $0.00 | | $0.00 |
| 6 | Abraham Berrospe | REG. 159.00 | $36.83 | $5,855.97 | $960.00 | $6,815.97 |
| | | O.T 95.00 | $49.92 | $4,741.93 | | $4,741.93 |
| | | D.T | | $0.00 | | $0.00 |
| 7 | Larry Roseboro | REG. 79.00 | $59.79 | $4,723.41 | $500.00 | $5,223.41 |
| | | O.T 35.00 | $80.65 | $2,822.75 | | $2,822.75 |
| | | D.T | | $0.00 | | $0.00 |
| 8 | Dusty Cline | REG. 24.00 | $59.79 | $1,434.96 | $315.00 | $1,749.96 |
| | | O.T 12.00 | $80.65 | $967.80 | | $967.80 |
| | | D.T | | $0.00 | | $0.00 |
| 9 | Taylor Crosley | REG. 35.00 | $59.79 | $2,092.48 | $350.00 | $2,412.48 |
| | | O.T 40.00 | $52.66 | $2,106.40 | | $2,106.40 |
| | | D.T | | $0.00 | | $0.00 |
| 10 | Jim Rubick | REG. 123.00 | $59.79 | $7,354.17 | $1,575.00 | $8,929.17 |
| | | O.T 65.00 | $80.65 | $5,242.25 | | $5,242.25 |
| | | D.T | | $0.00 | | $0.00 |
| 11 | Barion Snowten | REG. 80.00 | $38.66 | $3,092.80 | $1,725.00 | $4,817.80 |
| | | O.T 60.00 | $52.66 | $3,159.60 | | $3,159.60 |
| | | D.T | | $0.00 | | $0.00 |
| 12 | Kenny Densmore | REG. 80.00 | $59.79 | $4,783.20 | $1,050.00 | $5,833.20 |
| | | O.T 60.00 | $80.65 | $4,839.00 | | $4,839.00 |
| | | D.T | | $0.00 | | $0.00 |

| | | |
|---|---|---|
| D - LABOR SUB-TOTAL = | | $ 148,301.50 |
| 15 % Labor Surcharge | | $ 22,245.22 |
| SUBTOTAL | | $ 170,546.72 |
| 15 % MARKUP ON LABOR | | $ 25,582.01 |

## E - MISCELLANEOUS ITEMS

| MISC. DESCRIPTIONS | QTY. | Unit $ | EX. AMOUNT |
|---|---|---|---|
| Hotel | | | |
| | | $ 58.00 | $ - |
| | | $ 68.00 | $ - |
| Subsistance | 0 | | $ - |
| Misc. Items | | | |
| 0 | | | $ - |
| 0 | | | $ - |
| 0 | | | $ - |
| 0 | | | $ - |
| 0 | | | $ - |
| 0 | | | $ - |
| E= MISCELLANEOUS ITEMS SUB TOTAL | | | $ - |
| 0 % Sales/City/Room Tax | | | $ - |
| 15 % ADDED MARK-UP | | | $ - |
| 0 % Tax on Misc. Items | | | 0 |
| SUB TOTAL = E | | | $ - |

## TOTALS

| | |
|---|---|
| TOTAL COST A+B+C (Equipment /Material /Sub-Contractors) | $ 415,906.65 |
| TOTAL COST = D (Labor) | $ 196,128.73 |
| TOTAL COST = E (Miscellaneous Items) | $ - |
| SU | $ 612,035.38 |
| 2.5 % BOND & INSURANCE | $ 15,300.88 |
| TOTAL COST THIS SHEET | $ 627,336.26 |

| TIME | CLIENT DIRECTIVES AND COMMENTS |
|---|---|
| 0.00 | (See Daily Work Report) |
| 0.00 | |
| 0.00 | |

(many rows of 0.00)

---

THE HDD COMPANY:

_____
(Signature)

DATE: _____

CLIENT _____
(Signature)

DATE: _____

# Exhibit 25

IN THE DISTRICT COURT OF FRANKLIN COUNTY, KANSAS

Mechanic's Lien No. _____

## STATEMENT FOR MECHANIC'S LIEN

### (K.S.A. § 60-1103)

| | |
|---|---|
| **AMOUNT OF CLAIM:** | **$3,013,544.22** (exclusive of interest) |
| **NAME OF LANDOWNERS:** Jobsite Address: | **Black, Lyle D.; Black, Cheryl K.** 3062 Nebraska Rd., Ottawa, KS 66067 |
| Mailing Address: | 3159 Neosho Rd., Ottawa, KS 66067-8879 |
| Mortgage Holder: | Frontier Farm Credit, FLCA 1270 N. 300 Rd. PO Box 858 Baldwin City, KS, 66006 |
| Jobsite Address: | **Oswego Coal Company, Inc.** 3125 Marshall Rd., Ottawa, KS 66067 |
| Mailing Address: | PO Box 368, Ottawa, KS 66067-0368 |
| **NAME OF PROJECT OWNER:** | **Southern Star Central Gas Pipeline, Inc., a Delaware Corporation** 4700 Highway 56 Owensboro, KY 42301 |
| | Registered Agent The Corporation Company, Inc. 112 SW 7th Street Suite 3C Topeka, KS 66603 |
| **NAME OF CONTRACTOR:** | **Minnesota Limited, LLC., a Minnesota Limited Liability Corporation** 18640 200th Street – PO Box 410 Big Lake, MN 55309 |
| | Registered Agent National Registered Agents, Inc. of KS 112 SW 7th Street Suite 3C Topeka, KS 66603 |
| **NAME OF LIEN CLAIMANT:** | **The HDD Company, Inc., an Oregon Corporation** |

4525 Serrano Parkway, Office Suite 210
El Dorado Hills, CA 95762

Registered Agent
CT Corporation System
112 SW 7th Street, Suite 3C
Topeka, KS 66603

**DESCRIPTION OF**          ATTACHED HERETO AS **EXHIBIT A** AND
**PROPERTY:**               INCORPORATED HEREIN BY THIS REFERENCE,
commonly known as 3062 Nebraska Rd, Ottawa, KS 66067
and 3125 Marshall Rd., Ottawa, KS 66067 (the "Property")

       The undersigned, The HDD Company, Inc. ("Lien Claimant"), a subcontractor pursuant to
K.S.A. § 1103, claims a lien upon the Property and all other personal property furnished, placed
or installed on the Property, on account of furnishing labor, equipment, and materials for the
construction and/or completion of the Southern Star Central Gas Pipeline Project C60266
("Project") located on said Property and the buildings, erections, improvements and plants erected
or constructed, and all materials, fixtures, engines, boilers, pumps, belting, pulleys, shafting,
machinery and other personal property furnished, placed or installed on the Property, on account
of furnishing labor, equipment, and materials for the construction and/or completion of the Project
located at the Property, legally described in **Exhibit A**, attached hereto and incorporated herein by
reference.  The labor, equipment, and materials supplied by Lien Claimant were used and
consumed in the construction of said Project on the Property.  Lien Claimant supplied labor,
equipment, and materials to the Project as a supplier under agreement with Minnesota Limited,
L.L.C., the original contractor ("Contractor"), which in turn was under agreement with Southern
Star Central Gas Pipeline, Inc., the owner of the Project ("Project Owner").

       The aforesaid claim, a reasonably itemized statement of which is attached to this lien
statement (**Exhibit B**) and copies of invoices (**Exhibit C**) substantiating the labor, equipment, and
materials supplied to the Project Owner by Lien Claimant for improvements upon the Property, is
filed in order that it may constitute a lien upon the above-described Property, and every other right,
title, and interest in said real Property.  The amount claimed as owing is THREE MILLION
THIRTEEN THOUSAND, FIVE HUNDRED FORTY-FOUR DOLLARS and 22/100
($3,013,544.22), exclusive of interest.

       Lien Claimant last supplied labor, materials, and/or equipment within five (5) months of
the date of this lien statement after properly filing a notice of lien extension on December 1, 2020.
(**Exhibit D**).

WITNESS the hand of said Lien Claimant this 5th day of January 2021.

ON BEHALF OF: **The HDD Company, Inc.**, Lien Claimant

2

By: _____
    Jeremy King
    Vice President
    The HDD Company, Inc.

## VERIFICATION

STATE OF CALIFORNIA    )
                          ) ss.
COUNTY OF _El Dorado_  )

      Jeremy King, of lawful age, being first duly sworn upon his oath, that he is the Vice President and duly authorized representative of The HDD Company, Inc. and is duly authorized to make this verification on its behalf; and does verify under penalty of perjury that the above and foregoing statement is true and correct based on his personal knowledge, and is a just and true account of the demand of and the amount due Lien Claimant.

               ON BEHALF OF: **The HDD Company, Inc.,** Lien Claimant

                      By: _____
                            Jeremy King
                            Vice President
                            The HDD Company, Inc.

STATE OF CALIFORNIA    )
                          ) ss.
COUNTY OF             )

      On this ____ day of January, 2021, before me appeared Jeremy King, to me personally known, who being by me duly sworn did say that he is the Vice President and duly authorized representative of The HDD Company, Inc., and that he acknowledged that his execution of the foregoing instrument is on behalf of said company.

      IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal in the County and State aforesaid, the day and year first above written.

                        _____
                      Notary Public

                        _____
                      Printed Name
My Commission Expires:

_____

4

# ALL- PURPOSE
# CERTIFICATE OF ACKNOWLEDGMENT

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California )

County of El Dorado )

On January 5, 2021 before me, Wendy Brooke  Notary Public ,
<span style="font-size:small">(Here insert name and title of the officer)</span>

personally appeared, Jeremy King ,
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_Wendy Brooke_
Signature                                          (Seal)

WENDY BROOKE
COMM. #2319236
Notary Public · California
El Dorado County
Comm. Expires Feb 11, 2024

## ADDITIONAL OPTIONAL INFORMATION

DESCRIPTION OF THE ATTACHED DOCUMENT

Statement for Mechanic's Lien
<span style="font-size:small">(Title or description of attached document)</span>

<span style="font-size:small">(Title or description of attached document continued)</span>

Number of Pages _____ Document Date_____

CAPACITY CLAIMED BY THE SIGNER
- ☐ Individual (s)
- ☐ Corporate Officer

_____(Title)_____
- ☐ Partner(s)
- ☐ Attorney-in-Fact
- ☐ Trustee(s)
- ☐ Other _____

## INSTRUCTIONS FOR COMPLETING THIS FORM

*This form complies with current California statutes regarding notary wording and, if needed, should be completed and attached to the document. Acknowledgents from other states may be completed for documents being sent to that state so long as the wording does not require the California notary to violate California notary law.*

- State and County information must be the State and County where the document signer(s) personally appeared before the notary public for acknowledgment.
- Date of notarization must be the date that the signer(s) personally appeared which must also be the same date the acknowledgment is completed.
- The notary public must print his or her name as it appears within his or her commission followed by a comma and then your title (notary public).
- Print the name(s) of document signer(s) who personally appear at the time of notarization.
- Indicate the correct singular or plural forms by crossing off incorrect forms (i.e. he/she/they, is /are ) or circling the correct forms. Failure to correctly indicate this information may lead to rejection of document recording.
- The notary seal impression must be clear and photographically reproducible. Impression must not cover text or lines. If seal impression smudges, re-seal if a sufficient area permits, otherwise complete a different acknowledgment form.
- Signature of the notary public must match the signature on file with the office of the county clerk.
  - ❖ Additional information is not required but could help to ensure this acknowledgment is not misused or attached to a different document.
  - ❖ Indicate title or type of attached document, number of pages and date.
  - ❖ Indicate the capacity claimed by the signer. If the claimed capacity is a corporate officer, indicate the title (i.e. CEO, CFO, Secretary)
- Securely attach this document to the signed document with a staple.

EXHIBIT A

3125 Marshall Rd., Ottawa, KS 66067
All that part of the Southwest Quarter of Section 5, Township 17 South, Range 20 East, in Franklin County, Kansas, being more particularly described as follows: Commencing at the Southwest corner of the Southwest Quarter of said Section 5; thence North 87° 40' 17" East, along the South line of the Southwest Quarter of said Section 5, a distance of 70.01 feet to the point of beginning; thence North 03° 14' 35" West, along a line 70.00 feet East of and parallel with the West line of the Southwest Quarter of said Section 5, a distance of 1647.63 feet; thence North 60° 00' 55" East, a distance of 1074.78 feet; thence South 01° 52' 54" East, a distance of 2146.36 feet to a point on the South line of the Southwest Quarter of said Section 5; thence South 87° 40' 17" West, along the South line of the Southwest Quarter of said Section 5, a distance of 908.94 feet to the point of beginning, Franklin County, Kansas.

3062 Nebraska Rd., Ottawa, KS 66067:
The East 1/4 of the Southeast 1/4 of the Northeast 1/4 of Sec. 6, Twp. 17 S., Rng. 20 E., subject to any part thereof in roads, all in Franklin County, Kansas.
AND
Beginning at the Northwest corner of the Northwest Quarter of Section 5, Township 17 South, Range 20 East of the 6th P.M., thence South 02° 59' 16" East 680.67feet on the West line of the Northwest Quarter of said Section 5 to an existing 1/2" iron bar and the true point of beginning of New Tract 2; thence North 88° 18' 09" East 1327.15 feet to the East line of the Northwest Quarter of the Northwest Quarter of said Section 5, being marked with a 1/2" iron bar; thence South 03° 06' 08" East 613.78 feet to the Southeast corner of said Northwest Quarter of the Northwest Quarter of said Section 5, being marked with a 1/2" iron bar; thence South 03° 06' 08" East 659.24 feet to the Southeast corner of the North Half of the Southwest Quarter of the Northwest Quarter of said Section 5, being marked with a 1/2" iron bar; thence South 88° 26' 25" West 1329.76 feet to the Southwest corner of the North Half of the Southwest Quarter of the Northwest Quarter of said Section 5, being marked with an existing 1/2" iron bar; thence North 02° 59' 16" West 661.16 feet to the Southwest corner of the Northwest Quarter of the Northwest Quarter of said Section 5, being marked with an existing 1/2" iron bar; thence North 02° 59' 16" West 608.61 feet to the point of beginning, all in Franklin County, Kansas.

EXHIBIT B

Statement of Account

| | |
|---|---|
| Contract Value Unpaid | $ 1,180,857.60 |
| Retainage Withheld | $ 131,206.40 |
| Access Delay Expenses | $ 101,087.33 |
| Unpaid Change Orders | $1,600,392.89 |
| Total | $3,013,544.22 |

EXHIBIT C

C1: Subcontract Agreement
C2: Invoices
C3: Delay Summaries
C4: Day Shift and Night Shift Summaries (Unpaid Change Orders)

(Attached hereto)



**MINNESOTA LIMITED**
AN HVERGE COMPANY

Subcontractor Agreement
No. SR1916169002

This agreement is made at Big Lake, MN this day of __ January 17, 2020 _____ .

BETWEEN:

Minnesota Limited, LLC (Contractor)
18640 200ᵗʰ Street – PO Box 410
Big Lake, MN 55309

AND:

THE HDD COMPANY(Subcontractor)
4525 SERRANO PARKWAY, OFFICE SUITE 210
EL DORADO HILLS, CA 95762

RECITALS

Contractor ("Minnesota Limited, LLC) has entered into a contract (the "Prime Contract") with Southern Star Central Gas Pipeline, Inc. ("Owner") to perform certain labor and furnish certain materials for completion of the construction project KS - C60266 Install 31.5 miles of 36" (the "Project"). Subcontractor desires to perform certain services and/or provide certain materials as a subcontractor of Contractor pursuant to the terms and conditions of the Prime Contract, and agrees to the terms and conditions of this Agreement.

AGREEMENT

In consideration of the mutual covenants contained herein, the parties agree as follows:

I.      Subcontractor agrees to supply all the materials and labor and pay all license fees, permits and expenses for
        the work located at __ Various Sites _____ (the "Site"). As full compensation for performance of
        this Agreement and subject to all applicable provisions of this Agreement, Contractor agrees to pay
        Subcontractor:
        six million one-hundred eight-five thousand nine-hundred thirty six dollars ($6,185,936.00 _____ )

II.     **Contract Document**. Subcontractor's performance hereunder shall be subject to all terms and conditions
        contained in the Prime Contract and all drawings and/or specifications referred to therein (the "Contract
        Documents") except as such terms may be specifically amended by this Agreement, which includes HDD's
        Proposal, attached hereto and incorporated herein. Wherever the Contract Documents shall refer to the
        Contractor or its agents, the same shall be read to refer to the Subcontractor under this agreement.
        Subcontractor shall perform and coordinate its work hereunder in a manner necessary to assure the prompt
        and timely completion of the Project, time being of the essence to the



Agreement. At Subcontractor's request, a copy of the applicable Prime Contract Terms and Conditions will be supplied to Subcontractor.

Any terms and conditions proposed in Subcontractor's acceptance of or in any acknowledgement, invoice, or other form of Subcontractor that add to, vary from, or conflict with these terms hereby objected to. Any such proposed terms shall be void and these terms and conditions (1) shall constitute the complete and exclusive statement of the terms and conditions of the contract between the parties and (2) may be modified only by written instrument executed by the authorized representatives of both parties.

III.   **Insurance**. Subcontractor shall comply with the insurance requirements set forth in Exhibit A (attached).

IV.   **Additional Terms and Conditions**

A.   Subcontractor, not Contractor, assumes all the risk related to in performing its work under this Agreement, such as any injuries to Subcontractor, Subcontractor's workers, Facility employees and members of the public arising from the Subcontractors activities or use of tools and equipment, or from any other cause.

B.   Subcontractor will complete all work in a workmanlike and professional manner according to standard practices in the building trade, and in compliance with all building codes and other applicable laws. Subcontractor will warrant against defects in material and labor it supplies for the completion of the work. If subcontractor fails to perform under this Agreement, the party entitled to performance or the Contractor will have the right to hire other persons to correct the defective Work and hold Subcontractor liable for the costs thereof including costs, disbursements and reasonable attorneys' fees incurred in the enforcement of this provision.

C.   All Work will be done on a timely basis. The work to be performed under this contract shall be commenced as directed by Project Manager or Project Superintendent or Project Foreman and shall be substantially completed on or before _as agreed upon and directed onsite_____. Time is of the essence.

D.   Subcontractor shall indemnify, defend and hold harmless Contractor as set forth in Section VII.

E.   No work shall be subcontracted or assigned by Subcontractor without the prior written approval of the Contractor.

F.   Environmental, Health and Safety. Subcontractor shall take all necessary precautions to keep the work site free from hazards that are likely to cause injury, illness, or death or damage to property. Subcontractor shall provide any Safety Data Sheets (SDS) for any hazardous chemicals provided pursuant to this contract. Contractor is a company that operates under a "Culture of Safety" with the goal of zero incidents, and expects its subcontractor to similarly emphasize the paramount importance of safe behavior. Failure to abide by Contractor's policies may result in immediate removal of Subcontractor from the premises and will be a breach of Subcontractor's obligations hereunder.



**MINNESOTA LIMITED**

AN MVERDE COMPANY

Contractor shall have the right, at its option, to conduct a complete audit of Subcontractor's documents and practices to verify Subcontractor's compliance with this Section.

G.  Minnesota Limited has enacted a Subcontractor Management Program and Safety Requirements of which Subcontractor has received.  Subcontractor shall follow and adhere to all aspects of said program and the terms and conditions of such program are incorporated herein.

H.  Liens.  To the fullest extent permitted by law, and the extent the Contractors has paid the Subcontractor, Subcontractor will at all times keep the Project, the Site and each part thereof free from any attachment, lien, claim of lien, or other encumbrance arising out of the Work and Subcontractor will indemnify, defend and hold Contractor harmless from and against all claims, losses, demands, causes of action or expenses (including attorneys' fees and other costs of defense incurred by Contractor in defending against the foregoing or in enforcing this indemnity and defense obligation) of whatever nature, arising by reason of any such lien, claim of lien, attachment or encumbrance.  If any claim is filed to enforce any laborers, material men, mechanic's, or other similar lien arising out of or relating to the Work for which Contractor has paid the Subcontractor, Subcontractor will immediately cause such lien to be released and discharged and if Subcontractor fails to do so, then Contractor will have a right to pay all sums, including attorneys' fees and other costs and expenses incurred necessary to obtain such release and discharge, and hold Subcontractor liable for the amount thereof with the right to deduct all or a portion of such sum from accounts that may be due Subcontractor.

I.  Default. In addition to the other remedies available under law: (a) if Subcontractor should fail or refuse, except in cases where extension of time is provided, to supply enough properly skilled workers or proper materials for the Work; or (b) if Subcontractor should fail to make payment to its subcontractors for material or labor which are due to its Subcontractors, or (c) if Subcontractor should fail to keep and comply with any of the terms and provisions of this Agreement, or (d) if Subcontractor should be adjudged bankrupt, file or suffer to be filed a petition for relief under the Bankruptcy Act, or make a general assignment for the benefit of the creditors; or (e) if a receiver should be appointed on account of Subcontractor's insolvency; or (f) if Subcontractor fails to pay its employees' wages, benefits or tax withholdings; then, in any such event, Contractor may without prejudice to any other right or remedy and after giving Subcontractor and its surety, if any, upon twenty-four hours written notice, terminate its obligation to Subcontractor under this Agreement and take possession of the Site and complete (or cause to be completed) the Work by whatever method Contractor may deem expedient. In such case Subcontractor will not be entitled to receive any further payment until the Work is completed. Upon completion of the Work, Contractor will pay to Subcontractor an amount equal to (x) the unpaid portion of the Subcontract Amount attributable to the Work performed up to the termination less (y) the amount by which (i) the costs incurred by Contractor to complete the Work, including, without limitation, costs for architectural, managerial and administrative services and reasonable attorneys' fees, if legal counsel is employed, exceed (ii) the portion of the Subcontract Amount attributable to the balance of the Work yet to be performed at the time of termination. If the amount calculated under part (y) in the preceding sentence exceeds the amount owing under part (x), the Subcontractor will pay the difference to Contractor. If the amount in part (x) exceeds the amount in part (y), Contractor will pay the difference to Subcontractor.



J.    Subcontractor is an independent Subcontractor and is not an employee or agent of the Contractor and neither Subcontractor nor anyone employed by Subcontractor will be deemed for any purpose to be the agent, employee, servant or representative of Contractor in the performance of the Work. Subcontractor acknowledges and agrees that Contractor will have no direction or control over the means, methods, procedures or manner of the Work performed by Subcontractor or any of its subcontractors, or any of their employees, vendors or suppliers.

K.    No changes shall be made in the work proposed or in the price unless those changes are agreed to in writing by both Subcontractor and Contractor. Travis Gehr and / or ___James Redmond_____, shall be the Contractor's designated on site agent, if there is a dispute regarding whether the work is a change, Subcontractor may perform that work under protest and submit a claim to Contractor in accordance with this Agreement.

L.    Clean Up. Subcontractor will at all times keep the site or facility safe and free from the accumulation of waste materials or rubbish caused by its operations or related to the Work. Upon completion of the Work and each portion thereof, Subcontractor will remove all rubbish and waste produced by its operations or Work hereunder from the facility as well as all of its tools, equipment, machinery and surplus materials no longer needed and leave the site or facility in a "broom clean" or equivalent condition and safe for Subcontractor's employees and subsequent subcontractors to perform their work, unless otherwise specified in writing. If Subcontractor fails to clean up, Contractor may do so after written notice to Subcontractor and the cost thereof will be charged to Subcontractor.

V.   **Representations of Subcontractor**. Subcontractor represents and warrants the following:

A.    Subcontractor has examined the Agreement ("Prime Contract") between Owner and Minnesota Limited (if requested by the Subcontractor prior to the execution of the work) and agrees to all provisions affecting Subcontractors performance, including but not limited to the representations, obligations and warranties made by Minnesota Limited to the Owner.

B.    Subcontractor has the requisite authority and ability to perform the subcontract without delay.

C.    Subcontractor will not assign, subcontract or otherwise delegate its responsibilities and obligation hereunder without the written consent of Contractor.

D.    Subcontractor shall examined the specifications, site conditions, drawings and requirements of the work with due diligence and its bid has taken into consideration all conditions and risks which are reasonably related to the performance of the work.

E.    Ethics; Conflict of Interest. Subcontractor shall at all times during the performance of its obligations hereunder conform to sound ethical business practices in conformance with all applicable Laws and shall in its business practices promote the values of honesty, integrity, social responsibility, and human rights. Subcontractor shall not offer to any member of Contractor (including employees thereof) any gifts, entertainment, or other favors beyond the common courtesy usually associated with business practices. Subcontractor shall not pay any commissions or fees or grant any rebates or other



remuneration or monetary gratuity to any employee of Contractor. Subcontractor shall not grant any secret rebates nor pay any commissions or fees to any employee of Contractor.

F.  Invitees Prohibited. Subcontractor shall not, without prior written permission of Contractor, invite, permit entry or bring any Person onto the Contractor's Worksite or property who is not an employee of Subcontractor.

G.  Subcontractor will pay its employees promptly and maintain good labor relations. Subcontractor further represents that it has paid all union benefit contributions including fringe benefits. Subcontractor agrees that Contractor upon demand of the Labor Union, may withhold from any sums due Subcontractor and pay to the Administrator of the Plan any amounts owing and said payment shall be deducted from the invoice.

VI.  **Warranty**.

A.  Subcontractor warrants to the Contractor and Owner that all materials and equipment furnished under this Agreement will be new unless otherwise specified in writing, and that all work will be of good quality, free from faults and defects and in conformance with any Purchase Order and attachments thereto, including any specifications stipulated therein. All Work not so conforming to these standards may be considered defective, and the Subcontractor shall promptly repair and make good, after notice by the Contractor and Owner and without cost to the Contractor and Owner, any damages, defects or faults resulting from imperfect or defective Work done or materials furnished by the Subcontractor. The Subcontractor warrants that all labor, materials and equipment furnished under this Agreement shall be covered by warranty for a period of at least two (2) years (or during a longer period if required by the specifications and stipulated therein) from the date of acceptance of the completed Work by the Owner.

B.  Where material or equipment furnished by the Subcontractor is covered by a manufacturer's warranty or guarantee or other special warranty or guarantee the Subcontractor shall provide such warranty and provide additional or extended warranty or guarantees to the Contractor for its labor, materials and equipment to confirm to paragraph A above.

VII.  **Indemnification**. To the fullest extent permitted by law, the Subcontractor shall indemnify the Owner, Contractor and the agents and employees of any of them from and against claims, damages, losses and expenses, arising out of or in connection with, or resulting from the negliegent performance of the Subcontractor's work, the Subcontractor's subcontractors work, or anyone directly or indirectly employed by them but only to the extent caused by acts or omissions by either or any of them. In addition thereto, Subcontractor indemnifies Owner, Contractor and the agents and employees of any of them for expenses including attorney's fees and costs, incurred in responding to and defending against any claim or in enforcing this provision.

VIII.  **Payment**. Subcontractor shall invoice Minnesota Limited no later than 30 days after date of service. Contractor agrees to pay Subcontractor all sums due less ___10___ % retainage (if applicable) hereunder within



thirty (30) days from the date the invoice is received. However, it is a condition precedent to payment that if Owner withholds payments for that portion of any work performed by Subcontractor, then Minnesota Limited is only obligated to pay Subcontractor after receiving payment from the Owner. In such event payment will be made within ten (10) days. Contractor reserves the right to withhold such sums as may be necessary to pay expenses, including costs and attorney's fees, caused by, or related to, Subcontractor's breach of Agreement. Final payment of retainage will occur ten (10) days after final payment for Subcontractor's work is received and when lien waivers and job completion affidavit are executed.

IX.     **Maintaining Records / Audit.** For a period of five (5) years from final acceptance of Subcontractor's work, Subcontractor shall maintain all job records and shall, upon reasonable notice by Contractor, but no later than 10 business days, make such records available for inspection by Contractor or Owner. Contractor or Owner or their representatives may audit said records. If the results of the audit show an overpayment, Subcontractor shall reimburse the overpayment ~~together with interest of 1% per month. If the audit shows an overpayment more than one thousand dollars ($1,000), Subcontractor shall also reimburse Contractor or Company for the cost of the audit~~.

X.      **Interpretations and Enforcement.** The Agreement and contract documentation contains the parties entire understanding with regard to the subject hereof and shall not be modified except by a writing signed by both parties; provided, however, that Subcontractor shall be bound by changes in the Contract Documents agreed to between the Contractor and Owner, but only if Contractor has timely notified Subcontractor of such changes..  The interpretation and enforcement of this Agreement shall be governed by the laws of the state in which the work hereunder is to be performed or that specified in the Prime Contract if different than the state where the work is to be performed. If any provision hereof is deemed unenforceable, the remainder of the Agreement shall be enforced as though such provision were not a part hereof.

XI.     **Assignment.** Subcontractor shall not assign or subcontract this Agreement or any portion thereof or of any money due or which may become due hereunder without the prior written consent of Contractor. Notwithstanding anything to the contrary contained herein, Contractor may assign this Agreement without the consent of Subcontractor.

XII.    **Confidentiality of Agreement.** The Subcontractor agrees that all terms and conditions contained herein or in any other document(s) referencing the Project shall remain confidential. Said terms shall not be disclosed without the express written consent of the Contractor.

Minnesota Limited is required to protect all technical information supplied by the Owner. Subcontractor agrees that this Section is its written assurance that all such information, including but not limited to: drawings, diagrams, surveys, specifications, locations, and geophysical (GPS) coordinates of the work, will be kept confidential, protected, and will not be disclosed to third parties without obtaining Minnesota Limited's written consent unless ordered to do so by a court of law or arbitrator..   Breach of is provision will subject Subcontractor to all remedies awarded to Contractor and Owner including injunctive relief. Subcontractor agrees to pay all of Contractors and Owners attorney's fees in enforcing this provision.


**MINNESOTA LIMITED**
AN MVERGE COMPANY

XII.   **Notice.** Unless otherwise provided herein, any notice provided for herein will be in writing and delivered to the parties (a) in person, (b) by facsimile transmission (with the original and a copy of the facsimile confirmation following in the United States mail), (c) by overnight delivery service, or (d) by certified mail, return receipt requested. Notice will go to the address first shown herein for the respective party to whom notice is given or to such other address as may be designated by either party by written notice given pursuant hereto.

XIV.   **Governing Law/Venue/Attorney Fees.** This Agreement shall be construed and interpreted in accordance with the laws of the State of Minnesota, including, without limitation, matters of construction, validity, enforcement, and interpretation. The parties agree that venue for any dispute under this Agreement shall be in the District Court of Hennepin County, Minnesota. In the event any enforcement effort is initiated by Contractor against Subcontractor for default of this Agreement, ~~Subcontractor shall be liable to Contractor for any and all costs of collection, including but not limited to, reasonable attorneys' and professional fees, court costs, traveling and lodging expenses, costs of investigation and defense, accrued interest, and any other reasonable expenses incurred by Contractor in initiating such efforts.~~

Signed the day and year first written above.

CONTRACTOR: **Minnesota Limited, LLC.**

By: _____

Its: __Presidebt__
        Title

SUBCONTRACTOR: THE HDD COMPANY

By: _____

Its: __Vice President__
        Title



MINNESOTA LIMITED

## EXHIBIT A
## Insurance

Prior to commencing Work, Subcontractor shall, at its sole expense, procure and maintain insurance of the types, and in the form and amounts described below from insurer(s) authorized to transact business in the state where Work or operations will be performed by Subcontractor. Such insurance and required coverage in forms acceptable to General Contractor shall be placed with admitted insurers that maintain an A.M. Best's rating of not less than A- VII, unless otherwise approved by the General Contractor. The insurance requirements described below shall be maintained uninterrupted for the duration of the Project, including any warranty periods, and shall protect Subcontractor, and others for whom and/or to whom Subcontractor may be liable, for liabilities in connection with work performed by or on behalf of Subcontractor, its agents, representatives, employees or subcontractors.

### Insurance Requirements:

1.      **Commercial General and Umbrella Liability Insurance**. Subcontractor shall maintain commercial general liability ("CGL") and, if necessary, commercial umbrella insurance, with a limit of not less than $ 2,000,000.00         per occurrence, bodily injury or property damage liability; $ 2,000,000.00          per offense, personal and advertising injury liability; $  5,000,000.00                   products-completed operations aggregate; and $  5,000,000.00                   general aggregate applicable to claims other than products-completed operations.    To the extent that Subcontractor's CGL and any commercial umbrella insurance are subject to aggregate limits, the policy shall be endorsed so as to apply such aggregate limits separately to the Project.

Coverage afforded under Subcontractor's CGL and any commercial umbrella insurance shall be provided on an occurrence basis and shall be subject to the terms of the *Insurance Services Office ("ISO") Commercial General Liability Coverage Form CG 0001*, or a substitute form providing coverage at least as broad as the ISO form specified. There shall be no limitations or exclusions of coverage beyond those contained in the standard coverage form and coverage shall include liability arising from premises, operations, independent contractors, products-completed operations including construction defect, contractual liability or personal injury and advertising injury.

General Contractor, its officers, directors and employees and Project Owner(s) shall be included as additional insureds under Subcontractor's CGL, and any commercial umbrella insurance, with respect to liabilities arising out of both the ongoing and completed operations of Subcontractor. Such additional insured coverage shall be subject to the terms of ISO additional insured endorsement forms CG 2010 (ongoing operations) and form CG 2037 (products-completed operations), or substitute form(s) providing equivalent coverage. The edition date of the ISO endorsements required should be chosen based on the recipient's risk transfer objectives. The table below summarizes the options and major differences between the edition dates.

| Endorsement(s) | ISO Edition Date | Comments |
|---|---|---|
| CG 2010 | 11/85 Edition | Broadest Insuring Agreement - "liability arising out of" the Subcontractor's work - both ongoing |

Page 8 of 14
SR1916169002



| | | |
|---|---|---|
| | | operations and completed operations coverage provided by one endorsement. |
| CG 2010/CG2037 | 10/01 Edition | Same Insuring Agreement as 11/85 with ongoing operations and completed operations coverage provided by separate endorsements. |
| CG 2010/CG2037 | 07/04 Edition | More narrow Insuring Agreement – "caused in whole or in party by. . . .acts or omissions" of the Subcontractor. |
| CG2010/CG2037 | 04/13 Edition | Same Insuring Agreement as 07/04, but limits coverage to "extent permitted by law" and "not be broader than that which you are required by the contract or agreement to provide." |

Note: Recommended Additional Insured endorsement for states other than Minnesota may vary and Willis should be consulted. States including but not limited to IL, TX, & CA involve unique risk transfer considerations.

Additional insured coverage afforded by Subcontractors CGL, and any commercial umbrella insurance, shall be primary and non-contributing with respect to any insurance or self-insurance available to General Contractor or Project Owner. Such primary and non-contributory insurance shall be subject to the terms of ISO form CG 2001 (Primary and Noncontributory - Other insurance Condition) or its equivalent. Any other insurance or self-insurance maintained by General Contractor or Project owner shall be excess of, and non-contributory with, the coverage afforded by Subcontractors CGL and commercial umbrella insurance, if any.

In addition to procuring and maintaining CGL, and any commercial umbrella insurance, for the duration of the contract, Subcontractor agrees to continue to procure and maintain the products-completed operations liability insurance coverage for a minimum of __two__ ( 2 ) year(s) after the date that the Work is substantially complete. All terms and conditions of such coverage shall be maintained during this completed operations period, including the required coverage limits and the requirement to provide General Contractor and Project Owner with coverage as an additional insured for completed operations.

2.     **Commercial Automobile and Umbrella Liability Insurance.** Subcontractor shall maintain automobile liability and, if necessary, commercial umbrella insurance, with a limit of not less than $__2,000,000.00__ each accident. Such insurance shall cover liability for bodily injury and property damage arising from the use or operation of any auto, including those owned, hired or otherwise operated or used by or on behalf of Subcontractor. The coverage shall be subject to the terms of ISO *Business Auto Coverage Form CA 0001* (1990 edition or later), or a substitute form providing equivalent coverage.

3.     **Workers' Compensation and Employers Liability Insurance.** Subcontractor shall maintain workers' compensation coverage providing statutory benefits. Subcontractor shall additionally maintain employers liability insurance, and if necessary, commercial umbrella insurance, with a limit of not less than: $1,000,000, bodily injury by accident – each accident; $1,000,000, bodily injury by disease-policy limit; and $1,000,000, bodily injury by disease each employee. Workers' Compensation coverage must extend to every



employee, including owners/officers of a closely held corporation and/or individuals operating as a sole proprietorship or partnership. **Workers' Compensation must provide coverage in the state where the Project is located**.

Where applicable, evidence of coverage shall be required for U.S. Longshore and Harbor Workers Compensation, Maritime coverage, Federal Employer's Liability Act and other unique exposures requiring endorsement of coverage.

4. **Contractors Pollution Liability Insurance**. Required only if Subcontractor's scope of services include the remediation, treatment, storage or disposal of waste or hazardous materials on or about the project site, as determined by General Contractor. If required, Subcontractor shall maintain Contractors Pollution Liability coverage with a limit of not less than $_____n/a_____ per occurrence, $_____n/a_____ annual aggregate. Coverage shall apply to the scope of work as described under the Contract including transportation and shall include coverage for bodily injury; property damage, including loss of use of damaged property or property that has not been physically injured; clean-up costs; mold; defense and investigative costs. Subcontractor shall maintain Completed Operations coverage for _____n/a_____ years following final acceptance of the project or termination of the Contract.

If the scope of services in the contract require the Subcontractor to provide professional services associated with arranging for, or brokering of, hazardous material or construction and demolition (C&D) wastes off the job site, Subcontractor must amend the Contractors Pollution Liability policy to include coverage to address this scope of work. If any of the aforementioned insurance policies are written on a claims made basis, the Contractor warrants that continuous coverage will be maintained, or an extended discovery period will be exercised, for a period of three years beginning from the time the work under this contract is completed.

5. **Pollution (Environmental) Liability Insurance**. Required only if Subcontractor's scope of services involves disposal of waste or hazardous materials off-site, as determined by General Contractor. If required, Subcontractor shall maintain pollution (environmental) liability coverage with a limit of not less than: $_____n/a_____ per incident, $_____n/a_____ policy aggregate for hazardous waste disposal services, and $_____n/a_____ per incident, $_____n/a_____ for all other disposal facilities. Such coverage shall include clean-up costs, defense costs and products and completed operations.

If the scope of services in the contract requires the disposal of any hazardous materials or construction and demolition (C&D) wastes off the job site, Subcontractor must also obtain evidence that the Disposal Site Operator maintains Pollution Legal Liability Insurance with coverage for: a. bodily injury, sickness, disease, mental anguish or shock sustained by any person, including death; b. property damage including physical injury to or destruction of tangible property including the resulting loss of use thereof, clean-up costs, and the loss of use of tangible property that has not been physically injured or destroyed; c. defense including costs, charges and expenses incurred in the investigation, adjustment or defense of claims for such compensatory damages. d. pollution conditions on, at, under or emanating from any disposal site, location or facility, used by or on behalf of the disposal facility of any waste or waste materials relating to the performance of the work.



The Disposal Site Operator's Pollution Liability Policy will apply to losses arising from the facility that is accepting the waste under the contract. Minimum limits of Insurance for this policy shall be $_____n/a_____ each incident / $_____n/a_____ policy aggregate.

Claims-made coverage is permitted, provided the policy retroactive date is continuously maintained prior to the commencement date of the agreement, and coverage is continuously maintained during all periods in which Subcontractor accepts or treats waste generated from General Contractor's projects and for a period of *one (1)* year thereafter.

6.　　**Professional Liability Insurance**.　Required only if Subcontractor's scope of services include architectural, engineering, professional consulting or construction management, as determined by General Contractor. If required, Subcontractor shall maintain professional liability coverage with a limit of not less than $_____n/a_____ each wrongful act, $_____n/a_____ policy aggregate.

Coverage shall include liability arising from the errors, omissions or acts of the Subcontractor or any entity for which the Subcontractor is legally responsible in the providing of professional services under the Contract. Throughout the term the Contract, the PL/E&O policy shall include full prior acts coverage. Coverage shall be continuously maintained during the term of this Agreement and for a period of x years following final acceptance of the Project or termination of the Contract.

Coverage shall not include any exclusion or other limitations related to:
- Scope of the professional services
- Delays in project completion and cost overruns
- Who is authorized to notify the carrier of a claim or potential claim
- Mold, fungus, asbestos, pollutants or other hazardous substances

Claims-made coverage is permitted, provided the policy retroactive date is continuously maintained prior to the commencement date of this agreement, and coverage is continuously maintained during all periods in which Subcontractor performs professional services for General Contractor, and for an additional period of *one (1)* year after termination of this agreement or the last date such services are performed, whichever comes later. If Subcontractor's scope of work includes environmental engineering or consulting, the terms of coverage shall not exclude environmental professional services.

7.　　**Watercraft Liability Insurance**.　If watercraft of any kind is used by the CONTRACTOR or Subcontractor, including: (i) bodily injury; (ii) property damage; and (iii) passenger liability.

　　a.　　Limit of Liability: Combined Single Limit (Bodily Injury and Property Damage), $1,000,000 each occurrence;

　　b.　　Protection and Indemnity Insurance to include Jones Act crew coverage (or at least Maritime Employer's Liability: MEL), collision, tower's liability and wreck removal coverage, on a form providing



coverage no less extensive than that afforded in the P & I SP-23 form (revised 1/56), including a pollution buy-back endorsement.

8.     **Aircraft Liability Insurance**. If aircraft of any kind is used by the CONTRACTOR or Subcontractor, including: (i) bodily injury; (ii) property damage; and (iii) passenger liability.

        a.     Limit of Liability: Combined Single Limit (Bodily Injury and Property Damage and Passenger Liability), including hull physical damage insurance for the full replacement cost of each aircraft used in the work. Such Aircraft Liability and Hull Coverage shall include a waiver of subrogation against General Contractor and all others required by this Agreement to be additional insureds. $ ___n/a___ per seat; $ ___n/a___ per occurrence.

**Additional Provisions:**

1.     **Deductibles and Self-Insured Retentions**. The funding of deductibles and self-insured retentions maintained by Subcontractor shall be the sole responsibility of Subcontractor, including any amounts applicable to deductibles or self-insured retentions applicable to claims involving the General Contractor or Owner as an additional insured. Any self-insured retentions in excess of $ ___n/a___ must be declared to and approved by the General Contractor.

2.     **Primary / Non-Contributing**. Subcontractor's required insurance coverage shall be primary insurance, and any insurance or self-insurance maintained by the General Contractor or Project Owner shall be excess of and noncontributory with Subcontractor's insurance.

3.     **Severability of Interest**. Except with respect to the limits of insurance, Subcontractor's required insurance shall apply separately to each insured or additional insured.

4.     **Waiver of Subrogation**. Subcontractor agrees to waive all rights of subrogation against the General Contractor, Project Owner and Project Architect, and shall cause each of its subcontractors to waive all rights of subrogation against the General Contractor, Project Owner and Project Architect, their agents and employees, as respects loss, damage, claims, suits or demands, howsoever caused:

        a.     To real or personal property, vehicles, equipment, tools, etc. owned, leased or used by Subcontractor or Subcontractor's employees, agents or sub-subcontractors; and

        b.     To the extent such loss, damage, claims, suits or demands are, or should be, afforded coverage by the Subcontractor's required insurance or any other insurance (except professional liability to which this requirement does not apply) maintained by the Subcontractor. This waiver shall C1PPlY to all first party property, equipment, vehicle and workers' compensation claims (unless prohibited under applicable state statutes), and all third party liability claims. This waiver shall apply to all deductibles, retentions or self-insured layers applicable to the required or any other insurance (except professional liability to which this requirement does not apply) maintained by the Subcontractor. If necessary, Subcontractor agrees to endorse the required insurance policies to permit waivers of subrogation in



favor of General Contractor, Project Owner and Project Architect as required hereunder. Subcontractor further agrees to hold harmless and indemnify General Contractor, Project Owner and Project Architect for any loss or expense incurred as a result of Subcontractor's failure to obtain such waivers of subrogation from the insurers.

5. **Notice of Cancellation / Material Change / Nonrenewal.** Subcontractor's insurance policies must contain a provision or endorsement that the coverage afforded will not be canceled, materially changed or renewal refused until at least 30 days prior Written Notice has been given to General Contractor and to each other additional insured to whom a certificate of insurance has been issued; provided, however, that a ten (10) day prior notice requirement may apply in the event of cancellation due to nonpayment of premium.

6. **Verification of Coverage.** Prior to commencing Work, Subcontractor shall furnish General Contractor with certificate(s) of insurance executed by a duly authorized representative of each insurer, as evidence of compliance with the insurance requirements set forth above. Such certificates of insurance shall be accompanied by copies of endorsements evidencing coverage afforded to General Contractor and Project Owner as additional insured, and endorsements reflecting insurer's concurrence with Subcontractor's waiver of subrogation rights against General Contractor, Project Owner and Project Architect. Renewal certificates are to be provided to the General Contractor prior to the expiration of the required insurance policies.
Certified copies of policies, including all policy endorsements, shall be furnished by Subcontractor within 15 days of written request by General Contractor.

The certificate(s) of insurance shall be subject to approval of General Contractor, but failure of General Contractor to request such certificate or other evidence of Subcontractor compliance with insurance requirements, or failure of General Contractor to identify deficiencies from evidence that is provided, shall in no way limit or relieve Subcontractor of its obligations to maintain such insurance.

7. **Sub-Subcontractors.** No work shall be sublet to any Sub-subcontractor without first obtaining the General Contractor's written permission. All Sub-subcontractors, once approved by the General Contractor, are subject to the same insurance requirements as Subcontractor. Subcontractor shall cause each Sub-subcontractor employed by Subcontractor to purchase and maintain such insurance. Upon request, Subcontractor shall furnish General Contractor with copies of certificates of insurance evidencing coverage for each Sub-subcontractor.

Subcontractor shall voluntarily provide workers compensation coverage for proprietors, partners or others not statutorily required to maintain workers' compensation insurance.

8. **Leased Employees.** Use of leased employees by Subcontractor is expressly prohibited without General Contractor's written permission. If permitted by General Contractor, Subcontractor shall:

    a.    Provide General Contractor with a complete copy of its Agreement with the Leasing Company;



**MINNESOTA LIMITED**
AN HVERGE COMPANY

b.       Require that Leasing Company provide workers' compensation, employers liability and commercial general liability with coverage limits in amounts no less than Subcontractor insurance requirements for the same coverages.

c.       Require that Leasing Company provide Alternate Employer Endorsement naming General Contractor as alternate employer on Leasing Company's workers' compensation policy.

d.       Require that Leasing Company add General Contractor as an additional insured on its commercial general liability insurance policy, with primary/non-contributory wording.

e.       Require that Leasing Company provide waiver of subrogation in favor of General Contractor on both Leasing Company's workers' compensation and commercial general liability insurance policies.

f.       Provide General Contractor with a copy of the Leasing Company's certificate of insurance, with endorsements, evidencing the required coverage.

9.       **No Representation of Coverage Adequacy.** In specifying minimum Subcontractor insurance requirements, General Contractor does not represent that such insurance is adequate to protect Subcontractor for loss, damage or liability arising from its work. Subcontractor is solely responsible to inform itself of types or amounts of insurance it may need beyond these requirements to protect itself.

The insurance requirements set forth in minimum amounts shall not be construed to relieve Subcontractor for liability in excess of such coverage, nor shall it preclude General Contractor from taking such other actions as is available to it under any other provision of the Subcontract. To the extent Subcontractor maintains insurance greater than these minimum requirements, Subcontractor agrees that such insurance shall be applicable to any of Subcontractor's liability obligations hereunder.

Any acceptance of certificates of insurance by General Contractor shall in no way limit or relieve Subcontractor of its duties and responsibilities under this Subcontract, including the duty to indemnify and hold harmless General Contractor.

10.       **Compliance.** Failure of Subcontractor to maintain the required insurance shall constitute a default under this Subcontract and, at General Contractor's option, shall allow General Contractor to terminate this Subcontract for cause, withhold payment and/or purchase the required insurance at Subcontractor's expense.

11.       **Cross-Liability Coverage/Non-Standard Restrictive Endorsements.** All liability policies shall include cross liability coverage and a standard ISO separation of insureds provision, or its equivalent. No liability policy shall include or be endorsed to include any non-standard provisions restricting coverage for the named insured or the persons/entities required to be named as additional insureds under this Agreement, including but not limited to cross liability coverage exclusions or limitations.



THE
HDD
COMPANY

EL DORADO HILLS | OFFICE Suite 310
4526 Serrano Parkway, El Dorado Hills, CA USA 95762

MAIN 530 676 5700 | CROSSINGGROUP.COM

January 9, 2020

**Minnesota Limited**
18640 200th St, PO Box 410
Big Lake, MN 55309

ATTN: Amy Skuza

RE:     Southern Star Lines DT and DS Replacement Project
        Directionally drill and install approximately 6,052 feet of 36-inch steel pipeline in
        Anderson and Franklin Counties, KS.

The HDD Company is pleased to submit the following bid quote:

1.     **Responsibilities of The HDD Company**
       1.1.    Provide all required insurance certificates.
       1.2.    Provide any written submittals and qualifications required.
       1.3.    Provide 2 (two) drill rig(s) with sufficient capabilities to install the crossings, a
               closed-loop mud system, mud pumps, vacuum trucks, dump trucks, steering
               system, and all drill spread support equipment necessary.
       1.4.    Provide all required union labor for the drilling operations.
       1.5.    Provide preliminary drill profiles for each crossing.
       1.6.    Provide final as-built drawings.
       1.7.    Provide and haul water for drilling operations.
       1.8.    Provide water storage for the duration of drilling operations.
       1.9.    Provide all required pulling heads.
       1.10.   Leave the entry areas clean, free of debris, and to a rough grade.
       1.11.   Provide bonding at 1%, which is not included in the bid pricing below.

2.     **Responsibilities of THE CONTRACTOR**
       2.1.    Stake and survey the entry and exit points for each bore, with correct stations
               and elevations.
       2.2.    Provide all permitting to undertake the project.
       2.3.    Provide and maintain suitable truck access to and from entry and exit locations.
       2.4.    Provide stable, level, matted and/or graveled work pads for each bore.
       2.5.    Provide all BMPs around each bore's entry and exit locations. The HDD
               Company will maintain these items.
       2.6.    Provide, string, weld, and test all 36-inch pipe for each bore.

*Going to Greater Lengths™*

2.7.  Provide all plans, equipment, and manpower to handle pipe during pullback operations.

2.8.  Perform all final tie-ins.

2.9.  Provide all settlement monitoring, if required.

2.10.  Provide all final site restorations.

2.11.  Provide all field surveys to document existing conditions for the HDD installations, including but not limited to pictures, videos, field notes, etc.

## 3.  Pricing (Lump Sum)

| | | |
|---|---|---|
| 3.1. | HDD Cedar Creek 2,106' X 36" pipe: | $1,280,448.00 |
| 3.2. | HDD Pottawapomie Creek 1,788' X 36" pipe: | $1,087,104.00 |
| 3.3. | HDD Flint Hill 2,158' X 36" pipe: | $1,312,064.00 |
| 3.4. | Mobilization per rig spread: | $50,000.00 |

## 4.  Clarifications

4.1.  Additional footage due to no fault of The HDD Company, will be billed at $608.00/LF.

4.2.  This proposal is based upon the drawings, specifications, and geotechnical information provided to us on or before 7 June 2019.

4.3.  If any revised or additional drawings, specifications, geotechnical information, or permits are provided to us after the bid submission date, The HDD Company reserves the right to modify the proposal to account for any added costs and/or additional time associated with the change(s).

4.4.  The HDD Company's bid proposal is conditional upon reaching an agreement upon mutually acceptable contract terms. This bid proposal will be attached to and forms a part of the contract between The HDD Company and THE CONTRACTOR.

4.5.  Item 3.3 above includes the hauling and disposal of all non-contaminated drilled solids and excess drilling fluids.

4.6.  The pricing above is contingent upon a site visit.

## 5.  Exclusions

5.1.  The HDD Company and its personnel are not the Project Engineers. Therefore, we exclude all design and engineering services unless any are specifically noted as included in this proposal. Any drilling plans or profiles that we submit to you will be based upon the design information in the contract documents and our experience as HDD contractors. Any plans or profiles we provide are recommendations only and are subject to review and approval by the project owner and/or its engineers.

5.2.  All permits, including federal, State and local environmental permits, the SWPPP permit and any associated SWPPP plans, any right-of-way (ROW) agreement or easements, and all access necessary for us to perform our work shall be provided by others. If our operations are delayed or otherwise impacted by any delays or problems with permits, SWPPP plans, ROW agreements, easements or access arrangements our compensation and time for completion will be equitably adjusted.

Going to Greater Lengths™

6. **Terms and Conditions**
   6.1. Schedule
      6.1.1. This proposal is based upon performance under a reasonable and mutually agreed-to project schedule in so far as that schedule applies to our work. The approved project baseline schedule and all monthly updates must be provided to us on a regular and timely basis to keep us apprised of schedule changes which may impact the timing and efficiency of our work. We will not be liable for any delays caused by others or by factors beyond our reasonable control.
   6.2. Indemnification
      6.2.1. We will indemnify you and/or the project owner for personal injury or property damage claims to the extent of our own negligence. Our proposal excludes any obligation to indemnify you for your own negligence or to indemnify any other party for that party's own negligence or to indemnify any design professional.
   6.3. Payment
      6.3.1. Monthly progress payments will be made to The HDD Company within (7) seven days after you receive each monthly payment from the project owner, but in no event later than 120 days from the date you received your invoice.
      6.3.2. We will receive our final payment within 30 days after you receive our final billing and our work has been completed and accepted. Acceptance will not be unreasonably withheld or delayed. If you dispute any portion of any billing, you will promptly notify us in writing of the nature of the dispute and you will pay the undisputed portion of the billing without delay. If any undisputed amounts are past due for more than 10 days, we reserve the right to stop work until all payments are brought current. We will provide lien releases in accordance with applicable state statutes or regulations. We will keep the project free of liens from out subcontractors, suppliers and other vendors provided we have been paid by you for the work covered by any such liens.
   6.4. Extra/Force Account Work:
      6.4.1. If we are directed to perform any work on a force account or time and material basis, the rates for our labor and equipment will be as stated in our proposal, or if no rates are included with this proposal, as stated in our then current standard labor and equipment rate schedule. If we are directed to standby or suspend work while other operations occur, or delays or other problems are resolved, or if we are required to standby due to events or circumstances beyond our control, the standby time for our labor and equipment will be paid as stated in this proposal.
   6.5. Differing Site Conditions

*Going to Greater Lengths"*

6.5.1. If the conditions we encounter in the performance of our work differ materially from those indicated in the contract documents, boring logs, geotechnical reports or other information furnished to us prior to bid, or from those ordinarily encountered and generally recognized as inherent in the type of work provided for in our proposal, then our compensation and time for completion will be equitably adjusted to account for any resulting delay and added costs.

7. **Delays and Work Stoppages:**

7.1. All work stoppages that arise through no fault of The HDD Company will be billed at **$14,500** (no crew on site).

The HDD Company appreciates the opportunity to furnish you this quote and looks forward to working with you. Should any of the information presented above need further clarification, please do not hesitate to contact us.

Sincerely,
**The HDD Company**

Jeremy King
Vice President

Going to Greater Lengths™



THE
HDD
COMPANY

EL DORADO HILLS | OFFICE Suite 210,
4525 Serrano Parkway, El Dorado Hills, CA USA 95762

MAIN 530 676 5705 | CROSSINGGROUP.COM

17 January 2020

**Minnesota Limited**
18640 200th St, PO Box 410
Big Lake, MN 55309

ATTN: Brad Cordes

RE:    Southern Star Lines DT and DS Replacement Project
       Directionally drill and install approximately 4540 feet of 36-inch steel pipeline road
       crossings in Anderson and Franklin Counties, KS.

The HDD Company is pleased to submit the following bid quote:

1.   **Responsibilities of The HDD Company**
     1.1.   Provide all required insurance certificates.
     1.2.   Provide any written submittals and qualifications required.
     1.3.   Provide drill rig(s) with sufficient capabilities to install the crossings, a closed-
            loop mud system, mud pumps, vacuum trucks, dump trucks, steering system,
            and all drill spread support equipment necessary.
     1.4.   Provide all required union labor for the drilling operations.
     1.5.   Provide final as-built drawings.
     1.6.   Provide and haul water for drilling operations.
     1.7.   Provide water storage for the duration of drilling operations.
     1.8.   Provide all required pulling heads.
     1.9.   Leave the entry areas clean, free of debris, and to a rough grade.
     1.10.  Provide bonding at 1%, which is not included in the bid pricing below.

2.   **Responsibilities of THE CONTRACTOR**
     2.1.   Stake and survey the entry and exit points for each bore, with correct stations
            and elevations.
     2.2.   Provide all permitting to undertake the project.
     2.3.   Provide and maintain suitable truck access to and from entry and exit locations.
     2.4.   Provide stable, level, matted and/or graveled work pads for each bore.
     2.5.   Provide bore pits and shore if needed.
     2.6.   Provide all BMPs around each bore's entry and exit locations. The HDD
            Company will maintain these items.
     2.7.   Provide, string, weld, and test all 36-inch pipe for each bore.
     2.8.   Furnish support crew for road crossings, including excavators and manpower.

*Going to Greater Lengths*™

2.9.    Provide all plans, equipment, and manpower to handle pipe during pullback operations.

2.10.   Perform all final tie-ins.

2.11.   Dispose of cuttings.

2.12.   Provide all settlement monitoring, if required.

2.13.   Provide all final site restorations.

2.14.   Provide all field surveys to document existing conditions for the HDD installations, including but not limited to pictures, videos, field notes, etc.

## 3. Pricing

3.1.    4540' X 36" pipe:           **$508.00/ft**

3.2.    Mobilization per rig spread:    **$50,000.00**

## 4. Clarifications

4.1.    This proposal is based upon the drawings, specifications, and geotechnical information provided to us on or before **17 January 2020.**

4.2.    If any revised or additional drawings, specifications, geotechnical information, or permits are provided to us after the bid submission date, The HDD Company reserves the right to modify the proposal to account for any added costs and/or additional time associated with the change(s).

4.3.    The HDD Company's bid proposal is conditional upon reaching an agreement upon mutually acceptable contract terms. This bid proposal will be attached to and forms a part of the contract between The HDD Company and THE CONTRACTOR.

4.4.    The pricing above is contingent upon a site visit.

## 5. Exclusions

5.1.    The HDD Company and its personnel are not engineers. Therefore, we exclude all design and engineering services unless any are specifically noted as included in this proposal. Any drilling plans or profiles that we submit to you will be based upon the design information in the contract documents and our experience as HDD contractors. Any plans or profiles we provide are recommendations only and are subject to review and approval by the project owner and/or its engineers.

5.2.    All permits, including federal, State and local environmental permits, the SWPPP permit and any associated SWPPP plans, any right-of-way (ROW) agreement or easements, and all access necessary for us to perform our work shall be provided by others. If our operations are delayed or otherwise impacted by any delays or problems with permits, SWPPP plans, ROW agreements, easements or access arrangements our compensation and time for completion will be equitably adjusted.

## 6. Terms and Conditions

6.1.    Schedule

        6.1.1.    This proposal is based upon performance under a reasonable and mutually agreed-to project schedule in so far as that schedule applies to our work. The approved project baseline schedule and all monthly updates must be provided to us on a regular and timely basis to keep

us apprised of schedule changes which may impact the timing and efficiency of our work. We will not be liable for any delays caused by others or by factors beyond our reasonable control.

6.2. Indemnification

6.2.1. We will indemnify you and/or the project owner for personal injury or property damage claims to the extent of our own negligence. Our proposal excludes any obligation to indemnify you for your own negligence or to indemnify any other party for that party's own negligence or to indemnify any design professional.

6.3. Payment

6.3.1. Monthly progress payments will be made to The HDD Company within (7) seven days after you receive each monthly payment from the project owner, but in no event later than 120 days from the date you received your invoice.

6.3.2. We will receive our final payment within 30 days after you receive our final billing and our work has been completed and accepted. Acceptance will not be unreasonably withheld or delayed. If you dispute any portion of any billing, you will promptly notify us in writing of the nature of the dispute and you will pay the undisputed portion of the billing without delay. If any undisputed amounts are past due for more than 10 days, we reserve the right to stop work until all payments are brought current. We will provide lien releases in accordance with applicable state statutes or regulations. We will keep the project free of liens from out subcontractors, suppliers and other vendors provided we have been paid by you for the work covered by any such liens.

6.4. Extra/Force Account Work:

6.4.1. If we are directed to perform any work on a force account or time and material basis, the rates for our labor and equipment will be as stated in our proposal, or if no rates are included with this proposal, as stated in our then current standard labor and equipment rate schedule. If we are directed to standby or suspend work while other operations occur, or delays or other problems are resolved, or if we are required to standby due to events or circumstances beyond our control, the standby time for our labor and equipment will be paid as stated in this proposal.

6.5. Differing Site Conditions

6.5.1. If the conditions we encounter in the performance of our work differ materially from those indicated in the contract documents, boring logs, geotechnical reports or other information furnished to us prior to bid, or from those ordinarily encountered and generally recognized as inherent in the type of work provided for in our proposal, then our compensation and time for completion will be equitably adjusted to account for any resulting delay and added costs.

Going to Greater Lengths™

7.    **Delays and Work Stoppages:**

    7.1.    All work stoppages that arise through no fault of The HDD Company will be billed at **$14,500** (no crew on site).

The HDD Company appreciates the opportunity to furnish you this quote and looks forward to working with you.  Should any of the information presented above need further clarification, please do not hesitate to contact us.

Sincerely,
**The HDD Company**

Jeremy King

# The HDD Company, Inc.

4525 Serrano Pkwy #210
El Dorado Hills, CA  95762
(530) 676-5705  Fax (530) 676-3605

# Invoice

| DATE | INVOICE # |
|------|-----------|
| 7/10/2020 | 20-345-10 |

| BILL TO |
|---------|
| MINNESOTA LIMITED<br>PO BOX  410<br>BIG LAKE, MN  5530934 |

| P.O. NO. | TERMS | JOB NO. |
|----------|-------|---------|
| 1916169002 | Net 30 | 20-345-10 |

| SERVICE DAY | DESCRIPTION | QTY/FT | RATE | AMOUNT |
|-------------|-------------|--------|------|--------|
| 7/10/2020 | Completion of bore Flint Hill | | 1,312,064.00 | 1,312,064.00 |
| 7/10/2020 | LESS 10% RETENTION | 1,312,064 | -0.10 | -131,206.40 |
| | Subcontract Agreement No. SR1916169002<br>Southern Star Central Gas Pipeline  Project C-60266 | | | |

| Thank you for your business. | **Total** | $1,180,857.60 |
|------------------------------|-----------|---------------|

| PROJECT NAME: | | |
|---|---|---|
| PROJECT NO.: | Southern Star Line DT & DS Replacement |  Horizontal Directional Drilling |

| CLIENT/OWNER: | Minnesota Limited - Southern Star | DATE: | |
|---|---|---|---|
| WORK PRFM'D. BY: | The HDD Company, Inc. | EXTRA WRK. SHT. NO. | Cedar Creek HDD |
| DESCPTN. OF WORK: | Access and weather delays | | |
| 0 | | | |
| 0 | | | |
| 0 | | | |

## A – EQUIPMENT

| EQUIP. NO. | Company Owned Equipment | HRS. | RATE/HR. | TOTAL/DAY |
|---|---|---|---|---|
| 1 | Drilling Rig HDD Rig 7 - Vermeer 750 | 32,50 | $ 205,56 | $ 6.680,70 |
| 1 | Mud Tank / Solids Control Unit | 32,50 | $ 111,96 | $ 3.638,70 |
| 1 | Sump Pit/Trash Pump | 32,50 | $ 8,29 | $ 269,43 |
| 1 | Mud Pumping Units | 32,50 | $ 60,94 | $ 1.980,55 |
| 2 | Tool Van and tools | 32,50 | $ 17,55 | $ 1.140,75 |
| 0 | Dump Truck A–17 TRUN 2AXL | | | $ - |
| 3 | Vac. Truck A–17 TRUN 2AXL | 32,50 | $ 45,75 | $ 4.460,63 |
| 10 | Misc. Trailers | 32,50 | $ 1,79 | $ 581,75 |
| 1 | Haul Trucks | 32,50 | $ 34,13 | $ 1.109,23 |
| 1 | 6 3/4" Non Mag Drill Collars w/Jet Assembly | 32,50 | $ 6,83 | $ 221,98 |
| 168 | Drill Pipe (5-1/2 FH) | 32,50 | $ 0,53 | $ 2.893,80 |
| 2 | Misc. X–Subs and Rack (All X Subs for Spread) | 32,50 | $ 5,20 | $ 338,00 |
| 0 | Sonde and Housing | | | |
| 0 | Steering Tool (North Referencing w/Tru–Gyde) | | | |
| 48 | Rollers | 32,50 | $ 1,50 | $ 2.340,00 |
| 3 | Ford F-250 T&TT 06-12 | 32,50 | $ 5,04 | $ 491,40 |
| 0 | Ford F-450 T&TT 20-28 | | | |
| 0 | Ford F-350 T&TT 20-28 | | | |
| 0 | KW & Crane Truck | | | |
| 1 | Hammer | 32,50 | $ 41,93 | $ 1.362,73 |
| 1 | 300 Amp Welder | 32,50 | $ 9,49 | $ 308,43 |
| 1 | 1/2 Ton Truck | 32,50 | $ 32,48 | $ 1.055,60 |
| 1 | 60" Casing | 32,50 | $ 3,25 | $ 105,63 |
| 0 | Mud Bins | | | |

| Rental Equipment | | | | |
|---|---|---|---|---|
| 1 | 10K Reach Forklift | S.T. | 32,50 | $ 51,29 | $ 1.666,93 |
| | | O.T. | | | $ - |
| 2 | 225 Excavator | S.T. | 32,50 | $ 91,59 | $ 5.953,35 |
| | | O.T. | | | $ - |
| 2 | Portable toilets | S.T. | 32,50 | $ 1,50 | $ 97,50 |
| | | O.T. | | | $ - |
| 0 | Multiquip 20KW Generator | S.T. | | | $ - |
| | | O.T. | | | $ - |
| 3 | Frac Tank | S.T. | 32,50 | $ 7,32 | $ 713,70 |
| | | O.T. | | | $ - |
| 1 | Trash Bin | S.T. | 32,50 | $ 4,97 | $ 161,53 |
| | | O.T. | | | $ - |
| 1 | 500 Amp Welder | S.T. | 32,50 | $ 9,49 | $ 308,43 |
| | | O.T. | | | $ - |
| 2 | Light Tower | S.T. | 32,50 | $ 7,61 | $ 494,65 |
| | | O.T. | | | $ - |
| 1 | 175 KW Generator | S.T. | 32,50 | $ 71,36 | $ 2.319,20 |
| | | O.T. | | | $ - |
| 1 | 6" Diesel Trash Pump | S.T. | 32,50 | $ 23,60 | $ 767,00 |
| | | O.T. | | | $ - |
| 1 | HTI Mud Motor | S.T. | 32,50 | $ 42,50 | $ 1.381,25 |
| | | S.T. | | | $ - |
| | | O.T. | | | $ - |

| COMPANY OWNED EQUIPMENT | | 28.979,28 |
|---|---|---|
| RENTAL EQUIPMENT W/ 15% Markup | | 15.943,05 |
| A– EQUIPMENT SUB-TOTAL COST | | $ 44.922,33 |
| 0,00 | % Sales Tx. Rental Equip. | |

## B – MATERIALS

| MATERIALS DESCRIPTION | QTY. USED | UNIT $ | TOTAL |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |

| B–MATERIALS SUB-TOTAL COST | | $ - |
|---|---|---|
| 0,00 | % Sales Tax | |
| 15 | % ADDED M. U. | $ - |
| SUB-TOTAL A + B w/Tax | | $ 44.922,33 |

## C – SUBCONTRACT / WORK DONE BY SPECIALISTS/THIRD PARTY SERVICES

| Work Description | Individual / Company | Unit | RATE | TOTAL $ |
|---|---|---|---|---|
| Roller Damage | Minnesota Limited | 8,00 | $ 2.900,00 | $ 23.200,00 |
| | | | | $ - |
| | | | | $ - |
| | | | | $ - |
| | | COST OF SUBS – C | | $ 23.200,00 |
| 15 | % MARKUP (Subcontractor) | | | $ 3.480,00 |
| | | $ | | $ 26.680,00 |
| TOTAL COST A + B + C (Including Mark-Up) | | | | $ 71.602,33 |

## D – LABOR

| NO. | | HRS. | BASE RATE w/FRING'S. | SUB TOTAL | Per Diem Totals | TOTAL |
|---|---|---|---|---|---|---|
| 1 | Chris Crough (Day Rate) REG. | 3,00 | $1.916,84 | $3.050,52 | $120,00 | $3.170,52 |
| | O.T. | 0 | | $0,00 | | $0,00 |
| | D.T. | 0 | | $0,00 | | $0,00 |
| 2 | Randy Foster (Day Rate) REG. | 3,00 | $968,88 | $2.906,64 | $300,00 | $3.206,64 |
| | O.T. | | | $0,00 | | $0,00 |
| | D.T. | | | $0,00 | | $0,00 |
| 3 | Harold Shoemaker (Day REG. | 0,00 | | $0,00 | $0,00 | $0,00 |
| | O.T. | | | $0,00 | | $0,00 |
| | D.T. | | | $0,00 | | $0,00 |
| 4 | Justin Potter REG. | 32,50 | $59,79 | $1.943,18 | $345,00 | $2.288,18 |
| | O.T. | 0,00 | $80,65 | $0,00 | | $0,00 |
| | D.T. | | | $0,00 | | $0,00 |
| 5 | Brandon Morris REG. | 32,50 | $39,83 | $1.294,48 | $315,00 | $1.609,48 |
| | O.T. | 0,00 | $54,42 | $0,00 | | $0,00 |
| | D.T. | | | $0,00 | | $0,00 |
| 6 | David Jones REG. | 32,50 | $42,86 | $1.392,95 | $315,00 | $1.707,95 |
| | O.T. | 0,00 | $58,96 | $0,00 | | $0,00 |
| | D.T. | | | $0,00 | | $0,00 |
| 7 | Brandon Sammet REG. | 32,50 | $59,79 | $1.943,18 | $315,00 | $2.258,18 |
| | O.T. | 0,00 | $80,65 | $0,00 | | $0,00 |
| | D.T. | | | $0,00 | | $0,00 |
| 8 | Roger Reeter REG. | 32,50 | $59,79 | $1.943,18 | $300,00 | $2.243,18 |
| | O.T. | 0,00 | $80,65 | $0,00 | | $0,00 |
| | D.T. | | | $0,00 | | $0,00 |
| 9 | Augustin Zepeda REG. | 32,50 | $36,83 | $1.196,98 | $315,00 | $1.511,98 |
| | O.T. | 0,00 | $69,49 | $0,00 | | $0,00 |
| | D.T. | | | $0,00 | | $0,00 |
| 10 | Johnny Hatfield REG. | 32,50 | $43,49 | $1.413,43 | $150,00 | $1.563,43 |
| | O.T. | 0,00 | $59,91 | $0,00 | | $0,00 |
| | D.T. | | | $0,00 | | $0,00 |
| 11 | REG. | 0,00 | | $0,00 | | $0,00 |
| | O.T. | 0,00 | | $0,00 | | $0,00 |
| | D.T. | | | $0,00 | | $0,00 |
| 12 | REG. | 0,00 | | $0,00 | | $0,00 |
| | O.T. | 0,00 | | $0,00 | | $0,00 |
| | D.T. | | | $0,00 | | $0,00 |
| 13 | REG. | 0,00 | | $0,00 | | $0,00 |
| | O.T. | 0,00 | | $0,00 | | $0,00 |
| | D.T. | | | $0,00 | | $0,00 |

| D – LABOR SUB-TOTAL | $ | 19.559,51 |
|---|---|---|
| 15 % Labor Surcharge | | 2.933,93 |
| SUBTOTAL | | 22.493,44 |
| 15 % MARKUP ON LABOR | | 3.374,02 |

## E – MISCELLANEOUS ITEMS

| MISC. DESCRIPTIONS | QTY. | Unit $ | EX. AMOUNT |
|---|---|---|---|
| Hotel | | | |
| | 6 | $ 58,00 | $ 348,00 |
| | 9 | $ 68,00 | $ 612,00 |
| Subsistance | | | $ - |
| Misc. Items | | | $ - |
| 0 | 0 | | $ - |
| 0 | 0 | | $ - |
| 0 | 0 | | $ - |
| 0 | 0 | | $ - |
| 0 | 0 | | $ - |
| 0 | 0 | | $ - |

| E– MISCELLANEOUS ITEMS SUB TOTAL | | $ 960,00 |
|---|---|---|
| 5 % Sales/City/Room Tax | | 48,00 |
| 15 % ADDED MARK-UP | | 144,00 |
| 0 % Tax on Misc. Items | | 0 |
| SUB TOTAL - E | | $ 1.152,00 |

## TOTALS

| TOTAL COST A+B+C (Equipment /Material /Sub-Contractors) | $ 71.602,33 |
|---|---|
| TOTAL COST + D (Labor) | $ 25.867,45 |
| TOTAL COST + E (Miscellaneous Items) | $ 1.152,00 |
| SUB-TOTAL | $ 98.621,78 |
| 2,5 % BOND & INSURANCE | $ 2.465,54 |
| TOTAL COST THIS SHEET | $ 101.087,33 |

| TIME | CLIENT DIRECTIVES AND COMMENTS |
|---|---|
| 0:00 | (See Daily Work Report) |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |

| PROJECT NAME: | |
|---|---|
| PROJECT NO.: | Southern Star Line DT & DS Replacement |


Horizontal Directional Drilling

**EXTRA WORK SHEET REPORT**
**INTERNAL - OFFICE**

| | | | |
|---|---|---|---|
| CLIENT/OWNER: | Minnesota Limited - Southern Star | DATE: | |
| WORK PRFM'D. BY: | The HDD Company, Inc. | EXTRA WRK. SHT. NO. | Day Shift |
| DESCPTN. OF WORK: | Time spent reinstalling 36" pipeline, Multiple days from 6/22/20 - 7/15/20 and 8/22/20 - 9/9/20 | | |

## A - EQUIPMENT

| EQUIP. NO. | Company Owned Equipment | HRS. | RATE/HR. | TOTAL/DAY |
|---|---|---|---|---|
| 1 | Drilling Rig HDD Rig 7 - Vermeer 750 | 408.00 | $205.56 | $83,868.48 |
| 1 | Mud Tank / Solids Control Unit | 408.00 | $111.96 | $45,679.68 |
| 1 | Sump Pit/Trash Pump | 408.00 | $8.29 | $3,382.32 |
| 1 | Mud Pumping Units | 408.00 | $60.94 | $24,863.52 |
| 2 | Tool Van and tools | 408.00 | $17.55 | $14,320.80 |
| 0 | Dump Truck A~17 TRUN 2AXL | | | |
| 3 | Vac. Truck A~17 TRUN 2AXL | 408.00 | $45.75 | $55,998.00 |
| 10 | Misc. Trailers | 408.00 | $1.79 | $7,303.20 |
| 1 | Haul Trucks | 408.00 | $34.13 | $13,925.04 |
| 1 | 6 3/4" Non Mag Drill Collars w/Jet Assembly | 408.00 | $6.83 | $2,786.64 |
| 168 | Drill Pipe (5-1/2 FH) | 408.00 | $0.53 | $36,328.32 |
| 2 | Misc. X~Subs and Rack (All X Subs for Spread) | 408.00 | $5.20 | $4,243.20 |
| 0 | Sonde and Housing | | | |
| 0 | Steering Tool (North Referencing w/Tru~Gyde) | | | |
| 48 | Rollers | 408.00 | $1.50 | $29,376.00 |
| 3 | Ford F-250 T&TT 06~12 | 408.00 | $5.04 | $6,168.96 |
| 0 | Ford F-450 T&TT 20~28 | | | |
| 0 | Ford F-350 T&TT 20~28 | | | |
| 0 | KW & Crane Truck | | | |
| 1 | Hammer | 408.00 | $41.93 | $17,107.44 |
| 1 | 300 Amp Welder | 408.00 | $9.49 | $3,871.92 |
| 1 | 1/2 Ton Truck | 408.00 | $32.48 | $13,251.84 |
| 1 | 60" Casing | 408.00 | $3.25 | $1,326.00 |
| 0 | Mud Bins | | | |

### Rental Equipment

| EQUIP. NO. | Description | | HRS. | RATE/HR. | TOTAL/DAY |
|---|---|---|---|---|---|
| 1 | 10K Reach Forklift | S.T. | 408.00 | $51.29 | $20,926.32 |
| | | O.T. | | | $- |
| 2 | 225 Excavator | S.T. | 408.00 | $91.59 | $74,737.44 |
| | | O.T. | | | $- |
| 2 | Portable toilets | S.T. | 408.00 | $1.50 | $1,224.00 |
| | | O.T. | | | $- |
| 0 | Multiquip 20kW Generator | S.T. | | | $- |
| | | O.T. | | | $- |
| 3 | Frac Tank | S.T. | 408.00 | $7.32 | $8,959.68 |
| | | O.T. | | | $- |
| 1 | Trash Bin | S.T. | 408.00 | $4.97 | $2,027.76 |
| | | O.T. | | | $- |
| 1 | 500 Amp Welder | S.T. | 408.00 | $9.49 | $3,871.92 |
| | | O.T. | | | $- |
| 2 | Light Tower | S.T. | 408.00 | $7.61 | $6,209.76 |
| | | O.T. | | | $- |
| 1 | 175 KW Generator | S.T. | 408.00 | $71.36 | $29,114.88 |
| | | O.T. | | | $- |
| 1 | 6" Diesel Trash Pump | S.T. | 408.00 | $23.60 | $9,628.80 |
| | | O.T. | | | $- |
| 1 | HTI Mud Motor | S.T. | 408.00 | $42.50 | $17,340.00 |
| | | O.T. | | | $- |

| | |
|---|---|
| COMPANY OWNED EQUIPMENT | $363,801.36 |
| RENTAL EQUIPMENT W/ 15% Markup | $200,146.64 |
| A~ EQUIPMENT SUB - TOTAL COST | $563,948.00 |
| 0.00 % Sales Tx. Rental Equip. | |

## B - MATERIALS

| MATERIALS DESCRIPTION | QTY. USED | UNIT $ | TOTAL |
|---|---|---|---|
| Bentonite | 86.00 | $9.50 | $817.00 |
| Cement | 54.00 | $9.50 | $513.00 |
| Shaker Screens | 6.00 | $135.00 | $810.00 |
| 0 | | $- | $- |
| B~MATERIALS SUB-TOTAL COST | | | $2,140.00 |
| 0.00 % Sales Tax | | | |
| 15 % ADDED M.U. | | | $321.00 |
| SUB-TOTAL A + B w/Tax | | | $566,409.00 |

## C - SUBCONTRACT / WORK DONE BY SPECIALISTS/THIRD PARTY SERVICES

| Work Description | Individual / Company | Unit | RATE | TOTAL $ |
|---|---|---|---|---|
| Coating and Corrosion Expert | Lake Superior Consultants | 1.00 | $19,702.53 | $19,702.53 |
| Vac Trucks | Hurricane Services | 1.00 | $39,415.00 | $39,415.00 |
| Disposal Charges | Anderson County Landfill | 1.00 | $18,103.40 | $18,103.40 |
| 0 | 0 | | | $0.00 |
| 0 | 0 | | | $0.00 |
| COST OF SUBS = C | | | | $77,220.93 |
| 15 % MARKUP (Subcontract) | | | $ | $11,583.14 |
| | | | $ | $88,804.07 |
| TOTAL COST A + B + C (Including Mark-Up) | | | $ | $655,213.07 |

## D - LABOR

| NO. | D - LABOR | HRS. | | BASE RATE w/FRING'S. | SUB TOTAL | Per Diem Totals | TOTAL |
|---|---|---|---|---|---|---|---|
| 1 | Chris Crough (Day Rate) | REG. | 33.00 | $1,916.84 | $33,555.72 | $1,320.00 | $34,875.72 |
| | | O.T. | 0 | | $0.00 | | $0.00 |
| | | D.T. | 0 | | $0.00 | | $0.00 |
| 2 | Randy Foster (Day Rate) | REG. | 17.00 | $968.88 | $16,470.96 | $1,700.00 | $18,170.96 |
| | | O.T. | | | $0.00 | | $0.00 |
| | | D.T. | | | $0.00 | | $0.00 |
| 3 | Harold Shoemaker (Day | REG. | 17.00 | $755.00 | $12,835.00 | $1,785.00 | $14,620.00 |
| | | O.T. | | | $0.00 | | $0.00 |
| | | D.T. | | | $0.00 | | $0.00 |
| 4 | Justin Potier | REG. | 104.00 | $59.79 | $6,218.16 | $1,495.00 | $7,713.16 |
| | | O.T. | 52.00 | $80.65 | $4,193.80 | | $4,193.80 |
| | | D.T. | | | $0.00 | | $0.00 |
| 5 | Brandon Morris | REG. | 52.00 | $39.83 | $4,460.96 | $1,260.00 | $5,720.96 |
| | | O.T. | 52.00 | $54.42 | $2,829.58 | | $2,829.58 |
| | | D.T. | | | $0.00 | | $0.00 |
| 6 | David Jones | REG. | 248.00 | $42.86 | $10,629.28 | $3,255.00 | $13,884.28 |
| | | O.T. | 125.00 | $58.96 | $7,370.00 | | $7,370.00 |
| | | D.T. | | | $0.00 | | $0.00 |
| 7 | Brandon Sammet | REG. | 184.00 | $59.79 | $11,001.36 | $2,415.00 | $13,416.36 |
| | | O.T. | 97.00 | $80.65 | $7,823.05 | | $7,823.05 |
| | | D.T. | | | $0.00 | | $0.00 |
| 8 | Roger Reeter | REG. | 112.00 | $59.79 | $6,696.48 | $1,400.00 | $8,096.48 |
| | | O.T. | 66.00 | $80.65 | $5,322.90 | | $5,322.90 |
| | | D.T. | | | $0.00 | | $0.00 |
| 9 | Augustin Zepeda | REG. | 128.00 | $36.83 | $4,714.24 | $1,680.00 | $6,394.24 |
| | | O.T. | 69.00 | $69.49 | $4,794.81 | | $4,794.81 |
| | | D.T. | | | $0.00 | | $0.00 |
| 10 | Johnny Hatfield | REG. | 128.00 | $43.49 | $5,566.72 | $800.00 | $6,366.72 |
| | | O.T. | 69.00 | $59.91 | $4,133.45 | | $4,133.45 |
| | | D.T. | | | $0.00 | | $0.00 |
| 11 | Stephen Davis | REG. | 224.00 | $43.49 | $9,741.76 | $1,120.00 | $10,861.76 |
| | | O.T. | 112.00 | $59.91 | $6,709.36 | | $6,709.36 |
| | | D.T. | | | $0.00 | | $0.00 |
| 12 | Bruce Cooper | REG. | 224.00 | $44.53 | $9,974.72 | $1,120.00 | $11,094.72 |
| | | O.T. | 109.00 | $60.70 | $6,615.76 | | $6,615.76 |
| | | D.T. | | | $0.00 | | $0.00 |
| 13 | Juan Miguel Suarzes | REG. | 101.00 | $36.83 | $3,719.83 | $650.00 | $4,369.83 |
| | | O.T. | 48.00 | $49.92 | $2,395.92 | | $2,395.92 |
| | | D.T. | | | $0.00 | | $0.00 |

| | | |
|---|---|---|
| 15 % Labor Surcharge | D - LABOR SUB-TOTAL | $207,773.81 |
| | SUBTOTAL | $31,166.07 |
| 15 % MARKUP ON LABOR | | $238,939.88 |
| | | $35,840.98 |

## E - MISCELLANEOUS ITEMS

| MIBC. DESCRIPTIONS | QTY. | Unit $ | EX. AMOUNT |
|---|---|---|---|
| Hotel | | | |
| | 96 | $58.00 | $5,568.00 |
| | 155 | $68.00 | $10,540.00 |
| Subsistance | | | |
| Misc. Items | | | |
| 0 | 0 | 0 | $- |
| 0 | 0 | 0 | $- |
| 0 | 0 | 0 | $- |
| 0 | 0 | 0 | $- |
| 0 | 0 | 0 | $- |
| E~ MISCELLANEOUS ITEMS SUB TOTAL | | | $16,108.00 |
| 5 % Sales/City/Room Tax | | | $805.40 |
| 15 % ADDED MARK-UP | | | $2,416.20 |
| 15 % Tax on Misc. Items | | | $- |
| SUB TOTAL - E | | | $19,329.60 |

## TOTALS

| | |
|---|---|
| TOTAL COST A+B+C (Equipment /Material /Sub-Contractors) | $655,213.07 |
| TOTAL COST = D (Labor) | $274,780.86 |
| TOTAL COST = E (Miscellaneous Items) | $19,329.60 |
| SUBTOTAL | $949,323.53 |
| 2.5 % BOND & INSURANCE | $23,733.09 |
| TOTAL COST THIS SHEET | $973,056.63 |

| TIME | CLIENT DIRECTIVES AND COMMENTS |
|---|---|
| 0:00 | (See Daily Work Report) |
| 0:00 | |
| 0:00 | |
| 0:00 | |
| 0:00 | |
| 0:00 | |
| 0:00 | |
| 0:00 | |
| 0:00 | |
| 0:00 | |
| 0:00 | |
| 0:00 | |
| 0:00 | |
| 0:00 | |
| 0:00 | |

| PROJECT NAME: | | | | |
|---|---|---|---|---|
| PROJECT NO.: | Southern Star Line DT & DS Replacement | | | |



Horizontal Directional Drilling

**EXTRA WORK SHEET REPORT**
**INTERNAL - OFFICE**

| | |
|---|---|
| CLIENT/OWNER : | Minnesota Limited - Southern Star |
| WORK PRF'M'D. BY: | The HDD Company, Inc. |
| DESCP'TN. OF WORK: | Time spent reinstalling 36" pipeline, Multiple days from 6/22/20 • 7/15/20 and 8/22/20 • 9/9/20 |
| DATE: | |
| EXTRA WRK. SHT. NO.: | Night Shift |

0
0
0

## A - EQUIPMENT

| EQUIP. NO. | Company Owned Equipment | HRS. | RATE/HR. | TOTAL/DAY |
|---|---|---|---|---|
| 1 | Drilling Rig HDD Rig 7 - Vermeer 750 | 300.00 | $ 205.56 | $ 61,668.00 |
| 0 | Mud Tank / Solids Control Unit | 300.00 | $ 111.96 | $ 33,588.00 |
| 1 | Sump Pit/Trash Pump | 300.00 | $ 8.29 | $ 2,487.00 |
| 1 | Mud Pumping Units | 300.00 | $ 60.94 | $ 18,282.00 |
| 2 | Tool Van and tools | 300.00 | $ 17.55 | $ 10,530.00 |
| 0 | Dump Truck A-17 TRUN 2AXL | | | $ - |
| 3 | Vac. Truck A-17 TRUN 2AXL | 300.00 | $ 45.75 | $ 41,175.00 |
| 10 | Misc. Trailers | 300.00 | $ 1.79 | $ 5,370.00 |
| 1 | Haul Trucks | 300.00 | $ 34.13 | $ 10,239.00 |
| 1 | 6 3/4" Non Mag Drill Collars w/Jet Assembly | 300.00 | $ 6.83 | $ 2,049.00 |
| 168 | Drill Pipe (5-1/2 FH) | 300.00 | $ 0.53 | $ 26,712.00 |
| 2 | Misc. X-Subs and Rack (All X Subs for Spread) | 300.00 | $ 5.20 | $ 3,120.00 |
| 0 | Sonde and Housing | | | $ - |
| | Steering Tool (North Referencing w/Tru-Gyde) | | | $ - |
| 48 | Rollers | 300.00 | $ 1.50 | $ 21,600.00 |
| 3 | Ford F-250 T&TT 06-12 | 300.00 | $ 7.50 | $ 6,750.00 |
| 0 | Ford F450 T&TT 20-28 | | | $ - |
| 0 | Ford F-350 T&TT 20-28 | | | $ - |
| 0 | KW & Crane Truck | | | $ - |
| 1 | Hammer | 300.00 | $ 41.93 | $ 12,579.00 |
| 1 | 300 Amp Welder | 300.00 | $ 9.49 | $ 2,847.00 |
| 1 | 1/2 Ton Truck | 300.00 | $ 32.48 | $ 9,744.00 |
| 1 | 60' Casing | 300.00 | | $ - |
| 0 | Mud Bins | | | $ - |

| | Rental Equipment | | | |
|---|---|---|---|---|
| 1 | 10K Reach Forklift | S.T. 300.00 / O.T. | $ 51.29 | $ 15,387.00 |
| 2 | 225 Excavator | S.T. 300.00 / O.T. | $ 91.59 | $ 54,954.00 |
| 2 | Portable toilets | S.T. 300.00 / O.T. | $ 1.50 | $ 900.00 |
| 0 | Multiquip 20KW Generator | S.T. / O.T. | | $ - |
| 3 | Frac Tank | S.T. 300.00 / O.T. | $ 7.32 | $ 6,588.00 |
| 1 | Trash Bin | S.T. / O.T. | | $ - |
| 1 | 500 Amp Welder | S.T. 300.00 / O.T. | $ 9.49 | $ 2,847.00 |
| 2 | Light Tower | S.T. 300.00 / O.T. | $ 7.61 | $ 4,566.00 |
| 1 | 175 KW Generator | S.T. 300.00 / O.T. | $ 71.36 | $ 21,408.00 |
| 1 | 6" Diesel Trash Pump | S.T. 300.00 / O.T. | $ 23.60 | $ 7,080.00 |
| 1 | HTI Mud Motor | S.T. 300.00 / O.T. | $ 42.50 | $ 12,750.00 |
| | | S.T. / O.T. | | $ - |
| | | S.T. / O.T. | | $ - |
| | | O.T. | | $ - |
| | | O.T. | | $ - |
| | | O.T. | | $ - |
| | | O.T. | | $ - |
| | | O.T. | | $ - |
| | | S.T. | | $ - |
| | | S.T. | | $ - |

| | | | |
|---|---|---|---|
| COMPANY OWNED EQUIPMENT | | | $ 268,740.00 |
| RENTAL EQUIPMENT W/ 15% Markup | | | $ 147,166.65 |
| A- EQUIPMENT SUB - TOTAL COST | | | $ 415,906.65 |
| 0.00 % Sales Tx, Rental Equip. | | | $ - |

## B - MATERIALS

| MATERIALS DESCRIPTION | QTY. USED | UNIT $ | TOTAL |
|---|---|---|---|
| 0 | | | |
| 0 | | | |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| B-MATERIALS SUB-TOTAL COST | | $ - | $ - |
| 0.00 % Sales Tax | | | $ - |
| 10 % ADDED M. U. B | | | |
| SUB-TOTAL A + B w/Tax | | $ | 415,906.65 |

## C - SUBCONTRACT / WORK DONE BY SPECIALISTS/THIRD PARTY SERVICES

| Work Description | Individual / Company | Unit | RATE | TOTAL $ |
|---|---|---|---|---|
| | | | $ | - |
| | | | | |
| COST OF SUBS + C | | | $ | - |
| 15 % MARKUP(Subcontractor) | | | $ | - |
| TOTAL COST A + B + C (Including Mark-Up) | | | $ | 415,906.65 |

## D - LABOR

| NO. | | HRS. | BASE RATE w/FRING'S. | SUB TOTAL | Per Diem Totals | TOTAL |
|---|---|---|---|---|---|---|
| 1 | Shawn Posey (Day Rate) | REG. 33.00 | $755.00 | $24,915.00 | $2,730.00 | $27,645.00 |
| | | O.T. 0 | | $0.00 | | $0.00 |
| | | D.T. | | $0.00 | | $0.00 |
| 2 | Jacob Hoffman | REG. 131.00 | $59.79 | $7,832.49 | $2,380.00 | $10,212.49 |
| | | O.T. 69.00 | $80.65 | $5,564.85 | | $5,564.85 |
| | | D.T. | | $0.00 | | $0.00 |
| 3 | Westin Colgrove | REG. 96.00 | $59.79 | $5,739.84 | $1,260.00 | $6,999.84 |
| | | O.T. 68.00 | $80.65 | $5,484.20 | | $5,484.20 |
| | | D.T. | | $0.00 | | $0.00 |
| 4 | Dustin Anderson | REG. 156.00 | $48.20 | $9,399.00 | $1,920.00 | $11,319.00 |
| | | O.T. 92.00 | $66.20 | $6,090.40 | | $6,090.40 |
| | | D.T. | | $0.00 | | $0.00 |
| 5 | Jeromie Acres | REG. 164.00 | $46.20 | $7,576.80 | $1,680.00 | $9,256.80 |
| | | O.T. 96.00 | $63.20 | $6,067.20 | | $6,067.20 |
| | | D.T. | | $0.00 | | $0.00 |
| 6 | Abraham Berrospe | REG. 159.00 | $36.83 | $5,855.97 | $960.00 | $6,815.97 |
| | | O.T. 95.00 | $49.92 | $4,741.93 | | $4,741.93 |
| | | D.T. | | $0.00 | | $0.00 |
| 7 | Larry Roseboro | REG. 79.00 | $59.79 | $4,723.41 | $500.00 | $5,223.41 |
| | | O.T. 35.00 | $80.65 | $2,822.75 | | $2,822.75 |
| | | D.T. | | $0.00 | | $0.00 |
| 8 | Dusty Cline | REG. 24.00 | $59.79 | $1,434.96 | $315.00 | $1,749.96 |
| | | O.T. 12.00 | $80.65 | $967.80 | | $967.80 |
| | | D.T. | | $0.00 | | $0.00 |
| 9 | Taylor Crowley | REG. 33.00 | $63.83 | $2,062.48 | $350.00 | $2,412.48 |
| | | O.T. 40.00 | $52.66 | $2,106.40 | | $2,106.40 |
| | | D.T. | | $0.00 | | $0.00 |
| 10 | Jim Rubick | REG. 123.00 | $59.79 | $7,354.17 | $1,575.00 | $8,929.17 |
| | | O.T. 65.00 | $80.65 | $5,242.25 | | $5,242.25 |
| | | D.T. | | $0.00 | | $0.00 |
| 11 | Barion Snowten | REG. 80.00 | $38.66 | $3,092.80 | $1,725.00 | $4,817.80 |
| | | O.T. 60.00 | $52.66 | $3,159.60 | | $3,159.60 |
| | | D.T. | | $0.00 | | $0.00 |
| 12 | Kenny Densmore | REG. 80.00 | $59.79 | $4,783.20 | $1,050.00 | $5,833.20 |
| | | O.T. 60.00 | $80.65 | $4,839.00 | | $4,839.00 |
| | | D.T. | | $0.00 | | $0.00 |

| | | |
|---|---|---|
| D -LABOR SUB-TOTAL | | $ 148,391.50 |
| 15 % Labor Surcharge | | $ 22,245.22 |
| SUBTOTAL | | $ 170,546.72 |
| 15 % MARKUP ON LABOR | | $ 25,582.01 |

## E - MISCELLANEOUS ITEMS

| MISC. DESCRIPTIONS | QTY. | Unit $ | EX. AMOUNT |
|---|---|---|---|
| Hotel | | | |
| | | $ 58.00 | $ - |
| | | $ 68.00 | $ - |
| Subsistance | 0 | | $ - |
| Misc. Items | | | |
| 0 | | | $ - |
| 0 | | | $ - |
| 0 | | | $ - |
| 0 | | | $ - |
| 0 | | | $ - |
| 0 | | | $ - |
| E- MISCELLANEOUS ITEMS SUB TOTAL | | | $ - |
| 0 % Sales City/Room Tax | | | $ - |
| 15 % ADDED MARK-UP | | | $ - |
| 0 % Tax on Misc. Items | | | 0 |
| SUB TOTAL - E | | | $ - |

## TOTALS

| | | |
|---|---|---|
| TOTAL COST A+B+C (Equipment /Material /Sub-Contractors) | | $ 415,906.65 |
| TOTAL COST + D (Labor) | | $ 196,128.73 |
| TOTAL COST + E (Miscellaneous Items) | | $ - |
| | SU | $ 612,035.38 |
| 2.5 % BOND & INSURANCE | | $ 15,300.88 |
| TOTAL COST THIS SHEET | | $ 627,336.26 |

| TIME | CLIENT DIRECTIVES AND COMMENTS |
|---|---|
| 0.00 | (See Daily Work Report) |
| 0.00 | |
| 0.00 | |
| 0.00 | |

(many rows of 0.00)

| | |
|---|---|
| THE HDD COMPANY: | |
| | (Signature) |
| DATE: | |
| CLIENT | |
| | (Signature) |
| DATE: | |

# Exhibit 26



USPS TRACKING #
KANSAS CITY 640

9590 9402 6142 0209 2511 47

First-Class
Postage &
USPS
Permit No.

**United States**
**Postal Service**

• Sender: Please print your name, address, and ZIP+4® in this

# HUSCH BLACKWELL

4801 Main Street, Suite 1000
Kansas City, MO  64112

Moody  c/m  550367-1

| SENDER: *COMPLETE THIS SECTION* | COMPLETE THIS SECTION ON DELIVERY |

**SENDER:** *COMPLETE THIS SECTION*

- ■ Complete items 1, 2, and 3.
- ■ Print your name and address on the reverse so that we can return the card to you.
- ■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Frontier Farm Credit, FLCA
1270 N. 300 Rd.
Baldwin City, KS 66006-7223

9590 9402 6142 0209 2511 47

2. Article Number *(Transfer from service label)*

59 0090 0027 6303 9140 26

*COMPLETE THIS SECTION ON DELIVERY*

A. Signature

X _____

☐ Agent
☐ Addressee

B. Received by *(Printed Name)*

C. Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:  ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☒ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ ~~ured Mail~~
☐ ~~ured Mail Restricted Delivery~~
   ~~...er $500)~~

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2015 PSN 7530-02-000-9053

Domestic Return Receipt

| SENDER: *COMPLETE THIS SECTION* | COMPLETE THIS SECTION ON DELIVERY |
|---|---|
| ■ Complete items 1, 2, and 3.<br>■ Print your name and address on the reverse so that we can return the card to you.<br>■ Attach this card to the back of the mailpiece, or on the front if space permits. | A. Signature<br>X ☐ Agent ☐ Addressee<br>B. Received by *(Printed Name)*    C. Date of Delivery |
| 1. Article Addressed to:<br><br>Farm Credit Services, FLCA d/b/a<br>Frontier Farm Credit, FLCA<br>The Corporation Co.<br>112 SW 7th St<br>Topeka KS 66603 | D. Is delivery address different from item 1? ☐ Yes<br>   If YES, enter delivery address below: ☐ No |

‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖

9590 9402 5085 9092 3047 55

| 3. Service Type | |
|---|---|
| ☐ Adult Signature | ☐ Priority Mail Express® |
| ☐ Adult Signature Restricted Delivery | ☐ Registered Mail™ |
| ☐ Certified Mail® | ☐ Registered Mail Restricted Delivery |
| ☐ Certified Mail Restricted Delivery | ☐ Return Receipt for Merchandise |
| ☐ Collect on Delivery | ☐ Signature Confirmation™ |
| ☐ Collect on Delivery Restricted Delivery | ☐ Signature Confirmation Restricted Delivery |
| ☐ Insured Mail | |
| ☐ Mail Restricted Delivery (XX) | |

2. Article Number *(Transfer from service label)*

9489 0090 0027 6141 3082 85

PS Form 3811, July 2015 PSN 7530-02-000-9053     Domestic Return Receipt



9489 0090 0027 6141 3082 85

CERTIFIED MAIL

Label 690-PB, Oct. 2015
Pitney Bowes



HUSCH BLACKWELL
m. kelly
4801 Main Street, Suite 1000
Kansas City, MO 64112 550367-1

Farm Credit Services, FLCA d/b/a Frontier Farm Credit, F
THE CORPORATION COMPANY
112 SW 7TH STREET
TOPEKA KS 66603



U.S. POSTAGE≫ PITNEY BOWES

ZIP 64112 $ 0 6 . 5 0
02 4W
0001396540 FEB 17 2021

## Product Tracking & Reporting



### USPS Tracking Intranet
### Delivery Signature and Address

Price Change 1/26/2020:
USPS Premium Tracking: USPS will offer a fee-based service to extend the availability of tracking data on domestic competitive products for an additional 6 months up to 10 years. In addition, customers can also request a Premium Tracking Statement via email.

The Manual Entry Acceptance screen will be modified to use the Pricing Engine for all rates calculations. Users will no longer enter fees for Collect on Delivery (COD) and Additional Insurance; instead, users will enter the dollar amount to be collected for COD or the insured value for Insurance.

Tracking Number: 9489 0090 0027 6141 3082 86

This item was delivered on 02/23/2021 at 08:09:00

↰ Return to Tracking Number View



Enter up to 35 items separated by commas.

Select Search Type: Quick Search ∨    Submit

Product Tracking & Reporting, All Rights Reserved
Version: 21.2.2.0.17

## IN THE DISTRICT COURT OF FRANKLIN COUNTY, KANSAS

THE HDD COMPANY, INC., an Oregon
Corporation,

                    Plaintiff,

v.

MINNESOTA LIMITED, LLC., a Minnesota
Corporation,
**SERVE:**
**National Registered Agents, Inc. of KS**
**112 SW 7th Street, Suite 3C**
**Topeka, KS 66603**

SOUTHERN STAR CENTRAL GAS
PIPELINE, INC., a Delaware Corporation.
4700 Highway 56
Owensboro, KY 42301
**SERVE:**
**National Registered Agents, Inc. of KS**
**112 SW 7th Street, Suite 3C**
**Topeka, KS 66603**

RENE BURES and ANITA BURES
**SERVE:**
**Rene Bures**
**Anita Bures**
**31443 NW Meade Rd.**
**Richmond KS 66080**

RURAL WATER DISTRICT NO. 4
**SERVE:**
**Rural Water District No. 4**
**501 N. Olive St.**
**Garnett, KS 66032**

ANDERSON COUNTY, KANSAS
**SERVE:**
**County Clerk**
**100 E. 4th Ave.**
**Garnett, KS 66032**

JOHN T. RAYNE
**SERVE:**
**John T. Rayne**
**12 Overhill Drive**
**Paola, KS, 66071**

Case No. FR-2021-CV-000016

Petition Pursuant to K.S.A. Chapter 60

PATRICK ARTHUR RAYNE and KELLY
LEE RAYNE FAMILY TRUST under trust
agreement dated April 12, 2016
**SERVE:**
**Patrick Arthur Rayne, Co-Trustee**
**Kelly Lee Rayne, Co-Trustee**
**102 Crestview Dr.**
**Paola, KS 66071**

PICKERT FAMILY TRUST
**SERVE:**
**Keith J. Pickert, co-trustee**
**Mary J. Pickert, co-trustee**
**47890 Deer Trail Dr.**
**Canton Michigan 48187**

LYLE BLACK and CHERYL BLACK
**SERVE:**
**Lyle Black**
**Cheryl Black**
**3159 Neosho Rd.**
**Ottawa, KS 66067**

FARM CREDIT SERVICES, FLCA D/B/A
FRONTIER FARM CREDIT, FLCA
**SERVE: THE CORPORATION**
**COMPANY, INC.**
**112 S.W. 7TH STREET**

**TOPEKA, KS 66603**

AND

OSWEGO COAL COMPANY, INC.
**SERVE: Robert Caylor**
**Oswego Coal Company, Inc.**
**2476 Marshall Rd.**
**Ottawa, KS 66067**

Defendants.

## FILING OF ADDITIONAL EXHIBITS TO PETITION

Plaintiff The HDD Company, Inc., an Oregon Corporation ("HDD"), filed its original

Petition and initial exhibits, the remainder of which exceeded the file size limitations for

electronic filing.  Plaintiff attaches herewith Exhibit 6 of 26 as an additional exhibit.  Exhibits 7 through 26 will be included in subsequent filings.

Respectfully submitted,

HUSCH BLACKWELL, LLP

/s/*David B. Raymond*

| | |
|---|---|
| David B. Raymond | KS #14004 |
| Michael J. Kelly | KS #25666 |

4801 Main Street, Suite 1000
Kansas City, Missouri 64112
(816) 983-8000 (Phone)
(816) 983-8080 (FAX)
david.raymond@huschblackwell.com
mike.kelly@huschblackwell.com

**ATTORNEYS FOR PLAINTIFF**

# Exhibit 6

IN THE DISTRICT COURT OF FRANKLIN COUNTY, KANSAS

Mechanic's Lien No. _____

<u>STATEMENT FOR MECHANIC'S LIEN</u>

(K.S.A. §55-208)

| | |
|---|---|
| **AMOUNT OF CLAIM:** | **$5,887.143.28** (exclusive of interest) |
| **NAME OF LANDOWNERS:**<br>Jobsite and Mailing Address: | **Rene and Anita Bures**<br>31443 NW Meade Rd., Richmond, KS 66080 |
| | **John T. Rayne; Patrick Arthur Rayne and Kelly Lee Rayne Family Trust Under Trust Agreement date April 12, 2016; and Keith J. Pickert and Mary J. Pickert, co-trustee of the Pickert Family Trust u/a/d March 12, 2016** |
| Jobsite Address: | 00000 NW Meade Rd., Garnett, KS 66032 |
| Mailing Address: | John Rayne: 12 Overhill Dr., Paola, KS 66071 |
| | Patrick Arthur Rayne and Kelly Lee Rayne Family Trust: 102 Crestview Dr, Paola KS 66071 |
| | Keith J. Pickert and Mary J. Pickert, co-trustee of the Pickert Family Trust: 47890 Deer Trail Dr Canton, MI 48187 |
| Jobsite Address: | **Black, Lyle D.; Black, Cheryl K.**<br>3062 Nebraska Rd., Ottawa, KS 66067 |
| Mailing Address: | 3159 Neosho Rd., Ottawa, KS 66067-8879 |
| Mortgage Holder: | Frontier Farm Credit, FLCA<br>1270 N. 300 Rd.<br>PO Box 858<br>Baldwin City, KS, 66006 |
| Jobsite Address: | **Oswego Coal Company, Inc.**<br>3125 Marshall Rd., Ottawa, KS 66067 |
| Mailing Address: | PO Box 368, Ottawa, KS 66067-0368 |

| | |
|---|---|
| NAME OF PIPELINE OWNER: | Southern Star Central Gas Pipeline, Inc., a Delaware Corporation.<br>4700 Highway 56<br>Owensboro, KY 42301<br><br>Registered Agent<br>The Corporation Company, Inc.<br>112 SW 7th Street Suite 3C<br>Topeka, KS 66603 |
| NAME OF CONTRACTOR: | Minnesota Limited, LLC., a Minnesota Limited Liability Corporation<br>18640 200th Street – PO Box 410<br>Big Lake, MN 55309<br><br>Registered Agent<br>National Registered Agents, Inc. of KS<br>112 SW 7th Street Suite 3C<br>Topeka, KS 66603 |
| NAME OF LIEN CLAIMANT: | The HDD Company, Inc., an Oregon Corporation.<br>4525 Serrano Parkway, Office Suite 210<br>El Dorado Hills, CA 95762<br><br>Registered Agent<br>CT Corporation System<br>112 SW 7th Street, Suite 3C<br>Topeka, KS 66603 |
| DESCRIPTION OF PROPERTY: | ATTACHED HERETO AS **EXHIBIT A** AND INCORPORATED HEREIN BY THIS REFERENCE, Southern Star Central Gas Pipeline Project C60266 – 31.5 miles of 36" Pipeline – Line DPA and Launcher and Receiver located on property commonly known as 31443 NW Meade Rd., Richmond, KS 66080; 00000 NW Meade Rd., Garnett, KS 66032; 3062 Nebraska Rd, Ottawa, KS 66067 and 3125 Marshall Rd., Ottawa, KS 66067 (the "Property") |

The undersigned, The HDD Company, Inc. ("Lien Claimant"), a subcontractor pursuant to K.S.A. §55-208, claims a lien upon the Southern Star Central Gas Pipeline ("Pipeline"), on account of furnishing labor, equipment, and materials for the construction and/or completion of the Southern Star Central Gas Pipeline Project C60266 ("Project") located in and through Anderson County, Kansas. The pipeline and the land are described in **Exhibit A**, attached hereto and incorporated herein by reference. The labor, equipment, and materials supplied by Lien Claimant

were used and consumed in the construction of said Pipeline. Lien Claimant supplied labor, equipment, and materials to the Project as a subcontractor under agreement with Minnesota Limited, L.L.C., the original contractor ("Contractor"), which in turn was under agreement with Southern Star Central Gas Pipeline, Inc., the owner of the Project ("Project Owner").

The aforesaid claim, a reasonably itemized statement of which is attached to this lien statement (**Exhibit B**) and copies of documentation (**Exhibit C**) substantiating the labor, equipment, and materials supplied to the Project Owner by Lien Claimant for improvements upon the Property, is filed in order that it may constitute a lien upon the above-described Pipeline, and every other right, title, and interest in said Pipeline. The amount claimed as owing is FIVE MILLION EIGHT HUNDRED EIGHTY-SEVEN THOUSAND, ONE HUNDRED FORTY-THREE DOLLARS and 28/100 ($5,887,143.28), exclusive of interest.

Lien Claimant last supplied labor, materials, and/or equipment within four (4) months of the date of this lien statement.

WITNESS the hand of said Lien Claimant this 5ᵗʰ day of Jan 2020.

ON BEHALF OF: **The HDD Company, Inc.,** Lien Claimant

By: _____
Jeremy King
Vice President
The HDD Company, Inc.

## VERIFICATION

STATE OF CALIFORNIA )
) ss.
COUNTY OF _El Dorado_ )

    Jeremy King, of lawful age, being first duly sworn upon his oath, that he is the Vice President and duly authorized representative of The HDD Company, Inc. and is duly authorized to make this verification on its behalf; and does verify under penalty of perjury that the above and foregoing statement is true and correct based on his personal knowledge, and is a just and true account of the demand of and the amount due Lien Claimant.

ON BEHALF OF: **The HDD Company, Inc.,** Lien Claimant

By: _____
       Jeremy King
       Vice President
       The HDD Company, Inc.


STATE OF CALIFORNIA )
) ss.
COUNTY OF )

    On this ____ day of _____, 2020, before me appeared Jeremy King, to me personally known, who being by me duly sworn did say that he is the Vice President and duly authorized representative of The HDD Company, Inc., and that he acknowledged that his execution of the foregoing instrument is on behalf of said company.

    IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal in the County and State aforesaid, the day and year first above written.


_____
Notary Public

_____
Printed Name

My Commission Expires:

_____

# ALL- PURPOSE
# CERTIFICATE OF ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California )

County of El Dorado )

On January 5, 2021 before me, Wendy Brooke Notary Public
(Here enter name and title of the officer)

personally appeared, Jeremy King
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_Signature_ (Seal)

WENDY BROOKE
COMM. #2319236
Notary Public - California
El Dorado County
Comm. Expires Feb 11, 2024

## ADDITIONAL OPTIONAL INFORMATION

DESCRIPTION OF THE ATTACHED DOCUMENT

Statement for Mechanic's Lien
(Title or description of attached document)

_____
(Title or description of attached document continued)

Number of Pages _____ Document Date _____

CAPACITY CLAIMED BY THE SIGNER
- ☐ Individual (s)
- ☐ Corporate Officer

_____
(Title)
- ☐ Partner(s)
- ☐ Attorney-in-Fact
- ☐ Trustee(s)
- ☐ Other _____

## INSTRUCTIONS FOR COMPLETING THIS FORM

This form complies with current California statutes regarding notary wording and, if needed, should be completed and attached to the document. Acknowledgments from other states may be completed for documents being sent to that state so long as the wording does not require the California notary to violate California notary law.

- State and County information must be the State and County where the document signer(s) personally appeared before the notary public for acknowledgment.
- Date of notarization must be the date that the signer(s) personally appeared which must also be the same date the acknowledgment is completed.
- The notary public must print his or her name as it appears within his or her commission followed by a comma and then your title (notary public).
- Print the name(s) of document signer(s) who personally appear at the time of notarization.
- Indicate the correct singular or plural forms by crossing off incorrect forms (i.e. he/she/they, is /are ) or circling the correct forms. Failure to correctly indicate this information may lead to rejection of document recording.
- The notary seal impression must be clear and photographically reproducible. Impression must not cover text or lines. If seal impression smudges, re-seal if a sufficient area permits, otherwise complete a different acknowledgment form.
- Signature of the notary public must match the signature on file with the office of the county clerk.
  - ❖ Additional information is not required but could help to ensure this acknowledgment is not misused or attached to a different document.
  - ❖ Indicate title or type of attached document, number of pages and date.
  - ❖ Indicate the capacity claimed by the signer. If the claimed capacity is a corporate officer, indicate the title (i.e. CEO, CFO, Secretary).
- Securely attach this document to the signed document with a staple.

EXHIBIT A

Pipeline: Southern Star Central Gas Pipeline Project C60266 – 31.5 miles of 36" Pipeline – Line DPA and Launcher and Receiver

31443 NW Meade Rd., Richmond, KS 66080
The South Half (S½) of the Northeast Quarter (NE¼) of Section Thirty-four (34), Township Nineteen (19), Range Nineteen (19) AND the Southeast Quarter (SE¼) of Section Thirty-four (34), Township Nineteen (19), Range Nineteen (19), excepting that part of the last described quarter section lying South of the center of Pottawatomie Creek, and EXCEPT One acre of land situated in the N. E. 1/4 of Section 34 and the S. E. 1/4 of Section 34 all in Township 19 S., Range 19 E., Anderson County, Kansas and being more particularly described as follows: Commencing at the S. E. corner of the N. E. 1/4 of Section 34, Township 19 S., Range 19 E., Anderson County, Kansas; thence N. 0°01'46" E. along the East line of said N. E. 1/4 a distance of 58.87 ft. to a point; thence N. 89°31'34" W. a distance of 235.50 ft. to a point; thence S. 0°01'46" W. a distance of 61.88 ft. to a point on the N. Line of the S. E. 1/4 Section 34, Township 19 S., Range 19 E; thence continuing S. 0°0146" W., a distance of 123.09 ft. to a point; thence S. 89°31'34" E., a distance of 235.50 ft. to a point on the East line of said S. E. 1/4; thence N. 0°01'46" E. along said East line a distance of 126.10 ft. to the POINT OF BEGINNING.

00000 NW Meade Rd., Garnett, KS 66032
The Northeast Quarter (NE¼), except 1.52 acres in the northeast corner north of Pottawatomie River, of Section 3, Township 20 South, Range 19 East of the 6th P.M., Anderson County, Kansas.

3125 Marshall Rd., Ottawa, KS 66067
All that part of the Southwest Quarter of Section 5, Township 17 South, Range 20 East, in Franklin County, Kansas, being more particularly described as follows: Commencing at the Southwest corner of the Southwest Quarter of said Section 5; thence North 87° 40' 17" East, along the South line of the Southwest Quarter of said Section 5, a distance of 70.01 feet to the point of beginning; thence North 03° 14' 35" West, along a line 70.00 feet East of and parallel with the West line of the Southwest Quarter of said Section 5, a distance of 1647.63 feet; thence North 60° 00' 55" East, a distance of 1074.78 feet; thence South 01° 52' 54" East, a distance of 2146.36 feet to a point on the South line of the Southwest Quarter of said Section 5; thence South 87° 40' 17" West, along the South line of the Southwest Quarter of said Section 5, a distance of 908.94 feet to the point of beginning, Franklin County, Kansas.

3062 Nebraska Rd., Ottawa, KS 66067:
The East 1/4 of the Southeast 1/4 of the Northeast 1/4 of Sec. 6, Twp. 17 S., Rng. 20 E., subject to any part thereof in roads, all in Franklin County, Kansas.
AND
Beginning at the Northwest corner of the Northwest Quarter of Section 5, Township 17 South, Range 20 East of the 6th P.M., thence South 02° 59' 16" East 680.67feet on the West line of the

Northwest Quarter of said Section 5 to an existing 1/2" iron bar and the true point of beginning of New Tract 2; thence North 88° 18' 09" East 1327.15 feet to the East line of the Northwest Quarter of the Northwest Quarter of said Section 5, being marked with a 1/2" iron bar; thence South 03° 06' 08" East 613.78 feet to the Southeast corner of said Northwest Quarter of the Northwest Quarter of said Section 5, being marked with a 1/2" iron bar; thence South 03° 06' 08" East 659.24 feet to the Southeast corner of the North Half of the Southwest Quarter of the Northwest Quarter of said Section 5, being marked with a 1/2" iron bar; thence South 88° 26' 25" West 1329.76 feet to the Southwest corner of the North Half of the Southwest Quarter of the Northwest Quarter of said Section 5, being marked with an existing 1/2" iron bar; thence North 02° 59' 16" West 661.16 feet to the Southwest corner of the Northwest Quarter of the Northwest Quarter of said Section 5, being marked with an existing 1/2" iron bar; thence North 02° 59' 16" West 608.61 feet to the point of beginning, all in Franklin County, Kansas.

EXHIBIT B

Statement of Account

| | |
|---|---|
| Amount Due Per Agreement: | $6,185,936.00 |
| Delay Expenses: | $159,868.58 |
| Standby Expenses: | $500,975.00 |
| Extraction and Re-Installation | $1,600,392.89 |
| Differing Site Condition Costs | $555,000.00 |
| Retainage Withheld: | $599,640.00 |
| Less Payments Made: | $3,115,029.19 |
| Total Amounts Due and Owing: | $5,887,143.28 |

EXHIBIT C

C1: Subcontract Agreement
C2: Delay Summaries
C3: Standby Expense Summary
C4: Day Shift and Night Shift Summaries
C5: Addendum 4

(Attached hereto)

# EXHIBIT A



**MINNESOTA LIMITED**
AN NVERUS COMPANY

<div align="center">

**Subcontractor Agreement**
No. SR1916169002

</div>

This agreement is made at Big Lake, MN this day of ___January 17, 2020___ .

**BETWEEN:**

Minnesota Limited, LLC (Contractor)
18640 200th Street – PO Box 410
Big Lake, MN 55309

**AND:**

THE HDD COMPANY(Subcontractor)
4525 SERRANO PARKWAY, OFFICE SUITE 210
EL DORADO HILLS, CA  95762

**RECITALS**

Contractor ("Minnesota Limited, LLC) has entered into a contract (the "Prime Contract") with Southern Star Central Gas Pipeline, Inc. ("Owner") to perform certain labor and furnish certain materials for completion of the construction project KS – C60206 Install 31.5 miles of 36" (the "Project"). Subcontractor desires to perform certain services and/or provide certain materials as a subcontractor of Contractor pursuant to the terms and conditions of the Prime Contract and agrees to the terms and conditions of this Agreement.

**AGREEMENT**

In consideration of the mutual covenants contained herein, the parties agree as follows:

I.      Subcontractor agrees to supply all the materials and labor and pay all license fees, permits and expenses for the work located at __Various Sites_____ (the "Site"). As full compensation for performance of this Agreement and subject to all applicable provisions of this Agreement, Contractor agrees to pay Subcontractor:
six million one-hundred eight-five thousand nine-hundred thirty six dollars ($6,185,936.00_____ )

II.      <u>Contract Document</u>. Subcontractor's performance hereunder shall be subject to all terms and conditions contained in the Prime Contract and all drawings and/or specifications referred to therein (the "Contract Documents") except as such terms may be specifically amended by this Agreement, which includes HDD's Proposal, attached hereto and incorporated herein. Wherever the Contract Documents shall refer to the Contractor or its agents, the same shall be read to refer to the Subcontractor under this agreement. Subcontractor shall perform and coordinate its work hereunder in a manner necessary to assure the prompt and timely completion of the Project, time being of the essence to the



Agreement. At Subcontractor's request, a copy of the applicable Prime Contract Terms and Conditions will be supplied to Subcontractor.

Any terms and conditions proposed in Subcontractor's acceptance of or in any acknowledgement, invoice, or other form of Subcontractor that add to, vary from, or conflict with these terms hereby objected to. Any such proposed terms shall be void and these terms and conditions (1) shall constitute the complete and exclusive statement of the terms and conditions of the contract between the parties and (2) may be modified only by written instrument executed by the authorized representatives of both parties.

III.     **Insurance**. Subcontractor shall comply with the insurance requirements set forth in Exhibit A (attached).

IV.     **Additional Terms and Conditions**

A.  Subcontractor, not Contractor, assumes all the risk related to in performing its work under this Agreement, such as any injuries to Subcontractor, Subcontractor's workers, Facility employees and members of the public arising from the Subcontractors activities or use of tools and equipment, or from any other cause.

B.     Subcontractor will complete all work in a workmanlike and professional manner according to standard practices in the building trade, and in compliance with all building codes and other applicable laws. Subcontractor will warrant against defects in material and labor it supplies for the completion of the work. If subcontractor fails to perform under this Agreement, the party entitled to performance or the Contractor will have the right to hire other persons to correct the defective Work and hold Subcontractor liable for the costs thereof including costs, disbursements and reasonable attorneys' fees incurred in the enforcement of this provision.

C.     All Work will be done on a timely basis. The work to be performed under this contract shall be commenced as directed by Project Manager or Project Superintendent or Project Foreman and shall be substantially completed on or before ___as agreed upon and directed onsite_____. Time is of the essence.

D.     Subcontractor shall indemnify, defend and hold harmless Contractor as set forth in Section VII.

E.     No work shall be subcontracted or assigned by Subcontractor without the prior written approval of the Contractor.

F.     Environmental, Health and Safety. Subcontractor shall take all necessary precautions to keep the work site free from hazards that are likely to cause injury, illness, or death or damage to property. Subcontractor shall provide any Safety Data Sheets (SDS) for any hazardous chemicals provided pursuant to this contract. Contractor is a company that operates under a "Culture of Safety" with the goal of zero incidents, and expects its subcontractor to similarly emphasize the paramount importance of safe behavior. Failure to abide by Contractor's policies may result in immediate removal of Subcontractor from the premises and will be a breach of Subcontractor's obligations hereunder.



Contractor shall have the right, at its option, to conduct a complete audit of Subcontractor's documents and practices to verify Subcontractor's compliance with this Section.

G.    Minnesota Limited has enacted a Subcontractor Management Program and Safety Requirements of which Subcontractor has received. Subcontractor shall follow and adhere to all aspects of said program and the terms and conditions of such program are incorporated herein.

H.    Liens. To the fullest extent permitted by law, and the extent the Contractors has paid the Subcontractor, Subcontractor will at all times keep the Project, the Site and each part thereof free from any attachment, lien, claim of lien, or other encumbrance arising out of the Work and Subcontractor will indemnify, defend and hold Contractor harmless from and against all claims, losses, demands, causes of action or expenses (including attorneys' fees and other costs of defense incurred by Contractor in defending against the foregoing or in enforcing this indemnity and defense obligation) of whatever nature, arising by reason of any such lien, claim of lien, attachment or encumbrance. If any claim is filed to enforce any laborers, material men, mechanic's, or other similar lien arising out of or relating to the Work for which Contractor has paid the Subcontractor, Subcontractor will immediately cause such lien to be released and discharged and if Subcontractor fails to do so, then Contractor will have a right to pay all sums, including attorneys' fees and other costs and expenses incurred necessary to obtain such release and discharge, and hold Subcontractor liable for the amount thereof with the right to deduct all or a portion of such sum from accounts that may be due Subcontractor.

I.    Default. In addition to the other remedies available under law: (a) if Subcontractor should fail or refuse, except in cases where extension of time is provided, to supply enough properly skilled workers or proper materials for the Work; or (b) if Subcontractor should fail to make payment to its subcontractors for material or labor which are due to its Subcontractors, or (c) if Subcontractor should fail to keep and comply with any of the terms and provisions of this Agreement, or (d) if Subcontractor should be adjudged bankrupt, file or suffer to be filed a petition for relief under the Bankruptcy Act, or make a general assignment for the benefit of the creditors; or (e) if a receiver should be appointed on account of Subcontractor's insolvency; or (f) if Subcontractor fails to pay its employees' wages, benefits or tax withholdings; then, in any such event, Contractor may without prejudice to any other right or remedy and after giving Subcontractor and its surety, if any, upon twenty-four hours written notice, terminate its obligation to Subcontractor under this Agreement and take possession of the Site and complete (or cause to be completed) the Work by whatever method Contractor may deem expedient. In such case Subcontractor will not be entitled to receive any further payment until the Work is completed. Upon completion of the Work, Contractor will pay to Subcontractor an amount equal to (x) the unpaid portion of the Subcontract Amount attributable to the Work performed up to the termination less (y) the amount by which (i) the costs incurred by Contractor to complete the Work, including, without limitation, costs for architectural, managerial and administrative services and reasonable attorneys' fees, if legal counsel is employed, exceed (ii) the portion of the Subcontract Amount attributable to the balance of the Work yet to be performed at the time of termination. If the amount calculated under part (y) in the preceding sentence exceeds the amount owing under part (x), the Subcontractor will pay the difference to Contractor. If the amount in part (x) exceeds the amount in part (y), Contractor will pay the difference to Subcontractor.



J.  Subcontractor is an independent Subcontractor and is not an employee or agent of the Contractor and neither Subcontractor nor anyone employed by Subcontractor will be deemed for any purpose to be the agent, employee, servant or representative of Contractor in the performance of the Work. Subcontractor acknowledges and agrees that Contractor will have no direction or control over the means, methods, procedures or manner of the Work performed by Subcontractor or any of its subcontractors, or any of their employees, vendors or suppliers.

K.  No changes shall be made in the work proposed or in the price unless those changes are agreed to in writing by both Subcontractor and Contractor. Travis Gehr and / or __James Redmond_____, shall be the Contractor's designated on site agent. If there is a dispute regarding whether the work is a change, Subcontractor may perform that work under protest and submit a claim to Contractor in accordance with this Agreement.

L.  Clean Up. Subcontractor will at all times keep the site or facility safe and free from the accumulation of waste materials or rubbish caused by its operations or related to the Work. Upon completion of the Work and each portion thereof, Subcontractor will remove all rubbish and waste produced by its operations or Work hereunder from the facility as well as all of its tools, equipment, machinery and surplus materials no longer needed and leave the site or facility in a "broom clean" or equivalent condition and safe for Subcontractor's employees and subsequent subcontractors to perform their work, unless otherwise specified in writing. If Subcontractor fails to clean up, Contractor may do so after written notice to Subcontractor and the cost thereof will be charged to Subcontractor.

V  **Representations of Subcontractor.** Subcontractor represents and warrants the following:

A.  Subcontractor has examined the Agreement ("Prime Contract") between Owner and Minnesota Limited (if requested by the Subcontractor prior to the execution of the work) and agrees to all provisions affecting Subcontractors performance, including but not limited to the representations, obligations and warranties made by Minnesota Limited to the Owner.

B.  Subcontractor has the requisite authority and ability to perform the subcontract without delay.

C.  Subcontractor will not assign, subcontract or otherwise delegate its responsibilities and obligation hereunder without the written consent of Contractor.

D.  Subcontractor shall examined the specifications, site conditions, drawings and requirements of the work with due diligence and its bid has taken into consideration all conditions and risks which are reasonably related to the performance of the work.

E.  Ethics; Conflict of Interest. Subcontractor shall at all times during the performance of its obligations hereunder conform to sound ethical business practices in conformance with all applicable Laws and shall in its business practices promote the values of honesty, integrity, social responsibility, and human rights. Subcontractor shall not offer to any member of Contractor (including employees thereof) any gifts, entertainment, or other favors beyond the common courtesy usually associated with business practices. Subcontractor shall not pay any commissions or fees or grant any rebates or other



remuneration or monetary gratuity to any employee of Contractor. Subcontractor shall not grant any secret rebates nor pay any commissions or fees to any employee of Contractor.

F. Invitees Prohibited. Subcontractor shall not, without prior written permission of Contractor, invite, permit entry or bring any Person onto the Contractor's Worksite or property who is not an employee of Subcontractor

G. Subcontractor will pay its employees promptly and maintain good labor relations. Subcontractor further represents that it has paid all union benefit contributions including fringe benefits. Subcontractor agrees that Contractor upon demand of the Labor Union, may withhold from any sums due Subcontractor and pay to the Administrator of the Plan any amounts owing and said payment shall be deducted from the invoice.

VI. **Warranty**.

A. Subcontractor warrants to the Contractor and Owner that all materials and equipment furnished under this Agreement will be new unless otherwise specified in writing, and that all work will be of good quality, free from faults and defects and in conformance with any Purchase Order and attachments thereto, including any specifications stipulated therein. All Work not so conforming to these standards may be considered defective, and the Subcontractor shall promptly repair and make good, after notice by the Contractor and Owner and without cost to the Contractor and Owner, any damages, defects or faults resulting from imperfect or defective Work done or materials furnished by the Subcontractor. The Subcontractor warrants that all labor, materials and equipment furnished under this Agreement shall be covered by warranty for a period of at least two (2) years (or during a longer period if required by the specifications and stipulated therein) from the date of acceptance of the completed Work by the Owner.

B. Where material or equipment furnished by the Subcontractor is covered by a manufacturer's warranty or guarantee or other special warranty or guarantee the Subcontractor shall provide such warranty and provide additional or extended warranty or guarantees to the Contractor for its labor, materials and equipment to confirm to paragraph A above.

VII. **Indemnification**. To the fullest extent permitted by law, the Subcontractor shall indemnify the Owner, Contractor and the agents and employees of any of them from and against claims, damages, losses and expenses, arising out of or in connection with, or resulting from the negligent performance of the Subcontractor's work, the Subcontractor's subcontractors work, or anyone directly or indirectly employed by them but only to the extent caused by acts or omissions by either or any of them. In addition thereto, Subcontractor indemnifies Owner, Contractor and the agents and employees of any of them for expenses including attorney's fees and costs, incurred in responding to and defending against any claim or in enforcing this provision.

VIII. **Payment**. Subcontractor shall invoice Minnesota Limited no later than 30 days after date of service Contractor agrees to pay Subcontractor all sums due, less ___10___ % retainage (if applicable) hereunder within



thirty (30) days from the date the invoice is received. However, it is a condition precedent to payment that if Owner withholds payments for that portion of any work performed by Subcontractor, then Minnesota Limited is only obligated to pay Subcontractor after receiving payment from the Owner. In such event payment will be made within ten (10) days. Contractor reserves the right to withhold such sums as may be necessary to pay expenses, including costs and attorney's fees, caused by, or related to, Subcontractor's breach of Agreement. Final payment of retainage will occur ten (10) days after final payment for Subcontractor's work is received and when lien waivers and job completion affidavit are executed.

IX.   **Maintaining Records / Audit.** For a period of five (5) years from final acceptance of Subcontractor's work, Subcontractor shall maintain all job records and shall, upon reasonable notice by Contractor, but no later than 10 business days, make such records available for inspection by Contractor or Owner. Contractor or Owner or their representatives may audit said records. If the results of the audit show an overpayment, Subcontractor shall reimburse the overpayment together with interest of 1% per month. If the audit shows an overpayment more than one thousand dollars ($1,000), Subcontractor shall also reimburse Contractor or Company for the cost of the audit.

X.    **Interpretations and Enforcement.** The Agreement and contract documentation contains the parties entire understanding with regard to the subject hereof and shall not be modified except by a writing signed by both parties; provided, however, that Subcontractor shall be bound by changes in the Contract Documents agreed to between the Contractor and Owner, but only if Contractor has timely notified Subcontractor of such changes. The interpretation and enforcement of this Agreement shall be governed by the laws of the state in which the work hereunder is to be performed or that specified in the Prime Contract if different than the state where the work is to be performed. If any provision hereof is deemed unenforceable, the remainder of the Agreement shall be enforced as though such provision were not a part hereof.

XI.   **Assignment.** Subcontractor shall not assign or subcontract this Agreement or any portion thereof or of any money due or which may become due hereunder without the prior written consent of Contractor. Notwithstanding anything to the contrary contained herein, Contractor may assign this Agreement without the consent of Subcontractor.

XII.  **Confidentiality of Agreement.** The Subcontractor agrees that all terms and conditions contained herein or in any other document(s) referencing the Project shall remain confidential. Said terms shall not be disclosed without the express written consent of the Contractor.

Minnesota Limited is required to protect all technical information supplied by the Owner. Subcontractor agrees that this Section is its written assurance that all such information, including but not limited to: drawings, diagrams, surveys, specifications, locations, and geophysical (GPS) coordinates of the work, will be kept confidential, protected, and will not be disclosed to third parties without obtaining Minnesota Limited's written consent unless ordered to do so by a court of law or arbitrator.. Breach of is provision will subject Subcontractor to all remedies awarded to Contractor and Owner including injunctive relief. Subcontractor agrees to pay all of Contractors and Owners attorney's fees in enforcing this provision.



XII.   **Notice.** Unless otherwise provided herein, any notice provided for herein will be in writing and delivered to the parties (a) in person, (b) by facsimile transmission (with the original and a copy of the facsimile confirmation following in the United States mail), (c) by overnight delivery service, or (d) by certified mail, return receipt requested. Notice will go to the address first shown herein for the respective party to whom notice is given or to such other address as may be designated by either party by written notice given pursuant hereto.

XIV.   **Governing Law/Venue/Attorney Fees.** This Agreement shall be construed and interpreted in accordance with the laws of the State of Minnesota, including, without limitation, matters of construction, validity, enforcement, and interpretation. The parties agree that venue for any dispute under this Agreement shall be in the District Court of Hennepin County, Minnesota. In the event any enforcement effort is initiated by Contractor against Subcontractor for default of this Agreement, Subcontractor shall be liable to Contractor for any and all costs of collection, including but not limited to, reasonable attorneys' and professional fees, court costs, traveling and lodging expenses, costs of investigation and defense, accrued interest, and any other reasonable expenses incurred by Contractor in initiating such efforts.

Signed the day and year first written above.


CONTRACTOR:  Minnesota Limited, LLC.

By: _____

Its: _____
            Title


SUBCONTRACTOR: THE HDD COMPANY

By: _____

Its:  *Vice President*
            Title



Prior to commencing Work, Subcontractor shall, at its sole expense, procure and maintain insurance of the types, and in the form and amounts described below from insurer(s) authorized to transact business in the state where Work or operations will be performed by Subcontractor. Such insurance and required coverage in forms acceptable to General Contractor shall be placed with admitted insurers that maintain an A.M. Best's rating of not less than A- VII, unless otherwise approved by the General Contractor. The insurance requirements described below shall be maintained uninterrupted for the duration of the Project, including any warranty periods, and shall protect Subcontractor, and others for whom and/or to whom Subcontractor may be liable, for liabilities in connection with work performed by or on behalf of Subcontractor, its agents, representatives, employees or subcontractors.

**Insurance Requirements:**

1.    **Commercial General and Umbrella Liability Insurance.** Subcontractor shall maintain commercial general liability ("CGL") and, if necessary, commercial umbrella insurance, with a limit of not less than $ 2,000,000.00             per occurrence, bodily injury or property damage liability; $  2,000,000.00            per offense, personal and advertising injury liability; $      5,000,000.00                     products-completed operations aggregate; and $    5,000,000.00                     general aggregate applicable to claims other than products-completed operations.   To the extent that Subcontractor's CGL and any commercial umbrella insurance are subject to aggregate limits, the policy shall be endorsed so as to apply such aggregate limits separately to the Project.

Coverage afforded under Subcontractor's CGL and any commercial umbrella insurance shall be provided on an occurrence basis and shall be subject to the terms of the *Insurance Services Office ("ISO") Commercial General Liability Coverage Form CG 0001*, or a substitute form providing coverage at least as broad as the ISO form specified. There shall be no limitations or exclusions of coverage beyond those contained in the standard coverage form and coverage shall include liability arising from premises, operations, independent contractors, products-completed operations including construction defect, contractual liability or personal injury and advertising injury.

General Contractor, its officers, directors and employees and Project Owner(s) shall be included as additional insureds under Subcontractor's CGL, and any commercial umbrella insurance, with respect to liabilities arising out of both the ongoing and completed operations of Subcontractor. Such additional insured coverage shall be subject to the terms of ISO additional insured endorsement forms CG 2010 (ongoing operations) and form CG 2037 (products-completed operations), or substitute form(s) providing equivalent coverage. The edition date of the ISO endorsements required should be chosen based on the recipient's risk transfer objectives. The table below summarizes the options and major differences between the edition dates.

| Endorsement(s) | ISO Edition Date | Comments |
|---|---|---|
| CG 2010 | 11/85 Edition | Broadest Insuring Agreement - "liability arising out of" the Subcontractor's work – both ongoing |



| | | operations and completed operations coverage provided by one endorsement. |
|---|---|---|
| CG 2010/CG2037 | 10/01 Edition | Same Insuring Agreement as 11/85 with ongoing operations and completed operations coverage provided by separate endorsements. |
| CG 2010/CG2037 | 07/04 Edition | More narrow Insuring Agreement – "caused in whole or in party by. . . .acts or omissions" of the Subcontractor. |
| CG2010/CG2037 | 04/13 Edition | Same Insuring Agreement as 07/04, but limits coverage to "extent permitted by law" and "not be broader than that which you are required by the contract or agreement to provide." |

Note: Recommended Additional Insured endorsement for states other than Minnesota may vary and Willis should be consulted. States including but not limited to IL, TX, & CA involve unique risk transfer considerations.

Additional Insured coverage afforded by Subcontractors CGL, and any commercial umbrella insurance, shall be primary and non-contributing with respect to any insurance or self-insurance available to General Contractor or Project Owner. Such primary and non-contributory insurance shall be subject to the terms of ISO form CG 2001 (Primary and Noncontributory – Other insurance Condition) or its equivalent. Any other insurance or self-insurance maintained by General Contractor or Project owner shall be excess of, and non-contributory with, the coverage afforded by Subcontractors CGL and commercial umbrella insurance, if any.

In addition to procuring and maintaining CGL, and any commercial umbrella insurance, for the duration of the contract, Subcontractor agrees to continue to procure and maintain the products-completed operations liability insurance coverage for a minimum of __two__ ( _2_ ) year(s) after the date that the Work is substantially complete. All terms and conditions of such coverage shall be maintained during this completed operations period, including the required coverage limits and the requirement to provide General Contractor and Project Owner with coverage as an additional insured for completed operations.

2.      **Commercial Automobile and Umbrella Liability Insurance**. Subcontractor shall maintain automobile liability and, if necessary, commercial umbrella insurance, with a limit of not less than $ __2,000,000.00__        each accident. Such insurance shall cover liability for bodily injury and property damage arising from the use or operation of any auto, including those owned, hired or otherwise operated or used by or on behalf of Subcontractor. The coverage shall be subject to the terms of ISO *Business Auto Coverage Form CA 0001* (1990 edition or later), or a substitute form providing equivalent coverage.

3.      **Workers' Compensation and Employers Liability Insurance**. Subcontractor shall maintain workers' compensation coverage providing statutory benefits. Subcontractor shall additionally maintain employers liability insurance, and if necessary, commercial umbrella insurance, with a limit of not less than: $1,000,000, bodily injury by accident – each accident; $1,000,000, bodily injury by disease-policy limit; and $1,000,000, bodily injury by disease each employee. Workers' Compensation coverage must extend to every



employee, including owners/officers of a closely held corporation and/or individuals operating as a sole proprietorship or partnership. <u>Workers' Compensation must provide coverage in the state where the Project is located</u>.

Where applicable, evidence of coverage shall be required for U.S. Longshore and Harbor Workers Compensation, Maritime coverage, Federal Employer's Liability Act and other unique exposures requiring endorsement of coverage.

4. **Contractors Pollution Liability Insurance**. Required only if Subcontractor's scope of services include the remediation, treatment, storage or disposal of waste or hazardous materials on or about the project site, as determined by General Contractor. If required, Subcontractor shall maintain Contractors Pollution Liability coverage with a limit of not less than $____n/a____ per occurrence, $____n/a____ annual aggregate. Coverage shall apply to the scope of work as described under the Contract including transportation and shall include coverage for bodily injury; property damage, including loss of use of damaged property or property that has not been physically injured; clean-up costs; mold; defense and investigative costs. Subcontractor shall maintain Completed Operations coverage for ____n/a____ years following final acceptance of the project or termination of the Contract.

If the scope of services in the contract require the Subcontractor to provide professional services associated with arranging for, or brokering of, hazardous material or construction and demolition (C&D) wastes off the job site, Subcontractor must amend the Contractors Pollution Liability policy to include coverage to address this scope of work. If any of the aforementioned insurance policies are written on a claims made basis, the Contractor warrants that continuous coverage will be maintained, or an extended discovery period will be exercised, for a period of three years beginning from the time the work under this contract is completed.

5. **Pollution (Environmental) Liability Insurance**. Required only if Subcontractor's scope of services involves disposal of waste or hazardous materials off-site, as determined by General Contractor. If required, Subcontractor shall maintain pollution (environmental) liability coverage with a limit of not less than: $____n/a____ per incident, $____n/a____ policy aggregate for hazardous waste disposal services, and $____n/a____ per incident, $____n/a____ for all other disposal facilities. Such coverage shall include clean-up costs, defense costs and products and completed operations.

If the scope of services in the contract requires the disposal of any hazardous materials or construction and demolition (C&D) wastes off the job site, Subcontractor must also obtain evidence that the Disposal Site Operator maintains Pollution Legal Liability Insurance with coverage for: a. bodily injury, sickness, disease, mental anguish or shock sustained by any person, including death; b. property damage including physical injury to or destruction of tangible property including the resulting loss of use thereof, clean-up costs, and the loss of use of tangible property that has not been physically injured or destroyed; c. defense including costs, charges and expenses incurred in the investigation, adjustment or defense of claims for such compensatory damages, d. pollution conditions on, at, under or emanating from any disposal site, location or facility, used by or on behalf of the disposal facility of any waste or waste materials relating to the performance of the work.



The Disposal Site Operator's Pollution Liability Policy will apply to losses arising from the facility that is accepting the waste under the contract. Minimum limits of Insurance for this policy shall be $ _____n/a_____ each incident / $ _____n/a_____ policy aggregate.

Claims-made coverage is permitted, provided the policy retroactive date is continuously maintained prior to the commencement date of the agreement, and coverage is continuously maintained during all periods in which Subcontractor accepts or treats waste generated from General Contractor's projects and for a period of one (1) year thereafter.

6.　　　**Professional Liability Insurance.** Required only if Subcontractor's scope of services include architectural, engineering, professional consulting or construction management, as determined by General Contractor. If required, Subcontractor shall maintain professional liability coverage with a limit of not less than $ _____n/a_____ each wrongful act, $ _____n/a_____ policy aggregate.

Coverage shall include liability arising from the errors, omissions or acts of the Subcontractor or any entity for which the Subcontractor is legally responsible in the providing of professional services under the Contract. Throughout the term the Contract, the PL/E&O policy shall include full prior acts coverage. Coverage shall be continuously maintained during the term of this Agreement and for a period of x years following final acceptance of the Project or termination of the Contract.

Coverage shall not include any exclusion or other limitations related to:
- Scope of the professional services
- Delays in project completion and cost overruns
- Who is authorized to notify the carrier of a claim or potential claim
- Mold, fungus, asbestos, pollutants or other hazardous substances

Claims-made coverage is permitted, provided the policy retroactive date is continuously maintained prior to the commencement date of this agreement, and coverage is continuously maintained during all periods in which Subcontractor performs professional services for General Contractor, and for an additional period of one (1) year after termination of this agreement or the last date such services are performed, whichever comes later. If Subcontractor's scope of work includes environmental engineering or consulting, the terms of coverage shall not exclude environmental professional services.

7.　　　**Watercraft Liability Insurance.** If watercraft of any kind is used by the CONTRACTOR or Subcontractor, including: (i) bodily injury; (ii) property damage; and (iii) passenger liability.

　　　a.　　　Limit of Liability: Combined Single Limit (Bodily Injury and Property Damage), $1,000,000 each occurrence;

　　　b.　　　Protection and Indemnity Insurance to include Jones Act crew coverage (or at least Maritime Employer's Liability: MEL), collision, tower's liability and wreck removal coverage, on a form providing



coverage no less extensive than that afforded in the P & I SP-23 form (revised 1/56), including a pollution buy-back endorsement.

8. **Aircraft Liability Insurance.** If aircraft of any kind is used by the CONTRACTOR or Subcontractor, including: (i) bodily injury; (ii) property damage; and (iii) passenger liability.

    a. Limit of Liability: Combined Single Limit (Bodily Injury and Property Damage and Passenger Liability), including hull physical damage insurance for the full replacement cost of each aircraft used in the work. Such Aircraft Liability and Hull Coverage shall include a waiver of subrogation against General Contractor and all others required by this Agreement to be additional insureds. $ ____n/a____ per seat; $ ____n/a____ per occurrence.

## Additional Provisions:

1. **Deductibles and Self-Insured Retentions.** The funding of deductibles and self-insured retentions maintained by Subcontractor shall be the sole responsibility of Subcontractor, including any amounts applicable to deductibles or self-insured retentions applicable to claims involving the General Contractor or Owner as an additional insured. Any self-insured retentions in excess of $____n/a____ must be declared to and approved by the General Contractor.

2. **Primary / Non-Contributing.** Subcontractor's required insurance coverage shall be primary insurance, and any insurance or self-insurance maintained by the General Contractor or Project Owner shall be excess of and noncontributory with Subcontractor's insurance.

3. **Severability of Interest.** Except with respect to the limits of insurance, Subcontractor's required insurance shall apply separately to each insured or additional insured.

4. **Waiver of Subrogation.** Subcontractor agrees to waive all rights of subrogation against the General Contractor, Project Owner and Project Architect, and shall cause each of its subcontractors to waive all rights of subrogation against the General Contractor, Project Owner and Project Architect, their agents and employees, as respects loss, damage, claims, suits or demands, howsoever caused:

    a. To real or personal property, vehicles, equipment, tools, etc. owned, leased or used by Subcontractor or Subcontractor's employees, agents or sub-subcontractors; and

    b. To the extent such loss, damage, claims, suits or demands are, or should be, afforded coverage by the Subcontractor's required insurance or any other insurance (except professional liability to which this requirement does not apply) maintained by the Subcontractor. This waiver shall C1PPIY to all first party property, equipment, vehicle and workers' compensation claims (unless prohibited under applicable state statutes), and all third party liability claims. This waiver shall apply to all deductibles, retentions or self-insured layers applicable to the required or any other insurance (except professional liability to which this requirement does not apply) maintained by the Subcontractor. If necessary, Subcontractor agrees to endorse the required insurance policies to permit waivers of subrogation in



favor of General Contractor, Project Owner and Project Architect as required hereunder. Subcontractor further agrees to hold harmless and indemnify General Contractor, Project Owner and Project Architect for any loss or expense incurred as a result of Subcontractor's failure to obtain such waivers of subrogation from the insurers.

5. **Notice of Cancellation / Material Change / Nonrenewal.** Subcontractor's insurance policies must contain a provision or endorsement that the coverage afforded will not be canceled, materially changed or renewal refused until at least 30 days prior Written Notice has been given to General Contractor and to each other additional insured to whom a certificate of insurance has been issued; provided, however, that a ten (10) day prior notice requirement may apply in the event of cancellation due to nonpayment of premium.

6. **Verification of Coverage.** Prior to commencing Work, Subcontractor shall furnish General Contractor with certificate(s) of insurance executed by a duly authorized representative of each insurer, as evidence of compliance with the insurance requirements set forth above. Such certificates of insurance shall be accompanied by copies of endorsements evidencing coverage afforded to General Contractor and Project Owner as additional insured, and endorsements reflecting insurer's concurrence with Subcontractor's waiver of subrogation rights against General Contractor, Project Owner and Project Architect. Renewal certificates are to be provided to the General Contractor prior to the expiration of the required insurance policies. Certified copies of policies, including all policy endorsements, shall be furnished by Subcontractor within 15 days of written request by General Contractor.

The certificate(s) of insurance shall be subject to approval of General Contractor, but failure of General Contractor to request such certificate or other evidence of Subcontractor compliance with insurance requirements, or failure of General Contractor to identify deficiencies from evidence that is provided, shall in no way limit or relieve Subcontractor of its obligations to maintain such insurance.

7. **Sub-Subcontractors.** No work shall be sublet to any Sub-subcontractor without first obtaining the General Contractor's written permission. All Sub-subcontractors, once approved by the General Contractor, are subject to the same insurance requirements as Subcontractor. Subcontractor shall cause each Sub-subcontractor employed by Subcontractor to purchase and maintain such insurance. Upon request, Subcontractor shall furnish General Contractor with copies of certificates of insurance evidencing coverage for each Sub-subcontractor

Subcontractor shall voluntarily provide workers compensation coverage for proprietors, partners or others not statutorily required to maintain workers' compensation insurance.

8. **Leased Employees.** Use of leased employees by Subcontractor is expressly prohibited without General Contractor's written permission. If permitted by General Contractor, Subcontractor shall:

a. Provide General Contractor with a complete copy of its Agreement with the Leasing Company;



MINNESOTA LIMITED
AN NVERGE COMPANY

    b.    Require that Leasing Company provide workers' compensation, employers liability and commercial general liability with coverage limits in amounts no less than Subcontractor insurance requirements for the same coverages.

    c.    Require that Leasing Company provide Alternate Employer Endorsement naming General Contractor as alternate employer on Leasing Company's workers' compensation policy.

    d.    Require that Leasing Company add General Contractor as an additional insured on its commercial general liability insurance policy, with primary/non-contributory wording.

    e.    Require that Leasing Company provide waiver of subrogation in favor of General Contractor on both Leasing Company's workers' compensation and commercial general liability insurance policies.

    f.    Provide General Contractor with a copy of the Leasing Company's certificate of insurance, with endorsements, evidencing the required coverage.

9.    **No Representation of Coverage Adequacy.**  In specifying minimum Subcontractor insurance requirements, General Contractor does not represent that such insurance is adequate to protect Subcontractor for loss, damage or liability arising from its work. Subcontractor is solely responsible to inform itself of types or amounts of insurance it may need beyond these requirements to protect itself.

The insurance requirements set forth in minimum amounts shall not be construed to relieve Subcontractor for liability in excess of such coverage, nor shall it preclude General Contractor from taking such other actions as is available to it under any other provision of the Subcontract. To the extent Subcontractor maintains insurance greater than these minimum requirements, Subcontractor agrees that such insurance shall be applicable to any of Subcontractor's liability obligations hereunder.

Any acceptance of certificates of insurance by General Contractor shall in no way limit or relieve Subcontractor of its duties and responsibilities under this Subcontract, including the duty to indemnify and hold harmless General Contractor.

10.    **Compliance.**  Failure of Subcontractor to maintain the required insurance shall constitute a default under this Subcontract and, at General Contractor's option, shall allow General Contractor to terminate this Subcontract for cause, withhold payment and/or purchase the required insurance at Subcontractor's expense.

11.    **Cross-Liability Coverage/Non-Standard Restrictive Endorsements.**  All liability policies shall include cross liability coverage and a standard ISO separation of insureds provision, or its equivalent. No liability policy shall include or be endorsed to include any non-standard provisions restricting coverage for the named insured or the persons/entities required to be named as additional insureds under this Agreement, including but not limited to cross liability coverage exclusions or limitations.



THE HDD COMPANY

EL DORADO HILLS | OFFICE Suite 210
4505 Saturno Parkway, El Dorado Hills, CA USA 95762

MAIN 530 672-5705 | CROSSINGGROUP.COM

January 9, 2020

**Minnesota Limited**
18640 200th St, PO Box 410
Big Lake, MN 55309

ATTN: Amy Skuza

RE:     Southern Star Lines DT and DS Replacement Project
        Directionally drill and install approximately 6,052 feet of 36-inch steel pipeline in
        Anderson and Franklin Counties, KS.

The HDD Company is pleased to submit the following bid quote:

1.      **Responsibilities of The HDD Company**
        1.1.    Provide all required insurance certificates.
        1.2.    Provide any written submittals and qualifications required.
        1.3.    Provide 2 (two) drill rig(s) with sufficient capabilities to install the crossings, a
                closed-loop mud system, mud pumps, vacuum trucks, dump trucks, steering
                system, and all drill spread support equipment necessary.
        1.4.    Provide all required union labor for the drilling operations.
        1.5.    Provide preliminary drill profiles for each crossing.
        1.6.    Provide final as-built drawings.
        1.7.    Provide and haul water for drilling operations.
        1.8.    Provide water storage for the duration of drilling operations.
        1.9.    Provide all required pulling heads.
        1.10.   Leave the entry areas clean, free of debris, and to a rough grade.
        1.11.   Provide bonding at 1%, which is not included in the bid pricing below.

2.      **Responsibilities of THE CONTRACTOR**
        2.1.    Stake and survey the entry and exit points for each bore, with correct stations
                and elevations.
        2.2.    Provide all permitting to undertake the project.
        2.3.    Provide and maintain suitable truck access to and from entry and exit locations.
        2.4.    Provide stable, level, matted and/or graveled work pads for each bore.
        2.5.    Provide all BMPs around each bore's entry and exit locations. The HDD
                Company will maintain these items.
        2.6.    Provide, string, weld, and test all 36-inch pipe for each bore.

Going to Greater Lengths™

2.7. Provide all plans, equipment, and manpower to handle pipe during pullback operations.
2.8. Perform all final tie-ins.
2.9. Provide all settlement monitoring, if required.
2.10. Provide all final site restorations.
2.11. Provide all field surveys to document existing conditions for the HDD installations, including but not limited to pictures, videos, field notes, etc.

## 3. Pricing (Lump Sum)

| | | |
|---|---|---|
| 3.1. | HDD Cedar Creek 2,106' X 36" pipe: | **$1,280,448.00** |
| 3.2. | HDD Pottawapomie Creek 1,788' X 36" pipe: | **$1,087,104.00** |
| 3.3. | HDD Flint Hill 2,158' X 36" pipe: | **$1,312,064.00** |
| 3.4. | Mobilization per rig spread: | **$50,000.00** |

## 4. Clarifications

4.1. Additional footage due to no fault of The HDD Company, will be billed at $608.00/LF.
4.2. This proposal is based upon the drawings, specifications, and geotechnical information provided to us on or before **7 June 2019.**
4.3. If any revised or additional drawings, specifications, geotechnical information, or permits are provided to us after the bid submission date, The HDD Company reserves the right to modify the proposal to account for any added costs and/or additional time associated with the change(s).
4.4. The HDD Company's bid proposal is conditional upon reaching an agreement upon mutually acceptable contract terms. This bid proposal will be attached to and forms a part of the contract between The HDD Company and THE CONTRACTOR.
4.5. Item 3.3 above includes the hauling and disposal of all **non-contaminated** drilled solids and excess drilling fluids.
4.6. The pricing above is contingent upon a site visit.

## 5. Exclusions

5.1. The HDD Company and its personnel are not the Project Engineers. Therefore, we exclude all design and engineering services unless any are specifically noted as included in this proposal. Any drilling plans or profiles that we submit to you will be based upon the design information in the contract documents and our experience as HDD contractors. Any plans or profiles we provide are recommendations only and are subject to review and approval by the project owner and/or its engineers.
5.2. All permits, including federal, State and local environmental permits, the SWPPP permit and any associated SWPPP plans, any right-of-way (ROW) agreement or easements, and all access necessary for us to perform our work shall be provided by others. If our operations are delayed or otherwise impacted by any delays or problems with permits, SWPPP plans, ROW agreements, easements or access arrangements our compensation and time for completion will be equitably adjusted.

6. **Terms and Conditions**
  6.1. Schedule
    6.1.1. This proposal is based upon performance under a reasonable and mutually agreed-to project schedule in so far as that schedule applies to our work. The approved project baseline schedule and all monthly updates must be provided to us on a regular and timely basis to keep us apprised of schedule changes which may impact the timing and efficiency of our work. We will not be liable for any delays caused by others or by factors beyond our reasonable control.

  6.2. Indemnification
    6.2.1. We will indemnify you and/or the project owner for personal injury or property damage claims to the extent of our own negligence. Our proposal excludes any obligation to indemnify you for your own negligence or to indemnify any other party for that party's own negligence or to indemnify any design professional.

  6.3. Payment
    6.3.1. Monthly progress payments will be made to The HDD Company within (7) seven days after you receive each monthly payment from the project owner, but in no event later than 120 days from the date you received your invoice.
    6.3.2. We will receive our final payment within 30 days after you receive our final billing and our work has been completed and accepted. Acceptance will not be unreasonably withheld or delayed. If you dispute any portion of any billing, you will promptly notify us in writing of the nature of the dispute and you will pay the undisputed portion of the billing without delay. If any undisputed amounts are past due for more than 10 days, we reserve the right to stop work until all payments are brought current. We will provide lien releases in accordance with applicable state statutes or regulations. We will keep the project free of liens from out subcontractors, suppliers and other vendors provided we have been paid by you for the work covered by any such liens.

  6.4. Extra/Force Account Work:
    6.4.1. If we are directed to perform any work on a force account or time and material basis, the rates for our labor and equipment will be as stated in our proposal, or if no rates are included with this proposal, as stated in our then current standard labor and equipment rate schedule. If we are directed to standby or suspend work while other operations occur, or delays or other problems are resolved, or if we are required to standby due to events or circumstances beyond our control, the standby time for our labor and equipment will be paid as stated in this proposal.

  6.5. Differing Site Conditions

    6.5.1. If the conditions we encounter in the performance of our work differ materially from those indicated in the contract documents, boring logs, geotechnical reports or other information furnished to us prior to bid, or from those ordinarily encountered and generally recognized as inherent in the type of work provided for in our proposal, then our compensation and time for completion will be equitably adjusted to account for any resulting delay and added costs.

7. **Delays and Work Stoppages:**

    7.1 All work stoppages that arise through no fault of The HDD Company will be billed at **$14,500** (no crew on site).

The HDD Company appreciates the opportunity to furnish you this quote and looks forward to working with you. Should any of the information presented above need further clarification, please do not hesitate to contact us.

Sincerely,
**The HDD Company**

Jeremy King
Vice President



EL DORADO HILLS | OFFICE Suite 210,
4925 Serrano Parkway, El Dorado Hills, CA USA 95762

MAIN 530 676 0705 | CROSSINGGROUP.COM

17 January 2020


**Minnesota Limited**
18640 200th St, PO Box 410
Big Lake, MN 55309

ATTN: Brad Cordes

RE:     Southern Star Lines DT and DS Replacement Project
        Directionally drill and install approximately 4540 feet of 36-inch steel pipeline road
        crossings in Anderson and Franklin Counties, KS.

The HDD Company is pleased to submit the following bid quote:

1.    **Responsibilities of The HDD Company**
      1.1.   Provide all required insurance certificates.
      1.2.   Provide any written submittals and qualifications required.
      1.3.   Provide drill rig(s) with sufficient capabilities to install the crossings, a closed-
             loop mud system, mud pumps, vacuum trucks, dump trucks, steering system,
             and all drill spread support equipment necessary.
      1.4.   Provide all required union labor for the drilling operations.
      1.5.   Provide final as-built drawings.
      1.6.   Provide and haul water for drilling operations.
      1.7.   Provide water storage for the duration of drilling operations.
      1.8.   Provide all required pulling heads.
      1.9.   Leave the entry areas clean, free of debris, and to a rough grade.
      1.10.  Provide bonding at 1%, which is not included in the bid pricing below.

2.    **Responsibilities of THE CONTRACTOR**
      2.1.   Stake and survey the entry and exit points for each bore, with correct stations
             and elevations.
      2.2.   Provide all permitting to undertake the project.
      2.3.   Provide and maintain suitable truck access to and from entry and exit locations.
      2.4.   Provide stable, level, matted and/or graveled work pads for each bore.
      2.5.   Provide bore pits and shore if needed.
      2.6.   Provide all BMPs around each bore's entry and exit locations. The HDD
             Company will maintain these items.
      2.7.   Provide, string, weld, and test all 36-inch pipe for each bore.
      2.8.   Furnish support crew for road crossings, including excavators and manpower.

*Going to Greater Lengths®*

2.9. Provide all plans, equipment, and manpower to handle pipe during pullback operations.

2.10. Perform all final tie-ins.

2.11. Dispose of cuttings.

2.12. Provide all settlement monitoring, if required.

2.13. Provide all final site restorations.

2.14. Provide all field surveys to document existing conditions for the HDD installations, including but not limited to pictures, videos, field notes, etc.

3. **Pricing**

| | | |
|---|---|---|
| 3.1. | 4540' X 36" pipe: | **$508.00/ft** |
| 3.2. | Mobilization per rig spread: | **$50,000.00** |

4. **Clarifications**

4.1. This proposal is based upon the drawings, specifications, and geotechnical information provided to us on or before **17 January 2020.**

4.2. If any revised or additional drawings, specifications, geotechnical information, or permits are provided to us after the bid submission date, The HDD Company reserves the right to modify the proposal to account for any added costs and/or additional time associated with the change(s).

4.3. The HDD Company's bid proposal is conditional upon reaching an agreement upon mutually acceptable contract terms. This bid proposal will be attached to and forms a part of the contract between The HDD Company and THE CONTRACTOR.

4.4. The pricing above is contingent upon a site visit.

5. **Exclusions**

5.1. The HDD Company and its personnel are not engineers. Therefore, we exclude all design and engineering services unless any are specifically noted as included in this proposal. Any drilling plans or profiles that we submit to you will be based upon the design information in the contract documents and our experience as HDD contractors. Any plans or profiles we provide are recommendations only and are subject to review and approval by the project owner and/or its engineers.

5.2. All permits, including federal, State and local environmental permits, the SWPPP permit and any associated SWPPP plans, any right-of-way (ROW) agreement or easements, and all access necessary for us to perform our work shall be provided by others. If our operations are delayed or otherwise impacted by any delays or problems with permits, SWPPP plans, ROW agreements, easements or access arrangements our compensation and time for completion will be equitably adjusted.

6. **Terms and Conditions**

6.1. Schedule

6.1.1. This proposal is based upon performance under a reasonable and mutually agreed-to project schedule in so far as that schedule applies to our work. The approved project baseline schedule and all monthly updates must be provided to us on a regular and timely basis to keep

us apprised of schedule changes which may impact the timing and efficiency of our work. We will not be liable for any delays caused by others or by factors beyond our reasonable control.

6.2    Indemnification

    6.2.1.    We will indemnify you and/or the project owner for personal injury or property damage claims to the extent of our own negligence. Our proposal excludes any obligation to indemnify you for your own negligence or to indemnify any other party for that party's own negligence or to indemnify any design professional.

6.3    Payment

    6.3.1.    Monthly progress payments will be made to The HDD Company within (7) seven days after you receive each monthly payment from the project owner, but in no event later than 120 days from the date you received your invoice.

    6.3.2.    We will receive our final payment within 30 days after you receive our final billing and our work has been completed and accepted. Acceptance will not be unreasonably withheld or delayed. If you dispute any portion of any billing, you will promptly notify us in writing of the nature of the dispute and you will pay the undisputed portion of the billing without delay. If any undisputed amounts are past due for more than 10 days, we reserve the right to stop work until all payments are brought current. We will provide lien releases in accordance with applicable state statutes or regulations. We will keep the project free of liens from our subcontractors, suppliers and other vendors provided we have been paid by you for the work covered by any such liens.

6.4.    Extra/Force Account Work:

    6.4.1.    If we are directed to perform any work on a force account or time and material basis, the rates for our labor and equipment will be as stated in our proposal, or if no rates are included with this proposal, as stated in our then current standard labor and equipment rate schedule. If we are directed to standby or suspend work while other operations occur, or delays or other problems are resolved, or if we are required to standby due to events or circumstances beyond our control, the standby time for our labor and equipment will be paid as stated in this proposal.

6.5.    Differing Site Conditions

    6.5.1.    If the conditions we encounter in the performance of our work differ materially from those indicated in the contract documents, boring logs, geotechnical reports or other information furnished to us prior to bid, or from those ordinarily encountered and generally recognized as inherent in the type of work provided for in our proposal, then our compensation and time for completion will be equitably adjusted to account for any resulting delay and added costs.

Going to Greater Lengths"

7. **Delays and Work Stoppages:**

   7.1. All work stoppages that arise through no fault of The HDD Company will be billed at **$14,500** (no crew on site).

The HDD Company appreciates the opportunity to furnish you this quote and looks forward to working with you. Should any of the information presented above need further clarification, please do not hesitate to contact us.

Sincerely,
**The HDD Company**

Jeremy King

# EXHIBIT B


| CLIENT/OWNER : | Minnesota Limited – Southern Star | DATE: | |
| WORK PRFM'D. BY: | The HDD Company, Inc. | EXTRA WRK. SHT. NO. | Cedar Creek |
| DESCPTN. OF WORK | Access and weather delays | | |
| 0 | | | |
| 0 | | | |
| 0 | | | |

## A – EQUIPMENT

| EQUIP. NO. | Company Owned Equipment | | HRS. | RATE/HR. | TOTAL/DAY |
|---|---|---|---|---|---|
| 1 | Drilling Rig HDD Rig 3 | | 30,00 | $ 205,56 | $ 6.166,80 |
| 1 | Mud Tank / Solids Control Unit | | 30,00 | $ 111,96 | $ 3.358,80 |
| 1 | Sump Pit/Trash Pump | | 30,00 | $ 8,29 | $ 248,70 |
| 1 | Mud Pumping Units | | 30,00 | $ 60,94 | $ 1.828,20 |
| 2 | Tool Van and tools | | 30,00 | $ 17,55 | $ 1.053,00 |
| 0 | Dump Truck A=17 TRUN 2AXL | | | | $ - |
| 2 | Vac. Truck A-17 TRUN 2AXL | | 30,00 | $ 45,75 | $ 2.745,00 |
| 7 | Misc. Trailers | | 30,00 | $ 1,79 | $ 375,90 |
| 0 | Haul Trucks | | 30,00 | $ 34,13 | |
| 1 | 6 3/4" Non Mag Drill Collars w/Jet Assembly | | 30,00 | $ 6,83 | $ 204,90 |
| 168 | Drill Pipe (5+1/2 FH) | | 30,00 | $ 0,53 | $ 2.671,20 |
| 2 | Misc. X-Subs and Rack (All X Subs for Spread) | | 30,00 | $ 5,20 | $ 312,00 |
| 0 | Sonde and Housing | | | | |
| | Steering Tool (North Referencing w/Tru-Gyde) | | | | |
| 48 | Rollers | | 30,00 | $ 1,50 | $ 2.160,00 |
| 2 | Ford F-250 T&TT 06-12 | | 30,00 | $ 5,04 | $ 302,40 |
| 0 | Ford F-450 T&TT 20-28 | | | | |
| 0 | Ford F-350 T&TT 20-28 | | | | |
| 0 | KW & Crane Truck | | | | |
| 0 | Hammer | | 30,00 | $ 41,93 | |
| 1 | 300 Amp Welder | | 30,00 | $ 9,49 | $ 284,70 |
| 1 | 1/2 Ton Truck | | 30,00 | $ 32,48 | $ 974,40 |
| 1 | 60" Casing | | 30,00 | $ 3,25 | $ 97,50 |
| 0 | Mud Bins | | | | |

### Rental Equipment

| | | | | | |
|---|---|---|---|---|---|
| 1 | 10K Reach Forklift | S.T. | 30,00 | $ 51,29 | $ 1.538,70 |
| | | O.T. | | | $ - |
| 2 | 225 Excavator | S.T. | 30,00 | $ 91,59 | $ 5.495,40 |
| | | O.T. | | | $ - |
| 2 | Portable toilets | S.T. | 30,00 | $ 1,50 | $ 90,00 |
| | | O.T. | | | $ - |
| 0 | Multiquip 20kW Generator | S.T. | | | $ - |
| | | O.T. | | | $ - |
| 1 | Frac Tank | S.T. | 30,00 | $ 7,32 | $ 219,60 |
| | | O.T. | | | $ - |
| 1 | Trash Bin | S.T. | 30,00 | $ 4,97 | $ 149,10 |
| | | O.T. | | | $ - |
| 1 | 500 Amp Welder | S.T. | 30,00 | $ 9,49 | $ 284,70 |
| | | O.T. | | | $ - |
| 2 | Light Tower | S.T. | 30,00 | $ 7,61 | $ 456,60 |
| | | O.T. | | | $ - |
| 1 | 175 kW Generator | S.T. | 30,00 | $ 71,36 | $ 2.140,80 |
| | | O.T. | | | $ - |
| 1 | 6" Diesel Trash Pump | S.T. | 30,00 | $ 23,60 | $ 708,00 |
| | | O.T. | | | $ - |
| 1 | HTI Mud Motor | S.T. | 30,00 | $ 42,50 | $ 1.275,00 |
| | | O.T. | | | $ - |
| | | S.T. | | | $ - |
| | | O.T. | | | $ - |
| | | S.T. | | | $ - |
| | | O.T. | | | $ - |
| | | S.T. | | | $ - |
| | | O.T. | | | $ - |
| | | S.T. | | | $ - |
| | | O.T. | | | $ - |
| | | S.T. | | | $ - |
| | | O.T. | | | $ - |
| | | S.T. | | | $ - |
| | | O.T. | | | $ - |
| | | S.T. | | | $ - |
| | | O.T. | | | $ - |
| | | S.T. | | | $ - |
| | | O.T. | | | $ - |

| | COMPANY OWNED EQUIPMENT | 22.783,50 |
| | RENTAL EQUIPMENT W/ 15% Markup | 14.211,59 |
| | A- EQUIPMENT SUB – TOTAL COST | $ 36.995,09 |
| | 0,00  % Sales Tx, Rental Equip. | |

## B – MATERIALS

| MATERIALS DESCRIPTION | QTY. USED | UNIT $ | TOTAL |
|---|---|---|---|
| | | | |
| | | | |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| | B-MATERIALS SUB-TOTAL COST | | $ - |
| | 0,00  % Sales Tax | | $ - |
| | 15  % ADDED M, U, B | | $ - |
| | SUB-TOTAL A + B w/Tax | | $ 36.995,09 |

## C – SUBCONTRACT / WORK DONE BY SPECIALISTS/THIRD PARTY SERVICES

| Work Description | Individual / Company | Unit | RATE | TOTAL $ |
|---|---|---|---|---|
| | | | | $ - |
| | | | | $ - |
| | | | | $ - |
| | | COST OF SUBS - C | | |
| | 15 % MARK-UP (Subcontractor) | | $ | |
| | TOTAL COST A + B + C (Including Mark-Up) | | | $ 36.995,09 |

| NO. | D – LABOR | | HRS. | BASE RATE w/FRING'S. | SUB TOTAL | Per Diem Totals | TOTAL |
|---|---|---|---|---|---|---|---|
| 1 | Ben Bethany (Day Rate) | REG. | 3,00 | $1.016,84 | $3.050,52 | $120,00 | $3.170,52 |
| | | O.T. | 0 | | $0,00 | | $0,00 |
| | | D.T. | | | $0,00 | | $0,00 |
| 2 | James Ravenscraft | REG. | 30,00 | $44,66 | $1.339,80 | $300,00 | $1.639,80 |
| | | O.T. | 0,00 | | $0,00 | | $0,00 |
| | | D.T. | | | $0,00 | | $0,00 |
| 3 | Jeremy Acres | REG. | 30,00 | $46,20 | $1.386,00 | $315,00 | $1.701,00 |
| | | O.T. | 0,00 | | $0,00 | | $0,00 |
| | | D.T. | | | $0,00 | | $0,00 |
| 4 | Mark Horton | REG. | 30,00 | $59,79 | $1.793,70 | $345,00 | $2.138,70 |
| | | O.T. | 0,00 | | $0,00 | | $0,00 |
| | | D.T. | | | $0,00 | | $0,00 |
| 5 | Steven Davis | REG. | 30,00 | $59,79 | $1.793,70 | $315,00 | $2.108,70 |
| | | O.T. | 0,00 | | $0,00 | | $0,00 |
| | | D.T. | | | $0,00 | | $0,00 |
| 6 | Roger Reeter | REG. | 30,00 | $59,79 | $1.793,70 | $315,00 | $2.108,70 |
| | | O.T. | 0,00 | | $0,00 | | $0,00 |
| | | D.T. | | | $0,00 | | $0,00 |
| 7 | Bruce Cooper | REG. | 30,00 | $44,53 | $1.335,90 | $315,00 | $1.650,90 |
| | | O.T. | 0,00 | | $0,00 | | $0,00 |
| | | D.T. | | | $0,00 | | $0,00 |
| 8 | | REG. | 0,00 | | $0,00 | | $0,00 |
| | | O.T. | 0,00 | | $0,00 | | $0,00 |
| | | D.T. | | | $0,00 | | $0,00 |
| 9 | | REG. | 0,00 | | $0,00 | | $0,00 |
| | | O.T. | 0,00 | | $0,00 | | $0,00 |
| | | D.T. | | | $0,00 | | $0,00 |
| 10 | | REG. | 0,00 | | $0,00 | | $0,00 |
| | | O.T. | 0,00 | | $0,00 | | $0,00 |
| | | D.T. | | | $0,00 | | $0,00 |
| 11 | | REG. | 0,00 | | $0,00 | | $0,00 |
| | | O.T. | 0,00 | | $0,00 | | $0,00 |
| | | D.T. | | | $0,00 | | $0,00 |
| 12 | | REG. | 0,00 | | $0,00 | | $0,00 |
| | | O.T. | 0,00 | | $0,00 | | $0,00 |
| | | D.T. | | | $0,00 | | $0,00 |
| 13 | | REG. | 0,00 | | $0,00 | | $0,00 |
| | | O.T. | 0,00 | | $0,00 | | $0,00 |
| | | D.T. | | | $0,00 | | $0,00 |

| | | D – LABOR SUB-TOTAL | $ 14.518,32 |
| | 15 % Labor Surcharge | | $ 2.177,75 |
| | SUBTOTAL | | $ 16.696,07 |
| | 15 % MARKUP ON LABOR | | $ 2.504,41 |

## E – MISCELLANEOUS ITEMS

| MBSC. DESCRIPTIONS | | QTY. | Unit $ | EX. AMOUNT |
|---|---|---|---|---|
| Hotel | | 6 | $ 58,00 | $ 348,00 |
| | | 9 | $ 68,00 | $ 612,00 |
| Subsistance | | 0 | | $ - |
| Misc. Items | | | | |
| 0 | | 0 | | $ - |
| 0 | | 0 | | $ - |
| 0 | | 0 | | $ - |
| 0 | | 0 | | $ - |
| 0 | | 0 | | $ - |
| | E- MISCELLANEOUS ITEMS SUB TOTAL | | | $ 960,00 |
| 5 % Sales/City/Room Tax | | | | $ 48,00 |
| 15 % ADDED MARK-UP | | | | $ 144,00 |
| 0 % Tax on Misc. Items | | | | 0 |
| | SUB TOTAL - E | | | $ 1.152,00 |

## TOTALS

| TOTAL COST A+B+C (Equipment /Material /Sub-Contractors) | | $ 36.995,09 |
| TOTAL COST = D (Labor) | | $ 19.200,48 |
| TOTAL COST - E (Miscellaneous Items) | | $ 1.152,00 |
| | SUB-TOTAL | $ 57.347,56 |
| 2,5 % BOND & INSURANCE | | $ 1.433,69 |
| TOTAL COST THIS SHEET | | $ 58.781,25 |

| TIME | CLIENT DIRECTIVES AND COMMENTS |
|---|---|
| 0:00 | (See Daily Work Report) |
| 0:00 | |
| 0:00 | |
| 0:00 | |
| 0:00 | |
| 0:00 | |
| 0:00 | |
| 0:00 | |
| 0:00 | |
| 0:00 | |
| 0:00 | |
| 0:00 | |
| 0:00 | |
| 0:00 | |
| 0:00 | |
| 0:00 | |
| 0:00 | |
| 0:00 | |
| 0:00 | |
| 0:00 | |
| 0:00 | |
| 0:00 | |
| 0:00 | |
| 0:00 | |
| 0:00 | |

# EXHIBIT C

| PROJECT NAME: | | | |
|---|---|---|---|
| PROJECT NO.: | Southern Star Line DT & DS Replacement | | |



The HDD COMPANY
Horizontal Directional Drilling

**EXTRA WORK SHEET REPORT**
**INTERNAL - OFFICE**

| CLIENT/OWNER: | Minnesota Limited - Southern Star | DATE: | |
|---|---|---|---|
| WORK PRFM'D. BY: | The HDD Company, Inc. | EXTRA WRK. SHT. NO. | Cedar Creek HDD |
| DESCPTN. OF WORK: | Access and weather delays | | |
| 0 | | | |
| 0 | | | |
| 0 | | | |

## A - EQUIPMENT

| EQUIP. NO. | Company Owned Equipment | HRS. | RATE/HR. | TOTAL/DAY |
|---|---|---|---|---|
| 1 | Drilling Rig HDD Rig 7 - Vermeer 750 | 32.50 | $ 205.56 | $ 6,680.70 |
| 1 | Mud Tank / Solids Control Unit | 32.50 | $ 111.96 | $ 3,638.70 |
| 1 | Sump Pit/Trash Pump | 32.50 | $ 8.29 | $ 269.43 |
| 1 | Mud Pumping Units | 32.50 | $ 60.94 | $ 1,980.55 |
| 2 | Tool Van and tools | 32.50 | $ 17.55 | $ 1,140.75 |
| 0 | Dump Truck A-17  TRUN 2AXL | | | $ - |
| 3 | Vac. Truck A-17 TRUN 2AXL | 32.50 | $ 45.75 | $ 4,460.63 |
| 10 | Misc. Trailers | 32.50 | $ 1.79 | $ 581.75 |
| 1 | Haul Trucks | 32.50 | $ 34.13 | $ 1,109.23 |
| 1 | 6 3/4" Non Mag Drill Collars w/Jet Assembly | 32.50 | $ 6.83 | $ 221.98 |
| 168 | Drill Pipe (5-1/2 FH) | 32.50 | $ 0.53 | $ 2,893.80 |
| 2 | Misc. X-Subs and Rack (All X Subs for Spread) | 32.50 | $ 5.20 | $ 338.00 |
| 0 | Sonde and Housing | | | $ - |
| 0 | Steering Tool (North Referencing w/Tru-Gyde) | | | |
| 48 | Rollers | 32.50 | $ 1.50 | $ 2,340.00 |
| 3 | Ford F-250 T&TT 06-12 | 32.50 | $ 5.04 | $ 491.40 |
| 0 | Ford F-450 TT 20-28 | | | $ - |
| 0 | Ford F-350 TT 20-28 | | | $ - |
| 0 | KW & Crane Truck | | | $ - |
| 1 | Hammer | 32.50 | $ 41.93 | $ 1,362.73 |
| 1 | 300 Amp Welder | 32.50 | $ 9.49 | $ 308.43 |
| 1 | 1/2 Ton Truck | 32.50 | $ 32.48 | $ 1,055.60 |
| 1 | 60" Casing | 32.50 | $ 3.25 | $ 105.63 |
| 0 | Mud Bins | | | $ - |

| | Rental Equipment | | | |
|---|---|---|---|---|
| 1 | 10K Reach Forklift | S.T. | 32.50 | $ 51.29 | $ 1,666.93 |
| 2 | 225 Excavator | O.T. | 32.50 | $ 91.59 | $ 5,953.35 |
| 2 | Portable toilets | S.T. | 32.50 | $ 1.50 | $ 97.50 |
| 0 | Multiquip 20kW Generator | O.T. | | | $ - |
| 3 | Frac Tank | S.T. | 32.50 | $ 7.32 | $ 713.70 |
| 1 | Trash Bin | S.T. | 32.50 | $ 4.97 | $ 161.53 |
| 1 | 500 Amp Welder | S.T. | 32.50 | $ 9.49 | $ 308.43 |
| 2 | Light Tower | S.T. | 32.50 | $ 7.61 | $ 494.65 |
| 1 | 175 KW Generator | S.T. | 32.50 | $ 71.36 | $ 2,319.20 |
| 1 | 6" Diesel Trash Pump | S.T. | 32.50 | $ 23.60 | $ 767.00 |
| 1 | HTI Mud Motor | S.T. | 32.50 | $ 42.50 | $ 1,381.25 |
| | | S.T. | | | $ - |
| | | S.T. | | | $ - |
| | | O.T. | | | $ - |
| | | S.T. | | | $ - |
| | | O.T. | | | $ - |
| | | S.T. | | | $ - |
| | | S.T. | | | $ - |
| | | O.T. | | | $ - |
| | | O.T. | | | $ - |
| | | COMPANY OWNED EQUIPMENT | | | $ 28,979.28 |
| | | RENTAL EQUIPMENT W/ 15% Markup | | | 15,943.05 |
| | | A- EQUIPMENT SUB - TOTAL COST | | | $ 44,922.33 |
| | 0.00 | % Sales Tx. Rental Equip. | | | |

## B - MATERIALS

| MATERIALS DESCRIPTION | QTY. USED | UNIT $ | TOTAL |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| | B-MATERIALS SUB-TOTAL COST | | $ - |
| 0.00 | % Sales Tax | | $ - |
| 15 | % ADDED M. U. B | | |
| | SUB-TOTAL A + B w/Tax | | $ 44,922.33 |

## C - SUBCONTRACT / WORK DONE BY SPECIALISTS/THIRD PARTY SERVICES

| Work Description | Individual / Company | Unit | RATE | TOTAL $ |
|---|---|---|---|---|
| Roller Damage | Minnesota Limited | 8.00 | $ 2,900.00 | $ 23,200.00 |
| | | | | $ - |
| | | | | $ - |
| | COST OF SUBS - C | | | $ 23,200.00 |
| 15 % MARK-UP(Subcontractor) | | | | $ 3,480.00 |
| | | $ | | $ 26,680.00 |
| TOTAL COST A + B + C (Including Mark-Up) | | | | $ 71,602.33 |

| NO. | D - LABOR | | HRS. | BASE RATE w/FRING'S. | SUB TOTAL | Per Diem Totals | TOTAL |
|---|---|---|---|---|---|---|---|
| 1 | Chris Crough (Day Rate) | REG. | 3.00 | $1,016.84 | $3,050.52 | $120.00 | $3,170.52 |
| | | O.T. | 0 | | $0.00 | | $0.00 |
| | | D.T. | 0 | | $0.00 | | $0.00 |
| 2 | Randy Foster (Day Rate) | REG. | 3.00 | $968.88 | $2,906.64 | $300.00 | $3,206.64 |
| | | O.T. | | | $0.00 | | $0.00 |
| | | D.T. | | | $0.00 | | $0.00 |
| 3 | Harold Shoemaker (Day | REG. | 0.00 | | $0.00 | $0.00 | $0.00 |
| | | O.T. | | | $0.00 | | $0.00 |
| | | D.T. | | | $0.00 | | $0.00 |
| 4 | Justin Potter | REG. | 32.50 | $59.79 | $1,943.18 | $345.00 | $2,288.18 |
| | | O.T. | 0.00 | $80.65 | $0.00 | | $0.00 |
| | | D.T. | | | $0.00 | | $0.00 |
| 5 | Brandon Morris | REG. | 32.50 | $39.83 | $1,294.48 | $315.00 | $1,609.48 |
| | | O.T. | 0.00 | $54.42 | $0.00 | | $0.00 |
| | | D.T. | | | $0.00 | | $0.00 |
| 6 | David Jones | REG. | 32.50 | $42.86 | $1,392.95 | $315.00 | $1,707.95 |
| | | O.T. | 0.00 | $58.96 | $0.00 | | $0.00 |
| | | D.T. | | | $0.00 | | $0.00 |
| 7 | Brandon Sammet | REG. | 32.50 | $59.79 | $1,943.18 | $315.00 | $2,258.18 |
| | | O.T. | 0.00 | $80.65 | $0.00 | | $0.00 |
| | | D.T. | | | $0.00 | | $0.00 |
| 8 | Roger Reeter | REG. | 32.50 | $59.79 | $1,943.18 | $300.00 | $2,243.18 |
| | | O.T. | 0.00 | $80.65 | $0.00 | | $0.00 |
| | | D.T. | | | $0.00 | | $0.00 |
| 9 | Augustin Zepeda | REG. | 32.50 | $36.83 | $1,196.98 | $315.00 | $1,511.98 |
| | | O.T. | 0.00 | $49.49 | $0.00 | | $0.00 |
| | | D.T. | | | $0.00 | | $0.00 |
| 10 | Johnny Hatfield | REG. | 32.50 | $43.49 | $1,413.43 | $150.00 | $1,563.43 |
| | | O.T. | 0.00 | $59.91 | $0.00 | | $0.00 |
| | | D.T. | | | $0.00 | | $0.00 |
| 11 | | REG. | 0.00 | | $0.00 | | $0.00 |
| | | O.T. | 0.00 | | $0.00 | | $0.00 |
| | | D.T. | | | $0.00 | | $0.00 |
| 12 | | REG. | 0.00 | | $0.00 | | $0.00 |
| | | O.T. | 0.00 | | $0.00 | | $0.00 |
| | | D.T. | | | $0.00 | | $0.00 |
| 13 | | REG. | 0.00 | | $0.00 | | $0.00 |
| | | O.T. | 0.00 | | $0.00 | | $0.00 |
| | | D.T. | | | $0.00 | | $0.00 |
| | D - LABOR SUB-TOTAL | | | | | | $ 19,559.51 |
| | 15 % Labor Surcharge | | | | | | $ 2,933.93 |
| | SUBTOTAL | | | | | | $ 22,493.44 |
| | 15 % MARKUP ON LABOR | | | | | | $ 3,374.02 |

## E - MISCELLANEOUS ITEMS

| MISC. DESCRIPTIONS | QTY. | Unit $ | EX. AMOUNT |
|---|---|---|---|
| Hotel | | | |
| | 6 | $ 58.00 | $ 348.00 |
| | 9 | $ 68.00 | $ 612.00 |
| Subsistance | 0 | | $ - |
| Misc. Items | | | |
| 0 | 0 | | $ - |
| 0 | 0 | | $ - |
| 0 | 0 | | $ - |
| 0 | 0 | | $ - |
| 0 | 0 | | $ - |
| 0 | 0 | | $ - |
| E- MISCELLANEOUS ITEMS SUB TOTAL | | | $ 960.00 |
| 5 % Sales/City/Room Tax | | | 48.00 |
| 15 % ADDED MARK-UP | | | 144.00 |
| 0 % Tax on Misc. Items | | | 0 |
| SUB TOTAL - E | | | $ 1,152.00 |

## TOTALS

| | | |
|---|---|---|
| TOTAL COST  A+B+C (Equipment /Material /Sub-Contractors) | | $ 71,602.33 |
| TOTAL COST - D  (Labor) | | $ 25,867.46 |
| TOTAL COST - E  (Miscellaneous Items) | | $ 1,152.00 |
| SUB-TOTAL | | $ 98,621.78 |
| 2.5 % BOND & INSURANCE | | $ 2,465.54 |
| TOTAL COST THIS SHEET | | $ 101,087.33 |

| TIME | CLIENT DIRECTIVES AND COMMENTS |
|---|---|
| 0:00 | (See Daily Work Report) |
| 0:00 | |
| 0:00 | |
| 0:00 | |
| 0:00 | |
| 0:00 | |
| 0:00 | |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |

# EXHIBIT D



| Project Details | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| From | The Tunneling Company USA, LLC. | Job No. | TUS20011 | RCO No. | 003 | Rev | | 0 |
| RCO Title | Delays Due to Contractor | | | Date | August 31, 2020 | | | |
| Owner | The HDD Company | | Attention | Jeremy King | | | | |

| Description Of Requested Change Details |
|---|

Required by:     September 14, 2020

**Change Description**

Throughout the project, The Tunneling Company USA has experienced significant delays as a result of the contractor. These delays consist of (but not limited to);

- Dewatering the excavations
- Assisting with pit construction
- Waiting for pit completion
- Welding delays
- Safety shut downs
- Approvals

A detailed breakdown of these delays are attached.

**Change Costs:**

Total charges as a result of these delays is $500,975.

A detailed breakdown of these delays are attached.

All applicable taxes will be added at time of invoice



| Impact Details |
|---|

**Reason for Change**:     Delays Due to Contractor

| Additional Information |
|---|

Click here to enter text.

| Reference Or Attachments | | | | |
|---|

| Attach | Refer | Document No | Rev | Description |
|---|---|---|---|---|
| ☐ | ◆ | Timesheets | | Daily Timesheets for these delays are available upon request |
| ☐ | ☐ | | | |
| ☐ | ☐ | | | |

| Response |
|---|

Client Use:

| Approval Details© |
|---|

| **Submitted by    (Originator)** | **Client Use:** |
|---|---|
| Print Name:     Nick Hyde | Change Authorized:    Yes |
| Print Title:     Project Manager | Print Name:              Jeremy King |
| Date:              August-31-2020 | Print Title:              Vice President |
| Signature: | Date: |
| | Signature: |

## Project: Minnesota Limited - Kansas

| Date: | Crossing Name | Planned Activity Hours | Unplanned Activity Hours | Non- Billable Hours | Contract Reference Term | Description |
|---|---|---|---|---|---|---|
| 19-Mar-20 | HWY 31 | | 8 | | 7.1 | Pick up supplies and wait to offload last load of augers. ML still pumping water off of site and will start digging the pit tomorrow (Standby time). |
| 24-Mar-20 | HWY 31 | 4.5 | 7 | | 7.1 | Crew assisted with pit construction. By 1pm crew started placing mats and rails but had to remove them at EI's direction to place plastic under them to contain any spills. Mats and rails installed and boring machine brought over to site. Ready to start in the morning. |
| 16-Apr-20 | RD 1100 | 4 | 7.5 | | 7.1 | Set all gear around site and wait for pit completion (Standby time). |
| 17-Apr-20 | RD 1100 | | 11 | | 7.1 | Pit not ready (Standby time). |
| 27-Apr-20 | RD 1500 | | 10 | | 7.1 | Pit not ready (Standby time). |
| 2-May-20 | RD 1500 | 4.5 | 5.5 | | 7.1 | Completed casing install by 12pm. Exit pit no complete. ML work on exit pit for remainder of shift (Standby time). Daily Install 40'. Total Install 85'. |
| 18-May-20 | Clarke RD | 10 | 1 | | 7.1 | Confirm elevation and start welding casing. Unload excavators. Start setting equipment and engineer confirmed the setup is too low. Move equipment so grade can be adjusted. Daily Install 0'. Total Install 0'. |
| 19-May-20 | Clarke RD | 6.5 | 5.5 | | 7.1 | Fixed elevation of pit, set equipment and started drilling. Pit grade not excavated correctly. |
| 20-May-20 | Clarke RD | 10 | 1 | | 7.1 | Stanby time waiting for excavator in the morning |
| 26-May-20 | Allen RD | 9 | 3 | | 7.1 | Spent 3hrs pumping pit and standby for fixing excavation cave-in. Continued install. Daily Install 20'. Total Install 26'. |
| 28-May-20 | RD 2150 | 3 | 7 | | 7.1 | Continued install till 10:30 when project got shut down due to a safety stand down (standby time). Daily Install 6'. Total Install 51'. |
| 28-May-20 | Allen RD | 3 | 7 | | 7.1 | Continued install till 10:30 when project got shut down due to a safety stand down (standby time). Daily Install 13'. Total Install 80'. |
| 29-May-20 | Allen RD | 8 | 4 | | 7.1 | Help ML dewater pit (Standby time). Complete casing install. Daily Install 40'. Total Install 120'. |
| 1-Jun-20 | RD 2150 | 8 | 2 | | 7.1 | Arrived on site an had to pump out pit (standby time). Set boring machine and continued product pipe installation until complete. Daily Install 120' (product pipe). Total Install 120' (product pipe). |
| 8-Jun-20 | Jackson RD | | 6 | 6 | 7.1 | Still waiting for pit to be completed. Repaired Equipment for half the day |
| 9-Jun-20 | Jackson RD | | 6 | 6 | 7.1 | Still waiting for pit to be completed. Repaired Equipment for half the day |
| 10-Jun-20 | Jackson RD | | 12 | | 7.1 | Still waiting for pit to be completed. Daily Install 0'. Total Install 0'. |
| 11-Jun-20 | Jackson RD | | 12 | | 7.1 | Still waiting for pit to be completed. Daily Install 0'. Total Install 0'. |
| 18-Jun-20 | Hamilton RD | | 10 | | 7.1 | Pit not ready. Daily Install 0'. Total Install 0'. |
| 19-Jun-20 | Hamilton RD | | 10 | | 7.1 | Pit not ready. Daily Install 0'. Total Install 0'. |
| 20-Jun-20 | Hamilton RD | | 10 | | 7.1 | Pit not ready. Daily Install 0'. Total Install 0'. |
| 26-Jun-20 | Missouri RD | 3.5 | 6.5 | | 7.1 | Completed the exit pit and welders cut off the SBU. Waited on approval to push product pipe from 11:30 to end of shift (standby time). Daily Install 0'. Total Install 185'. |
| 2-Jul-20 | Rock Ridge RD | | 10 | | 7.1 | Site not ready. Standby time. |
| 6-Jul-20 | Rock Ridge RD | | 10 | | 7.1 | Waiting on pit. |
| 8-Jul-20 | Nebraska RD | 7 | 4 | | 7.1 | Augered out casing. Wait for ML to complete exit pit (standby time). First product pipe welded. Daily Install 0' (product pipe). Total Install 0' (product pipe). |

| | | | | | | |
|---|---|---|---|---|---|---|
| 8-Jul-20 | John Brown RD | 5 | 5 | | 7.1 | Finish moving equipment to site. Pit not complete (standby time). Daily Install 0'. Total Install 0'. |
| 9-Jul-20 | John Brown RD | 10 | 10 | | 7.1 | Pit not complete. Standby time. Daily Install 0'. Total Intall 0' |
| 13-Jul-20 | John Brown RD | 7 | 3 | | 7.1 | Prepared to stuff augers and set casing. Pit shut down due to safety concerns with the shoring (Standby time). Daily Install 0'. Total Install 0'. |
| 14-Jul-20 | John Brown RD | 8 | 2 | | 7.1 | Installed another trench box. 2h delay (Standby time). Start installing casing. Daily install 18'. Total install 18'. |
| 15-Jul-20 | John Brown RD | 8 | 2 | | 7.1 | Continue installing casing all shift. 2h delay because welders refused to rebevel pipe. Welders welded the casing on crooked (Standby time. Pipe would not fit in the machine. Daily Install 37'. Total Install 55'. |
| 16-Jul-20 | John Brown RD | 5 | 5 | | 7.1 | Redo weld from yesterday. 5h delay (standby time). Continue boring. Daily Install 16'. Total Install 50'. |
| 22-Jul-20 | Lavette Terrace RD | 11 | 1 | | 7.1 | Delayed start by 1 hour because crew had to remove debris from road surface (Standby time). Start drilling by 8am. Daily Install 10.5'. Total Install 90.5'. |
| 22-Jul-20 | John Brown RD | 7 | 3 | | 7.1 | Delayed start due to pit flooded. Unsafe to work (Standby time). Cut of SBU head and weld product pipe to casing. Daily Install 0' (product pipe). Total Install 0' (product pipe). |
| 22-Jul-20 | John Brown RD | 6 | 4 | | 7.1 | Unable to get casing from other sites due to rain yesterday (Standby time). Had to move equipment because ML was using dynamite to open ditch. Prep casing for install. Daily install 0'. Total Install ??? |
| 22-Jul-20 | Kingman RD | 10 | 2 | | 7.1 | Completed casing install and augering. Wait for 2hrs for welders. Weld first product pipe to casing. Daily Install 0' (product pipe). Total Install 0' (product pipe). |
| 23-Jul-20 | Lavette Terrace RD | 6 | 4 | | 7.1 | Waiting for welders and coaters for 4hrs (Standby time). Install product pipe for remainder of day. |
| 23-Jul-20 | John Brown RD | 9 | 3 | | 7.1 | Wait for 3hrs for welders (Standby time). Continue drilling. Daily Install 15'. Total install 80'. |
| 23-Jul-20 | Kingman RD | 5 | 5 | | 7.1 | Finished casing install. Waited for welders for rest of shift (Standby time). Daily Install 10'. Total install 90'. |
| 24-Jul-20 | Kingman RD | 5 | 5 | | 7.1 | Move equipment from John Brown to Marshall. Pit not ready (Standby time). Daily Install 0'. Total Install 0'. |
| 29-Jul-20 | Marshall RD | 5 | 5 | | 7.1 | Pit not ready (Standby time). Shift cancelled at 1:30 due to rain. Daily Install 0'. Total Install 0'. |
| 30-Jul-20 | Marshall RD | 6.5 | | 1.5 | 7.1 | Minn LTD started excavating launch pit on north side of Marshall Rd. Not ready for us |
| 31-Jul-20 | Marshall RD | 10 | | | 7.1 | Tool box with all crews. Marshall rd is on hold till Minnesota decides what side they want to drill from. Set to collar in casing at lebbett had issues with casing length will collaring first thing tomorrow morning. |
| 31-Jul-20 | John Brown RD | 10 | | | 7.1 | Minn LTD started excavating launch pit on north side of Marshall Rd. Not ready for us (Standby time). |
| 1-Aug-20 | Marshall RD | 8 | 8 | | 7.1 | Waiting for pit to be dug (Standby time). |
| 3-Aug-20 | Marshall RD | 4 | 8 | | 7.1 | Had to continuously stop and give our excavator to blasting crew, being shut down for blasting (Standby time). |
| 4-Aug-20 | Marshall RD | 9.5 | 2.5 | | 7.1 | Waiting for welders, 10-12 and 12:30-2pm (Standby time). |
| 4-Aug-20 | Lavette Terrace RD | 6.5 | 3.5 | | 7.1 | Waited for Minn Ltd. For an hour to come unload product pipe (Standby time). |
| 8-Aug-20 | Neosho Rd | 9 | 1 | | 7.1 | Pit full of water, on standby all day |
| 12-Aug-20 | Missouri RD | 10 | 10 | | 7.1 | Had to continuously stop and give our excavator to blasting crew, being shut down for blasting (Standby time). |
| 13-Aug-20 | Missouri RD | 2 | 8 | | 7.1 | Dewater pit and wait for second excavator to set up equipment (Standby time). |
| 14-Aug-20 | Missouri RD | 9.5 | 0.5 | | 7.1 | Dewater Pit (Standby time). |

| Date | Location | | | Terms & Conditions | | Amount | Terms & Conditions |
|---|---|---|---|---|---|---|---|
| 17-Aug-20 | Missouri RD | 7.5 | 2.5 | 7.1 | | 7.1 | Wait for welders (Standby time). |
| 20-Aug-20 | Marshall RD | 8 | 4 | | | 7.1 | Had to wait on fuel truck to get out of the way, had to shut down multiple times for mat truck to get through, waited on welders (Standby time). |
| 20-Aug-20 | 1650 RD | 6 | 4 | | | 7.1 | Pumped water out of exit pit at 1650 Rd from 12:30 to 4:30 (Standby time). |
| 21-Aug-20 | Marshall RD | 9 | 3 | | | 7.1 | Waited on welders 9:50AM-1PM  (Standby time). |
| 21-Aug-20 | 1650 RD | | 10 | | | 7.1 | Pumped water out of exit pit at 1650 Rd from 12:30 to 4:30 (Standby time). |
| 24-Aug-20 | 1650 RD | | 12 | | | 7.1 | Waiting for Minn. Ltd to move the boring machine to site while  tunneling crew dewatering 1650 pits (Standby time). |
| 27-Aug-20 | 1650 RD | | 12 | | | 7.1 | Nigth shift scheduled but no operator from Minn. Ltd. showed up (Standby time). |

345.5

### Summary

| | Hours | Rate / HR | Amount |
|---|---|---|---|
| | 345.5 | $ 1,450.00 | $ 500,975.00 |

Total Change Amount $500,975.00

# EXHIBIT E

| PROJECT NAME: | | |
|---|---|---|
| PROJECT NO.: | Southern Star Line DT & DS Replacement | |



**THE HDD COMPANY**
Horizontal Directional Drilling

**EXTRA WORK SHEET REPORT
INTERNAL - OFFICE**

| CLIENT/OWNER : | Minnesota Limited - Southern Star | DATE: | |
|---|---|---|---|
| WORK PRFM'D. BY: | The HDD Company, Inc. | EXTRA WRK. SHT. NO. | Day Shift |
| DESCPTN. OF WORK : | Time spent reinstalling 36" pipeline,  Multiple days from 6/22/20 - 7/15/20 and 8/22/20 - 9/9/20 | | |
| | 0 | | |
| | 0 | | |
| | 0 | | |

## A - EQUIPMENT

| EQUIP. NO. | Company Owned Equipment | | HRS. | RATE/HR. | TOTAL/DAY |
|---|---|---|---|---|---|
| 1 | Drilling Rig HDD Rig 7 - Vermeer 750 | | 408,00 | $ 205,56 | $ 83.868,48 |
| 1 | Mud Tank / Solids Control Unit | | 408,00 | $ 111,96 | $ 45.679,68 |
| 1 | Sump Pit/Trash Pump | | 408,00 | $ 8,29 | $ 3.382,32 |
| 1 | Mud Pumping Units | | 408,00 | $ 60,94 | $ 24.863,52 |
| 2 | Tool Van and tools | | 408,00 | $ 17,55 | $ 14.320,80 |
| 0 | Dump Truck A=17  TRUN 2AXL | | | | $ - |
| 3 | Vac. Truck A-17 TRUN 2AXL | | 408,00 | $ 45,75 | $ 55.998,00 |
| 10 | Misc. Trailers | | 408,00 | $ 1,79 | $ 7.303,20 |
| 1 | Haul Trucks | | 408,00 | $ 34,13 | $ 13.925,04 |
| 1 | 6 3/4" Non Mag Drill Collars w/Jet Assembly | | 408,00 | $ 6,83 | $ 2.786,64 |
| 168 | Drill Pipe (5+1/2 FH) | | 408,00 | $ 0,53 | $ 36.328,32 |
| 2 | Misc. X-Subs and Rack (All X Subs for Spread) | | 408,00 | $ 5,20 | $ 4.243,20 |
| 0 | Sonde and Housing | | | | $ - |
| 0 | Steering Tool (North Referencing w/Tru-Gyde) | | | | $ - |
| 48 | Rollers | | 408,00 | $ 1,50 | $ 29.376,00 |
| 3 | Ford F-250 T&TT 06-12 | | 408,00 | $ 5,04 | $ 6.168,96 |
| 0 | Ford F-450 T&TT 20-28 | | | | $ - |
| 0 | Ford F-250 T&TT 20-28 | | | | $ - |
| 0 | KW & Crane Truck | | | | $ - |
| 1 | Hammer | | 408,00 | $ 41,93 | $ 17.107,44 |
| 1 | 300 Amp Welder | | 408,00 | $ 9,49 | $ 3.871,92 |
| 1 | 1/2 Ton Truck | | 408,00 | $ 32,48 | $ 13.251,84 |
| 1 | 60" Casing | | 408,00 | $ 3,25 | $ 1.326,00 |
| 0 | Mud Bins | | | | $ - |

| | Rental Equipment | | | | |
|---|---|---|---|---|---|
| 1 | 10K Reach Forklift | S.T. | 408,00 | $ 51,29 | $ 20.926,32 |
| | | O.T. | | | $ - |
| 2 | 225 Excavator | S.T. | 408,00 | $ 91,59 | $ 74.737,44 |
| | | O.T. | | | $ - |
| 2 | Portable toilets | S.T. | 408,00 | $ 1,50 | $ 1.224,00 |
| | | O.T. | | | $ - |
| 0 | Multiquip 20KW Generator | S.T. | | | $ - |
| | | O.T. | | | $ - |
| 3 | Frac Tank | S.T. | 408,00 | $ 7,32 | $ 8.959,68 |
| | | O.T. | | | $ - |
| 1 | Trash Bin | S.T. | 408,00 | $ 4,97 | $ 2.027,76 |
| | | O.T. | | | $ - |
| 1 | 500 Amp Welder | S.T. | 408,00 | $ 9,49 | $ 3.871,92 |
| | | O.T. | | | $ - |
| 2 | Light Tower | S.T. | 408,00 | $ 7,61 | $ 6.209,76 |
| | | O.T. | | | $ - |
| 1 | 175 KW Generator | S.T. | 408,00 | $ 71,36 | $ 29.114,88 |
| | | O.T. | | | $ - |
| 1 | 6" Diesel Trash Pump | S.T. | 408,00 | $ 23,60 | $ 9.628,80 |
| | | O.T. | | | $ - |
| 1 | HTI Mud Motor | S.T. | 408,00 | $ 42,50 | $ 17.340,00 |
| | | O.T. | | | $ - |
| | | S.T. | | | $ - |
| | | O.T. | | | $ - |
| | | S.T. | | | $ - |
| | | O.T. | | | $ - |
| | | S.T. | | | $ - |
| | | O.T. | | | $ - |
| | | S.T. | | | $ - |
| | | O.T. | | | $ - |
| | | S.T. | | | $ - |
| | | O.T. | | | $ - |
| | | S.T. | | | $ - |
| | | O.T. | | | $ - |
| | | S.T. | | | $ - |
| | | O.T. | | | $ - |
| | COMPANY OWNED EQUIPMENT | | | | 363.801,36 |
| | RENTAL EQUIPMENT W/ 15% Markup | | | | 200.146,64 |
| | A= EQUIPMENT SUB - TOTAL COST | | | | $ 563.948,00 |
| | 0,00 | % Sales Tx, Rental Equip. | | | |

## B - MATERIALS

| MATERIALS DESCRIPTION | QTY. USED | UNIT $ | TOTAL |
|---|---|---|---|
| Bentonite | 86,00 | $ 9,50 | $ 817,00 |
| Cement | 54,00 | $ 9,50 | $ 513,00 |
| Shaker Screens | 6,00 | $ 135,00 | $ 810,00 |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| | B-MATERIALS  SUB-TOTAL COST | | $ 2.140,00 |
| | 0,00 % Sales Tax | | $ - |
| 15 | % ADDED M_U_ | | $ 321,00 |
| | SUB-TOTAL A + B w/Tax | | $ 566.409,00 |

## C - SUBCONTRACT / WORK DONE BY SPECIALISTS/THIRD PARTY SERVICES

| Work Description | Individual / Company | Unit | RATE | TOTAL $ |
|---|---|---|---|---|
| Coating and Corrosion Expert | Lake Superior Consultants | 1,00 | $ 19.702,53 | $ 19.702,53 |
| Vac Trucks | Hurricane Services | 1,00 | $ 39.415,00 | $ 39.415,00 |
| Disposal Charges | Anderson County Landfill | 1,00 | $ 18.103,40 | $ 18.103,40 |
| | 0 | 0 | | $ - |
| | 0 | 0 | | $ - |
| | | COST OF SUBS - C | | $ 77.220,93 |
| | 15 % MARK-UP (Subcontractor) | | | $ 11.583,14 |
| | * | | | $ 88.804,07 |
| | TOTAL COST A + B + C (Including Mark-Up) | | | $ 655.213,07 |

| NO. | D - LABOR | | HRS. | BASE RATE w/FRING'S. | SUB TOTAL | Per Diem Totals | TOTAL |
|---|---|---|---|---|---|---|---|
| 1 | Chris Crough (Day Rate) | REG. | 33,00 | $1.016,84 | $33.555,72 | $1.320,00 | $34.875,72 |
| | | O.T. | 0 | | $0,00 | | $0,00 |
| | | D.T. | 0 | | $0,00 | | |
| 2 | Randy Foster (Day Rate) | REG. | 17,00 | $968,88 | $16.470,96 | $1.700,00 | $18.170,96 |
| | | O.T. | | | $0,00 | | $0,00 |
| | | D.T. | | | $0,00 | | |
| 3 | Harold Shoemaker (Day | REG. | 17,00 | $755,00 | $12.835,00 | $1.785,00 | $14.620,00 |
| | | O.T. | | | $0,00 | | $0,00 |
| | | D.T. | | | $0,00 | | |
| 4 | Justin Potter | REG. | 104,00 | $59,79 | $6.218,16 | $1.495,00 | $7.713,16 |
| | | O.T. | 52,00 | $80,65 | $4.193,80 | | $4.193,80 |
| | | D.T. | | | $0,00 | | $0,00 |
| 5 | Brandon Morris | REG. | 112,00 | $39,83 | $4.460,96 | $1.260,00 | $5.720,96 |
| | | O.T. | 52,00 | $54,42 | $2.829,58 | | $2.829,58 |
| | | D.T. | | | $0,00 | | $0,00 |
| 6 | David Jones | REG. | 248,00 | $42,86 | $10.629,28 | $3.255,00 | $13.884,28 |
| | | O.T. | 125,00 | $58,96 | $7.370,00 | | $7.370,00 |
| | | D.T. | | | $0,00 | | $0,00 |
| 7 | Brandon Sammet | REG. | 184,00 | $59,79 | $11.001,36 | $2.415,00 | $13.416,36 |
| | | O.T. | 97,00 | $80,65 | $7.823,05 | | $7.823,05 |
| | | D.T. | | | $0,00 | | $0,00 |
| 8 | Roger Reeter | REG. | 112,00 | $59,79 | $6.696,48 | $1.400,00 | $8.096,48 |
| | | O.T. | 66,00 | $80,65 | $5.322,90 | | $5.322,90 |
| | | D.T. | | | $0,00 | | $0,00 |
| 9 | Augustin Zepeda | REG. | 128,00 | $36,83 | $4.714,24 | $1.680,00 | $6.394,24 |
| | | O.T. | 69,00 | $69,49 | $4.794,81 | | $4.794,81 |
| | | D.T. | | | $0,00 | | $0,00 |
| 10 | Johnny Hatfield | REG. | 128,00 | $43,49 | $5.566,72 | $800,00 | $6.366,72 |
| | | O.T. | 69,00 | $59,91 | $4.133,45 | | $4.133,45 |
| | | D.T. | | | $0,00 | | $0,00 |
| 11 | Stephen Davis | REG. | 224,00 | $43,49 | $9.741,76 | $1.120,00 | $10.861,76 |
| | | O.T. | 112,00 | $59,91 | $6.709,36 | | $6.709,36 |
| | | D.T. | | | $0,00 | | $0,00 |
| 12 | Bruce Cooper | REG. | 224,00 | $44,53 | $9.974,72 | $1.120,00 | $11.094,72 |
| | | O.T. | 109,00 | $60,70 | $6.615,76 | | $6.615,76 |
| | | D.T. | | | $0,00 | | $0,00 |
| 13 | Juan Miguel Suarzes | REG. | 101,00 | $36,83 | $3.719,83 | $650,00 | $4.369,83 |
| | | O.T. | 48,00 | $49,92 | $2.395,92 | | $2.395,92 |
| | | D.T. | | | | | $0,00 |
| | | | | | D - LABOR SUB-TOTAL | | $ 207.773,81 |
| | 15 % Labor Surcharge | | | | | | $ 31.166,07 |
| | | | | | SUBTOTAL | | $ 238.939,88 |
| | 15 % MARKUP ON LABOR | | | | | | $ 35.840,98 |

## E - MISCELLANEOUS ITEMS

| MBSC. DESCRIPTIONS | QTY. | Unit $ | EX. AMOUNT |
|---|---|---|---|
| Hotel | | | $ - |
| | 96 | $ 58,00 | $ 5.568,00 |
| | 155 | $ 68,00 | $ 10.540,00 |
| Subsistance | 0 | | $ - |
| Misc. Items | | | $ - |
| 0 | | 0 | $ - |
| 0 | | 0 | $ - |
| 0 | | 0 | $ - |
| 0 | | 0 | $ - |
| 0 | | 0 | $ - |
| 0 | | 0 | $ - |
| | E- MISCELLANEOUS ITEMS SUB TOTAL | | $ 16.108,00 |
| 5 | % Sales/City/Room Tax | | $ 805,40 |
| 15 | % ADDED MARK-UP | | $ 2.416,20 |
| 0 | % Tax on Misc. Items | | $ - |
| | SUB TOTAL + E | | $ 19.329,60 |

## TOTALS

| TOTAL COST  A+B+C (Equipment /Material/Sub-Contractors) | | $ 655.213,07 |
|---|---|---|
| TOTAL COST = D  (Labor) | | $ 274.780,86 |
| TOTAL COST - E  (Miscellaneous Items) | | $ 19.329,60 |
| | SUB-TOTAL | $ 949.323,54 |
| 2,5 % BOND & INSURANCE | | $ 23.733,09 |
| TOTAL COST THIS SHEET | | $ 973.056,63 |

| TIME | CLIENT DIRECTIVES AND COMMENTS |
|---|---|
| 0:00 | (See Daily Work Report) |
| 0:00 | |
| 0:00 | |
| 0:00 | |
| 0:00 | |
| 0:00 | |
| 0:00 | |
| 0:00 | |
| 0:00 | |
| 0:00 | |
| 0:00 | |
| 0:00 | |
| 0:00 | |
| 0:00 | |
| 0:00 | |
| 0:00 | |
| 0:00 | |
| 0:00 | |
| 0:00 | |
| 0:00 | |
| 0:00 | |
| 0:00 | |

# EXHIBIT F

**PROJECT NAME:**
**PROJECT NO.:** Southern Star Line DT & DS Replacement

THE HDD COMPANY
Horizontal Directional Drilling

**EXTRA WORK SHEET REPORT**
**INTERNAL – OFFICE**

**CLIENT/OWNER:** Minnesota Limited – Southern Star  **DATE:**
**WORK PRFM'D. BY:** The HDD Company, Inc.  **EXTRA WRK. SHT. NO.:** Night Shift
**DESCPT'N. OF WORK:** Time spent reinstalling 36" pipeline, Multiple days from 6/22/20 + 7/15/20 and 8/22/20 + 9/9/20

## A - EQUIPMENT

| EQUIP. NO. | Company Owned Equipment | HRS. | RATE/HR. | TOTAL/DAY |
|---|---|---|---|---|
| 1 | Drilling Rig HDD Rig 7 - Vermeer 750 | 300,00 | $205,56 | $61.668,00 |
| 1 | Mud Tank / Solids Control Unit | 300,00 | $111,96 | $33.588,00 |
| 1 | Sump Pit/Trash Pump | 300,00 | $8,29 | $2.487,00 |
| 1 | Mud Pumping Units | 300,00 | $60,94 | $18.282,00 |
| 2 | Tool Van and tools | 300,00 | $17,55 | $10.530,00 |
| 0 | Dump Truck A-17 TRUN 2AXL | | | |
| 3 | Vac. Truck A-17 TRUN 2AXL | 300,00 | $45,75 | $41.175,00 |
| 10 | Misc. Trailers | 300,00 | $1,79 | $5.370,00 |
| 1 | Haul Trucks | 300,00 | $34,13 | $10.239,00 |
| 1 | 6 3/4" Non Mag Drill Collars w/Jet Assembly | 300,00 | $6,83 | $2.049,00 |
| 168 | Drill Pipe (5-1/2 FH) | 300,00 | $0,53 | $26.712,00 |
| 2 | Misc. X-Subs and Rack (All X Subs for Spread) | 300,00 | $5,20 | $3.120,00 |
| 0 | Sonde and Housing | | | |
| | Steering Tool (North Referencing or Tru-Gyde) | | | |
| 48 | Rollers | 300,00 | $1,50 | $21.600,00 |
| 3 | Ford F-250 T&TT 06-12 | 300,00 | $7,50 | $6.750,00 |
| 0 | Ford F-450 T&TT 20-28 | | | |
| 0 | Ford F-350 T&TT 20-28 | | | |
| 0 | KW & Crane Truck | | | |
| 1 | Hammer | 300,00 | $41,93 | $12.579,00 |
| 1 | 300 Amp Welder | 300,00 | $9,49 | $2.847,00 |
| 1 | 1/2 Ton Truck | 300,00 | $32,48 | $9.744,00 |
| 1 | 60' Casing | 300,00 | | $ - |
| 0 | Mud Bins | | | |

### Rental Equipment

| NO. | Rental Equipment | | HRS. | RATE/HR. | TOTAL/DAY |
|---|---|---|---|---|---|
| 1 | 10K Reach Forklift | S.T. / O.T. | 300,00 | $51,29 | $15.387,00 |
| 1 | 225 Excavator | S.T. / O.T. | 300,00 | $91,59 | $54.954,00 |
| 2 | Portable toilets | S.T. / O.T. | 300,00 | $1,50 | $900,00 |
| 0 | Multiquip 20kW Generator | S.T. / O.T. | | | |
| 3 | Frac Tank | S.T. / O.T. | 300,00 | $7,32 | $6.588,00 |
| 1 | Trash Bin | S.T. / O.T. | 300,00 | $4,97 | $1.491,00 |
| 1 | 500 Amp Welder | S.T. / O.T. | 300,00 | $9,49 | $2.847,00 |
| 2 | Light Tower | S.T. / O.T. | 300,00 | $7,61 | $4.566,00 |
| 1 | 175 KW Generator | S.T. / O.T. | 300,00 | $71,36 | $21.408,00 |
| 1 | 6" Diesel Trash Pump | S.T. / O.T. | 300,00 | $23,60 | $7.080,00 |
| 1 | HTI Mud Motor | S.T. / O.T. | 300,00 | $42,50 | $12.750,00 |

| | | |
|---|---|---|
| COMPANY OWNED EQUIPMENT | | $ 268.740,00 |
| RENTAL EQUIPMENT W/ 15% Markup | | $ 147.166,65 |
| A= EQUIPMENT SUB = TOTAL COST | | $ 415.906,65 |
| 0,00 % Sales Tx, Rental Equip. | | |

## B - MATERIALS

| MATERIALS DESCRIPTION | QTY. USED | UNIT $ | TOTAL |
|---|---|---|---|
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| B=MATERIALS SUB-TOTAL COST | | | $ - |
| 0,00 % Sales Tax | | | |
| 10 % ADDED M, U, B | | | |
| SUB-TOTAL A + B w/Tax | | | $ 415.906,65 |

## C - SUBCONTRACT / WORK DONE BY SPECIALISTS/THIRD PARTY SERVICES

| Work Description | Individual / Company | Unit | RATE | TOTAL $ |
|---|---|---|---|---|
| | | | | $ - |
| COST OF SUBS - C | | | | $ - |
| 15 % MARK-UP(Subcontractor) | | | | $ - |
| TOTAL COST A - B - C (Including Mark-Up) | | | | $ 415.906,65 |

## D - LABOR

| NO. | D - LABOR | | HRS. | BASE RATE w/FRING'S | SUB TOTAL | Per Diem Totals | TOTAL |
|---|---|---|---|---|---|---|---|
| 1 | Sharon Posey (Day Rate) | REG. | 33,00 | $755,00 | $24.915,00 | $2.700,00 | $27.645,00 |
| | | O.T. | 0 | | $0,00 | | $0,00 |
| 2 | Jacob Hoffman | REG. | 131,00 | $59,79 | $7.832,49 | $2.380,00 | $10.212,49 |
| | | O.T. | 69,00 | $80,65 | $5.564,85 | | $5.564,85 |
| | | | | | $0,00 | | $0,00 |
| 3 | Westin Colgrove | REG. | 96,00 | $59,79 | $5.739,84 | $1.260,00 | $6.999,84 |
| | | O.T. | 68,00 | $80,65 | $5.484,20 | | $5.484,20 |
| | | | | | $0,00 | | $0,00 |
| 4 | Dustin Anderson | REG. | 195,00 | $48,20 | $9.399,00 | $1.920,00 | $11.319,00 |
| | | O.T. | 92,00 | $66,20 | $6.090,40 | | $6.090,40 |
| | | | | | $0,00 | | $0,00 |
| 5 | Jeromie Acres | REG. | 164,00 | $46,20 | $7.576,80 | $1.680,00 | $9.256,80 |
| | | O.T. | 96,00 | $63,20 | $6.067,20 | | $6.067,20 |
| | | | | | $0,00 | | $0,00 |
| 6 | Abraham Berrospe | REG. | 159,00 | $36,83 | $5.855,97 | $960,00 | $6.815,97 |
| | | O.T. | 95,00 | $49,92 | $4.741,83 | | $4.741,83 |
| | | | | | $0,00 | | $0,00 |
| 7 | Larry Roseboro | REG. | 76,00 | $59,79 | $4.723,41 | $500,00 | $5.223,41 |
| | | O.T. | 35,00 | $80,65 | $2.822,75 | | $2.822,75 |
| | | | | | $0,00 | | $0,00 |
| 8 | Dusty Cline | REG. | 24,00 | $59,79 | $1.434,96 | $315,00 | $1.749,96 |
| | | O.T. | 12,00 | $80,65 | $967,80 | | $967,80 |
| | | | | | $0,00 | | $0,00 |
| 9 | Taylor Crowley | REG. | 56,00 | $36,83 | $2.062,48 | $350,00 | $2.412,48 |
| | | O.T. | 40,00 | $52,66 | $2.106,40 | | $2.106,40 |
| | | | | | $0,00 | | $0,00 |
| 10 | Jim Rubick | REG. | 123,00 | $59,79 | $7.354,17 | $1.575,00 | $8.929,17 |
| | | O.T. | 65,00 | $80,65 | $5.242,25 | | $5.242,25 |
| | | | | | $0,00 | | $0,00 |
| 11 | Barton Snowten | REG. | 80,00 | $38,66 | $3.092,80 | $1.725,00 | $4.817,80 |
| | | O.T. | 60,00 | $52,66 | $3.159,60 | | $3.159,60 |
| | | | | | $0,00 | | $0,00 |
| 12 | Kenny Densmore | REG. | 80,00 | $59,79 | $4.783,20 | $1.050,00 | $5.833,20 |
| | | O.T. | 60,00 | $80,65 | $4.839,00 | | $4.839,00 |
| | | | | | $0,00 | | $0,00 |

| | | |
|---|---|---|
| 15 % Labor Surcharge | | $ 22.245,22 |
| SUBTOTAL | | $ 170.546,72 |
| 15 % MARKUP ON LABOR | | $ 25.582,01 |
| D = LABOR SUB-TOTAL | | $ 148.301,50 |

## E - MISCELLANEOUS ITEMS

| MISC. DESCRIPTIONS | QTY. | Unit $ | EX. AMOUNT |
|---|---|---|---|
| Hotel | | $58,00 | $ - |
| Substance | 0 | $68,00 | $ - |
| Misc. Items | | | |
| 0 | | 0 | $ - |
| 0 | | 0 | $ - |
| 0 | | 0 | $ - |
| 0 | | 0 | $ - |
| 0 | | 0 | $ - |
| E=MISCELLANEOUS ITEMS SUB TOTAL | | | $ - |
| 0 % Sales/City/Room Tax | | | $ - |
| 15 % ADDED MARK-UP | | | $ - |
| 0 % Tax on Misc. Items | | | 0 |
| SUB TOTAL - E | | | $ - |

## TOTALS

| | | |
|---|---|---|
| TOTAL COST A+B+C (Equipment ,Material ,SubContractors) | | $ 415.906,65 |
| TOTAL COST = D (Labor) | | $ 196.125,73 |
| TOTAL COST = E (Miscellaneous Items) | | $ - |
| | SU $ | 612.035,38 |
| 2,5 % BOND & INSURANCE | | $ 15.300,88 |
| TOTAL COST THIS SHEET | | $ 627.336,26 |

| TIME | CLIENT DIRECTIVES AND COMMENTS |
|---|---|
| | (See Daily Work Report) |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |

THE HDD COMPANY
(Signature)
DATE:

CLIENT
(Signature)
DATE:

# EXHIBIT G



Addendum #4
Subcontract Agreement
SR1916169002

The following addition is made to the Subcontract Agreement with HHD Company:

- Per the attached documents for a total of $555,000.00

  *This cannot be invoiced for until all drills are pulled and bores are installed*

Any additional state and local taxes incurred will be charged accordingly.

Minnesota Limited:

_____

HDD Company

_____

## IN THE DISTRICT COURT OF FRANKLIN COUNTY, KANSAS

THE HDD COMPANY, INC., an Oregon
Corporation,

                Plaintiff,

v.

MINNESOTA LIMITED, LLC., a Minnesota
Corporation,
**SERVE:**
**National Registered Agents, Inc. of KS**
**112 SW 7th Street, Suite 3C**
**Topeka, KS 66603**

SOUTHERN STAR CENTRAL GAS
PIPELINE, INC., a Delaware Corporation.
4700 Highway 56
Owensboro, KY 42301
**SERVE:**
**National Registered Agents, Inc. of KS**
**112 SW 7th Street, Suite 3C**
**Topeka, KS 66603**

RENE BURES and ANITA BURES
**SERVE:**
**Rene Bures**
**Anita Bures**
**31443 NW Meade Rd.**
**Richmond KS 66080**

RURAL WATER DISTRICT NO. 4
**SERVE:**
**Rural Water District No. 4**
**501 N. Olive St.**
**Garnett, KS 66032**

ANDERSON COUNTY, KANSAS
**SERVE:**
**County Clerk**
**100 E. 4th Ave.**
**Garnett, KS 66032**

JOHN T. RAYNE
**SERVE:**
**John T. Rayne**
**12 Overhill Drive**
**Paola, KS, 66071**

Case No. FR-2021-CV-000016

Petition Pursuant to K.S.A. Chapter 60

PATRICK ARTHUR RAYNE and KELLY
LEE RAYNE FAMILY TRUST under trust
agreement dated April 12, 2016
**SERVE:**
**Patrick Arthur Rayne, Co-Trustee**
**Kelly Lee Rayne, Co-Trustee**
**102 Crestview Dr.**
**Paola, KS 66071**

PICKERT FAMILY TRUST
**SERVE:**
**Keith J. Pickert, co-trustee**
**Mary J. Pickert, co-trustee**
**47890 Deer Trail Dr.**
**Canton Michigan 48187**

LYLE BLACK and CHERYL BLACK
**SERVE:**
**Lyle Black**
**Cheryl Black**
**3159 Neosho Rd.**
**Ottawa, KS 66067**

FARM CREDIT SERVICES, FLCA D/B/A
FRONTIER FARM CREDIT, FLCA
**SERVE: THE CORPORATION**
**COMPANY, INC.**
**112 S.W. 7TH STREET**

**TOPEKA, KS 66603**

AND

OSWEGO COAL COMPANY, INC.
**SERVE: Robert Caylor**
**Oswego Coal Company, Inc.**
**2476 Marshall Rd.**
**Ottawa, KS 66067**

Defendants.

## FILING OF ADDITIONAL EXHIBITS TO PETITION

Plaintiff The HDD Company, Inc., an Oregon Corporation ("HDD"), filed its original

Petition and initial exhibits, the remainder of which exceeded the file size limitations for

electronic filing. Plaintiff attaches herewith Exhibits 7 through 23 of 26 as additional exhibits.

Exhibits 24 through 26 will be included in a subsequent filing.

Respectfully submitted,

HUSCH BLACKWELL, LLP

/s/*David B. Raymond*

| David B. Raymond | KS #14004 |
| Michael J. Kelly | KS #25666 |

4801 Main Street, Suite 1000
Kansas City, Missouri 64112
(816) 983-8000 (Phone)
(816) 983-8080 (FAX)
david.raymond@huschblackwell.com
mike.kelly@huschblackwell.com

**ATTORNEYS FOR PLAINTIFF**

HB: 4845-8340-7838.1

# Exhibit 7

**IN THE DISTRICT COURT OF ANDERSON COUNTY, KANSAS**

## <u>NOTICE OF MECHANICS' LIEN FILING</u>

COMES NOW The HDD Company, Inc., an Oregon Corporation, and submits Notice

that it has filed its Mechanics' Lien pursuant to K.S.A. § 55-208 in Franklin County, KS, Lien

No. FR-2021-SL-000002, a file-stamped copy of which is attached as Exhibit A hereto, upon

pipeline which was partially performed in Anderson County, KS.


Respectfully submitted,

HUSCH BLACKWELL, LLP

/s/ *Michael J. Kelly*
Michael J. Kelly                    KS #25666
4801 Main Street, Suite 1000
Kansas City, Missouri 64112
(816) 983-8000 (Phone)
(816) 983-8080 (FAX)
mike.kelly@huschblackwell.com

**ATTORNEYS FOR THE HDD COMPANY, INC.**

ELECTRONICALLY FILED
2021 Jan 06 PM 4:35
CLERK OF THE FRANKLIN COUNTY
IN THE DISTRICT COURT OF FRANKLIN COUNTY, KANSAS
CASE NUMBER: FR-2021-SL-000002
PII COMPLIANT

**EXHIBIT A**

Mechanic's Lien No. _____

## STATEMENT FOR MECHANIC'S LIEN

### (K.S.A. §55-208)

| | |
|---|---|
| **AMOUNT OF CLAIM:** | $5,887,143.28 (exclusive of interest) |

**NAME OF LANDOWNERS:**    **Rene and Anita Bures**
Jobsite and Mailing Address:    31443 NW Meade Rd., Richmond, KS 66080

**John T. Rayne; Patrick Arthur Rayne and Kelly Lee Rayne Family Trust Under Trust Agreement date April 12, 2016; and Keith J. Pickert and Mary J. Pickert, co-trustee of the Pickert Family Trust u/a/d March 12, 2016**

Jobsite Address:    00000 NW Meade Rd., Garnett, KS 66032

Mailing Address:    John Rayne: 12 Overhill Dr., Paola, KS 66071

Patrick Arthur Rayne and Kelly Lee Rayne Family Trust: 102 Crestview Dr, Paola KS 66071

Keith J. Pickert and Mary J. Pickert, co-trustee of the Pickert Family Trust: 47890 Deer Trail Dr Canton, MI 48187

**Black, Lyle D.; Black, Cheryl K.**
Jobsite Address:    3062 Nebraska Rd., Ottawa, KS 66067

Mailing Address:    3159 Neosho Rd., Ottawa, KS 66067-8879

Mortgage Holder:    Frontier Farm Credit, FLCA
1270 N. 300 Rd.
PO Box 858
Baldwin City, KS, 66006

**Oswego Coal Company, Inc.**
Jobsite Address:    3125 Marshall Rd., Ottawa, KS 66067

Mailing Address:    PO Box 368, Ottawa, KS 66067-0368

NAME OF PIPELINE OWNER:   Southern Star Central Gas Pipeline, Inc., a Delaware Corporation.
4700 Highway 56
Owensboro, KY 42301

Registered Agent
The Corporation Company, Inc.
112 SW 7th Street Suite 3C
Topeka, KS 66603

NAME OF CONTRACTOR:   Minnesota Limited, LLC., a Minnesota Limited Liability Corporation
18640 200th Street – PO Box 410
Big Lake, MN 55309

Registered Agent
National Registered Agents, Inc. of KS
112 SW 7th Street Suite 3C
Topeka, KS 66603

NAME OF LIEN CLAIMANT:   The HDD Company, Inc., an Oregon Corporation
4525 Serrano Parkway, Office Suite 210
El Dorado Hills, CA 95762

Registered Agent
CT Corporation System
112 SW 7th Street, Suite 3C
Topeka, KS 66603

DESCRIPTION OF
PROPERTY:
ATTACHED HERETO AS **EXHIBIT A** AND INCORPORATED HEREIN BY THIS REFERENCE, Southern Star Central Gas Pipeline Project C60266 – 31.5 miles of 36" Pipeline – Line DPA and Launcher and Receiver located on property commonly known as 31443 NW Meade Rd., Richmond, KS 66080; 00000 NW Meade Rd., Garnett, KS 66032; 3062 Nebraska Rd, Ottawa, KS 66067 and 3125 Marshall Rd., Ottawa, KS 66067 (the "Property")

The undersigned, The HDD Company, Inc. ("Lien Claimant"), a subcontractor pursuant to K.S.A. §55-208, claims a lien upon the Southern Star Central Gas Pipeline ("Pipeline"), on account of furnishing labor, equipment, and materials for the construction and/or completion of the Southern Star Central Gas Pipeline Project C60266 ("Project") located in and through Anderson County, Kansas. The pipeline and the land are described in **Exhibit A**, attached hereto and incorporated herein by reference. The labor, equipment, and materials supplied by Lien Claimant

were used and consumed in the construction of said Pipeline. Lien Claimant supplied labor, equipment, and materials to the Project as a subcontractor under agreement with Minnesota Limited, L.L.C., the original contractor ("Contractor"), which in turn was under agreement with Southern Star Central Gas Pipeline, Inc., the owner of the Project ("Project Owner").

The aforesaid claim, a reasonably itemized statement of which is attached to this lien statement (**Exhibit B**) and copies of documentation (**Exhibit C**) substantiating the labor, equipment, and materials supplied to the Project Owner by Lien Claimant for improvements upon the Property, is filed in order that it may constitute a lien upon the above-described Pipeline, and every other right, title, and interest in said Pipeline. The amount claimed as owing is FIVE MILLION EIGHT HUNDRED EIGHTY-SEVEN THOUSAND, ONE HUNDRED FORTY-THREE DOLLARS and 28/100 ($5,887,143.28), exclusive of interest.

Lien Claimant last supplied labor, materials, and/or equipment within four (4) months of the date of this lien statement.

WITNESS the hand of said Lien Claimant this 5ᵗʰ day of ⎽Jan⎽ 2020.

ON BEHALF OF: **The HDD Company, Inc.,** Lien Claimant

By: _____
Jeremy King
Vice President
The HDD Company, Inc.

## VERIFICATION

STATE OF CALIFORNIA    )
                       ) ss.
COUNTY OF  *El Dorado* )

    Jeremy King, of lawful age, being first duly sworn upon his oath, that he is the Vice President and duly authorized representative of The HDD Company, Inc. and is duly authorized to make this verification on its behalf; and does verify under penalty of perjury that the above and foregoing statement is true and correct based on his personal knowledge, and is a just and true account of the demand of and the amount due Lien Claimant.

ON BEHALF OF:  **The HDD Company, Inc.,** Lien Claimant

By: _____
               Jeremy King
               Vice President
               The HDD Company, Inc.


STATE OF CALIFORNIA    )
                       ) ss.
COUNTY OF              )

    On this ____ day of _____, 2020, before me appeared Jeremy King, to me personally known, who being by me duly sworn did say that he is the Vice President and duly authorized representative of The HDD Company, Inc., and that he acknowledged that his execution of the foregoing instrument is on behalf of said company.

    IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal in the County and State aforesaid, the day and year first above written.


             _____
             Notary Public


             _____
             Printed Name
My Commission Expires:

_____

# ALL- PURPOSE
# CERTIFICATE OF ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California )

County of El Dorado )

On January 5, 2021 before me, Wendy Brooke Notary Public
<span>(Here insert name and title of the officer)</span>

personally appeared, Jeremy King
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_Wendy Brooke_
Signature                         (Seal)

WENDY BROOKE
COMM. #2319236
Notary Public - California
El Dorado County
Comm. Expires Feb 11, 2024

## ADDITIONAL OPTIONAL INFORMATION

DESCRIPTION OF THE ATTACHED DOCUMENT

Statement for Mechanic's Lien
(Title or description of attached document)

_____
(Title or description of attached document continued)

Number of Pages _____ Document Date _____

CAPACITY CLAIMED BY THE SIGNER
- ☐ Individual (s)
- ☐ Corporate Officer

_____
(Title)
- ☐ Partner(s)
- ☐ Attorney-in-Fact
- ☐ Trustee(s)
- ☐ Other _____

### INSTRUCTIONS FOR COMPLETING THIS FORM

This form complies with current California statutes regarding notary wording and, if needed, should be completed and attached to the document. Acknowledgments from other states may be completed for documents being sent to that state so long as the wording does not require the California notary to violate California notary law.

- State and County information must be the State and County where the document signer(s) personally appeared before the notary public for acknowledgment.
- Date of notarization must be the date that the signer(s) personally appeared which must also be the same date the acknowledgment is completed.
- The notary public must print his or her name as it appears within his or her commission followed by a comma and then your title (notary public).
- Print the name(s) of document signer(s) who personally appear at the time of notarization.
- Indicate the correct singular or plural forms by crossing off incorrect forms (i.e. he/she/they, is/are ) or circling the correct forms. Failure to correctly indicate this information may lead to rejection of document recording.
- The notary seal impression must be clear and photographically reproducible. Impression must not cover text or lines. If seal impression smudges, re-seal if a sufficient area permits, otherwise complete a different acknowledgment form.
- Signature of the notary public must match the signature on file with the office of the county clerk.
  - ❖ Additional information is not required but could help to ensure this acknowledgment is not misused or attached to a different document.
  - ❖ Indicate title or type of attached document, number of pages and date.
  - ❖ Indicate the capacity claimed by the signer. If the claimed capacity is a corporate officer, indicate the title (i.e. CEO, CFO, Secretary).
- Securely attach this document to the signed document with a staple.

EXHIBIT A

Pipeline: Southern Star Central Gas Pipeline Project C60266 – 31.5 miles of 36" Pipeline – Line DPA and Launcher and Receiver

31443 NW Meade Rd., Richmond, KS 66080
The South Half (S½) of the Northeast Quarter (NE¼) of Section Thirty-four (34), Township Nineteen (19), Range Nineteen (19) AND the Southeast Quarter (SE¼) of Section Thirty-four (34), Township Nineteen (19), Range Nineteen (19), excepting that part of the last described quarter section lying South of the center of Pottawatomie Creek, and EXCEPT One acre of land situated in the N. E. 1/4 of Section 34 and the S. E. 1/4 of Section 34 all in Township 19 S., Range 19 E., Anderson County, Kansas and being more particularly described as follows: Commencing at the S. E. corner of the N. E. 1/4 of Section 34, Township 19 S., Range 19 E., Anderson County, Kansas; thence N. 0°01'46" E. along the East line of said N. E. 1/4 a distance of 58.87 ft. to a point; thence N. 89°31'34" W. a distance of 235.50 ft. to a point; thence S. 0°01'46" W. a distance of 61.88 ft. to a point on the N. Line of the S. E. 1/4 Section 34, Township 19 S., Range 19 E; thence continuing S. 0°0146" W., a distance of 123.09 ft. to a point; thence S. 89°31'34" E., a distance of 235.50 ft. to a point on the East line of said S. E. 1/4; thence N. 0°01'46" E. along said East line a distance of 126.10 ft. to the POINT OF BEGINNING.

00000 NW Meade Rd., Garnett, KS 66032
The Northeast Quarter (NE¼), except 1.52 acres in the northeast corner north of Pottawatomie River, of Section 3, Township 20 South, Range 19 East of the 6th P.M., Anderson County, Kansas.

3125 Marshall Rd., Ottawa, KS 66067
All that part of the Southwest Quarter of Section 5, Township 17 South, Range 20 East, in Franklin County, Kansas, being more particularly described as follows: Commencing at the Southwest corner of the Southwest Quarter of said Section 5; thence North 87° 40' 17" East, along the South line of the Southwest Quarter of said Section 5, a distance of 70.01 feet to the point of beginning; thence North 03° 14' 35" West, along a line 70.00 feet East of and parallel with the West line of the Southwest Quarter of said Section 5, a distance of 1647.63 feet; thence North 60° 00' 55" East, a distance of 1074.78 feet; thence South 01° 52' 54" East, a distance of 2146.36 feet to a point on the South line of the Southwest Quarter of said Section 5; thence South 87° 40' 17" West, along the South line of the Southwest Quarter of said Section 5, a distance of 908.94 feet to the point of beginning, Franklin County, Kansas.

3062 Nebraska Rd., Ottawa, KS 66067:
The East 1/4 of the Southeast 1/4 of the Northeast 1/4 of Sec. 6, Twp. 17 S., Rng. 20 E., subject to any part thereof in roads, all in Franklin County, Kansas.
AND
Beginning at the Northwest corner of the Northwest Quarter of Section 5, Township 17 South, Range 20 East of the 6th P.M., thence South 02° 59' 16" East 680.67feet on the West line of the

Northwest Quarter of said Section 5 to an existing 1/2" iron bar and the true point of beginning of New Tract 2; thence North 88° 18' 09" East 1327.15 feet to the East line of the Northwest Quarter of the Northwest Quarter of said Section 5, being marked with a 1/2" iron bar; thence South 03° 06' 08" East 613.78 feet to the Southeast corner of said Northwest Quarter of the Northwest Quarter of said Section 5, being marked with a 1/2" iron bar; thence South 03° 06' 08" East 659.24 feet to the Southeast corner of the North Half of the Southwest Quarter of the Northwest Quarter of said Section 5, being marked with a 1/2" iron bar; thence South 88° 26' 25" West 1329.76 feet to the Southwest corner of the North Half of the Southwest Quarter of the Northwest Quarter of said Section 5, being marked with an existing 1/2" iron bar; thence North 02° 59' 16" West 661.16 feet to the Southwest corner of the Northwest Quarter of the Northwest Quarter of said Section 5, being marked with an existing 1/2" iron bar; thence North 02° 59' 16" West 608.61 feet to the point of beginning, all in Franklin County, Kansas.

EXHIBIT B

Statement of Account

| | |
|---|---|
| Amount Due Per Agreement: | $6,185,936.00 |
| Delay Expenses: | $159,868.58 |
| Standby Expenses: | $500,975.00 |
| Extraction and Re-Installation | $1,600,392.89 |
| Differing Site Condition Costs | $555,000.00 |
| Retainage Withheld: | $599,640.00 |
| Less Payments Made: | $3,115,029.19 |
| Total Amounts Due and Owing: | $5,887,143.28 |

# EXHIBIT C

C1: Subcontract Agreement
C2: Delay Summaries
C3: Standby Expense Summary
C4: Day Shift and Night Shift Summaries
C5: Addendum 4

(Attached hereto)

# EXHIBIT A



**Subcontractor Agreement**
**No. SR1916169002**

This agreement is made at Big Lake, MN this day of ___January 17, 2020___

**BETWEEN:**

Minnesota Limited, LLC (Contractor)
18640 200ᵗʰ Street – PO Box 410
Big Lake, MN 55309

**AND:**

THE HDD COMPANY(Subcontractor)
4525 SERRANO PARKWAY, OFFICE SUITE 210
EL DORADO HILLS, CA 95762

**RECITALS**

Contractor ("Minnesota Limited, LLC) has entered into a contract (the "Prime Contract") with Southern Star Central Gas Pipeline, Inc. ("Owner") to perform certain labor and furnish certain materials for completion of the construction project KS - C60266 Install 31.5 miles of 36" (the "Project"). Subcontractor desires to perform certain services and/or provide certain materials as a subcontractor of Contractor pursuant to the terms and conditions of the Prime Contract, and agrees to the terms and conditions of this Agreement.

**AGREEMENT**

In consideration of the mutual covenants contained herein, the parties agree as follows:

I.      Subcontractor agrees to supply all the materials and labor and pay all license fees, permits and expenses for the work located at __Various Sites_____ (the "Site"). As full compensation for performance of this Agreement and subject to all applicable provisions of this Agreement, Contractor agrees to pay Subcontractor:
        six million one-hundred eight-five thousand nine-hundred thirty six dollars($6185936.00_____ )

II.     **Contract Document.** Subcontractor's performance hereunder shall be subject to all terms and conditions contained in the Prime Contract and all drawings and/or specifications referred to therein (the "Contract Documents") except as such terms may be specifically amended by this Agreement, which includes HDD's Proposal, attached hereto and incorporated herein. Wherever the Contract Documents shall refer to the Contractor or its agents, the same shall be read to refer to the Subcontractor under this agreement. Subcontractor shall perform and coordinate its work hereunder in a manner necessary to assure the prompt and timely completion of the Project, time being of the essence to the



Agreement. At Subcontractor's request, a copy of the applicable Prime Contract Terms and Conditions will be supplied to Subcontractor.

Any terms and conditions proposed in Subcontractor's acceptance of or in any acknowledgement, invoice, or other form of Subcontractor that add to, vary from, or conflict with these terms hereby objected to. Any such proposed terms shall be void and these terms and conditions (1) shall constitute the complete and exclusive statement of the terms and conditions of the contract between the parties and (2) may be modified only by written instrument executed by the authorized representatives of both parties.

III.    **Insurance.** Subcontractor shall comply with the insurance requirements set forth in Exhibit A (attached).

IV.    **Additional Terms and Conditions**

A.    Subcontractor, not Contractor, assumes all the risk related to in performing its work under this Agreement, such as any injuries to Subcontractor, Subcontractor's workers, Facility employees and members of the public arising from the Subcontractors activities or use of tools and equipment, or from any other cause.

B.    Subcontractor will complete all work in a workmanlike and professional manner according to standard practices in the building trade, and in compliance with all building codes and other applicable laws. Subcontractor will warrant against defects in material and labor it supplies for the completion of the work. If subcontractor fails to perform under this Agreement, the party entitled to performance or the Contractor will have the right to hire other persons to correct the defective Work and hold Subcontractor liable for the costs thereof including costs, disbursements and reasonable attorneys' fees incurred in the enforcement of this provision.

C.    All Work will be done on a timely basis. The work to be performed under this contract shall be commenced as directed by Project Manager or Project Superintendent or Project Foreman and shall be substantially completed on or before _as agreed upon and directed onsite_____. Time is of the essence.

D.    Subcontractor shall indemnify, defend and hold harmless Contractor as set forth in Section VII.

E.    No work shall be subcontracted or assigned by Subcontractor without the prior written approval of the Contractor.

F.    Environmental, Health and Safety. Subcontractor shall take all necessary precautions to keep the work site free from hazards that are likely to cause injury, illness, or death or damage to property. Subcontractor shall provide any Safety Data Sheets (SDS) for any hazardous chemicals provided pursuant to this contract. Contractor is a company that operates under a "Culture of Safety" with the goal of zero incidents, and expects its subcontractor to similarly emphasize the paramount importance of safe behavior. Failure to abide by Contractor's policies may result in immediate removal of Subcontractor from the premises and will be a breach of Subcontractor's obligations hereunder.



Contractor shall have the right, at its option, to conduct a complete audit of Subcontractor's documents and practices to verify Subcontractor's compliance with this Section.

G. Minnesota Limited has enacted a Subcontractor Management Program and Safety Requirements of which Subcontractor has received. Subcontractor shall follow and adhere to all aspects of said program and the terms and conditions of such program are incorporated herein.

H. Liens. To the fullest extent permitted by law, and the extent the Contractors has paid the Subcontractor, Subcontractor will at all times keep the Project, the Site and each part thereof free from any attachment, lien, claim of lien, or other encumbrance arising out of the Work and Subcontractor will indemnify, defend and hold Contractor harmless from and against all claims, losses, demands, causes of action or expenses (including attorneys' fees and other costs of defense incurred by Contractor in defending against the foregoing or in enforcing this indemnity and defense obligation) of whatever nature, arising by reason of any such lien, claim of lien, attachment or encumbrance. If any claim is filed to enforce any laborers, material men, mechanic's, or other similar lien arising out of or relating to the Work for which Contractor has paid the Subcontractor, Subcontractor will immediately cause such lien to be released and discharged and if Subcontractor fails to do so, then Contractor will have a right to pay all sums, including attorneys' fees and other costs and expenses incurred necessary to obtain such release and discharge, and hold Subcontractor liable for the amount thereof with the right to deduct all or a portion of such sum from accounts that may be due Subcontractor.

I. Default. In addition to the other remedies available under law: (a) if Subcontractor should fail or refuse, except in cases where extension of time is provided, to supply enough properly skilled workers or proper materials for the Work; or (b) if Subcontractor should fail to make payment to its subcontractors for material or labor which are due to its Subcontractors, or (c) if Subcontractor should fail to keep and comply with any of the terms and provisions of this Agreement, or (d) if Subcontractor should be adjudged bankrupt, file or suffer to be filed a petition for relief under the Bankruptcy Act, or make a general assignment for the benefit of the creditors; or (e) if a receiver should be appointed on account of Subcontractor's insolvency; or (f) if Subcontractor fails to pay its employees' wages, benefits or tax withholdings; then, in any such event, Contractor may without prejudice to any other right or remedy and after giving Subcontractor and its surety, if any, upon twenty-four hours written notice, terminate its obligation to Subcontractor under this Agreement and take possession of the Site and complete (or cause to be completed) the Work by whatever method Contractor may deem expedient. In such case Subcontractor will not be entitled to receive any further payment until the Work is completed. Upon completion of the Work, Contractor will pay to Subcontractor an amount equal to (x) the unpaid portion of the Subcontract Amount attributable to the Work performed up to the termination less (y) the amount by which (i) the costs incurred by Contractor to complete the Work, including, without limitation, costs for architectural, managerial and administrative services and reasonable attorneys' fees, if legal counsel is employed, exceed (ii) the portion of the Subcontract Amount attributable to the balance of the Work yet to be performed at the time of termination. If the amount calculated under part (y) in the preceding sentence exceeds the amount owing under part (x), the Subcontractor will pay the difference to Contractor. If the amount in part (x) exceeds the amount in part (y), Contractor will pay such balance to Subcontractor.



J.      Subcontractor is an independent Subcontractor and is not an employee or agent of the Contractor and neither Subcontractor nor anyone employed by Subcontractor will be deemed for any purpose to be the agent, employee, servant or representative of Contractor in the performance of the Work. Subcontractor acknowledges and agrees that Contractor will have no direction or control over the means, methods, procedures or manner of the Work performed by Subcontractor or any of its subcontractors, or any of their employees, vendors or suppliers.

K.      No changes shall be made in the work proposed or in the price unless those changes are agreed to in writing by both Subcontractor and Contractor. Travis Gehr and / or ___James Redmond_____, shall be the Contractor's designated on site agent, if there is a dispute regarding whether the work is a change, Subcontractor may perform that work under protest and submit a claim to Contractor in accordance with this Agreement.

L.      Clean Up. Subcontractor will at all times keep the site or facility safe and free from the accumulation of waste materials or rubbish caused by its operations or related to the Work. Upon completion of the Work and each portion thereof, Subcontractor will remove all rubbish and waste produced by its operations or Work hereunder from the facility as well as all of its tools, equipment, machinery and surplus materials no longer needed and leave the site or facility in a "broom clean" or equivalent condition and safe for Subcontractor's employees and subsequent subcontractors to perform their work, unless otherwise specified in writing. If Subcontractor fails to clean up, Contractor may do so after written notice to Subcontractor and the cost thereof will be charged to Subcontractor.

V.      **Representations of Subcontractor.** Subcontractor represents and warrants the following:

A.      Subcontractor has examined the Agreement ("Prime Contract") between Owner and Minnesota Limited (if requested by the Subcontractor prior to the execution of the work) and agrees to all provisions affecting Subcontractors performance, including but not limited to the representations, obligations and warranties made by Minnesota Limited to the Owner.

B.      Subcontractor has the requisite authority and ability to perform the subcontract without delay.

C.      Subcontractor will not assign, subcontract or otherwise delegate its responsibilities and obligation hereunder without the written consent of Contractor.

D.      Subcontractor shall examined the specifications, site conditions, drawings and requirements of the work with due diligence and its bid has taken into consideration all conditions and risks which are reasonably related to the performance of the work.

E.      Ethics; Conflict of Interest. Subcontractor shall at all times during the performance of its obligations hereunder conform to sound ethical business practices in conformance with all applicable Laws and shall in its business practices promote the values of honesty, integrity, social responsibility, and human rights. Subcontractor shall not offer to any member of Contractor (including employees thereof) any gifts, entertainment, or other favors beyond the common courtesy usually associated with business practices. Subcontractor shall not pay any commissions or fees or grant any rebates or other



remuneration or monetary gratuity to any employee of Contractor. Subcontractor shall not grant any secret rebates nor pay any commissions or fees to any employee of Contractor.

F.   Invitees Prohibited. Subcontractor shall not, without prior written permission of Contractor, invite, permit entry or bring any Person onto the Contractor's Worksite or property who is not an employee of Subcontractor.

G.   Subcontractor will pay its employees promptly and maintain good labor relations. Subcontractor further represents that it has paid all union benefit contributions including fringe benefits. Subcontractor agrees that Contractor upon demand of the Labor Union, may withhold from any sums due Subcontractor and pay to the Administrator of the Plan any amounts owing and said payment shall be deducted from the invoice.

## VI.   Warranty.

A.   Subcontractor warrants to the Contractor and Owner that all materials and equipment furnished under this Agreement will be new unless otherwise specified in writing, and that all work will be of good quality, free from faults and defects and in conformance with any Purchase Order and attachments thereto, including any specifications stipulated therein. All Work not so conforming to these standards may be considered defective, and the Subcontractor shall promptly repair and make good, after notice by the Contractor and Owner and without cost to the Contractor and Owner, any damages, defects or faults resulting from imperfect or defective Work done or materials furnished by the Subcontractor. The Subcontractor warrants that all labor, materials and equipment furnished under this Agreement shall be covered by warranty for a period of at least two (2) years (or during a longer period if required by the specifications and stipulated therein) from the date of acceptance of the completed Work by the Owner.

B.   Where material or equipment furnished by the Subcontractor is covered by a manufacturer's warranty or guarantee or other special warranty or guarantee the Subcontractor shall provide such warranty and provide additional or extended warranty or guarantees to the Contractor for its labor, materials and equipment to confirm to paragraph A above.

VII.   Indemnification. To the fullest extent permitted by law, the Subcontractor shall indemnify the Owner, Contractor and the agents and employees of any of them from and against claims, damages, losses and expenses, arising out of or in connection with, or resulting from the negligent performance of the Subcontractor's work, the Subcontractor's subcontractors work, or anyone directly or indirectly employed by them but only to the extent caused by acts or omissions by either or any of them. In addition thereto, Subcontractor indemnifies Owner, Contractor and the agents and employees of any of them for expenses including attorney's fees and costs, incurred in responding to and defending against any claim or in enforcing this provision.

VIII.   Payment. Subcontractor shall invoice Minnesota Limited no later than 30 days after date of service. Contractor agrees to pay Subcontractor all sums due less ___10___ % retainage (if applicable) hereunder within



thirty (30) days from the date the invoice is received. However, it is a condition precedent to payment that if Owner withholds payments for that portion of any work performed by Subcontractor, then Minnesota Limited is only obligated to pay Subcontractor after receiving payment from the Owner. In such event payment will be made within ten (10) days. Contractor reserves the right to withhold such sums as may be necessary to pay expenses, including costs and attorney's fees, caused by, or related to, Subcontractor's breach of Agreement. Final payment of retainage will occur ten (10) days after final payment for Subcontractor's work is received and when lien waivers and job completion affidavit are executed.

IX.     **Maintaining Records / Audit.** For a period of five (5) years from final acceptance of Subcontractor's work, Subcontractor shall maintain all job records and shall, upon reasonable notice by Contractor, but no later than 10 business days, make such records available for inspection by Contractor or Owner. Contractor or Owner or their representatives may audit said records. If the results of the audit show an overpayment, Subcontractor shall reimburse the overpayment together with interest of 1% per month. If the audit shows an overpayment more than one thousand dollars ($1,000), Subcontractor shall also reimburse Contractor or Company for the cost of the audit.

X.      **Interpretations and Enforcement.** The Agreement and contract documentation contains the parties entire understanding with regard to the subject hereof and shall not be modified except by a writing signed by both parties; provided, however, that Subcontractor shall be bound by changes in the Contract Documents agreed to between the Contractor and Owner, but only if Contractor has timely notified Subcontractor of such changes. The interpretation and enforcement of this Agreement shall be governed by the laws of the state in which the work hereunder is to be performed or that specified in the Prime Contract if different than the state where the work is to be performed. If any provision hereof is deemed unenforceable, the remainder of the Agreement shall be enforced as though such provision were not a part hereof.

XI.     **Assignment.** Subcontractor shall not assign or subcontract this Agreement or any portion thereof or of any money due or which may become due hereunder without the prior written consent of Contractor. Notwithstanding anything to the contrary contained herein, Contractor may assign this Agreement without the consent of Subcontractor.

XII.    **Confidentiality of Agreement**. The Subcontractor agrees that all terms and conditions contained herein or in any other document(s) referencing the Project shall remain confidential. Said terms shall not be disclosed without the express written consent of the Contractor.
Minnesota Limited is required to protect all technical information supplied by the Owner. Subcontractor agrees that this Section is its written assurance that all such information, including but not limited to: drawings, diagrams, surveys, specifications, locations, and geophysical (GPS) coordinates of the work, will be kept confidential, protected, and will not be disclosed to third parties without obtaining Minnesota Limited's written consent unless information is ordered to do so by a court of law or arbitrator.. Breach of is provision will subject Subcontractor to all remedies awarded to Contractor and Owner including injunctive relief. Subcontractor agrees to pay all of Contractors and Owners attorney's fees in enforcing this provision.



XII.    **Notice**. Unless otherwise provided herein, any notice provided for herein will be in writing and delivered to the parties (a) in person, (b) by facsimile transmission (with the original and a copy of the facsimile confirmation following in the United States mail), (c) by overnight delivery service, or (d) by certified mail, return receipt requested. Notice will go to the address first shown herein for the respective party to whom notice is given or to such other address as may be designated by either party by written notice given pursuant hereto.

XIV.    **Governing Law/Venue/Attorney Fees**. This Agreement shall be construed and interpreted in accordance with the laws of the State of Minnesota, including, without limitation, matters of construction, validity, enforcement, and interpretation. The parties agree that venue for any dispute under this Agreement shall be in the District Court of Hennepin County, Minnesota. In the event any enforcement effort is initiated by Contractor against Subcontractor for default of this Agreement, ~~Subcontractor shall be liable to Contractor for any and all costs of collection, including but not limited to, reasonable attorneys' and professional fees, court costs, traveling and lodging expenses, costs of investigation and defense, accrued interest, and any other reasonable expenses incurred by Contractor in initiating such efforts.~~

Signed the day and year first written above.

CONTRACTOR: Minnesota Limited, LLC.

By: _____

Its: __Pvesident__
            Title

SUBCONTRACTOR: THE HDD COMPANY

By: _____

Its: __Vice President__
            Title



## EXHIBIT A
### Insurance

Prior to commencing Work, Subcontractor shall, at its sole expense, procure and maintain insurance of the types, and in the form and amounts described below from insurer(s) authorized to transact business in the state where Work or operations will be performed by Subcontractor. Such insurance and required coverage in forms acceptable to General Contractor shall be placed with admitted insurers that maintain an A.M. Best's rating of not less than A- VII, unless otherwise approved by the General Contractor. The insurance requirements described below shall be maintained uninterrupted for the duration of the Project, including any warranty periods, and shall protect Subcontractor, and others for whom and/or to whom Subcontractor may be liable, for liabilities in connection with work performed by or on behalf of Subcontractor, its agents, representatives, employees or subcontractors.

**Insurance Requirements:**

1     **Commercial General and Umbrella Liability Insurance.**  Subcontractor shall maintain commercial general liability ("CGL") and, if necessary, commercial umbrella insurance, with a limit of not less than $ 2,000,000.00      per occurrence, bodily injury or property damage liability; $  2,000,000.00      per offense, personal and advertising injury liability; $   5,000,000.00      products-completed operations aggregate; and $   5,000,000.00      general aggregate applicable to claims other than products-completed operations.  To the extent that Subcontractor's CGL and any commercial umbrella insurance are subject to aggregate limits, the policy shall be endorsed so as to apply such aggregate limits separately to the Project.

Coverage afforded under Subcontractor's CGL and any commercial umbrella insurance shall be provided on an occurrence basis and shall be subject to the terms of the *Insurance Services Office ("ISO") Commercial General Liability Coverage Form CG 0001*, or a substitute form providing coverage at least as broad as the ISO form specified. There shall be no limitations or exclusions of coverage beyond those contained in the standard coverage form and coverage shall include liability arising from premises, operations, independent contractors, products-completed operations including construction defect, contractual liability or personal injury and advertising injury.

General Contractor, its officers, directors and employees and Project Owner(s) shall be included as additional insureds under Subcontractor's CGL, and any commercial umbrella insurance, with respect to liabilities arising out of both the ongoing and completed operations of Subcontractor. Such additional insured coverage shall be subject to the terms of ISO additional insured endorsement forms CG 2010 (ongoing operations) and form CG 2037 (products-completed operations), or substitute form(s) providing equivalent coverage. The edition date of the ISO endorsements required should be chosen based on the recipient's risk transfer objectives. The table below summarizes the options and major differences between the edition dates.

| Endorsement(s) | ISO Edition Date | Comments |
|---|---|---|
| CG 2010 | 11/85 Edition | Broadest Insuring Agreement – "liability arising out of" the Subcontractor's work – both ongoing |



| | | operations and completed operations coverage provided by one endorsement. |
|---|---|---|
| CG 2010/CG2037 | 10/01 Edition | Same Insuring Agreement as 11/85 with ongoing operations and completed operations coverage provided by separate endorsements. |
| CG 2010/CG2037 | 07/04 Edition | More narrow Insuring Agreement – "caused in whole or in party by. . . .acts or omissions" of the Subcontractor. |
| CG2010/CG2037 | 04/13 Edition | Same Insuring Agreement as 07/04, but limits coverage to "extent permitted by law" and "not be broader than that which you are required by the contract or agreement to provide." |

Note: Recommended Additional Insured endorsement for states other than Minnesota may vary and Willis should be consulted. States including but not limited to IL, TX, & CA involve unique risk transfer considerations.

Additional insured coverage afforded by Subcontractors CGL and any commercial umbrella insurance, shall be primary and non-contributing with respect to any insurance or self-insurance available to General Contractor or Project Owner. Such primary and non-contributory insurance shall be subject to the terms of ISO form CG 2001 (Primary and Noncontributory - Other Insurance Condition) or its equivalent. Any other insurance or self-insurance maintained by General Contractor or Project owner shall be excess of, and non-contributory with, the coverage afforded by Subcontractors CGL and commercial umbrella insurance, if any.

In addition to procuring and maintaining CGL, and any commercial umbrella insurance, for the duration of the contract, Subcontractor agrees to continue to procure and maintain the products-completed operations liability insurance coverage for a minimum of __two__ ( 2 ) year(s) after the date that the Work is substantially complete. All terms and conditions of such coverage shall be maintained during this completed operations period, including the required coverage limits and the requirement to provide General Contractor and Project Owner with coverage as an additional insured for completed operations.

2.      **Commercial Automobile and Umbrella Liability Insurance.** Subcontractor shall maintain automobile liability and, if necessary, commercial umbrella insurance, with a limit of not less than $__2,000,000.00__ each accident. Such insurance shall cover liability for bodily injury and property damage arising from the use or operation of any auto, including those owned, hired or otherwise operated or used by or on behalf of Subcontractor. The coverage shall be subject to the terms of ISO *Business Auto Coverage Form CA 0001* (1990 edition or later), or a substitute form providing equivalent coverage.

3.      **Workers' Compensation and Employers Liability Insurance.** Subcontractor shall maintain workers' compensation coverage providing statutory benefits. Subcontractor shall additionally maintain employers liability insurance, and if necessary, commercial umbrella insurance, with a limit of not less than: $1,000,000, bodily injury by accident – each accident; $1,000,000, bodily injury by disease-policy limit; and $1,000,000, bodily injury by disease each employee. Workers' Compensation coverage must extend to every



employee; including owners/officers of a closely held corporation and/or individuals operating as a sole proprietorship or partnership. **Workers' Compensation must provide coverage in the state where the Project is located**.

Where applicable, evidence of coverage shall be required for U.S. Longshore and Harbor Workers Compensation, Maritime coverage, Federal Employer's Liability Act and other unique exposures requiring endorsement of coverage.

4.    **Contractors Pollution Liability Insurance**. Required only if Subcontractor's scope of services include the remediation, treatment, storage or disposal of waste or hazardous materials on or about the project site, as determined by General Contractor. If required, Subcontractor shall maintain Contractors Pollution Liability coverage with a limit of not less than $_____n/a_____ per occurrence, $_____n/a_____ annual aggregate. Coverage shall apply to the scope of work as described under the Contract including transportation and shall include coverage for bodily injury; property damage, including loss of use of damaged property or property that has not been physically injured; clean-up costs; mold; defense and investigative costs. Subcontractor shall maintain Completed Operations coverage for _____n/a_____ years following final acceptance of the project or termination of the Contract.

If the scope of services in the contract require the Subcontractor to provide professional services associated with arranging for, or brokering of, hazardous material or construction and demolition (C&D) wastes off the job site, Subcontractor must amend the Contractors Pollution Liability policy to include coverage to address this scope of work. If any of the aforementioned insurance policies are written on a claims made basis, the Contractor warrants that continuous coverage will be maintained, or an extended discovery period will be exercised, for a period of three years beginning from the time the work under this contract is completed.

5.    **Pollution (Environmental) Liability Insurance**. Required only if Subcontractor's scope of services involves disposal of waste or hazardous materials off-site, as determined by General Contractor. If required, Subcontractor shall maintain pollution (environmental) liability coverage with a limit of not less than: $_____n/a_____ per incident, $_____n/a_____ policy aggregate for hazardous waste disposal services, and $_____n/a_____ per incident, $_____n/a_____ for all other disposal facilities. Such coverage shall include clean-up costs, defense costs and products and completed operations.

If the scope of services in the contract requires the disposal of any hazardous materials or construction and demolition (C&D) wastes off the job site, Subcontractor must also obtain evidence that the Disposal Site Operator maintains Pollution Legal Liability Insurance with coverage for; a. bodily injury, sickness, disease, mental anguish or shock sustained by any person, including death; b. property damage including physical injury to or destruction of tangible property including the resulting loss of use thereof, clean-up costs, and the loss of use of tangible property that has not been physically injured or destroyed; c. defense including costs, charges and expenses incurred in the investigation, adjustment or defense of claims for such compensatory damages. d. pollution conditions on, at, under or emanating from any disposal site, location or facility, used by or on behalf of the disposal facility of any waste or waste materials relating to the performance of the work.



The Disposal Site Operator's Pollution Liability Policy will apply to losses arising from the facility that is accepting the waste under the contract. Minimum limits of Insurance for this policy shall be $_____ n/a _____ each incident / $_____ n/a _____ policy aggregate.

Claims-made coverage is permitted, provided the policy retroactive date is continuously maintained prior to the commencement date of the agreement, and coverage is continuously maintained during all periods in which Subcontractor accepts or treats waste generated from General Contractor's projects and for a period of *one (1) year* thereafter.

6.      **Professional Liability Insurance**.   Required only if Subcontractor's scope of services include architectural, engineering, professional consulting or construction management, as determined by General Contractor. If required, Subcontractor shall maintain professional liability coverage with a limit of not less than $_____ n/a _____ each wrongful act, $_____ n/a _____ policy aggregate.

Coverage shall include liability arising from the errors, omissions or acts of the Subcontractor or any entity for which the Subcontractor is legally responsible in the providing of professional services under the Contract. Throughout the term the Contract, the PL/E&O policy shall include full prior acts coverage. Coverage shall be continuously maintained during the term of this Agreement and for a period of x years following final acceptance of the Project or termination of the Contract.

Coverage shall not include any exclusion or other limitations related to:
- Scope of the professional services
- Delays in project completion and cost overruns
- Who is authorized to notify the carrier of a claim or potential claim
- Mold, fungus, asbestos, pollutants or other hazardous substances

Claims-made coverage is permitted, provided the policy retroactive date is continuously maintained prior to the commencement date of this agreement, and coverage is continuously maintained during all periods in which Subcontractor performs professional services for General Contractor, and for an additional period of *one (1)* year after termination of this agreement or the last date such services are performed, whichever comes later. If Subcontractor's scope of work includes environmental engineering or consulting, the terms of coverage shall not exclude environmental professional services.

7.      **Watercraft Liability Insurance**.   If watercraft of any kind is used by the CONTRACTOR or Subcontractor, including: (i) bodily injury; (ii) property damage; and (iii) passenger liability.

         a.      Limit of Liability: Combined Single Limit (Bodily Injury and Property Damage), $1,000,000 each occurrence;

         b.      Protection and Indemnity Insurance to include Jones Act crew coverage (or at least Maritime Employer's Liability: MEL), collision, tower's liability and wreck removal coverage, on a form providing



coverage no less extensive than that afforded in the P & I SP-23 form (revised 1/56), including a pollution buy-back endorsement.

8.      **Aircraft Liability Insurance**.  If aircraft of any kind is used by the CONTRACTOR or Subcontractor, including: (i) bodily injury; (ii) property damage; and (iii) passenger liability.

   a.   Limit of Liability:  Combined Single Limit (Bodily Injury and Property Damage and Passenger Liability), including hull physical damage insurance for the full replacement cost of each aircraft used   in the work.  Such Aircraft Liability and Hull Coverage shall include a waiver of subrogation against General Contractor and all others required by this Agreement to be additional insureds. $___n/a___ per seat; $___n/a___ per occurrence

### Additional Provisions:

1.      **Deductibles and Self-Insured Retentions**.  The funding of deductibles and self-insured retentions maintained by Subcontractor shall be the sole responsibility of Subcontractor, including any amounts applicable to deductibles or self-insured retentions applicable to claims involving the General Contractor or Owner as an additional insured. Any self-insured retentions in excess of $___n/a___ must be declared to and approved by the General Contractor.

2.      **Primary / Non-Contributing**.  Subcontractor's required insurance coverage shall be primary insurance, and any insurance or self-insurance maintained by the General Contractor or Project Owner shall be excess of and noncontributory with Subcontractor's insurance.

3.      **Severability of Interest**.  Except with respect to the limits of insurance, Subcontractor's required insurance shall apply separately to each insured or additional insured.

4.      **Waiver of Subrogation**.  Subcontractor agrees to waive all rights of subrogation against the General Contractor, Project Owner and Project Architect, and shall cause each of its subcontractors to waive all rights of subrogation against the General Contractor, Project Owner and Project Architect, their agents and employees, as respects loss, damage, claims, suits or demands, howsoever caused:

   a.   To real or personal property, vehicles, equipment, tools, etc. owned, leased or used by Subcontractor or Subcontractor's employees, agents or sub-subcontractors; and
   b.   To the extent such loss, damage, claims, suits or demands are, or should be, afforded coverage by the Subcontractor's required insurance or any other insurance (except professional liability to which this requirement does not apply) maintained by the Subcontractor. This waiver shall C1PPIY to all first party property, equipment, vehicle and workers' compensation claims (unless prohibited under applicable state statutes), and all third party liability claims. This waiver shall apply to all deductibles, retentions or self-insured layers applicable to the required or any other insurance (except professional liability to which this requirement does not apply) maintained by the Subcontractor.  If necessary, Subcontractor agrees to endorse the required insurance policies to permit waivers of subrogation in



favor of General Contractor, Project Owner and Project Architect as required hereunder. Subcontractor further agrees to hold harmless and indemnify General Contractor, Project Owner and Project Architect for any loss or expense incurred as a result of Subcontractor's failure to obtain such waivers of subrogation from the insurers.

5.     **Notice of Cancellation / Material Change / Nonrenewal**. Subcontractor's insurance policies must contain a provision or endorsement that the coverage afforded will not be canceled, materially changed or renewal refused until at least 30 days prior Written Notice has been given to General Contractor and to each other additional insured to whom a certificate of insurance has been issued; provided, however, that a ten (10) day prior notice requirement may apply in the event of cancellation due to nonpayment of premium.

6.     **Verification of Coverage**. Prior to commencing Work, Subcontractor shall furnish General Contractor with certificate(s) of insurance executed by a duly authorized representative of each insurer, as evidence of compliance with the insurance requirements set forth above. Such certificates of insurance shall be accompanied by copies of endorsements evidencing coverage afforded to General Contractor and Project Owner as additional insured, and endorsements reflecting insurer's concurrence with Subcontractor's waiver of subrogation rights against General Contractor, Project Owner and Project Architect. Renewal certificates are to be provided to the General Contractor prior to the expiration of the required insurance policies.
Certified copies of policies, including all policy endorsements, shall be furnished by Subcontractor within 15 days of written request by General Contractor.

The certificate(s) of insurance shall be subject to approval of General Contractor, but failure of General Contractor to request such certificate or other evidence of Subcontractor compliance with insurance requirements, or failure of General Contractor to identify deficiencies from evidence that is provided, shall in no way limit or relieve Subcontractor of its obligations to maintain such insurance.

7.     **Sub-Subcontractors**. No work shall be sublet to any Sub-subcontractor without first obtaining the General Contractor's written permission. All Sub-subcontractors, once approved by the General Contractor, are subject to the same insurance requirements as Subcontractor. Subcontractor shall cause each Sub-subcontractor employed by Subcontractor to purchase and maintain such insurance. Upon request, Subcontractor shall furnish General Contractor with copies of certificates of insurance evidencing coverage for each Sub-subcontractor.

Subcontractor shall voluntarily provide workers compensation coverage for proprietors, partners or others not statutorily required to maintain workers' compensation insurance.

8.     **Leased Employees**. Use of leased employees by Subcontractor is expressly prohibited without General Contractor's written permission. If permitted by General Contractor, Subcontractor shall:

        a.     Provide General Contractor with a complete copy of its Agreement with the Leasing Company;



b.        Require that Leasing Company provide workers' compensation, employers liability and commercial general liability with coverage limits in amounts no less than Subcontractor insurance requirements for the same coverages.

c.        Require that Leasing Company provide Alternate Employer Endorsement naming General Contractor as alternate employer on Leasing Company's workers' compensation policy.

d.        Require that Leasing Company add General Contractor as an additional insured on its commercial general liability insurance policy, with primary/non-contributory wording.

e.        Require that Leasing Company provide waiver of subrogation in favor of General Contractor on both Leasing Company's workers' compensation and commercial general liability insurance policies.

f.        Provide General Contractor with a copy of the Leasing Company's certificate of insurance, with endorsements, evidencing the required coverage.

9.        **No Representation of Coverage Adequacy.**   In specifying minimum Subcontractor insurance requirements, General Contractor does not represent that such insurance is adequate to protect Subcontractor for loss, damage or liability arising from its work.  Subcontractor is solely responsible to inform itself of types or amounts of insurance it may need beyond these requirements to protect itself.

The insurance requirements set forth in minimum amounts shall not be construed to relieve Subcontractor for liability in excess of such coverage, nor shall it preclude General Contractor from taking such other actions as is available to it under any other provision of the Subcontract.  To the extent Subcontractor maintains insurance greater than these minimum requirements, Subcontractor agrees that such insurance shall be applicable to any of Subcontractor's liability obligations hereunder.

Any acceptance of certificates of insurance by General Contractor shall in no way limit or relieve Subcontractor of its duties and responsibilities under this Subcontract, including the duty to indemnify and hold harmless General Contractor.

10.        **Compliance.**   Failure of Subcontractor to maintain the required insurance shall constitute a default under this Subcontract and, at General Contractor's option, shall allow General Contractor to terminate this Subcontract for cause, withhold payment and/or purchase the required insurance at Subcontractor's expense.

11.        **Cross-Liability Coverage/Non-Standard Restrictive Endorsements.**   All liability policies shall include cross liability coverage and a standard ISO separation of insureds provision, or its equivalent.  No liability policy shall include or be endorsed to include any non-standard provisions restricting coverage for the named insured or the persons/entities required to be named as additional insureds under this Agreement, including but not limited to cross liability coverage exclusions or limitations.



January 9, 2020

**Minnesota Limited**
18640 200th St, PO Box 410
Big Lake, MN 55309

ATTN: Amy Skuza

RE:  Southern Star Lines DT and DS Replacement Project
Directionally drill and install approximately 6,052 feet of 36-inch steel pipeline in
Anderson and Franklin Counties, KS.

The HDD Company is pleased to submit the following bid quote:

1.  **Responsibilities of The HDD Company**
    1.1.  Provide all required insurance certificates.
    1.2.  Provide any written submittals and qualifications required.
    1.3.  Provide 2 (two) drill rig(s) with sufficient capabilities to install the crossings, a
          closed-loop mud system, mud pumps, vacuum trucks, dump trucks, steering
          system, and all drill spread support equipment necessary.
    1.4.  Provide all required union labor for the drilling operations.
    1.5.  Provide preliminary drill profiles for each crossing.
    1.6.  Provide final as-built drawings.
    1.7.  Provide and haul water for drilling operations.
    1.8.  Provide water storage for the duration of drilling operations.
    1.9.  Provide all required pulling heads.
    1.10. Leave the entry areas clean, free of debris, and to a rough grade.
    1.11. Provide bonding at 1%, which is not included in the bid pricing below.

2.  **Responsibilities of THE CONTRACTOR**
    2.1.  Stake and survey the entry and exit points for each bore, with correct stations
          and elevations.
    2.2.  Provide all permitting to undertake the project.
    2.3.  Provide and maintain suitable truck access to and from entry and exit locations.
    2.4.  Provide stable, level, matted and/or graveled work pads for each bore.
    2.5.  Provide all BMPs around each bore's entry and exit locations. The HDD
          Company will maintain these items.
    2.6.  Provide, string, weld, and test all 36-inch pipe for each bore.

Going to Greater Lengths™

2.7. Provide all plans, equipment, and manpower to handle pipe during pullback operations.
2.8. Perform all final tie-ins.
2.9. Provide all settlement monitoring, if required.
2.10. Provide all final site restorations.
2.11. Provide all field surveys to document existing conditions for the HDD installations, including but not limited to pictures, videos, field notes, etc.

## 3. Pricing (Lump Sum)

| | | |
|---|---|---|
| 3.1. | HDD Cedar Creek 2,106' X 36" pipe: | $1,280,448.00 |
| 3.2. | HDD Pottawapomie Creek 1,788' X 36" pipe: | $1,087,104.00 |
| 3.3. | HDD Flint Hill 2,158' X 36" pipe: | $1,312,064.00 |
| 3.4. | Mobilization per rig spread: | $50,000.00 |

## 4. Clarifications

4.1. Additional footage due to no fault of The HDD Company, will be billed at $608.00/LF.
4.2. This proposal is based upon the drawings, specifications, and geotechnical information provided to us on or before **7 June 2019.**
4.3. If any revised or additional drawings, specifications, geotechnical information, or permits are provided to us after the bid submission date, The HDD Company reserves the right to modify the proposal to account for any added costs and/or additional time associated with the change(s).
4.4. The HDD Company's bid proposal is conditional upon reaching an agreement upon mutually acceptable contract terms. This bid proposal will be attached to and forms a part of the contract between The HDD Company and THE CONTRACTOR.
4.5. Item 3.3 above includes the hauling and disposal of all non-contaminated drilled solids and excess drilling fluids.
4.6. The pricing above is contingent upon a site visit.

## 5. Exclusions

5.1. The HDD Company and its personnel are not the Project Engineers. Therefore, we exclude all design and engineering services unless any are specifically noted as included in this proposal. Any drilling plans or profiles that we submit to you will be based upon the design information in the contract documents and our experience as HDD contractors. Any plans or profiles we provide are recommendations only and are subject to review and approval by the project owner and/or its engineers.
5.2. All permits, including federal, State and local environmental permits, the SWPPP permit and any associated SWPPP plans, any right-of-way (ROW) agreement or easements, and all access necessary for us to perform our work shall be provided by others. If our operations are delayed or otherwise impacted by any delays or problems with permits, SWPPP plans, ROW agreements, easements or access arrangements our compensation and time for completion will be equitably adjusted.

6.  **Terms and Conditions**
    6.1   Schedule
          6.1.1.   This proposal is based upon performance under a reasonable and mutually agreed-to project schedule in so far as that schedule applies to our work. The approved project baseline schedule and all monthly updates must be provided to us on a regular and timely basis to keep us apprised of schedule changes which may impact the timing and efficiency of our work. We will not be liable for any delays caused by others or by factors beyond our reasonable control.

    6.2.  Indemnification
          6.2.1.   We will indemnify you and/or the project owner for personal injury or property damage claims to the extent of our own negligence. Our proposal excludes any obligation to indemnify you for your own negligence or to indemnify any other party for that party's own negligence or to indemnify any design professional.

    6.3.  Payment
          6.3.1.   Monthly progress payments will be made to The HDD Company within (7) seven days after you receive each monthly payment from the project owner, but in no event later than 120 days from the date you received your invoice.
          6.3.2.   We will receive our final payment within 30 days after you receive our final billing and our work has been completed and accepted. Acceptance will not be unreasonably withheld or delayed. If you dispute any portion of any billing, you will promptly notify us in writing of the nature of the dispute and you will pay the undisputed portion of the billing without delay. If any undisputed amounts are past due for more than 10 days, we reserve the right to stop work until all payments are brought current. We will provide lien releases in accordance with applicable state statutes or regulations. We will keep the project free of liens from out subcontractors, suppliers and other vendors provided we have been paid by you for the work covered by any such liens.

    6.4.  Extra/Force Account Work:
          6.4.1.   If we are directed to perform any work on a force account or time and material basis, the rates for our labor and equipment will be as stated in our proposal, or if no rates are included with this proposal, as stated in our then current standard labor and equipment rate schedule. If we are directed to standby or suspend work while other operations occur, or delays or other problems are resolved, or if we are required to standby due to events or circumstances beyond our control, the standby time for our labor and equipment will be paid as stated in this proposal.

    6.5.  Differing Site Conditions

      6.5.1.    If the conditions we encounter in the performance of our work differ materially from those indicated in the contract documents, boring logs, geotechnical reports or other information furnished to us prior to bid, or from those ordinarily encountered and generally recognized as inherent in the type of work provided for in our proposal, then our compensation and time for completion will be equitably adjusted to account for any resulting delay and added costs.

7.     **Delays and Work Stoppages:**

    7.1.    All work stoppages that arise through no fault of The HDD Company will be billed at **$14,500** (no crew on site).

The HDD Company appreciates the opportunity to furnish you this quote and looks forward to working with you. Should any of the information presented above need further clarification, please do not hesitate to contact us.

Sincerely,
**The HDD Company**

Jeremy King
Vice President

Going to Greater Lengths™



EL DORADO HILLS | OFFICE Suite 310,
4320 Serrano Parkway, El Dorado Hills, CA USA 95762

MAIN 530 676 5705 | CROSSINGGROUP.COM

17 January 2020

**Minnesota Limited**
18640 200th St, PO Box 410
Big Lake, MN 55309

ATTN: Brad Cordes

RE:   Southern Star Lines DT and DS Replacement Project
      Directionally drill and install approximately 4540 feet of 36-inch steel pipeline road
      crossings in Anderson and Franklin Counties, KS.

The HDD Company is pleased to submit the following bid quote:

1.  **Responsibilities of The HDD Company**
    1.1.   Provide all required insurance certificates.
    1.2.   Provide any written submittals and qualifications required.
    1.3.   Provide drill rig(s) with sufficient capabilities to install the crossings, a closed-
           loop mud system, mud pumps, vacuum trucks, dump trucks, steering system,
           and all drill spread support equipment necessary.
    1.4.   Provide all required union labor for the drilling operations.
    1.5.   Provide final as-built drawings.
    1.6.   Provide and haul water for drilling operations.
    1.7.   Provide water storage for the duration of drilling operations.
    1.8.   Provide all required pulling heads.
    1.9.   Leave the entry areas clean, free of debris, and to a rough grade.
    1.10.  Provide bonding at 1%, which is not included in the bid pricing below.

2.  **Responsibilities of THE CONTRACTOR**
    2.1.   Stake and survey the entry and exit points for each bore, with correct stations
           and elevations.
    2.2.   Provide all permitting to undertake the project.
    2.3.   Provide and maintain suitable truck access to and from entry and exit locations.
    2.4.   Provide stable, level, matted and/or graveled work pads for each bore.
    2.5.   Provide bore pits and shore if needed.
    2.6.   Provide all BMPs around each bore's entry and exit locations. The HDD
           Company will maintain these items.
    2.7.   Provide, string, weld, and test all 36-inch pipe for each bore.
    2.8.   Furnish support crew for road crossings, including excavators and manpower.

Going to Greater Lengths™

2.9. Provide all plans, equipment, and manpower to handle pipe during pullback operations.

2.10. Perform all final tie-ins.

2.11. Dispose of cuttings.

2.12. Provide all settlement monitoring, if required.

2.13. Provide all final site restorations.

2.14. Provide all field surveys to document existing conditions for the HDD installations, including but not limited to pictures, videos, field notes, etc.

3. **Pricing**

| | | |
|---|---|---|
| 3.1. | 4540' X 36" pipe: | $508.00/ft |
| 3.2. | Mobilization per rig spread: | $50,000.00 |

4. **Clarifications**

4.1. This proposal is based upon the drawings, specifications, and geotechnical information provided to us on or before **17 January 2020.**

4.2. If any revised or additional drawings, specifications, geotechnical information, or permits are provided to us after the bid submission date, The HDD Company reserves the right to modify the proposal to account for any added costs and/or additional time associated with the change(s).

4.3. The HDD Company's bid proposal is conditional upon reaching an agreement upon mutually acceptable contract terms. This bid proposal will be attached to and forms a part of the contract between The HDD Company and THE CONTRACTOR.

4.4. The pricing above is contingent upon a site visit.

5. **Exclusions**

5.1. The HDD Company and its personnel are not engineers. Therefore, we exclude all design and engineering services unless any are specifically noted as included in this proposal. Any drilling plans or profiles that we submit to you will be based upon the design information in the contract documents and our experience as HDD contractors. Any plans or profiles we provide are recommendations only and are subject to review and approval by the project owner and/or its engineers.

5.2. All permits, including federal, State and local environmental permits, the SWPPP permit and any associated SWPPP plans, any right-of-way (ROW) agreement or easements, and all access necessary for us to perform our work shall be provided by others. If our operations are delayed or otherwise impacted by any delays or problems with permits, SWPPP plans, ROW agreements, easements or access arrangements our compensation and time for completion will be equitably adjusted.

6. **Terms and Conditions**

6.1. Schedule

6.1.1. This proposal is based upon performance under a reasonable and mutually agreed-to project schedule in so far as that schedule applies to our work. The approved project baseline schedule and all monthly updates must be provided to us on a regular and timely basis to keep

*Going to Greater Lengths*"

us apprised of schedule changes which may impact the timing and efficiency of our work. We will not be liable for any delays caused by others or by factors beyond our reasonable control.

6.2. Indemnification

    6.2.1. We will indemnify you and/or the project owner for personal injury or property damage claims to the extent of our own negligence. Our proposal excludes any obligation to indemnify you for your own negligence or to indemnify any other party for that party's own negligence or to indemnify any design professional.

6.3. Payment

    6.3.1. Monthly progress payments will be made to The HDD Company within (7) seven days after you receive each monthly payment from the project owner, but in no event later than 120 days from the date you received your invoice.

    6.3.2. We will receive our final payment within 30 days after you receive our final billing and our work has been completed and accepted. Acceptance will not be unreasonably withheld or delayed. If you dispute any portion of any billing, you will promptly notify us in writing of the nature of the dispute and you will pay the undisputed portion of the billing without delay. If any undisputed amounts are past due for more than 10 days, we reserve the right to stop work until all payments are brought current. We will provide lien releases in accordance with applicable state statutes or regulations. We will keep the project free of liens from out subcontractors, suppliers and other vendors provided we have been paid by you for the work covered by any such liens.

6.4. Extra/Force Account Work:

    6.4.1. If we are directed to perform any work on a force account or time and material basis, the rates for our labor and equipment will be as stated in our proposal, or if no rates are included with this proposal, as stated in our then current standard labor and equipment rate schedule. If we are directed to standby or suspend work while other operations occur, or delays or other problems are resolved, or if we are required to standby due to events or circumstances beyond our control, the standby time for our labor and equipment will be paid as stated in this proposal.

6.5. Differing Site Conditions

    6.5.1. If the conditions we encounter in the performance of our work differ materially from those indicated in the contract documents, boring logs, geotechnical reports or other information furnished to us prior to bid, or from those ordinarily encountered and generally recognized as inherent in the type of work provided for in our proposal, then our compensation and time for completion will be equitably adjusted to account for any resulting delay and added costs.

Going to Greater Lengths"

7.  **Delays and Work Stoppages:**

    7.1.  All work stoppages that arise through no fault of The HDD Company will be billed at **$14,500** (no crew on site).

The HDD Company appreciates the opportunity to furnish you this quote and looks forward to working with you. Should any of the information presented above need further clarification, please do not hesitate to contact us.

Sincerely,
**The HDD Company**


Jeremy King

# EXHIBIT B

| PROJECT NAME: | |
|---|---|
| PROJECT NO.: | Southern Star Line DT & DS Replacement |

THE HDD COMPANY
Horizontal Directional Drilling



| | | | |
|---|---|---|---|
| CLIENT/OWNER: | Minnesota Limited - Southern Star | DATE: | |
| WORK PRFM'D. BY: | The HDD Company, Inc. | EXTRA WRK. SHT. NO. | Cedar Creek |
| DESCPTN. OF WORK: | Access and weather delays | | |
| 0 | | | |
| 0 | | | |
| 0 | | | |

## A – EQUIPMENT

| EQUIP. NO. | Company Owned Equipment | HRS. | RATE/HR. | TOTAL/DAY |
|---|---|---|---|---|
| 1 | Drilling Rig HDD Rig 3 | 30.00 | $205.56 | $6,166.80 |
| 1 | Mud Tank / Solids Control Unit | 30.00 | $111.96 | $3,358.80 |
| 1 | Sump Pit/Trash Pump | 30.00 | $8.29 | $248.70 |
| 1 | Mud Pumping Units | 30.00 | $60.94 | $1,828.20 |
| 2 | Tool Van and tools | 30.00 | $17.55 | $1,053.00 |
| 0 | Dump Truck A-17  TRUN 2AXL | | | |
| 2 | Vac. Truck A-17 TRUN 2AXL | 30.00 | $45.75 | $2,745.00 |
| 7 | Misc. Trailers | 30.00 | $1.79 | $375.90 |
| 0 | Haul Trucks | 30.00 | $34.13 | |
| 1 | 6 3/4" Non Mag Drill Collars w/Jet Assembly | 30.00 | $6.83 | $204.90 |
| 168 | Drill Pipe (5-1/2 FH) | 30.00 | $0.53 | $2,671.20 |
| 2 | Misc. X-Subs and Rack (All X Subs for Spread) | 30.00 | $5.20 | $312.00 |
| 0 | Sonde and Housing | | | |
| 0 | Steering Tool (North Referencing w/Tru-Gyde) | | | |
| 48 | Rollers | 30.00 | $1.50 | $2,160.00 |
| 2 | Ford F-250 T&TT 06-12 | 30.00 | $5.04 | $302.40 |
| 0 | Ford F-450 T&TT 20-28 | | | |
| 0 | Ford F-350 T&TT 20-28 | | | |
| 0 | KW & Crane Truck | | | |
| 0 | Hammer | 30.00 | $41.93 | |
| 1 | 300 Amp Welder | 30.00 | $9.49 | $284.70 |
| 1 | 1/2 Ton Truck | 30.00 | $32.48 | $974.40 |
| 1 | 60" Casing | 30.00 | $3.25 | $97.50 |
| 0 | Mud Bins | | | |

### Rental Equipment

| EQUIP. NO. | Rental Equipment | | HRS. | RATE/HR. | TOTAL/DAY |
|---|---|---|---|---|---|
| 1 | 10K Reach Forklift | S.T. | 30.00 | $51.29 | $1,538.70 |
| 2 | 225 Excavator | S.T. | 30.00 | $91.59 | $5,495.40 |
| | | O.T. | | | |
| 2 | Portable toilets | S.T. | 30.00 | $1.50 | $90.00 |
| | | O.T. | | | |
| 0 | Multiquip 20kW Generator | S.T. | | | |
| | | O.T. | | | |
| 1 | Frac Tank | S.T. | 30.00 | $7.32 | $219.60 |
| | | O.T. | | | |
| 1 | Trash Bin | S.T. | 30.00 | $4.97 | $149.10 |
| | | O.T. | | | |
| 1 | 500 Amp Welder | S.T. | 30.00 | $9.49 | $284.70 |
| | | O.T. | | | |
| 2 | Light Tower | S.T. | 30.00 | $7.61 | $456.60 |
| | | O.T. | | | |
| 1 | 175 KW Generator | S.T. | 30.00 | $71.36 | $2,140.80 |
| | | O.T. | | | |
| 1 | 6" Diesel Trash Pump | S.T. | 30.00 | $23.60 | $708.00 |
| | | O.T. | | | |
| 1 | HTI Mud Motor | S.T. | 30.00 | $42.50 | $1,275.00 |
| | | O.T. | | | |

| | | |
|---|---|---|
| COMPANY OWNED EQUIPMENT | 22,783.50 | |
| RENTAL EQUIPMENT W/ 15% Markup | 14,211.59 | |
| A- EQUIPMENT SUB -TOTAL COST | $36,995.09 | |
| 0.00 % Sales Tx. Rental Equip. | | |

## B - MATERIALS

| MATERIALS DESCRIPTION | QTY. USED | UNIT $ | TOTAL |
|---|---|---|---|
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| | B-MATERIALS SUB-TOTAL COST | | $ - |
| | 0.00 % Sales Tax | | |
| | 15 % ADDED M, U, B | | $ - |
| | SUB-TOTAL A + B w/Tax | | $36,995.09 |

## C – SUBCONTRACT / WORK DONE BY SPECIALISTS/THIRD PARTY SERVICES

| Work Description | Individual / Company | Unit | RATE | TOTAL $ |
|---|---|---|---|---|
| | | | | $ - |
| | | | | $ - |
| | | | | $ - |
| | | COST OF SUBS - C | | $ - |
| | | 15 % MARK-UP (Subcontractor) | | $ - |
| | | | $ | $ - |
| TOTAL COST A + B + C (Including Mark-Up) | | | | $ 36,995.09 |

## D - LABOR

| NO. | D - LABOR | HRS. | BASE RATE w/FRING'S. | SUB TOTAL | Per Diem Totals | TOTAL |
|---|---|---|---|---|---|---|
| 1 | Ben Bethany (Day Rate) | REG. 3.00 | $1,016.84 | $3,050.52 | $120.00 | $3,170.52 |
| | | O.T. 0 | | $0.00 | | |
| | | D.T. | | $0.00 | | |
| 2 | James Ravenscraft | REG. 30.00 | $44.66 | $1,339.80 | $300.00 | $1,639.80 |
| | | O.T. | | $0.00 | | |
| | | D.T. | | $0.00 | | |
| 3 | Jeremy Acres | REG. 30.00 | $46.20 | $1,386.00 | $315.00 | $1,701.00 |
| | | O.T. | | $0.00 | | |
| | | D.T. | | $0.00 | | |
| 4 | Mark Horton | REG. 30.00 | $59.79 | $1,793.70 | $345.00 | $2,138.70 |
| | | O.T. | | $0.00 | | |
| | | D.T. | | $0.00 | | |
| 5 | Steven Davis | REG. 30.00 | $59.79 | $1,793.70 | $315.00 | $2,108.70 |
| | | O.T. | | $0.00 | | |
| | | D.T. | | $0.00 | | |
| 6 | Roger Reeter | REG. 30.00 | $59.79 | $1,793.70 | $315.00 | $2,108.70 |
| | | O.T. | | $0.00 | | |
| | | D.T. | | $0.00 | | |
| 7 | Bruce Cooper | REG. 30.00 | $44.53 | $1,335.90 | $315.00 | $1,650.90 |
| | | O.T. | | $0.00 | | |
| | | D.T. | | $0.00 | | |
| 8 | | REG. 0.00 | | $0.00 | | $0.00 |
| | | O.T. | | $0.00 | | |
| | | D.T. | | $0.00 | | |
| 9 | | REG. 0.00 | | $0.00 | | $0.00 |
| | | O.T. | | $0.00 | | |
| | | D.T. | | $0.00 | | |
| 10 | | REG. 0.00 | | $0.00 | | $0.00 |
| | | O.T. | | $0.00 | | |
| | | D.T. | | $0.00 | | |
| 11 | | REG. 0.00 | | $0.00 | | $0.00 |
| | | O.T. | | $0.00 | | |
| | | D.T. | | $0.00 | | |
| 12 | | REG. 0.00 | | $0.00 | | $0.00 |
| | | O.T. | | $0.00 | | |
| | | D.T. | | $0.00 | | |
| 13 | | REG. 0.00 | | $0.00 | | $0.00 |
| | | O.T. | | $0.00 | | |
| | | D.T. | | $0.00 | | |

| | | |
|---|---|---|
| | D - LABOR SUB-TOTAL | $ 14,518.32 |
| 15 % Labor Surcharge | | $ 2,177.75 |
| SUBTOTAL | | 16,696.07 |
| 15 % MARKUP ON LABOR | | $ 2,504.41 |

## E - MISCELLANEOUS ITEMS

| MIBC, DESCRIPTIONS | QTY. | Unit $ | EX. AMOUNT |
|---|---|---|---|
| Hotel | | | |
| | 6 | $ 58.00 | $ 348.00 |
| | 9 | $ 68.00 | $ 612.00 |
| Subsistance | 0 | | $ - |
| Misc. Items | | | |
| 0 | | 0 | $ - |
| 0 | | 0 | $ - |
| 0 | | 0 | $ - |
| 0 | | 0 | $ - |
| 0 | | 0 | $ - |
| E- MISCELLANEOUS ITEMS SUB TOTAL | | | $ 960.00 |
| 5 % Sales/City/Room Tax | | | 48.00 |
| 15 % ADDED MARK-UP | | | 144.00 |
| 0 % Tax on Misc. Items | | | 0 |
| SUB TOTAL - E | | | $ 1,152.00 |

## TOTALS

| | | |
|---|---|---|
| TOTAL COST  A+B+C (Equipment /Material /Sub-Contractors) | | $ 36,995.09 |
| TOTAL COST + D  (Labor) | | $ 19,200.48 |
| TOTAL COST + E  (Miscellaneous Items) | | $ 1,152.00 |
| SUB-TOTAL | | $ 57,347.56 |
| 2.5 % BOND & INSURANCE | | $ 1,433.69 |
| **TOTAL COST THIS SHEET** | | **$ 58,781.25** |

| TIME | CLIENT DIRECTIVES AND COMMENTS |
|---|---|
| 0:00 | (See Daily Work Report) |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |

# EXHIBIT C



Horizontal Directional Drilling

**EXTRA WORK SHEET REPORT**
**INTERNAL - OFFICE**

| PROJECT NAME: | |
|---|---|
| PROJECT NO.: | Southern Star Line DT & DS Replacement |

| CLIENT/OWNER: | Minnesota Limited - Southern Star | DATE: | |
|---|---|---|---|
| WORK PRFM'D. BY: | The HDD Company, Inc. | EXTRA WRK. SHT. NO. | Cedar Creek HDD |
| DESCPTN. OF WORK: | Access and weather delays | | |

0
0
0

## A – EQUIPMENT

| EQUIP. NO. | Company Owned Equipment | HRS. | RATE/HR. | TOTAL/DAY |
|---|---|---|---|---|
| 1 | Drilling Rig HDD Rig 7 - Vermeer 750 | 32,50 | $ 205,56 | $ 6,680,70 |
| 1 | Mud Tank / Solids Control Unit | 32,50 | $ 111,96 | $ 3,638,70 |
| 1 | Sump Pit/Trash Pump | 32,50 | $ 8,29 | $ 269,43 |
| 1 | Mud Pumping Units | 32,50 | $ 60,94 | $ 1,980,55 |
| 2 | Tool Van and tools | 32,50 | $ 17,55 | $ 1,140,75 |
| 0 | Dump Truck A=17  TRUN 2AXL | | | |
| 3 | Vac. Truck A=17 TRUN 2AXL | 32,50 | $ 45,75 | $ 4,460,63 |
| 10 | Misc. Trailers | 32,50 | $ 1,79 | $ 581,75 |
| 1 | Haul Trucks | 32,50 | $ 34,13 | $ 1,109,23 |
| 1 | 6 3/4" Non Mag Drill Collars w/Jet Assembly | 32,50 | $ 6,83 | $ 221,98 |
| 168 | Drill Pipe (5-1/2 FH) | 32,50 | $ 0,53 | $ 2,893,80 |
| 2 | Misc. X-Subs and Rack (All X Subs for Spread) | 32,50 | $ 5,20 | $ 338,00 |
| 0 | Sonde and Housing | | | |
| 0 | Steering Tool (North Referencing w/Tru-Gyde) | | | |
| 48 | Rollers | 32,50 | $ 1,50 | $ 2,340,00 |
| 3 | Ford F-250 T&TT 06-12 | 32,50 | $ 5,04 | $ 491,40 |
| 0 | Ford F-450 T&TT 20-28 | | | |
| 0 | Ford F-350 T&TT 20-28 | | | |
| 0 | KW & Crane Truck | | | |
| 1 | Hammer | 32,50 | $ 41,93 | $ 1,362,73 |
| 1 | 300 Amp Welder | 32,50 | $ 9,49 | $ 308,43 |
| 1 | 1/2 Ton Truck | 32,50 | $ 32,48 | $ 1,055,60 |
| 1 | 60" Casing | 32,50 | $ 3,25 | $ 105,63 |
| 0 | Mud Bins | | | |

| | Rental Equipment | | | |
|---|---|---|---|---|
| 1 | 10K Reach Forklift | S.T. 32,50 / O.T. | $ 51,29 | $ 1,666,93 / $ - |
| 2 | 225 Excavator | S.T. 32,50 / O.T. | $ 91,59 | $ 5,953,35 / $ - |
| 2 | Portable toilets | S.T. 32,50 / O.T. | $ 1,50 | $ 97,50 / $ - |
| 0 | Multiquip 20kW Generator | S.T. / O.T. | | $ - / $ - |
| 3 | Frac Tank | S.T. 32,50 / O.T. | $ 7,32 | $ 713,70 / $ - |
| 1 | Trash Bin | S.T. 32,50 / O.T. | $ 4,97 | $ 161,53 / $ - |
| 1 | 500 Amp Welder | S.T. 32,50 / O.T. | $ 9,49 | $ 308,43 / $ - |
| 2 | Light Tower | S.T. 32,50 / O.T. | $ 7,61 | $ 494,65 / $ - |
| 1 | 175 KW Generator | S.T. 32,50 / O.T. | $ 71,36 | $ 2,319,20 / $ - |
| 1 | 6" Diesel Trash Pump | S.T. 32,50 / O.T. | $ 23,60 | $ 767,00 / $ - |
| 1 | HTI Mud Motor | S.T. 32,50 / O.T. | $ 42,50 | $ 1,381,25 / $ - |
| | | S.T. / O.T. | | $ - / $ - |
| | | S.T. / O.T. | | $ - / $ - |
| | | S.T. / O.T. | | $ - / $ - |
| | | S.T. / O.T. | | $ - / $ - |
| | | S.T. / O.T. | | $ - / $ - |
| | | S.T. / O.T. | | $ - / $ - |
| | | S.T. / O.T. | | $ - / $ - |
| | | S.T. / O.T. | | $ - / $ - |
| | | S.T. / O.T. | | $ - / $ - |
| | | S.T. / O.T. | | $ - / $ - |
| | | S.T. / O.T. | | $ - / $ - |

| | | | |
|---|---|---|---|
| COMPANY OWNED EQUIPMENT | | | $ 28,979,28 |
| RENTAL EQUIPMENT W/ 15% Markup | | | $ 15,943,05 |
| A- EQUIPMENT SUB - TOTAL COST | | | $ 44,922,33 |
| 0,00 % Sales Tx. Rental Equip. | | | |

## B - MATERIALS

| | MATERIALS DESCRIPTION | QTY. USED | UNIT $ | TOTAL |
|---|---|---|---|---|
| 0 | | | $ - | $ - |
| 0 | | | $ - | $ - |
| 0 | | | $ - | $ - |
| 0 | | | $ - | $ - |
| 0 | | | $ - | $ - |
| 0 | | | $ - | $ - |
| 0 | | | $ - | $ - |
| 0 | | | $ - | $ - |
| | B-MATERIALS SUB-TOTAL COST | | $ - | |
| | 0,00 % Sales Tax | | | |
| | 15 % ADDED M..U. % | | | |
| | SUB-TOTAL A + B w/Tax | | | $ 44,922,33 |

## C – SUBCONTRACT / WORK DONE BY SPECIALISTS/THIRD PARTY SERVICES

| Work Description | Individual / Company | Unit | RATE | TOTAL $ |
|---|---|---|---|---|
| Roller Damage | Minnesota Limited | 8,00 | $ 2.900,00 | $ 23,200,00 |
| | | | | $ - |
| | | | | $ - |
| | | | | $ - |
| | COST OF SUBS - C | | | $ 23,200,00 |
| 15 % MARKUP(Subcontract) | | | | $ 3,480,00 |
| | | $ | | $ 26,680,00 |
| TOTAL COST A + B + C (Including Mark-Up) | | | | $ 71,602,33 |

### D – LABOR

| NO. | D – LABOR | | HRS. | BASE RATE w/FRING'S. | SUB TOTAL | Per Diem Totals | TOTAL |
|---|---|---|---|---|---|---|---|
| 1 | Chris Crough (Day Rate) | REG. | 3,00 | $1,916,84 | $3,050,52 | $120,00 | $3,170,52 |
| | | O.T. | 0 | | $0,00 | | $0,00 |
| | | D.T. | | | $0,00 | | $0,00 |
| 2 | Randy Foster (Day Rate) | REG. | 3,00 | $968,88 | $2,906,64 | $300,00 | $3,206,64 |
| | | O.T. | | | $0,00 | | $0,00 |
| | | D.T. | | | $0,00 | | $0,00 |
| 3 | Harold Shoemaker (Day | REG. | 0,00 | | $0,00 | $0,00 | $0,00 |
| | | O.T. | | | $0,00 | | $0,00 |
| | | D.T. | | | $0,00 | | $0,00 |
| 4 | Justin Poter | REG. | 32,50 | $59,79 | $1,943,18 | $345,00 | $2,288,18 |
| | | O.T. | 0,00 | $80,65 | $0,00 | | $0,00 |
| | | D.T. | | | $0,00 | | $0,00 |
| 5 | Brandon Morris | REG. | 32,50 | $39,83 | $1,294,48 | $315,00 | $1,609,48 |
| | | O.T. | 0,00 | $54,42 | $0,00 | | $0,00 |
| | | D.T. | | | $0,00 | | $0,00 |
| 6 | David Jones | REG. | 32,50 | $42,86 | $1,392,95 | $315,00 | $1,707,95 |
| | | O.T. | 0,00 | $58,96 | $0,00 | | $0,00 |
| | | D.T. | | | $0,00 | | $0,00 |
| 7 | Brandon Sammet | REG. | 32,50 | $59,79 | $1,943,18 | $315,00 | $2,258,18 |
| | | O.T. | 0,00 | $80,65 | $0,00 | | $0,00 |
| | | D.T. | | | $0,00 | | $0,00 |
| 8 | Roger Reeter | REG. | 32,50 | $59,79 | $1,943,18 | $300,00 | $2,243,18 |
| | | O.T. | 0,00 | $80,65 | $0,00 | | $0,00 |
| | | D.T. | | | $0,00 | | $0,00 |
| 9 | Augustin Zepeda | REG. | 32,50 | $36,83 | $1,196,98 | $315,00 | $1,511,98 |
| | | O.T. | 0,00 | $69,49 | $0,00 | | $0,00 |
| | | D.T. | | | $0,00 | | $0,00 |
| 10 | Johnny Hatfield | REG. | 32,50 | $43,49 | $1,413,43 | $150,00 | $1,563,43 |
| | | O.T. | 0,00 | $59,91 | $0,00 | | $0,00 |
| | | D.T. | | | $0,00 | | $0,00 |
| 11 | | REG. | 0,00 | | $0,00 | | $0,00 |
| | | O.T. | 0,00 | | $0,00 | | $0,00 |
| | | D.T. | | | $0,00 | | $0,00 |
| 12 | | REG. | 0,00 | | $0,00 | | $0,00 |
| | | O.T. | 0,00 | | $0,00 | | $0,00 |
| | | D.T. | | | $0,00 | | $0,00 |
| 13 | | REG. | 0,00 | | $0,00 | | $0,00 |
| | | O.T. | 0,00 | | $0,00 | | $0,00 |
| | | D.T. | | | $0,00 | | $0,00 |

| | | |
|---|---|---|
| | D – LABOR SUB-TOTAL | $ 19,559,51 |
| 15 % Labor Surcharge | | $ 2,933,93 |
| SUBTOTAL | | $ 22,493,44 |
| 15 % MARKUP ON LABOR | | $ 3,374,02 |

### E – MISCELLANEOUS ITEMS

| MISC. DESCRIPTIONS | QTY. | Unit $ | EX. AMOUNT |
|---|---|---|---|
| Hotel | 6 | $ 58,00 | $ 348,00 |
| | 9 | $ 68,00 | $ 612,00 |
| Subsistance | 0 | | $ - |
| Misc. Items | 0 | | $ - |
| 0 | 0 | | $ - |
| 0 | 0 | | $ - |
| 0 | 0 | | $ - |
| 0 | 0 | | $ - |
| 0 | 0 | | $ - |
| E- MISCELLANEOUS ITEMS SUB TOTAL | | | $ 960,00 |
| 5 % Sales/City/Room Tax | | | $ 48,00 |
| 15 % ADDED MARK-UP | | | $ 144,00 |
| 0 % Tax on Misc. Items | | | 0 |
| SUB TOTAL - E | | | $ 1,152,00 |

### TOTALS

| | | |
|---|---|---|
| TOTAL COST  A+B+C (Equipment /Material /Sub-Contractors) | | $ 71,602,33 |
| TOTAL COST + D  (Labor) | | $ 25,867,45 |
| TOTAL COST + E  (Miscellaneous Items) | | $ 1,152,00 |
| SUB-TOTAL | | $ 98,621,78 |
| 2,5 % BOND & INSURANCE | | $ 2,465,54 |
| **TOTAL COST THIS SHEET** | | **$ 101,087,33** |

### CLIENT DIRECTIVES AND COMMENTS

| TIME | |
|---|---|
| 0:00 | (See Daily Work Report) |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |

# EXHIBIT D



| Project Details | | | | | | | |
|---|---|---|---|---|---|---|---|
| From | The Tunneling Company USA, LLC. | Job No. | TUS20011 | RCO No. | 003 | Rev | 0 |
| RCO Title | Delays Due to Contractor | | | Date | August 31, 2020 | | |
| Owner | The HDD Company | | Attention | Jeremy King | | | |

| **Description Of Requested Change Details** |
|---|

Required by:     September 14, 2020

**Change Description**


Throughout the project, The Tunneling Company USA has experienced significant delays as a result of the contractor. These delays consist of (but not limited to);

- Dewatering the excavations

- Assisting with pit construction

- Waiting for pit completion

- Welding delays

- Safety shut downs

- Approvals


A detailed breakdown of these delays are attached.



**Change Costs:**

Total charges as a result of these delays is $500,975.

A detailed breakdown of these delays are attached.



All applicable taxes will be added at time of invoice



| Impact Details | | | | |
|---|---|---|---|---|
| **Reason for Change**: Delays Due to Contractor | | | | |
| **Additional Information** | | | | |
| Click here to enter text. | | | | |
| **Reference Or Attachments** | | | | |
| Attach | Refer | Document No | Rev | Description |
| ☐ | ◆ | Timesheets | | Daily Timesheets for these delays are available upon request |
| ☐ | ☐ | | | |
| ☐ | ☐ | | | |
| **Response** | | | | |
| <span style="color:red">Client Use:</span> | | | | |
| **Approval Details©** | | | | |

| **Submitted by    (Originator)** | <span style="color:red">Client Use:</span> |
|---|---|
| Print Name:    Nick Hyde | Change Authorized:    Yes |
| Print Title:     Project Manager | Print Name:        Jeremy King |
| Date:            August-31-2020 | Print Title:         Vice President |
| Signature: | Date: |
| | Signature: |
| | ✖ |

| Project: | Minnesota Limited - Kansas | | | | | |
|---|---|---|---|---|---|---|
| **Date:** | **Crossing Name** | **Planned Activity Hours** | **Unplanned Activity Hours** | **Non- Billable Hours** | **Contract Reference Term** | **Description** |
| 19-Mar-20 | HWY 31 | | 8 | | 7.1 | Pick up supplies and wait to offload last load of augers. ML still pumping water off of site and will start digging the pit tomorrow (Standby time). |
| 24-Mar-20 | HWY 31 | 4.5 | 7 | | 7.1 | Crew assisted with pit construction. By 1pm crew started placing mats and rails but had to remove them at EI's direction to place plastic under them to contain any spills. Mats and rails installed and boring machine brought over to site. Ready to start in the morning. |
| 16-Apr-20 | RD 1100 | 4 | 7.5 | | 7.1 | Set all gear around site and wait for pit completion (Standby time). |
| 17-Apr-20 | RD 1100 | | 11 | | 7.1 | Pit not ready (Standby time). |
| 27-Apr-20 | RD 1500 | | 10 | | 7.1 | Pit not ready (Standby time). |
| 2-May-20 | RD 1500 | 4.5 | 5.5 | | 7.1 | Completed casing install by 12pm. Exit pit no complete. ML work on exit pit for remainder of shift (Standby time). Daily Install 40'. Total Install 85'. |
| 18-May-20 | Clarke RD | 10 | 1 | | 7.1 | Confirm elevation and start welding casing. Unload excavators. Start setting equipment and engineer confirmed the setup is too low. Move equipment so grade can be adjusted. Daily Install 0'. Total Install 0'. |
| 19-May-20 | Clarke RD | 6.5 | 5.5 | | 7.1 | Fixed elevation of pit, set equipment and started drilling. Pit grade not excavated corectly. |
| 20-May-20 | Clarke RD | 10 | 1 | | 7.1 | Stanby time waiting for excavator in the morning |
| 26-May-20 | Allen RD | 9 | 3 | | 7.1 | Spent 3hrs pumping pit and standby for fixing excavation cave-in. Continued install. Daily Install 20'. Total Install 26'. |
| 28-May-20 | RD 2150 | 3 | 7 | | 7.1 | Continued install till 10:30 when project got shut down due to a safety stand down (standby time). Daily Install 6'. Total Install 51'. |
| 28-May-20 | Allen RD | 3 | 7 | | 7.1 | Continued install till 10:30 when project got shut down due to a safety stand down (standby time). Daily Install 13'. Total Install 80'. |
| 29-May-20 | Allen RD | 8 | 4 | | 7.1 | Help ML dewater pit (Standby time). Complete casing install. Daily Install 40'. Total Install 120'. |
| 1-Jun-20 | RD 2150 | 8 | 2 | | 7.1 | Arrived on site an had to pump out pit (standby time). Set boring machine and continued product pipe installation until complete. Daily Install 120' (product pipe). Total Install 120' (product pipe). |
| 8-Jun-20 | Jackson RD | | 6 | 6 | 7.1 | Still waiting for pit to be completed. Repaired Equipment for half the day |
| 9-Jun-20 | Jackson RD | | 6 | 6 | 7.1 | Still waiting for pit to be completed. Repaired Equipment for half the day |
| 10-Jun-20 | Jackson RD | | 12 | | 7.1 | Still waiting for pit to be completed. Daily Install 0'. Total Install 0'. |
| 11-Jun-20 | Jackson RD | | 12 | | 7.1 | Still waiting for pit to be completed. Daily Install 0'. Total Install 0'. |
| 18-Jun-20 | Hamilton RD | | 10 | | 7.1 | Pit not ready. Daily Install 0'. Total Install 0'. |
| 19-Jun-20 | Hamilton RD | | 10 | | 7.1 | Pit not ready. Daily Install 0'. Total Install 0'. |
| 20-Jun-20 | Hamilton RD | | 10 | | 7.1 | Pit not ready. Daily Install 0'. Total Install 0'. |
| 26-Jun-20 | Missouri RD | 3.5 | 6.5 | | 7.1 | Completed the exit pit and welders cut off the SBU. Waited on approval to push product pipe from 11:30 to end of shift (standby time). Daily Install 0'. Total Install 185'. |
| 2-Jul-20 | Rock Ridge RD | | 10 | | 7.1 | Site not ready. Standby time. |
| 6-Jul-20 | Rock Ridge RD | | 10 | | 7.1 | Waiting on pit. |
| 8-Jul-20 | Nebraska RD | 7 | 4 | | 7.1 | Augered out casing. Wait for ML to complete exit pit (standby time). First product pipe welded. Daily Install 0' (product pipe). Total Install 0' (product pipe). |

| Date | Location | | | | | Notes |
|---|---|---|---|---|---|---|
| 8-Jul-20 | John Brown RD | 5 | 5 | | 7.1 | Finish moving equipment to site. Pit not complete (standby time). Daily Install 0'. Total Install 0'. |
| 9-Jul-20 | John Brown RD | 5 | 10 | | 7.1 | Pit not complete. Standby time. Daily Install 0'. Total Intall 0'. |
| 13-Jul-20 | John Brown RD | 7 | 3 | | 7.1 | Prepared to stuff augers and set casing. Pit shut down due to safety concerns with the shoring (Standby time). Daily Install 0'. Total Install 0'. |
| 14-Jul-20 | John Brown RD | 8 | 2 | | 7.1 | Installed another trench box. 2h delay (Standby time). Start installing casing. Daily install 18'. Total Install 18'. |
| 15-Jul-20 | John Brown RD | 8 | 2 | | 7.1 | Continue installing casing all shift. 2h delay because welders refused to rebevel pipe. Welders welded the casing on crooked (Standby time. Pipe would not fit in the machine. Daily Install 37'. Total Install 55'. |
| 16-Jul-20 | John Brown RD | 5 | 5 | | 7.1 | Redo weld from yesterday. 5h delay (standby time). Continue boring. Daily Install 16'. Total Install 50'. |
| 22-Jul-20 | Lavette Terrace RD | 11 | 1 | | 7.1 | Delayed start by 1 hour because crew had to remove debris from road surface (Standby time). Start drilling by 8am. Daily Install 10.5'. Total Install 90.5'. |
| 22-Jul-20 | John Brown RD | 7 | 3 | | 7.1 | Delayed start due to pit flooded. Unsafe to work (Standby time). Cut of SBU head and weld product pipe to casing. Daily Install 0' (product pipe). Total Install 0' (product pipe). |
| 22-Jul-20 | John Brown RD | 6 | 4 | | 7.1 | Unable to get casing from other sites due to rain yesterday (Standby time). Had to move equipment because ML was using dynamite to open ditch. Prep casing for install. Daily install 0'. Total Install ???. |
| 23-Jul-20 | Kingman RD | 10 | 2 | | 7.1 | Completed casing install and augering. Wait for 2hrs for welders. Weld first product pipe to casing. Daily Install 0' (product pipe). Total Install 0' (product pipe). |
| 23-Jul-20 | Lavette Terrace RD | 6 | 4 | | 7.1 | Waiting for welders and coaters for 4hrs (Standby time). Install product pipe for remainder of day. |
| 23-Jul-20 | John Brown RD | 9 | 3 | | 7.1 | Wait for 3hrs for welders (Standby time). Continue drilling. Daily Install 15'. Total Install 80'. |
| 24-Jul-20 | Kingman RD | 5 | 5 | | 7.1 | Finished casing install. Waited for welders for rest of shift (Standby time). Daily Install 10'. Total Install 90'. |
| 29-Jul-20 | Marshall RD | 5 | 5 | | 7.1 | Move equipment from John Brown to Marshall. Pit not ready (Standby time). Daily Install 0'. Total Install 0'. |
| 30-Jul-20 | Marshall RD | 6.5 | | 1.5 | 7.1 | Pit not ready (Standby time). Shift cancelled at 1:30 due to rain. Daily Install 0'. Total Install 0'. |
| 31-Jul-20 | Marshall RD | 10 | 10 | | 7.1 | Minn LTD started excavating launch pit on north side of Marshall Rd. Not ready for us. |
| 31-Jul-20 | John Brown RD | 10 | 10 | | 7.1 | Tool box with all crews. Marshall rd is on hold till Minnesota decides what side they want to drill from. Set to collar in casing at lebbett had issues with casing length will collaring first thing tomorrow morning. |
| 1-Aug-20 | Marshall RD | | 8 | | 7.1 | Minn LTD started excavating launch pit on north side of Marshall Rd. Not ready for us (Standby time). |
| 3-Aug-20 | Marshall RD | 4 | 8 | | 7.1 | Waiting for pit to be dug (Standby time). |
| 4-Aug-20 | Marshall RD | 9.5 | 2.5 | | 7.1 | Had to continuously stop and give our excavator to blasting crew, being shut down for blasting (Standby time). |
| 4-Aug-20 | Labette Terrace RD | 6.5 | 3.5 | | 7.1 | Waiting for welders, 10-12 and 12:30-2pm (Standby time). |
| 8-Aug-20 | Neosho Rd | 9 | 1 | | 7.1 | Waited for Minn Ltd. For an hour to come unload product pipe (Standby time). |
| 12-Aug-20 | Missouri RD | 10 | 10 | | 7.1 | Pit full of water, on standby all day |
| 13-Aug-20 | Missouri RD | 2 | 8 | | 7.1 | Dewater bore pit and wait for second excavator to set up equipment (Standby time). |
| 14-Aug-20 | Missouri RD | 9.5 | 0.5 | | 7.1 | Dewater Pit (Standby time). |

| Date | Location | | Terms & Conditions | | | Description |
|---|---|---|---|---|---|---|
| 17-Aug-20 | Missouri RD | 7.5 | 7.1 | 2.5 | 7.1 | Wait for welders (Standby time). |
| 20-Aug-20 | Marshall RD | 8 | | 4 | 7.1 | Had to wait on fuel truck to get out of the way, had to shut down multiple times for mat truck to get through, waited on welders (Standby time). |
| 20-Aug-20 | 1650 RD | 6 | | 4 | 7.1 | Pumped water out of exit pit at 1650 Rd from 12:30 to 4:30 (Standby time). |
| 21-Aug-20 | Marshall RD | 9 | | 3 | 7.1 | Waited on welders 9:50AM-1PM  (Standby time). |
| 21-Aug-20 | 1650 RD | | | 10 | 7.1 | Pumped water out of exit pit at 1650 Rd from 12:30 to 4:30 (Standby time). |
| 24-Aug-20 | 1650 RD | | | 12 | 7.1 | Waiting for Minn. Ltd to move the boring machine to site while tunneling crew dewatering 1650 pits (Standby time). |
| 27-Aug-20 | 1650 RD | | | 12 | 7.1 | Nigth shift scheduled but no operator from Minn. Ltd. showed up (Standby time). |

345.5

## Summary

| | Hours | Rate / HR | Amount |
|---|---|---|---|
| | 345.5 | $ 1,450.00 | $ 500,975.00 |

Total Change Amount    $500,975.00

# EXHIBIT E

| PROJECT NAME: | | |
|---|---|---|
| PROJECT NO.: | Southern Star Line DT & DS Replacement |  Horizontal Directional Drilling |

<div style="border:1px solid red">

**EXTRA  WORK SHEET REPORT**
**INTERNAL - OFFICE**

</div>

| CLIENT/OWNER : | Minnesota Limited - Southern Star | | DATE: | |
|---|---|---|---|---|
| WORK PRFM'D. BY: | The HDD Company, Inc. | | EXTRA WRK. SHT. NO. | Day Shift |
| DESCPTN. OF WORK: | Time spent reinstalling 36" pipeline,  Multiple days from 6/22/20 - 7/15/20 and 8/22/20 - 9/9/20 | | | |
| | 0 | | | |
| | 0 | | | |
| | 0 | | | |

## A – EQUIPMENT

| EQUIP. NO. | Company Owned Equipment | HRS. | RATE/HR. | TOTAL/DAY |
|---|---|---|---|---|
| 1 | Drilling Rig HDD Rig 7 - Vermeer 750 | 408,00 | $ 205,56 | $ 83.868,48 |
| 1 | Mud Tank / Solids Control Unit | 408,00 | $ 111,96 | $ 45.679,68 |
| 1 | Sump Pit/Trash Pump | 408,00 | $ 8,29 | $ 3.382,32 |
| 1 | Mud Pumping Units | 408,00 | $ 60,94 | 24.863,52 |
| 2 | Tool Van and tools | 408,00 | $ 17,55 | $ 14.320,80 |
| 0 | Dump Truck A=17  TRUN 2AXL | | | $ - |
| 3 | Vac. Truck A=17 TRUN 2AXL | 408,00 | $ 45,75 | $ 55.998,00 |
| 10 | Misc. Trailers | 408,00 | $ 1,79 | $ 7.303,20 |
| 1 | Haul Trucks | 408,00 | $ 34,13 | 13.925,04 |
| 1 | 6 3/4" Non Mag Drill Collars w/Jet Assembly | 408,00 | $ 6,83 | $ 2.786,64 |
| 168 | Drill Pipe (5-1/2 FH) | 408,00 | $ 0,53 | 36.328,32 |
| 2 | Misc. X-Subs and Rack (All X Subs for Spread) | 408,00 | $ 5,20 | $ 4.243,20 |
| 0 | Sonde and Housing | | | $ - |
| | Steering Tool (North Referencing w/Tru-Gyde) | | | |
| 48 | Rollers | 408,00 | $ 1,50 | $ 29.376,00 |
| 3 | Ford F-250 T&TT 06-12 | 408,00 | $ 5,04 | $ 6.168,96 |
| 0 | Ford F-450 T&TT 20-28 | | | $ - |
| 0 | Ford F-350 T&TT 20=28 | | | $ - |
| 0 | KW & Crane Truck | | | |
| 1 | Hammer | 408,00 | $ 41,93 | $ 17.107,44 |
| 1 | 300 Amp Welder | 408,00 | $ 9,49 | $ 3.871,92 |
| 1 | 1/2 Ton Truck | 408,00 | $ 32,48 | $ 13.251,84 |
| 1 | 60" Casing | 408,00 | $ 3,25 | $ 1.326,00 |
| 0 | Mud Bins | | | |

| | Rental Equipment | | | |
|---|---|---|---|---|
| 1 | 10K Reach Forklift | S.T. | 408,00 | $ 51,29 | $ 20.926,32 |
| 2 | 225 Excavator | S.T. | 408,00 | $ 91,59 | $ 74.737,44 |
| 2 | Portable toilets | S.T. | 408,00 | $ 1,50 | $ 1.224,00 |
| 0 | Multiquip 20KW Generator | S.T. | | | $ - |
| 3 | Frac Tank | S.T. | 408,00 | $ 7,32 | $ 8.959,68 |
| 1 | Trash Bin | S.T. | 408,00 | $ 4,97 | $ 2.027,76 |
| 1 | 500 Amp Welder | S.T. | 408,00 | $ 9,49 | $ 3.871,92 |
| 2 | Light Tower | S.T. | 408,00 | $ 7,61 | $ 6.209,76 |
| 1 | 175 KW Generator | S.T. | 408,00 | $ 71,36 | 29.114,88 |
| 1 | 6" Diesel Trash Pump | S.T. | 408,00 | $ 23,60 | $ 9.628,80 |
| 1 | HTI Mud Motor | S.T. | 408,00 | $ 42,50 | $ 17.340,00 |

| | COMPANY OWNED EQUIPMENT | | | $ 363.801,36 |
|---|---|---|---|---|
| | RENTAL EQUIPMENT W/ 15% Markup | | | $ 200.146,64 |
| | A= EQUIPMENT SUB = TOTAL COST | | | $ 563.948,00 |
| | 0,00 % Sales Tx. Rental Equip. | | | |

## B – MATERIALS

| MATERIALS DESCRIPTION | QTY. USED | UNIT $ | TOTAL |
|---|---|---|---|
| Bentonite | 86,00 | $ 9,50 | $ 817,00 |
| Cement | 54,00 | $ 9,50 | $ 513,00 |
| Shaker Screens | 6,00 | $ 135,00 | $ 810,00 |
| 0 | | $ - | $ - |
| 0 | | | $ - |
| 0 | | $ - | $ - |
| 0 | | | $ - |
| 0 | | $ - | $ - |
| 0 | | | $ - |
| 0 | | $ - | $ - |

| | B=MATERIALS SUB-TOTAL COST | $ 2.140,00 |
|---|---|---|
| | 0,00 % Sales Tax | |
| | 15 % ADDED M. U. $ | 321,00 |
| | SUB-TOTAL A + B w/Tax | $ 566.409,00 |

## C – SUBCONTRACT / WORK DONE BY SPECIALISTS/THIRD PARTY SERVICES

| Work Description | Individual / Company | Unit | RATE | TOTAL $ |
|---|---|---|---|---|
| Coating and Corrosion Expert | Lake Superior Consultants | 1,00 | $ 19.702,53 | $ 19.702,53 |
| Vac Trucks | Hurricane Services | 1,00 | $ 39.415,00 | $ 39.415,00 |
| Disposal Charges | Anderson County Landfill | 1,00 | $ 18.103,40 | $ 18.103,40 |
| | 0 | 0 | | $ - |
| | 0 | 0 | | $ - |
| | COST OF SUBS = C | | | $ 77.220,93 |
| | 15 % MARKUP(Subcontract) | | | $ 11.583,14 |
| | $ | | | $ 88.804,07 |
| | TOTAL COST A + B + C (Including Mark=Up) | | | $ 655.213,07 |

| NO. | D – LABOR | HRS. | BASE RATE w/FRING'S. | SUB TOTAL | Per Diem Totals | TOTAL |
|---|---|---|---|---|---|---|
| 1 | Chris Crough (Day Rate) | REG. 33,00 | $1.016,84 | $33.555,72 | $1.320,00 | $34.875,72 |
| | | O.T. 0 | | $0,00 | | $0,00 |
| | | D.T. | | $0,00 | | |
| 2 | Randy Foster (Day Rate) | REG. 17,00 | $968,88 | $16.470,96 | $1.700,00 | $18.170,96 |
| | | O.T. | | $0,00 | | $0,00 |
| | | D.T. | | $0,00 | | |
| 3 | Harold Shoemaker (Day | REG. 17,00 | $755,00 | $12.835,00 | $1.785,00 | $14.620,00 |
| | | O.T. | | $0,00 | | $0,00 |
| | | D.T. | | $0,00 | | |
| 4 | Justin Potter | REG. 104,00 | $59,79 | $6.218,16 | $1.495,00 | $7.713,16 |
| | | O.T. 52,00 | $80,65 | $4.193,80 | | $4.193,80 |
| | | D.T. | | $0,00 | | |
| 5 | Brandon Morris | REG. 112,00 | $36,83 | $4.460,96 | $1.260,00 | $5.720,96 |
| | | O.T. 52,00 | $55,42 | $2.829,58 | | $2.829,58 |
| | | D.T. | | $0,00 | | |
| 6 | David Jones | REG. 248,00 | $42,86 | $10.629,28 | $3.255,00 | $13.884,28 |
| | | O.T. 125,00 | $58,96 | $7.370,00 | | $7.370,00 |
| | | D.T. | | $0,00 | | |
| 7 | Brandon Sammet | REG. 194,00 | $59,79 | $11.601,36 | $2.415,00 | $13.416,36 |
| | | O.T. 97,00 | $80,65 | $7.823,05 | | $7.823,05 |
| | | D.T. | | $0,00 | | |
| 8 | Roger Reeter | REG. 112,00 | $59,79 | $6.696,48 | $1.400,00 | $8.096,48 |
| | | O.T. 66,00 | $80,65 | $5.322,90 | | $5.322,90 |
| | | D.T. | | $0,00 | | |
| 9 | Augustin Zepeda | REG. 128,00 | $36,83 | $4.714,24 | $1.680,00 | $6.394,24 |
| | | O.T. 69,00 | $69,49 | $4.794,81 | | $4.794,81 |
| | | D.T. | | $0,00 | | |
| 10 | Johnny Hatfield | REG. 128,00 | $43,49 | $5.566,72 | $800,00 | $6.366,72 |
| | | O.T. 68,00 | $59,91 | $4.133,45 | | $4.133,45 |
| | | D.T. | | $0,00 | | |
| 11 | Stephen Davis | REG. 224,00 | $43,49 | $9.741,76 | $1.120,00 | $10.861,76 |
| | | O.T. 112,00 | $59,91 | $6.709,36 | | $6.709,36 |
| | | D.T. | | $0,00 | | |
| 12 | Bruce Cooper | REG. 224,00 | $44,53 | $9.974,72 | $1.120,00 | $11.094,72 |
| | | O.T. 109,00 | $60,70 | $6.615,76 | | $6.615,76 |
| | | D.T. | | $0,00 | | |
| 13 | Juan Miguel Suarzes | REG. 101,00 | $36,83 | $3.719,83 | $650,00 | $4.369,83 |
| | | O.T. 48,00 | $49,92 | $2.395,92 | | $2.395,92 |
| | | D.T. | | $0,00 | | |

| | D – LABOR SUB=TOTAL | $ 207.773,81 |
|---|---|---|
| 15 % Labor Surcharge | | $ 31.166,07 |
| | SUBTOTAL | $ 238.939,88 |
| 15 % MARKUP ON LABOR | | $ 35.840,98 |

## E – MISCELLANEOUS ITEMS

| MBC, DESCRIPTIONS | QTY. | Unit $ | EX. AMOUNT |
|---|---|---|---|
| Hotel | | | |
| | 96 | $ 58,00 | $ 5.568,00 |
| | 155 | $ 68,00 | $ 10.540,00 |
| Subsistance | | | $ - |
| Misc. Items | | | |
| 0 | | 0 | $ - |
| 0 | | 0 | $ - |
| 0 | | 0 | $ - |
| 0 | | 0 | $ - |
| 0 | | 0 | $ - |
| 0 | | 0 | $ - |

| | E= MISCELLANEOUS ITEMS SUB TOTAL | $ 16.108,00 |
|---|---|---|
| 15 % Sales/City/Room Tax | | 805,40 |
| 15 % ADDED MARK=UP | | $ 2.416,20 |
| 0 % Tax on Misc. Items | | $ - |
| | SUB TOTAL = E | $ 19.329,60 |

## TOTALS

| | TOTAL COST A+B+C (Equipment /Material /Sub=Contractors) | $ 655.213,07 |
|---|---|---|
| | TOTAL COST = D  (Labor) | $ 274.780,86 |
| | TOTAL COST = E  (Miscellaneous Items) | $ 19.329,60 |
| | SUB-TOTAL | $ 949.323,53 |
| 2,5 % BOND & INSURANCE | | $ 23.733,09 |
| | TOTAL COST THIS SHEET | $ 973.056,63 |

| TIME | CLIENT DIRECTIVES AND COMMENTS |
|---|---|
| 0.00 | (See Daily Work Report) |
| 0.00 | |
| 0.00 | |
| 0.00 | |
| 0.00 | |
| 0.00 | |
| 0.00 | |
| 0.00 | |
| 0.00 | |
| 0.00 | |
| 0.00 | |
| 0.00 | |
| 0.00 | |
| 0.00 | |
| 0.00 | |
| 0.00 | |
| 0.00 | |
| 0.00 | |
| 0.00 | |
| 0.00 | |
| 0.00 | |

# EXHIBIT F

# EXTRA WORK SHEET REPORT
# INTERNAL - OFFICE

PROJECT NAME:
PROJECT NO.: Southern Star Line DT & DS Replacement

*Horizontal Directional Drilling*

CLIENT/OWNER: Minnesota Limited – Southern Star
WORK PRFM'D. BY: The HDD Company, Inc.
DESCPT'N. OF WORK: Time spent reinstalling 36" pipeline,  Multiple days from 6/22/20 - 7/15/20 and 8/22/20 - 9/9/20

DATE:
EXTRA WRK. SHT. NO.: Night Shift

EQUIP. NO. | A – EQUIPMENT

## A – EQUIPMENT

| EQUIP. NO. | Company Owned Equipment | HRS. | RATE/HR. | TOTAL/DAY |
|---|---|---|---|---|
| 1 | Drilling Rig HDD Rig 7 - Vermeer 750 | 300,00 | $ 205,56 | $ 61.668,00 |
| 1 | Mud Tank / Solids Control Unit | 300,00 | $ 111,96 | $ 33.588,00 |
| 1 | Sump Pit/Trash Pump | 300,00 | $ 8,29 | $ 2.487,00 |
| 1 | Mud Pumping Units | 300,00 | $ 60,94 | $ 18.282,00 |
| 2 | Tool Van and tools | 300,00 | $ 17,55 | $ 10.530,00 |
| 0 | Dump Truck A-17  TRUN 2AXL | | | $ - |
| 3 | Vac. Truck A-17 TRUN 2AXL | 300,00 | $ 45,75 | $ 41.175,00 |
| 10 | Misc. Trailers | 300,00 | $ 1,79 | $ 5.370,00 |
| 1 | Haul Trucks | 300,00 | $ 34,13 | $ 10.239,00 |
| 1 | 6 3/4" Non Mag Drill Collars w/Jet Assembly | 300,00 | $ 6,83 | $ 2.049,00 |
| 168 | Drill Pipe (5-1/2 FH) | 300,00 | $ 0,53 | $ 26.712,00 |
| 2 | Misc. X-Subs and Rack (All X Subs for Spread) | 300,00 | $ 5,20 | $ 3.120,00 |
| 0 | Sonde and Housing | | | $ - |
| | Steering Tool (North Referencing w/Tru-Gyde) | | | $ - |
| 48 | Rollers | 300,00 | $ 1,50 | $ 21.600,00 |
| 3 | Ford F-250 T&TT 06-12 | 300,00 | $ 7,50 | $ 6.750,00 |
| 0 | Ford F-450 T&TT 20-28 | | | $ - |
| 0 | Ford F-350 T&TT 20-28 | | | $ - |
| 0 | KW & Crane Truck | | | $ - |
| 1 | Hammer | 300,00 | $ 41,93 | $ 12.579,00 |
| 1 | 300 Amp Welder | 300,00 | $ 9,49 | $ 2.847,00 |
| 1 | 1/2 Ton Truck | 300,00 | $ 32,48 | $ 9.744,00 |
| 1 | 60' Casing | 300,00 | | $ - |
| 0 | Mud Bins | | | $ - |

### Rental Equipment

| | | | | |
|---|---|---|---|---|
| 1 | 10K Reach Forklift | O.T. | $ 51,29 | $ 15.387,00 |
| 2 | 225 Excavator | O.T. 300,00 | $ 91,59 | $ 54.954,00 |
| 2 | Portable toilets | O.T. 300,00 | $ 1,50 | $ 900,00 |
| 0 | Multiquip 20kW Generator | O.T. | | $ - |
| 3 | Frac Tank | O.T. 300,00 | $ 7,32 | $ 6.588,00 |
| 1 | Trash Bin | O.T. 300,00 | $ 4,97 | $ 1.491,00 |
| 1 | 500 Amp Welder | O.T. 300,00 | $ 9,49 | $ 2.847,00 |
| 2 | Light Tower | O.T. 300,00 | $ 7,61 | $ 4.566,00 |
| 1 | 175 KW Generator | O.T. 300,00 | $ 71,36 | $ 21.408,00 |
| 1 | 6" Diesel Trash Pump | O.T. 300,00 | $ 23,60 | $ 7.080,00 |
| 1 | HTI Mud Motor | O.T. 300,00 | $ 42,50 | $ 12.750,00 |

| | | | | |
|---|---|---|---|---|
| | COMPANY OWNED EQUIPMENT | | | $ 268.740,00 |
| | RENTAL EQUIPMENT W/ 15% Markup | | | $ 147.166,65 |
| | A– EQUIPMENT SUB - TOTAL COST | | | $ 415.906,65 |
| | 0,00  % Sales Tx, Rental Equip. | | | $ - |

## B - MATERIALS

| MATERIALS DESCRIPTION | QTY. USED | UNIT $ | TOTAL |
|---|---|---|---|
| | | $ - | $ - |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| 0 | | | $ - |
| 0 | | | $ - |
| | B-MATERIALS SUB-TOTAL COST | | $ - |
| | 0,00 % Sales Tax | | |
| 10 % ADDED M, U, B | | | |
| | SUB-TOTAL A + B w/Tax | | $ 415.906,65 |

## C – SUBCONTRACT / WORK DONE BY SPECIALISTS/THIRD PARTY SERVICES

| Work Description | Individual / Company | Unit | RATE | TOTAL $ |
|---|---|---|---|---|
| | | | | $ - |
| | COST OF SUBS - C | | | $ - |
| 15 % MARKd-UPSubcontractor) | | | | $ - |
| TOTAL COST A + B + C (including Mark-Up) | | | | $ 415.906,65 |

## D – LABOR

| NO. | D – LABOR | | HRS. | BASE RATE w/FRING'S | SUB TOTAL | Per Diem Totals | TOTAL |
|---|---|---|---|---|---|---|---|
| 1 | Shavin Posey (Day Rate) | REG. | 33,00 | $755,00 | $24.915,00 | $2.730,00 | $27.645,00 |
| | | O.T. | 0 | | $0,00 | | $0,00 |
| | | O.T. | | | $0,00 | | $0,00 |
| 2 | Jacob Hoffman | REG. | 131,00 | $59,79 | $7.832,49 | $2.380,00 | $10.212,49 |
| | | O.T. | 69,00 | $80,65 | $5.564,85 | | $5.564,85 |
| | | O.T. | | | $0,00 | | $0,00 |
| 3 | Westin Cosgrove | REG. | 96,00 | $59,79 | $5.739,84 | $1.260,00 | $6.999,84 |
| | | O.T. | 68,00 | $80,65 | $5.484,20 | | $5.484,20 |
| | | O.T. | | | $0,00 | | $0,00 |
| 4 | Dustin Anderson | REG. | 195,00 | $48,20 | $9.399,00 | $1.920,00 | $11.319,00 |
| | | O.T. | 92,00 | $66,20 | $6.090,40 | | $6.090,40 |
| | | O.T. | | | $0,00 | | $0,00 |
| 5 | Jeromie Acres | REG. | 164,00 | $48,20 | $7.576,80 | $1.680,00 | $9.256,80 |
| | | O.T. | 96,00 | $63,20 | $6.067,20 | | $6.067,20 |
| | | O.T. | | | $0,00 | | $0,00 |
| 6 | Abraham Berrospe | REG. | 159,00 | $36,83 | $5.855,97 | $960,00 | $6.815,97 |
| | | O.T. | 95,00 | $49,92 | $4.741,90 | | $4.741,90 |
| | | O.T. | | | $0,00 | | $0,00 |
| 7 | Larry Roseboro | REG. | 79,00 | $59,79 | $4.723,41 | $500,00 | $5.223,41 |
| | | O.T. | 35,00 | $80,65 | $2.822,75 | | $2.822,75 |
| | | O.T. | | | $0,00 | | $0,00 |
| 8 | Dusty Cline | REG. | 24,00 | $59,79 | $1.434,96 | $315,00 | $1.749,96 |
| | | O.T. | 12,00 | $80,65 | $967,80 | | $967,80 |
| | | O.T. | | | $0,00 | | $0,00 |
| 9 | Taylor Crosley | REG. | 35,00 | $59,79 | $2.092,48 | $350,00 | $2.412,48 |
| | | O.T. | 40,00 | $52,66 | $2.106,40 | | $2.106,40 |
| | | O.T. | | | $0,00 | | $0,00 |
| 10 | Jim Rubick | REG. | 123,00 | $59,79 | $7.354,17 | $1.575,00 | $8.929,17 |
| | | O.T. | 65,00 | $80,65 | $5.242,25 | | $5.242,25 |
| | | O.T. | | | $0,00 | | $0,00 |
| 11 | Barlon Snowten | REG. | 80,00 | $38,86 | $3.092,80 | $1.725,00 | $4.817,80 |
| | | O.T. | 60,00 | $52,66 | $3.159,60 | | $3.159,60 |
| | | O.T. | | | $0,00 | | $0,00 |
| 12 | Kenny Densmore | REG. | 80,00 | $59,79 | $4.783,20 | $1.050,00 | $5.833,20 |
| | | O.T. | 60,00 | $80,65 | $4.839,00 | | $4.839,00 |
| | | O.T. | | | $0,00 | | $0,00 |
| | D – LABOR SUB-TOTAL | | | | | | $ 148.301,53 |
| 15 % Labor Surcharge | | | | | | | $ 22.245,22 |
| SUBTOTAL | | | | | | | $ 170.546,72 |
| 15 % MARKUP ON LABOR | | | | | | | $ 25.582,01 |

## E – MISCELLANEOUS ITEMS

| MISC. DESCRIPTIONS | QTY. | Unit $ | EX. AMOUNT |
|---|---|---|---|
| Hotel | | | |
| | 0 | $ 58,00 | $ - |
| | 0 | $ 68,00 | $ - |
| Subsistance | 0 | | $ - |
| Misc. Items | | | |
| 0 | | 0 | $ - |
| 0 | | 0 | $ - |
| 0 | | 0 | $ - |
| 0 | | 0 | $ - |
| 0 | | 0 | $ - |
| 0 | | 0 | $ - |
| E–MISCELLANEOUS ITEMS SUB TOTAL | | | $ - |
| 0 % Sales/City/Room Tax | | | $ - |
| 15 % ADDED MARK-UP | | | $ - |
| 0 % Tax on Misc. Items | | | $ - |
| SUB TOTAL + E | | | $ - |

## TOTALS

| | | |
|---|---|---|
| TOTAL COST  A+B+C (Equipment /Material /Sub=Contractors) | | $ 415.906,65 |
| TOTAL COST = D  (Labor) | | $ 196.128,73 |
| TOTAL COST = E  (Miscellaneous Items) | | $ - |
| | SU % BOND & INSURANCE | $ 612.035,38 |
| 2,5  % BOND & INSURANCE | | $ 15.300,88 |
| | TOTAL COST THIS SHEET | $ 627.336,26 |

| TIME | | CLIENT DIRECTIVES AND COMMENTS |
|---|---|---|
| 0:00 | (See Daily Work Report) | |
| 0:00 | | |
| 0:00 | | |
| 0:00 | | |
| 0:00 | | |
| 0:00 | | |
| 0:00 | | |
| 0:00 | | |
| 0:00 | | |
| 0:00 | | |
| 0:00 | | |
| 0:00 | | |

THE HDD COMPANY:

DATE: _____  (Signature)

CLIENT _____ (Signature)

DATE: _____

# EXHIBIT G



Addendum #4
Subcontract Agreement
SR1916169002

The following addition is made to the Subcontract Agreement with HHD Company:

- Per the attached documents for a total of $555,000.00

  *This cannot be invoiced for until all drills are pulled and bores are installed*

Any additional state and local taxes incurred will be charged accordingly.

Minnesota Limited:

_____

HDD Company

_____

# Exhibit 8

USPS TRACKING #

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

9590 9402 6142 0209 2513 07

**United States**
**Postal Service**

• Sender: Please print your name, address, and ZIP+4® in this box•

**HUSCH BLACKWELL**
4801 Main Street, Suite 1000
Kansas City, MO  64112

 M. Moody

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

**Minnesota Limited, LLC.**
c/o National Registered Agents, Inc. of KS
112 SW 7th Street Suite 3C
Topeka, KS 66603

9590 9402 6142 0209 2513 07

2. Article Number (Transfer from service label)

91 7199 9991 7037 1995 7442

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X _____ ☑ Agent
                 ☐ Addressee

B. Received by (Printed Name)      C. Date of Delivery

MELINDA FORGE

D. Is delivery address different from item 1?   ☐ Yes
   If YES, enter delivery address below:        ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☒ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Restricted Delivery

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☒ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2015 PSN 7530-02-000-9053          Domestic Return Receipt

# Exhibit 9

USPS TRACKING #





First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

9590 9402 6142 0209 2513 14

**United States
Postal Service**

* Sender: Please print your name, address, and ZIP+4® in this box*

# HUSCH BLACKWELL

4801 Main Street, Suite 1000
Kansas City, MO 64112

*m·Moody*

⊢255150

**SENDER: COMPLETE THIS SECTION**

■ Complete items 1, 2, and 3.
■ Print your name and address on the reverse so that we can return the card to you.
■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

**Southern Star Central Gas Pipeline, Inc.**
c/o The Corporation Company, Inc.
112 SW 7th Street Suite 3C
Topeka, KS 66603

9590 9402 6142 0209 2513 14

2. Article Number (Transfer from service label)
9489 0090 0027 6303 9140 40

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _____ ☐ Agent
☐ Addressee

B. Received by (Printed Name)        C. Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:        ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☒ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ ____ cted Delivery

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☒ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2015 PSN 7530-02-000-9053          Domestic Return Receipt

# Exhibit 10

USPS TRACKING #
KANSAS CITY 640

5590 9402 6142 0209 2613 21

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

**United States
Postal Service**

* Sender: Please print your name, address, and ZIP+4® in this box*



**HUSCH BLACKWELL**
4801 Main Street, Suite 1000
Kansas City, MO  64112



**SENDER:** *COMPLETE THIS SECTION*

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

**Rene and Anita Bures**
31443 NW Meade Rd.
Richmond, KS 66080

*COMPLETE THIS SECTION ON DELIVERY*

A. Signature
X _JGRR√71 C+7_
☐ Agent
☐ Addressee

B. Received by (Printed Name)     C. Date of Delivery
_Rosalie Buros_     _1/11/202_

D. Is delivery address different from item 1?   ☐ Yes
If YES, enter delivery address below:    ☒ No

9590 9402 6142 0209 2513 21

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☒ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
   Insured Delivery

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☒ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

2. Article Number (Transfer from service label)
9489 0090 0027 6303 9142 48

PS Form **3811**, July 2015 PSN 7530-02-000-9053

Domestic Return Receipt

# Exhibit 11

USPS TRACKING #

METROPLEX MT 480

16 JUN 2021 PM 3 L

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

9590 9402 6142 0209 2513 38

United States
Postal Service

* Sender: Please print your name, address, and ZIP+4® in this box*

**HUSCH BLACKWELL**
4801 Main Street, Suite 1000
Kansas City, MO 64112

**SENDER:** *COMPLETE THIS SECTION*

■ Complete items 1, 2, and 3.
■ Print your name and address on the reverse so that we can return the card to you.
■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Keith J. Pickert and Mary J. Pickert, co-trustee of the Pickert Family Trust
47890 Deer Trail Dr.
Canton, MI 48187

9590 9402 6142 0209 2513 38

2. Article Number *(Transfer from service label)*
9469 0090 0027 6303 9142 31

*COMPLETE THIS SECTION ON DELIVERY*

A. Signature
X _____
☐ Agent
☐ Addressee

B. Received by *(Printed Name)*      C. Date of Delivery

D. Is delivery address different from item 1? ☐ Yes
   If YES, enter delivery address below:     ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☒ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
      icted Delivery

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☒ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2015 PSN 7530-02-000-9053            Domestic Return Receipt

# Exhibit 12

USPS TRACKING #

9590 9402 6142 0209 2513 52

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

United States
Postal Service

• Sender: Please print your name, address, and ZIP+4® in this box•

**HUSCH BLACKWELL**

4801 Main Street, Suite 1000
Kansas City, MO 64112

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

John Rayne
12 Overhill Dr.
Paola, KS 66071

9590 9402 6142 0209 2513 52

2. Article Number (Transfer from service label)

9489 0090 0027 6303 9142 24

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X
☐ Agent
☐ Addressee

B. Received by (Printed Name)    C. Date of Delivery

D. Is delivery address different from item 1?   ☐ Yes
If YES, enter delivery address below:    ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☑ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ ...cted Delivery

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☒ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2015 PSN 7530-02-000-9053    Domestic Return Receipt

# Exhibit 13

USPS TRACKING #




2 L

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

9590 9402 6142 0209 2513 45

**United States**
**Postal Service**

• Sender: Please print your name, address, and ZIP+4® in this box•

# HUSCH BLACKWELL

4801 Main Street, Suite 1000
Kansas City, MO 64112

| SENDER: *COMPLETE THIS SECTION* | COMPLETE THIS SECTION ON DELIVERY |
|---|---|

**SENDER: *COMPLETE THIS SECTION***

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Patrick Arthur Rayne and Kelly Lee
Rayne Family Trust
102 Crestview Dr.
Paola KS 66071

9590 9402 6142 0209 2513 45

2. Article Number *(Transfer from service label)*

9489 0090 0027 6303 9142 55

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X
☐ Agent
☐ Addressee

B. Received by *(Printed Name)*     C. Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:  ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☒ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
     'tricted Delivery

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2015 PSN 7530-02-000-9053     Domestic Return Receipt

# Exhibit 14

USPS TRACKING #

KANSAS CITY MO
MAR 2020 PM 4 L

9590 9402 6142 0209 2511 30

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

**United States Postal Service**

* Sender: Please print your name, address, and ZIP+4® in this box•

**HUSCH BLACKWELL**
4801 Main Street, Suite 1000
Kansas City, MO 64112

Moody C/ni 550367-1

**SENDER: COMPLETE THIS SECTION**

- ■ Complete items 1, 2, and 3.
- ■ Print your name and address on the reverse so that we can return the card to you.
- ■ Attach this card to the back of the mailpiece, or on the front if space permits.

**1. Article Addressed to:**

Oswego Coal Company, Inc.
Resident Agent: Robert Caylor
2476 Marshall Road
Ottawa, KS 66067

9590 9402 6142 0209 2511 30

**2. Article Number** *(Transfer from service label)*

9 0090 0027 6303 9140 19

PS Form **3811**, July 2015 PSN 7530-02-000-9053

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X _Freedra Caylor_   ☐ Agent
                      ☐ Addressee

B. Received by *(Printed Name)*     C. Date of Delivery
Claudia Caylor                       01/11/21

D. Is delivery address different from item 1?  ☐ Yes
If YES, enter delivery address below:          ☐ No

**3. Service Type**
- ☐ Adult Signature
- ☐ Adult Signature Restricted Delivery
- ☑ Certified Mail®
- ☐ Certified Mail Restricted Delivery
- ☐ Collect on Delivery
- ☐ Collect on Delivery Restricted Delivery
- ☐ Insured Mail
- ☐ Insured Mail Restricted Delivery (over $500)

- ☐ Priority Mail Express®
- ☐ Registered Mail™
- ☐ Registered Mail Restricted Delivery
- ☐ Return Receipt for Merchandise
- ☐ Signature Confirmation™
- ☐ Signature Confirmation Restricted Delivery

Domestic Return Receipt

# Exhibit 15

**USPS TRACKING #**

9590 9402 6142 0209 2511 54

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

**United States Postal Service**

• Sender: Please print your name, address, and ZIP+4® in this box•

# HUSCH BLACKWELL

4801 Main Street, Suite 1000
Kansas City, MO 64112

Moody c/m 550367-1

112-255150

89

**SENDER: COMPLETE THIS SECTION**

■ Complete items 1, 2, and 3.
■ Print your name and address on the reverse so that we can return the card to you.
■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Black, Lyle D.; Cheryl K.
3159 Neosho Rd.
Ottawa, KS 66067-8879



9590 9402 6142 0209 2511 54

2. Article Number (Transfer from service label)

0090 0027 6303 9140 33

PS Form 3811, July 2015 PSN 7530-02-000-9053

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X C-19 RB et 2

☐ Agent
☐ Addressee

B. Received by (Printed Name)

C. Date of Delivery
1/11/21

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☒ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (over $500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

Domestic Return Receipt

# Exhibit 16

EXHIBIT A

31443 NW Meade Rd., Richmond, KS 66080
The South Half (S½) of the Northeast Quarter (NE¼) of Section Thirty-four (34), Township
Nineteen (19), Range Nineteen (19) AND the Southeast Quarter (SE¼) of Section Thirty-four
(34), Township Nineteen (19), Range Nineteen (19), excepting that part of the last described
quarter section lying South of the center of Pottawatomie Creek, and EXCEPT One acre of land
situated in the N. E. 1/4 of Section 34 and the S. E. 1/4 of Section 34 all in Township 19 S.,
Range 19 E., Anderson County, Kansas and being more particularly described as follows:
Commencing at the S. E. corner of the N. E. 1/4 of Section 34, Township 19 S., Range 19 E.,
Anderson County, Kansas; thence N. 0°01'46" E. along the East line of said N. E. 1/4 a distance
of 58.87 ft. to a point; thence N. 89°31'34" W. a distance of 235.50 ft. to a point; thence S.
0°01'46" W. a distance of 61.88 ft. to a point on the N. Line of the S. E. 1/4 Section 34,
Township 19 S., Range 19 E; thence continuing S. 0°0146" W., a distance of 123.09 ft. to a
point; thence S. 89°31'34" E., a distance of 235.50 ft. to a point on the East line of said S. E. 1/4;
thence N. 0°01'46" E. along said East line a distance of 126.10 ft. to the POINT OF
BEGINNING.

00000 NW Meade Rd., Garnett, KS 66032
The Northeast Quarter (NE¼), except 1.52 acres in the northeast corner north of Pottawatomie
River, of Section 3, Township 20 South, Range 19 East of the 6th P.M., Anderson County,
Kansas.

Exhibit 17

EXHIBIT B

Statement of Account

| | |
|---|---|
| Contract Value Unpaid | $ 978,393.60 |
| Retainage Withheld | $ 108,710.40 |
| Total | **$ 1,087,104.00** |

# Exhibit 18

# EXHIBIT C

C1: Subcontract Agreement
C2: Invoices

(Attached hereto)



**Subcontractor Agreement**
**No. SR1916169002**

This agreement is made at Big Lake, MN this day of __January 17, 2020__ .

BETWEEN:

Minnesota Limited, LLC (Contractor)
18640 200ᵗʰ Street – PO Box 410
Big Lake, MN 55309

AND:

THE HDD COMPANY(Subcontractor)
4525 SERRANO PARKWAY, OFFICE SUITE 210
EL DORADO HILLS, CA 95762

RECITALS

Contractor ("Minnesota Limited, LLC) has entered into a contract (the "Prime Contract") with Southern Star Central Gas Pipeline, Inc. ("Owner") to perform certain labor and furnish certain materials for completion of the construction project KS - C60206 Install 31.5 miles of 36" (the "Project"). Subcontractor desires to perform certain services and/or provide certain materials as a subcontractor of Contractor pursuant to the terms and conditions of the Prime Contract and agrees to the terms and conditions of this Agreement.

AGREEMENT

In consideration of the mutual covenants contained herein, the parties agree as follows:

I.      Subcontractor agrees to supply all the materials and labor and pay all license fees, permits and expenses for the work located at __Various Sites__ (the "Site"). As full compensation for performance of this Agreement and subject to all applicable provisions of this Agreement, Contractor agrees to pay Subcontractor:
        six million one-hundred eight-five thousand nine-hundred thirty six dollars ($6,185,936.00_____ )

II.     **Contract Document**. Subcontractor's performance hereunder shall be subject to all terms and conditions contained in the Prime Contract and all drawings and/or specifications referred to therein (the "Contract Documents") except as such terms may be specifically amended by this Agreement, which includes HDD's Proposal, attached hereto and incorporated herein. Wherever the Contract Documents shall refer to the Contractor or its agents, the same shall be read to refer to the Subcontractor under this agreement. Subcontractor shall perform and coordinate its work hereunder in a manner necessary to assure the prompt and timely completion of the Project, time being of the essence to the



Agreement. At Subcontractor's request, a copy of the applicable Prime Contract Terms and Conditions will be supplied to Subcontractor.

Any terms and conditions proposed in Subcontractor's acceptance of or in any acknowledgement, invoice, or other form of Subcontractor that add to, vary from, or conflict with these terms hereby objected to. Any such proposed terms shall be void and these terms and conditions (1) shall constitute the complete and exclusive statement of the terms and conditions of the contract between the parties and (2) may be modified only by written instrument executed by the authorized representatives of both parties.

III.     **Insurance.** Subcontractor shall comply with the insurance requirements set forth in Exhibit A (attached).

IV.     **Additional Terms and Conditions**

   A.  Subcontractor, not Contractor, assumes all the risk related to in performing its work under this Agreement, such as any injuries to Subcontractor, Subcontractor's workers, Facility employees and members of the public arising from the Subcontractors activities or use of tools and equipment, or from any other cause.

   B.  Subcontractor will complete all work in a workmanlike and professional manner according to standard practices in the building trade, and in compliance with all building codes and other applicable laws. Subcontractor will warrant against defects in material and labor it supplies for the completion of the work. If subcontractor fails to perform under this Agreement, the party entitled to performance or the Contractor will have the right to hire other persons to correct the defective Work and hold Subcontractor liable for the costs thereof including costs, disbursements and reasonable attorneys' fees incurred in the enforcement of this provision.

   C.  All Work will be done on a timely basis. The work to be performed under this contract shall be commenced as directed by Project Manager or Project Superintendent or Project Foreman and shall be substantially completed on or before __as agreed upon and directed onsite_____.  Time is of the essence.

   D.  Subcontractor shall indemnify, defend and hold harmless Contractor as set forth in Section VII.

   E.  No work shall be subcontracted or assigned by Subcontractor without the prior written approval of the Contractor.

   F.  Environmental, Health and Safety. Subcontractor shall take all necessary precautions to keep the work site free from hazards that are likely to cause injury, illness, or death or damage to property. Subcontractor shall provide any Safety Data Sheets (SDS) for any hazardous chemicals provided pursuant to this contract. Contractor is a company that operates under a "Culture of Safety" with the goal of zero incidents, and expects its subcontractor to similarly emphasize the paramount importance of safe behavior. Failure to abide by Contractor's policies may result in immediate removal of Subcontractor from the premises and will be a breach of Subcontractor's obligations hereunder.



Contractor shall have the right, at its option, to conduct a complete audit of Subcontractor's documents and practices to verify Subcontractor's compliance with this Section.

G.    Minnesota Limited has enacted a Subcontractor Management Program and Safety Requirements of which Subcontractor has received. Subcontractor shall follow and adhere to all aspects of said program and the terms and conditions of such program are incorporated herein.

H.    Liens. To the fullest extent permitted by law, and the extent the Contractors has paid the Subcontractor, Subcontractor will at all times keep the Project, the Site and each part thereof free from any attachment, lien, claim of lien, or other encumbrance arising out of the Work and Subcontractor will indemnify, defend and hold Contractor harmless from and against all claims, losses, demands, causes of action or expenses (including attorneys' fees and other costs of defense incurred by Contractor in defending against the foregoing or in enforcing this indemnity and defense obligation) of whatever nature, arising by reason of any such lien, claim of lien, attachment or encumbrance. If any claim is filed to enforce any laborers, material men, mechanic's, or other similar lien arising out of or relating to the Work for which Contractor has paid the Subcontractor, Subcontractor will immediately cause such lien to be released and discharged and if Subcontractor fails to do so, then Contractor will have a right to pay all sums, including attorneys' fees and other costs and expenses incurred necessary to obtain such release and discharge, and hold Subcontractor liable for the amount thereof with the right to deduct all or a portion of such sum from accounts that may be due Subcontractor.

I.    Default. In addition to the other remedies available under law; (a) if Subcontractor should fail or refuse, except in cases where extension of time is provided, to supply enough properly skilled workers or proper materials for the Work; or (b) if Subcontractor should fail to make payment to its subcontractors for material or labor which are due to its Subcontractors, or (c) if Subcontractor should fail to keep and comply with any of the terms and provisions of this Agreement, or (d) if Subcontractor should be adjudged bankrupt, file or suffer to be filed a petition for relief under the Bankruptcy Act, or make a general assignment for the benefit of the creditors; or (e) if a receiver should be appointed on account of Subcontractor's insolvency; or (f) if Subcontractor fails to pay its employees' wages, benefits or tax withholdings; then, in any such event, Contractor may without prejudice to any other right or remedy and after giving Subcontractor and its surety, if any, upon twenty-four hours written notice, terminate its obligation to Subcontractor under this Agreement and take possession of the Site and complete (or cause to be completed) the Work by whatever method Contractor may deem expedient. In such case Subcontractor will not be entitled to receive any further payment until the Work is completed. Upon completion of the Work, Contractor will pay to Subcontractor an amount equal to (x) the unpaid portion of the Subcontract Amount attributable to the Work performed up to the termination less (y) the amount by which (i) the costs incurred by Contractor to complete the Work, including, without limitation, costs for architectural, managerial and administrative services and reasonable attorneys' fees, if legal counsel is employed, exceed (ii) the portion of the Subcontract Amount attributable to the balance of the Work yet to be performed at the time of termination. If the amount calculated under part (y) in the preceding sentence exceeds the amount owing under part (x), the Subcontractor will pay the difference to Contractor. If the amount in part (x) exceeds the amount in part (y), Contractor will pay the difference to Subcontractor.



J.     Subcontractor is an independent Subcontractor and is not an employee or agent of the Contractor and neither Subcontractor nor anyone employed by Subcontractor will be deemed for any purpose to be the agent, employee, servant or representative of Contractor in the performance of the Work. Subcontractor acknowledges and agrees that Contractor will have no direction or control over the means, methods, procedures or manner of the Work performed by Subcontractor or any of its subcontractors, or any of their employees, vendors or suppliers.

K.     No changes shall be made in the work proposed or in the price unless those changes are agreed to in writing     by     both     Subcontractor     and     Contractor.     Travis     Gehr     and     /     or __James Redmond_____, shall be the Contractor's designated on site agent, If there is a dispute regarding whether the work is a change, Subcontractor may perform that work under protest and submit a claim to Contractor in accordance with this Agreement.

L.     Clean Up.  Subcontractor will at all times keep the site or facility safe and free from the accumulation of waste materials or rubbish caused by its operations or related to the Work. Upon completion of the Work and each portion thereof, Subcontractor will remove all rubbish and waste produced by its operations or Work hereunder from the facility as well as all of its tools, equipment, machinery and surplus materials no longer needed and leave the site or facility in a "broom clean" or equivalent condition and safe for Subcontractor's employees and subsequent subcontractors to perform their work, unless otherwise specified in writing. If Subcontractor fails to clean up, Contractor may do so after written notice to Subcontractor and the cost thereof will be charged to Subcontractor.

V     **Representations of Subcontractor.**  Subcontractor represents and warrants the following:

A.     Subcontractor has examined the Agreement ("Prime Contract") between Owner and Minnesota Limited (if requested by the Subcontractor prior to the execution of the work) and agrees to all provisions affecting Subcontractors performance, including but not limited to the representations, obligations and warranties made by Minnesota Limited to the Owner.

B.     Subcontractor has the requisite authority and ability to perform the subcontract without delay.

C.     Subcontractor will not assign, subcontract or otherwise delegate its responsibilities and obligation hereunder without the written consent of Contractor.

D.     Subcontractor shall examined the specifications, site conditions, drawings and requirements of the work with due diligence and its bid has taken into consideration all conditions and risks which are reasonably related to the performance of the work.

E.     Ethics; Conflict of Interest.  Subcontractor shall at all times during the performance of its obligations hereunder conform to sound ethical business practices in conformance with all applicable Laws and shall in its business practices promote the values of honesty, integrity, social responsibility, and human rights.  Subcontractor shall not offer to any member of Contractor (including employees thereof) any gifts, entertainment, or other favors beyond the common courtesy usually associated with business practices.  Subcontractor shall not pay any commissions or fees or grant any rebates or other



remuneration or monetary gratuity to any employee of Contractor. Subcontractor shall not grant any secret rebates nor pay any commissions or fees to any employee of Contractor.

F. Invitees Prohibited. Subcontractor shall not, without prior written permission of Contractor, invite, permit entry or bring any Person onto the Contractor's Worksite or property who is not an employee of Subcontractor

G. Subcontractor will pay its employees promptly and maintain good labor relations. Subcontractor further represents that it has paid all union benefit contributions including fringe benefits. Subcontractor agrees that Contractor upon demand of the Labor Union, may withhold from any sums due Subcontractor and pay to the Administrator of the Plan any amounts owing and said payment shall be deducted from the invoice.

VI. **Warranty.**

A. Subcontractor warrants to the Contractor and Owner that all materials and equipment furnished under this Agreement will be new unless otherwise specified in writing, and that all work will be of good quality, free from faults and defects and in conformance with any Purchase Order and attachments thereto, including any specifications stipulated therein. All Work not so conforming to these standards may be considered defective, and the Subcontractor shall promptly repair and make good, after notice by the Contractor and Owner and without cost to the Contractor and Owner, any damages, defects or faults resulting from imperfect or defective Work done or materials furnished by the Subcontractor. The Subcontractor warrants that all labor, materials and equipment furnished under this Agreement shall be covered by warranty for a period of at least two (2) years (or during a longer period if required by the specifications and stipulated therein) from the date of acceptance of the completed Work by the Owner.

B. Where material or equipment furnished by the Subcontractor is covered by a manufacturer's warranty or guarantee or other special warranty or guarantee the Subcontractor shall provide such warranty and provide additional or extended warranty or guarantees to the Contractor for its labor, materials and equipment to confirm to paragraph A above.

VII. **Indemnification.** To the fullest extent permitted by law, the Subcontractor shall indemnify the Owner, Contractor and the agents and employees of any of them from and against claims, damages, losses and expenses, arising out of or in connection with, or resulting from the negligent performance of the Subcontractor's work, the Subcontractor's subcontractors work, or anyone directly or indirectly employed by them but only to the extent caused by acts or omissions by either or any of them. In addition thereto, Subcontractor indemnifies Owner, Contractor and the agents and employees of any of them for expenses including attorney's fees and costs, incurred in responding to and defending against any claim or in enforcing this provision.

VIII. **Payment**. Subcontractor shall invoice Minnesota Limited no later than 30 days after date of service Contractor agrees to pay Subcontractor all sums due less ___10___ % retainage (if applicable) hereunder within



thirty (30) days from the date the invoice is received. However, it is a condition precedent to payment that if Owner withholds payments for that portion of any work performed by Subcontractor, then Minnesota Limited is only obligated to pay Subcontractor after receiving payment from the Owner. In such event payment will be made within ten (10) days. Contractor reserves the right to withhold such sums as may be necessary to pay expenses, including costs and attorney's fees, caused by, or related to, Subcontractor's breach of Agreement. Final payment of retainage will occur ten (10) days after final payment for Subcontractor's work is received and when lien waivers and job completion affidavit are executed.

IX.    **Maintaining Records / Audit.** For a period of five (5) years from final acceptance of Subcontractor's work, Subcontractor shall maintain all job records and shall, upon reasonable notice by Contractor, but no later than 10 business days, make such records available for inspection by Contractor or Owner. Contractor or Owner or their representatives may audit said records. If the results of the audit show an overpayment, Subcontractor shall reimburse the overpayment ~~together with interest of 1% per month. If the audit shows an overpayment more than one thousand dollars ($1,000), Subcontractor shall also reimburse Contractor or Company for the cost of the audit.~~

X.    **Interpretations and Enforcement.** The Agreement and contract documentation contains the parties entire understanding with regard to the subject hereof and shall not be modified except by a writing signed by both parties; provided, however, that Subcontractor shall be bound by changes in the Contract Documents agreed to between the Contractor and Owner, but only if Contractor has timely notified Subcontractor of such changes. The interpretation and enforcement of this Agreement shall be governed by the laws of the state in which the work hereunder is to be performed or that specified in the Prime Contract if different than the state where the work is to be performed. If any provision hereof is deemed unenforceable, the remainder of the Agreement shall be enforced as though such provision were not a part hereof.

XI.    **Assignment.** Subcontractor shall not assign or subcontract this Agreement or any portion thereof or of any money due or which may become due hereunder without the prior written consent of Contractor. Notwithstanding anything to the contrary contained herein, Contractor may assign this Agreement without the consent of Subcontractor.

XII.    **Confidentiality of Agreement.** The Subcontractor agrees that all terms and conditions contained herein or in any other document(s) referencing the Project shall remain confidential. Said terms shall not be disclosed without the express written consent of the Contractor.
Minnesota Limited is required to protect all technical information supplied by the Owner. Subcontractor agrees that this Section is its written assurance that all such information, including but not limited to: drawings, diagrams, surveys, specifications, locations, and geophysical (GPS) coordinates of the work, will be kept confidential, protected, and will not be disclosed to third parties without obtaining Minnesota Limited's written consent unless ordered to do so by a court of law or arbitrator. Breach of is provision will subject Subcontractor to all remedies awarded to Contractor and Owner including injunctive relief. Subcontractor agrees to pay all of Contractors and Owners attorney's fees in enforcing this provision.



XII.  **Notice.** Unless otherwise provided herein, any notice provided for herein will be in writing and delivered to the parties (a) in person, (b) by facsimile transmission (with the original and a copy of the facsimile confirmation following in the United States mail), (c) by overnight delivery service, or (d) by certified mail, return receipt requested. Notice will go to the address first shown herein for the respective party to whom notice is given or to such other address as may be designated by either party by written notice given pursuant hereto.

XIV.  **Governing Law/Venue/Attorney Fees.** This Agreement shall be construed and interpreted in accordance with the laws of the State of Minnesota, including, without limitation, matters of construction, validity, enforcement, and interpretation. The parties agree that venue for any dispute under this Agreement shall be in the District Court of Hennepin County, Minnesota. In the event any enforcement effort is initiated by Contractor against Subcontractor for default of this Agreement, Subcontractor shall be liable to Contractor for any and all costs of collection, including but not limited to, reasonable attorneys' and professional fees, court costs, traveling and lodging expenses, costs of investigation and defense, accrued interest, and any other reasonable expenses incurred by Contractor in initiating such efforts.

Signed the day and year first written above.


CONTRACTOR:  Minnesota Limited, LLC.

By: _____

Its: _____
            Title


SUBCONTRACTOR: THE HDD COMPANY

By: _____

Its: ___*Vice President*___
            Title



## EXHIBIT A
### Insurance

Prior to commencing Work, Subcontractor shall, at its sole expense, procure and maintain insurance of the types, and in the form and amounts described below from insurer(s) authorized to transact business in the state where Work or operations will be performed by Subcontractor. Such insurance and required coverage in forms acceptable to General Contractor shall be placed with admitted insurers that maintain an A.M. Best's rating of not less than A- VII, unless otherwise approved by the General Contractor. The insurance requirements described below shall be maintained uninterrupted for the duration of the Project, including any warranty periods, and shall protect Subcontractor, and others for whom and/or to whom Subcontractor may be liable, for liabilities in connection with work performed by or on behalf of Subcontractor, its agents, representatives, employees or subcontractors.

### Insurance Requirements:

1.　　　**Commercial General and Umbrella Liability Insurance.** Subcontractor shall maintain commercial general liability ("CGL") and, if necessary, commercial umbrella insurance, with a limit of not less than $ 2,000,000.00 _____ per occurrence, bodily injury or property damage liability; $ 2,000,000.00 _____ per offense, personal and advertising injury liability; $ 5,000,000.00 _____ products-completed operations aggregate; and $ 5,000,000.00 _____ general aggregate applicable to claims other than products-completed operations. To the extent that Subcontractor's CGL and any commercial umbrella insurance are subject to aggregate limits, the policy shall be endorsed so as to apply such aggregate limits separately to the Project.

Coverage afforded under Subcontractor's CGL and any commercial umbrella insurance shall be provided on an occurrence basis and shall be subject to the terms of the *Insurance Services Office ("ISO") Commercial General Liability Coverage Form CG 0001*, or a substitute form providing coverage at least as broad as the ISO form specified. There shall be no limitations or exclusions of coverage beyond those contained in the standard coverage form and coverage shall include liability arising from premises, operations, independent contractors, products-completed operations including construction defect, contractual liability or personal injury and advertising injury.

General Contractor, its officers, directors and employees and Project Owner(s) shall be included as additional insureds under Subcontractor's CGL, and any commercial umbrella insurance, with respect to liabilities arising out of both the ongoing and completed operations of Subcontractor. Such additional insured coverage shall be subject to the terms of ISO additional insured endorsement forms CG 2010 (ongoing operations) and form CG 2037 (products-completed operations), or substitute form(s) providing equivalent coverage. The edition date of the ISO endorsements required should be chosen based on the recipient's risk transfer objectives. The table below summarizes the options and major differences between the edition dates.

| Endorsement(s) | ISO Edition Date | Comments |
|---|---|---|
| CG 2010 | 11/85 Edition | Broadest Insuring Agreement - "liability arising out of" the Subcontractor's work – both ongoing |



**MINNESOTA LIMITED**
AN HYDROGE COMPANY

| | | operations and completed operations coverage provided by one endorsement. |
|---|---|---|
| CG 2010/CG2037 | 10/01 Edition | Same Insuring Agreement as 11/85 with ongoing operations and completed operations coverage provided by separate endorsements. |
| CG 2010/CG2037 | 07/04 Edition | More narrow Insuring Agreement – "caused in whole or in party by. . . .acts or omissions" of the Subcontractor. |
| CG2010/CG2037 | 04/13 Edition | Same Insuring Agreement as 07/04, but limits coverage to "extent permitted by law" and "not be broader than that which you are required by the contract or agreement to provide." |

Note: Recommended Additional Insured endorsement for states other than Minnesota may vary and Willis should be consulted. States including but not limited to IL, TX, & CA involve unique risk transfer considerations.

Additional insured coverage afforded by Subcontractors CGL, and any commercial umbrella insurance, shall be primary and non-contributing with respect to any insurance or self-insurance available to General Contractor or Project Owner. Such primary and non-contributory insurance shall be subject to the terms of ISO form CG 2001 (Primary and Noncontributory – Other Insurance Condition) or its equivalent. Any other insurance or self-insurance maintained by General Contractor or Project owner shall be excess of, and non-contributory with, the coverage afforded by Subcontractors CGL and commercial umbrella insurance, if any.

In addition to procuring and maintaining CGL, and any commercial umbrella insurance, for the duration of the contract, Subcontractor agrees to continue to procure and maintain the products-completed operations liability insurance coverage for a minimum of __two__ ( 2 ) year(s) after the date that the Work is substantially complete. All terms and conditions of such coverage shall be maintained during this completed operations period, including the required coverage limits and the requirement to provide General Contractor and Project Owner with coverage as an additional insured for completed operations.

2.    **Commercial Automobile and Umbrella Liability Insurance.** Subcontractor shall maintain automobile liability and, if necessary, commercial umbrella insurance, with a limit of not less than $ __2,000,000.00__ each accident. Such insurance shall cover liability for bodily injury and property damage arising from the use or operation of any auto, including those owned, hired or otherwise operated or used by or on behalf of Subcontractor. The coverage shall be subject to the terms of ISO *Business Auto Coverage Form CA 0001* (1990 edition or later), or a substitute form providing equivalent coverage.

3.    **Workers' Compensation and Employers Liability Insurance.** Subcontractor shall maintain workers' compensation coverage providing statutory benefits. Subcontractor shall additionally maintain employers liability insurance, and if necessary, commercial umbrella insurance, with a limit of not less than: $1,000,000, bodily injury by accident – each accident; $1,000,000, bodily injury by disease-policy limit; and $1,000,000, bodily injury by disease each employee. Workers' Compensation coverage must extend to every



**MINNESOTA LIMITED**
AN NVERDE COMPANY

employee, including owners/officers of a closely held corporation and/or individuals operating as a sole proprietorship or partnership. <u>Workers' Compensation must provide coverage in the state where the Project is located</u>.

Where applicable, evidence of coverage shall be required for U.S. Longshore and Harbor Workers Compensation, Maritime coverage, Federal Employer's Liability Act and other unique exposures requiring endorsement of coverage.

4. **Contractors Pollution Liability Insurance.** Required only if Subcontractor's scope of services include the remediation, treatment, storage or disposal of waste or hazardous materials on or about the project site, as determined by General Contractor. If required, Subcontractor shall maintain Contractors Pollution Liability coverage with a limit of not less than $_____n/a_____ per occurrence, $____n/a____ annual aggregate. Coverage shall apply to the scope of work as described under the Contract including transportation and shall include coverage for bodily injury; property damage, including loss of use of damaged property or property that has not been physically injured; clean-up costs; mold; defense and investigative costs. Subcontractor shall maintain Completed Operations coverage for ____n/a____ years following final acceptance of the project or termination of the Contract.

If the scope of services in the contract require the Subcontractor to provide professional services associated with arranging for, or brokering of, hazardous material or construction and demolition (C&D) wastes off the job site, Subcontractor must amend the Contractors Pollution Liability policy to include coverage to address this scope of work. If any of the aforementioned insurance policies are written on a claims made basis, the Contractor warrants that continuous coverage will be maintained, or an extended discovery period will be exercised, for a period of three years beginning from the time the work under this contract is completed.

5. **Pollution (Environmental) Liability Insurance.** Required only if Subcontractor's scope of services involves disposal of waste or hazardous materials off-site, as determined by General Contractor. If required, Subcontractor shall maintain pollution (environmental) liability coverage with a limit of not less than: $____n/a____ per incident, $____n/a____ policy aggregate for hazardous waste disposal services, and $____n/a____ per incident, $____n/a____ for all other disposal facilities. Such coverage shall include clean-up costs, defense costs and products and completed operations.

If the scope of services in the contract requires the disposal of any hazardous materials or construction and demolition (C&D) wastes off the job site, Subcontractor must also obtain evidence that the Disposal Site Operator maintains Pollution Legal Liability Insurance with coverage for: a. bodily injury, sickness, disease, mental anguish or shock sustained by any person, including death; b. property damage including physical injury to or destruction of tangible property including the resulting loss of use thereof, clean-up costs, and the loss of use of tangible property that has not been physically injured or destroyed; c. defense including costs, charges and expenses incurred in the investigation, adjustment or defense of claims for such compensatory damages. d. pollution conditions on, at, under or emanating from any disposal site, location or facility, used by or on behalf of the disposal facility of any waste or waste materials relating to the performance of the work.



The Disposal Site Operator's Pollution Liability Policy will apply to losses arising from the facility that is accepting the waste under the contract. Minimum limits of Insurance for this policy shall be $_____n/a_____ each incident / $_____n/a_____ policy aggregate.

Claims-made coverage is permitted, provided the policy retroactive date is continuously maintained prior to the commencement date of the agreement, and coverage is continuously maintained during all periods in which Subcontractor accepts or treats waste generated from General Contractor's projects and for a period of one (1) year thereafter.

6.    **Professional Liability Insurance.** Required only if Subcontractor's scope of services include architectural, engineering, professional consulting or construction management, as determined by General Contractor. If required, Subcontractor shall maintain professional liability coverage with a limit of not less than $_____n/a_____ each wrongful act, $_____n/a_____ policy aggregate.

Coverage shall include liability arising from the errors, omissions or acts of the Subcontractor or any entity for which the Subcontractor is legally responsible in the providing of professional services under the Contract. Throughout the term the Contract, the PL/E&O policy shall include full prior acts coverage. Coverage shall be continuously maintained during the term of this Agreement and for a period of x years following final acceptance of the Project or termination of the Contract.

Coverage shall not include any exclusion or other limitations related to:
- Scope of the professional services
- Delays in project completion and cost overruns
- Who is authorized to notify the carrier of a claim or potential claim
- Mold, fungus, asbestos, pollutants or other hazardous substances

Claims-made coverage is permitted, provided the policy retroactive date is continuously maintained prior to the commencement date of this agreement, and coverage is continuously maintained during all periods in which Subcontractor performs professional services for General Contractor, and for an additional period of one (1) year after termination of this agreement or the last date such services are performed, whichever comes later. If Subcontractor's scope of work includes environmental engineering or consulting, the terms of coverage shall not exclude environmental professional services.

7.    **Watercraft Liability Insurance.** If watercraft of any kind is used by the CONTRACTOR or Subcontractor, including: (i) bodily injury; (ii) property damage; and (iii) passenger liability.

a.    Limit of Liability: Combined Single Limit (Bodily Injury and Property Damage), $1,000,000 each occurrence;

b.    Protection and Indemnity Insurance to include Jones Act crew coverage (or at least Maritime Employer's Liability: MEL), collision, tower's liability and wreck removal coverage, on a form providing



coverage no less extensive than that afforded in the P & I SP-23 form (revised 1/59), including a pollution buy-back endorsement.

8.     **Aircraft Liability Insurance.** If aircraft of any kind is used by the CONTRACTOR or Subcontractor, including: (i) bodily injury; (ii) property damage; and (iii) passenger liability.

   a.     Limit of Liability: Combined Single Limit (Bodily Injury and Property Damage and Passenger Liability), including hull physical damage insurance for the full replacement cost of each aircraft used in the work. Such Aircraft Liability and Hull Coverage shall include a waiver of subrogation against General Contractor and all others required by this Agreement to be additional insureds. $ ___n/a___ per seat; $ ___n/a___ per occurrence

## Additional Provisions:

1.     **Deductibles and Self-Insured Retentions.** The funding of deductibles and self-insured retentions maintained by Subcontractor shall be the sole responsibility of Subcontractor, including any amounts applicable to deductibles or self-insured retentions applicable to claims involving the General Contractor or Owner as an additional insured. Any self-insured retentions in excess of $ ___n/a___ must be declared to and approved by the General Contractor.

2.     **Primary / Non-Contributing.** Subcontractor's required insurance coverage shall be primary insurance, and any insurance or self-insurance maintained by the General Contractor or Project Owner shall be excess of and noncontributory with Subcontractor's insurance.

3.     **Severability of Interest.** Except with respect to the limits of insurance, Subcontractor's required insurance shall apply separately to each insured or additional insured.

4.     **Waiver of Subrogation.** Subcontractor agrees to waive all rights of subrogation against the General Contractor, Project Owner and Project Architect, and shall cause each of its subcontractors to waive all rights of subrogation against the General Contractor, Project Owner and Project Architect, their agents and employees, as respects loss, damage, claims, suits or demands, howsoever caused:

   a.  To real or personal property, vehicles, equipment, tools, etc. owned, leased or used by Subcontractor or Subcontractor's employees, agents or sub-subcontractors; and
   b.  To the extent such loss, damage, claims, suits or demands are, or should be, afforded coverage by the Subcontractor's required insurance or any other insurance (except professional liability to which this requirement does not apply) maintained by the Subcontractor. This waiver shall C1PPIY to all first party property, equipment, vehicle and workers' compensation claims (unless prohibited under applicable state statutes), and all third party liability claims. This waiver shall apply to all deductibles, retentions or self-insured layers applicable to the required or any other insurance (except professional liability to which this requirement does not apply) maintained by the Subcontractor. If necessary, Subcontractor agrees to endorse the required insurance policies to permit waivers of subrogation in



favor of General Contractor, Project Owner and Project Architect as required hereunder. Subcontractor further agrees to hold harmless and indemnify General Contractor, Project Owner and Project Architect for any loss or expense incurred as a result of Subcontractor's failure to obtain such waivers of subrogation from the insurers.

5.        **Notice of Cancellation / Material Change / Nonrenewal.** Subcontractor's insurance policies must contain a provision or endorsement that the coverage afforded will not be canceled, materially changed or renewal refused until at least 30 days prior Written Notice has been given to General Contractor and to each other additional insured to whom a certificate of insurance has been issued; provided, however, that a ten (10) day prior notice requirement may apply in the event of cancellation due to nonpayment of premium.

6.        **Verification of Coverage.** Prior to commencing Work, Subcontractor shall furnish General Contractor with certificate(s) of insurance executed by a duly authorized representative of each insurer, as evidence of compliance with the insurance requirements set forth above   Such certificates of insurance shall be accompanied by copies of endorsements evidencing coverage afforded to General Contractor and Project Owner as additional insured, and endorsements reflecting insurer's concurrence with Subcontractor's waiver of subrogation rights against General Contractor, Project Owner and Project Architect.   Renewal certificates are to be provided to the General Contractor prior to the expiration of the required insurance policies.
Certified copies of policies, including all policy endorsements, shall be furnished by Subcontractor within 15 days of written request by General Contractor.

The certificate(s) of insurance shall be subject to approval of General Contractor, but failure of General Contractor to request such certificate or other evidence of Subcontractor compliance with insurance requirements, or failure of General Contractor to identify deficiencies from evidence that is provided, shall in no way limit or relieve Subcontractor of its obligations to maintain such insurance

7.        **Sub-Subcontractors.** No work shall be sublet to any Sub-subcontractor without first obtaining the General Contractor's written permission. All Sub-subcontractors, once approved by the General Contractor, are subject to the same insurance requirements as Subcontractor.  Subcontractor shall cause each Sub-subcontractor employed by Subcontractor to purchase and maintain such insurance.  Upon request, Subcontractor shall furnish General Contractor with copies of certificates of insurance evidencing coverage for each Sub-subcontractor

Subcontractor shall voluntarily provide workers compensation coverage for proprietors, partners or others not statutorily required to maintain workers' compensation insurance.

8.        **Leased Employees.** Use of leased employees by Subcontractor is expressly prohibited without General Contractor's written permission.  If permitted by General Contractor, Subcontractor shall:

     a.        Provide General Contractor with a complete copy of its Agreement with the Leasing Company;



b.    Require that Leasing Company provide workers' compensation, employers liability and commercial general liability with coverage limits in amounts no less than Subcontractor insurance requirements for the same coverages.

c.    Require that Leasing Company provide Alternate Employer Endorsement naming General Contractor as alternate employer on Leasing Company's workers' compensation policy.

d.    Require that Leasing Company add General Contractor as an additional insured on its commercial general liability insurance policy, with primary/non-contributory wording.

e.    Require that Leasing Company provide waiver of subrogation in favor of General Contractor on both Leasing Company's workers' compensation and commercial general liability insurance policies.

f.    Provide General Contractor with a copy of the Leasing Company's certificate of insurance, with endorsements, evidencing the required coverage.

9.    **No Representation of Coverage Adequacy.**    In specifying minimum Subcontractor insurance requirements, General Contractor does not represent that such insurance is adequate to protect Subcontractor for loss, damage or liability arising from its work.  Subcontractor is solely responsible to inform itself of types or amounts of insurance it may need beyond these requirements to protect itself.

The insurance requirements set forth in minimum amounts shall not be construed to relieve Subcontractor for liability in excess of such coverage, nor shall it preclude General Contractor from taking such other actions as is available to it under any other provision of the Subcontract.  To the extent Subcontractor maintains insurance greater than these minimum requirements, Subcontractor agrees that such insurance shall be applicable to any of Subcontractor's liability obligations hereunder.

Any acceptance of certificates of insurance by General Contractor shall in no way limit or relieve Subcontractor of its duties and responsibilities under this Subcontract, including the duty to indemnify and hold harmless General Contractor.

10.    **Compliance.**    Failure of Subcontractor to maintain the required insurance shall constitute a default under this Subcontract and, at General Contractor's option, shall allow General Contractor to terminate this Subcontract for cause, withhold payment and/or purchase the required insurance at Subcontractor's expense.

11.    **Cross-Liability Coverage/Non-Standard Restrictive Endorsements.**    All liability policies shall include cross liability coverage and a standard ISO separation of insureds provision, or its equivalent.  No liability policy shall include or be endorsed to include any non-standard provisions restricting coverage for the named insured or the persons/entities required to be named as additional insureds under this Agreement, including but not limited to cross liability coverage exclusions or limitations.



January 9, 2020

**Minnesota Limited**
18640 200ᵗʰ St, PO Box 410
Big Lake, MN 55309

ATTN: Amy Skuza

RE: Southern Star Lines DT and DS Replacement Project
Directionally drill and install approximately 6,052 feet of 36-inch steel pipeline in
Anderson and Franklin Counties, KS.

The HDD Company is pleased to submit the following bid quote:

1.  **Responsibilities of The HDD Company**
    1.1.   Provide all required insurance certificates.
    1.2.   Provide any written submittals and qualifications required.
    1.3.   Provide 2 (two) drill rig(s) with sufficient capabilities to install the crossings, a
           closed-loop mud system, mud pumps, vacuum trucks, dump trucks, steering
           system, and all drill spread support equipment necessary.
    1.4.   Provide all required union labor for the drilling operations.
    1.5.   Provide preliminary drill profiles for each crossing.
    1.6.   Provide final as-built drawings.
    1.7.   Provide and haul water for drilling operations.
    1.8.   Provide water storage for the duration of drilling operations.
    1.9.   Provide all required pulling heads.
    1.10.  Leave the entry areas clean, free of debris, and to a rough grade.
    1.11.  Provide bonding at 1%, which is not included in the bid pricing below.

2.  **Responsibilities of THE CONTRACTOR**
    2.1.   Stake and survey the entry and exit points for each bore, with correct stations
           and elevations.
    2.2.   Provide all permitting to undertake the project.
    2.3.   Provide and maintain suitable truck access to and from entry and exit locations.
    2.4.   Provide stable, level, matted and/or graveled work pads for each bore.
    2.5.   Provide all BMPs around each bore's entry and exit locations. The HDD
           Company will maintain these items.
    2.6.   Provide, string, weld, and test all 36-inch pipe for each bore.

2.7. Provide all plans, equipment, and manpower to handle pipe during pullback operations.
2.8. Perform all final tie-ins.
2.9. Provide all settlement monitoring, if required.
2.10. Provide all final site restorations.
2.11. Provide all field surveys to document existing conditions for the HDD installations, including but not limited to pictures, videos, field notes, etc.

## 3. Pricing (Lump Sum)

| | | |
|---|---|---|
| 3.1. | HDD Cedar Creek 2,106' X 36" pipe: | $1,280,448.00 |
| 3.2. | HDD Pottawapomie Creek 1,788' X 36" pipe: | $1,087,104.00 |
| 3.3. | HDD Flint Hill 2,158' X 36" pipe: | $1,312,064.00 |
| 3.4. | Mobilization per rig spread: | $50,000.00 |

## 4. Clarifications

4.1. Additional footage due to no fault of The HDD Company, will be billed at $608.00/LF.
4.2. This proposal is based upon the drawings, specifications, and geotechnical information provided to us on or before **7 June 2019**.
4.3. If any revised or additional drawings, specifications, geotechnical information, or permits are provided to us after the bid submission date, The HDD Company reserves the right to modify the proposal to account for any added costs and/or additional time associated with the change(s).
4.4. The HDD Company's bid proposal is conditional upon reaching an agreement upon mutually acceptable contract terms. This bid proposal will be attached to and forms a part of the contract between The HDD Company and THE CONTRACTOR.
4.5. Item 3.3 above includes the hauling and disposal of all **non-contaminated** drilled solids and excess drilling fluids.
4.6. The pricing above is contingent upon a site visit.

## 5. Exclusions

5.1. The HDD Company and its personnel are not the Project Engineers. Therefore, we exclude all design and engineering services unless any are specifically noted as included in this proposal. Any drilling plans or profiles that we submit to you will be based upon the design information in the contract documents and our experience as HDD contractors. Any plans or profiles we provide are recommendations only and are subject to review and approval by the project owner and/or its engineers.
5.2. All permits, including federal, State and local environmental permits, the SWPPP permit and any associated SWPPP plans, any right-of-way (ROW) agreement or easements, and all access necessary for us to perform our work shall be provided by others. If our operations are delayed or otherwise impacted by any delays or problems with permits, SWPPP plans, ROW agreements, easements or access arrangements our compensation and time for completion will be equitably adjusted.

6. **Terms and Conditions**
   6.1. Schedule
       6.1.1. This proposal is based upon performance under a reasonable and mutually agreed-to project schedule in so far as that schedule applies to our work. The approved project baseline schedule and all monthly updates must be provided to us on a regular and timely basis to keep us apprised of schedule changes which may impact the timing and efficiency of our work. We will not be liable for any delays caused by others or by factors beyond our reasonable control.
   6.2. Indemnification
       6.2.1. We will indemnify you and/or the project owner for personal injury or property damage claims to the extent of our own negligence. Our proposal excludes any obligation to indemnify you for your own negligence or to indemnify any other party for that party's own negligence or to indemnify any design professional.
   6.3. Payment
       6.3.1. Monthly progress payments will be made to The HDD Company within (7) seven days after you receive each monthly payment from the project owner, but in no event later than 120 days from the date you received your invoice.
       6.3.2. We will receive our final payment within 30 days after you receive our final billing and our work has been completed and accepted. Acceptance will not be unreasonably withheld or delayed. If you dispute any portion of any billing, you will promptly notify us in writing of the nature of the dispute and you will pay the undisputed portion of the billing without delay. If any undisputed amounts are past due for more than 10 days, we reserve the right to stop work until all payments are brought current. We will provide lien releases in accordance with applicable state statutes or regulations. We will keep the project free of liens from out subcontractors, suppliers and other vendors provided we have been paid by you for the work covered by any such liens.
   6.4. Extra/Force Account Work:
       6.4.1. If we are directed to perform any work on a force account or time and material basis, the rates for our labor and equipment will be as stated in our proposal, or if no rates are included with this proposal, as stated in our then current standard labor and equipment rate schedule. If we are directed to standby or suspend work while other operations occur, or delays or other problems are resolved, or if we are required to standby due to events or circumstances beyond our control, the standby time for our labor and equipment will be paid as stated in this proposal.
   6.5. Differing Site Conditions

Going to Greater Lengths™

6.5.1. If the conditions we encounter in the performance of our work differ materially from those indicated in the contract documents, boring logs, geotechnical reports or other information furnished to us prior to bid, or from those ordinarily encountered and generally recognized as inherent in the type of work provided for in our proposal, then our compensation and time for completion will be equitably adjusted to account for any resulting delay and added costs.

7. **Delays and Work Stoppages:**

7.1 All work stoppages that arise through no fault of The HDD Company will be billed at **$14,500** (no crew on site).

The HDD Company appreciates the opportunity to furnish you this quote and looks forward to working with you. Should any of the information presented above need further clarification, please do not hesitate to contact us.

Sincerely,
**The HDD Company**


Jeremy King
Vice President



EL DORADO HILLS | OFFICE Suite 210,
4925 Serrano Parkway, El Dorado Hills, CA USA 95762

MAIN 530 676 5705 | CROSSINGGROUP.COM

17 January 2020

**Minnesota Limited**
18640 200ᵗʰ St, PO Box 410
Big Lake, MN 55309

ATTN: Brad Cordes

RE:   Southern Star Lines DT and DS Replacement Project
      Directionally drill and install approximately 4540 feet of 36-inch steel pipeline road
      crossings in Anderson and Franklin Counties, KS.

The HDD Company is pleased to submit the following bid quote:

1.   **Responsibilities of The HDD Company**
     1.1.   Provide all required insurance certificates.
     1.2.   Provide any written submittals and qualifications required.
     1.3.   Provide drill rig(s) with sufficient capabilities to install the crossings, a closed-
            loop mud system, mud pumps, vacuum trucks, dump trucks, steering system,
            and all drill spread support equipment necessary.
     1.4.   Provide all required union labor for the drilling operations.
     1.5.   Provide final as-built drawings.
     1.6.   Provide and haul water for drilling operations.
     1.7.   Provide water storage for the duration of drilling operations.
     1.8.   Provide all required pulling heads.
     1.9.   Leave the entry areas clean, free of debris, and to a rough grade.
     1.10.  Provide bonding at 1%, which is not included in the bid pricing below.

2.   **Responsibilities of THE CONTRACTOR**
     2.1.   Stake and survey the entry and exit points for each bore, with correct stations
            and elevations.
     2.2.   Provide all permitting to undertake the project.
     2.3.   Provide and maintain suitable truck access to and from entry and exit locations.
     2.4.   Provide stable, level, matted and/or graveled work pads for each bore.
     2.5.   Provide bore pits and shore if needed.
     2.6.   Provide all BMPs around each bore's entry and exit locations. The HDD
            Company will maintain these items.
     2.7.   Provide, string, weld, and test all 36-inch pipe for each bore.
     2.8.   Furnish support crew for road crossings, including excavators and manpower.

*Going to Greater Lengths"*

2.9.   Provide all plans, equipment, and manpower to handle pipe during pullback operations.

2.10.  Perform all final tie-ins.

2.11.  Dispose of cuttings.

2.12.  Provide all settlement monitoring, if required.

2.13.  Provide all final site restorations.

2.14.  Provide all field surveys to document existing conditions for the HDD installations, including but not limited to pictures, videos, field notes, etc.

## 3.  Pricing

| 3.1. | 4540' X 36" pipe: | $508.00/ft |
|---|---|---|
| 3.2. | Mobilization per rig spread: | $50,000.00 |

## 4.  Clarifications

4.1.  This proposal is based upon the drawings, specifications, and geotechnical information provided to us on or before **17 January 2020.**

4.2.  If any revised or additional drawings, specifications, geotechnical information, or permits are provided to us after the bid submission date, The HDD Company reserves the right to modify the proposal to account for any added costs and/or additional time associated with the change(s).

4.3.  The HDD Company's bid proposal is conditional upon reaching an agreement upon mutually acceptable contract terms. This bid proposal will be attached to and forms a part of the contract between The HDD Company and THE CONTRACTOR.

4.4.  The pricing above is contingent upon a site visit.

## 5.  Exclusions

5.1.  The HDD Company and its personnel are not engineers. Therefore, we exclude all design and engineering services unless any are specifically noted as included in this proposal. Any drilling plans or profiles that we submit to you will be based upon the design information in the contract documents and our experience as HDD contractors. Any plans or profiles we provide are recommendations only and are subject to review and approval by the project owner and/or its engineers.

5.2.  All permits, including federal, State and local environmental permits, the SWPPP permit and any associated SWPPP plans, any right-of-way (ROW) agreement or easements, and all access necessary for us to perform our work shall be provided by others. If our operations are delayed or otherwise impacted by any delays or problems with permits, SWPPP plans, ROW agreements, easements or access arrangements our compensation and time for completion will be equitably adjusted.

## 6.  Terms and Conditions

6.1.  Schedule

6.1.1.  This proposal is based upon performance under a reasonable and mutually agreed-to project schedule in so far as that schedule applies to our work. The approved project baseline schedule and all monthly updates must be provided to us on a regular and timely basis to keep

us apprised of schedule changes which may impact the timing and efficiency of our work. We will not be liable for any delays caused by others or by factors beyond our reasonable control.

6.2   Indemnification

6.2.1.   We will indemnify you and/or the project owner for personal injury or property damage claims to the extent of our own negligence. Our proposal excludes any obligation to indemnify you for your own negligence or to indemnify any other party for that party's own negligence or to indemnify any design professional.

6.3   Payment

6.3.1.   Monthly progress payments will be made to The HDD Company within (7) seven days after you receive each monthly payment from the project owner, but in no event later than 120 days from the date you received your invoice.

6.3.2.   We will receive our final payment within 30 days after you receive our final billing and our work has been completed and accepted. Acceptance will not be unreasonably withheld or delayed. If you dispute any portion of any billing, you will promptly notify us in writing of the nature of the dispute and you will pay the undisputed portion of the billing without delay. If any undisputed amounts are past due for more than 10 days, we reserve the right to stop work until all payments are brought current. We will provide lien releases in accordance with applicable state statutes or regulations. We will keep the project free of liens from out subcontractors, suppliers and other vendors provided we have been paid by you for the work covered by any such liens.

6.4.   Extra/Force Account Work:

6.4.1.   If we are directed to perform any work on a force account or time and material basis, the rates for our labor and equipment will be as stated in our proposal, or if no rates are included with this proposal, as stated in our then current standard labor and equipment rate schedule. If we are directed to standby or suspend work while other operations occur, or delays or other problems are resolved, or if we are required to standby due to events or circumstances beyond our control, the standby time for our labor and equipment will be paid as stated in this proposal.

6.5.   Differing Site Conditions

6.5.1.   If the conditions we encounter in the performance of our work differ materially from those indicated in the contract documents, boring logs, geotechnical reports or other information furnished to us prior to bid, or from those ordinarily encountered and generally recognized as inherent in the type of work provided for in our proposal, then our compensation and time for completion will be equitably adjusted to account for any resulting delay and added costs.

Going to Greater Lengths"

7.    **Delays and Work Stoppages:**

    7.1.    All work stoppages that arise through no fault of The HDD Company will be billed at $14,500 (no crew on site).

The HDD Company appreciates the opportunity to furnish you this quote and looks forward to working with you. Should any of the information presented above need further clarification, please do not hesitate to contact us.

Sincerely,
**The HDD Company**

Jeremy King

# The HDD Company, Inc.

4525 Serrano Pkwy #210
El Dorado Hills, CA  95762
(530) 676-5705  Fax (530) 676-3605

# Invoice

| DATE | INVOICE # |
|------|-----------|
| 8/24/2020 | 20-345-14 |

| BILL TO |
|---------|
| MINNESOTA LIMITED<br>PO BOX  410<br>BIG LAKE, MN  5530934 |

| P.O. NO. | TERMS | JOB NO. |
|----------|-------|---------|
| 1916169002 | Net 30 | 20-345-14 |

| SERVICE DAY | DESCRIPTION | QTY/FT | RATE | AMOUNT |
|-------------|-------------|--------|------|--------|
| 8/24/2020 | Completion of HDD  -  Pottawapomie Creek Bore   1788' of 36" Pipe | | 1,087,104.00 | 1,087,104.00 |
| 8/24/2020 | LESS 10% RETENTION | 1,087,104 | -0.10 | -108,710.40 |
| | Subcontract Agreement No. SR1916169002<br>Southern Star Central Gas Pipeline  Project C-60266 | | | |

| Thank you for your business. | Total | $978,393.60 |
|------------------------------|-------|-------------|

# Exhibit 19

**IN THE DISTRICT COURT OF ANDERSON COUNTY, KANSAS**

Mechanic's Lien No. _____

<u>STATEMENT FOR MECHANIC'S LIEN</u>

(K.S.A. § 60-1103)

**AMOUNT OF CLAIM:**  **$1,087,104.00.** (exclusive of interest)

**NAME OF LANDOWNERS:**  **Rene and Anita Bures**
Jobsite and Mailing Address:  31443 NW Meade Rd., Richmond, KS 66080

**John T. Rayne; Patrick Arthur Rayne and Kelly Lee Rayne Family Trust Under Trust Agreement date April 12, 2016; and Keith J. Pickert and Mary J. Pickert, co-trustee of the Pickert Family Trust u/a/d March 12, 2016**

Jobsite Address:  00000 NW Meade Rd., Garnett, KS 66032

Mailing Address:  John Rayne: 12 Overhill Dr., Paola, KS 66071

Patrick Arthur Rayne and Kelly Lee Rayne Family Trust: 102 Crestview Dr, Paola KS 66071

Keith J. Pickert and Mary J. Pickert, co-trustee of the Pickert Family Trust: 47890 Deer Trail Dr Canton, MI 48187

**NAME OF PROJECT OWNER:**  **Southern Star Central Gas Pipeline, Inc., a Delaware Corporation.**
4700 Highway 56
Owensboro, KY 42301

<u>Registered Agent</u>
The Corporation Company, Inc.
112 SW 7th Street Suite 3C
Topeka, KS 66603

**NAME OF CONTRACTOR:**  **Minnesota Limited, LLC., a Minnesota Limited Liability Corporation**
18640 200th Street – PO Box 410
Big Lake, MN 55309

<u>Registered Agent</u>
National Registered Agents, Inc. of KS
112 SW 7th Street Suite 3C

Topeka, KS 66603

**NAME OF LIEN CLAIMANT:**  **The HDD Company, Inc., an Oregon Corporation.**
4525 Serrano Parkway, Office Suite 210
El Dorado Hills, CA 95762

Registered Agent
CT Corporation System
112 SW 7th Street, Suite 3C
Topeka, KS 66603

**DESCRIPTION OF**  ATTACHED HERETO AS **EXHIBIT A** AND
**PROPERTY:**  INCORPORATED HEREIN BY THIS REFERENCE,
commonly known as 31443 NW Meade Rd., Richmond,
KS 66080 and 00000 NW Meade Rd., Garnett, KS 66032
(the "Property")

    The undersigned, The HDD Company, Inc. ("Lien Claimant"), a subcontractor pursuant to K.S.A. § 1103, claims a lien upon the Property and all other personal property furnished, placed or installed on the Property, on account of furnishing labor, equipment, and materials for the construction and/or completion of the Southern Star Central Gas Pipeline Project C60266 ("Project") located on said Property and the buildings, erections, improvements and plants erected or constructed, and all materials, fixtures, engines, boilers, pumps, belting, pulleys, shafting, machinery and other personal property furnished, placed or installed on the Property, on account of furnishing labor, equipment, and materials for the construction and/or completion of the Project located at the Property, legally described in **Exhibit A**, attached hereto and incorporated herein by reference. The labor, equipment, and materials supplied by Lien Claimant were used and consumed in the construction of said Project on the Property. Lien Claimant supplied labor, equipment, and materials to the Project as a supplier under agreement with Minnesota Limited, L.L.C., the original contractor ("Contractor"), which in turn was under agreement with Southern Star Central Gas Pipeline, Inc., the owner of the Project ("Project Owner").

    The aforesaid claim, a reasonably itemized statement of which is attached to this lien statement (**Exhibit B**) and copies of invoices (**Exhibit C**) substantiating the labor, equipment, and materials supplied to the Project Owner by Lien Claimant for improvements upon the Property, is filed in order that it may constitute a lien upon the above-described Property, and every other right, title, and interest in said real Property. The amount claimed as owing is ONE MILLION EIGHTY-SEVEN THOUSAND, ONE HUNDRED FOUR DOLLARS and 00/100 ($1,087,104.00), exclusive of interest.

    Lien Claimant last supplied labor, materials, and/or equipment within five (5) months of the date of this lien statement after properly filing a notice of lien extension on December 1, 2020 (**Exhibit D**).

    WITNESS the hand of said Lien Claimant this 5th day of January 2021.

ON BEHALF OF:  **The HDD Company, Inc.,** Lien Claimant

By: _____
 Jeremy King
 Vice President
 The HDD Company, Inc.

## VERIFICATION

STATE OF CALIFORNIA )
) ss.
COUNTY OF *El Porado* )

Jeremy King, of lawful age, being first duly sworn upon his oath, that he is the Vice President and duly authorized representative of The HDD Company, Inc. and is duly authorized to make this verification on its behalf; and does verify under penalty of perjury that the above and foregoing statement is true and correct based on his personal knowledge, and is a just and true account of the demand of and the amount due Lien Claimant.

ON BEHALF OF: **The HDD Company, Inc.**, Lien Claimant

By: _____
Jeremy King
Vice President
The HDD Company, Inc.

STATE OF CALIFORNIA )
) ss.
COUNTY OF )

On this ____ day of January, 2021, before me appeared Jeremy King, to me personally known, who being by me duly sworn did say that he is the Vice President and duly authorized representative of The HDD Company, Inc., and that he acknowledged that his execution of the foregoing instrument is on behalf of said company.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal in the County and State aforesaid, the day and year first above written.

_____
Notary Public

_____
Printed Name

My Commission Expires:

_____

# ALL- PURPOSE
# CERTIFICATE OF ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California )

County of El Dorado )

On January 5, 2021 before me, Wendy Brooke  Notary Public .
<small>(Here insert name and title of the officer)</small>

personally appeared, Jeremy King ,
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_Signature_  (Seal)

WENDY BROOKE
COMM. #2319236
Notary Public • California
El Dorado County
Comm. Expires Feb 11, 2024

---

## ADDITIONAL OPTIONAL INFORMATION

DESCRIPTION OF THE ATTACHED DOCUMENT

Statement for Mechanic's Lien
<small>(Title or description of attached document)</small>

<small>(Title or description of attached document continued)</small>

Number of Pages _____ Document Date_____

### CAPACITY CLAIMED BY THE SIGNER
- ☐ Individual (s)
- ☐ Corporate Officer

  _____
  (Title)
- ☐ Partner(s)
- ☐ Attorney-In-Fact
- ☐ Trustee(s)
- ☐ Other _____

### INSTRUCTIONS FOR COMPLETING THIS FORM
*This form complies with current California statutes regarding notary wording and, if needed, should be completed and attached to the document. Acknowledgments from other states may be completed for documents being sent to that state so long as the wording does not require the California notary to violate California notary law.*

- State and County information must be the State and County where the document signer(s) personally appeared before the notary public for acknowledgment.
- Date of notarization must be the date that the signer(s) personally appeared which must also be the same date the acknowledgment is completed.
- The notary public must print his or her name as it appears within his or her commission followed by a comma and then your title (notary public).
- Print the name(s) of document signer(s) who personally appear at the time of notarization.
- Indicate the correct singular or plural forms by crossing off incorrect forms (i.e. he/she/they- is /are ) or circling the correct forms. Failure to correctly indicate this information may lead to rejection of document recording.
- The notary seal impression must be clear and photographically reproducible. Impression must not cover text or lines. If seal impression smudges, re-seal if a sufficient area permits, otherwise complete a different acknowledgment form.
- Signature of the notary public must match the signature on file with the office of the county clerk.
  - ❖ Additional information is not required but could help to ensure this acknowledgment is not misused or attached to a different document.
  - ❖ Indicate title or type of attached document, number of pages and date.
  - ❖ Indicate the capacity claimed by the signer. If the claimed capacity is a corporate officer, indicate the title (i.e. CEO, CFO, Secretary).
- Securely attach this document to the signed document with a staple.

EXHIBIT A

31443 NW Meade Rd., Richmond, KS 66080
The South Half (S½) of the Northeast Quarter (NE¼) of Section Thirty-four (34), Township
Nineteen (19), Range Nineteen (19) AND the Southeast Quarter (SE¼) of Section Thirty-four
(34), Township Nineteen (19), Range Nineteen (19), excepting that part of the last described
quarter section lying South of the center of Pottawatomie Creek, and EXCEPT One acre of land
situated in the N. E. 1/4 of Section 34 and the S. E. 1/4 of Section 34 all in Township 19 S.,
Range 19 E., Anderson County, Kansas and being more particularly described as follows:
Commencing at the S. E. corner of the N. E. 1/4 of Section 34, Township 19 S., Range 19 E.,
Anderson County, Kansas; thence N. 0°01'46" E, along the East line of said N. E. 1/4 a distance
of 58.87 ft. to a point; thence N. 89°31'34" W, a distance of 235.50 ft. to a point; thence S.
0°01'46" W. a distance of 61.88 ft. to a point on the N. Line of the S. E. 1/4 Section 34,
Township 19 S., Range 19 E; thence continuing S. 0°0146" W., a distance of 123.09 ft. to a
point; thence S. 89°31'34" E., a distance of 235.50 ft. to a point on the East line of said S. E. 1/4;
thence N. 0°01'46" E. along said East line a distance of 126.10 ft. to the POINT OF
BEGINNING.

00000 NW Meade Rd., Garnett, KS 66032
The Northeast Quarter (NE¼), except 1.52 acres in the northeast corner north of Pottawatomie
River, of Section 3, Township 20 South, Range 19 East of the 6th P.M., Anderson County,
Kansas.

## Statement of Account

| | |
|---|---|
| Contract Value Unpaid | $ 978,393.60 |
| Retainage Withheld | $ 108,710.40 |
| Total | **$ 1,087,104.00** |

EXHIBIT C

C1: Subcontract Agreement
C2: Invoices

(Attached hereto)



This agreement is made at Big Lake, MN this day of ___January 17, 2020___.

**BETWEEN:**

Minnesota Limited, LLC (Contractor)
18640 200ᵗʰ Street – PO Box 410
Big Lake, MN 55309

**AND:**

THE HDD COMPANY(Subcontractor)
4525 SERRANO PARKWAY, OFFICE SUITE 210
EL DORADO HILLS, CA  95762

**RECITALS**

Contractor ("Minnesota Limited, LLC) has entered into a contract (the "Prime Contract") with Southern Star Central Gas Pipeline, Inc. ("Owner") to perform certain labor and furnish certain materials for completion of the construction project KS - C60206 Install 31.5 miles of 36" (the "Project").  Subcontractor desires to perform certain services and/or provide certain materials as a subcontractor of Contractor pursuant to the terms and conditions of the Prime Contract and agrees to the terms and conditions of this Agreement.

**AGREEMENT**

In consideration of the mutual covenants contained herein, the parties agree as follows:

I.   Subcontractor agrees to supply all the materials and labor and pay all license fees, permits and expenses for the work located at __Various Sites_____ (the "Site").  As full compensation for performance of this Agreement and subject to all applicable provisions of this Agreement, Contractor agrees to pay Subcontractor:
six million one-hundred eight-five thousand nine-hundred thirty six dollars ($6,185,936.00_____ )

II.   Contract Document.  Subcontractor's performance hereunder shall be subject to all terms and conditions contained in the Prime Contract and all drawings and/or specifications referred to therein (the "Contract Documents") except as such terms may be specifically amended by this Agreement, which includes HDD's Proposal, attached hereto and incorporated herein.  Wherever the Contract Documents shall refer to the Contractor or its agents, the same shall be read to refer to the Subcontractor under this agreement.  Subcontractor shall perform and coordinate its work hereunder in a manner necessary to assure the prompt and timely completion of the Project, time being of the essence to the



Agreement. At Subcontractor's request, a copy of the applicable Prime Contract Terms and Conditions will be supplied to Subcontractor.

Any terms and conditions proposed in Subcontractor's acceptance of or in any acknowledgement, invoice, or other form of Subcontractor that add to, vary from, or conflict with these terms hereby objected to. Any such proposed terms shall be void and these terms and conditions (1) shall constitute the complete and exclusive statement of the terms and conditions of the contract between the parties and (2) may be modified only by written instrument executed by the authorized representatives of both parties.

III.    **Insurance.** Subcontractor shall comply with the insurance requirements set forth in Exhibit A (attached).

IV.    **Additional Terms and Conditions**

    A.  Subcontractor, not Contractor, assumes all the risk related to in performing its work under this Agreement, such as any injuries to Subcontractor, Subcontractor's workers, Facility employees and members of the public arising from the Subcontractors activities or use of tools and equipment, or from any other cause.

    B.  Subcontractor will complete all work in a workmanlike and professional manner according to standard practices in the building trade, and in compliance with all building codes and other applicable laws. Subcontractor will warrant against defects in material and labor it supplies for the completion of the work.  If subcontractor fails to perform under this Agreement, the party entitled to performance or the Contractor will have the right to hire other persons to correct the defective Work and hold Subcontractor liable for the costs thereof including costs, disbursements and reasonable attorneys' fees incurred in the enforcement of this provision.

    C.  All Work will be done on a timely basis.  The work to be performed under this contract shall be commenced as directed by Project Manager or Project Superintendent or Project Foreman and shall be substantially completed on or before ___as agreed upon and directed onsite_____.  Time is of the essence.

    D.  Subcontractor shall indemnify, defend and hold harmless Contractor as set forth in Section VII.

    E.  No work shall be subcontracted or assigned by Subcontractor without the prior written approval of the Contractor.

    F.  Environmental, Health and Safety.  Subcontractor shall take all necessary precautions to keep the work site free from hazards that are likely to cause injury, illness, or death or damage to property. Subcontractor shall provide any Safety Data Sheets (SDS) for any hazardous chemicals provided pursuant to this contract.   Contractor is a company that operates under a "Culture of Safety" with the goal of zero incidents, and expects its subcontractor to similarly emphasize the paramount importance of safe behavior.  Failure to abide by Contractor's policies may result in immediate removal of Subcontractor from the premises and will be a breach of Subcontractor's obligations hereunder.



Contractor shall have the right, at its option, to conduct a complete audit of Subcontractor's documents and practices to verify Subcontractor's compliance with this Section.

G.    Minnesota Limited has enacted a Subcontractor Management Program and Safety Requirements of which Subcontractor has received. Subcontractor shall follow and adhere to all aspects of said program and the terms and conditions of such program are incorporated herein.

H.    Liens. To the fullest extent permitted by law, and the extent the Contractors has paid the Subcontractor, Subcontractor will at all times keep the Project, the Site and each part thereof free from any attachment, lien, claim of lien, or other encumbrance arising out of the Work and Subcontractor will indemnify, defend and hold Contractor harmless from and against all claims, losses, demands, causes of action or expenses (including attorneys' fees and other costs of defense incurred by Contractor in defending against the foregoing or in enforcing this indemnity and defense obligation) of whatever nature, arising by reason of any such lien, claim of lien, attachment or encumbrance. If any claim is filed to enforce any laborers, material men, mechanic's, or other similar lien arising out of or relating to the Work for which Contractor has paid the Subcontractor, Subcontractor will immediately cause such lien to be released and discharged and if Subcontractor fails to do so, then Contractor will have a right to pay all sums, including attorneys' fees and other costs and expenses incurred necessary to obtain such release and discharge, and hold Subcontractor liable for the amount thereof with the right to deduct all or a portion of such sum from accounts that may be due Subcontractor.

I.    Default. In addition to the other remedies available under law: (a) if Subcontractor should fail or refuse, except in cases where extension of time is provided, to supply enough properly skilled workers or proper materials for the Work; or (b) if Subcontractor should fail to make payment to its subcontractors for material or labor which are due to its Subcontractors, or (c) if Subcontractor should fail to keep and comply with any of the terms and provisions of this Agreement, or (d) if Subcontractor should be adjudged bankrupt, file or suffer to be filed a petition for relief under the Bankruptcy Act, or make a general assignment for the benefit of the creditors; or (e) if a receiver should be appointed on account of Subcontractor's insolvency; or (f) if Subcontractor fails to pay its employees' wages, benefits or tax withholdings; then, in any such event, Contractor may without prejudice to any other right or remedy and after giving Subcontractor and its surety, if any, upon twenty-four hours written notice, terminate its obligation to Subcontractor under this Agreement and take possession of the Site and complete (or cause to be completed) the Work by whatever method Contractor may deem expedient. In such case Subcontractor will not be entitled to receive any further payment until the Work is completed. Upon completion of the Work, Contractor will pay to Subcontractor an amount equal to (x) the unpaid portion of the Subcontract Amount attributable to the Work performed up to the termination less (y) the amount by which (i) the costs incurred by Contractor to complete the Work, including, without limitation, costs for architectural, managerial and administrative services and reasonable attorneys' fees, if legal counsel is employed, exceed (ii) the portion of the Subcontract Amount attributable to the balance of the Work yet to be performed at the time of termination. If the amount calculated under part (y) in the preceding sentence exceeds the amount owing under part (x), the Subcontractor will pay the difference to Contractor. If the amount in part (x) exceeds the amount in part (y), Contractor will pay the difference to Subcontractor.



J.     Subcontractor is an independent Subcontractor and is not an employee or agent of the Contractor and neither Subcontractor nor anyone employed by Subcontractor will be deemed for any purpose to be the agent, employee, servant or representative of Contractor in the performance of the Work. Subcontractor acknowledges and agrees that Contractor will have no direction or control over the means, methods, procedures or manner of the Work performed by Subcontractor or any of its subcontractors, or any of their employees, vendors or suppliers.

K.     No changes shall be made in the work proposed or in the price unless those changes are agreed to in writing by both Subcontractor and Contractor. Travis Gehr and / or __James Redmond_____, shall be the Contractor's designated on-site agent, If there is a dispute regarding whether the work is a change, Subcontractor may perform that work under protest and submit a claim to Contractor in accordance with this Agreement.

L.     Clean Up. Subcontractor will at all times keep the site or facility safe and free from the accumulation of waste materials or rubbish caused by its operations or related to the Work. Upon completion of the Work and each portion thereof, Subcontractor will remove all rubbish and waste produced by its operations or Work hereunder from the facility as well as all of its tools, equipment, machinery and surplus materials no longer needed and leave the site or facility in a "broom clean" or equivalent condition and safe for Subcontractor's employees and subsequent subcontractors to perform their work, unless otherwise specified in writing. If Subcontractor fails to clean up, Contractor may do so after written notice to Subcontractor and the cost thereof will be charged to Subcontractor.

V.    **Representations of Subcontractor.** Subcontractor represents and warrants the following:

A.     Subcontractor has examined the Agreement ("Prime Contract") between Owner and Minnesota Limited (if requested by the Subcontractor prior to the execution of the work) and agrees to all provisions affecting Subcontractors performance, including but not limited to the representations, obligations and warranties made by Minnesota Limited to the Owner.

B.     Subcontractor has the requisite authority and ability to perform the subcontract without delay.

C.     Subcontractor will not assign, subcontract or otherwise delegate its responsibilities and obligation hereunder without the written consent of Contractor.

D.     Subcontractor shall examined the specifications, site conditions, drawings and requirements of the work with due diligence and its bid has taken into consideration all conditions and risks which are reasonably related to the performance of the work.

E.     Ethics; Conflict of Interest. Subcontractor shall at all times during the performance of its obligations hereunder conform to sound ethical business practices in conformance with all applicable Laws and shall in its business practices promote the values of honesty, integrity, social responsibility, and human rights. Subcontractor shall not offer to any member of Contractor (including employees thereof) any gifts, entertainment, or other favors beyond the common courtesy usually associated with business practices. Subcontractor shall not pay any commissions or fees or grant any rebates or other



remuneration or monetary gratuity to any employee of Contractor. Subcontractor shall not grant any secret rebates nor pay any commissions or fees to any employee of Contractor.

F.     Invitees Prohibited. Subcontractor shall not, without prior written permission of Contractor, invite, permit entry or bring any Person onto the Contractor's Worksite or property who is not an employee of Subcontractor

G.     Subcontractor will pay its employees promptly and maintain good labor relations. Subcontractor further represents that it has paid all union benefit contributions including fringe benefits. Subcontractor agrees that Contractor upon demand of the Labor Union, may withhold from any sums due Subcontractor and pay to the Administrator of the Plan any amounts owing and said payment shall be deducted from the invoice.

VI.    **Warranty**.

A.     Subcontractor warrants to the Contractor and Owner that all materials and equipment furnished under this Agreement will be new unless otherwise specified in writing, and that all work will be of good quality, free from faults and defects and in conformance with any Purchase Order and attachments thereto, including any specifications stipulated therein. All Work not so conforming to these standards may be considered defective, and the Subcontractor shall promptly repair and make good, after notice by the Contractor and Owner and without cost to the Contractor and Owner, any damages, defects or faults resulting from imperfect or defective Work done or materials furnished by the Subcontractor. The Subcontractor warrants that all labor, materials and equipment furnished under this Agreement shall be covered by warranty for a period of at least two (2) years (or during a longer period if required by the specifications and stipulated therein) from the date of acceptance of the completed Work by the Owner.

B.     Where material or equipment furnished by the Subcontractor is covered by a manufacturer's warranty or guarantee or other special warranty or guarantee the Subcontractor shall provide such warranty and provide additional or extended warranty or guarantees to the Contractor for its labor, materials and equipment to confirm to paragraph A above.

VII.   **Indemnification**. To the fullest extent permitted by law, the Subcontractor shall indemnify the Owner, Contractor and the agents and employees of any of them from and against claims, damages, losses and expenses, arising out of or in connection with, or resulting from the negligent performance of the Subcontractor's work, the Subcontractor's subcontractors work, or anyone directly or indirectly employed by them but only to the extent caused by acts or omissions by either or any of them. In addition thereto, Subcontractor indemnifies Owner, Contractor and the agents and employees of any of them for expenses including attorney's fees and costs, incurred in responding to and defending against any claim or in enforcing this provision.

VIII.  **Payment**. Subcontractor shall invoice Minnesota Limited no later than 30 days after date of service. Contractor agrees to pay Subcontractor all sums due less    10   % retainage (if applicable) hereunder within



thirty (30) days from the date the invoice is received. However, it is a condition precedent to payment that if Owner withholds payments for that portion of any work performed by Subcontractor, then Minnesota Limited is only obligated to pay Subcontractor after receiving payment from the Owner. In such event payment will be made within ten (10) days. Contractor reserves the right to withhold such sums as may be necessary to pay expenses, including costs and attorney's fees, caused by, or related to, Subcontractor's breach of Agreement. Final payment of retainage will occur ten (10) days after final payment for Subcontractor's work is received and when lien waivers and job completion affidavit are executed.

IX.   **Maintaining Records / Audit.** For a period of five (5) years from final acceptance of Subcontractor's work, Subcontractor shall maintain all job records and shall, upon reasonable notice by Contractor, but no later than 10 business days, make such records available for inspection by Contractor or Owner. Contractor or Owner or their representatives may audit said records. If the results of the audit show an overpayment, Subcontractor shall reimburse the overpayment ~~together with interest of 1% per month. If the audit shows an overpayment more than one thousand dollars ($1,000), Subcontractor shall also reimburse Contractor or Company for the cost of the audit.~~

X.   **Interpretations and Enforcement.** The Agreement and contract documentation contains the parties entire understanding with regard to the subject hereof and shall not be modified except by a writing signed by both parties; provided, however, that Subcontractor shall be bound by changes in the Contract Documents agreed to between the Contractor and Owner, but only if Contractor has timely notified Subcontractor of such changes.. The interpretation and enforcement of this Agreement shall be governed by the laws of the state in which the work hereunder is to be performed or that specified in the Prime Contract if different than the state where the work is to be performed. If any provision hereof is deemed unenforceable, the remainder of the Agreement shall be enforced as though such provision were not a part hereof.

XI.   **Assignment.** Subcontractor shall not assign or subcontract this Agreement or any portion thereof or of any money due or which may become due hereunder without the prior written consent of Contractor. Notwithstanding anything to the contrary contained herein, Contractor may assign this Agreement without the consent of Subcontractor.

XII.   **Confidentiality of Agreement.** The Subcontractor agrees that all terms and conditions contained herein or in any other document(s) referencing the Project shall remain confidential. Said terms shall not be disclosed without the express written consent of the Contractor.
Minnesota Limited is required to protect all technical information supplied by the Owner. Subcontractor agrees that this Section is its written assurance that all such information, including but not limited to: drawings, diagrams, surveys, specifications, locations, and geophysical (GPS) coordinates of the work, will be kept confidential, protected, and will not be disclosed to third parties without obtaining Minnesota Limited's written consent unless ordered to do so by a court of law or arbitrator.. Breach of is provision will subject Subcontractor to all remedies awarded to Contractor and Owner including injunctive relief. Subcontractor agrees to pay all of Contractors and Owners attorney's fees in enforcing this provision.



XII.  **Notice.** Unless otherwise provided herein, any notice provided for herein will be in writing and delivered to the parties (a) in person, (b) by facsimile transmission (with the original and a copy of the facsimile confirmation following in the United States mail), (c) by overnight delivery service, or (d) by certified mail, return receipt requested. Notice will go to the address first shown herein for the respective party to whom notice is given or to such other address as may be designated by either party by written notice given pursuant hereto.

XIV.  **Governing Law/Venue/Attorney Fees.** This Agreement shall be construed and interpreted in accordance with the laws of the State of Minnesota, including, without limitation, matters of construction, validity, enforcement, and interpretation. The parties agree that venue for any dispute under this Agreement shall be in the District Court of Hennepin County, Minnesota. In the event any enforcement effort is initiated by Contractor against Subcontractor for default of this Agreement, Subcontractor shall be liable to Contractor for any and all costs of collection, including but not limited to, reasonable attorneys' and professional fees, court costs, traveling and lodging expenses, costs of investigation and defense, accrued interest, and any other reasonable expenses incurred by Contractor in initiating such efforts.

Signed the day and year first written above.

CONTRACTOR:  Minnesota Limited, LLC.

By: _____

Its: _____
        Title

SUBCONTRACTOR:  THE HDD COMPANY

By: _____

Its: ___Vice President_____
        Title



## EXHIBIT A
### Insurance

Prior to commencing Work, Subcontractor shall, at its sole expense, procure and maintain insurance of the types, and in the form and amounts described below from insurer(s) authorized to transact business in the state where Work or operations will be performed by Subcontractor. Such insurance and required coverage in forms acceptable to General Contractor shall be placed with admitted insurers that maintain an A.M. Best's rating of not less than A- VII, unless otherwise approved by the General Contractor. The insurance requirements described below shall be maintained uninterrupted for the duration of the Project, including any warranty periods, and shall protect Subcontractor, and others for whom and/or to whom Subcontractor may be liable, for liabilities in connection with work performed by or on behalf of Subcontractor, its agents, representatives, employees or subcontractors.

### Insurance Requirements:

1.  **Commercial General and Umbrella Liability Insurance.** Subcontractor shall maintain commercial general liability ("CGL") and, if necessary, commercial umbrella insurance, with a limit of not less than $ 2,000,000.00 _____ per occurrence, bodily injury or property damage liability; $ 2,000,000.00 _____ per offense, personal and advertising injury liability; $ 5,000,000.00 _____ products-completed operations aggregate; and $ 5,000,000.00 _____ general aggregate applicable to claims other than products-completed operations. To the extent that Subcontractor's CGL and any commercial umbrella insurance are subject to aggregate limits, the policy shall be endorsed so as to apply such aggregate limits separately to the Project.

    Coverage afforded under Subcontractor's CGL and any commercial umbrella insurance shall be provided on an occurrence basis and shall be subject to the terms of the *Insurance Services Office ("ISO") Commercial General Liability Coverage Form CG 0001*, or a substitute form providing coverage at least as broad as the ISO form specified. There shall be no limitations or exclusions of coverage beyond those contained in the standard coverage form and coverage shall include liability arising from premises, operations, independent contractors, products-completed operations including construction defect, contractual liability or personal injury and advertising injury.

    General Contractor, its officers, directors and employees and Project Owner(s) shall be included as additional insureds under Subcontractor's CGL, and any commercial umbrella insurance, with respect to liabilities arising out of both the ongoing and completed operations of Subcontractor. Such additional insured coverage shall be subject to the terms of ISO additional insured endorsement forms CG 2010 (ongoing operations) and form CG 2037 (products-completed operations), or substitute form(s) providing equivalent coverage. The edition date of the ISO endorsements required should be chosen based on the recipient's risk transfer objectives. The table below summarizes the options and major differences between the edition dates.

| Endorsement(s) | ISO Edition Date | Comments |
|---|---|---|
| CG 2010 | 11/85 Edition | Broadest Insuring Agreement - "liability arising out of" the Subcontractor's work – both ongoing |


**MINNESOTA LIMITED**
AN HYDROE COMPANY

| | | operations and completed operations coverage provided by one endorsement. |
|---|---|---|
| CG 2010/CG2037 | 10/01 Edition | Same Insuring Agreement as 11/85 with ongoing operations and completed operations coverage provided by separate endorsements. |
| CG 2010/CG2037 | 07/04 Edition | More narrow Insuring Agreement – "caused in whole or in party by. . . .acts or omissions" of the Subcontractor. |
| CG2010/CG2037 | 04/13 Edition | Same Insuring Agreement as 07/04, but limits coverage to "extent permitted by law" and "not be broader than that which you are required by the contract or agreement to provide." |

Note: Recommended Additional Insured endorsement for states other than Minnesota may vary and Willis should be consulted. States including but not limited to IL, TX, & CA involve unique risk transfer considerations.

Additional insured coverage afforded by Subcontractors CGL, and any commercial umbrella insurance, shall be primary and non-contributing with respect to any insurance or self-insurance available to General Contractor or Project Owner. Such primary and non-contributory insurance shall be subject to the terms of ISO form CG 2001 (Primary and Noncontributory – Other insurance Condition) or its equivalent. Any other insurance or self-insurance maintained by General Contractor or Project owner shall be excess of, and non-contributory with, the coverage afforded by Subcontractors CGL and commercial umbrella insurance, if any.

In addition to procuring and maintaining CGL, and any commercial umbrella insurance, for the duration of the contract, Subcontractor agrees to continue to procure and maintain the products-completed operations liability insurance coverage for a minimum of __two__ ( _2_ ) year(s) after the date that the Work is substantially complete. All terms and conditions of such coverage shall be maintained during this completed operations period, including the required coverage limits and the requirement to provide General Contractor and Project Owner with coverage as an additional insured for completed operations.

2.    **Commercial Automobile and Umbrella Liability Insurance.**    Subcontractor shall maintain automobile liability and, if necessary, commercial umbrella insurance, with a limit of not less than $ __2,000,000.00__    each accident. Such insurance shall cover liability for bodily injury and property damage arising from the use or operation of any auto, including those owned, hired or otherwise operated or used by or on behalf of Subcontractor. The coverage shall be subject to the terms of ISO *Business Auto Coverage Form CA 0001* (1990 edition or later), or a substitute form providing equivalent coverage.

3.    **Workers' Compensation and Employers Liability Insurance.**    Subcontractor shall maintain workers' compensation coverage providing statutory benefits. Subcontractor shall additionally maintain employers liability insurance, and if necessary, commercial umbrella insurance, with a limit of not less than: $1,000,000, bodily injury by accident – each accident; $1,000,000, bodily injury by disease-policy limit; and $1,000,000, bodily injury by disease each employee. Workers' Compensation coverage must extend to every


employee, including owners/officers of a closely held corporation and/or individuals operating as a sole proprietorship or partnership. <u>Workers' Compensation must provide coverage in the state where the Project is located</u>.

Where applicable, evidence of coverage shall be required for U.S. Longshore and Harbor Workers Compensation, Maritime coverage, Federal Employer's Liability Act and other unique exposures requiring endorsement of coverage.

4. **Contractors Pollution Liability Insurance**. Required only if Subcontractor's scope of services include the remediation, treatment, storage or disposal of waste or hazardous materials on or about the project site, as determined by General Contractor. If required, Subcontractor shall maintain Contractors Pollution Liability coverage with a limit of not less than $_____n/a_____ per occurrence, $_____n/a_____ annual aggregate. Coverage shall apply to the scope of work as described under the Contract including transportation and shall include coverage for bodily injury; property damage, including loss of use of damaged property or property that has not been physically injured; clean-up costs; mold; defense and investigative costs. Subcontractor shall maintain Completed Operations coverage for _____n/a_____ years following final acceptance of the project or termination of the Contract.

If the scope of services in the contract require the Subcontractor to provide professional services associated with arranging for, or brokering of, hazardous material or construction and demolition (C&D) wastes off the job site, Subcontractor must amend the Contractors Pollution Liability policy to include coverage to address this scope of work. If any of the aforementioned insurance policies are written on a claims made basis, the Contractor warrants that continuous coverage will be maintained, or an extended discovery period will be exercised, for a period of three years beginning from the time the work under this contract is completed.

5. **Pollution (Environmental) Liability Insurance**. Required only if Subcontractor's scope of services involves disposal of waste or hazardous materials off-site, as determined by General Contractor. If required, Subcontractor shall maintain pollution (environmental) liability coverage with a limit of not less than: $_____n/a_____ per incident, $_____n/a_____ policy aggregate for hazardous waste disposal services, and $_____n/a_____ per incident, $_____n/a_____ for all other disposal facilities. Such coverage shall include clean-up costs, defense costs and products and completed operations.

If the scope of services in the contract requires the disposal of any hazardous materials or construction and demolition (C&D) wastes off the job site, Subcontractor must also obtain evidence that the Disposal Site Operator maintains Pollution Legal Liability Insurance with coverage for: a. bodily injury, sickness, disease, mental anguish or shock sustained by any person, including death; b. property damage including physical injury to or destruction of tangible property including the resulting loss of use thereof, clean-up costs, and the loss of use of tangible property that has not been physically injured or destroyed; c. defense including costs, charges and expenses incurred in the investigation, adjustment or defense of claims for such compensatory damages. d. pollution conditions on, at, under or emanating from any disposal site, location or facility, used by or on behalf of the disposal facility of any waste or waste materials relating to the performance of the work.



The Disposal Site Operator's Pollution Liability Policy will apply to losses arising from the facility that is accepting the waste under the contract. Minimum limits of Insurance for this policy shall be $_____n/a_____ each incident / $_____n/a_____ policy aggregate.

Claims-made coverage is permitted, provided the policy retroactive date is continuously maintained prior to the commencement date of the agreement, and coverage is continuously maintained during all periods in which Subcontractor accepts or treats waste generated from General Contractor's projects and for a period of one (1) year thereafter.

6.      **Professional Liability Insurance.** Required only if Subcontractor's scope of services include architectural, engineering, professional consulting or construction management, as determined by General Contractor. If required, Subcontractor shall maintain professional liability coverage with a limit of not less than $_____n/a_____ each wrongful act, $_____n/a_____ policy aggregate.

Coverage shall include liability arising from the errors, omissions or acts of the Subcontractor or any entity for which the Subcontractor is legally responsible in the providing of professional services under the Contract. Throughout the term the Contract, the PL/E&O policy shall include full prior acts coverage. Coverage shall be continuously maintained during the term of this Agreement and for a period of x years following final acceptance of the Project or termination of the Contract.

Coverage shall not include any exclusion or other limitations related to:
- Scope of the professional services
- Delays in project completion and cost overruns
- Who is authorized to notify the carrier of a claim or potential claim
- Mold, fungus, asbestos, pollutants or other hazardous substances

Claims-made coverage is permitted, provided the policy retroactive date is continuously maintained prior to the commencement date of this agreement, and coverage is continuously maintained during all periods in which Subcontractor performs professional services for General Contractor, and for an additional period of one (1) year after termination of this agreement or the last date such services are performed, whichever comes later. If Subcontractor's scope of work includes environmental engineering or consulting, the terms of coverage shall not exclude environmental professional services.

7.      **Watercraft Liability Insurance.** If watercraft of any kind is used by the CONTRACTOR or Subcontractor, including: (i) bodily injury; (ii) property damage; and (iii) passenger liability.

     a.     Limit of Liability: Combined Single Limit (Bodily Injury and Property Damage), $1,000,000 each occurrence;

     b.     Protection and Indemnity Insurance to include Jones Act crew coverage (or at least Maritime Employer's Liability: MEL), collision, tower's liability and wreck removal coverage, on a form providing



coverage no less extensive than that afforded in the P & I SP-23 form (revised 1/56), including a pollution buy-back endorsement.

8.    **Aircraft Liability Insurance.** If aircraft of any kind is used by the CONTRACTOR or Subcontractor, including: (i) bodily injury; (ii) property damage; and (iii) passenger liability.

    a.    Limit of Liability: Combined Single Limit (Bodily Injury and Property Damage and Passenger Liability), including hull physical damage insurance for the full replacement cost of each aircraft used in the work. Such Aircraft Liability and Hull Coverage shall include a waiver of subrogation against General Contractor and all others required by this Agreement to be additional insureds. $ ___n/a___ per seat; $ ___n/a___ per occurrence.

## Additional Provisions:

1.    **Deductibles and Self-Insured Retentions.** The funding of deductibles and self-insured retentions maintained by Subcontractor shall be the sole responsibility of Subcontractor, including any amounts applicable to deductibles or self-insured retentions applicable to claims involving the General Contractor or Owner as an additional insured. Any self-insured retentions in excess of $ ___n/a___ must be declared to and approved by the General Contractor.

2.    **Primary / Non-Contributing.** Subcontractor's required insurance coverage shall be primary insurance, and any insurance or self-insurance maintained by the General Contractor or Project Owner shall be excess of and noncontributory with Subcontractor's insurance.

3.    **Severability of Interest.** Except with respect to the limits of insurance, Subcontractor's required insurance shall apply separately to each insured or additional insured.

4.    **Waiver of Subrogation.** Subcontractor agrees to waive all rights of subrogation against the General Contractor, Project Owner and Project Architect, and shall cause each of its subcontractors to waive all rights of subrogation against the General Contractor, Project Owner and Project Architect, their agents and employees, as respects loss, damage, claims, suits or demands, howsoever caused:

    a.    To real or personal property, vehicles, equipment, tools, etc. owned, leased or used by Subcontractor or Subcontractor's employees, agents or sub-subcontractors; and

    b.    To the extent such loss, damage, claims, suits or demands are, or should be, afforded coverage by the Subcontractor's required insurance or any other insurance (except professional liability to which this requirement does not apply) maintained by the Subcontractor. This waiver shall C1PPIY to all first party property, equipment, vehicle and workers' compensation claims (unless prohibited under applicable state statutes), and all third party liability claims. This waiver shall apply to all deductibles, retentions or self-insured layers applicable to the required or any other insurance (except professional liability to which this requirement does not apply) maintained by the Subcontractor. If necessary, Subcontractor agrees to endorse the required insurance policies to permit waivers of subrogation in



favor of General Contractor, Project Owner and Project Architect as required hereunder. Subcontractor further agrees to hold harmless and indemnify General Contractor, Project Owner and Project Architect for any loss or expense incurred as a result of Subcontractor's failure to obtain such waivers of subrogation from the insurers.

5.      **Notice of Cancellation / Material Change / Nonrenewal**. Subcontractor's insurance policies must contain a provision or endorsement that the coverage afforded will not be canceled, materially changed or renewal refused until at least 30 days prior Written Notice has been given to General Contractor and to each other additional insured to whom a certificate of insurance has been issued; provided, however, that a ten (10) day prior notice requirement may apply in the event of cancellation due to nonpayment of premium.

6.      **Verification of Coverage**. Prior to commencing Work, Subcontractor shall furnish General Contractor with certificate(s) of insurance executed by a duly authorized representative of each insurer, as evidence of compliance with the insurance requirements set forth above   Such certificates of insurance shall be accompanied by copies of endorsements evidencing coverage afforded to General Contractor and Project Owner as additional insured, and endorsements reflecting insurer's concurrence with Subcontractor's waiver of subrogation rights against General Contractor, Project Owner and Project Architect.   Renewal certificates are to be provided to the General Contractor prior to the expiration of the required insurance policies.
Certified copies of policies, including all policy endorsements, shall be furnished by Subcontractor within 15 days of written request by General Contractor.

The certificate(s) of insurance shall be subject to approval of General Contractor, but failure of General Contractor to request such certificate or other evidence of Subcontractor compliance with insurance requirements, or failure of General Contractor to identify deficiencies from evidence that is provided, shall in no way limit or relieve Subcontractor of its obligations to maintain such insurance.

7       **Sub-Subcontractors**. No work shall be sublet to any Sub-subcontractor without first obtaining the General Contractor's written permission. All Sub-subcontractors, once approved by the General Contractor, are subject to the same insurance requirements as Subcontractor. Subcontractor shall cause each Sub-subcontractor employed by Subcontractor to purchase and maintain such insurance.   Upon request, Subcontractor shall furnish General Contractor with copies of certificates of insurance evidencing coverage for each Sub-subcontractor

Subcontractor shall voluntarily provide workers compensation coverage for proprietors, partners or others not statutorily required to maintain workers' compensation insurance.

8.      **Leased Employees**. Use of leased employees by Subcontractor is expressly prohibited without General Contractor's written permission. If permitted by General Contractor, Subcontractor shall

        a.      Provide General Contractor with a complete copy of its Agreement with the Leasing Company;



    b.      Require that Leasing Company provide workers' compensation, employers liability and commercial general liability with coverage limits in amounts no less than Subcontractor insurance requirements for the same coverages.

    c.      Require that Leasing Company provide Alternate Employer Endorsement naming General Contractor as alternate employer on Leasing Company's workers' compensation policy.

    d.      Require that Leasing Company add General Contractor as an additional insured on its commercial general liability insurance policy, with primary/non-contributory wording.

    e.      Require that Leasing Company provide waiver of subrogation in favor of General Contractor on both Leasing Company's workers' compensation and commercial general liability insurance policies.

    f.      Provide General Contractor with a copy of the Leasing Company's certificate of insurance, with endorsements, evidencing the required coverage.

9.      **No Representation of Coverage Adequacy.**  In specifying minimum Subcontractor insurance requirements, General Contractor does not represent that such insurance is adequate to protect Subcontractor for loss, damage or liability arising from its work. Subcontractor is solely responsible to inform itself of types or amounts of insurance it may need beyond these requirements to protect itself.

The insurance requirements set forth in minimum amounts shall not be construed to relieve Subcontractor for liability in excess of such coverage, nor shall it preclude General Contractor from taking such other actions as is available to it under any other provision of the Subcontract. To the extent Subcontractor maintains insurance greater than these minimum requirements, Subcontractor agrees that such insurance shall be applicable to any of Subcontractor's liability obligations hereunder.

Any acceptance of certificates of insurance by General Contractor shall in no way limit or relieve Subcontractor of its duties and responsibilities under this Subcontract, including the duty to indemnify and hold harmless General Contractor.

10.      **Compliance.**  Failure of Subcontractor to maintain the required insurance shall constitute a default under this Subcontract and, at General Contractor's option, shall allow General Contractor to terminate this Subcontract for cause, withhold payment and/or purchase the required insurance at Subcontractor's expense.

11.      **Cross-Liability Coverage/Non-Standard Restrictive Endorsements.**  All liability policies shall include cross liability coverage and a standard ISO separation of insureds provision, or its equivalent. No liability policy shall include or be endorsed to include any non-standard provisions restricting coverage for the named insured or the persons/entities required to be named as additional insureds under this Agreement, including but not limited to cross liability coverage exclusions or limitations.


January 9, 2020

**Minnesota Limited**
18640 200th St, PO Box 410
Big Lake, MN 55309

ATTN: Amy Skuza

RE:     Southern Star Lines DT and DS Replacement Project
        Directionally drill and install approximately 6,052 feet of 36-inch steel pipeline in
        Anderson and Franklin Counties, KS.

The HDD Company is pleased to submit the following bid quote:

1.      **Responsibilities of The HDD Company**
        1.1.    Provide all required insurance certificates.
        1.2.    Provide any written submittals and qualifications required.
        1.3.    Provide 2 (two) drill rig(s) with sufficent capabilities to install the crossings, a
                closed-loop mud system, mud pumps, vacuum trucks, dump trucks, steering
                system, and all drill spread support equipment necessary.
        1.4.    Provide all required union labor for the drilling operations.
        1.5.    Provide preliminary drill profiles for each crossing.
        1.6.    Provide final as-built drawings.
        1.7.    Provide and haul water for drilling operations.
        1.8.    Provide water storage for the duration of drilling operations.
        1.9.    Provide all required pulling heads.
        1.10.   Leave the entry areas clean, free of debris, and to a rough grade.
        1.11.   Provide bonding at 1%, which is not included in the bid pricing below.

2.      **Responsibilities of THE CONTRACTOR**
        2.1.    Stake and survey the entry and exit points for each bore, with correct stations
                and elevations.
        2.2.    Provide all permitting to undertake the project.
        2.3.    Provide and maintain suitable truck access to and from entry and exit locations.
        2.4.    Provide stable, level, matted and/or graveled work pads for each bore.
        2.5.    Provide all BMPs around each bore's entry and exit locations. The HDD
                Company will maintain these items.
        2.6.    Provide, string, weld, and test all 36-inch pipe for each bore.

2.7. Provide all plans, equipment, and manpower to handle pipe during pullback operations.
2.8. Perform all final tie-ins.
2.9. Provide all settlement monitoring, if required.
2.10. Provide all final site restorations.
2.11. Provide all field surveys to document existing conditions for the HDD installations, including but not limited to pictures, videos, field notes, etc.

## 3. Pricing (Lump Sum)

| | | |
|---|---|---|
| 3.1. | HDD Cedar Creek 2,106' X 36" pipe: | **$1,280,448.00** |
| 3.2. | HDD Pottawapomie Creek 1,788' X 36" pipe: | **$1,087,104.00** |
| 3.3. | HDD Flint Hill 2,158' X 36" pipe: | **$1,312,064.00** |
| 3.4. | Mobilization per rig spread: | **$50,000.00** |

## 4. Clarifications

4.1. Additional footage due to no fault of The HDD Company, will be billed at $608.00/LF.
4.2. This proposal is based upon the drawings, specifications, and geotechnical information provided to us on or before **7 June 2019**.
4.3. If any revised or additional drawings, specifications, geotechnical information, or permits are provided to us after the bid submission date, The HDD Company reserves the right to modify the proposal to account for any added costs and/or additional time associated with the change(s).
4.4. The HDD Company's bid proposal is conditional upon reaching an agreement upon mutually acceptable contract terms. This bid proposal will be attached to and forms a part of the contract between The HDD Company and THE CONTRACTOR.
4.5. Item 3.3 above includes the hauling and disposal of all **non-contaminated** drilled solids and excess drilling fluids.
4.6. The pricing above is contingent upon a site visit.

## 5. Exclusions

5.1. The HDD Company and its personnel are not the Project Engineers. Therefore, we exclude all design and engineering services unless any are specifically noted as included in this proposal. Any drilling plans or profiles that we submit to you will be based upon the design information in the contract documents and our experience as HDD contractors. Any plans or profiles we provide are recommendations only and are subject to review and approval by the project owner and/or its engineers.
5.2. All permits, including federal, State and local environmental permits, the SWPPP permit and any associated SWPPP plans, any right-of-way (ROW) agreement or easements, and all access necessary for us to perform our work shall be provided by others. If our operations are delayed or otherwise impacted by any delays or problems with permits, SWPPP plans, ROW agreements, easements or access arrangements our compensation and time for completion will be equitably adjusted.

6. **Terms and Conditions**

   6.1. Schedule

       6.1.1. This proposal is based upon performance under a reasonable and mutually agreed-to project schedule in so far as that schedule applies to our work. The approved project baseline schedule and all monthly updates must be provided to us on a regular and timely basis to keep us apprised of schedule changes which may impact the timing and efficiency of our work. We will not be liable for any delays caused by others or by factors beyond our reasonable control.

   6.2. Indemnification

       6.2.1. We will indemnify you and/or the project owner for personal injury or property damage claims to the extent of our own negligence. Our proposal excludes any obligation to indemnify you for your own negligence or to indemnify any other party for that party's own negligence or to indemnify any design professional.

   6.3. Payment

       6.3.1. Monthly progress payments will be made to The HDD Company within (7) seven days after you receive each monthly payment from the project owner, but in no event later than 120 days from the date you received your invoice.

       6.3.2. We will receive our final payment within 30 days after you receive our final billing and our work has been completed and accepted. Acceptance will not be unreasonably withheld or delayed. If you dispute any portion of any billing, you will promptly notify us in writing of the nature of the dispute and you will pay the undisputed portion of the billing without delay. If any undisputed amounts are past due for more than 10 days, we reserve the right to stop work until all payments are brought current. We will provide lien releases in accordance with applicable state statutes or regulations. We will keep the project free of liens from out subcontractors, suppliers and other vendors provided we have been paid by you for the work covered by any such liens.

   6.4. Extra/Force Account Work:

       6.4.1. If we are directed to perform any work on a force account or time and material basis, the rates for our labor and equipment will be as stated in our proposal, or if no rates are included with this proposal, as stated in our then current standard labor and equipment rate schedule. If we are directed to standby or suspend work while other operations occur, or delays or other problems are resolved, or if we are required to standby due to events or circumstances beyond our control, the standby time for our labor and equipment will be paid as stated in this proposal.

   6.5. Differing Site Conditions

6.5.1.   If the conditions we encounter in the performance of our work differ materially from those indicated in the contract documents, boring logs, geotechnical reports or other information furnished to us prior to bid, or from those ordinarily encountered and generally recognized as inherent in the type of work provided for in our proposal, then our compensation and time for completion will be equitably adjusted to account for any resulting delay and added costs.

7.  **Delays and Work Stoppages:**

7.1   All work stoppages that arise through no fault of The HDD Company will be billed at **$14,500** (no crew on site).

The HDD Company appreciates the opportunity to furnish you this quote and looks forward to working with you.  Should any of the information presented above need further clarification, please do not hesitate to contact us.

Sincerely,
**The HDD Company**


Jeremy King
Vice President

Going to Greater Lengths"



17 January 2020

**Minnesota Limited**
18640 200ᵗʰ St, PO Box 410
Big Lake, MN 55309

ATTN: Brad Cordes

RE:   Southern Star Lines DT and DS Replacement Project
      Directionally drill and install approximately 4540 feet of 36-inch steel pipeline road
      crossings in Anderson and Franklin Counties, KS.

The HDD Company is pleased to submit the following bid quote:

1.   **Responsibilities of The HDD Company**
     1.1.   Provide all required insurance certificates.
     1.2.   Provide any written submittals and qualifications required.
     1.3.   Provide drill rig(s) with sufficient capabilities to install the crossings, a closed-
            loop mud system, mud pumps, vacuum trucks, dump trucks, steering system,
            and all drill spread support equipment necessary.
     1.4.   Provide all required union labor for the drilling operations.
     1.5.   Provide final as-built drawings.
     1.6.   Provide and haul water for drilling operations.
     1.7.   Provide water storage for the duration of drilling operations.
     1.8.   Provide all required pulling heads.
     1.9.   Leave the entry areas clean, free of debris, and to a rough grade.
     1.10.  Provide bonding at 1%, which is not included in the bid pricing below.

2.   **Responsibilities of THE CONTRACTOR**
     2.1.   Stake and survey the entry and exit points for each bore, with correct stations
            and elevations.
     2.2.   Provide all permitting to undertake the project.
     2.3.   Provide and maintain suitable truck access to and from entry and exit locations.
     2.4.   Provide stable, level, matted and/or graveled work pads for each bore.
     2.5.   Provide bore pits and shore if needed.
     2.6.   Provide all BMPs around each bore's entry and exit locations. The HDD
            Company will maintain these items.
     2.7.   Provide, string, weld, and test all 36-inch pipe for each bore.
     2.8.   Furnish support crew for road crossings, including excavators and manpower.

*Going to Greater Lengths®*

2.9.   Provide all plans, equipment, and manpower to handle pipe during pullback operations.

2.10.  Perform all final tie-ins.

2.11.  Dispose of cuttings.

2.12.  Provide all settlement monitoring, if required.

2.13.  Provide all final site restorations.

2.14.  Provide all field surveys to document existing conditions for the HDD installations, including but not limited to pictures, videos, field notes, etc.

## 3.  Pricing

| | | |
|---|---|---|
| 3.1. | 4540' X 36" pipe: | **$508.00/ft** |
| 3.2. | Mobilization per rig spread: | **$50,000.00** |

## 4.  Clarifications

4.1.  This proposal is based upon the drawings, specifications, and geotechnical information provided to us on or before **17 January 2020.**

4.2.  If any revised or additional drawings, specifications, geotechnical information, or permits are provided to us after the bid submission date, The HDD Company reserves the right to modify the proposal to account for any added costs and/or additional time associated with the change(s).

4.3.  The HDD Company's bid proposal is conditional upon reaching an agreement upon mutually acceptable contract terms. This bid proposal will be attached to and forms a part of the contract between The HDD Company and THE CONTRACTOR.

4.4.  The pricing above is contingent upon a site visit.

## 5.  Exclusions

5.1.  The HDD Company and its personnel are not engineers. Therefore, we exclude all design and engineering services unless any are specifically noted as included in this proposal. Any drilling plans or profiles that we submit to you will be based upon the design information in the contract documents and our experience as HDD contractors. Any plans or profiles we provide are recommendations only and are subject to review and approval by the project owner and/or its engineers.

5.2.  All permits, including federal, State and local environmental permits, the SWPPP permit and any associated SWPPP plans, any right-of-way (ROW) agreement or easements, and all access necessary for us to perform our work shall be provided by others. If our operations are delayed or otherwise impacted by any delays or problems with permits, SWPPP plans, ROW agreements, easements or access arrangements our compensation and time for completion will be equitably adjusted.

## 6.  Terms and Conditions

6.1.  Schedule

6.1.1.  This proposal is based upon performance under a reasonable and mutually agreed-to project schedule in so far as that schedule applies to our work. The approved project baseline schedule and all monthly updates must be provided to us on a regular and timely basis to keep

us apprised of schedule changes which may impact the timing and efficiency of our work. We will not be liable for any delays caused by others or by factors beyond our reasonable control.

6.2 Indemnification

    6.2.1. We will indemnify you and/or the project owner for personal injury or property damage claims to the extent of our own negligence. Our proposal excludes any obligation to indemnify you for your own negligence or to indemnify any other party for that party's own negligence or to indemnify any design professional.

6.3 Payment

    6.3.1. Monthly progress payments will be made to The HDD Company within (7) seven days after you receive each monthly payment from the project owner, but in no event later than 120 days from the date you received your invoice.

    6.3.2. We will receive our final payment within 30 days after you receive our final billing and our work has been completed and accepted. Acceptance will not be unreasonably withheld or delayed. If you dispute any portion of any billing, you will promptly notify us in writing of the nature of the dispute and you will pay the undisputed portion of the billing without delay. If any undisputed amounts are past due for more than 10 days, we reserve the right to stop work until all payments are brought current. We will provide lien releases in accordance with applicable state statutes or regulations. We will keep the project free of liens from out subcontractors, suppliers and other vendors provided we have been paid by you for the work covered by any such liens.

6.4. Extra/Force Account Work:

    6.4.1. If we are directed to perform any work on a force account or time and material basis, the rates for our labor and equipment will be as stated in our proposal, or if no rates are included with this proposal, as stated in our then current standard labor and equipment rate schedule. If we are directed to standby or suspend work while other operations occur, or delays or other problems are resolved, or if we are required to standby due to events or circumstances beyond our control, the standby time for our labor and equipment will be paid as stated in this proposal.

6.5. Differing Site Conditions

    6.5.1. If the conditions we encounter in the performance of our work differ materially from those indicated in the contract documents, boring logs, geotechnical reports or other information furnished to us prior to bid, or from those ordinarily encountered and generally recognized as inherent in the type of work provided for in our proposal, then our compensation and time for completion will be equitably adjusted to account for any resulting delay and added costs.

Going to Greater Lengths"

7. **Delays and Work Stoppages:**

    7.1. All work stoppages that arise through no fault of The HDD Company will be billed at $14,500 (no crew on site).

The HDD Company appreciates the opportunity to furnish you this quote and looks forward to working with you. Should any of the information presented above need further clarification, please do not hesitate to contact us.

Sincerely,
**The HDD Company**

Jeremy King

# The HDD Company, Inc.

4525 Serrano Pkwy #210
El Dorado Hills, CA  95762
(530) 676-5705  Fax (530) 676-3605

# Invoice

| DATE | INVOICE # |
|------|-----------|
| 8/24/2020 | 20-345-14 |

| BILL TO |
|---------|
| MINNESOTA LIMITED<br>PO BOX  410<br>BIG LAKE, MN  5530934 |

| P.O. NO. | TERMS | JOB NO. |
|----------|-------|---------|
| 1916169002 | Net 30 | 20-345-14 |

| SERVICE DAY | DESCRIPTION | QTY/FT | RATE | AMOUNT |
|-------------|-------------|--------|------|--------|
| 8/24/2020 | Completion of HDD  -  Pottawapomie Creek Bore   1788' of 36" Pipe | | 1,087,104.00 | 1,087,104.00 |
| 8/24/2020 | LESS 10% RETENTION | 1,087,104 | -0.10 | -108,710.40 |
| | Subcontract Agreement No. SR1916169002<br>Southern Star Central Gas Pipeline  Project C-60266 | | | |

| Thank you for your business. | Total | $978,393.60 |
|------------------------------|-------|-------------|

# Exhibit 20



USPS TRACKING #

9590 9402 6142 0209 2512 84

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

United States
Postal Service

* Sender: Please print your name, address, and ZIP+4® in this box*

**HUSCH BLACKWELL**
4801 Main Street, Suite 1000
Kansas City, MO  64112

MiKE KElly  550367-1

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Anderson RWD 4
501 N. Olive St.
Garnett, KS 66032-1840

‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖

9590 9402 6142 0209 2512 84

2. Article Number (Transfer from service label)
9489 0090 0027 6303 9140 57

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X  K E                          ☐ Agent
                                ☐ Addressee

B. Received by (Printed Name)    C. Date of Delivery
GC R+1 C-19                      1-15-21

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:        ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☒ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☒ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2015 PSN 7530-02-000-9053          Domestic Return Receipt

# Exhibit 21

USPS TRACKING #

9590 9402 6142 0209 2512 91

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

United States
Postal Service

* Sender: Please print your name, address, and ZIP+4® in this box*

**HUSCH BLACKWELL**
4801 Main Street, Suite 1000
Kansas City, MO  64112

*Mike Kelly 550367-1*

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Anderson County
c/o Anderson County Clerk –
Julie Wettstein
100 East 4ᵗʰ Ave.
Garnett, KS 66032

9590 9402 6142 0209 2512 91

2. Article Number (Transfer from service label)

9489 0090 0027 6303 9140 64

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X _____  ☐ Agent   ☐ Addressee

B. Received by (Printed Name)   C. Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:   ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☒ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
     ...cted Delivery

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☒ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2015 PSN 7530-02-000-9053          Domestic Return Receipt

# Exhibit 22

EXHIBIT A

3125 Marshall Rd., Ottawa, KS 66067
All that part of the Southwest Quarter of Section 5, Township 17 South, Range 20 East, in
Franklin County, Kansas, being more particularly described as follows: Commencing at the
Southwest corner of the Southwest Quarter of said Section 5; thence North 87° 40' 17" East,
along the South line of the Southwest Quarter of said Section 5, a distance of 70.01 feet to
the point of beginning; thence North 03° 14' 35" West, along a line 70.00 feet East of and
parallel with the West line of the Southwest Quarter of said Section 5, a distance of 1647.63
feet; thence North 60° 00' 55" East, a distance of 1074.78 feet; thence South 01° 52' 54" East,
a distance of 2146.36 feet to a point on the South line of the Southwest Quarter of said
Section 5; thence South 87° 40' 17" West, along the South line of the Southwest Quarter of
said Section 5, a distance of 908.94 feet to the point of beginning, Franklin County, Kansas.

3062 Nebraska Rd., Ottawa, KS 66067:
The East 1/4 of the Southeast 1/4 of the Northeast 1/4 of Sec. 6, Twp. 17 S., Rng. 20 E., subject
to any part thereof in roads, all in Franklin County, Kansas.
AND
Beginning at the Northwest corner of the Northwest Quarter of Section 5, Township 17 South,
Range 20 East of the 6th P.M., thence South 02° 59' 16" East 680.67feet on the West line of the
Northwest Quarter of said Section 5 to an existing 1/2" iron bar and the true point of beginning
of New Tract 2; thence North 88° 18' 09" East 1327.15 feet to the East line of the Northwest
Quarter of the Northwest Quarter of said Section 5, being marked with a 1/2" iron bar; thence
South 03° 06' 08" East 613.78 feet to the Southeast corner of said Northwest Quarter of the
Northwest Quarter of said Section 5, being marked with a 1/2" iron bar; thence South 03° 06'
08" East 659.24 feet to the Southeast corner of the North Half of the Southwest Quarter of the
Northwest Quarter of said Section 5, being marked with a 1/2" iron bar; thence South 88° 26'
25" West 1329.76 feet to the Southwest corner of the North Half of the Southwest Quarter of
the Northwest Quarter of said Section 5, being marked with an existing 1/2" iron bar; thence
North 02° 59' 16" West 661.16 feet to the Southwest corner of the Northwest Quarter of the
Northwest Quarter of said Section 5, being marked with an existing 1/2" iron bar; thence North
02° 59' 16" West 608.61 feet to the point of beginning, all in Franklin County, Kansas.

5

# Exhibit 23

Statement of Account

| | |
|---|---|
| Contract Value Unpaid | $ 1,180,857.60 |
| Retainage Withheld | $ 131,206.40 |
| Access Delay Expenses | $ 101,087.33 |
| Unpaid Change Orders | $1,600,392.89 |
| Total | $3,013,544.22 |

## IN THE DISTRICT COURT OF FRANKLIN COUNTY, KANSAS

THE HDD COMPANY, INC., an Oregon
Corporation,

                Plaintiff,

v.

MINNESOTA LIMITED, LLC., a Minnesota
Corporation,
**SERVE:**
**National Registered Agents, Inc. of KS**
**112 SW 7th Street, Suite 3C**
**Topeka, KS 66603**

SOUTHERN STAR CENTRAL GAS
PIPELINE, INC., a Delaware Corporation.
4700 Highway 56
Owensboro, KY 42301
**SERVE:**
**National Registered Agents, Inc. of KS**
**112 SW 7th Street, Suite 3C**
**Topeka, KS 66603**

RENE BURES and ANITA BURES
**SERVE:**
**Rene Bures**
**Anita Bures**
**31443 NW Meade Rd.**
**Richmond KS 66080**

RURAL WATER DISTRICT NO. 4
**SERVE:**
**Rural Water District No. 4**
**501 N. Olive St.**
**Garnett, KS 66032**

ANDERSON COUNTY, KANSAS
**SERVE:**
**County Clerk**
**100 E. 4th Ave.**
**Garnett, KS 66032**

JOHN T. RAYNE
**SERVE:**
**John T. Rayne**
**12 Overhill Drive**
**Paola, KS, 66071**

Case No. FR-2021-CV-000016

Petition Pursuant to K.S.A. Chapter 60

PATRICK ARTHUR RAYNE and KELLY
LEE RAYNE FAMILY TRUST under trust
agreement dated April 12, 2016
**SERVE:**
**Patrick Arthur Rayne, Co-Trustee**
**Kelly Lee Rayne, Co-Trustee**
**102 Crestview Dr.**
**Paola, KS 66071**

PICKERT FAMILY TRUST
**SERVE:**
**Keith J. Pickert, co-trustee**
**Mary J. Pickert, co-trustee**
**47890 Deer Trail Dr.**
**Canton Michigan 48187**

LYLE BLACK and CHERYL BLACK
**SERVE:**
**Lyle Black**
**Cheryl Black**
**3159 Neosho Rd.**
**Ottawa, KS 66067**

FARM CREDIT SERVICES, FLCA D/B/A
FRONTIER FARM CREDIT, FLCA
**SERVE: THE CORPORATION**
**COMPANY, INC.**
**112 S.W. 7TH STREET**

**TOPEKA, KS 66603**

AND

OSWEGO COAL COMPANY, INC.
**SERVE: Robert Caylor**
**Oswego Coal Company, Inc.**
**2476 Marshall Rd.**
**Ottawa, KS 66067**

        Defendants.

HB: 4828-3949-4878.1

## FILING OF ADDITIONAL EXHIBITS TO PETITION

Plaintiff The HDD Company, Inc., an Oregon Corporation ("HDD"), filed its original Petition and initial exhibits, the remainder of which exceeded the file size limitations for electronic filing. Plaintiff attaches herewith Exhibits 24 through 26 of 26 as additional exhibits.

Respectfully submitted,

HUSCH BLACKWELL, LLP

/s/*David B. Raymond*

| David B. Raymond | KS #14004 |
| Michael J. Kelly | KS #25666 |

4801 Main Street, Suite 1000
Kansas City, Missouri 64112
(816) 983-8000 (Phone)
(816) 983-8080 (FAX)
david.raymond@huschblackwell.com
mike.kelly@huschblackwell.com

**ATTORNEYS FOR PLAINTIFF**

HB: 4828-3949-4878.1

# Exhibit 24

EXHIBIT C

C1: Subcontract Agreement
C2: Invoices
C3: Delay Summaries
C4: Day Shift and Night Shift Summaries (Unpaid Change Orders)

(Attached hereto)



**MINNESOTA LIMITED**
AN HVERGE COMPANY

<div align="center">

**Subcontractor Agreement**
**No. SR1916169002**

</div>

This agreement is made at Big Lake, MN this day of ___January 17, 2020_____.

**BETWEEN:**

Minnesota Limited, LLC (Contractor)
18640 200ᵗʰ Street – PO Box 410
Big Lake, MN 55309

**AND:**

THE HDD COMPANY(Subcontractor)
4525 SERRANO PARKWAY, OFFICE SUITE 210
EL DORADO HILLS, CA  95762

**RECITALS**

Contractor ("Minnesota Limited, LLC) has entered into a contract (the "Prime Contract") with Southern Star Central Gas Pipeline, Inc. ("Owner") to perform certain labor and furnish certain materials for completion of the construction project KS - C60266 Install 31.5 miles of 36" (the "Project").  Subcontractor desires to perform certain services and/or provide certain materials as a subcontractor of Contractor pursuant to the terms and conditions of the Prime Contract, and agrees to the terms and conditions of this Agreement.

**AGREEMENT**

In consideration of the mutual covenants contained herein, the parties agree as follows:

I.	Subcontractor agrees to supply all the materials and labor and pay all license fees, permits and expenses for the work located at __Various Sites_____ (the "Site").  As full compensation for performance of this Agreement and subject to all applicable provisions of this Agreement, Contractor agrees to pay Subcontractor:
	six million one-hundred eight-five thousand nine-hundred thirty six dollars ($6,185,936.00_____)

II.	**Contract Document**.  Subcontractor's performance hereunder shall be subject to all terms and conditions contained in the Prime Contract and all drawings and/or specifications referred to therein (the "Contract Documents") except as such terms may be specifically amended by this Agreement, which includes HDD's Proposal, attached hereto and incorporated herein.  Wherever the Contract Documents shall refer to the Contractor or its agents, the same shall be read to refer to the Subcontractor under this agreement. Subcontractor shall perform and coordinate its work hereunder in a manner necessary to assure the prompt and timely completion of the Project, time being of the essence to the



Agreement. At Subcontractor's request, a copy of the applicable Prime Contract Terms and Conditions will be supplied to Subcontractor.

Any terms and conditions proposed in Subcontractor's acceptance of or in any acknowledgement, invoice, or other form of Subcontractor that add to, vary from, or conflict with these terms hereby objected to. Any such proposed terms shall be void and these terms and conditions (1) shall constitute the complete and exclusive statement of the terms and conditions of the contract between the parties and (2) may be modified only by written instrument executed by the authorized representatives of both parties.

III.     **Insurance.** Subcontractor shall comply with the insurance requirements set forth in Exhibit A (attached).

IV.     **Additional Terms and Conditions**

   A.  Subcontractor, not Contractor, assumes all the risk related to in performing its work under this Agreement, such as any injuries to Subcontractor, Subcontractor's workers, Facility employees and members of the public arising from the Subcontractors activities or use of tools and equipment, or from any other cause.

   B.  Subcontractor will complete all work in a workmanlike and professional manner according to standard practices in the building trade, and in compliance with all building codes and other applicable laws. Subcontractor will warrant against defects in material and labor it supplies for the completion of the work. If subcontractor fails to perform under this Agreement, the party entitled to performance or the Contractor will have the right to hire other persons to correct the defective Work and hold Subcontractor liable for the costs thereof including costs, disbursements and reasonable attorneys' fees incurred in the enforcement of this provision.

   C.  All Work will be done on a timely basis. The work to be performed under this contract shall be commenced as directed by Project Manager or Project Superintendent or Project Foreman and shall be substantially completed on or before _as agreed upon and directed onsite_____. Time is of the essence.

   D.  Subcontractor shall indemnify, defend and hold harmless Contractor as set forth in Section VII.

   E.  No work shall be subcontracted or assigned by Subcontractor without the prior written approval of the Contractor.

   F.  Environmental, Health and Safety. Subcontractor shall take all necessary precautions to keep the work site free from hazards that are likely to cause injury, illness, or death or damage to property. Subcontractor shall provide any Safety Data Sheets (SDS) for any hazardous chemicals provided pursuant to this contract. Contractor is a company that operates under a "Culture of Safety" with the goal of zero incidents, and expects its subcontractor to similarly emphasize the paramount importance of safe behavior. Failure to abide by Contractor's policies may result in immediate removal of Subcontractor from the premises and will be a breach of Subcontractor's obligations hereunder.



Contractor shall have the right, at its option, to conduct a complete audit of Subcontractor's documents and practices to verify Subcontractor's compliance with this Section.

G.   Minnesota Limited has enacted a Subcontractor Management Program and Safety Requirements of which Subcontractor has received.   Subcontractor shall follow and adhere to all aspects of said program and the terms and conditions of such program are incorporated herein.

H.   Liens.  To the fullest extent permitted by law, and the extent the Contractors has paid the Subcontractor, Subcontractor will at all times keep the Project, the Site and each part thereof free from any attachment, lien, claim of lien, or other encumbrance arising out of the Work and Subcontractor will indemnify, defend and hold Contractor harmless from and against all claims, losses, demands, causes of action or expenses (including attorneys' fees and other costs of defense incurred by Contractor in defending against the foregoing or in enforcing this indemnity and defense obligation) of whatever nature, arising by reason of any such lien, claim of lien, attachment or encumbrance.  If any claim is filed to enforce any laborers, material men, mechanic's, or other similar lien arising out of or relating to the Work for which Contractor has paid the Subcontractor, Subcontractor will immediately cause such lien to be released and discharged and if Subcontractor fails to do so, then Contractor will have a right to pay all sums, including attorneys' fees and other costs and expenses incurred necessary to obtain such release and discharge, and hold Subcontractor liable for the amount thereof with the right to deduct all or a portion of such sum from accounts that may be due Subcontractor.

I.    Default. In addition to the other remedies available under law: (a) if Subcontractor should fail or refuse, except in cases where extension of time is provided, to supply enough properly skilled workers or proper materials for the Work; or (b) if Subcontractor should fail to make payment to its subcontractors for material or labor which are due to its Subcontractors, or (c) if Subcontractor should fail to keep and comply with any of the terms and provisions of this Agreement, or (d) if Subcontractor should be adjudged bankrupt, file or suffer to be filed a petition for relief under the Bankruptcy Act, or make a general assignment for the benefit of the creditors; or (e) if a receiver should be appointed on account of Subcontractor's insolvency; or (f) if Subcontractor fails to pay its employees' wages, benefits or tax withholdings; then, in any such event, Contractor may without prejudice to any other right or remedy and after giving Subcontractor and its surety, if any, upon twenty-four hours written notice, terminate its obligation to Subcontractor under this Agreement and take possession of the Site and complete (or cause to be completed) the Work by whatever method Contractor may deem expedient. In such case Subcontractor will not be entitled to receive any further payment until the Work is completed. Upon completion of the Work, Contractor will pay to Subcontractor an amount equal to (x) the unpaid portion of the Subcontract Amount attributable to the Work performed up to the termination less (y) the amount by which (i) the costs incurred by Contractor to complete the Work, including, without limitation, costs for architectural, managerial and administrative services and reasonable attorneys' fees, if legal counsel is employed, exceed (ii) the portion of the Subcontract Amount attributable to the balance of the Work yet to be performed at the time of termination. If the amount calculated under part (y) in the preceding sentence exceeds the amount owing under part (x), the Subcontractor will pay the difference to Contractor. If the amount in part (x) exceeds the amount in part (y), Contractor will pay the difference to Subcontractor.



J.    Subcontractor is an independent Subcontractor and is not an employee or agent of the Contractor and neither Subcontractor nor anyone employed by Subcontractor will be deemed for any purpose to be the agent, employee, servant or representative of Contractor in the performance of the Work. Subcontractor acknowledges and agrees that Contractor will have no direction or control over the means, methods, procedures or manner of the Work performed by Subcontractor or any of its subcontractors, or any of their employees, vendors or suppliers.

K.    No changes shall be made in the work proposed or in the price unless those changes are agreed to in writing by both Subcontractor and Contractor. Travis Gehr and / or ___James Redmond_____, shall be the Contractor's designated on site agent, if there is a dispute regarding whether the work is a change, Subcontractor may perform that work under protest and submit a claim to Contractor in accordance with this Agreement.

L.    Clean Up. Subcontractor will at all times keep the site or facility safe and free from the accumulation of waste materials or rubbish caused by its operations or related to the Work. Upon completion of the Work and each portion thereof, Subcontractor will remove all rubbish and waste produced by its operations or Work hereunder from the facility as well as all of its tools, equipment, machinery and surplus materials no longer needed and leave the site or facility in a "broom clean" or equivalent condition and safe for Subcontractor's employees and subsequent subcontractors to perform their work, unless otherwise specified in writing. If Subcontractor fails to clean up, Contractor may do so after written notice to Subcontractor and the cost thereof will be charged to Subcontractor.

V.    **Representations of Subcontractor**.  Subcontractor represents and warrants the following:

A.    Subcontractor has examined the Agreement ("Prime Contract") between Owner and Minnesota Limited (if requested by the Subcontractor prior to the execution of the work) and agrees to all provisions affecting Subcontractors performance, including but not limited to the representations, obligations and warranties made by Minnesota Limited to the Owner.

B.    Subcontractor has the requisite authority and ability to perform the subcontract without delay.

C.    Subcontractor will not assign, subcontract or otherwise delegate its responsibilities and obligation hereunder without the written consent of Contractor.

D.    Subcontractor shall examined the specifications, site conditions, drawings and requirements of the work with due diligence and its bid has taken into consideration all conditions and risks which are reasonably related to the performance of the work.

E.    Ethics; Conflict of Interest. Subcontractor shall at all times during the performance of its obligations hereunder conform to sound ethical business practices in conformance with all applicable Laws and shall in its business practices promote the values of honesty, integrity, social responsibility, and human rights. Subcontractor shall not offer to any member of Contractor (including employees thereof) any gifts, entertainment, or other favors beyond the common courtesy usually associated with business practices. Subcontractor shall not pay any commissions or fees or grant any rebates or other



remuneration or monetary gratuity to any employee of Contractor. Subcontractor shall not grant any secret rebates nor pay any commissions or fees to any employee of Contractor.

F.  Invitees Prohibited. Subcontractor shall not, without prior written permission of Contractor, invite, permit entry or bring any Person onto the Contractor's Worksite or property who is not an employee of Subcontractor.

G.  Subcontractor will pay its employees promptly and maintain good labor relations. Subcontractor further represents that it has paid all union benefit contributions including fringe benefits. Subcontractor agrees that Contractor upon demand of the Labor Union, may withhold from any sums due Subcontractor and pay to the Administrator of the Plan any amounts owing and said payment shall be deducted from the invoice.

VI.  **Warranty**.

A.  Subcontractor warrants to the Contractor and Owner that all materials and equipment furnished under this Agreement will be new unless otherwise specified in writing, and that all work will be of good quality, free from faults and defects and in conformance with any Purchase Order and attachments thereto, including any specifications stipulated therein. All Work not so conforming to these standards may be considered defective, and the Subcontractor shall promptly repair and make good, after notice by the Contractor and Owner and without cost to the Contractor and Owner, any damages, defects or faults resulting from imperfect or defective Work done or materials furnished by the Subcontractor. The Subcontractor warrants that all labor, materials and equipment furnished under this Agreement shall be covered by warranty for a period of at least two (2) years (or during a longer period if required by the specifications and stipulated therein) from the date of acceptance of the completed Work by the Owner.

B.  Where material or equipment furnished by the Subcontractor is covered by a manufacturer's warranty or guarantee or other special warranty or guarantee the Subcontractor shall provide such warranty and provide additional or extended warranty or guarantees to the Contractor for its labor, materials and equipment to confirm to paragraph A above.

VII.  **Indemnification**. To the fullest extent permitted by law, the Subcontractor shall indemnify the Owner, Contractor and the agents and employees of any of them from and against claims, damages, losses and expenses, arising out of or in connection with, or resulting from the negligent performance of the Subcontractor's work, the Subcontractor's subcontractors work, or anyone directly or indirectly employed by them but only to the extent caused by acts or omissions by either or any of them. In addition thereto, Subcontractor indemnifies Owner, Contractor and the agents and employees of any of them for expenses including attorney's fees and costs, incurred in responding to and defending against any claim or in enforcing this provision.

VIII.  **Payment**. Subcontractor shall invoice Minnesota Limited no later than 30 days after date of service. Contractor agrees to pay Subcontractor all sums due less ___10___ % retainage (if applicable) hereunder within


**MINNESOTA
LIMITED**
AN HYVERGE COMPANY

thirty (30) days from the date the invoice is received. However, it is a condition precedent to payment that if Owner withholds payments for that portion of any work performed by Subcontractor, then Minnesota Limited is only obligated to pay Subcontractor after receiving payment from the Owner. In such event payment will be made within ten (10) days. Contractor reserves the right to withhold such sums as may be necessary to pay expenses, including costs and attorney's fees, caused by, or related to, Subcontractor's breach of Agreement. Final payment of retainage will occur ten (10) days after final payment for Subcontractor's work is received and when lien waivers and job completion affidavit are executed.

IX.     **Maintaining Records / Audit.** For a period of five (5) years from final acceptance of Subcontractor's work, Subcontractor shall maintain all job records and shall, upon reasonable notice by Contractor, but no later than 10 business days, make such records available for inspection by Contractor or Owner. Contractor or Owner or their representatives may audit said records. If the results of the audit show an overpayment, Subcontractor shall reimburse the overpayment ~~together with interest of 1% per month. If the audit shows an overpayment more than one thousand dollars ($1,000), Subcontractor shall also reimburse Contractor or Company for the cost of the audit.~~

X.      **Interpretations and Enforcement.** The Agreement and contract documentation contains the parties entire understanding with regard to the subject hereof and shall not be modified except by a writing signed by both parties; provided, however, that Subcontractor shall be bound by changes in the Contract Documents agreed to between the Contractor and Owner, but only if Contractor has timely notified Subcontractor of such changes.. The interpretation and enforcement of this Agreement shall be governed by the laws of the state in which the work hereunder is to be performed or that specified in the Prime Contract if different than the state where the work is to be performed. If any provision hereof is deemed unenforceable, the remainder of the Agreement shall be enforced as though such provision were not a part hereof.

XI.     **Assignment.** Subcontractor shall not assign or subcontract this Agreement or any portion thereof or of any money due or which may become due hereunder without the prior written consent of Contractor. Notwithstanding anything to the contrary contained herein, Contractor may assign this Agreement without the consent of Subcontractor.

XII.    **Confidentiality of Agreement.** The Subcontractor agrees that all terms and conditions contained herein or in any other document(s) referencing the Project shall remain confidential. Said terms shall not be disclosed without the express written consent of the Contractor.

Minnesota Limited is required to protect all technical information supplied by the Owner. Subcontractor agrees that this Section is its written assurance that all such information, including but not limited to: drawings, diagrams, surveys, specifications, locations, and geophysical (GPS) coordinates of the work, will be kept confidential, protected, and will not be disclosed to third parties without obtaining Minnesota Limited's written consent unless ordered to do so by a court of law or arbitrator.. Breach of is provision will subject Subcontractor to all remedies awarded to Contractor and Owner including injunctive relief. Subcontractor agrees to pay all of Contractors and Owners attorney's fees in enforcing this provision.



XII.   **Notice.** Unless otherwise provided herein, any notice provided for herein will be in writing and delivered to the parties (a) in person, (b) by facsimile transmission (with the original and a copy of the facsimile confirmation following in the United States mail), (c) by overnight delivery service, or (d) by certified mail, return receipt requested. Notice will go to the address first shown herein for the respective party to whom notice is given or to such other address as may be designated by either party by written notice given pursuant hereto.

XIV.   **Governing Law/Venue/Attorney Fees.** This Agreement shall be construed and interpreted in accordance with the laws of the State of Minnesota, including, without limitation, matters of construction, validity, enforcement, and interpretation. The parties agree that venue for any dispute under this Agreement shall be in the District Court of Hennepin County, Minnesota. In the event any enforcement effort is initiated by Contractor against Subcontractor for default of this Agreement, ~~Subcontractor shall be liable to Contractor for any and all costs of collection, including but not limited to, reasonable attorneys' and professional fees, court costs, traveling and lodging expenses, costs of investigation and defense, accrued interest, and any other reasonable expenses incurred by Contractor in initiating such efforts.~~

Signed the day and year first written above.

CONTRACTOR: **Minnesota Limited, LLC.**

By: _____

Its: ___Pvesident_____
                Title

SUBCONTRACTOR: THE HDD COMPANY

By: _____

Its: ___Vice President_____
                Title



## EXHIBIT A
## Insurance

Prior to commencing Work, Subcontractor shall, at its sole expense, procure and maintain insurance of the types, and in the form and amounts described below from insurer(s) authorized to transact business in the state where Work or operations will be performed by Subcontractor. Such insurance and required coverage in forms acceptable to General Contractor shall be placed with admitted insurers that maintain an A.M. Best's rating of not less than A- VII, unless otherwise approved by the General Contractor. The insurance requirements described below shall be maintained uninterrupted for the duration of the Project, including any warranty periods, and shall protect Subcontractor, and others for whom and/or to whom Subcontractor may be liable, for liabilities in connection with work performed by or on behalf of Subcontractor, its agents, representatives, employees or subcontractors.

### Insurance Requirements:

1.	**Commercial General and Umbrella Liability Insurance.** Subcontractor shall maintain commercial general liability ("CGL") and, if necessary, commercial umbrella insurance, with a limit of not less than $ 2,000,000.00 per occurrence, bodily injury or property damage liability; $ 2,000,000.00 per offense, personal and advertising injury liability; $ 5,000,000.00 products-completed operations aggregate; and $ 5,000,000.00 general aggregate applicable to claims other than products-completed operations. To the extent that Subcontractor's CGL and any commercial umbrella insurance are subject to aggregate limits, the policy shall be endorsed so as to apply such aggregate limits separately to the Project.

Coverage afforded under Subcontractor's CGL and any commercial umbrella insurance shall be provided on an occurrence basis and shall be subject to the terms of the *Insurance Services Office ("ISO") Commercial General Liability Coverage Form CG 0001*, or a substitute form providing coverage at least as broad as the ISO form specified. There shall be no limitations or exclusions of coverage beyond those contained in the standard coverage form and coverage shall include liability arising from premises, operations, independent contractors, products-completed operations including construction defect, contractual liability or personal injury and advertising injury.

General Contractor, its officers, directors and employees and Project Owner(s) shall be included as additional insureds under Subcontractor's CGL, and any commercial umbrella insurance, with respect to liabilities arising out of both the ongoing and completed operations of Subcontractor. Such additional insured coverage shall be subject to the terms of ISO additional insured endorsement forms CG 2010 (ongoing operations) and form CG 2037 (products-completed operations), or substitute form(s) providing equivalent coverage. The edition date of the ISO endorsements required should be chosen based on the recipient's risk transfer objectives. The table below summarizes the options and major differences between the edition dates.

| Endorsement(s) | ISO Edition Date | Comments |
|---|---|---|
| CG 2010 | 11/85 Edition | Broadest Insuring Agreement - "liability arising out of" the Subcontractor's work - both ongoing |



| | | operations and completed operations coverage provided by one endorsement. |
|---|---|---|
| CG 2010/CG2037 | 10/01 Edition | Same Insuring Agreement as 11/85 with ongoing operations and completed operations coverage provided by separate endorsements. |
| CG 2010/CG2037 | 07/04 Edition | More narrow Insuring Agreement – "caused in whole or in party by. . . .acts or omissions" of the Subcontractor. |
| CG2010/CG2037 | 04/13 Edition | Same Insuring Agreement as 07/04, but limits coverage to "extent permitted by law" and "not be broader than that which you are required by the contract or agreement to provide." |

Note: Recommended Additional Insured endorsement for states other than Minnesota may vary and Willis should be consulted. States including but not limited to IL, TX, & CA involve unique risk transfer considerations.

Additional insured coverage afforded by Subcontractors CGL, and any commercial umbrella insurance, shall be primary and non-contributing with respect to any insurance or self-insurance available to General Contractor or Project Owner. Such primary and non-contributory insurance shall be subject to the terms of ISO form CG 2001 (Primary and Noncontributory - Other insurance Condition) or its equivalent. Any other insurance or self-insurance maintained by General Contractor or Project owner shall be excess of, and non-contributory with, the coverage afforded by Subcontractors CGL and commercial umbrella insurance, if any.

In addition to procuring and maintaining CGL, and any commercial umbrella insurance, for the duration of the contract, Subcontractor agrees to continue to procure and maintain the products-completed operations liability insurance coverage for a minimum of ___two___ ( 2 ) year(s) after the date that the Work is substantially complete. All terms and conditions of such coverage shall be maintained during this completed operations period, including the required coverage limits and the requirement to provide General Contractor and Project Owner with coverage as an additional insured for completed operations.

2.      **Commercial Automobile and Umbrella Liability Insurance.** Subcontractor shall maintain automobile liability and, if necessary, commercial umbrella insurance, with a limit of not less than $ __2,000,000.00__ each accident. Such insurance shall cover liability for bodily injury and property damage arising from the use or operation of any auto, including those owned, hired or otherwise operated or used by or on behalf of Subcontractor. The coverage shall be subject to the terms of ISO *Business Auto Coverage Form CA 0001* (1990 edition or later), or a substitute form providing equivalent coverage.

3.      **Workers' Compensation and Employers Liability Insurance.** Subcontractor shall maintain workers' compensation coverage providing statutory benefits. Subcontractor shall additionally maintain employers liability insurance, and if necessary, commercial umbrella insurance, with a limit of not less than: $1,000,000, bodily injury by accident – each accident; $1,000,000, bodily injury by disease-policy limit; and $1,000,000, bodily injury by disease each employee. Workers' Compensation coverage must extend to every



employee, including owners/officers of a closely held corporation and/or individuals operating as a sole proprietorship or partnership. **Workers' Compensation must provide coverage in the state where the Project is located.**

Where applicable, evidence of coverage shall be required for U.S. Longshore and Harbor Workers Compensation, Maritime coverage, Federal Employer's Liability Act and other unique exposures requiring endorsement of coverage.

4.  **Contractors Pollution Liability Insurance.** Required only if Subcontractor's scope of services include the remediation, treatment, storage or disposal of waste or hazardous materials on or about the project site, as determined by General Contractor. If required, Subcontractor shall maintain Contractors Pollution Liability coverage with a limit of not less than $_____n/a_____ per occurrence, $_____n/a_____ annual aggregate. Coverage shall apply to the scope of work as described under the Contract including transportation and shall include coverage for bodily injury; property damage, including loss of use of damaged property or property that has not been physically injured; clean-up costs; mold; defense and investigative costs. Subcontractor shall maintain Completed Operations coverage for _____n/a_____ years following final acceptance of the project or termination of the Contract.

If the scope of services in the contract require the Subcontractor to provide professional services associated with arranging for, or brokering of, hazardous material or construction and demolition (C&D) wastes off the job site, Subcontractor must amend the Contractors Pollution Liability policy to include coverage to address this scope of work. If any of the aforementioned insurance policies are written on a claims made basis, the Contractor warrants that continuous coverage will be maintained, or an extended discovery period will be exercised, for a period of three years beginning from the time the work under this contract is completed.

5.  **Pollution (Environmental) Liability Insurance.** Required only if Subcontractor's scope of services involves disposal of waste or hazardous materials off-site, as determined by General Contractor. If required, Subcontractor shall maintain pollution (environmental) liability coverage with a limit of not less than: $_____n/a_____ per incident, $_____n/a_____ policy aggregate for hazardous waste disposal services, and $_____n/a_____ per incident, $_____n/a_____ for all other disposal facilities. Such coverage shall include clean-up costs, defense costs and products and completed operations.

If the scope of services in the contract requires the disposal of any hazardous materials or construction and demolition (C&D) wastes off the job site, Subcontractor must also obtain evidence that the Disposal Site Operator maintains Pollution Legal Liability insurance with coverage for; a. bodily injury, sickness, disease, mental anguish or shock sustained by any person, including death; b. property damage including physical injury to or destruction of tangible property including the resulting loss of use thereof, clean-up costs, and the loss of use of tangible property that has not been physically injured or destroyed; c. defense including costs, charges and expenses incurred in the investigation, adjustment or defense of claims for such compensatory damages. d. pollution conditions on, at, under or emanating from any disposal site, location or facility, used by or on behalf of the disposal facility of any waste or waste materials relating to the performance of the work.



The Disposal Site Operator's Pollution Liability Policy will apply to losses arising from the facility that is accepting the waste under the contract. Minimum limits of insurance for this policy shall be $_____n/a_____ each incident / $_____n/a_____ policy aggregate.

Claims-made coverage is permitted, provided the policy retroactive date is continuously maintained prior to the commencement date of the agreement, and coverage is continuously maintained during all periods in which Subcontractor accepts or treats waste generated from General Contractor's projects and for a period of *one (1)* year thereafter.

6.        **Professional Liability Insurance**. Required only if Subcontractor's scope of services include architectural, engineering, professional consulting or construction management, as determined by General Contractor. If required, Subcontractor shall maintain professional liability coverage with a limit of not less than $_____n/a_____ each wrongful act, $_____n/a_____ policy aggregate.

Coverage shall include liability arising from the errors, omissions or acts of the Subcontractor or any entity for which the Subcontractor is legally responsible in the providing of professional services under the Contract. Throughout the term the Contract, the PL/E&O policy shall include full prior acts coverage. Coverage shall be continuously maintained during the term of this Agreement and for a period of x years following final acceptance of the Project or termination of the Contract.

Coverage shall not include any exclusion or other limitations related to:
*    Scope of the professional services
*    Delays in project completion and cost overruns
*    Who is authorized to notify the carrier of a claim or potential claim
*    Mold, fungus, asbestos, pollutants or other hazardous substances

Claims-made coverage is permitted, provided the policy retroactive date is continuously maintained prior to the commencement date of this agreement, and coverage is continuously maintained during all periods in which Subcontractor performs professional services for General Contractor, and for an additional period of *one (1)* year after termination of this agreement or the last date such services are performed, whichever comes later. If Subcontractor's scope of work includes environmental engineering or consulting, the terms of coverage shall not exclude environmental professional services.

7.        **Watercraft Liability Insurance**. If watercraft of any kind is used by the CONTRACTOR or Subcontractor, including: (i) bodily injury; (ii) property damage; and (iii) passenger liability.

        a.        Limit of Liability: Combined Single Limit (Bodily Injury and Property Damage), $1,000,000 each occurrence;
        b.        Protection and Indemnity Insurance to include Jones Act crew coverage (or at least Maritime Employer's Liability: MEL), collision, tower's liability and wreck removal coverage, on a form providing



coverage no less extensive than that afforded in the P & I SP-23 form (revised 1/56), including a pollution buy-back endorsement.

8.       **Aircraft Liability Insurance**.  If aircraft of any kind is used by the CONTRACTOR or Subcontractor, including: (i) bodily injury; (ii) property damage; and (iii) passenger liability.

     a.       Limit of Liability:  Combined Single Limit (Bodily Injury and Property Damage and Passenger Liability), including hull physical damage insurance for the full replacement cost of each aircraft used   in the work.  Such Aircraft Liability and Hull Coverage shall include a waiver of subrogation against General Contractor and all others required by this Agreement to be additional insureds. $ ___n/a___ per seat; $___n/a___ per occurrence.

## Additional Provisions:

1.       **Deductibles and Self-Insured Retentions**.  The funding of deductibles and self-insured retentions maintained by Subcontractor shall be the sole responsibility of Subcontractor, including any amounts applicable to deductibles or self-insured retentions applicable to claims involving the General Contractor or Owner as an additional insured. Any self-insured retentions in excess of $___n/a___ must be declared to and approved by the General Contractor.

2.       **Primary / Non-Contributing**.  Subcontractor's required insurance coverage shall be primary insurance, and any insurance or self-insurance maintained by the General Contractor or Project Owner shall be excess of and noncontributory with Subcontractor's insurance.

3.       **Severability of Interest**.  Except with respect to the limits of insurance, Subcontractor's required insurance shall apply separately to each insured or additional insured.

4.       **Waiver of Subrogation**.  Subcontractor agrees to waive all rights of subrogation against the General Contractor, Project Owner and Project Architect, and shall cause each of its subcontractors to waive all rights of subrogation against the General Contractor, Project Owner and Project Architect, their agents and employees, as respects loss, damage, claims, suits or demands, howsoever caused:

     a.   To real or personal property, vehicles, equipment, tools, etc. owned, leased or used by Subcontractor or Subcontractor's employees, agents or sub-subcontractors; and

     b.   To the extent such loss, damage, claims, suits or demands are, or should be, afforded coverage by the Subcontractor's required insurance or any other insurance (except professional liability to which this requirement does not apply) maintained by the Subcontractor. This waiver shall C1PPIY to all first party property, equipment, vehicle and workers' compensation claims (unless prohibited under applicable state statutes), and all third party liability claims.  This waiver shall apply to all deductibles, retentions or self-insured layers applicable to the required or any other insurance (except professional liability to which this requirement does not apply) maintained by the Subcontractor.  If necessary, Subcontractor agrees to endorse the required insurance policies to permit waivers of subrogation in



favor of General Contractor, Project Owner and Project Architect as required hereunder. Subcontractor further agrees to hold harmless and indemnity General Contractor, Project Owner and Project Architect for any loss or expense incurred as a result of Subcontractor's failure to obtain such waivers of subrogation from the insurers.

5.      **Notice of Cancellation / Material Change / Nonrenewal.**  Subcontractor's insurance policies must contain a provision or endorsement that the coverage afforded will not be canceled, materially changed or renewal refused until at least 30 days prior Written Notice has been given to General Contractor and to each other additional insured to whom a certificate of insurance has been issued; provided, however, that a ten (10) day prior notice requirement may apply in the event of cancellation due to nonpayment of premium.

6.      **Verification of Coverage.**  Prior to commencing Work, Subcontractor shall furnish General Contractor with certificate(s) of insurance executed by a duly authorized representative of each insurer, as evidence of compliance with the insurance requirements set forth above.   Such certificates of insurance shall be accompanied by copies of endorsements evidencing coverage afforded to General Contractor and Project Owner as additional insured, and endorsements reflecting insurer's concurrence with Subcontractor's waiver of subrogation rights against General Contractor, Project Owner and Project Architect.   Renewal certificates are to be provided to the General Contractor prior to the expiration of the required insurance policies.
Certified copies of policies, including all policy endorsements, shall be furnished by Subcontractor within 15 days of written request by General Contractor.

The certificate(s) of insurance shall be subject to approval of General Contractor, but failure of General Contractor to request such certificate or other evidence of Subcontractor compliance with insurance requirements, or failure of General Contractor to identify deficiencies from evidence that is provided, shall in no way limit or relieve Subcontractor of its obligations to maintain such insurance.

7.      **Sub-Subcontractors.**  No work shall be sublet to any Sub-subcontractor without first obtaining the General Contractor's written permission.  All Sub-subcontractors, once approved by the General Contractor, are subject to the same insurance requirements as Subcontractor.  Subcontractor shall cause each Sub-subcontractor employed by Subcontractor to purchase and maintain such insurance.   Upon request, Subcontractor shall furnish General Contractor with copies of certificates of insurance evidencing coverage for each Sub-subcontractor.

Subcontractor shall voluntarily provide workers compensation coverage for proprietors, partners or others not statutorily required to maintain workers' compensation insurance.

8.      **Leased Employees.**  Use of leased employees by Subcontractor is expressly prohibited without General Contractor's written permission.  If permitted by General Contractor, Subcontractor shall:

        a.      Provide General Contractor with a complete copy of its Agreement with the Leasing Company;



b.    Require that Leasing Company provide workers' compensation, employers liability and commercial general liability with coverage limits in amounts no less than Subcontractor insurance requirements for the same coverages.

c.    Require that Leasing Company provide Alternate Employer Endorsement naming General Contractor as alternate employer on Leasing Company's workers' compensation policy.

d.    Require that Leasing Company add General Contractor as an additional insured on its commercial general liability insurance policy, with primary/non-contributory wording.

e.    Require that Leasing Company provide waiver of subrogation in favor of General Contractor on both Leasing Company's workers' compensation and commercial general liability insurance policies.

f.    Provide General Contractor with a copy of the Leasing Company's certificate of insurance, with endorsements, evidencing the required coverage.

9.    **No Representation of Coverage Adequacy.**    In specifying minimum Subcontractor insurance requirements, General Contractor does not represent that such insurance is adequate to protect Subcontractor for loss, damage or liability arising from its work. Subcontractor is solely responsible to inform itself of types or amounts of insurance it may need beyond these requirements to protect itself.

The insurance requirements set forth in minimum amounts shall not be construed to relieve Subcontractor for liability in excess of such coverage, nor shall it preclude General Contractor from taking such other actions as is available to it under any other provision of the Subcontract. To the extent Subcontractor maintains insurance greater than these minimum requirements, Subcontractor agrees that such insurance shall be applicable to any of Subcontractor's liability obligations hereunder.

Any acceptance of certificates of insurance by General Contractor shall in no way limit or relieve Subcontractor of its duties and responsibilities under this Subcontract, including the duty to indemnify and hold harmless General Contractor.

10.    **Compliance.** Failure of Subcontractor to maintain the required insurance shall constitute a default under this Subcontract and, at General Contractor's option, shall allow General Contractor to terminate this Subcontract for cause, withhold payment and/or purchase the required insurance at Subcontractor's expense.

11.    **Cross-Liability Coverage/Non-Standard Restrictive Endorsements.**    All liability policies shall include cross liability coverage and a standard ISO separation of insureds provision, or its equivalent. No liability policy shall include or be endorsed to include any non-standard provisions restricting coverage for the named insured or the persons/entities required to be named as additional insureds under this Agreement, including but not limited to cross liability coverage exclusions or limitations.



**THE HDD COMPANY**

EL DORADO HILLS | OFFICE Suite 210
4526 Serrano Parkway, El Dorado Hills, CA USA 95762

MAIN 530 676 5700 | CROSSINGGROUP.COM

January 9, 2020

**Minnesota Limited**
18640 200th St, PO Box 410
Big Lake, MN 55309

ATTN: Amy Skuza

RE: Southern Star Lines DT and DS Replacement Project
Directionally drill and install approximately 6,052 feet of 36-inch steel pipeline in
Anderson and Franklin Counties, KS.

The HDD Company is pleased to submit the following bid quote:

1. **Responsibilities of The HDD Company**
   1.1.   Provide all required insurance certificates.
   1.2.   Provide any written submittals and qualifications required.
   1.3.   Provide 2 (two) drill rig(s) with sufficient capabilities to install the crossings, a
          closed-loop mud system, mud pumps, vacuum trucks, dump trucks, steering
          system, and all drill spread support equipment necessary.
   1.4.   Provide all required union labor for the drilling operations.
   1.5.   Provide preliminary drill profiles for each crossing.
   1.6.   Provide final as-built drawings.
   1.7.   Provide and haul water for drilling operations.
   1.8.   Provide water storage for the duration of drilling operations.
   1.9.   Provide all required pulling heads.
   1.10.  Leave the entry areas clean, free of debris, and to a rough grade.
   1.11.  Provide bonding at 1%, which is not included in the bid pricing below.

2. **Responsibilities of THE CONTRACTOR**
   2.1.   Stake and survey the entry and exit points for each bore, with correct stations
          and elevations.
   2.2.   Provide all permitting to undertake the project.
   2.3.   Provide and maintain suitable truck access to and from entry and exit locations.
   2.4.   Provide stable, level, matted and/or graveled work pads for each bore.
   2.5.   Provide all BMPs around each bore's entry and exit locations. The HDD
          Company will maintain these items.
   2.6.   Provide, string, weld, and test all 36-inch pipe for each bore.

Going to Greater Lengths™

2.7. Provide all plans, equipment, and manpower to handle pipe during pullback operations.

2.8. Perform all final tie-ins.

2.9. Provide all settlement monitoring, if required.

2.10. Provide all final site restorations.

2.11. Provide all field surveys to document existing conditions for the HDD installations, including but not limited to pictures, videos, field notes, etc.

## 3. Pricing (Lump Sum)

| | | |
|---|---|---|
| 3.1. | HDD Cedar Creek 2,106' X 36" pipe: | $1,280,448.00 |
| 3.2. | HDD Pottawapomie Creek 1,788' X 36" pipe: | $1,087,104.00 |
| 3.3. | HDD Flint Hill 2,158' X 36" pipe: | $1,312,064.00 |
| 3.4. | Mobilization per rig spread: | $50,000.00 |

## 4. Clarifications

4.1. Additional footage due to no fault of The HDD Company, will be billed at $608.00/LF.

4.2. This proposal is based upon the drawings, specifications, and geotechnical information provided to us on or before **7 June 2019.**

4.3. If any revised or additional drawings, specifications, geotechnical information, or permits are provided to us after the bid submission date, The HDD Company reserves the right to modify the proposal to account for any added costs and/or additional time associated with the change(s).

4.4. The HDD Company's bid proposal is conditional upon reaching an agreement upon mutually acceptable contract terms. This bid proposal will be attached to and forms a part of the contract between The HDD Company and THE CONTRACTOR.

4.5. Item 3.3 above includes the hauling and disposal of all **non-contaminated** drilled solids and excess drilling fluids.

4.6. The pricing above is contingent upon a site visit.

## 5. Exclusions

5.1. The HDD Company and its personnel are not the Project Engineers. Therefore, we exclude all design and engineering services unless any are specifically noted as included in this proposal. Any drilling plans or profiles that we submit to you will be based upon the design information in the contract documents and our experience as HDD contractors. Any plans or profiles we provide are recommendations only and are subject to review and approval by the project owner and/or its engineers.

5.2. All permits, including federal, State and local environmental permits, the SWPPP permit and any associated SWPPP plans, any right-of-way (ROW) agreement or easements, and all access necessary for us to perform our work shall be provided by others. If our operations are delayed or otherwise impacted by any delays or problems with permits, SWPPP plans, ROW agreements, easements or access arrangements our compensation and time for completion will be equitably adjusted.

Going to Greater Lengths™

6. **Terms and Conditions**
   6.1. Schedule
       6.1.1. This proposal is based upon performance under a reasonable and mutually agreed-to project schedule in so far as that schedule applies to our work. The approved project baseline schedule and all monthly updates must be provided to us on a regular and timely basis to keep us apprised of schedule changes which may impact the timing and efficiency of our work. We will not be liable for any delays caused by others or by factors beyond our reasonable control.

   6.2. Indemnification
       6.2.1. We will indemnify you and/or the project owner for personal injury or property damage claims to the extent of our own negligence. Our proposal excludes any obligation to indemnify you for your own negligence or to indemnify any other party for that party's own negligence or to indemnify any design professional.

   6.3. Payment
       6.3.1. Monthly progress payments will be made to The HDD Company within (7) seven days after you receive each monthly payment from the project owner, but in no event later than 120 days from the date you received your invoice.
       6.3.2. We will receive our final payment within 30 days after you receive our final billing and our work has been completed and accepted. Acceptance will not be unreasonably withheld or delayed. If you dispute any portion of any billing, you will promptly notify us in writing of the nature of the dispute and you will pay the undisputed portion of the billing without delay. If any undisputed amounts are past due for more than 10 days, we reserve the right to stop work until all payments are brought current. We will provide lien releases in accordance with applicable state statutes or regulations. We will keep the project free of liens from out subcontractors, suppliers and other vendors provided we have been paid by you for the work covered by any such liens.

   6.4. Extra/Force Account Work:
       6.4.1. If we are directed to perform any work on a force account or time and material basis, the rates for our labor and equipment will be as stated in our proposal, or if no rates are included with this proposal, as stated in our then current standard labor and equipment rate schedule. If we are directed to standby or suspend work while other operations occur, or delays or other problems are resolved, or if we are required to standby due to events or circumstances beyond our control, the standby time for our labor and equipment will be paid as stated in this proposal.

   6.5. Differing Site Conditions

    6.5.1.    If the conditions we encounter in the performance of our work differ materially from those indicated in the contract documents, boring logs, geotechnical reports or other information furnished to us prior to bid, or from those ordinarily encountered and generally recognized as inherent in the type of work provided for in our proposal, then our compensation and time for completion will be equitably adjusted to account for any resulting delay and added costs.

**7.** **Delays and Work Stoppages:**

    7.1.    All work stoppages that arise through no fault of The HDD Company will be billed at **$14,500** (no crew on site).

The HDD Company appreciates the opportunity to furnish you this quote and looks forward to working with you. Should any of the information presented above need further clarification, please do not hesitate to contact us.

Sincerely,
**The HDD Company**

Jeremy King
Vice President

Going to Greater Lengths™



**THE HDD COMPANY**

EL DORADO HILLS | OFFICE Suite 210
4525 Serrano Parkway, El Dorado Hills, CA USA 95762

MAIN 530 676 5705 | CROSSINGGROUP.COM

17 January 2020

**Minnesota Limited**
18640 200th St, PO Box 410
Big Lake, MN 55309

ATTN: Brad Cordes

RE: Southern Star Lines DT and DS Replacement Project
Directionally drill and install approximately 4540 feet of 36-inch steel pipeline road
crossings in Anderson and Franklin Counties, KS.

The HDD Company is pleased to submit the following bid quote:

1. **Responsibilities of The HDD Company**
   1.1. Provide all required insurance certificates.
   1.2. Provide any written submittals and qualifications required.
   1.3. Provide drill rig(s) with sufficient capabilities to install the crossings, a closed-loop mud system, mud pumps, vacuum trucks, dump trucks, steering system, and all drill spread support equipment necessary.
   1.4. Provide all required union labor for the drilling operations.
   1.5. Provide final as-built drawings.
   1.6. Provide and haul water for drilling operations.
   1.7. Provide water storage for the duration of drilling operations.
   1.8. Provide all required pulling heads.
   1.9. Leave the entry areas clean, free of debris, and to a rough grade.
   1.10. Provide bonding at 1%, which is not included in the bid pricing below.

2. **Responsibilities of THE CONTRACTOR**
   2.1. Stake and survey the entry and exit points for each bore, with correct stations and elevations.
   2.2. Provide all permitting to undertake the project.
   2.3. Provide and maintain suitable truck access to and from entry and exit locations.
   2.4. Provide stable, level, matted and/or graveled work pads for each bore.
   2.5. Provide bore pits and shore if needed.
   2.6. Provide all BMPs around each bore's entry and exit locations. The HDD Company will maintain these items.
   2.7. Provide, string, weld, and test all 36-inch pipe for each bore.
   2.8. Furnish support crew for road crossings, including excavators and manpower.

<span style="color:red">Going to Greater Lengths</span>℠

2.9. Provide all plans, equipment, and manpower to handle pipe during pullback operations.

2.10. Perform all final tie-ins.

2.11. Dispose of cuttings.

2.12. Provide all settlement monitoring, if required.

2.13. Provide all final site restorations.

2.14. Provide all field surveys to document existing conditions for the HDD installations, including but not limited to pictures, videos, field notes, etc.

3. **Pricing**

| | | |
|---|---|---|
| 3.1. | 4540' X 36" pipe: | **$508.00/ft** |
| 3.2. | Mobilization per rig spread: | **$60,000.00** |

4. **Clarifications**

4.1. This proposal is based upon the drawings, specifications, and geotechnical information provided to us on or before **17 January 2020.**

4.2. If any revised or additional drawings, specifications, geotechnical information, or permits are provided to us after the bid submission date, The HDD Company reserves the right to modify the proposal to account for any added costs and/or additional time associated with the change(s).

4.3. The HDD Company's bid proposal is conditional upon reaching an agreement upon mutually acceptable contract terms. This bid proposal will be attached to and forms a part of the contract between The HDD Company and THE CONTRACTOR.

4.4. The pricing above is contingent upon a site visit.

5. **Exclusions**

5.1. The HDD Company and its personnel are not engineers. Therefore, we exclude all design and engineering services unless any are specifically noted as included in this proposal. Any drilling plans or profiles that we submit to you will be based upon the design information in the contract documents and our experience as HDD contractors. Any plans or profiles we provide are recommendations only and are subject to review and approval by the project owner and/or its engineers.

5.2. All permits, including federal, State and local environmental permits, the SWPPP permit and any associated SWPPP plans, any right-of-way (ROW) agreement or easements, and all access necessary for us to perform our work shall be provided by others. If our operations are delayed or otherwise impacted by any delays or problems with permits, SWPPP plans, ROW agreements, easements or access arrangements our compensation and time for completion will be equitably adjusted.

6. **Terms and Conditions**

6.1. Schedule

6.1.1. This proposal is based upon performance under a reasonable and mutually agreed-to project schedule in so far as that schedule applies to our work. The approved project baseline schedule and all monthly updates must be provided to us on a regular and timely basis to keep

Going to Greater Lengths™

us apprised of schedule changes which may impact the timing and efficiency of our work. We will not be liable for any delays caused by others or by factors beyond our reasonable control.

6.2. Indemnification

    6.2.1. We will indemnify you and/or the project owner for personal injury or property damage claims to the extent of our own negligence. Our proposal excludes any obligation to indemnify you for your own negligence or to indemnify any other party for that party's own negligence or to indemnify any design professional.

6.3. Payment

    6.3.1. Monthly progress payments will be made to The HDD Company within (7) seven days after you receive each monthly payment from the project owner, but in no event later than 120 days from the date you received your invoice.

    6.3.2. We will receive our final payment within 30 days after you receive our final billing and our work has been completed and accepted. Acceptance will not be unreasonably withheld or delayed. If you dispute any portion of any billing, you will promptly notify us in writing of the nature of the dispute and you will pay the undisputed portion of the billing without delay. If any undisputed amounts are past due for more than 10 days, we reserve the right to stop work until all payments are brought current. We will provide lien releases in accordance with applicable state statutes or regulations. We will keep the project free of liens from out subcontractors, suppliers and other vendors provided we have been paid by you for the work covered by any such liens.

6.4. Extra/Force Account Work:

    6.4.1. If we are directed to perform any work on a force account or time and material basis, the rates for our labor and equipment will be as stated in our proposal, or if no rates are included with this proposal, as stated in our then current standard labor and equipment rate schedule. If we are directed to standby or suspend work while other operations occur, or delays or other problems are resolved, or if we are required to standby due to events or circumstances beyond our control, the standby time for our labor and equipment will be paid as stated in this proposal.

6.5. Differing Site Conditions

    6.5.1. If the conditions we encounter in the performance of our work differ materially from those indicated in the contract documents, boring logs, geotechnical reports or other information furnished to us prior to bid, or from those ordinarily encountered and generally recognized as inherent in the type of work provided for in our proposal, then our compensation and time for completion will be equitably adjusted to account for any resulting delay and added costs.

Going to Greater Lengths™

7. **Delays and Work Stoppages:**
   7.1. All work stoppages that arise through no fault of The HDD Company will be billed at **$14,500** (no crew on site).

The HDD Company appreciates the opportunity to furnish you this quote and looks forward to working with you. Should any of the information presented above need further clarification, please do not hesitate to contact us.

Sincerely,
**The HDD Company**


Jeremy King

# The HDD Company, Inc.

4525 Serrano Pkwy #210
El Dorado Hills, CA  95762
(530) 676-5705  Fax (530) 676-3605

# Invoice

| DATE | INVOICE # |
|------|-----------|
| 7/10/2020 | 20-345-10 |

| BILL TO |
|---------|
| MINNESOTA LIMITED<br>PO BOX  410<br>BIG LAKE, MN  5530934 |

| P.O. NO. | TERMS | JOB NO. |
|----------|-------|---------|
| 1916169002 | Net 30 | 20-345-10 |

| SERVICE DAY | DESCRIPTION | QTY/FT | RATE | AMOUNT |
|-------------|-------------|--------|------|--------|
| 7/10/2020 | Completion of bore Flint Hill | | 1,312,064.00 | 1,312,064.00 |
| 7/10/2020 | LESS 10% RETENTION | 1,312,064 | -0.10 | -131,206.40 |
| | Subcontract Agreement No. SR1916169002<br>Southern Star Central Gas Pipeline  Project C-60266 | | | |

| Thank you for your business. | Total | $1,180,857.60 |
|------------------------------|-------|---------------|

| PROJECT NAME: | | | | |
|---|---|---|---|---|
| PROJECT NO.: | Southern Star Line DT & DS Replacement | | | |


Horizontal Directional Drilling

**EXTRA WORK SHEET REPORT**
**INTERNAL - OFFICE**

| | | | |
|---|---|---|---|
| CLIENT/OWNER: | Minnesota Limited - Southern Star | DATE: | |
| WORK PRFM'D. BY: | The HDD Company, Inc. | EXTRA WRK. SHT. NO. | Cedar Creek HDD |
| DESCPTN. OF WORK: | Access and weather delays | | |
| 0 | | | |
| 0 | | | |
| 0 | | | |

## A – EQUIPMENT

| EQUIP. NO. | Company Owned Equipment | HRS. | RATE/HR. | TOTAL/DAY |
|---|---|---|---|---|
| 1 | Drilling Rig HDD Rig 7 – Vermeer 750 | 32.50 | $ 205.56 | $ 6,680.70 |
| 1 | Mud Tank / Solids Control Unit | 32.50 | $ 111.96 | $ 3,638.70 |
| 1 | Sump Pit/Trash Pump | 32.50 | $ 8.29 | $ 269.43 |
| 1 | Mud Pumping Units | 32.50 | $ 60.94 | $ 1,980.55 |
| 2 | Tool Van and tools | 32.50 | $ 17.55 | $ 1,140.75 |
| 0 | Dump Truck A–17  TRUN 2AXL | | | $ - |
| 3 | Vac. Truck A–17 TRUN 2AXL | 32.50 | $ 45.75 | $ 4,460.63 |
| 10 | Misc. Trailers | 32.50 | $ 1.79 | $ 581.75 |
| 1 | Haul Trucks | 32.50 | $ 34.13 | $ 1,109.23 |
| 1 | 6 3/4" Non Mag Drill Collars w/Jet Assembly | 32.50 | $ 6.83 | $ 221.98 |
| 168 | Drill Pipe (5+1/2 FH) | 32.50 | $ 0.53 | $ 2,893.80 |
| 2 | Misc. X–Subs and Rack (All X Subs for Spread) | 32.50 | $ 5.20 | $ 338.00 |
| 0 | Sonde and Housing | | | |
| 0 | Steering Tool (North Referencing w/Tru–Gyde) | | | |
| 48 | Rollers | 32.50 | $ 1.50 | $ 2,340.00 |
| 3 | Ford F-250 T&TT 06-12 | 32.50 | $ 5.04 | $ 491.40 |
| 0 | Ford F-450 T&TT 20-28 | | | $ - |
| 0 | Ford F-350 T&TT 20-28 | | | $ - |
| 0 | KW & Crane Truck | | | |
| 1 | Hammer | 32.50 | $ 41.93 | $ 1,362.73 |
| 1 | 300 Amp Welder | 32.50 | $ 9.49 | $ 308.43 |
| 1 | 1/2 Ton Truck | 32.50 | $ 32.48 | $ 1,055.60 |
| 1 | 60" Casing | 32.50 | $ 3.25 | $ 105.63 |
| 0 | Mud Bins | | | |

| | Rental Equipment | | | |
|---|---|---|---|---|
| 1 | 10K Reach Forklift | S.T. 32.50 | $ 51.29 | $ 1,666.93 |
| | | O.T. | | $ - |
| 2 | 225 Excavator | S.T. 32.50 | $ 91.59 | $ 5,953.35 |
| | | O.T. | | $ - |
| 2 | Portable toilets | S.T. 32.50 | $ 1.50 | $ 97.50 |
| | | O.T. | | $ - |
| 0 | Multiquip 20kW Generator | S.T. | | $ - |
| | | O.T. | | $ - |
| 3 | Frac Tank | S.T. 32.50 | $ 7.32 | $ 713.70 |
| | | O.T. | | $ - |
| 1 | Trash Bin | S.T. 32.50 | $ 4.97 | $ 161.53 |
| | | O.T. | | $ - |
| 1 | 500 Amp Welder | S.T. 32.50 | $ 9.49 | $ 308.43 |
| | | O.T. | | $ - |
| 2 | Light Tower | S.T. 32.50 | $ 7.61 | $ 494.65 |
| | | O.T. | | $ - |
| 1 | 175 KW Generator | S.T. 32.50 | $ 71.36 | $ 2,319.20 |
| | | O.T. | | $ - |
| 1 | 6" Diesel Trash Pump | S.T. 32.50 | $ 23.60 | $ 767.00 |
| | | O.T. | | $ - |
| 1 | HTI Mud Motor | S.T. 32.50 | $ 42.50 | $ 1,381.25 |
| | | S.T. | | $ - |
| | | O.T. | | $ - |
| | | S.T. | | $ - |
| | | O.T. | | $ - |
| | | S.T. | | $ - |
| | | O.T. | | $ - |
| | | S.T. | | $ - |
| | | O.T. | | $ - |
| | | S.T. | | $ - |
| | | O.T. | | $ - |
| | | S.T. | | $ - |
| | | O.T. | | $ - |

| | | | |
|---|---|---|---|
| COMPANY OWNED EQUIPMENT | | $ | 28,979.28 |
| RENTAL EQUIPMENT W/ 15% Markup | | $ | 15,943.05 |
| A– EQUIPMENT SUB-TOTAL COST | | $ | 44,922.33 |
| 0.00 % Sales Tx, Rental Equip. | | | |

## B – MATERIALS

| MATERIALS DESCRIPTION | QTY. USED | UNIT $ | TOTAL |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |

| | | |
|---|---|---|
| B–MATERIALS SUB-TOTAL COST | $ | - |
| 0.00 % Sales Tax | | |
| 15 % ADDED M. U. B | $ | - |
| SUB-TOTAL A + B w/Tax | $ | 44,922.33 |

## C – SUBCONTRACT / WORK DONE BY SPECIALISTS/THIRD PARTY SERVICES

| Work Description | Individual / Company | Unit | RATE | TOTAL $ |
|---|---|---|---|---|
| Roller Damage | Minnesota Limited | 8.00 | $ 2,900.00 | $ 23,200.00 |
| | | | | $ - |
| | | | | $ - |
| | | | | $ - |
| | | COST OF SUBS – C | | $ 23,200.00 |
| | 15 % MARKUP(Subcontractor) | | | $ 3,480.00 |
| | | $ | | $ 26,680.00 |
| TOTAL COST A + B + C (Including Mark-Up) | | | | $ 71,602.33 |

| NO. | D – LABOR | HRS. | BASE RATE w/FRING'S. | SUB TOTAL | Per Diem Totals | TOTAL |
|---|---|---|---|---|---|---|
| 1 | Chris Crough (Day Rate) | REG. 3.00 | $1,916.84 | $3,050.52 | $120.00 | $3,170.52 |
| | | O.T. 0 | | $0.00 | | $0.00 |
| | | D.T. 0 | | $0.00 | | $0.00 |
| 2 | Randy Foster (Day Rate) | REG. 3.00 | $968.88 | $2,906.64 | $300.00 | $3,206.64 |
| | | O.T. | | $0.00 | | $0.00 |
| | | D.T. | | $0.00 | | $0.00 |
| 3 | Harold Shoemaker (Day | REG. 0.00 | | $0.00 | $0.00 | $0.00 |
| | | O.T. | | $0.00 | | $0.00 |
| | | D.T. | | $0.00 | | $0.00 |
| 4 | Justin Poter | REG. 32.50 | $59.79 | $1,943.18 | $345.00 | $2,288.18 |
| | | O.T. 0.00 | $80.65 | $0.00 | | $0.00 |
| | | D.T. | | $0.00 | | $0.00 |
| 5 | Brandon Morris | REG. 32.50 | $39.83 | $1,294.48 | $315.00 | $1,609.48 |
| | | O.T. 0.00 | $54.42 | $0.00 | | $0.00 |
| | | D.T. | | $0.00 | | $0.00 |
| 6 | David Jones | REG. 32.50 | $42.86 | $1,392.95 | $315.00 | $1,707.95 |
| | | O.T. 0.00 | $58.96 | $0.00 | | $0.00 |
| | | D.T. | | $0.00 | | $0.00 |
| 7 | Brandon Sammet | REG. 32.50 | $59.79 | $1,943.18 | $315.00 | $2,258.18 |
| | | O.T. 0.00 | $80.65 | $0.00 | | $0.00 |
| | | D.T. | | $0.00 | | $0.00 |
| 8 | Roger Reeter | REG. 32.50 | $59.79 | $1,943.18 | $300.00 | $2,243.18 |
| | | O.T. 0.00 | $80.65 | $0.00 | | $0.00 |
| | | D.T. | | $0.00 | | $0.00 |
| 9 | Augustin Zepeda | REG. 32.50 | $36.83 | $1,196.98 | $315.00 | $1,511.98 |
| | | O.T. 0.00 | $69.49 | $0.00 | | $0.00 |
| | | D.T. | | $0.00 | | $0.00 |
| 10 | Johnny Hatfield | REG. 32.50 | $43.49 | $1,413.43 | $150.00 | $1,563.43 |
| | | O.T. 0.00 | $59.91 | $0.00 | | $0.00 |
| | | D.T. | | $0.00 | | $0.00 |
| 11 | | REG. 0.00 | | $0.00 | | $0.00 |
| | | O.T. 0.00 | | $0.00 | | $0.00 |
| | | D.T. | | $0.00 | | $0.00 |
| 12 | | REG. 0.00 | | $0.00 | | $0.00 |
| | | O.T. 0.00 | | $0.00 | | $0.00 |
| | | D.T. | | $0.00 | | $0.00 |
| 13 | | REG. 0.00 | | $0.00 | | $0.00 |
| | | O.T. 0.00 | | $0.00 | | $0.00 |
| | | D.T. | | $0.00 | | $0.00 |

| | | |
|---|---|---|
| D – LABOR SUB-TOTAL | $ | 19,559.51 |
| 15 % Labor Surcharge | $ | 2,933.93 |
| SUBTOTAL | $ | 22,493.44 |
| 15 % MARKUP ON LABOR | $ | 3,374.02 |

## E – MISCELLANEOUS ITEMS

| MISC. DESCRIPTIONS | QTY. | Unit $ | EX. AMOUNT |
|---|---|---|---|
| Hotel | | | |
| | 6 | $ 58.00 | $ 348.00 |
| | 9 | $ 68.00 | $ 612.00 |
| Subsistance | | | $ - |
| Misc. Items | | | |
| 0 | 0 | | $ - |
| 0 | 0 | | $ - |
| 0 | 0 | | $ - |
| 0 | 0 | | $ - |
| 0 | 0 | | $ - |
| 0 | 0 | | $ - |

| | | |
|---|---|---|
| E– MISCELLANEOUS ITEMS SUB TOTAL | $ | 960.00 |
| 5 % Sales/City/Room Tax | $ | 48.00 |
| 15 % ADDED MARK-UP | $ | 144.00 |
| 0 % Tax on Misc. Items | | 0 |
| SUB TOTAL - E | $ | 1,152.00 |

## TOTALS

| | | |
|---|---|---|
| TOTAL COST A+B+C (Equipment /Material /Sub-Contractors) | $ | 71,602.33 |
| TOTAL COST + D  (Labor) | $ | 25,867.45 |
| TOTAL COST + E  (Miscelaneous Items) | $ | 1,152.00 |
| SUB-TOTAL | $ | 98,621.78 |
| 2.5 % BOND & INSURANCE | $ | 2,465.54 |
| TOTAL COST THIS SHEET | $ | 101,087.33 |

| TIME | CLIENT DIRECTIVES AND COMMENTS |
|---|---|
| 0:00 | (See Daily Work Report) |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |

| PROJECT NAME: | | | |
| PROJECT NO.: | Southern Star Line DT & DS Replacement | |  Horizontal Directional Drilling |

<div style="border:2px solid red">

**EXTRA WORK SHEET REPORT**
**INTERNAL - OFFICE**

</div>

| CLIENT/OWNER : | Minnesota Limited - Southern Star | DATE: | |
| WORK PRFM'D. BY: | The HDD Company, Inc. | EXTRA WRK. SHT. NO. | Day Shift |
| DESCPTN. OF WORK : | Time spent reinstalling 36" pipeline,  Multiple days from 6/22/20 - 7/15/20 and 8/22/20 - 9/9/20 | | |
| | 0 | | |
| | 0 | | |
| | 0 | | |

## A – EQUIPMENT

| EQUIP. NO. | Company Owned Equipment | HRS. | RATE/HR. | TOTAL/DAY |
|---|---|---|---|---|
| 1 | Drilling Rig HDD Rig 7 - Vermeer 750 | 408,00 | $ 205,56 | $ 83.868,48 |
| 1 | Mud Tank / Solids Control Unit | 408,00 | $ 111,96 | $ 45.679,68 |
| 1 | Sump Pit/Trash Pump | 408,00 | $ 8,29 | $ 3.382,32 |
| 1 | Mud Pumping Units | 408,00 | $ 60,94 | 24.863,52 |
| 2 | Tool Van and tools | 408,00 | $ 17,55 | $ 14.320,80 |
| | | | | $  - |
| 0 | Dump Truck A=17  TRUN 2AXL | | | |
| 3 | Vac. Truck A=17 TRUN 2AXL | 408,00 | $ 45,75 | $ 55.998,00 |
| 10 | Misc. Trailers | 408,00 | $ 1,79 | $ 7.303,20 |
| 1 | Haul Trucks | 408,00 | $ 34,13 | $ 13.925,04 |
| 1 | 6 3/4" Non Mag Drill Collars w/Jet Assembly | 408,00 | $ 6,83 | $ 2.786,64 |
| 168 | Drill Pipe (5-1/2 FH) | 408,00 | $ 0,53 | $ 36.328,32 |
| 2 | Misc. X=Subs and Rack (All X Subs for Spread) | 408,00 | $ 5,20 | $ 4.243,20 |
| 0 | Sonde and Housing | | | $  - |
| | Steering Tool (North Referencing w/Tru=Gyde) | | | |
| 48 | Rollers | 408,00 | $ 1,50 | $ 29.376,00 |
| 3 | Ford F-250 T&TT 06=12 | 408,00 | $ 5,04 | $ 6.168,96 |
| 0 | Ford F-450 T&TT 20=28 | | | |
| 0 | Ford F-350 T&TT 20=28 | | | |
| 0 | KW & Crane Truck | | | |
| 1 | Hammer | 408,00 | $ 41,93 | $ 17.107,44 |
| 1 | 300 Amp Welder | 408,00 | $ 9,49 | $ 3.871,92 |
| 1 | 1/2 Ton Truck | 408,00 | $ 32,48 | $ 13.251,84 |
| 1 | 60" Casing | 408,00 | $ 3,25 | $ 1.326,00 |
| 0 | Mud Bins | | | |

| | Rental Equipment | | | | |
|---|---|---|---|---|---|
| 1 | 10K Reach Forklift | S.T. | 408,00 | $ 51,29 | $ 20.926,32 |
| | | O.T. | | | $  - |
| 2 | 225 Excavator | S.T. | 408,00 | $ 91,59 | $ 74.737,44 |
| | | O.T. | | | $  - |
| 2 | Portable toilets | S.T. | 408,00 | $ 1,50 | $ 1.224,00 |
| | | O.T. | | | $  - |
| 0 | Multiquip 20kW Generator | S.T. | | | $  - |
| | | O.T. | | | $  - |
| 3 | Frac Tank | S.T. | 408,00 | $ 7,32 | $ 8.959,68 |
| | | O.T. | | | $  - |
| 1 | Trash Bin | S.T. | 408,00 | $ 4,97 | $ 2.027,76 |
| | | O.T. | | | $  - |
| 1 | 500 Amp Welder | S.T. | 408,00 | $ 9,49 | $ 3.871,92 |
| | | O.T. | | | $  - |
| 2 | Light Tower | S.T. | 408,00 | $ 7,61 | $ 6.209,76 |
| | | O.T. | | | $  - |
| 1 | 175 KW Generator | S.T. | 408,00 | $ 71,36 | 29.114,88 |
| | | O.T. | | | $  - |
| 1 | 6" Diesel Trash Pump | S.T. | 408,00 | $ 23,60 | $ 9.628,80 |
| | | O.T. | | | $  - |
| 1 | HTI Mud Motor | S.T. | 408,00 | $ 42,50 | $ 17.340,00 |
| | | O.T. | | | $  - |
| | | S.T. | | | $  - |
| | | O.T. | | | $  - |
| | | S.T. | | | $  - |
| | | O.T. | | | $  - |
| | | S.T. | | | $  - |
| | | O.T. | | | $  - |
| | | S.T. | | | $  - |
| | | O.T. | | | $  - |
| | | S.T. | | | $  - |
| | | O.T. | | | $  - |
| | | S.T. | | | $  - |
| | | O.T. | | | $  - |

| | | | |
|---|---|---|---|
| | COMPANY OWNED EQUIPMENT | | $ 363.801,36 |
| | RENTAL EQUIPMENT W/ 15% Markup | | $ 200.146,64 |
| | A= EQUIPMENT SUB - TOTAL COST | | $ 563.948,00 |
| | 0,00 % Sales Tx. Rental Equip. | | |

## B – MATERIALS

| MATERIALS DESCRIPTION | QTY. USED | UNIT $ | TOTAL |
|---|---|---|---|
| Bentonite | 86,00 | $ 9,50 | $ 817,00 |
| Cement | 54,00 | $ 9,50 | $ 513,00 |
| Shaker Screens | 6,00 | $ 135,00 | $ 810,00 |
| 0 | | $  - | $  - |
| 0 | | $  - | $  - |
| 0 | | $  - | $  - |
| 0 | | $  - | $  - |
| 0 | | $  - | $  - |
| 0 | | $  - | $  - |
| 0 | | $  - | $  - |
| 0 | | $  - | $  - |
| | B=MATERIALS SUB-TOTAL COST | | $ 2.140,00 |
| | 0,00 % Sales Tax | | |
| | 15 % ADDED M. U. | | $ 321,00 |
| | SUB-TOTAL A + B w/Tax | | $ 566.409,00 |

## C – SUBCONTRACT / WORK DONE BY SPECIALISTS/THIRD PARTY SERVICES

| Work Description | Individual / Company | Unit | RATE | TOTAL $ |
|---|---|---|---|---|
| Coating and Corrosion Expert | Lake Superior Consultants | 1,00 | $ 19.702,53 | $ 19.702,53 |
| Vac Trucks | Hurricane Services | 1,00 | $ 39.415,00 | $ 39.415,00 |
| Disposal Charges | Anderson County Landfill | 1,00 | $ 18.103,40 | $ 18.103,40 |
| 0 | 0 | 0,00 | | $  - |
| 0 | 0 | 0,00 | | $  - |
| | | COST OF SUBS = C | | $ 77.220,93 |
| | 15 % MARKUP (Subcontractor) | | | $ 11.583,14 |
| | | | $ | $ 88.804,07 |
| | TOTAL COST A + B + C (Including Mark-Up) | | | $ 655.213,07 |

| NO. | D – LABOR | HRS. | BASE RATE w/FRING'S. | SUB TOTAL | Per Diem Totals | TOTAL |
|---|---|---|---|---|---|---|
| 1 | Chris Crough (Day Rate) | REG. 33,00 | $1.016,84 | $33.555,72 | $1.320,00 | $34.875,72 |
| | | O.T. 0 | | $0,00 | | $0,00 |
| | | D.T. 0 | | $0,00 | | $0,00 |
| 2 | Randy Foster (Day Rate) | REG. 17,00 | $968,88 | $16.470,96 | $1.700,00 | $18.170,96 |
| | | O.T. | | $0,00 | | $0,00 |
| | | D.T. | | $0,00 | | $0,00 |
| 3 | Harold Shoemaker (Day | REG. 17,00 | $755,00 | $12.835,00 | $1.785,00 | $14.620,00 |
| | | O.T. | | $0,00 | | $0,00 |
| | | D.T. | | $0,00 | | $0,00 |
| 4 | Justin Potter | REG. 104,00 | $59,79 | $6.218,16 | $1.495,00 | $7.713,16 |
| | | O.T. 52,00 | $80,65 | $4.193,80 | | $4.193,80 |
| | | D.T. | | $0,00 | | $0,00 |
| 5 | Brandon Morris | REG. 112,00 | $39,83 | $4.460,96 | $1.260,00 | $5.720,96 |
| | | O.T. 52,00 | $54,42 | $2.829,58 | | $2.829,58 |
| | | D.T. | | $0,00 | | $0,00 |
| 6 | David Jones | REG. 248,00 | $42,86 | $10.629,28 | $3.255,00 | $13.884,28 |
| | | O.T. 125,00 | $58,96 | $7.370,00 | | $7.370,00 |
| | | D.T. | | $0,00 | | $0,00 |
| 7 | Brandon Sammet | REG. 184,00 | $59,79 | $11.001,36 | $2.415,00 | $13.416,36 |
| | | O.T. 97,00 | $80,65 | $7.823,05 | | $7.823,05 |
| | | D.T. | | $0,00 | | $0,00 |
| 8 | Roger Reeter | REG. 112,00 | $59,79 | $6.696,48 | $1.400,00 | $8.096,48 |
| | | O.T. 66,00 | $80,65 | $5.322,90 | | $5.322,90 |
| | | D.T. | | $0,00 | | $0,00 |
| 9 | Augustin Zepeda | REG. 128,00 | $36,83 | $4.714,24 | $1.680,00 | $6.394,24 |
| | | O.T. 69,00 | $69,49 | $4.794,81 | | $4.794,81 |
| | | D.T. | | $0,00 | | $0,00 |
| 10 | Johnny Hatfield | REG. 128,00 | $43,49 | $5.566,72 | $800,00 | $6.366,72 |
| | | O.T. 69,00 | $59,91 | $4.133,45 | | $4.133,45 |
| | | D.T. | | $0,00 | | $0,00 |
| 11 | Stephen Davis | REG. 224,00 | $43,49 | $9.741,76 | $1.120,00 | $10.861,76 |
| | | O.T. 112,00 | $59,91 | $6.709,36 | | $6.709,36 |
| | | D.T. | | $0,00 | | $0,00 |
| 12 | Bruce Cooper | REG. 224,00 | $44,53 | $9.974,72 | $1.120,00 | $11.094,72 |
| | | O.T. 109,00 | $60,70 | $6.615,76 | | $6.615,76 |
| | | D.T. | | $0,00 | | $0,00 |
| 13 | Juan Miguel Suarzes | REG. 101,00 | $36,83 | $3.719,83 | $650,00 | $4.369,83 |
| | | O.T. 48,00 | $49,92 | $2.395,92 | | $2.395,92 |
| | | D.T. | | $0,00 | | $0,00 |
| | | | | **D - LABOR SUB-TOTAL** | | **$ 207.773,81** |
| | 15 % Labor Surcharge | | | | | $ 31.166,07 |
| | | | | SUBTOTAL | | $ 238.939,88 |
| | 15 % MARKUP ON LABOR | | | | | $ 35.840,98 |

## E – MISCELLANEOUS ITEMS

| MISC. DESCRIPTIONS | QTY. | Unit $ | EX. AMOUNT |
|---|---|---|---|
| Hotel | | | |
| | 96 | $ 58,00 | $ 5.568,00 |
| | 155 | $ 68,00 | $ 10.540,00 |
| Subsistance | | | $  - |
| Misc. Items | | | $  - |
| 0 | 0 | 0 | $  - |
| 0 | 0 | 0 | $  - |
| 0 | 0 | 0 | $  - |
| 0 | 0 | 0 | $  - |
| 0 | 0 | 0 | $  - |
| 0 | 0 | 0 | $  - |
| E= MISCELLANEOUS ITEMS SUB TOTAL | | | $ 16.108,00 |
| 5 % Sales/City/Room Tax | | | $ 805,40 |
| 15 % ADDED MARK-UP | | | $ 2.416,20 |
| 0 % Tax on Misc. Items | | | $  - |
| SUB TOTAL - E | | | $ 19.329,60 |

## TOTALS

| | | |
|---|---|---|
| TOTAL COST  A+B+C  (Equipment /Material/Sub=Contractors) | | $ 655.213,07 |
| TOTAL COST = D  (Labor) | | $ 274.780,86 |
| TOTAL COST = E  (Miscellaneous Items) | | $ 19.329,60 |
| SUBTOTAL | | $ 949.323,53 |
| 2,5 % BOND & INSURANCE | | $ 23.733,09 |
| **TOTAL COST THIS SHEET** | | **$ 973.056,63** |

| TIME | CLIENT DIRECTIVES AND COMMENTS |
|---|---|
| 0:00 | (See Daily Work Report) |
| 0:00 | |
| 0:00 | |
| 0:00 | |
| 0:00 | |
| 0:00 | |
| 0:00 | |
| 0:00 | |
| 0:00 | |
| 0:00 | |
| 0:00 | |
| 0:00 | |
| 0:00 | |
| 0:00 | |
| 0:00 | |
| 0:00 | |
| 0:00 | |
| 0:00 | |
| 0:00 | |
| 0:00 | |

**PROJECT NAME:**

**PROJECT NO.:** Southern Star Line DT & DS Replacement


Horizontal Directional Drilling

**EXTRA WORK SHEET REPORT
INTERNAL - OFFICE**

| | |
|---|---|
| CLIENT/OWNER : | Minnesota Limited - Southern Star |
| WORK PRFM'D. BY: | The HDD Company, Inc. |
| DESCPT'N. OF WORK: | Time spent reinstalling 36" pipeline,  Multiple days from 6/22/20 - 7/15/20 and 8/22/20 - 9/9/20 |

DATE:
EXTRA WRK. SHT. NO.: Night Shift

0
0
0

## A - EQUIPMENT

| EQUIP. NO. | Company Owned Equipment | HRS. | RATE/HR. | TOTAL/DAY |
|---|---|---|---|---|
| 1 | Drilling Rig HDD Rig 7 - Vermeer 750 | 300.00 | $ 205.56 | $ 61,668.00 |
| 1 | Mud Tank / Solids Control Unit | 300.00 | $ 111.96 | $ 33,588.00 |
| 1 | Sump Pit/Trash Pump | 300.00 | $ 8.29 | $ 2,487.00 |
| 1 | Mud Pumping Units | 300.00 | $ 60.94 | $ 18,282.00 |
| 2 | Tool Van and tools | 300.00 | $ 17.55 | $ 10,530.00 |
| 0 | Dump Truck A-17  TRUN 2AXL | | | $ - |
| 3 | Vac. Truck A-17 TRUN 2AXL | 300.00 | $ 45.75 | $ 41,175.00 |
| 10 | Misc. Trailers | 300.00 | $ 1.79 | $ 5,370.00 |
| 1 | Haul Trucks | 300.00 | $ 34.13 | $ 10,239.00 |
| 1 | 6 3/4" Non Mag Drill Collars w/Jet Assembly | 300.00 | $ 6.83 | $ 2,049.00 |
| 168 | Drill Pipe (5-1/2 FH) | 300.00 | $ 0.53 | $ 26,712.00 |
| 2 | Misc. X-Subs and Rack (All X Subs for Spread) | 300.00 | $ 5.20 | $ 3,120.00 |
| 0 | Sonde and Housing | | | $ - |
| | Steering Tool (North Referencing w/Tru-Gyde) | | | |
| 48 | Rollers | 300.00 | $ 1.50 | $ 21,600.00 |
| 3 | Ford F-250 T&TT 06-12 | 300.00 | $ 7.50 | $ 6,750.00 |
| 0 | Ford F450 T&TT 20-28 | | | $ - |
| 0 | Ford F-350 T&TT 20-28 | | | $ - |
| 0 | KW & Crane Truck | | | $ - |
| 1 | Hammer | 300.00 | $ 41.93 | $ 12,579.00 |
| 1 | 300 Amp Welder | 300.00 | $ 9.49 | $ 2,847.00 |
| 1 | 1/2 Ton Truck | 300.00 | $ 32.48 | $ 9,744.00 |
| 1 | 60" Casing | 300.00 | | $ - |
| 0 | Mud Bins | | | $ - |

**Rental Equipment**

| | | | | | |
|---|---|---|---|---|---|
| 1 | 10K Reach Forklift | S.T. | 300.00 | $ 51.29 | $ 15,387.00 |
| | | O.T. | | | $ - |
| 2 | 225 Excavator | S.T. | 300.00 | $ 91.59 | $ 34,954.00 |
| | | O.T. | | | $ - |
| 2 | Portable toilets | S.T. | 300.00 | $ 1.50 | $ 900.00 |
| | | O.T. | | | $ - |
| 0 | Multiquip 20KW Generator | S.T. | | | $ - |
| | | O.T. | | | $ - |
| 3 | Frac Tank | S.T. | 300.00 | $ 7.32 | $ 6,588.00 |
| | | O.T. | | | $ - |
| 1 | Trash Bin | S.T. | 300.00 | $ 4.97 | $ 1,491.00 |
| | | O.T. | | | $ - |
| 1 | 500 Amp Welder | S.T. | 300.00 | $ 9.49 | $ 2,847.00 |
| | | O.T. | | | $ - |
| 2 | Light Tower | S.T. | 300.00 | $ 7.61 | $ 4,566.00 |
| | | O.T. | | | $ - |
| 1 | 175 KW Generator | S.T. | 300.00 | $ 71.36 | $ 21,408.00 |
| | | O.T. | | | $ - |
| 1 | 6" Diesel Trash Pump | S.T. | 300.00 | $ 23.60 | $ 7,080.00 |
| | | O.T. | | | $ - |
| 1 | HTII Mud Motor | S.T. | 300.00 | $ 42.50 | $ 12,750.00 |
| | | O.T. | | | $ - |
| | | S.T. | | | $ - |
| | | O.T. | | | $ - |
| | | S.T. | | | $ - |
| | | O.T. | | | $ - |

| | |
|---|---|
| COMPANY OWNED EQUIPMENT | $ 268,740.00 |
| RENTAL EQUIPMENT W/ 15% Markup | $ 147,166.65 |
| A- EQUIPMENT SUB - TOTAL COST | $ 415,906.65 |
| 0.00 % Sales Tx, Rental Equip. | $ - |

## B - MATERIALS

| | MATERIALS DESCRIPTION | QTY. USED | UNIT $ | TOTAL |
|---|---|---|---|---|
| 0 | | | | |
| 0 | | | $ - | $ - |
| 0 | | | $ - | $ - |
| 0 | | | $ - | $ - |
| 0 | | | $ - | $ - |
| 0 | | | $ - | $ - |
| 0 | | | $ - | $ - |
| | B-MATERIALS  SUB-TOTAL COST | | $ - | $ - |
| | 0.00 % Sales Tax | | | $ - |
| 10 % ADDED M. U. B | | | | $ - |
| | SUB-TOTAL A + B w/Tax | | $ | 415,906.65 |

## C - SUBCONTRACT / WORK DONE BY SPECIALISTS/THIRD PARTY SERVICES

| Work Description | Individual / Company | Unit | RATE | TOTAL $ |
|---|---|---|---|---|
| | | | | $ - |
| | | | | |
| | COST OF SUBS = C | | | $ - |
| | 15 % MARKUP%(Subcontractor) | | | $ - |
| | | | | $ - |
| TOTAL COST A + B + C (Including Mark-Up) | | | | $ 415,906.65 |

## D - LABOR

| NO. | D - LABOR | | HRS. | BASE RATE w/FRNG'S. | SUB TOTAL | Per Diem Totals | TOTAL |
|---|---|---|---|---|---|---|---|
| 1 | Shawn Posey (Day Rate) | REG. | 33.00 | $755.00 | $24,915.00 | $2,730.00 | $27,645.00 |
| | | O.T. | 0 | | $0.00 | | $0.00 |
| | | D.T. | | | | | $0.00 |
| 2 | Jacob Hoffman | REG. | 131.00 | $59.79 | $7,832.49 | $2,380.00 | $10,212.49 |
| | | O.T. | 69.00 | $80.65 | $5,564.85 | | $5,564.85 |
| | | D.T. | | | $0.00 | | $0.00 |
| 3 | Westin Colgrove | REG. | 96.00 | $59.79 | $5,739.84 | $1,260.00 | $6,999.84 |
| | | O.T. | 68.00 | $80.65 | $5,484.20 | | $5,484.20 |
| | | D.T. | | | $0.00 | | $0.00 |
| 4 | Dustin Anderson | REG. | 156.00 | $48.20 | $9,399.00 | $1,920.00 | $11,319.00 |
| | | O.T. | 92.00 | $66.20 | $6,090.40 | | $6,090.40 |
| | | D.T. | | | $0.00 | | $0.00 |
| 5 | Jeromie Acres | REG. | 164.00 | $48.20 | $7,576.80 | $1,680.00 | $9,256.80 |
| | | O.T. | 96.00 | $63.20 | $6,067.20 | | $6,067.20 |
| | | D.T. | | | $0.00 | | $0.00 |
| 6 | Abraham Berrospe | REG. | 159.00 | $36.83 | $5,855.97 | $960.00 | $6,815.97 |
| | | O.T. | 95.00 | $49.92 | $4,741.93 | | $4,741.93 |
| | | D.T. | | | $0.00 | | $0.00 |
| 7 | Larry Roseboro | REG. | 79.00 | $59.79 | $4,723.41 | $500.00 | $5,223.41 |
| | | O.T. | 35.00 | $80.65 | $2,822.75 | | $2,822.75 |
| | | D.T. | | | $0.00 | | $0.00 |
| 8 | Dusty Cline | REG. | 24.00 | $59.79 | $1,434.96 | $315.00 | $1,749.96 |
| | | O.T. | 12.00 | $80.65 | $967.80 | | $967.80 |
| | | D.T. | | | $0.00 | | $0.00 |
| 9 | Taylor Crowley | REG. | 33.00 | $59.79 | $2,062.48 | $350.00 | $2,412.48 |
| | | O.T. | 40.00 | $52.66 | $2,106.40 | | $2,106.40 |
| | | D.T. | | | $0.00 | | $0.00 |
| 10 | Jim Rubick | REG. | 123.00 | $59.79 | $7,354.17 | $1,575.00 | $8,929.17 |
| | | O.T. | 65.00 | $80.65 | $5,242.25 | | $5,242.25 |
| | | D.T. | | | $0.00 | | $0.00 |
| 11 | Barion Snowten | REG. | 80.00 | $38.66 | $3,092.80 | $1,725.00 | $4,817.80 |
| | | O.T. | 50.00 | $52.66 | $3,159.60 | | $3,159.60 |
| | | D.T. | | | $0.00 | | $0.00 |
| 12 | Kenny Densmore | REG. | 80.00 | $59.79 | $4,783.20 | $1,050.00 | $5,833.20 |
| | | O.T. | 60.00 | $80.65 | $4,839.00 | | $4,839.00 |
| | | D.T. | | | $0.00 | | $0.00 |

| | |
|---|---|
| D - LABOR SUB-TOTAL | $ 148,301.50 |
| 15 % Labor Surcharge | $ 22,245.22 |
| SUBTOTAL | $ 170,546.72 |
| 15 % MARKUP ON LABOR | $ 25,582.01 |

## E - MISCELLANEOUS ITEMS

| MISC. DESCRIPTIONS | QTY. | Unit $ | EX. AMOUNT |
|---|---|---|---|
| **Hotel** | | | |
| | | $ 58.00 | $ - |
| | | $ 68.00 | $ - |
| **Subsistance** | 0 | | $ - |
| **Misc. Items** | | | |
| 0 | | | $ - |
| 0 | | | $ - |
| 0 | | | $ - |
| 0 | | | $ - |
| 0 | | | $ - |
| 0 | | | $ - |
| E- MISCELLANEOUS ITEMS SUB TOTAL | | | $ - |
| 0 % Sales/City/Room Tax | | | $ - |
| 15 % ADDED MARK-UP | | | $ - |
| 0 % Tax on Misc. Items | | | 0 |
| SUB TOTAL - E | | | $ - |

## TOTALS

| | |
|---|---|
| TOTAL COST  A+B+C (Equipment /Material /Sub-Contractors) | $ 415,906.65 |
| TOTAL COST - D  (Labor) | $ 196,128.73 |
| TOTAL COST - E  (Miscellaneous Items) | $ - |
| | SU $ 612,035.38 |
| 2.5 % BOND & INSURANCE | $ 15,300.88 |
| TOTAL COST THIS SHEET | $ 627,336.26 |

| TIME | CLIENT DIRECTIVES AND COMMENTS |
|---|---|
| 0.00 | (See Daily Work Report) |
| 0.00 | |
| 0.00 | |

THE HDD COMPANY:
_____
(Signature)
DATE:

CLIENT
_____
(Signature)
DATE:

# Exhibit 25

IN THE DISTRICT COURT OF FRANKLIN COUNTY, KANSAS

Mechanic's Lien No. _____

## STATEMENT FOR MECHANIC'S LIEN

### (K.S.A. § 60-1103)

**AMOUNT OF CLAIM:**      **$3,013,544.22** (exclusive of interest)

**NAME OF LANDOWNERS:**      **Black, Lyle D.; Black, Cheryl K.**
Jobsite Address:      3062 Nebraska Rd., Ottawa, KS 66067

Mailing Address:      3159 Neosho Rd., Ottawa, KS 66067-8879

Mortgage Holder:      Frontier Farm Credit, FLCA
1270 N. 300 Rd.
PO Box 858
Baldwin City, KS, 66006

     **Oswego Coal Company, Inc.**
Jobsite Address:      3125 Marshall Rd., Ottawa, KS 66067

Mailing Address:      PO Box 368, Ottawa, KS 66067-0368

**NAME OF PROJECT OWNER:**      **Southern Star Central Gas Pipeline, Inc., a Delaware Corporation**
4700 Highway 56
Owensboro, KY 42301

Registered Agent
The Corporation Company, Inc.
112 SW 7th Street Suite 3C
Topeka, KS 66603

**NAME OF CONTRACTOR:**      **Minnesota Limited, LLC., a Minnesota Limited Liability Corporation**
18640 200th Street – PO Box 410
Big Lake, MN 55309

Registered Agent
National Registered Agents, Inc. of KS
112 SW 7th Street Suite 3C
Topeka, KS 66603

**NAME OF LIEN CLAIMANT:**      **The HDD Company, Inc., an Oregon Corporation**

4525 Serrano Parkway, Office Suite 210
El Dorado Hills, CA 95762

Registered Agent
CT Corporation System
112 SW 7th Street, Suite 3C
Topeka, KS 66603

**DESCRIPTION OF**        ATTACHED HERETO AS **EXHIBIT A** AND
**PROPERTY:**        INCORPORATED HEREIN BY THIS REFERENCE,
commonly known as 3062 Nebraska Rd, Ottawa, KS 66067
and 3125 Marshall Rd., Ottawa, KS 66067 (the "Property")

The undersigned, The HDD Company, Inc. ("Lien Claimant"), a subcontractor pursuant to K.S.A. § 1103, claims a lien upon the Property and all other personal property furnished, placed or installed on the Property, on account of furnishing labor, equipment, and materials for the construction and/or completion of the Southern Star Central Gas Pipeline Project C60266 ("Project") located on said Property and the buildings, erections, improvements and plants erected or constructed, and all materials, fixtures, engines, boilers, pumps, belting, pulleys, shafting, machinery and other personal property furnished, placed or installed on the Property, on account of furnishing labor, equipment, and materials for the construction and/or completion of the Project located at the Property, legally described in **Exhibit A**, attached hereto and incorporated herein by reference. The labor, equipment, and materials supplied by Lien Claimant were used and consumed in the construction of said Project on the Property. Lien Claimant supplied labor, equipment, and materials to the Project as a supplier under agreement with Minnesota Limited, L.L.C., the original contractor ("Contractor"), which in turn was under agreement with Southern Star Central Gas Pipeline, Inc., the owner of the Project ("Project Owner").

The aforesaid claim, a reasonably itemized statement of which is attached to this lien statement (**Exhibit B**) and copies of invoices (**Exhibit C**) substantiating the labor, equipment, and materials supplied to the Project Owner by Lien Claimant for improvements upon the Property, is filed in order that it may constitute a lien upon the above-described Property, and every other right, title, and interest in said real Property. The amount claimed as owing is THREE MILLION THIRTEEN THOUSAND, FIVE HUNDRED FORTY-FOUR DOLLARS and 22/100 ($3,013,544.22), exclusive of interest.

Lien Claimant last supplied labor, materials, and/or equipment within five (5) months of the date of this lien statement after properly filing a notice of lien extension on December 1, 2020. (**Exhibit D**).

WITNESS the hand of said Lien Claimant this 5th day of January 2021.

ON BEHALF OF: **The HDD Company, Inc.**, Lien Claimant

2

By: _____
     Jeremy King
     Vice President
     The HDD Company, Inc.

## VERIFICATION

STATE OF CALIFORNIA )
                        ) ss.
COUNTY OF *El Dorado* )

    Jeremy King, of lawful age, being first duly sworn upon his oath, that he is the Vice President and duly authorized representative of The HDD Company, Inc. and is duly authorized to make this verification on its behalf; and does verify under penalty of perjury that the above and foregoing statement is true and correct based on his personal knowledge, and is a just and true account of the demand of and the amount due Lien Claimant.

                    ON BEHALF OF: **The HDD Company, Inc.,** Lien Claimant

                    By: _____
                           Jeremy King
                           Vice President
                           The HDD Company, Inc.

STATE OF CALIFORNIA )
                        ) ss.
COUNTY OF            )

    On this ____ day of January, 2021, before me appeared Jeremy King, to me personally known, who being by me duly sworn did say that he is the Vice President and duly authorized representative of The HDD Company, Inc., and that he acknowledged that his execution of the foregoing instrument is on behalf of said company.

    IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal in the County and State aforesaid, the day and year first above written.

                    _____
                    Notary Public

                    _____
                    Printed Name
My Commission Expires:

_____

4

# ALL- PURPOSE
# CERTIFICATE OF ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the
identity of the individual who signed the document to which this certificate
is attached, and not the truthfulness, accuracy, or validity of that document.

State of  California                    )

County of  El Dorado                   )

On  January 5, 2021      before me,  Wendy Brooke  Notary Public            ,
                                      (Here insert name and title of the officer)

personally appeared, Jeremy King                                            ,
who proved to me on the basis of satisfactory evidence to be the person(s) whose
name(s) is/are subscribed to the within instrument and acknowledged to me that
he/she/they executed the same in his/her/their authorized capacity(ies), and that by
his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of
which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that
the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

```
                                        WENDY BROOKE
                                       COMM. #2319236
                                    Notary Public - California
                                        El Dorado County
                                    Comm. Expires Feb 11, 2024
```

_(signature)_
Signature                              (Seal)

## ADDITIONAL OPTIONAL INFORMATION

DESCRIPTION OF THE ATTACHED DOCUMENT

Statement for Mechanic's Lien
_____
(Title or description of attached document)

_____
(Title or description of attached document continued)

Number of Pages _____ Document Date_____

CAPACITY CLAIMED BY THE SIGNER
- ☐ Individual (s)
- ☐ Corporate Officer

_____
(Title)
- ☐ Partner(s)
- ☐ Attorney-in-Fact
- ☐ Trustee(s)
- ☐ Other _____

## INSTRUCTIONS FOR COMPLETING THIS FORM

*This form complies with current California statutes regarding notary wording and,
if needed, should be completed and attached to the document. Acknowledgents from
other states may be completed for documents being sent to that state so long as the
wording does not require the California notary to violate California notary law.*

- State and County information must be the State and County where the document signer(s) personally appeared before the notary public for acknowledgment.
- Date of notarization must be the date that the signer(s) personally appeared which must also be the same date the acknowledgment is completed.
- The notary public must print his or her name as it appears within his or her commission followed by a comma and then your title (notary public).
- Print the name(s) of document signer(s) who personally appear at the time of notarization.
- Indicate the correct singular or plural forms by crossing off incorrect forms (i.e. he/she/they,- is /are ) or circling the correct forms. Failure to correctly indicate this information may lead to rejection of document recording.
- The notary seal impression must be clear and photographically reproducible. Impression must not cover text or lines. If seal impression smudges, re-seal if a sufficient area permits, otherwise complete a different acknowledgment form.
- Signature of the notary public must match the signature on file with the office of the county clerk.
  - ❖ Additional information is not required but could help to ensure this acknowledgment is not misused or attached to a different document.
  - ❖ Indicate title or type of attached document, number of pages and date.
  - ❖ Indicate the capacity claimed by the signer. If the claimed capacity is a corporate officer, indicate the title (i.e. CEO, CFO, Secretary).
- Securely attach this document to the signed document with a staple.

EXHIBIT A

3125 Marshall Rd., Ottawa, KS 66067

All that part of the Southwest Quarter of Section 5, Township 17 South, Range 20 East, in Franklin County, Kansas, being more particularly described as follows: Commencing at the Southwest corner of the Southwest Quarter of said Section 5; thence North 87° 40' 17" East, along the South line of the Southwest Quarter of said Section 5, a distance of 70.01 feet to the point of beginning; thence North 03° 14' 35" West, along a line 70.00 feet East of and parallel with the West line of the Southwest Quarter of said Section 5, a distance of 1647.63 feet; thence North 60° 00' 55" East, a distance of 1074.78 feet; thence South 01° 52' 54" East, a distance of 2146.36 feet to a point on the South line of the Southwest Quarter of said Section 5; thence South 87° 40' 17" West, along the South line of the Southwest Quarter of said Section 5, a distance of 908.94 feet to the point of beginning, Franklin County, Kansas.

3062 Nebraska Rd., Ottawa, KS 66067:

The East 1/4 of the Southeast 1/4 of the Northeast 1/4 of Sec. 6, Twp. 17 S., Rng. 20 E., subject to any part thereof in roads, all in Franklin County, Kansas.

AND

Beginning at the Northwest corner of the Northwest Quarter of Section 5, Township 17 South, Range 20 East of the 6th P.M., thence South 02° 59' 16" East 680.67feet on the West line of the Northwest Quarter of said Section 5 to an existing 1/2" iron bar and the true point of beginning of New Tract 2; thence North 88° 18' 09" East 1327.15 feet to the East line of the Northwest Quarter of the Northwest Quarter of said Section 5, being marked with a 1/2" iron bar; thence South 03° 06' 08" East 613.78 feet to the Southeast corner of said Northwest Quarter of the Northwest Quarter of said Section 5, being marked with a 1/2" iron bar; thence South 03° 06' 08" East 659.24 feet to the Southeast corner of the North Half of the Southwest Quarter of the Northwest Quarter of said Section 5, being marked with a 1/2" iron bar; thence South 88° 26' 25" West 1329.76 feet to the Southwest corner of the North Half of the Southwest Quarter of the Northwest Quarter of said Section 5, being marked with an existing 1/2" iron bar; thence North 02° 59' 16" West 661.16 feet to the Southwest corner of the Northwest Quarter of the Northwest Quarter of said Section 5, being marked with an existing 1/2" iron bar; thence North 02° 59' 16" West 608.61 feet to the point of beginning, all in Franklin County, Kansas.

EXHIBIT B

Statement of Account

| | |
|---|---|
| Contract Value Unpaid | $ 1,180,857.60 |
| Retainage Withheld | $ 131,206.40 |
| Access Delay Expenses | $ 101,087.33 |
| Unpaid Change Orders | $1,600,392.89 |
| Total | $3,013,544.22 |

# EXHIBIT C

C1: Subcontract Agreement
C2: Invoices
C3: Delay Summaries
C4: Day Shift and Night Shift Summaries (Unpaid Change Orders)

(Attached hereto)



**MINNESOTA LIMITED**
AN MVERGE COMPANY

<center>

**Subcontractor Agreement**
**No. SR1916169002**

</center>

This agreement is made at Big Lake, MN this day of ___January 17, 2020_____ .

**BETWEEN:**

Minnesota Limited, LLC (Contractor)
18640 200th Street – PO Box 410
Big Lake, MN 55309

**AND:**

THE HDD COMPANY(Subcontractor)
4525 SERRANO PARKWAY, OFFICE SUITE 210
EL DORADO HILLS, CA 95762

**RECITALS**

Contractor ("Minnesota Limited, LLC) has entered into a contract (the "Prime Contract") with Southern Star Central Gas Pipeline, Inc. ("Owner") to perform certain labor and furnish certain materials for completion of the construction project KS - C60266 Install 31.5 miles of 36" (the "Project"). Subcontractor desires to perform certain services and/or provide certain materials as a subcontractor of Contractor pursuant to the terms and conditions of the Prime Contract, and agrees to the terms and conditions of this Agreement.

**AGREEMENT**

In consideration of the mutual covenants contained herein, the parties agree as follows:

I.      Subcontractor agrees to supply all the materials and labor and pay all license fees, permits and expenses for the work located at __Various Sites_____ (the "Site"). As full compensation for performance of this Agreement and subject to all applicable provisions of this Agreement, Contractor agrees to pay Subcontractor:
six million one-hundred eight-five thousand nine-hundred thirty six dollars ($6,185,936.00_____ )

II.     **Contract Document**. Subcontractor's performance hereunder shall be subject to all terms and conditions contained in the Prime Contract and all drawings and/or specifications referred to therein (the "Contract Documents") except as such terms may be specifically amended by this Agreement, which includes HDD's Proposal, attached hereto and incorporated herein. Wherever the Contract Documents shall refer to the Contractor or its agents, the same shall be read to refer to the Subcontractor under this agreement. Subcontractor shall perform and coordinate its work hereunder in a manner necessary to assure the prompt and timely completion of the Project, time being of the essence to the

<center>

Page 1 of 14
SR1916169002

</center>



Agreement. At Subcontractor's request, a copy of the applicable Prime Contract Terms and Conditions will be supplied to Subcontractor.

Any terms and conditions proposed in Subcontractor's acceptance of or in any acknowledgement, invoice, or other form of Subcontractor that add to, vary from, or conflict with these terms hereby objected to. Any such proposed terms shall be void and these terms and conditions (1) shall constitute the complete and exclusive statement of the terms and conditions of the contract between the parties and (2) may be modified only by written instrument executed by the authorized representatives of both parties.

III.  **Insurance.**  Subcontractor shall comply with the insurance requirements set forth in Exhibit A (attached).

IV.  **Additional Terms and Conditions**

    A.  Subcontractor, not Contractor, assumes all the risk related to in performing its work under this Agreement, such as any injuries to Subcontractor, Subcontractor's workers, Facility employees and members of the public arising from the Subcontractors activities or use of tools and equipment, or from any other cause.

    B.  Subcontractor will complete all work in a workmanlike and professional manner according to standard practices in the building trade, and in compliance with all building codes and other applicable laws. Subcontractor will warrant against defects in material and labor it supplies for the completion of the work. If subcontractor fails to perform under this Agreement, the party entitled to performance or the Contractor will have the right to hire other persons to correct the defective Work and hold Subcontractor liable for the costs thereof including costs, disbursements and reasonable attorneys' fees incurred in the enforcement of this provision.

    C.  All Work will be done on a timely basis. The work to be performed under this contract shall be commenced as directed by Project Manager or Project Superintendent or Project Foreman and shall be substantially completed on or before _as agreed upon and directed onsite_____. Time is of the essence.

    D.  Subcontractor shall indemnify, defend and hold harmless Contractor as set forth in Section VII.

    E.  No work shall be subcontracted or assigned by Subcontractor without the prior written approval of the Contractor.

    F.  Environmental, Health and Safety. Subcontractor shall take all necessary precautions to keep the work site free from hazards that are likely to cause injury, illness, or death or damage to property. Subcontractor shall provide any Safety Data Sheets (SDS) for any hazardous chemicals provided pursuant to this contract. Contractor is a company that operates under a "Culture of Safety" with the goal of zero incidents, and expects its subcontractor to similarly emphasize the paramount importance of safe behavior. Failure to abide by Contractor's policies may result in immediate removal of Subcontractor from the premises and will be a breach of Subcontractor's obligations hereunder.



Contractor shall have the right, at its option, to conduct a complete audit of Subcontractor's documents and practices to verify Subcontractor's compliance with this Section.

G.   Minnesota Limited has enacted a Subcontractor Management Program and Safety Requirements of which Subcontractor has received. Subcontractor shall follow and adhere to all aspects of said program and the terms and conditions of such program are incorporated herein.

H.   Liens. To the fullest extent permitted by law, and the extent the Contractors has paid the Subcontractor, Subcontractor will at all times keep the Project, the Site and each part thereof free from any attachment, lien, claim of lien, or other encumbrance arising out of the Work and Subcontractor will indemnify, defend and hold Contractor harmless from and against all claims, losses, demands, causes of action or expenses (including attorneys' fees and other costs of defense incurred by Contractor in defending against the foregoing or in enforcing this indemnity and defense obligation) of whatever nature, arising by reason of any such lien, claim of lien, attachment or encumbrance. If any claim is filed to enforce any laborers, material men, mechanic's, or other similar lien arising out of or relating to the Work for which Contractor has paid the Subcontractor, Subcontractor will immediately cause such lien to be released and discharged and if Subcontractor fails to do so, then Contractor will have a right to pay all sums, including attorneys' fees and other costs and expenses incurred necessary to obtain such release and discharge, and hold Subcontractor liable for the amount thereof with the right to deduct all or a portion of such sum from accounts that may be due Subcontractor.

I.   Default. In addition to the other remedies available under law: (a) if Subcontractor should fail or refuse, except in cases where extension of time is provided, to supply enough properly skilled workers or proper materials for the Work; or (b) if Subcontractor should fail to make payment to its subcontractors for material or labor which are due to its Subcontractors, or (c) if Subcontractor should fail to keep and comply with any of the terms and provisions of this Agreement, or (d) if Subcontractor should be adjudged bankrupt, file or suffer to be filed a petition for relief under the Bankruptcy Act, or make a general assignment for the benefit of the creditors; or (e) if a receiver should be appointed on account of Subcontractor's insolvency; or (f) if Subcontractor fails to pay its employees' wages, benefits or tax withholdings; then, in any such event, Contractor may without prejudice to any other right or remedy and after giving Subcontractor and its surety, if any, upon twenty-four hours written notice, terminate its obligation to Subcontractor under this Agreement and take possession of the Site and complete (or cause to be completed) the Work by whatever method Contractor may deem expedient. In such case Subcontractor will not be entitled to receive any further payment until the Work is completed. Upon completion of the Work, Contractor will pay to Subcontractor an amount equal to (x) the unpaid portion of the Subcontract Amount attributable to the Work performed up to the termination less (y) the amount by which (i) the costs incurred by Contractor to complete the Work, including, without limitation, costs for architectural, managerial and administrative services and reasonable attorneys' fees, if legal counsel is employed, exceed (ii) the portion of the Subcontract Amount attributable to the balance of the Work yet to be performed at the time of termination. If the amount calculated under part (y) in the preceding sentence exceeds the amount owing under part (x), the Subcontractor will pay the difference to Contractor. If the amount in part (x) exceeds the amount in part (y), Contractor will pay the difference to Subcontractor.



J.      Subcontractor is an independent Subcontractor and is not an employee or agent of the Contractor and neither Subcontractor nor anyone employed by Subcontractor will be deemed for any purpose to be the agent, employee, servant or representative of Contractor in the performance of the Work. Subcontractor acknowledges and agrees that Contractor will have no direction or control over the means, methods, procedures or manner of the Work performed by Subcontractor or any of its subcontractors, or any of their employees, vendors or suppliers.

K.      No changes shall be made in the work proposed or in the price unless those changes are agreed to in writing by both Subcontractor and Contractor. Travis Gehr and / or ___James Redmond_____, shall be the Contractor's designated on site agent, if there is a dispute regarding whether the work is a change, Subcontractor may perform that work under protest and submit a claim to Contractor in accordance with this Agreement.

L.      Clean Up. Subcontractor will at all times keep the site or facility safe and free from the accumulation of waste materials or rubbish caused by its operations or related to the Work. Upon completion of the Work and each portion thereof, Subcontractor will remove all rubbish and waste produced by its operations or Work hereunder from the facility as well as all of its tools, equipment, machinery and surplus materials no longer needed and leave the site or facility in a "broom clean" or equivalent condition and safe for Subcontractor's employees and subsequent subcontractors to perform their work, unless otherwise specified in writing. If Subcontractor fails to clean up, Contractor may do so after written notice to Subcontractor and the cost thereof will be charged to Subcontractor.

V.    **Representations of Subcontractor**. Subcontractor represents and warrants the following:

A.      Subcontractor has examined the Agreement ("Prime Contract") between Owner and Minnesota Limited (if requested by the Subcontractor prior to the execution of the work) and agrees to all provisions affecting Subcontractors performance, including but not limited to the representations, obligations and warranties made by Minnesota Limited to the Owner.

B.      Subcontractor has the requisite authority and ability to perform the subcontract without delay.

C.      Subcontractor will not assign, subcontract or otherwise delegate its responsibilities and obligation hereunder without the written consent of Contractor.

D.      Subcontractor shall examined the specifications, site conditions, drawings and requirements of the work with due diligence and its bid has taken into consideration all conditions and risks which are reasonably related to the performance of the work.

E.      Ethics; Conflict of Interest. Subcontractor shall at all times during the performance of its obligations hereunder conform to sound ethical business practices in conformance with all applicable Laws and shall in its business practices promote the values of honesty, integrity, social responsibility, and human rights. Subcontractor shall not offer to any member of Contractor (including employees thereof) any gifts, entertainment, or other favors beyond the common courtesy usually associated with business practices. Subcontractor shall not pay any commissions or fees or grant any rebates or other



remuneration or monetary gratuity to any employee of Contractor. Subcontractor shall not grant any secret rebates nor pay any commissions or fees to any employee of Contractor.

F.  Invitees Prohibited. Subcontractor shall not, without prior written permission of Contractor, invite, permit entry or bring any Person onto the Contractor's Worksite or property who is not an employee of Subcontractor.

G.  Subcontractor will pay its employees promptly and maintain good labor relations. Subcontractor further represents that it has paid all union benefit contributions including fringe benefits. Subcontractor agrees that Contractor upon demand of the Labor Union, may withhold from any sums due Subcontractor and pay to the Administrator of the Plan any amounts owing and said payment shall be deducted from the invoice.

VI.  **Warranty**.

A.  Subcontractor warrants to the Contractor and Owner that all materials and equipment furnished under this Agreement will be new unless otherwise specified in writing, and that all work will be of good quality, free from faults and defects and in conformance with any Purchase Order and attachments thereto, including any specifications stipulated therein. All Work not so conforming to these standards may be considered defective, and the Subcontractor shall promptly repair and make good, after notice by the Contractor and Owner and without cost to the Contractor and Owner, any damages, defects or faults resulting from imperfect or defective Work done or materials furnished by the Subcontractor. The Subcontractor warrants that all labor, materials and equipment furnished under this Agreement shall be covered by warranty for a period of at least two (2) years (or during a longer period if required by the specifications and stipulated therein) from the date of acceptance of the completed Work by the Owner.

B.  Where material or equipment furnished by the Subcontractor is covered by a manufacturer's warranty or guarantee or other special warranty or guarantee the Subcontractor shall provide such warranty and provide additional or extended warranty or guarantees to the Contractor for its labor, materials and equipment to confirm to paragraph A above.

VII.  **Indemnification**. To the fullest extent permitted by law, the Subcontractor shall indemnify the Owner, Contractor and the agents and employees of any of them from and against claims, damages, losses and expenses, arising out of or in connection with, or resulting from the negliegent performance of the Subcontractor's work, the Subcontractor's subcontractors work, or anyone directly or indirectly employed by them but only to the extent caused by acts or omissions by either or any of them. In addition thereto, Subcontractor indemnifies Owner, Contractor and the agents and employees of any of them for expenses including attorney's fees and costs, incurred in responding to and defending against any claim or in enforcing this provision.

VIII.  **Payment**. Subcontractor shall invoice Minnesota Limited no later than 30 days after date of service. Contractor agrees to pay Subcontractor all sums due less ___10___% retainage (if applicable) hereunder within



thirty (30) days from the date the invoice is received. However, it is a condition precedent to payment that if Owner withholds payments for that portion of any work performed by Subcontractor, then Minnesota Limited is only obligated to pay Subcontractor after receiving payment from the Owner. In such event payment will be made within ten (10) days. Contractor reserves the right to withhold such sums as may be necessary to pay expenses, including costs and attorney's fees, caused by, or related to, Subcontractor's breach of Agreement. Final payment of retainage will occur ten (10) days after final payment for Subcontractor's work is received and when lien waivers and job completion affidavit are executed.

IX.     **Maintaining Records / Audit.** For a period of five (5) years from final acceptance of Subcontractor's work, Subcontractor shall maintain all job records and shall, upon reasonable notice by Contractor, but no later than 10 business days, make such records available for inspection by Contractor or Owner. Contractor or Owner or their representatives may audit said records. If the results of the audit show an overpayment, Subcontractor shall reimburse the overpayment ~~together with interest of 1% per month. If the audit shows an overpayment more than one thousand dollars ($1,000), Subcontractor shall also reimburse Contractor or Company for the cost of the audit.~~

X.      **Interpretations and Enforcement.** The Agreement and contract documentation contains the parties entire understanding with regard to the subject hereof and shall not be modified except by a writing signed by both parties; provided, however, that Subcontractor shall be bound by changes in the Contract Documents agreed to between the Contractor and Owner, but only if Contractor has timely notified Subcontractor of such changes.. The interpretation and enforcement of this Agreement shall be governed by the laws of the state in which the work hereunder is to be performed or that specified in the Prime Contract if different than the state where the work is to be performed. If any provision hereof is deemed unenforceable, the remainder of the Agreement shall be enforced as though such provision were not a part hereof.

XI.     **Assignment.** Subcontractor shall not assign or subcontract this Agreement or any portion thereof or of any money due or which may become due hereunder without the prior written consent of Contractor. Notwithstanding anything to the contrary contained herein, Contractor may assign this Agreement without the consent of Subcontractor.

XII.    **Confidentiality of Agreement.** The Subcontractor agrees that all terms and conditions contained herein or in any other document(s) referencing the Project shall remain confidential. Said terms shall not be disclosed without the express written consent of the Contractor.
Minnesota Limited is required to protect all technical information supplied by the Owner. Subcontractor agrees that this Section is its written assurance that all such information, including but not limited to: drawings, diagrams, surveys, specifications, locations, and geophysical (GPS) coordinates of the work, will be kept confidential, protected, and will not be disclosed to third parties without obtaining Minnesota Limited's written consent unless ordered to do so by a court of law or arbitrator.. Breach of is provision will subject Subcontractor to all remedies awarded to Contractor and Owner including injunctive relief. Subcontractor agrees to pay all of Contractors and Owners attorney's fees in enforcing this provision.



**MINNESOTA LIMITED**
AN MVERGE COMPANY

XII.     **Notice.** Unless otherwise provided herein, any notice provided for herein will be in writing and
delivered to the parties (a) in person, (b) by facsimile transmission (with the original and a copy of the
facsimile confirmation following in the United States mail), (c) by overnight delivery service, or (d) by
certified mail, return receipt requested. Notice will go to the address first shown herein for the
respective party to whom notice is given or to such other address as may be designated by either
party by written notice given pursuant hereto.

XIV.     **Governing Law/Venue/Attorney Fees.** This Agreement shall be construed and interpreted in
accordance with the laws of the State of Minnesota, including, without limitation, matters of
construction, validity, enforcement, and interpretation. The parties agree that venue for any dispute
under this Agreement shall be in the District Court of Hennepin County, Minnesota. In the event any
enforcement effort is initiated by Contractor against Subcontractor for default of this Agreement,
~~Subcontractor shall be liable to Contractor for any and all costs of collection, including but not limited~~
~~to, reasonable attorneys' and professional fees, court costs, traveling and lodging expenses, costs of~~
~~investigation and defense, accrued interest, and any other reasonable expenses incurred by~~
~~Contractor in initiating such efforts.~~

Signed the day and year first written above.

CONTRACTOR: **Minnesota Limited, LLC.**

By: _____

Its: _____Pvesident_____
                       Title

SUBCONTRACTOR: THE HDD COMPANY

By: _____

Its: ___Vice  President_____
                       Title



### EXHIBIT A
### Insurance

Prior to commencing Work, Subcontractor shall, at its sole expense, procure and maintain insurance of the types, and in the form and amounts described below from insurer(s) authorized to transact business in the state where Work or operations will be performed by Subcontractor. Such insurance and required coverage in forms acceptable to General Contractor shall be placed with admitted insurers that maintain an A.M. Best's rating of not less than A- VII, unless otherwise approved by the General Contractor. The insurance requirements described below shall be maintained uninterrupted for the duration of the Project, including any warranty periods, and shall protect Subcontractor, and others for whom and/or to whom Subcontractor may be liable, for liabilities in connection with work performed by or on behalf of Subcontractor, its agents, representatives, employees or subcontractors.

### Insurance Requirements:

1.       **Commercial General and Umbrella Liability Insurance**. Subcontractor shall maintain commercial general liability ("CGL") and, if necessary, commercial umbrella insurance, with a limit of not less than $ 2,000,000.00          per occurrence, bodily injury or property damage liability; $  2,000,000.00          per offense, personal and advertising injury liability; $    5,000,000.00                          products-completed operations aggregate; and $    5,000,000.00                          general aggregate applicable to claims other than products-completed operations.   To the extent that Subcontractor's CGL and any commercial umbrella insurance are subject to aggregate limits, the policy shall be endorsed so as to apply such aggregate limits separately to the Project.

Coverage afforded under Subcontractor's CGL and any commercial umbrella insurance shall be provided on an occurrence basis and shall be subject to the terms of the *Insurance Services Office ("ISO") Commercial General Liability Coverage Form CG 0001*, or a substitute form providing coverage at least as broad as the ISO form specified. There shall be no limitations or exclusions of coverage beyond those contained in the standard coverage form and coverage shall include liability arising from premises, operations, independent contractors, products-completed operations including construction defect, contractual liability or personal injury and advertising injury.

General Contractor, its officers, directors and employees and Project Owner(s) shall be included as additional insureds under Subcontractor's CGL, and any commercial umbrella insurance, with respect to liabilities arising out of both the ongoing and completed operations of Subcontractor. Such additional insured coverage shall be subject to the terms of ISO additional insured endorsement forms CG 2010 (ongoing operations) and form CG 2037 (products-completed operations), or substitute form(s) providing equivalent coverage. The edition date of the ISO endorsements required should be chosen based on the recipient's risk transfer objectives. The table below summarizes the options and major differences between the edition dates.

| Endorsement(s) | ISO Edition Date | Comments |
|---|---|---|
| CG 2010 | 11/85 Edition | Broadest Insuring Agreement - "liability arising out of" the Subcontractor's work - both ongoing |



| | | operations and completed operations coverage provided by one endorsement. |
|---|---|---|
| CG 2010/CG2037 | 10/01 Edition | Same Insuring Agreement as 11/85 with ongoing operations and completed operations coverage provided by separate endorsements. |
| CG 2010/CG2037 | 07/04 Edition | More narrow Insuring Agreement – "caused in whole or in party by. . . .acts or omissions" of the Subcontractor. |
| CG2010/CG2037 | 04/13 Edition | Same Insuring Agreement as 07/04, but limits coverage to "extent permitted by law" and "not be broader than that which you are required by the contract or agreement to provide." |

Note: Recommended Additional Insured endorsement for states other than Minnesota may vary and Willis should be consulted. States including but not limited to IL, TX, & CA involve unique risk transfer considerations.

Additional insured coverage afforded by Subcontractors CGL, and any commercial umbrella insurance, shall be primary and non-contributing with respect to any insurance or self-insurance available to General Contractor or Project Owner. Such primary and non-contributory insurance shall be subject to the terms of ISO form CG 2001 (Primary and Noncontributory - Other insurance Condition) or its equivalent. Any other insurance or self-insurance maintained by General Contractor or Project owner shall be excess of, and non-contributory with, the coverage afforded by Subcontractors CGL and commercial umbrella insurance, if any.

In addition to procuring and maintaining CGL, and any commercial umbrella insurance, for the duration of the contract, Subcontractor agrees to continue to procure and maintain the products-completed operations liability insurance coverage for a minimum of __two__ ( 2 ) year(s) after the date that the Work is substantially complete. All terms and conditions of such coverage shall be maintained during this completed operations period, including the required coverage limits and the requirement to provide General Contractor and Project Owner with coverage as an additional insured for completed operations.

2.      **Commercial Automobile and Umbrella Liability Insurance.** Subcontractor shall maintain automobile liability and, if necessary, commercial umbrella insurance, with a limit of not less than $__2,000,000.00__ each accident. Such insurance shall cover liability for bodily injury and property damage arising from the use or operation of any auto, including those owned, hired or otherwise operated or used by or on behalf of Subcontractor. The coverage shall be subject to the terms of ISO *Business Auto Coverage Form CA 0001* (1990 edition or later), or a substitute form providing equivalent coverage.

3.      **Workers' Compensation and Employers Liability Insurance.** Subcontractor shall maintain workers' compensation coverage providing statutory benefits. Subcontractor shall additionally maintain employers liability insurance, and if necessary, commercial umbrella insurance, with a limit of not less than: $1,000,000, bodily injury by accident – each accident; $1,000,000, bodily injury by disease-policy limit; and $1,000,000, bodily injury by disease each employee. Workers' Compensation coverage must extend to every



employee, including owners/officers of a closely held corporation and/or individuals operating as a sole proprietorship or partnership. **Workers' Compensation must provide coverage in the state where the Project is located**.

Where applicable, evidence of coverage shall be required for U.S. Longshore and Harbor Workers Compensation, Maritime coverage, Federal Employer's Liability Act and other unique exposures requiring endorsement of coverage.

4.        **Contractors Pollution Liability Insurance**.  Required only if Subcontractor's scope of services include the remediation, treatment, storage or disposal of waste or hazardous materials on or about the project site, as determined by General Contractor. If required, Subcontractor shall maintain Contractors Pollution Liability coverage with a limit of not less than $_____n/a_____ per occurrence, $_____n/a_____ annual aggregate. Coverage shall apply to the scope of work as described under the Contract including transportation and shall include coverage for bodily injury; property damage, including loss of use of damaged property or property that has not been physically injured; clean-up costs; mold; defense and investigative costs.  Subcontractor shall maintain Completed Operations coverage for _____n/a_____ years following final acceptance of the project or termination of the Contract.

If the scope of services in the contract require the Subcontractor to provide professional services associated with arranging for, or brokering of, hazardous material or construction and demolition (C&D) wastes off the job site, Subcontractor must amend the Contractors Pollution Liability policy to include coverage to address this scope of work.  If any of the aforementioned insurance policies are written on a claims made basis, the Contractor warrants that continuous coverage will be maintained, or an extended discovery period will be exercised, for a period of three years beginning from the time the work under this contract is completed.

5.        **Pollution (Environmental) Liability Insurance**.  Required only if Subcontractor's scope of services involves disposal of waste or hazardous materials off-site, as determined by General Contractor. If required, Subcontractor shall maintain pollution (environmental) liability coverage with a limit of not less than: $_____n/a_____ per incident, $_____n/a_____ policy aggregate for hazardous waste disposal services, and $_____n/a_____ per incident, $_____n/a_____ for all other disposal facilities. Such coverage shall include clean-up costs, defense costs and products and completed operations.

If the scope of services in the contract requires the disposal of any hazardous materials or construction and demolition (C&D) wastes off the job site, Subcontractor must also obtain evidence that the Disposal Site Operator maintains Pollution Legal Liability Insurance with coverage for: a. bodily injury, sickness, disease, mental anguish or shock sustained by any person, including death; b. property damage including physical injury to or destruction of tangible property including the resulting loss of use thereof, clean-up costs, and the loss of use of tangible property that has not been physically injured or destroyed; c. defense including costs, charges and expenses incurred in the investigation, adjustment or defense of claims for such compensatory damages. d. pollution conditions on, at, under or emanating from any disposal site, location or facility, used by or on behalf of the disposal facility of any waste or waste materials relating to the performance of the work.



The Disposal Site Operator's Pollution Liability Policy will apply to losses arising from the facility that is accepting the waste under the contract. Minimum limits of Insurance for this policy shall be $_____n/a_____ each incident / $_____n/a_____ policy aggregate.

Claims-made coverage is permitted, provided the policy retroactive date is continuously maintained prior to the commencement date of the agreement, and coverage is continuously maintained during all periods in which Subcontractor accepts or treats waste generated from General Contractor's projects and for a period of *one (1)* year thereafter.

6.  **Professional Liability Insurance**. Required only if Subcontractor's scope of services include architectural, engineering, professional consulting or construction management, as determined by General Contractor. If required, Subcontractor shall maintain professional liability coverage with a limit of not less than $_____n/a_____ each wrongful act, $_____n/a_____ policy aggregate.

Coverage shall include liability arising from the errors, omissions or acts of the Subcontractor or any entity for which the Subcontractor is legally responsible in the providing of professional services under the Contract. Throughout the term the Contract, the PL/E&O policy shall include full prior acts coverage. Coverage shall be continuously maintained during the term of this Agreement and for a period of x years following final acceptance of the Project or termination of the Contract.

Coverage shall not include any exclusion or other limitations related to:
    *   Scope of the professional services
    *   Delays in project completion and cost overruns
    *   Who is authorized to notify the carrier of a claim or potential claim
    *   Mold, fungus, asbestos, pollutants or other hazardous substances

Claims-made coverage is permitted, provided the policy retroactive date is continuously maintained prior to the commencement date of this agreement, and coverage is continuously maintained during all periods in which Subcontractor performs professional services for General Contractor, and for an additional period of *one (1)* year after termination of this agreement or the last date such services are performed, whichever comes later. If Subcontractor's scope of work includes environmental engineering or consulting, the terms of coverage shall not exclude environmental professional services.

7.  **Watercraft Liability Insurance**. If watercraft of any kind is used by the CONTRACTOR or Subcontractor, including: (i) bodily injury; (ii) property damage; and (iii) passenger liability.

    a.  Limit of Liability: Combined Single Limit (Bodily Injury and Property Damage), $1,000,000 each occurrence;
    b.  Protection and Indemnity Insurance to include Jones Act crew coverage (or at least Maritime Employer's Liability: MEL), collision, tower's liability and wreck removal coverage, on a form providing



coverage no less extensive than that afforded in the P & I SP-23 form (revised 1/56), including a pollution buy-back endorsement.

8.   **Aircraft Liability Insurance**. If aircraft of any kind is used by the CONTRACTOR or Subcontractor, including: (i) bodily injury; (ii) property damage; and (iii) passenger liability.

   a.   Limit of Liability: Combined Single Limit (Bodily Injury and Property Damage and Passenger Liability), including hull physical damage insurance for the full replacement cost of each aircraft used   in the work. Such Aircraft Liability and Hull Coverage shall include a waiver of subrogation against General Contractor and all others required by this Agreement to be additional insureds. $ ___n/a___ per seat; $___n/a___ per occurrence.

## Additional Provisions:

1.   **Deductibles and Self-Insured Retentions**. The funding of deductibles and self-insured retentions maintained by Subcontractor shall be the sole responsibility of Subcontractor, including any amounts applicable to deductibles or self-insured retentions applicable to claims involving the General Contractor or Owner as an additional insured. Any self-insured retentions in excess of $___n/a___ must be declared to and approved by the General Contractor.

2.   **Primary / Non-Contributing**. Subcontractor's required insurance coverage shall be primary insurance, and any insurance or self-insurance maintained by the General Contractor or Project Owner shall be excess of and noncontributory with Subcontractor's insurance.

3.   **Severability of Interest**. Except with respect to the limits of insurance, Subcontractor's required insurance shall apply separately to each insured or additional insured.

4.   **Waiver of Subrogation**. Subcontractor agrees to waive all rights of subrogation against the General Contractor, Project Owner and Project Architect, and shall cause each of its subcontractors to waive all rights of subrogation against the General Contractor, Project Owner and Project Architect, their agents and employees, as respects loss, damage, claims, suits or demands, howsoever caused:

   a.   To real or personal property, vehicles, equipment, tools, etc. owned, leased or used by Subcontractor or Subcontractor's employees, agents or sub-subcontractors; and
   b.   To the extent such loss, damage, claims, suits or demands are, or should be, afforded coverage by the Subcontractor's required insurance or any other insurance (except professional liability to which this requirement does not apply) maintained by the Subcontractor. This waiver shall C1PPlY to all first party property, equipment, vehicle and workers' compensation claims (unless prohibited under applicable state statutes), and all third party liability claims. This waiver shall apply to all deductibles, retentions or self-insured layers applicable to the required or any other insurance (except professional liability to which this requirement does not apply) maintained by the Subcontractor. If necessary, Subcontractor agrees to endorse the required insurance policies to permit waivers of subrogation in



favor of General Contractor, Project Owner and Project Architect as required hereunder. Subcontractor further agrees to hold harmless and indemnify General Contractor, Project Owner and Project Architect for any loss or expense incurred as a result of Subcontractor's failure to obtain such waivers of subrogation from the insurers.

5. **Notice of Cancellation / Material Change / Nonrenewal**. Subcontractor's insurance policies must contain a provision or endorsement that the coverage afforded will not be canceled, materially changed or renewal refused until at least 30 days prior Written Notice has been given to General Contractor and to each other additional insured to whom a certificate of insurance has been issued; provided, however, that a ten (10) day prior notice requirement may apply in the event of cancellation due to nonpayment of premium.

6. **Verification of Coverage**. Prior to commencing Work, Subcontractor shall furnish General Contractor with certificate(s) of insurance executed by a duly authorized representative of each insurer, as evidence of compliance with the insurance requirements set forth above. Such certificates of insurance shall be accompanied by copies of endorsements evidencing coverage afforded to General Contractor and Project Owner as additional insured, and endorsements reflecting insurer's concurrence with Subcontractor's waiver of subrogation rights against General Contractor, Project Owner and Project Architect. Renewal certificates are to be provided to the General Contractor prior to the expiration of the required insurance policies.
Certified copies of policies, including all policy endorsements, shall be furnished by Subcontractor within 15 days of written request by General Contractor.

The certificate(s) of insurance shall be subject to approval of General Contractor, but failure of General Contractor to request such certificate or other evidence of Subcontractor compliance with insurance requirements, or failure of General Contractor to identify deficiencies from evidence that is provided, shall in no way limit or relieve Subcontractor of its obligations to maintain such insurance.

7. **Sub-Subcontractors**. No work shall be sublet to any Sub-subcontractor without first obtaining the General Contractor's written permission. All Sub-subcontractors, once approved by the General Contractor, are subject to the same insurance requirements as Subcontractor. Subcontractor shall cause each Sub-subcontractor employed by Subcontractor to purchase and maintain such insurance. Upon request, Subcontractor shall furnish General Contractor with copies of certificates of insurance evidencing coverage for each Sub-subcontractor.

Subcontractor shall voluntarily provide workers compensation coverage for proprietors, partners or others not statutorily required to maintain workers' compensation insurance.

8. **Leased Employees**. Use of leased employees by Subcontractor is expressly prohibited without General Contractor's written permission. If permitted by General Contractor, Subcontractor shall:

   a. Provide General Contractor with a complete copy of its Agreement with the Leasing Company;



MINNESOTA LIMITED
AN HVERGE COMPANY

b.    Require that Leasing Company provide workers' compensation, employers liability and commercial general liability with coverage limits in amounts no less than Subcontractor insurance requirements for the same coverages.

c.    Require that Leasing Company provide Alternate Employer Endorsement naming General Contractor as alternate employer on Leasing Company's workers' compensation policy.

d.    Require that Leasing Company add General Contractor as an additional insured on its commercial general liability insurance policy, with primary/non-contributory wording.

e.    Require that Leasing Company provide waiver of subrogation in favor of General Contractor on both Leasing Company's workers' compensation and commercial general liability insurance policies.

f.    Provide General Contractor with a copy of the Leasing Company's certificate of insurance, with endorsements, evidencing the required coverage.

9.    **No Representation of Coverage Adequacy.** In specifying minimum Subcontractor insurance requirements, General Contractor does not represent that such insurance is adequate to protect Subcontractor for loss, damage or liability arising from its work. Subcontractor is solely responsible to inform itself of types or amounts of insurance it may need beyond these requirements to protect itself.

The insurance requirements set forth in minimum amounts shall not be construed to relieve Subcontractor for liability in excess of such coverage, nor shall it preclude General Contractor from taking such other actions as is available to it under any other provision of the Subcontract. To the extent Subcontractor maintains insurance greater than these minimum requirements, Subcontractor agrees that such insurance shall be applicable to any of Subcontractor's liability obligations hereunder.

Any acceptance of certificates of insurance by General Contractor shall in no way limit or relieve Subcontractor of its duties and responsibilities under this Subcontract, including the duty to indemnify and hold harmless General Contractor.

10.    **Compliance.** Failure of Subcontractor to maintain the required insurance shall constitute a default under this Subcontract and, at General Contractor's option, shall allow General Contractor to terminate this Subcontract for cause, withhold payment and/or purchase the required insurance at Subcontractor's expense.

11.    **Cross-Liability Coverage/Non-Standard Restrictive Endorsements.** All liability policies shall include cross liability coverage and a standard ISO separation of insureds provision, or its equivalent. No liability policy shall include or be endorsed to include any non-standard provisions restricting coverage for the named insured or the persons/entities required to be named as additional insureds under this Agreement, including but not limited to cross liability coverage exclusions or limitations.

SRI916169002



EL DORADO HILLS | OFFICE Suite 210
4526 Serrano Parkway, El Dorado Hills, CA USA 95762

MAIN 530 676 5700 | CROSSINGGROUP.COM

January 9, 2020

**Minnesota Limited**
18640 200ᵗʰ St, PO Box 410
Big Lake, MN 55309

ATTN: Amy Skuza

RE:   Southern Star Lines DT and DS Replacement Project
      Directionally drill and install approximately 6,052 feet of 36-inch steel pipeline in
      Anderson and Franklin Counties, KS.

The HDD Company is pleased to submit the following bid quote:

1.    **Responsibilities of The HDD Company**
      1.1.   Provide all required insurance certificates.
      1.2.   Provide any written submittals and qualifications required.
      1.3.   Provide 2 (two) drill rig(s) with sufficient capabilities to install the crossings, a
             closed-loop mud system, mud pumps, vacuum trucks, dump trucks, steering
             system, and all drill spread support equipment necessary.
      1.4.   Provide all required union labor for the drilling operations.
      1.5.   Provide preliminary drill profiles for each crossing.
      1.6.   Provide final as-built drawings.
      1.7.   Provide and haul water for drilling operations.
      1.8.   Provide water storage for the duration of drilling operations.
      1.9.   Provide all required pulling heads.
      1.10.  Leave the entry areas clean, free of debris, and to a rough grade.
      1.11.  Provide bonding at 1%, which is not included in the bid pricing below.

2.    **Responsibilities of THE CONTRACTOR**
      2.1.   Stake and survey the entry and exit points for each bore, with correct stations
             and elevations.
      2.2.   Provide all permitting to undertake the project.
      2.3.   Provide and maintain suitable truck access to and from entry and exit locations.
      2.4.   Provide stable, level, matted and/or graveled work pads for each bore.
      2.5.   Provide all BMPs around each bore's entry and exit locations. The HDD
             Company will maintain these items.
      2.6.   Provide, string, weld, and test all 36-inch pipe for each bore.

Going to Greater Lengths™

2.7.  Provide all plans, equipment, and manpower to handle pipe during pullback operations.

2.8.  Perform all final tie-ins.

2.9.  Provide all settlement monitoring, if required.

2.10.  Provide all final site restorations.

2.11.  Provide all field surveys to document existing conditions for the HDD installations, including but not limited to pictures, videos, field notes, etc.

## 3. Pricing (Lump Sum)

| | | |
|---|---|---|
| 3.1. | HDD Cedar Creek 2,106' X 36" pipe: | **$1,280,448.00** |
| 3.2. | HDD Pottawapomie Creek 1,788' X 36" pipe: | **$1,087,104.00** |
| 3.3. | HDD Flint Hill 2,158' X 36" pipe: | **$1,312,064.00** |
| 3.4. | Mobilization per rig spread: | **$50,000.00** |

## 4. Clarifications

4.1.  Additional footage due to no fault of The HDD Company, will be billed at $608.00/LF.

4.2.  This proposal is based upon the drawings, specifications, and geotechnical information provided to us on or before **7 June 2019.**

4.3.  If any revised or additional drawings, specifications, geotechnical information, or permits are provided to us after the bid submission date, The HDD Company reserves the right to modify the proposal to account for any added costs and/or additional time associated with the change(s).

4.4.  The HDD Company's bid proposal is conditional upon reaching an agreement upon mutually acceptable contract terms. This bid proposal will be attached to and forms a part of the contract between The HDD Company and THE CONTRACTOR.

4.5.  Item 3.3 above includes the hauling and disposal of all **non-contaminated** drilled solids and excess drilling fluids.

4.6.  The pricing above is contingent upon a site visit.

## 5. Exclusions

5.1.  The HDD Company and its personnel are not the Project Engineers. Therefore, we exclude all design and engineering services unless any are specifically noted as included in this proposal. Any drilling plans or profiles that we submit to you will be based upon the design information in the contract documents and our experience as HDD contractors. Any plans or profiles we provide are recommendations only and are subject to review and approval by the project owner and/or its engineers.

5.2.  All permits, including federal, State and local environmental permits, the SWPPP permit and any associated SWPPP plans, any right-of-way (ROW) agreement or easements, and all access necessary for us to perform our work shall be provided by others. If our operations are delayed or otherwise impacted by any delays or problems with permits, SWPPP plans, ROW agreements, easements or access arrangements our compensation and time for completion will be equitably adjusted.

Going to Greater Lengths™

6. **Terms and Conditions**
   6.1.   Schedule
      6.1.1.   This proposal is based upon performance under a reasonable and mutually agreed-to project schedule in so far as that schedule applies to our work. The approved project baseline schedule and all monthly updates must be provided to us on a regular and timely basis to keep us apprised of schedule changes which may impact the timing and efficiency of our work. We will not be liable for any delays caused by others or by factors beyond our reasonable control.

   6.2.   Indemnification
      6.2.1.   We will indemnify you and/or the project owner for personal injury or property damage claims to the extent of our own negligence. Our proposal excludes any obligation to indemnify you for your own negligence or to indemnify any other party for that party's own negligence or to indemnify any design professional.

   6.3.   Payment
      6.3.1.   Monthly progress payments will be made to The HDD Company within (7) seven days after you receive each monthly payment from the project owner, but in no event later than 120 days from the date you received your invoice.
      6.3.2.   We will receive our final payment within 30 days after you receive our final billing and our work has been completed and accepted. Acceptance will not be unreasonably withheld or delayed. If you dispute any portion of any billing, you will promptly notify us in writing of the nature of the dispute and you will pay the undisputed portion of the billing without delay. If any undisputed amounts are past due for more than 10 days, we reserve the right to stop work until all payments are brought current. We will provide lien releases in accordance with applicable state statutes or regulations. We will keep the project free of liens from out subcontractors, suppliers and other vendors provided we have been paid by you for the work covered by any such liens.

   6.4.   Extra/Force Account Work:
      6.4.1.   If we are directed to perform any work on a force account or time and material basis, the rates for our labor and equipment will be as stated in our proposal, or if no rates are included with this proposal, as stated in our then current standard labor and equipment rate schedule. If we are directed to standby or suspend work while other operations occur, or delays or other problems are resolved, or if we are required to standby due to events or circumstances beyond our control, the standby time for our labor and equipment will be paid as stated in this proposal.

   6.5.   Differing Site Conditions

Going to Greater Lengths"

6.5.1.  If the conditions we encounter in the performance of our work differ materially from those indicated in the contract documents, boring logs, geotechnical reports or other information furnished to us prior to bid, or from those ordinarily encountered and generally recognized as inherent in the type of work provided for in our proposal, then our compensation and time for completion will be equitably adjusted to account for any resulting delay and added costs.

7.  **Delays and Work Stoppages:**

7.1.  All work stoppages that arise through no fault of The HDD Company will be billed at **$14,500** (no crew on site).

The HDD Company appreciates the opportunity to furnish you this quote and looks forward to working with you.  Should any of the information presented above need further clarification, please do not hesitate to contact us.

Sincerely,
**The HDD Company**

Jeremy King
Vice President



THE
**HDD**
**COMPANY**

EL DORADO HILLS | OFFICE Suite 210
4525 Serrano Parkway, El Dorado Hills, CA USA 95762

MAIN 530 676 5705 | CROSSINGGROUP.COM

17 January 2020

**Minnesota Limited**
18640 200th St, PO Box 410
Big Lake, MN 55309

ATTN: Brad Cordes

RE:   Southern Star Lines DT and DS Replacement Project
      Directionally drill and install approximately 4540 feet of 36-inch steel pipeline road
      crossings in Anderson and Franklin Counties, KS.

The HDD Company is pleased to submit the following bid quote:

**1.   Responsibilities of The HDD Company**
   1.1.   Provide all required insurance certificates.
   1.2.   Provide any written submittals and qualifications required.
   1.3.   Provide drill rig(s) with sufficient capabilities to install the crossings, a closed-
          loop mud system, mud pumps, vacuum trucks, dump trucks, steering system,
          and all drill spread support equipment necessary.
   1.4.   Provide all required union labor for the drilling operations.
   1.5.   Provide final as-built drawings.
   1.6.   Provide and haul water for drilling operations.
   1.7.   Provide water storage for the duration of drilling operations.
   1.8.   Provide all required pulling heads.
   1.9.   Leave the entry areas clean, free of debris, and to a rough grade.
   1.10.  Provide bonding at 1%, which is not included in the bid pricing below.

**2.   Responsibilities of THE CONTRACTOR**
   2.1.   Stake and survey the entry and exit points for each bore, with correct stations
          and elevations.
   2.2.   Provide all permitting to undertake the project.
   2.3.   Provide and maintain suitable truck access to and from entry and exit locations.
   2.4.   Provide stable, level, matted and/or graveled work pads for each bore.
   2.5.   Provide bore pits and shore if needed.
   2.6.   Provide all BMPs around each bore's entry and exit locations. The HDD
          Company will maintain these items.
   2.7.   Provide, string, weld, and test all 36-inch pipe for each bore.
   2.8.   Furnish support crew for road crossings, including excavators and manpower.

*Going to Greater Lengths*™

2.9. Provide all plans, equipment, and manpower to handle pipe during pullback operations.

2.10. Perform all final tie-ins.

2.11. Dispose of cuttings.

2.12. Provide all settlement monitoring, if required.

2.13. Provide all final site restorations.

2.14. Provide all field surveys to document existing conditions for the HDD installations, including but not limited to pictures, videos, field notes, etc.

## 3. Pricing

| | | |
|---|---|---|
| 3.1. | 4540' X 36" pipe: | **$508.00/ft** |
| 3.2. | Mobilization per rig spread: | **$60,000.00** |

## 4. Clarifications

4.1. This proposal is based upon the drawings, specifications, and geotechnical information provided to us on or before **17 January 2020.**

4.2. If any revised or additional drawings, specifications, geotechnical information, or permits are provided to us after the bid submission date, The HDD Company reserves the right to modify the proposal to account for any added costs and/or additional time associated with the change(s).

4.3. The HDD Company's bid proposal is conditional upon reaching an agreement upon mutually acceptable contract terms. This bid proposal will be attached to and forms a part of the contract between The HDD Company and THE CONTRACTOR.

4.4. The pricing above is contingent upon a site visit.

## 5. Exclusions

5.1. The HDD Company and its personnel are not engineers. Therefore, we exclude all design and engineering services unless any are specifically noted as included in this proposal. Any drilling plans or profiles that we submit to you will be based upon the design information in the contract documents and our experience as HDD contractors. Any plans or profiles we provide are recommendations only and are subject to review and approval by the project owner and/or its engineers.

5.2. All permits, including federal, State and local environmental permits, the SWPPP permit and any associated SWPPP plans, any right-of-way (ROW) agreement or easements, and all access necessary for us to perform our work shall be provided by others. If our operations are delayed or otherwise impacted by any delays or problems with permits, SWPPP plans, ROW agreements, easements or access arrangements our compensation and time for completion will be equitably adjusted.

## 6. Terms and Conditions

6.1. Schedule

6.1.1. This proposal is based upon performance under a reasonable and mutually agreed-to project schedule in so far as that schedule applies to our work. The approved project baseline schedule and all monthly updates must be provided to us on a regular and timely basis to keep

Going to Greater Lengths™

us apprised of schedule changes which may impact the timing and efficiency of our work. We will not be liable for any delays caused by others or by factors beyond our reasonable control.

6.2.  Indemnification

    6.2.1.  We will indemnify you and/or the project owner for personal injury or property damage claims to the extent of our own negligence. Our proposal excludes any obligation to indemnify you for your own negligence or to indemnify any other party for that party's own negligence or to indemnify any design professional.

6.3.  Payment

    6.3.1.  Monthly progress payments will be made to The HDD Company within (7) seven days after you receive each monthly payment from the project owner, but in no event later than 120 days from the date you received your invoice.

    6.3.2.  We will receive our final payment within 30 days after you receive our final billing and our work has been completed and accepted. Acceptance will not be unreasonably withheld or delayed. If you dispute any portion of any billing, you will promptly notify us in writing of the nature of the dispute and you will pay the undisputed portion of the billing without delay. If any undisputed amounts are past due for more than 10 days, we reserve the right to stop work until all payments are brought current. We will provide lien releases in accordance with applicable state statutes or regulations. We will keep the project free of liens from out subcontractors, suppliers and other vendors provided we have been paid by you for the work covered by any such liens.

6.4.  Extra/Force Account Work:

    6.4.1.  If we are directed to perform any work on a force account or time and material basis, the rates for our labor and equipment will be as stated in our proposal, or if no rates are included with this proposal, as stated in our then current standard labor and equipment rate schedule. If we are directed to standby or suspend work while other operations occur, or delays or other problems are resolved, or if we are required to standby due to events or circumstances beyond our control, the standby time for our labor and equipment will be paid as stated in this proposal.

6.5.  Differing Site Conditions

    6.5.1.  If the conditions we encounter in the performance of our work differ materially from those indicated in the contract documents, boring logs, geotechnical reports or other information furnished to us prior to bid, or from those ordinarily encountered and generally recognized as inherent in the type of work provided for in our proposal, then our compensation and time for completion will be equitably adjusted to account for any resulting delay and added costs.

Going to Greater Lengths™

7.    **Delays and Work Stoppages:**

    7.1.    All work stoppages that arise through no fault of The HDD Company will be billed at **$14,500** (no crew on site).

The HDD Company appreciates the opportunity to furnish you this quote and looks forward to working with you.  Should any of the information presented above need further clarification, please do not hesitate to contact us.

Sincerely,
**The HDD Company**

Jeremy King

# The HDD Company, Inc.

4525 Serrano Pkwy #210
El Dorado Hills, CA  95762
(530) 676-5705  Fax (530) 676-3605

# Invoice

| DATE | INVOICE # |
|------|-----------|
| 7/10/2020 | 20-345-10 |

| BILL TO |
|---------|
| MINNESOTA LIMITED<br>PO BOX  410<br>BIG LAKE, MN  5530934 |

| P.O. NO. | TERMS | JOB NO. |
|----------|-------|---------|
| 1916169002 | Net 30 | 20-345-10 |

| SERVICE DAY | DESCRIPTION | QTY/FT | RATE | AMOUNT |
|-------------|-------------|--------|------|--------|
| 7/10/2020 | Completion of bore Flint Hill | | 1,312,064.00 | 1,312,064.00 |
| 7/10/2020 | LESS 10% RETENTION | 1,312,064 | -0.10 | -131,206.40 |
| | Subcontract Agreement No. SR1916169002<br>Southern Star Central Gas Pipeline  Project C-60266 | | | |

| Thank you for your business. | **Total** | $1,180,857.60 |
|---|---|---|

| PROJECT NAME: | |
|---|---|
| PROJECT NO.: | Southern Star Line DT & DS Replacement |



Horizontal Directional Drilling

**EXTRA WORK SHEET REPORT**
**INTERNAL - OFFICE**

| CLIENT/OWNER: | Minnesota Limited - Southern Star | DATE: | |
|---|---|---|---|
| WORK PRFM'D. BY: | The HDD Company, Inc. | EXTRA WRK. SHT. NO. | Cedar Creek HDD |
| DESCPTN. OF WORK: | Access and weather delays | | |
| 0 | | | |
| 0 | | | |
| 0 | | | |

## A - EQUIPMENT

| EQUIP. NO. | Company Owned Equipment | HRS. | RATE/HR. | TOTAL/DAY |
|---|---|---|---|---|
| 1 | Drilling Rig HDD Rig 7 - Vermeer 750 | 32,50 | $ 205,56 | $ 6.680,70 |
| 1 | Mud Tank / Solids Control Unit | 32,50 | $ 111,96 | $ 3.638,70 |
| 1 | Sump Pit/Trash Pump | 32,50 | $ 8,29 | $ 269,43 |
| 1 | Mud Pumping Units | 32,50 | $ 60,94 | $ 1.980,55 |
| 2 | Tool Van and tools | 32,50 | $ 17,55 | $ 1.140,75 |
| 0 | Dump Truck A-17  TRUN 2AXL | | | $ - |
| 3 | Vac. Truck A-17 TRUN 2AXL | 32,50 | $ 45,75 | $ 4.460,63 |
| 10 | Misc. Trailers | 32,50 | $ 1,79 | $ 581,75 |
| 1 | Haul Trucks | 32,50 | $ 34,13 | $ 1.109,23 |
| 1 | 6 3/4" Non Mag Drill Collars w/Jet Assembly | 32,50 | $ 6,83 | $ 221,98 |
| 168 | Drill Pipe (5-1/2 FH) | 32,50 | $ 0,53 | $ 2.893,80 |
| 2 | Misc. X-Subs and Rack (All X Subs for Spread) | 32,50 | $ 5,20 | $ 338,00 |
| 0 | Sonde and Housing | | | |
| 0 | Steering Tool (North Referencing w/Tru-Gyde) | | | |
| 48 | Rollers | 32,50 | $ 1,50 | $ 2.340,00 |
| 3 | Ford F-250 T&TT 06-12 | 32,50 | $ 5,04 | $ 491,40 |
| 0 | Ford F-450 T&TT 20-28 | | | $ - |
| 0 | Ford F-350 T&TT 20-28 | | | $ - |
| 0 | KW & Crane Truck | | | $ - |
| 1 | Hammer | 32,50 | $ 41,93 | $ 1.362,73 |
| 1 | 300 Amp Welder | 32,50 | $ 9,49 | $ 308,43 |
| 1 | 1/2 Ton Truck | 32,50 | $ 32,48 | $ 1.055,60 |
| 1 | 60" Casing | 32,50 | $ 3,25 | $ 105,63 |
| 0 | Mud Bins | | | |

| EQUIP. NO. | Rental Equipment | | HRS. | RATE/HR. | TOTAL/DAY |
|---|---|---|---|---|---|
| 1 | 10K Reach Forklift | S.T. | 32,50 | $ 51,29 | $ 1.666,93 |
| | | O.T. | | | $ - |
| 2 | 225 Excavator | S.T. | 32,50 | $ 91,59 | $ 5.953,35 |
| | | O.T. | | | $ - |
| 2 | Portable toilets | S.T. | 32,50 | $ 1,50 | $ 97,50 |
| | | O.T. | | | $ - |
| 0 | Multiquip 20kW Generator | S.T. | | | $ - |
| | | O.T. | | | $ - |
| 3 | Frac Tank | S.T. | 32,50 | $ 7,32 | $ 713,70 |
| | | O.T. | | | $ - |
| 1 | Trash Bin | S.T. | 32,50 | $ 4,97 | $ 161,53 |
| | | O.T. | | | $ - |
| 1 | 500 Amp Welder | S.T. | 32,50 | $ 9,49 | $ 308,43 |
| | | O.T. | | | $ - |
| 2 | Light Tower | S.T. | 32,50 | $ 7,61 | $ 494,65 |
| | | O.T. | | | $ - |
| 1 | 175 KW Generator | S.T. | 32,50 | $ 71,36 | $ 2.319,20 |
| | | O.T. | | | $ - |
| 1 | 6" Diesel Trash Pump | S.T. | 32,50 | $ 23,60 | $ 767,00 |
| | | O.T. | | | $ - |
| 1 | HTI Mud Motor | S.T. | 32,50 | $ 42,50 | $ 1.381,25 |
| | | S.T. | | | $ - |
| | | O.T. | | | $ - |
| | | S.T. | | | $ - |
| | | O.T. | | | $ - |
| | | O.T. | | | $ - |
| | | S.T. | | | $ - |
| | | O.T. | | | $ - |
| | | S.T. | | | $ - |
| | | O.T. | | | $ - |
| | | S.T. | | | $ - |
| | | O.T. | | | $ - |
| | | S.T. | | | $ - |
| | | O.T. | | | $ - |

| | | | |
|---|---|---|---|
| COMPANY OWNED EQUIPMENT | | | $ 28.979,28 |
| RENTAL EQUIPMENT W/ 15% Markup | | | $ 15.943,05 |
| A- EQUIPMENT SUB - TOTAL COST | | | $ 44.922,33 |
| 0,00 | % Sales Tx. Rental Equip. | | $ - |

## B - MATERIALS

| MATERIALS DESCRIPTION | QTY. USED | UNIT $ | TOTAL |
|---|---|---|---|
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |

| | | |
|---|---|---|
| B-MATERIALS  SUB-TOTAL COST | | $ - |
| 0,00 | % Sales Tax | $ - |
| 15 | % ADDED M.U. B | $ - |
| SUB-TOTAL A + B w/Tax | | $ 44.922,33 |

## C - SUBCONTRACT / WORK DONE BY SPECIALISTS/THIRD PARTY SERVICES

| Work Description | Individual / Company | Unit | RATE | TOTAL $ |
|---|---|---|---|---|
| Roller Damage | Minnesota Limited | 8,00 | $ 2.900,00 | $ 23.200,00 |
| | | | | $ - |
| | | | | $ - |
| | COST OF SUBS - C | | | $ 23.200,00 |
| | 15 % MARKUP(Subcontractor) | | | $ 3.480,00 |
| | | $ | | $ 26.680,00 |
| | TOTAL COST A + B + C (Including Mark-Up) | | | $ 71.602,33 |

## D - LABOR

| NO. | D - LABOR | HRS. | BASE RATE w/FRING'S. | SUB TOTAL | Per Diem Totals | TOTAL |
|---|---|---|---|---|---|---|
| 1 | Chris Crough (Day Rate) | REG. 3,00 | $1.916,84 | $3.050,52 | $120,00 | $3.170,52 |
| | | O.T. 0 | | $0,00 | | $0,00 |
| | | O.T. | | $0,00 | | $0,00 |
| 2 | Randy Foster (Day Rate) | REG. 3,00 | $968,88 | $2.906,64 | $300,00 | $3.206,64 |
| | | O.T. | | $0,00 | | $0,00 |
| | | O.T. | | $0,00 | | $0,00 |
| 3 | Harold Shoemaker (Day | REG. 0,00 | | $0,00 | $0,00 | $0,00 |
| | | O.T. | | $0,00 | | $0,00 |
| | | O.T. | | $0,00 | | $0,00 |
| 4 | Justin Potter | REG. 32,50 | $59,79 | $1.943,18 | $345,00 | $2.288,18 |
| | | O.T. 0,00 | $80,65 | $0,00 | | $0,00 |
| | | O.T. | | $0,00 | | $0,00 |
| 5 | Brandon Morris | REG. 32,50 | $39,83 | $1.294,48 | $315,00 | $1.609,48 |
| | | O.T. 0,00 | $54,42 | $0,00 | | $0,00 |
| | | O.T. | | $0,00 | | $0,00 |
| 6 | David Jones | REG. 32,50 | $42,86 | $1.392,95 | $315,00 | $1.707,95 |
| | | O.T. 0,00 | $58,96 | $0,00 | | $0,00 |
| | | O.T. | | $0,00 | | $0,00 |
| 7 | Brandon Sammet | REG. 32,50 | $59,79 | $1.943,18 | $315,00 | $2.258,18 |
| | | O.T. 0,00 | $80,65 | $0,00 | | $0,00 |
| | | O.T. | | $0,00 | | $0,00 |
| 8 | Roger Reeter | REG. 32,50 | $59,79 | $1.943,18 | $300,00 | $2.243,18 |
| | | O.T. 0,00 | $80,65 | $0,00 | | $0,00 |
| | | O.T. | | $0,00 | | $0,00 |
| 9 | Augustin Zepeda | REG. 32,50 | $36,83 | $1.196,98 | $315,00 | $1.511,98 |
| | | O.T. 0,00 | $69,49 | $0,00 | | $0,00 |
| | | O.T. | | $0,00 | | $0,00 |
| 10 | Johnny Hatfield | REG. 32,50 | $43,49 | $1.413,43 | $150,00 | $1.563,43 |
| | | O.T. 0,00 | $59,91 | $0,00 | | $0,00 |
| | | O.T. | | $0,00 | | $0,00 |
| 11 | | REG. 0,00 | | $0,00 | | $0,00 |
| | | O.T. 0,00 | | $0,00 | | $0,00 |
| | | D.T. | | $0,00 | | $0,00 |
| 12 | | REG. 0,00 | | $0,00 | | $0,00 |
| | | O.T. 0,00 | | $0,00 | | $0,00 |
| | | D.T. | | $0,00 | | $0,00 |
| 13 | | REG. 0,00 | | $0,00 | | $0,00 |
| | | O.T. 0,00 | | $0,00 | | $0,00 |
| | | D.T. | | $0,00 | | $0,00 |

| | | |
|---|---|---|
| D - LABOR SUB-TOTAL $ | | 19.559,51 |
| 15 % Labor Surcharge | | $ 2.933,93 |
| SUBTOTAL | | 22.493,44 |
| 15 % MARKUP ON LABOR | | $ 3.374,02 |

## E - MISCELLANEOUS ITEMS

| MISC, DESCRIPTIONS | QTY. | Unit $ | EX. AMOUNT |
|---|---|---|---|
| Hotel | | | |
| | 6 | $ 58,00 | $ 348,00 |
| | 9 | $ 68,00 | $ 612,00 |
| Subsistance | | | $ - |
| Misc. Items | | | |
| 0 | | 0 | $ - |
| 0 | | 0 | $ - |
| 0 | | 0 | $ - |
| 0 | | 0 | $ - |
| 0 | | 0 | $ - |
| 0 | | 0 | $ - |

| | | |
|---|---|---|
| E- MISCELLANEOUS ITEMS SUB TOTAL | | $ 960,00 |
| 5 % Sales/City/Room Tax | | $ 48,00 |
| 15 % ADDED MARK-UP | | $ 144,00 |
| 0 % Tax on Misc. Items | | 0 |
| SUB TOTAL - E | | $ 1.152,00 |

## TOTALS

| | | |
|---|---|---|
| TOTAL COST  A+B+C (Equipment /Material /Sub-Contractors) | | $ 71.602,33 |
| TOTAL COST + D (Labor) | | $ 25.867,45 |
| TOTAL COST + E (Miscellaneous Items) | | $ 1.152,00 |
| SUB-TOTAL | | $ 98.621,78 |
| 2,5 % BOND & INSURANCE | | $ 2.465,54 |
| **TOTAL COST THIS SHEET** | | **$ 101.087,33** |

| TIME | CLIENT DIRECTIVES AND COMMENTS |
|---|---|
| 0:00 | (See Daily Work Report) |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |
| 0:00 | 0 |


Horizontal Directional Drilling

**EXTRA WORK SHEET REPORT**
**INTERNAL - OFFICE**

CLIENT/OWNER: Minnesota Limited - Southern Star   DATE:
WORK PRFM'D. BY: The HDD Company, Inc.   EXTRA WRK. SHT. NO.: Day Shift
DESCPTN. OF WORK: Time spent reinstalling 36" pipeline, Multiple days from 6/22/20 - 7/15/20 and 8/22/20 - 9/9/20

| EQUIP. NO. | A – EQUIPMENT | | | |
|---|---|---|---|---|
| | **Company Owned Equipment** | HRS. | RATE/HR. | TOTAL/DAY |
| 1 | Drilling Rig HDD Rig 7 – Vermeer 750 | 408.00 | $ 205.56 | $ 83,868.48 |
| 1 | Mud Tank / Solids Control Unit | 408.00 | $ 111.96 | $ 45,679.68 |
| 1 | Sump Pit/Trash Pump | 408.00 | $ 8.29 | $ 3,382.32 |
| 1 | Mud Pumping Units | 408.00 | $ 60.94 | $ 24,863.52 |
| 2 | Tool Van and tools | 408.00 | $ 17.55 | $ 14,320.80 |
| 0 | Dump Truck A-17 TRUN 2AXL | | $ | $ - |
| 3 | Vac. Truck A-17 TRUN 2AXL | 408.00 | $ 45.75 | $ 55,998.00 |
| 10 | Misc. Trailers | 408.00 | $ 1.79 | $ 7,303.20 |
| 1 | Haul Trucks | 408.00 | $ 34.13 | $ 13,925.04 |
| 1 | 6 3/4" Non Mag Drill Collars w/Jet Assembly | 408.00 | $ 6.83 | $ 2,786.64 |
| 168 | Drill Pipe (5-1/2 FH) | 408.00 | $ 0.53 | $ 36,328.32 |
| 2 | Misc. X-Subs and Rack (All X Subs for Spread) | 408.00 | $ 5.20 | $ 4,243.20 |
| 0 | Sonde and Housing | | $ | $ - |
| 0 | Steering Tool (North Referencing w/Tru-Gyde) | | | |
| 48 | Rollers | 408.00 | $ 1.50 | $ 29,376.00 |
| 3 | Ford F-250 T&TT 06-12 | 408.00 | $ 5.04 | $ 6,168.96 |
| 0 | Ford F-450 T&TT 20-28 | | $ | $ - |
| 0 | Ford F-350 T&TT 20-28 | | $ | $ - |
| 0 | KW & Crane Truck | | $ | $ - |
| 1 | Hammer | 408.00 | $ 41.93 | $ 17,107.44 |
| 1 | 300 Amp Welder | 408.00 | $ 9.49 | $ 3,871.92 |
| 1 | 1/2 Ton Truck | 408.00 | $ 32.48 | $ 13,251.84 |
| 1 | 60" Casing | 408.00 | $ 3.25 | $ 1,326.00 |
| 0 | Mud Bins | | $ | $ - |
| | **Rental Equipment** | | | |
| 1 | 10K Reach Forklift | S.T. 408.00 | $ 51.29 | $ 20,926.32 |
| 2 | 225 Excavator | S.T. 408.00 | $ 91.59 | $ 74,737.44 |
| 2 | Portable toilets | S.T. 408.00 | $ 1.50 | $ 1,224.00 |
| 0 | Multiquip 20KW Generator | O.T. | $ | $ - |
| 3 | Frac Tank | S.T. 408.00 | $ 7.32 | $ 8,959.68 |
| 1 | Trash Bin | S.T. 408.00 | $ 4.97 | $ 2,027.76 |
| 1 | 500 Amp Welder | S.T. 408.00 | $ 9.49 | $ 3,871.92 |
| 2 | Light Tower | S.T. 408.00 | $ 7.61 | $ 6,209.76 |
| 1 | 175 KW Generator | S.T. 408.00 | $ 71.36 | $ 29,114.88 |
| 1 | 6" Diesel Trash Pump | S.T. 408.00 | $ 23.60 | $ 9,628.80 |
| 1 | HTI Mud Motor | S.T. 408.00 | $ 42.50 | $ 17,340.00 |
| | | S.T. | $ | $ - |
| | | O.T. | | $ - |
| | | | COMPANY OWNED EQUIPMENT | $ 363,801.36 |
| | | | RENTAL EQUIPMENT W/ 15% Markup | $ 200,146.64 |
| | | | A- EQUIPMENT SUB - TOTAL COST | $ 563,948.00 |
| | 0.00 % Sales Tx. Rental Equip. | | | |

| B – MATERIALS | | | |
|---|---|---|---|
| **MATERIALS DESCRIPTION** | QTY. USED | UNIT $ | TOTAL |
| Bentonite | 86.00 | $ 9.50 | $ 817.00 |
| Cement | 54.00 | $ 9.50 | $ 513.00 |
| Shaker Screens | 6.00 | $ 135.00 | $ 810.00 |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| | | B-MATERIALS SUB-TOTAL COST | $ 2,140.00 |
| | 0.00 % Sales Tax | | |
| | 15 % ADDED M.U. B | | $ 321.00 |
| | SUB-TOTAL A + B w/Tax | | $ 566,409.00 |

| C – SUBCONTRACT / WORK DONE BY SPECIALISTS/THIRD PARTY SERVICES | | | | |
|---|---|---|---|---|
| Work Description | Individual / Company | Unit | RATE | TOTAL $ |
| Coating and Corrosion Expert | Lake Superior Consultants | 1.00 | $ 19,702.53 | $ 19,702.53 |
| Vac Trucks | Hurricane Services | 1.00 | $ 39,415.00 | $ 39,415.00 |
| Disposal Charges | Anderson County Landfill | 1.00 | $ 18,103.40 | $ 18,103.40 |
| | 0 | 0 | 0.00 | $ - |
| 0 | | | | $ - |
| | | COST OF SUBS = C | | $ 77,220.93 |
| | 15 % MARK-UP(Subcontractor) | | | $ 11,583.14 |
| | | | $ | $ 88,804.07 |
| | TOTAL COST A + B + C (Including Mark-Up) | | | $ 655,213.07 |

| NO. | D – LABOR | HRS. | BASE RATE w/FRING'S. | SUB TOTAL | Per Diem Totals | TOTAL |
|---|---|---|---|---|---|---|
| 1 | Chris Crough (Day Rate) | REG. 33.00 | $1,016.84 | $33,555.72 | $1,320.00 | $34,875.72 |
| | | O.T. 0 | | $0.00 | | $0.00 |
| | | D.T. 0 | | $0.00 | | $0.00 |
| 2 | Randy Foster (Day Rate) | REG. 17.00 | $968.88 | $16,470.96 | $1,700.00 | $18,170.96 |
| | | O.T. | | $0.00 | | $0.00 |
| | | D.T. | | $0.00 | | $0.00 |
| 3 | Harold Shoemaker (Day | REG. 17.00 | $755.00 | $12,835.00 | $1,785.00 | $14,620.00 |
| | | O.T. | | $0.00 | | $0.00 |
| | | D.T. | | $0.00 | | $0.00 |
| 4 | Justin Poter | REG. 104.00 | $59.79 | $6,218.16 | $1,495.00 | $7,713.16 |
| | | O.T. 52.00 | $80.65 | $4,193.80 | | $4,193.80 |
| | | D.T. | | $0.00 | | $0.00 |
| 5 | Brandon Morris | REG. 112.00 | $39.83 | $4,460.96 | $1,260.00 | $5,720.96 |
| | | O.T. 52.00 | $54.42 | $2,829.58 | | $2,829.58 |
| | | D.T. | | $0.00 | | $0.00 |
| 6 | David Jones | REG. 248.00 | $42.86 | $10,629.28 | $3,255.00 | $13,884.28 |
| | | O.T. 125.00 | $58.96 | $7,370.00 | | $7,370.00 |
| | | D.T. | | $0.00 | | $0.00 |
| 7 | Brandon Sammet | REG. 184.00 | $59.79 | $11,001.36 | $2,415.00 | $13,416.36 |
| | | O.T. 97.00 | $80.65 | $7,823.05 | | $7,823.05 |
| | | D.T. | | $0.00 | | $0.00 |
| 8 | Roger Reeter | REG. 112.00 | $59.79 | $6,696.48 | $1,400.00 | $8,096.48 |
| | | O.T. 66.00 | $80.65 | $5,322.90 | | $5,322.90 |
| | | D.T. | | $0.00 | | $0.00 |
| 9 | Augustin Zepeda | REG. 128.00 | $36.83 | $4,714.24 | $1,680.00 | $6,394.24 |
| | | O.T. 69.00 | $69.49 | $4,794.81 | | $4,794.81 |
| | | D.T. | | $0.00 | | $0.00 |
| 10 | Johnny Hatfield | REG. 128.00 | $43.49 | $5,566.72 | $800.00 | $6,366.72 |
| | | O.T. 69.00 | $59.91 | $4,133.45 | | $4,133.45 |
| | | D.T. | | $0.00 | | $0.00 |
| 11 | Stephen Davis | REG. 224.00 | $43.49 | $9,741.76 | $1,120.00 | $10,861.76 |
| | | O.T. 112.00 | $59.91 | $6,709.36 | | $6,709.36 |
| | | D.T. | | $0.00 | | $0.00 |
| 12 | Bruce Cooper | REG. 224.00 | $44.53 | $9,974.72 | $1,120.00 | $11,094.72 |
| | | O.T. 109.00 | $60.70 | $6,615.76 | | $6,615.76 |
| | | D.T. | | $0.00 | | $0.00 |
| 13 | Juan Miguel Suarzes | REG. 101.00 | $36.83 | $3,719.83 | $650.00 | $4,369.83 |
| | | O.T. 48.00 | $49.92 | $2,395.92 | | $2,395.92 |
| | | D.T. | | $0.00 | | $0.00 |
| | | | | **D – LABOR SUB-TOTAL** | | **$ 207,773.81** |
| | 15 % Labor Surcharge | | | SUBTOTAL | | $ 31,166.07 |
| | | | | SUBTOTAL | | $ 238,939.88 |
| | 15 % MARKUP ON LABOR | | | | | $ 35,840.98 |

| E – MISCELLANEOUS ITEMS | | | |
|---|---|---|---|
| MIBC, DESCRIPTIONS | QTY. | Unit $ | EX. AMOUNT |
| Hotel | | | |
| | 96 | $ 58.00 | $ 5,568.00 |
| | 155 | $ 68.00 | $ 10,540.00 |
| Subsistance | | | $ - |
| Misc. Items | | | $ - |
| 0 | 0 | 0 | $ - |
| 0 | 0 | 0 | $ - |
| 0 | 0 | 0 | $ - |
| 0 | 0 | 0 | $ - |
| 0 | 0 | 0 | $ - |
| | | E- MISCELLANEOUS ITEMS SUB TOTAL | $ 16,108.00 |
| | 5 % Sales/City/Room Tax | | $ 805.40 |
| | 15 % ADDED MARK-UP | | $ 2,416.20 |
| | 15 % Tax on Misc. Items | | $ - |
| | SUB TOTAL - E | | $ 19,329.60 |

| TOTALS | | |
|---|---|---|
| TOTAL COST A+B+C (Equipment /Material/Sub-Contractors) | | $ 655,213.07 |
| TOTAL COST - D (Labor) | | $ 274,780.86 |
| TOTAL COST - E (Miscellaneous Items) | | $ 19,329.60 |
| | SUB-TOTAL | $ 949,323.53 |
| 2.5 % BOND & INSURANCE | | $ 23,733.09 |
| | TOTAL COST THIS SHEET | $ 973,056.63 |

| TIME | CLIENT DIRECTIVES AND COMMENTS |
|---|---|
| 0.00 | (See Daily Work Report) |
| 0.00 | |
| 0.00 | |
| 0.00 | |
| 0.00 | |
| 0.00 | |
| 0.00 | |
| 0.00 | |
| 0.00 | |
| 0.00 | |
| 0.00 | |
| 0.00 | |
| 0.00 | |
| 0.00 | |
| 0.00 | |
| 0.00 | |
| 0.00 | |
| 0.00 | |
| 0.00 | |

| PROJECT NAME: | | |
|---|---|---|
| PROJECT NO.: | Southern Star Line DT & DS Replacement | |



The HDD Company
Horizontal Directional Drilling

**EXTRA WORK SHEET REPORT**
**INTERNAL - OFFICE**

CLIENT/OWNER : Minnesota Limited - Southern Star  DATE:
WORK PRFM'D. BY: The HDD Company, Inc.  EXTRA WRK. SHT. NO.: Night Shift
DESCPT'N. OF WORK: Time spent reinstalling 36" pipeline, Multiple days from 6/22/20 - 7/15/20 and 8/22/20 - 9/9/20

0
0
0

## A - EQUIPMENT

| EQUIP. NO. | Company Owned Equipment | HRS. | RATE/HR. | TOTAL/DAY |
|---|---|---|---|---|
| 1 | Drilling Rig HDD Rig 7 - Vermeer 750 | 300.00 | $ 205.56 | $ 61,668.00 |
| 0 | Mud Tank / Solids Control Unit | 300.00 | $ 111.96 | $ 33,588.00 |
| 1 | Sump Pit/Trash Pump | 300.00 | $ 8.29 | $ 2,487.00 |
| 1 | Mud Pumping Units | 300.00 | $ 60.94 | $ 18,282.00 |
| 2 | Tool Van and tools | 300.00 | $ 17.55 | $ 10,530.00 |
| 0 | Dump Truck A-17 TRUN 2AXL | | | |
| 3 | Vac. Truck A-17 TRUN 2AXL | 300.00 | $ 45.75 | $ 41,175.00 |
| 10 | Misc. Trailers | 300.00 | $ 1.79 | $ 5,370.00 |
| 1 | Haul Trucks | 300.00 | $ 34.13 | $ 10,239.00 |
| 1 | 6 3/4" Non Mag Drill Collars w/Jet Assembly | 300.00 | $ 6.83 | $ 2,049.00 |
| 168 | Drill Pipe (5-1/2 FH) | 300.00 | $ 0.53 | $ 26,712.00 |
| 2 | Misc. X-Subs and Rack (All X Subs for Spread) | 300.00 | $ 5.20 | $ 3,120.00 |
| 0 | Sonde and Housing | | | |
| | Steering Tool (North Referencing w/Tru-Gyde) | | | |
| 48 | Rollers | 300.00 | $ 1.50 | $ 21,600.00 |
| 3 | Ford F-250 T&TT 06-12 | 300.00 | $ 7.50 | $ 6,750.00 |
| 0 | Ford F450 T&TT 20-28 | | | $ - |
| 0 | Ford F-350 T&TT 20-28 | | | $ - |
| 0 | KW & Crane Truck | | | $ - |
| 1 | Hammer | 300.00 | $ 41.93 | $ 12,579.00 |
| 1 | 300 Amp Welder | 300.00 | $ 9.49 | $ 2,847.00 |
| 1 | 1/2 Ton Truck | 300.00 | $ 32.48 | $ 9,744.00 |
| 1 | 60' Casing | 300.00 | | $ - |
| 0 | Mud Bins | | | $ - |

| | Rental Equipment | | | |
|---|---|---|---|---|
| 1 | 10K Reach Forklift | S.T 300.00 O.T | $ 51.29 | $ 15,387.00 |
| 2 | 225 Excavator | S.T 300.00 O.T | $ 91.59 | $ 54,954.00 |
| 2 | Portable toilets | S.T 300.00 O.T | $ 1.50 | $ 900.00 |
| 0 | Multiquip 20KW Generator | S.T O.T | | $ - |
| 3 | Frac Tank | S.T 300.00 O.T | $ 7.32 | $ 6,588.00 |
| 1 | Trash Bin | S.T O.T | | $ - |
| 1 | 500 Amp Welder | S.T 300.00 O.T | $ 9.49 | $ 2,847.00 |
| 2 | Light Tower | S.T 300.00 O.T | $ 7.61 | $ 4,566.00 |
| 1 | 175 KW Generator | S.T 300.00 O.T | $ 71.36 | $ 21,408.00 |
| 1 | 6" Diesel Trash Pump | S.T 300.00 O.T | $ 23.60 | $ 7,080.00 |
| 1 | HTI Mud Motor | S.T 300.00 O.T | $ 42.50 | $ 12,750.00 |
| | | S.T O.T | | $ - |
| | | S.T O.T | | $ - |
| | | O.T | | $ - |
| | | O.T | | $ - |
| | | O.T | | $ - |
| | | O.T | | $ - |
| | | O.T | | $ - |
| | | O.T | | $ - |
| | | S.T | | $ - |
| | | S.T | | $ - |
| | | S.T | | $ - |
| | | S.T | | $ - |

| | | | | |
|---|---|---|---|---|
| | COMPANY OWNED EQUIPMENT | | | $ 268,740.00 |
| | RENTAL EQUIPMENT W/ 15% Markup | | | $ 147,166.65 |
| | A- EQUIPMENT SUB - TOTAL COST | | | $ 415,906.65 |
| | 0.00 % Sales Tx, Rental Equip. | | | $ - |

## B - MATERIALS

| MATERIALS DESCRIPTION | QTY. USED | UNIT $ | TOTAL |
|---|---|---|---|
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| 0 | | $ - | $ - |
| | B-MATERIALS SUB-TOTAL COST | | $ - |
| | 0.00 % Sales Tax | | $ - |
| 10 % ADDED M. U. B | | | |
| | SUB-TOTAL = A + B w/Tax | | $ 415,906.65 |

## C - SUBCONTRACT / WORK DONE BY SPECIALISTS/THIRD PARTY SERVICES

| Work Description | Individual / Company | Unit | RATE | TOTAL $ |
|---|---|---|---|---|
| | | | $ | $ - |
| | | | COST OF SUBS = C | $ - |
| | 15 % MARKUP(Subcontractor) | | | $ - |
| | | | $ | |
| | TOTAL COST A + B + C (Including Mark-Up) | | | $ 415,906.65 |

## D - LABOR

| NO. | D - LABOR | | HRS. | BASE RATE w/FRNG'S. | SUB TOTAL | Per Diem Totals | TOTAL |
|---|---|---|---|---|---|---|---|
| 1 | Shawn Posey (Day Rate) | REG. 33.00 O.T 0 D.T | $755.00 | $24,915.00 $0.00 $0.00 | $2,730.00 | $27,645.00 $0.00 $0.00 |
| 2 | Jacob Hoffman | REG. 131.00 O.T 69.00 D.T | $59.79 $80.65 | $7,832.49 $5,564.85 $0.00 | $2,380.00 | $10,212.49 $5,564.85 $0.00 |
| 3 | Westin Colgrove | REG. 96.00 O.T 68.00 D.T | $59.79 $80.65 | $5,739.84 $5,484.20 $0.00 | $1,260.00 | $6,999.84 $5,484.20 $0.00 |
| 4 | Dustin Anderson | REG. 156.00 O.T 92.00 D.T | $48.20 $66.20 | $9,399.00 $6,090.40 $0.00 | $1,920.00 | $11,319.00 $6,090.40 $0.00 |
| 5 | Jeromie Acres | REG. 164.00 O.T 96.00 D.T | $48.20 $63.20 | $7,576.80 $6,067.20 $0.00 | $1,680.00 | $9,256.80 $6,067.20 $0.00 |
| 6 | Abraham Berrospe | REG. 159.00 O.T 95.00 D.T | $36.83 $49.92 | $5,855.97 $4,741.93 $0.00 | $960.00 | $6,815.97 $4,741.93 $0.00 |
| 7 | Larry Roseboro | REG. 79.00 O.T 35.00 D.T | $59.79 $80.65 | $4,723.41 $2,822.75 $0.00 | $500.00 | $5,223.41 $2,822.75 $0.00 |
| 8 | Dusty Cline | REG. 24.00 O.T 12.00 D.T | $59.79 $80.65 | $1,434.96 $967.80 $0.00 | $315.00 | $1,749.96 $967.80 $0.00 |
| 9 | Taylor Crowley | REG. 35.00 O.T 40.00 D.T | $59.79 $52.66 | $2,092.48 $2,106.40 $0.00 | $350.00 | $2,442.48 $2,106.40 $0.00 |
| 10 | Jim Rubick | REG. 123.00 O.T 65.00 D.T | $59.79 $80.65 | $7,354.17 $5,242.25 $0.00 | $1,575.00 | $8,929.17 $5,242.25 $0.00 |
| 11 | Barion Snowten | REG. 80.00 O.T 60.00 D.T | $38.66 $52.66 | $3,092.80 $3,159.60 $0.00 | $1,725.00 | $4,817.80 $3,159.60 $0.00 |
| 12 | Kenny Densmore | REG. 80.00 O.T 60.00 D.T | $59.79 $80.65 | $4,783.20 $4,839.00 $0.00 | $1,050.00 | $5,833.20 $4,839.00 $0.00 |

| | | |
|---|---|---|
| | D - LABOR SUB-TOTAL | $ 148,301.50 |
| 15 % Labor Surcharge | | $ 22,245.22 |
| | SUBTOTAL | $ 170,546.72 |
| 15 % MARKUP ON LABOR | | $ 25,582.01 |

## E - MISCELLANEOUS ITEMS

| MISC. DESCRIPTIONS | QTY. | Unit $ | EX. AMOUNT |
|---|---|---|---|
| Hotel | | | |
| | | $ 58.00 | $ - |
| | | $ 68.00 | $ - |
| Subsistence | 0 | | $ - |
| Misc. Items | | | |
| 0 | | | $ - |
| 0 | | | $ - |
| 0 | | | $ - |
| 0 | | | $ - |
| 0 | | | $ - |
| 0 | | | $ - |
| E- MISCELLANEOUS ITEMS SUB TOTAL | | | $ - |
| 0 % Sales/City/Room Tax | | | $ - |
| 15 % ADDED MARK-UP | | | $ - |
| 0 % Tax on Misc. Items | | | 0 |
| SUB TOTAL - E | | | $ - |

## TOTALS

| | | |
|---|---|---|
| TOTAL COST A+B+C (Equipment /Material /Sub-Contractors) | | $ 415,906.65 |
| TOTAL COST - D (Labor) | | $ 196,128.73 |
| TOTAL COST - E (Miscellaneous Items) | | $ - |
| | SU | $ 612,035.38 |
| 2.5 % BOND & INSURANCE | | $ 15,300.88 |
| | TOTAL COST THIS SHEET | $ 627,336.26 |

| TIME | CLIENT DIRECTIVES AND COMMENTS |
|---|---|
| 0.00 | (See Daily Work Report) |
| 0.00 | |
| 0.00 | |
| 0.00 | |
| 0.00 | |
| 0.00 | 0 |
| 0.00 | 0 |
| 0.00 | 0 |
| 0.00 | 0 |
| 0.00 | 0 |
| 0.00 | 0 |
| 0.00 | 0 |
| 0.00 | 0 |
| 0.00 | 0 |
| 0.00 | 0 |
| 0.00 | 0 |

THE HDD COMPANY:
_____
(Signature)
DATE: _____

CLIENT _____
(Signature)
DATE: _____

# Exhibit 26



USPS TRACKING #

KANSAS CITY 640

JAN 2021 PM 5 L

First-Class
Postage &
USPS
Permit No.

9590 9402 6142 0209 2511 47

**United States
Postal Service**

• Sender: Please print your name, address, and ZIP+4® in this

## HUSCH BLACKWELL

4801 Main Street, Suite 1000
Kansas City, MO 64112

Moody c/m 550367-1

| SENDER: *COMPLETE THIS SECTION* |

■ Complete items 1, 2, and 3.
■ Print your name and address on the reverse so that we can return the card to you.
■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Frontier Farm Credit, FLCA
1270 N. 300 Rd.
Baldwin City, KS 66006-7223

9590 9402 6142 0209 2511 47

2. Article Number *(Transfer from service label)*

59 0090 0027 6303 9140 26

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X _____   ☐ Agent
                         ☐ Addressee

B. Received by *(Printed Name)*   C. Date of Delivery

D. Is delivery address different from item 1?   ☐ Yes
   If YES, enter delivery address below:        ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☒ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ ~~ured Mail~~
☐ ~~ured Mail Restricted Delivery~~
   ~~ver $500)~~

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2015 PSN 7530-02-000-9053          Domestic Return Receipt

**SENDER: COMPLETE THIS SECTION**

- ■ Complete items 1, 2, and 3.
- ■ Print your name and address on the reverse so that we can return the card to you.
- ■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Farm Credit Services, FLCA d/b/a
Frontier Farm Credit, FLCA
The Corporation Co.
112 SW 7th St
Topeka KS 66603

9590 9402 5085 9092 3047 55

2. Article Number (Transfer from service label)

9489 0090 0027 6141 3082 85

PS Form 3811, July 2015 PSN 7530-02-000-9053

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X

☐ Agent
☐ Addressee

B. Received by (Printed Name)   C. Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
If YES, enter delivery address below:  ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Mail Restricted Delivery ($500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

Domestic Return Receipt



HUSCH BLACKWELL
M. Kelly
4801 Main Street, Suite 1000
Kansas City, MO 64112   550367-1

Farm Credit Services, FLCA d/b/a Frontier Farm Credit, FLCA
THE CORPORATION COMPANY
112 SW 7TH STREET
TOPEKA KS 66603



9489 0090 0027 6141 3082 85

CERTIFIED MAIL®

Label 600-PB, Oct. 2015
Pitney Bowes



U.S. POSTAGE≫ PITNEY BOWES

ZIP 64112
02 4W
0001396540 FEB 17 2021

## Product Tracking & Reporting



Home    Search    Reports    Manual Entry    Rates/ Commitments    PTR / EDW    USPS Corporate Accounts

### USPS Tracking Intranet
### Delivery Signature and Address

Price Change 1/26/2020:
USPS Premium Tracking: USPS will offer a fee-based service to extend the availability of tracking data on domestic competitive products for an additional 6 months up to 10 years. In addition, customers can also request a Premium Tracking Statement via email.

The Manual Entry Acceptance screen will be modified to use the Pricing Engine for all rates calculations. Users will no longer enter fees for Collect on Delivery (COD) and Additional Insurance; instead, users will enter the dollar amount to be collected for COD or the insured value for insurance.

Tracking Number: 9489 0090 0027 6141 3082 86

This item was delivered on 02/23/2021 at 08:09:00

» Return to Tracking Number View



Enter up to 35 items separated by commas.

Select Search Type: Quick Search    Submit

Product Tracking & Reporting, All Rights Reserved
Version: 21.2.2.0.17

## AFFIDAVIT OF SERVICE

**State of Kansas**  
                          **County of Franklin**  
                                                      **District Court**

Case Number: FR-2021-CV-000016

Plaintiff/Petitioner:  
**THE HDD COMPANY, INC., AN OREGON CORPORATION**

vs.

Defendant/Respondent:  
**MINNESOTA LIMITED LLC, A MINNESOTA CORPORATION, et al.**

Received by HPS Process Service & Investigations to be served on **Farm Credit Services, FLCA d/b/a Frontier Farm Credit, FLCA c/o The Corporation Company, Inc., 112 Southwest 7th Street, Topeka, KS 66603**.

I, KATIE SHIFLETT, being duly sworn, depose and say that on the **16th day of March, 2021 at 1:42 pm, I:**

Served the within named establishment by delivering a true copy of **Summons; Petition; and Exhibits 1-26** to **Denise Rookstool, Office Manager** at the address of **112 Southwest 7th Street, Topeka, KS 66603**.

I am over the age of eighteen, and have no interest in the above action.

Subscribed and Sworn to before me on the 21 day of March, 21 by the affiant who is personally known to me.

_____  
NOTARY PUBLIC

**KATIE SHIFLETT**  
Process Server

**HPS Process Service & Investigations**  
www.hpsprocess.com  
1669 Jefferson  
Kansas City, MO 64108  
(800) 796-9559

Our Job Serial Number: HAT-2021005428



Elmer William Wilson  
**NOTARY PUBLIC—STATE OF KANSAS**  
MY APPT EXP: Dec. 8, 2021

Copyright © 1992-2021 Database Services, Inc. - Process Server's Toolbox V8.2a

## AFFIDAVIT OF SERVICE

**State of Kansas**   **County of Franklin**   **District Court**

Case Number: FR-2021-CV-000016

Plaintiff/Petitioner:
**THE HDD COMPANY, INC., AN OREGON CORPORATION**

vs.

Defendant/Respondent:
**MINNESOTA LIMITED LLC, A MINNESOTA CORPORATION, et al.**

Received by HPS Process Service & Investigations to be served on **Minnesota Limited LLC, a Minnesota Corporation c/o Nation Registered Agents, Inc., of KS, 112 Southwest 7th Street, Suite 3C, Topeka, KS 66603** .

I, KATIE SHIFLETT, being duly sworn, depose and say that on the **16th day of March, 2021** at **1:42 pm, I:**

Served the within named establishment by delivering a true copy of **Summons; Petition; and Exhibits 1-26** to **Denise Rookstool, Office Manager** at the address of **112 Southwest 7th Street, Suite 3C, Topeka, KS 66603** .

I am over the age of eighteen, and have no interest in the above action.

Subscribed and Sworn to before me on the ⧸⧸ day of _March_ , _21_ by the affiant who is personally known to me.

_____
NOTARY PUBLIC

**KATIE SHIFLETT**
Process Server

**HPS Process Service & Investigations**
www.hpsprocess.com
**1669 Jefferson**
**Kansas City, MO 64108**
**(800) 796-9559**

Our Job Serial Number: HAT-2021005429



Elmer William Wilson
NOTARY PUBLIC—STATE OF KANSAS
MY APPT EXP: Dec 8 2021

Copyright © 1992-2021 Database Services, Inc. - Process Server's Toolbox V8.2a

## **AFFIDAVIT OF SERVICE**

**State of Kansas**                    **County of Franklin**                    **District Court**

Case Number: FR-2021-CV-000016

Plaintiff/Petitioner:
**THE HDD COMPANY, INC., AN OREGON CORPORATION**

vs.

Defendant/Respondent:
**MINNESOTA LIMITED LLC, A MINNESOTA CORPORATION, et al.**

Received by HPS Process Service & Investigations to be served on **Southern Star Central Gas Pipeline, Inc., a Delaware Corporation c/o Nation Registered Agents, Inc., of KS, 112 Southwest 7th Street, Suite 3C, Topeka, KS 66603.**

I, KATIE SHIFLETT, being duly sworn, depose and say that on the **16th day of March, 2021 at 1:42 pm, I:**

Served the within named establishment by delivering a true copy of **Summons; Petition; and Exhibits 1-26** to **Denise Rookstool, Office Manager** at the address of **112 Southwest 7th Street, Suite 3C, Topeka, KS 66603.**

I am over the age of eighteen, and have no interest in the above action.


_Katie Shiflett_
**KATIE SHIFLETT**
Process Server

Subscribed and Sworn to before me on the ___ day
of _March_ , ___ by the affiant who is
personally known to me.

_____
NOTARY PUBLIC

**HPS Process Service & Investigations**
**www.hpsprocess.com**
**1669 Jefferson**
**Kansas City, MO 64108**
**(800) 796-9559**

Our Job Serial Number: HAT-2021005430

**Elmer William Wilson**
**NOTARY PUBLIC—STATE OF KANSAS**
**MY APPT EXP:** Dec 8 2021

Copyright © 1992-2021 Database Services, Inc. - Process Server's Toolbox V8.2a

## AFFIDAVIT OF SERVICE

**State of Kansas**                     **County of Franklin**                               **District Court**

Case Number: 2021-CV-000016

Plaintiff/Petitioner:
**THE HDD COMPANY, INC., an Oregon Corporation**

vs.

Defendant/Respondent:
**MINNESOTA LIMITED, LLC, a Minnesota Corporation, et al.**

Received by HPS Process Service & Investigations to be served on **Anderson County, Kansas, c/o County Clerk, 100 East 4th Avenue, Garnett, KS 66032**.

I, **ALISHA ALLEN**, being duly sworn, depose and say that on the **12th day of March, 2021** at **3:52 pm**, I:

Served the within named establishment by delivering a true copy of **Summons; Petition; and Exhibits 1-26 to Julie Wettstein, County Clerk** at the address of **100 East 4th Avenue, Garnett, KS 66032**.

I am over the age of eighteen, and have no interest in the above action.

**ALISHA ALLEN**
Process Server

Subscribed and Sworn to before me on the _____ day
of _____, _____ by the affiant who is
personally known to me.

_____
NOTARY PUBLIC

REBEKAH FLANERY
My Commission Expires
October 13, 2023
Clinton County
Commission #15420953

**HPS Process Service & Investigations**
www.hpsprocess.com
1669 Jefferson
Kansas City, MO 64108
(800) 796-9559

Our Job Serial Number: HAT-2021005425
Ref: 550367-1

Copyright © 1992-2021 Database Services, Inc. - Process Server's Toolbox V8.2a

## IN THE DISTRICT COURT OF FRANKLIN COUNTY, KANSAS

THE HDD COMPANY, INC., an Oregon
Corporation,

                        Case No. FR-2021-CV-000016

        Plaintiff,           Division No.

v.

MINNESOTA LIMITED, LLC., a Minnesota
Corporation, et al.

### SUMMONS

To:   **ANDERSON COUNTY, KANSAS**
      **Serve: County Clerk**
      **100 E. 4th Ave.**
      **Garnett, KS 66032**

A lawsuit has been filed against you.

Within (21) (30) (40) days after service of this summons on you (not counting the day you

received it), you must serve on the plaintiff an answer to the attached petition or a motion under

K.S.A. 60-212. The answer or motion must be served on the plaintiff's attorney, or the plaintiff

if plaintiff has no attorney, at the following address:

**David B. Raymond & Mike Kelly Attorneys for:**
**Plaintiff THE HDD COMPANY, INC., an Oregon Corporation**
**4801 Main Street, Suite 1000**
**Kansas City, MO 64112**

If you fail to file an answer or motion as described above, judgment by default will be

entered against you for the relief demanded in the petition. You also must file your answer or

motion with the court.

If you file an answer, any related claim which you may have against the plaintiff must be

stated as a counterclaim in your answer. If you fail to do so you will thereafter be barred from

## AFFIDAVIT OF SERVICE

State of Kansas                    County of Franklin                    District Court

Case Number: 2021-CV-000016

Plaintiff/Petitioner:
**THE HDD COMPANY, INC., an Oregon Corporation**

vs.

Defendant/Respondent:
**MINNESOTA LIMITED, LLC, a Minnesota Corporation, et al.**

Received by HPS Process Service & Investigations to be served on **Lyle and Cheryl Black, 3159 Neosho Road, Ottawa, KS 66067.**

I, CODY KYSER, being duly sworn, depose and say that on the **12th day of March, 2021 at 5:21 pm, I:**

Served the within named establishment by delivering a true copy of **Summons; Petition; and Exhibits 1-26** to **Cheryl Black** at the address of **3159 Neosho Road, Ottawa, KS 66067.**

I am over the age of eighteen, and have no interest in the above action.

Subscribed and Sworn to before me on the ___ day
of _____, ___ by the affiant who is
personally known to me.

NOTARY PUBLIC REBEKAH FLANERY
My Commission Expires
October 13, 2023
Clinton County
Commission #15420953

**CODY KYSER**
Process Server

**HPS Process Service & Investigations**
www.hpsprocess.com
1669 Jefferson
Kansas City, MO 64108
(800) 796-9559

Our Job Serial Number: HAT-2021005423
Ref: 550367-1

Copyright © 1992-2021 Database Services, Inc. - Process Server's Toolbox V8.2a

## IN THE DISTRICT COURT OF FRANKLIN COUNTY, KANSAS

THE HDD COMPANY, INC., an Oregon
Corporation,

Case No. FR-2021-CV-000016

Plaintiff,

Division No.

v.

MINNESOTA LIMITED, LLC., a Minnesota
Corporation, et al.

### SUMMONS

To:    **LYLE BLACK and CHERYL BLACK**
       **Serve: Lyle Black & Cheryl Black**
       **3159 Neosho Rd.**
       **Ottawa, KS 66067**

A lawsuit has been filed against you.

Within (21) (30) (40) days after service of this summons on you (not counting the day you

received it), you must serve on the plaintiff an answer to the attached petition or a motion under

K.S.A. 60-212. The answer or motion must be served on the plaintiff's attorney, or the plaintiff

if plaintiff has no attorney, at the following address:

**David B. Raymond & Mike Kelly Attorneys for:**
**Plaintiff THE HDD COMPANY, INC., an Oregon Corporation**
**4801 Main Street, Suite 1000**
**Kansas City, MO 64112**

If you fail to file an answer or motion as described above, judgment by default will be

entered against you for the relief demanded in the petition. You also must file your answer or

motion with the court.

If you file an answer, any related claim which you may have against the plaintiff must be

stated as a counterclaim in your answer. If you fail to do so you will thereafter be barred from

## AFFIDAVIT OF SERVICE

State of Kansas        County of Franklin        District Court

Case Number: 2021-CV-000016

Plaintiff/Petitioner:
**THE HDD COMPANY, INC., an Oregon Corporation**

vs.

Defendant/Respondent:
**MINNESOTA LIMITED, LLC, a Minnesota Corporation, et al.**

Received by HPS Process Service & Investigations to be served on **Rene and Anita Bures, 31443 Northwest Meade Road, Richmond, KS 66080**.

I, ALISHA ALLEN, being duly sworn, depose and say that on the **12th day of March, 2021 at 4:16 pm, I:**

Served the within named establishment by delivering a true copy of **Summons; Petition; and Exhibits 1-26 to Rene Bures** at the address of **31443 Northwest Meade Road, Richmond, KS 66080**.

I am over the age of eighteen, and have no interest in the above action.

Subscribed and Sworn to before me on the 24 day
of _____ by the affiant who is
personally known to me.

NOTARY PUBLIC

REBEKAH FLANERY
My Commission Expires
October 13, 2023
Clinton County
Commission #15420953

**ALISHA ALLEN**
Process Server

**HPS Process Service & Investigations**
www.hpsprocess.com
1669 Jefferson
Kansas City, MO 64108
(800) 796-9559

Our Job Serial Number: HAT-2021005420
Ref: 550367-1

Copyright © 1992-2021 Database Services, Inc. - Process Server's Toolbox V8.2a

## IN THE DISTRICT COURT OF FRANKLIN COUNTY, KANSAS

THE HDD COMPANY, INC., an Oregon
Corporation,

Case No. FR-2021-CV-000016

Plaintiff,

Division No.

v.

MINNESOTA LIMITED, LLC., a Minnesota
Corporation, et al.

### SUMMONS

**To:** **RENE BURES and ANITA BURES**
**Serve: Rene and Anita Bures**
**31443 NW Meade Rd.**
**Richmond, KS 66080**

A lawsuit has been filed against you.

Within (21) (30) (40) days after service of this summons on you (not counting the day you

received it), you must serve on the plaintiff an answer to the attached petition or a motion under

K.S.A. 60-212. The answer or motion must be served on the plaintiff's attorney, or the plaintiff

if plaintiff has no attorney, at the following address:

**David B. Raymond & Mike Kelly Attorneys for:**
**Plaintiff THE HDD COMPANY, INC., an Oregon Corporation**
**4801 Main Street, Suite 1000**
**Kansas City, MO 64112**

If you fail to file an answer or motion as described above, judgment by default will be

entered against you for the relief demanded in the petition. You also must file your answer or

motion with the court.

If you file an answer, any related claim which you may have against the plaintiff must be

stated as a counterclaim in your answer. If you fail to do so you will thereafter be barred from

## AFFIDAVIT OF SERVICE

**State of Kansas**                     **County of Franklin**                              **District Court**

Case Number: 2021-CV-000016

Plaintiff/Petitioner:
**THE HDD COMPANY, INC., an Oregon Corporation**

vs.

Defendant/Respondent:
**MINNESOTA LIMITED, LLC, a Minnesota Corporation, et al.**

Received by HPS Process Service & Investigations to be served on **Oswego Coal Company, Inc., c/o Robert Caylor, 2476 Marshall Road, Ottawa, KS 66067.**

I, CODY KYSER, being duly sworn, depose and say that on the **17th day of March, 2021 at 8:48 pm, I:**

SERVED this **Summons; Petition; and Exhibits 1-26** on Robert Caylor as REGISTERED AGENT at the provided address of **1229 Lincoln Street, Ottawa, KS 66067.**

I am over the age of eighteen, and have no interest in the above action.

Subscribed and Sworn to before me on the ____ day
of _____, ____ by the affiant who is
personally known to me.

NOTARY PUBLIC

REBEKAH FLANERY
My Commission Expires
October 13, 2023
Clinton County
Commission #15420953

**CODY KYSER**
Process Server

**HPS Process Service & Investigations**
www.hpsprocess.com
**1669 Jefferson**
**Kansas City, MO 64108**
**(800) 796-9559**

Our Job Serial Number: HAT-2021005427
Ref: 550367-1

Copyright © 1992-2021 Database Services, Inc. - Process Server's Toolbox V8.2a

## IN THE DISTRICT COURT OF FRANKLIN COUNTY, KANSAS

THE HDD COMPANY, INC., an Oregon
Corporation,

Case No. FR-2021-CV-000016

Plaintiff,

Division No.

v.

MINNESOTA LIMITED, LLC., a Minnesota
Corporation, et al.

### SUMMONS

**To:** **OSWEGO COAL COMPANY, INC.**
**Serve: Robert Caylor**
**2476 Marshall Rd.**
**Ottawa, KS 66067**

A lawsuit has been filed against you.

Within (21) (30) (40) days after service of this summons on you (not counting the day you

received it), you must serve on the plaintiff an answer to the attached petition or a motion under

K.S.A. 60-212. The answer or motion must be served on the plaintiff's attorney, or the plaintiff

if plaintiff has no attorney, at the following address:

**David B. Raymond & Mike Kelly Attorneys for:**
**Plaintiff THE HDD COMPANY, INC., an Oregon Corporation**
**4801 Main Street, Suite 1000**
**Kansas City, MO 64112**

If you fail to file an answer or motion as described above, judgment by default will be

entered against you for the relief demanded in the petition. You also must file your answer or

motion with the court.

If you file an answer, any related claim which you may have against the plaintiff must be

stated as a counterclaim in your answer. If you fail to do so you will thereafter be barred from

## AFFIDAVIT OF SERVICE

State of Kansas        County of Franklin        District Court

Case Number: 2021-CV-000016

Plaintiff/Petitioner:
**THE HDD COMPANY, INC., an Oregon Corporation**

vs.

Defendant/Respondent:
**MINNESOTA LIMITED, LLC, a Minnesota Corporation, et al.**

Received by HPS Process Service & Investigations to be served on **Patrick Arthur Rayne and Kelly Lee Rayne Family Trust Under Trust Agreement Dated April 12, 2016, c/o Patrick Arthur Rayne or Kelly Lee Rayne, Co-Trustees, 102 Crestview Drive, Paola, KS 66071.**

I, CODY KYSER, being duly sworn, depose and say that on the **12th day of March, 2021** at **6:18 pm**, I:

Served the within named establishment by delivering a true copy of **Summons; Petition; and Exhibits 1-26** to Kelly Rayne at the address of **102 Crestview Drive, Paola, KS 66071.**

I am over the age of eighteen, and have no interest in the above action.

Subscribed and Sworn to before me on the 24 day
of _____, 21 by the affiant who is
personally known to me.

NOTARY PUBLIC

REBEKAH FLANERY
My Commission Expires
October 13, 2023
Clinton County
Commission #15420953

**CODY KYSER**
Process Server

HPS Process Service & Investigations
www.hpsprocess.com
1669 Jefferson
Kansas City, MO 64108
(800) 796-9559

Our Job Serial Number: HAT-2021005426
Ref: 550367-1

Copyright © 1992-2021 Database Services, Inc. - Process Server's Toolbox V8.2a

## IN THE DISTRICT COURT OF FRANKLIN COUNTY, KANSAS

THE HDD COMPANY, INC., an Oregon
Corporation,

        Plaintiff,

v.

MINNESOTA LIMITED, LLC., a Minnesota
Corporation, et al.

Case No. FR-2021-CV-000016

Division No.

### SUMMONS

**To:** **PATRICK ARTHUR RAYNE and KELLY LEE RAYNE FAMILY TRUST, under
trust agreement dated April 12, 2016**
**Serve: Patrick Arthur Rayne, Co-Trustee and Kelly Lee Rayne, Co-Trustee**
**102 Crestview Dr.**
**Paola, KS 66071**

A lawsuit has been filed against you.

Within (21) (30) (40) days after service of this summons on you (not counting the day you

received it), you must serve on the plaintiff an answer to the attached petition or a motion under

K.S.A. 60-212. The answer or motion must be served on the plaintiff's attorney, or the plaintiff

if plaintiff has no attorney, at the following address:

**David B. Raymond & Mike Kelly Attorneys for:**
**Plaintiff THE HDD COMPANY, INC., an Oregon Corporation**
**4801 Main Street, Suite 1000**
**Kansas City, MO 64112**

If you fail to file an answer or motion as described above, judgment by default will be

entered against you for the relief demanded in the petition. You also must file your answer or

motion with the court.

If you file an answer, any related claim which you may have against the plaintiff must be

stated as a counterclaim in your answer. If you fail to do so you will thereafter be barred from

## AFFIDAVIT OF SERVICE

State of Kansas          County of Franklin          District Court

Case Number: 2021-CV-000016

Plaintiff/Petitioner:
**THE HDD COMPANY, INC., an Oregon Corporation**

vs.

Defendant/Respondent:
**MINNESOTA LIMITED, LLC, a Minnesota Corporation, et al.**

Received by HPS Process Service & Investigations to be served on **John T. Rayne, 12 Overhill Drive, Paola, KS 66071.**

I, CODY KYSER, being duly sworn, depose and say that on the **12th day of March, 2021 at 6:21 pm, I:**

INDIVIDUALLY SERVED the within named person with a true copy of this **Summons; Petition; and Exhibits 1-26** at the address of **12 Overhill Drive, Paola, KS 66071.**

I am over the age of eighteen, and have no interest in the above action.

**CODY KYSER**
Process Server

Subscribed and Sworn to before me on the _____ day
of _____, _____ by the affiant who is
personally known to me.

_____
NOTARY PUBLIC

REBEKAH FLANERY
My Commission Expires
October 13, 2023
Clinton County
Commission #15420953

**HPS Process Service & Investigations**
www.hpsprocess.com
1669 Jefferson
Kansas City, MO 64108
(800) 796-9559

Our Job Serial Number: HAT-2021005422
Ref: 550367-1

Copyright © 1992-2021 Database Services, Inc. - Process Server's Toolbox V8.2a

## IN THE DISTRICT COURT OF FRANKLIN COUNTY, KANSAS

THE HDD COMPANY, INC., an Oregon
Corporation,

Case No. FR-2021-CV-000016

Plaintiff,

Division No.

v.

MINNESOTA LIMITED, LLC., a Minnesota
Corporation, et al.

### SUMMONS

To: **JOHN T. RAYNE**
**Serve: John T. Rayne**
**12 Overhill Drive**
**Paola, KS 66071**

A lawsuit has been filed against you.

Within (21) (30) (40) days after service of this summons on you (not counting the day you

received it), you must serve on the plaintiff an answer to the attached petition or a motion under

K.S.A. 60-212. The answer or motion must be served on the plaintiff's attorney, or the plaintiff

if plaintiff has no attorney, at the following address:

**David B. Raymond & Mike Kelly Attorneys for:**
**Plaintiff THE HDD COMPANY, INC., an Oregon Corporation**
**4801 Main Street, Suite 1000**
**Kansas City, MO 64112**

If you fail to file an answer or motion as described above, judgment by default will be

entered against you for the relief demanded in the petition. You also must file your answer or

motion with the court.

If you file an answer, any related claim which you may have against the plaintiff must be

stated as a counterclaim in your answer. If you fail to do so you will thereafter be barred from

## AFFIDAVIT OF SERVICE

**State of Kansas**             **County of Franklin**             **District Court**

Case Number: 2021-CV-000016

Plaintiff/Petitioner:
**THE HDD COMPANY, INC., an Oregon Corporation**

vs.

Defendant/Respondent:
**MINNESOTA LIMITED, LLC, a Minnesota Corporation, et al.**

Received by HPS Process Service & Investigations to be served on **Rural Water District No. 4, 501 North Olive Street, Garnett, KS 66032**.

I, ALISHA ALLEN, being duly sworn, depose and say that on the **12th day of March, 2021 at 3:58 pm, I:**

Served the within named establishment by delivering a true copy of **Summons; Petition; and Exhibits 1-26** to **Kendall Eickman, Bookkeeper/Operator** at the address of **501 North Olive Street, Garnett, KS 66032**.

I am over the age of eighteen, and have no interest in the above action.

Subscribed and Sworn to before me on the ____ day
of _____ by the affiant who is
personally known to me.

_____
NOTARY PUBLIC

REBEKAH FLANERY
My Commission Expires
October 13, 2023
Clinton County
Commission #15420953

_____
**ALISHA ALLEN**
Process Server

**HPS Process Service & Investigations**
www.hpsprocess.com
1669 Jefferson
Kansas City, MO 64108
(800) 796-9559

Our Job Serial Number: HAT-2021005424
Ref: 550367-1

Copyright © 1992-2021 Database Services, Inc. - Process Server's Toolbox V8.2a

## IN THE DISTRICT COURT OF FRANKLIN COUNTY, KANSAS

THE HDD COMPANY, INC., an Oregon
Corporation,

Case No. FR-2021-CV-000016

Plaintiff,

Division No.

v.

MINNESOTA LIMITED, LLC., a Minnesota
Corporation, et al.

## SUMMONS

**To:** **RURAL WATER DISTRICT NO. 4**
**Serve: Rural Water District No. 4**
**501 N. Olive St.**
**Garnett, KS 66032**

A lawsuit has been filed against you.

Within (21) (30) (40) days after service of this summons on you (not counting the day you

received it), you must serve on the plaintiff an answer to the attached petition or a motion under

K.S.A. 60-212. The answer or motion must be served on the plaintiff's attorney, or the plaintiff

if plaintiff has no attorney, at the following address:

**David B. Raymond & Mike Kelly Attorneys for:**
**Plaintiff THE HDD COMPANY, INC., an Oregon Corporation**
**4801 Main Street, Suite 1000**
**Kansas City, MO 64112**

If you fail to file an answer or motion as described above, judgment by default will be

entered against you for the relief demanded in the petition. You also must file your answer or

motion with the court.

If you file an answer, any related claim which you may have against the plaintiff must be

stated as a counterclaim in your answer. If you fail to do so you will thereafter be barred from

IN THE FOURTH JUDICIAL DISTRICT
DISTRICT COURT, FRANKLIN COUNTY, KANSAS

THE HDD COMPANY, INC., an Oregon
Corporation,

Plaintiff,

-vs-                                        Case No. FR-2021-CV-000016

MINNESOTA LIMITED, LLC, *et al.*,

Defendants.

## ENTRY OF APPEARANCE

Derek S. Casey of TRIPLETT WOOLF GARRETSON, LLC, enters his appearance for

Defendant MINNESOTA LIMITED, LLC

## CERTIFICATE OF SERVICE

I served this document through the notice of electronic filing for parties and attorneys who

are filing users in this case.

Respectfully submitted,

Derek S. Casey, #15215
dscasey@twgfirm.com
TRIPLETT WOOLF GARRETSON, LLC
2959 North Rock Road, Suite 300
Wichita, Kansas 67226
(316) 630-8100
(316) 630-8101 (Facsimile)
www.twgfirm.com

 /s/Derek S. Casey
*Attorneys for Defendant*
*Minnesota Limited, LLC*

IN THE FOURTH JUDICIAL DISTRICT
DISTRICT COURT, FRANKLIN COUNTY, KANSAS

THE HDD COMPANY, INC., an Oregon
Corporation,

Plaintiff,

-vs-

MINNESOTA LIMITED, LLC, *et al.*,

Defendants.

Case No. FR-2021-CV-000016

**JURY TRIAL DEMANDED**

## DEFENDANT MINNESOTA LIMITED, LLC'S
## ANSWER TO PLAINTIFF'S PETITION,
## COUNTERCLAIM AGAINST PLAINTIFF,
## & CROSS CLAIM AGAINST DEFENDANT
## SOUTHERN STAR CENTRAL GAS PIPELINE, INC.

1    Defendant MINNESOTA LIMITED, LLC, through its lawyers William C. Walker,

2  Attorney at Law, and Derek S. Casey of TRIPLETT WOOLF GARRETSON, LLC, submits this

3  answer to Plaintiff THE HDD COMPANY, INC.'s Petition; counterclaims against Plaintiff THE

4  HDD COMPANY, INC.; and cross claims against Defendant SOUTHERN STAR CENTRAL

5  GAS PIPELINE, LLC.  In support of its Answer, Counterclaim, and Cross Claim, Defendant

6  Minnesota Limited, LLC, states:

7            **DEFENDANT MINNESOTA LIMITED, LLC'S**
8            **ANSWER TO PLAINTIFF'S PETITION**

9    Defendant MINNESOTA LIMITED, LLC, through its lawyers William C. Walker,

10  Attorney at Law, and Derek S. Casey of TRIPLETT WOOLF GARRETSON, LLC, submits this

11  answer to Plaintiff's Petition.  For ease of reference, Plaintiff's allegations are restated in italics

12  followed by Minnesota Limited's answer.

In support of its answer, Minnesota Limited states:

**DEFENDANT'S ANSWER TO PLAINTIFF'S "THE PARTIES"**

1.     *The HDD Company, Inc. is an Oregon Corporation authorized to do business in the state of Kansas, with its principal place of business at 4525 Serrano parkway, Office Suite 210, El Dorado Hills, CA 95762.*

Minnesota Limited's Answer:  Minnesota Limited admits that The HDD Company, Inc. ("HDD") is an Oregon Corporation authorized to do business in the state of Kansas.  Minnesota Limited is without information sufficient to admit or deny the remainder of Paragraph 1, thus it is denied.

2.     *Defendant Minnesota Limited, LLC is a Minnesota Limited Liability Corporation authorized to do business in the state of Kansas, with its principal place of business at 18640 200th Street, PO Box 410, Big Lake, MN 55309.*

Minnesota Limited's Answer: Minnesota Limited admits the allegations in Paragraph 2.

3.     *Defendant Southern Star Central Gas Pipeline, Inc. ("Southern Star") is a Delaware Corporation authorized to do business in the state of Kansas, with its principal place of business at 4700 Highway 56, Owensboro, Kentucky, 42301.   Upon information and belief, Defendant Southern Star is the successor in interest to several right of way interests on real property that is subject to a mechanic's lien filed by HDD: a right of way easement on the property located at 31443 NW Mead Rd., Richmond, KS 66080 as set forth at Book R. Mcl., Page 552 and amended at Book 114 Mcl., Page 118; a right of way easement on the property located at 00000 NW Meade Rd., Garnett, KS 66032 and recorded at Book R Mcl., Page 543 and amended at Book*

1  *114 Mcl., Page 82; and a right of way easement located at Book W Mcl., Page 405 and amended*

2  *at Book 114 Mcl., Page 82.*

3  <u>Minnesota Limited's Answer</u>:  Minnesota Limited admits the allegations in the first

4  sentence of Paragraph 3.  The remainder of the allegations state a legal conclusion for which no

5  response is required.  To the extent a response is required, the remaining allegations are denied.

6  4.  *Upon information and belief, Defendants Rene and Anita Bures are the owners of*

7  *property located at 31443 NW Meade Rd., Richmond KS 66080 and can be served at that address.*

8  <u>Minnesota Limited's Answer</u>:  Minnesota Limited is without information sufficient to

9  admit or deny the allegations in Paragraph 4, thus they are denied.

10  5.  *Upon information and belief, Rural Water District No. 4 is the holder of a right of*

11  *way easement on the property located at 31443 NW Meade Rd., Richmond KS 66080 and recorded*

12  *at Book 1 Mcl., Page 286.  Further, upon information and belief, Rural Water District No.4 is the*

13  *holder of a right of way easement on the property located at 00000 NW Meade Rd., Garnett, KS*

14  *66032 recorded at Book Z Mcl., Page 433.  Rural Water District No. 4 can be served at 501 N.*

15  *Olive St., Garnett, KS 66032.*

16  <u>Minnesota Limited's Answer</u>:  Minnesota Limited is without information sufficient to

17  admit or deny the allegations in Paragraph 5, thus they are denied.

18  6.  *Upon information and belief, Anderson County is a political subdivision of the State*

19  *of Kansas and is the holder of a right of way easement on the property located at 31443 NW Meade*

20  *Rd., Richmond KS 66080.  Further, Anderson County is the holder of a right of way easement on*

21  *the Property located at 00000 NW Meade Rd., Garnett KS 66032 and recorded at Book 69 Mcl.,*

22  *Page 35.  Anderson County can be served at 100 E. 4th Ave., Garnett, KS. 66032.*

1    <u>Minnesota Limited's Answer</u>:    Minnesota Limited admits that Anderson County is a

2    political subdivision of the State of Kansas.  The remainder of the allegations in Paragraph 6 are a

3    legal conclusion for which no response is required.  To the extent a response is required, it is

4    denied.

5         7.    *Upon information and belief, John T. Rayne is a co-owner of property located at*

6    *00000 NW Meade Road, Richmond, KS, 66080 and can be served at 12 Overhill Drive, Paola, KS,*

7    *66071.*

8         <u>Minnesota Limited's Answer</u>:    Minnesota Limited is without information sufficient to

9    admit or deny the allegations in Paragraph 7, thus they are denied.

10        8.    *Upon information and belief, Defendant Patrick Arthur Rayne and Kelly Lee Rayne*

11   *Family Trust under trust agreement dated April 12, 2016, Patrick Arthur Rayne and Kelly Lee*

12   *Rayne co-trustees, is a co-owner of property located at 00000 NW Meade Road, Richmond, KS,*

13   *66080 and can be served at 102 Crestview Dr., Paola, KS 66071.*

14        <u>Minnesota Limited's Answer</u>:    Minnesota Limited is without information sufficient to

15   admit or deny the allegations in Paragraph 8, thus they are denied.

16        9.    *Upon information and belief, Defendant Pickert Family Trust, Keith J. Pickert and*

17   *Mary J. Pickert are co-trustees, is a co-owner of property located at 00000 NW Meade Road,*

18   *Richmond, KS, 66080 and can be served at 47890 Deer Trail Dr., Canton Michigan 48187.*

19        <u>Minnesota Limited's Answer</u>:    Minnesota Limited is without information sufficient to

20   admit or deny the allegations in Paragraph 9, thus they are denied.

10.     *Upon information and belief, Defendants Lyle and Cheryl Black are owners of the property located at 3062 Nebraska Rd., Ottawa, KS 66067, and can be served at 3159 Neosho Rd., Ottawa, KS 66067.*

Minnesota Limited's Answer:  Minnesota Limited is without information sufficient to admit or deny the allegations in Paragraph 10, thus they are denied.

11.     *Upon Information and belief, Defendant Farm Credit Services, FLCA d/b/a Frontier Farm Credit, FLCA is a lending association with its principal place of business in Manhattan, Kansas and the holder of a mortgage executed by Lyle and Cheryl Black and recorded June 10,2014 at Book 544, Page 181 to secure the payment of an original principal indebtedness dated June 5, 2014 in the amount of $71,250.00.  Frontier Farm Credit can be served through its registered agent The Corporation Company, Inc. at 112 S.W. 7th Street, Topeka, KS 66603.*

Minnesota Limited's Answer:  Minnesota Limited is without information sufficient to admit or deny the allegations in Paragraph 11, thus they are denied.

12.     *Upon information and belief, Defendant Oswego Coal Company, Inc. is a Kansas Corporation with its principal place of business in Ottawa Kansas, and is the owner of property located at 3125 Marshall Rd., Ottawa, KS 66067 and can be served through its registered agent Robert Caylor at 2476 Marshall Rd., Ottawa, KS 66067.*

Minnesota Limited's Answer:  Minnesota Limited is without information sufficient to admit or deny the allegations in Paragraph 12, thus they are denied.

**DEFENDANT'S ANSWER TO PLAINTIFF'S "JURISDICTION AND VENUE"**

13.     *Jurisdiction is proper in this Court, pursuant to K.S.A. § 60-308(b), in that defendant conducted business and entered into contracts in the state of Kansas and that the properties at issue are located in Kansas.*

Minnesota Limited's Answer:  Minnesota Limited admits that it conducted business in Kansas and entered into contracts in Kansas.  Minnesota Limited also admits the Court has personal jurisdiction over it and the properties at issue are located in Kansas.

14.     *Venue is proper in this Court pursuant to K.S.A. § 60-604 in that the agreement was to be performed in part in Franklin County, the pipeline project is located in Franklin County, and the properties at issue are located in Kansas.  See Subcontract Agreement attached as Exhibit 1 and incorporated by reference.*

Minnesota Limited's Answer:  Minnesota Limited admits that venue is proper in this Court and the factual allegations in Paragraph 14.  However, because the Subcontract Agreement attached as Exhibit 1 is unreadable as received by Minnesota Limited, Minnesota Limited denies that a true and correct copy of the Subcontract Agreement is incorporated by reference.  The remainder of the allegations are denied.

**DEFENDANT'S ANSWER TO PLAINTIFF'S "FACTUAL ALLEGATIONS"**

15.     *HDD is a leading supplier of Horizontal Directional Drilling services for the installation, replacement, and rehabilitation of pipelines and utilities at vital crossings.  HDD provides services throughout the nation.*

Minnesota Limited's Answer:   Minnesota Limited admits the factual allegations in Paragraph 15, except that HDD is a "leading supplier," which is denied.

1       16.    *MNLTD is a pipeline transmission contractor doing business in many states.*

2       <u>Minnesota Limited's Answer</u>: Minnesota Limited admits the allegations in Paragraph 16.

3       17.    *MNLTD entered into a contract with Southern Star to install 31.5 miles of 36" pipe*

4 *through Franklin and Anderson County, Kansas, referred to as Project KS-C60266 ("Project" or*

5 *"Pipeline Project").*

6       <u>Minnesota Limited's Answer</u>: Minnesota Limited admits the allegations in Paragraph 17.

7       18.    *On January 9, 2020, HDD submitted a quote for directional drilling services and*

8 *installation of the 36 inch steel pipeline at specific crossings for the Project. See Quote, Exhibit 2,*

9 *included and incorporated within Subcontract Agreement, Exhibit 1.*

10       <u>Minnesota Limited's Answer</u>: Minnesota Limited admits that on or about January 9, 2020,

11 HDD submitted a quote that among other things provided for the services listed above. Minnesota

12 Limited also admits that HDD's January 9, 2020 quote was included in the Subcontract

13 Agreement. However, since the copy of the Quote received by Minnesota Limited is unreadable,

14 Minnesota Limited denies that it is a true and accurate copy incorporated by reference here. The

15 remainder of the allegation is a legal conclusion which is denied.

16       19.    *On January 17, 2020, HDD entered into an agreement with MNLTD to provide the.*

17 *HDD services quoted. The amount of the agreement was for $6,185,936.00.   Exhibit l.*

18       <u>Minnesota Limited's Answer</u>: Minnesota Limited admits that on or about January 17,

19 2020, HDD and Minnesota Limited entered into the Subcontract Agreement No. SR1916169002,

20 for certain HDD services and "full compensation" to HDD of $6,185,936.00. The Subcontract

21 Agreement speaks for itself and HDD's remaining summary of the document is denied.

1    20.    *Per the Subcontract Agreement, payment was to be made through monthly progress*

2    *payments "within seven (7) days after [MNLTD] receive each monthly payment from the project*

3    *owner, but in no event later than 120 days from the date (MNLTD] received [HDD]'s invoice." A*

4    *final payment was to be made within 30 days after MNLTD received HDD's final billing and*

5    *HDD's work has been completed and accepted. Exhibit 1.*

6    <u>Minnesota Limited's Answer</u>:    Paragraph 20 purports to summarize portions of the

7    Subcontract Agreement, which speaks for itself.    Minnesota Limited denies that Paragraph 20

8    accurately states or summarizes the Subcontract Agreement.

9    21.    *The Subcontract Agreement provided that HDD's compensation and time for*

10   *completion would be equitably adjusted to account for any resulting delay and added costs due to*

11   *differing site conditions.  Exhibit 1.*

12   <u>Minnesota Limited's Answer</u>:    Paragraph 21 purports to summarize portions of the

13   Subcontract Agreement, which speaks for itself.    Minnesota Limited denies that Paragraph 21

14   accurately summarizes the Subcontract Agreement.

15   22.    *The Subcontract Agreement provided that "All work stoppages that arise through*

16   *no fault of The HDD Company will be billed at $14,500 (no crew on site)."  Exhibit 1.*

17   <u>Minnesota Limited's Answer</u>:    Paragraph 22 purports to summarize portions of the

18   Subcontract Agreement, which speaks for itself.    Minnesota Limited denies that Paragraph 22

19   accurately summarizes the Subcontract Agreement.

20   23.    *The Subcontract Agreement required that MNLTD "[P]rovide and maintain*

21   *suitable truck access to and from entry and exit locations" and "[P]rovide  stable,  level, matted*

22   *and/or graveled work pads for each bore."  Exhibit 1.*

1    <u>Minnesota Limited's Answer</u>:  Paragraph 23 purports to summarize portions of the

2    Subcontract Agreement, which speaks for itself.  Minnesota Limited denies that Paragraph 23

3    accurately summarizes the Subcontract Agreement.

4         24.    *Southern Star designed the pipe to be used, the method of installation, the location*

5    *of the entry and exit points, and the diameter of the borehole for each horizontal directional drill.*

6    <u>Minnesota Limited's Answer</u>:  Minnesota Limited admits the allegations in Paragraph 24.

7         25.    *Within the Subcontract Agreement, HDD excluded all design responsibility: "The*

8    *HDD Company and its personnel are not the Project Engineers. Therefore we exclude all design*

9    *and engineering services unless any are specifically noted as included in this proposal. Any*

10   *drilling plans or profiles that we submit to you will be based upon the design information in the*

11   *contract documents and our experience as HDD contractors.  Any plans or profiles we provide*

12   *are recommendations only and are subject to review and approval by the project owner and/or its*

13   *engineers."  Exhibit 1.*

14   <u>Minnesota Limited's Answer</u>:  Paragraph 25 purports to summarize portions of the

15   Subcontract Agreement, which speaks for itself.  Minnesota Limited denies that Paragraph 25

16   accurately summarizes the Subcontract Agreement.

17        26.    *HDD's work on the project is complete.*

18   <u>Minnesota Limited's Answer</u>:  Although Minnesota Limited admits that HDD finished

19   working on the Project, Minnesota Limited denies HDD completed its work on the project in

20   accordance with the Subcontract Agreement.

1        27.    *MNLTD has made payments in the amount of $3,115,029.19. The unpaid balance*

2   *of $2,471,266.81, as well as retainage withheld of $599,640.00, leaves a balance due and owing*

3   *of $3,070,906.81.*

4       <u>Minnesota Limited's Answer</u>:  Minnesota Limited denies the allegation in Paragraph 27.

5        28.    *Due to no fault of HDD, delays occurred on the project. Delays were incurred due*

6   *to weather, including lightning strikes, as well as insufficient site access for HDD equipment.*

7       <u>Minnesota Limited's Answer</u>:  Minnesota Limited admits that there were delays that

8   occurred on the project due to no fault of HDD.  Minnesota Limited also admits delays were

9   incurred due to weather, including lightning strikes, as well as insufficient site access for HDD

10  equipment.  However, Minnesota Limited denies any implication that there were no delays on the

11  project that were HDD's fault.

12       29.    *As contemplated within the Subcontract Agreement, HDD incurred delay expenses*

13  *of $159,868.58 as well as standby expenses of $500,975.00.*

14      <u>Minnesota Limited's Answer</u>:  Minnesota Limited denies the allegations in Paragraph 29.

15       30.    *Due to improper design of the bore and pipe, coating damage occurred. Due to*

16  *the coating damage, HDD was tasked with reinstalling the pipe. The extra work and resulting*

17  *delays due to extraction, and re-installation of the pipe resulted in additional costs to HDD of*

18  *$1,600,392.89.*

19      <u>Minnesota Limited's Answer</u>:  Minnesota Limited admits the allegations in Paragraph 30.

20       31.    *Due to undisclosed differing site conditions, HDD incurred additional boring and*

21  *delay expenses of $555,000.*

22      <u>Minnesota Limited's Answer</u>:  Minnesota Limited denies the allegations in Paragraph 31.

1        32.    *A total balance due and owing to HDD under the Subcontract Agreement, delays,*

2   *extra work, and change orders from improper design and undisclosed differing site conditions is*

3   *$5,887,143.28.*

4        <u>Minnesota Limited's Answer</u>:  Minnesota Limited denies the allegations in Paragraph 32.

5        33.    *Demand has been made on this unpaid balance.  MNLTD, without justification or*

6   *excuse, has refused to make further payments on the amounts due.*

7        <u>Minnesota Limited's Answer</u>:  Minnesota Limited admits that HDD has requested payment

8   of unpaid amounts and that Minnesota Limited has not paid all amounts HDD has requested.

9   Minnesota Limited otherwise denies the remaining allegations in Paragraph 33.

10   <u>**DEFENDANT'S ANSWER TO PLAINTIFF'S "COUNT 1 – BREACH OF CONTRACT"**</u>

11        34.    *HDD hereby incorporates by reference the allegations contained in paragraphs 1*

12   *through 33 above as though fully set forth herein in their entirety.*

13        <u>Minnesota Limited's Answer</u>:  Minnesota Limited hereby incorporates by reference its

14   responses to the allegations in Paragraphs 1 through 33 above as though fully set forth herein.

15        35.    *The Subcontract Agreement constitutes a valid, binding, and enforceable*

16   *agreement.*

17        <u>Minnesota Limited's Answer</u>:  Minnesota Limited admits the allegations in Paragraph 35.

18        36.    *HDD performed on the Subcontract Agreement by providing the material and labor*

19   *identified in the Agreement.*

20        <u>Minnesota Limited's Answer</u>:  Minnesota Limited admits the allegations in Paragraph 36,

21   except to the extent it implies that HDD has performed all of its obligations on the Subcontract

22   Agreement, which is denied.

1      37.    *MNTLD materially breached its duties and obligations under the agreement by*

2  *failing to pay HDD amounts due pursuant to the terms of the Agreement.*

3      <u>Minnesota Limited's Answer</u>:  Minnesota Limited denies the allegations in Paragraph 37.

4      38.    *Due to the breach of the Agreement by MNLTD, HDD has been harmed and is*

5  *entitled to damages.*

6      <u>Minnesota Limited's Answer</u>:  Minnesota Limited denies the allegations in Paragraph 38.

7      WHEREFORE, Defendant MINNESOTA LIMITED, LLC, through its lawyers William

8  C. Walker, Attorney at Law, and Derek S. Casey of TRIPLETT WOOLF GARRETSON, LLC,

9  demands JUDGMENT denying Plaintiff's Petition, dismissing Plaintiff's claims with prejudice,

10  and granting Defendant recovery of its attorneys' fees, expenses, and costs, insofar as allowed by

11  law, with such other and further relief as the Court deems just and equitable.

12      **<u>DEFENDANT'S ANSWER TO PLAINTIFF'S "COUNT 2 – QUANTUM MERUIT"</u>**

13      39.    *In the alternative to its allegations of Breach of Contract (Count I), HDD asserts*

14  *its quantum meruit claim as follows.*

15      <u>Minnesota Limited's Answer</u>:  Minnesota Limited denies the allegations in Paragraph 39

16  to the extent a response is required.

17      40.    *HDD performed work under circumstances consistent with contract relations on*

18  *the Pipeline Project that conferred a benefit upon MNLTD.*

19      <u>Minnesota Limited's Answer</u>:  Minnesota Limited admits that it received a benefit from

20  work HDD performed, but otherwise denies the allegations in Paragraph 40.

21      41.    *At all relevant times, MNLTD knew or should have known that HDD was*

22  *performing work on the Pipeline Project.*

1    <u>Minnesota Limited's Answer</u>:    Minnesota Limited admits that it knew that HDD was

2    performing work on the Pipeline Project.  Because "[a]t all relevant times" is not specified,

3    Minnesota Limited otherwise denies the allegations in Paragraph 41.

4        42.    *MNLTD acquiesced and accepted the work which directly benefitted MNLTD.*

5        <u>Minnesota Limited's Answer</u>:  Minnesota Limited admits that it accepted some work which

6    directly benefited Minnesota Limited, but otherwise denies the allegations in Paragraph 42.

7        43.    *The fair and reasonable value of the work performed under the Contract is*

8    *$9,002,172.47.*

9        <u>Minnesota Limited's Answer</u>:  Minnesota Limited denies the allegations in Paragraph 43.

10       44.    *As of this date, HDD has been paid $3,115,029.19 for its work on the Project.*

11       <u>Minnesota Limited's Answer</u>:    Minnesota Limited admits that it has paid HDD over

12   $3,000,000 for HDD's work pursuant to the Subcontractor Agreement, but denies the remainder

13   of the allegations in Paragraph 44.

14       45.    *HDD is still owed $5,887.143.28 for the work on the Project despite making*

15   *demand for the same.*

16       <u>Minnesota Limited's Answer</u>:    Minnesota Limited admits that HDD has requested

17   payment of additional money on the Project, but otherwise denies the allegations in Paragraph 45.

18       46.    *MNLTD received and retained the benefit of $9,002,172.47 worth of work*

19   *performed by HDD without paying for the same.*

20       <u>Minnesota Limited's Answer</u>:  Minnesota Limited denies the allegations in Paragraph 46.

21       47.    *As a direct result of MNLTD's failure to pay for the work on the Project, HDD has*

22   *been damaged in the amount of $5,887,143.28.*

1        <u>Minnesota Limited's Answer</u>:  Minnesota Limited denies the allegations in Paragraph 47.

2        48.     *It would be inequitable and unjust for MNLTD to retain the benefit of the work*

3  *provided by HDD without paying for the same.*

4        <u>Minnesota Limited's Answer</u>:  Minnesota Limited denies the allegations in Paragraph 48.

5        WHEREFORE, Defendant MINNESOTA LIMITED, LLC, through its lawyers William

6  C. Walker, Attorney at Law, and Derek S. Casey of TRIPLETT WOOLF GARRETSON, LLC,

7  demands JUDGMENT denying Plaintiff's Petition, dismissing Plaintiff's claims with prejudice,

8  and granting Defendant recovery of its attorneys' fees, expenses, and costs, insofar as allowed by

9  law, with such other and further relief as the Court deems just and equitable.

10  **<u>DEFENDANT'S ANSWER TO PLAINTIFF'S "COUNT 3 – UNJUST ENRICHMENT"</u>**

11        49.     *In the alternative to its claims for breach of contract and quantum meruit, HDD*

12  *asserts its claim for unjust enrichment as follows.*

13        <u>Minnesota Limited's Answer</u>:  Minnesota Limited denies the allegations in Paragraph 49

14  to the extent a response is required.

15        50.     *HDD performed work on the Pipeline Project that conferred a benefit upon*

16  *MNLTD.*

17        <u>Minnesota Limited's Answer</u>:  Minnesota Limited admits the allegations in Paragraph 50.

18        51.     *At all relevant times, MNLTD knew or should have known that HDD was*

19  *performing work on the Pipeline Project, and acquiesced and accepted the work which directly*

20  *benefitted MNLTD.*

21        <u>Minnesota Limited's Answer</u>:  Minnesota Limited admits that it knew that HDD was

22  performing work on the Pipeline Project and that it accepted some work which directly benefited

1  Minnesota Limited. Minnesota Limited otherwise denies the remaining allegations in Paragraph

2  41.

3      52.    *The fair and reasonable value of the work performed under the Contract is*

4  *$9,002,172.47.*

5      Minnesota Limited's Answer:  Minnesota Limited denies the allegations in Paragraph 52.

6      53.    *As of this date, HDD has been paid $3,115,029.19 for its work on the Project.*

7      Minnesota Limited's Answer:  Minnesota Limited admits that it has paid HDD over

8  $3,000,000 for HDD's work pursuant to the Subcontractor Agreement, but denies the remainder

9  of the allegations in Paragraph 53.

10     54.    *HDD· is still owed $5,887.143.28 for the Work on the Project despite making*

11 *demand for the same.*

12     Minnesota Limited's Answer:  Minnesota Limited denies the allegations in Paragraph 54.

13     55.    *MNLTD received and retained the benefit of $9,002,172.47 worth of work*

14 *performed by HDD without paying for the same.*

15     Minnesota Limited's Answer:  Minnesota Limited denies the allegations in Paragraph 55.

16     56.    *As a direct result of MNLTD's failure to pay for the work on the Project, HDD has*

17 *been damaged in the amount of $5,887,143.28.*

18     Minnesota Limited's Answer:  Minnesota Limited denies the allegations in Paragraph 56.

19     57.    *It would be inequitable and unjust for MNLTD to retain the benefit of the work*

20 *provided by HDD without paying for the same.*

21     Minnesota Limited's Answer:  Minnesota Limited denies the allegations in Paragraph 57.

WHEREFORE, Defendant MINNESOTA LIMITED, LLC, through its lawyers William C. Walker, Attorney at Law, and Derek S. Casey of TRIPLETT WOOLF GARRETSON, LLC, demands JUDGMENT denying Plaintiff's Petition, dismissing Plaintiff's claims with prejudice, and granting Defendant recovery of its attorneys' fees, expenses, and costs, insofar as allowed by law, with such other and further relief as the Court deems just and equitable.

<div align="center">

**DEFENDANT'S ANSWER TO PLAINTIFF'S**
**"COUNT 4 – FORECLOSURE OF MECHANIC'S LIEN**
**ON SOUTHERN STAR PIPELINE PROJECT (K.S.A. 55-208)"**

</div>

58.     *HDD hereby incorporates by reference the allegations contained in paragraphs 1 through 33 above as though fully set forth herein in their entirety.*

Minnesota Limited's Answer:  Minnesota Limited hereby incorporates by reference its responses to the allegations in Paragraphs 1 through 33 above as though fully set forth herein.

59.     *HDD seeks foreclosure of its lien on the Southern Star Pipeline Project pursuant to Kansas law.*

Minnesota Limited's Answer:  Minnesota Limited admits that HDD seeks foreclosure of its lien, but otherwise denies that such foreclosure is proper under Kansas law.

60.     *HDD furnished work on the Pipeline Project beginning on or about January 17, 2020 and the work was furnished for, applied to, used and consumed in the Pipeline Project.*

Minnesota Limited's Answer:  Minnesota Limited admits the allegations in Paragraph 60, except for the beginning date of HDD furnishing work, which is denied.

61.     *HDD's work furnished for, applied to, used and consumed in the Pipeline Project is set out in the statement of account showing the amount still due and owing attached as Exhibits B-D of HDD's Pipeline Project Mechanic's Lien, and incorporated herein as Exhibits 3, 4, and 5.*

1    <u>Minnesota Limited's Answer</u>:  Minnesota Limited admits HDD provided work for the

2    Pipeline Project and that there is a statement of account attached as alleged, but otherwise denies

3    the allegations in Paragraph 61.

4         62.    *In spite of HDD's demand for payment, MNLTD failed and refused to pay the now*

5    *outstanding balance of $5,887,143.28.*

6    <u>Minnesota Limited's Answer</u>:  Minnesota Limited admits it received a demand for

7    payment, but otherwise denies the allegations in Paragraph 62.

8         63.    *On January 6, 2021, and within four months of the last date that HDD performed*

9    *work on the Pipeline Project, HDD properly filed its mechanic's lien against the Pipeline Project*

10   *with the Clerk of the District Court of Franklin County, Kansas, which has been designated*

11   *Mechanic's Lien No. FR-2021-SL-000002 ("Pipeline Project Mechanic's Lien"). A true and*

12   *accurate copy of HDD's Pipeline Project Mechanic's Lien is attached to this Petition as Exhibit*

13   *6.*

14   <u>Minnesota Limited's Answer</u>:  Minnesota Limited denies that January 6, 2021 fell within

15   four months of the last date HDD performed work on the Pipeline Project.  Minnesota Limited is

16   without knowledge sufficient to admit or deny the remainder of the allegations, which also contains

17   legal conclusions, so they are denied.

18        64.    *HDD fully complied with all statutory requirements under K.S.A. 55-208, et. Seq.*

19   *when it filed its Pipeline Project Mechanic's Lien.*

20   <u>Minnesota Limited's Answer</u>:  Minnesota Limited is without knowledge sufficient to admit

21   or deny the allegations in Paragraph 64, which also contains legal conclusions, so they are denied.

22        65.    *After filing its Pipeline Project Mechanic's Lien, HDD filed a notice of the Lien in*

1    *Anderson County, KS, attached hereto as Exhibit 7.*

2        <u>Minnesota Limited's Answer</u>:  Minnesota Limited is without knowledge sufficient to admit

3    or deny the allegations in Paragraph 65, so they are denied.

4        66.    *HDD sent a copy of the Pipeline Project Mechanic's Lien to MNLTD and Southern*

5    *Star via certified mail which were received on January 15, 2021.  Return receipts for the*

6    *Mechanic's Lien are attached as Exhibit 8 and Exhibit 9.*

7        <u>Minnesota Limited's Answer</u>:  Minnesota Limited admits it received a copy of HDD's

8    mechanic's lien as shown by the return receipt.  Minnesota Limited is without knowledge sufficient

9    to admit or deny the remainder of Paragraph 66, so it is denied.

10       67.    *HDD notified all of the landowners of the Pipeline Project Mechanic's Lien.  A*

11   *copy of the return of service receipts are attached to this Petition as Exhibit 10 (Bures), 11*

12   *(Pickert-Family Trust), 12 (Rayne), 13 (Rayne Family Trust), 14 (Oswego), and 15 (Black).*

13       <u>Minnesota Limited's Answer</u>:  Minnesota Limited is without knowledge sufficient to admit

14   or deny the allegations in Paragraph 67, so they are denied.

15       68.    *This lawsuit to enforce HDD's Pipeline Project Mechanic's Lien was filed less than*

16   *one year after the Mechanic's Lien was filed.*

17       <u>Minnesota Limited's Answer</u>:  Minnesota Limited admits that HDD filed this lawsuit

18   within one year of January 6, 2021.  Minnesota Limited is without knowledge sufficient to admit

19   or deny the remainder of the allegations in Paragraph 68, so they are denied.

20       69.    *The amounts claimed and prices stated in HDD's Pipeline Project Mechanic's Lien*

21   *are the fair and reasonable value of the labor and materials HDD supplied or performed to*

1  *improve the Pipeline as set for in HDD's Pipeline Project Mechanic's Lien Exhibits B and C,*

2  *incorporated herein as Exhibits 3 and 4.*

3  <u>Minnesota Limited's Answer</u>: Minnesota Limited admits that there amounts claimed and

4  prices stated in the exhibits, but otherwise denies the allegations in Paragraph 69.

5  70. *All of the work described in HDD's Pipeline Project Mechanic's Lien was*

6  *incorporated into and directly benefitted and improved the Pipeline Project.*

7  <u>Minnesota Limited's Answer</u>: Minnesota Limited denies the allegations in Paragraph 70.

8  71. *At the time it was filed, the Mechanic's Lien was a true and accurate account of*

9  *HDD's work and demand of MNLTD, allowing a credit for all valid setoffs and itemizing the labor*

10  *and materials supplied by HDD for the Pipeline Project.*

11  <u>Minnesota Limited's Answer</u>: Minnesota Limited denies the allegations in Paragraph 71.

12  72. *HDD bas performed and complied with all conditions precedent to the creation and*

13  *enforcement of its mechanic's lien, including service of its mechanic's lien on MNLTD and*

14  *Southern Star.*

15  <u>Minnesota Limited's Answer</u>: Minnesota Limited is without knowledge sufficient to admit

16  or deny the allegations in Paragraph 72, so they are denied.

17  73. *HDD's lien on the Pipeline Project, being properly perfected under Kansas law,*

18  *entitles HDD to foreclose said Pipeline interest installed on the Pipeline which is held for the debt*

19  *contracted, the proceeds of which shall be used to satisfy the encumbrances on said Pipeline in*

20  *the priority established by this Court.*

21  <u>Minnesota Limited's Answer</u>: Minnesota Limited denies the allegations in Paragraph 73.

1    74.    *All of the Work described in HDD's Lien was furnished to MNLTD on the faith and*

2    *credit of HDD's lien rights against the Pipeline Project.*

3    <u>Minnesota Limited's Answer</u>:  Minnesota Limited denies the allegations in Paragraph 74.

4    75.    *All of the Work described in HDD's lien directly benefitted and improved the*

5    *Pipeline Project.*

6    <u>Minnesota Limited's Answer</u>:  Minnesota Limited denies the allegations in Paragraph 75.

7    76.    *MNLTD was obligated, but failed to pay HDD for the work furnished to improve*

8    *the Pipeline Project.*

9    <u>Minnesota Limited's Answer</u>:  Minnesota Limited denies the allegations in Paragraph 76.

10   WHEREFORE, Defendant MINNESOTA LIMITED, LLC, through its lawyers William

11   C. Walker, Attorney at Law, and Derek S. Casey of TRIPLETT WOOLF GARRETSON, LLC,

12   demands JUDGMENT denying Plaintiff's Petition, dismissing Plaintiff's claims with prejudice,

13   and granting Defendant recovery of its attorneys' fees, expenses, and costs, insofar as allowed by

14   law, with such other and further relief as the Court deems just and equitable.

15   **DEFENDANT'S ANSWER TO PLAINTIFF'S**
16   **"COUNT 5 – FORECLOSURE OF MECHANIC'S LIEN**
17   **ON REAL PROPERTY LOCATED AT 31443 NW MEADE RD, RICHMOND KS 66080**
18   **AND 00000 NW MEADE RD., GARNETT, KS 66032 (K.S.A60-1103)"**

19   77.    *HDD hereby incorporates by reference the allegations contained in paragraphs 1*

20   *through 33 above as though fully set forth herein in their entirety.*

21   <u>Minnesota Limited's Answer</u>:  Minnesota Limited hereby incorporates by reference its

22   responses to the allegations in Paragraphs 1 through 33 above as though fully set forth herein.

23   78.    *HDD seeks foreclosure of its lien on the properties located at 31443 NW Meade*

24   *Rd., Richmond KS 66080 and 00000 NW Meade Rd., Garnett, KS 66032 pursuant to Kansas law.*

1    <u>Minnesota Limited's Answer</u>:  Minnesota Limited admits that HDD seeks foreclosure of

2    its lien, but otherwise denies that such foreclosure is proper under Kansas law.

3    79.    *HDD furnished labor and materials for the Pipeline Project beginning on or about*

4    *January 17, 2020.*

5    <u>Minnesota Limited's Answer</u>:  Minnesota Limited admits the allegations in Paragraph 79,

6    except for the beginning date of HDD furnishing work, which is denied.

7    80.    *HDD's work was furnished for, applied to, used and consumed in the Pipeline*

8    *Project located on certain real property in Anderson County, Kansas at 31443 NW Meade Rd.,*

9    *Richmond KS 66080 and 00000 NW Meade Rd., Garnett, KS 66032 (the "real property"). The*

10   *legal descriptions of the real property are set forth as Exhibit A to the Anderson County*

11   *Mechanic's Lien filed by HDD as AN-2020-SL-000006, and incorporated herein as Exhibit 16.*

12   <u>Minnesota Limited's Answer</u>:  Minnesota Limited admits HDD provided work for the

13   Pipeline Project located in Anderson County, but otherwise denies the allegations in Paragraph 80.

14   81.    *HDD's work furnished for the Pipeline Project on the real property in Anderson*

15   *County is set out in detail showing the prices charged therefore and the amount still due and*

16   *owing, and are attached as Exhibit B and C to the Anderson County mechanic's lien filed by HDD*

17   *as AN-2020-SL-000006, and incorporated herein as Exhibit 17 and 18.*

18   <u>Minnesota Limited's Answer</u>:  Minnesota Limited admits that HDD furnished work on the

19   Pipeline Project in Anderson County, but otherwise denies the allegations in Paragraph 81.

20   82.    *In spite of HDD's demand for payment, MNLTD failed and refused to pay the now-*

21   *outstanding balance of $1,087,104.00 for work done on the Anderson County real property.*

1     <u>Minnesota Limited's Answer</u>:  Minnesota Limited admits that HDD requested payment

2     from Minnesota Limited and Minnesota Limited has not paid all of HDD's payment demands, but

3     otherwise denies the remainder of Paragraph 82.

4          83.     *On January 6, 2020, and within five months of the last date that HDD performed*

5     *work on the Project, HDD properly filed its mechanic's lien against the real property with the*

6     *Clerk of the District Court of Anderson County, Kansas, which has been designated Mechanic's*

7     *Lien No. AN-2020-SL-000006 (Anderson County Mechanic's Lien).  A true and accurate copy of*

8     *HDD's Anderson County Mechanic's Lien is attached to this Petition as Exhibit 19.*

9     <u>Minnesota Limited's Answer</u>:  Minnesota Limited admits that January 6, 2021 fell within

10    five months of the last date HDD performed work on the Pipeline Project.  Minnesota Limited is

11    without knowledge sufficient to admit or deny the remainder of the allegations, which also contains

12    legal conclusions, so they are denied.

13         84.     *HDD fully complied with all statutory requirements under K.S.A. 60-1103, et. seq.*

14    *when it filed its lien.*

15    <u>Minnesota Limited's Answer</u>:    Minnesota Limited is without knowledge sufficient to

16    admit or deny the allegations in Paragraph 84, which also contains legal conclusions, so they are

17    denied.

18         85.     *HDD sent a copy of the Mechanic's Lien to MNLTD and Southern Star via certified*

19    *mail.  A copy of the return receipts for the Lien are attached as Exhibit 8 (MNLTD) and Exhibit 9*

20    *(Southern Star).*

1    <u>Minnesota Limited's Answer</u>:  Minnesota Limited admits it received a copy of HDD's

2    mechanic's lien as shown by the return receipt.  Minnesota Limited is without knowledge sufficient

3    to admit or deny the remainder of the allegations, so they are denied.

4          86.    *HDD notified the landowners of the Mechanic's Lien via certified mail. A copy of*

5    *the return receipts are attached to this Petition as Exhibit 10 (Bures), 11 (Pickert Family Trust),*

6    *12 (Rayne) and 13 (Rayne Family Trust).*

7          <u>Minnesota Limited's Answer</u>:  Minnesota Limited is without knowledge sufficient to admit

8    or deny the allegations in Paragraph 86, so they are denied.

9          87.    *HDD Notified the holders of a recorded interest in the real property of the*

10   *Mechanic's Lien.  A copy of the return receipts are attached to this Petition as Exhibit 20 (RWD4)*

11   *and 21 (Anderson County).*

12         <u>Minnesota Limited's Answer</u>:  Minnesota Limited is without knowledge sufficient to admit

13   or deny the allegations in Paragraph 86, so they are denied.

14         88.    *This lawsuit to enforce HDD's Mechanic's Lien was filed less than one year after*

15   *the Mechanic's Lien was filed.*

16         <u>Minnesota Limited's Answer</u>:  Minnesota Limited admits that HDD filed this lawsuit

17   within one year of January 6, 2021.  Minnesota Limited is without knowledge sufficient to admit

18   or deny the remainder of the allegations in Paragraph 88, so they are denied.

19         89.    *The amounts claimed and prices stated in HDD's Anderson County Mechanic's*

20   *Lien are the fair and reasonable value of the labor and materials HDD supplied or performed to*

21   *improve the Pipeline Project as itemized and set for in HDD's Anderson County Mechanic's Lien.*

22         <u>Minnesota Limited's Answer</u>:  Minnesota Limited denies the allegations in Paragraph 89.

1      90.    *All of the work described in HDD's Anderson County Mechanic's Lien was*

2 *incorporated into and directly benefitted and improved the Pipeline Project.*

3      <u>Minnesota Limited's Answer</u>:  Minnesota Limited denies the allegations in Paragraph 90.

4      91.    *At the time it was filed, the Mechanic's Lien was a true and accurate account of*

5 *HDDs work and demand of MNLTD for the work performed on the Anderson County real*

6 *property, allowing a credit for all valid setoffs and itemizing the labor and materials supplied by*

7 *HDD for the Pipeline Project.*

8      <u>Minnesota Limited's Answer</u>:  Minnesota Limited denies the allegations in Paragraph 91.

9      92.    *HDD's Lien on the Property, being properly perfected under Kansas law, entitles*

10 *HDD to foreclose said Anderson County real property interests, buildings, erections,*

11 *improvements and plants erected or constructed, and all materials, fixtures, machinery and other*

12 *personal property furnished, placed or installed on the Anderson County real property which is*

13 *held for the debt contracted, the proceeds of which shall be used to satisfy the encumbrances on*

14 *said Anderson County real property in the priority established by this Court.*

15      <u>Minnesota Limited's Answer</u>:   Minnesota Limited denies the allegations in Paragraph 92,

16 which also includes legal conclusions that are denied.

17      93.    *HDD satisfied all conditions precedent under Kansas' Mechanic's Lien statutes for*

18 *filing and perfecting the Anderson County Mechanic's Lien.*

19      <u>Minnesota Limited's Answer</u>:  Minnesota Limited is without knowledge sufficient to admit

20 or deny the allegations of Paragraph 93, which are legal conclusions, and thus they are denied.

21      94.    *All of the Work described in HDD's Lien was furnished to MNLTD on the faith and*

22 *credit of HDD's lien rights against the Anderson County real property.*

1    Minnesota Limited's Answer:  Minnesota Limited denies the allegations in Paragraph 94.

2    95.    *All of the Work described in HDD's lien directly benefitted and improved the*

3    *Pipeline Project located on the Anderson County real property.*

4    Minnesota Limited's Answer:  Minnesota Limited denies the allegations in Paragraph 95.

5    96.    *MNLTD was obligated, but failed to pay HDD for the work furnished to improve*

6    *the Pipeline Project located on the Anderson County real property.*

7    Minnesota Limited's Answer:  Minnesota Limited denies the allegations in Paragraph 96.

8    **DEFENDANT'S ANSWER TO PLAINTIFF'S**
9    **"COUNT V FORECLOSURE OF MECHANIC'S LIEN ON REAL PROPERTY**
10   **LOCATED AT 3062 NEBRASKA RD., OTTAWA, KS 66067 and**
11   **3159 NEOSHO RD., OTTAWA, KS 66067 (I.S.A 60-1103)**

12   97.    *HDD hereby incorporates by reference the allegations contained in paragraphs 1*

13   *through 33 above as though fully set forth herein in their entirety.*

14   Minnesota Limited's Answer:  Minnesota Limited hereby incorporates by reference its

15   responses to the allegations in Paragraphs 1 through 33 above as though fully set forth herein.

16   98.    *HDD seeks foreclosure of its lien on the properties located at 3062 Nebraska Rd.,*

17   *Ottawa, KS 66067 and 3159 Neosho Rd., Ottawa, KS 66067 pursuant to Kansas law.*

18   Minnesota Limited's Answer:  Minnesota Limited admits that HDD seeks foreclosure of

19   a lien, but otherwise denies that such foreclosure is proper under Kansas law.

20   99.    *HDD furnished labor and materials for the Pipeline Project beginning on or about*

21   *January 17, 2020.*

22   Minnesota Limited's Answer:  Minnesota Limited admits the allegations in Paragraph 99,

23   except for the beginning date of HDD furnishing work, which is denied.

1      100.    *HDD's work was furnished for, applied to, used and consumed in the Pipeline*

2      *project located on certain real property in Franklin County, Kansas at 3062 Nebraska Rd.,*

3      *Ottawa, KS 66067 and 3159 Neosho Rd., Ottawa, KS 66067 (the "Franklin County real property").*

4      *The legal descriptions of the real property are set forth as Exhibit A to the Franklin County*

5      *Mechanic's Lien filed by HDD as FR-2020-SL-000017, and incorporated herein as Exhibit 22.*

6      <u>Minnesota Limited's Answer</u>:  Minnesota Limited admits that HDD furnished work on the

7      Pipeline Project on certain real property in Franklin County, Kansas.  Minnesota Limited is without

8      knowledge sufficient to admit or deny the remainder of the allegations, so they are denied.

9      101.    *HDD's work furnished  for the Pipeline Project on the real property in Franklin*

10     *County is set out in detail and fully itemized showing the prices charged therefore and the amount*

11     *still due and owing, and are attached as Exhibit B and C to the Franklin County Mechanic's Lien*

12     *filed by HDD as FR-2020-SL-000017 ("Franklin  County Mechanic's Lien"), and incorporated*

13     *herein as Exhibit 23 and 24.*

14     <u>Minnesota Limited's Answer</u>:  Minnesota Limited admits that HDD furnished work for the

15     Pipeline Project on real property in Franklin County. Minnesota Limited denies the remainder of

16     the allegations in Paragraph 101.

17     102.    *In spite of HDD's demand for payment, MNLTD failed and refused to pay the now*

18     *outstanding balance of $3,013,544.22  for work done on the Franklin County real property.*

19     <u>Minnesota Limited's Answer</u>:  Minnesota Limited admits that it has not paid HDD all of

20     the amounts HDD has requested for its work in Franklin County.  Minnesota Limited denies the

21     remainder of the allegations in Paragraph 102.

1      103.   *On January 6, 2020, and within five months of the last date that HDD performed*

2 *work on the Project, HDD properly filed its mechanic's lien against the Franklin County real*

3 *property with the Clerk of the District Court of Franklin County, Kansas, which has been*

4 *designated Mechanic's Lien No. FR-2020-SL-000017. A true and accurate copy of HDD's*

5 *Franklin County Mechanic's Lien is attached to this Petition as Exhibit 25.*

6     Minnesota Limited's Answer:  Minnesota Limited admits that January 6, 2021 fell within

7 five months of the last date HDD performed work on the Pipeline Project. Minnesota Limited is

8 without knowledge sufficient to admit or deny the remainder of the allegations, which also contains

9 legal conclusions, so they are denied.

10      104.   *HDD fully complied with all statutory requirements under K.S.A. 60-1103, et. seq.*

11 *when it filed its lien.*

12     Minnesota Limited's Answer:  Minnesota Limited is without knowledge sufficient to admit

13 or deny the allegations of Paragraph 93, which are legal conclusions, and thus they are denied.

14      105.   *HDD sent a copy of the Franklin County Mechanic's Lien to MNLTD and Southern*

15 *Star via certified mail. Return receipts are attached as Exhibit 8 (MNLTD) and 9 (Southern Star).*

16     Minnesota Limited's Answer:  Minnesota Limited admits it received a copy of HDD's

17 mechanic's lien as shown by the return receipt. Minnesota Limited is without knowledge sufficient

18 to admit or deny the remainder of the allegations, so they are denied.

19      106.   *HDD notified the landowners of the Franklin County Mechanic's Lien via certified*

20 *mail. A copy of the return receipts are attached to this Petition as Exhibit 14 (Oswego Coal*

21 *Company, Inc.) and 15 (Black).*

1  <u>Minnesota Limited's Answer</u>:  Minnesota Limited is without knowledge sufficient to admit

2  or deny the allegations in Paragraph 106, so they are denied.

3  107.    *HDD Notified Farm Credit Services, FLCA d/b/a Frontier Farm Credit, FLCA, the*

4  *holders of a recorded interest in the Franklin County real property, of the Mechanic's Lien.   A*

5  *copy of the return receipts are attached to this Petition as Exhibit 26.*

6  <u>Minnesota Limited's Answer</u>:  Minnesota Limited is without knowledge sufficient to admit

7  or deny the allegations in Paragraph 107, so they are denied.

8  108.    *This lawsuit to enforce HDD's Franklin County Mechanic's Lien was filed less than*

9  *one year after the Franklin County Mechanic's Lien was filed.*

10  <u>Minnesota Limited's Answer</u>:   Minnesota Limited admits that HDD filed this lawsuit

11  within one year of January 6, 2021.  Minnesota Limited is without knowledge sufficient to admit

12  or deny the remainder of the allegations in Paragraph 108, so they are denied.

13  109.    *The amounts claimed and prices stated in HDD's Franklin County Mechanic's Lien*

14  *are the fair and reasonable value of the labor and materials HDD supplied or performed to*

15  *improve the Pipeline Project as itemized and set for in HDD's Mechanic's Lien.*

16  <u>Minnesota Limited's Answer</u>:  Minnesota Limited denies the allegations in Paragraph 109.

17  110.    *All of the work described in HDD's Mechanic's Lien was incorporated into and*

18  *directly benefitted and improved the Pipeline Project located on the Franklin County Real*

19  *Property.*

20  <u>Minnesota Limited's Answer</u>:  Minnesota Limited denies the allegations in Paragraph 110.

21  111.    *At the time it was filed, the Franklin County Mechanic's Lien was a true and*

22  *accurate account of HDD's work and demand of MNLTD for the work performed on the Franklin*

1  *County real property, allowing a credit for all valid setoffs and itemizing the labor and materials*

2  *supplied by HDD for the Project.*

3  Minnesota Limited's Answer: Minnesota Limited denies the allegations in Paragraph 111.

4  112.  *HDD has performed and complied with all conditions precedent to the creation and*

5  *enforcement of its mechanic's lien, including service of its Franklin County Mechanic's Lien on*

6  *MNLTD and Southern Star.*

7  Minnesota Limited's Answer: Minnesota Limited is without knowledge sufficient to admit

8  or deny the allegations of Paragraph 112, which are legal conclusions, and thus they are denied.

9  113.  *HDD's Lien on the Franklin County real property, being properly perfected under*

10  *Kansas law, entitles HDD to foreclose said Franklin County real property interests, buildings,*

11  *erections, improvements and plants erected or constructed, and all materials, fixtures, machinery*

12  *and other personal property furnished, placed or installed on the Franklin County real property*

13  *which is held for the debt contracted, the proceeds of which shall be used to satisfy the*

14  *encumbrances on said Franklin County real property in the priority established by this Court.*

15  Minnesota Limited's Answer: Minnesota Limited denies the allegations in Paragraph 113.

16  114.  *HDD satisfied all conditions precedent under Kansas' Mechanic's Lien statutes for*

17  *filing and perfecting the Franklin County Mechanic's Lien.*

18  Minnesota Limited's Answer: Minnesota Limited is without knowledge sufficient to admit

19  or deny the allegations of Paragraph 114, which are legal conclusions, and thus they are denied.

20  115.  *All of the Work described in HDD's Franklin County Mechanic's Lien was*

21  *furnished to MNLTD on the faith and credit of HDD's lien rights against the Franklin County real*

22  *property.*

1      <u>Minnesota Limited's Answer</u>:  Minnesota Limited denies the allegations in Paragraph 115.

2      116.    *All of the Work described in HDD's lien directly benefitted and improved the*

3 *Pipeline Project located on the Franklin County real property.*

4      <u>Minnesota Limited's Answer</u>:  Minnesota Limited denies the allegations in Paragraph 116.

5      117.    *MNLTD was obligated, but failed to pay HDD for the work furnished to improve*

6 *the Pipeline Project located on the Franklin County real property,*

7      <u>Minnesota Limited's Answer</u>:  Minnesota Limited admits that it has not paid HDD all of

8 the amounts HDD requested for work in Franklin County, but denies the remainder of the

9 allegations in Paragraph 117.

10      WHEREFORE, Defendant MINNESOTA LIMITED, LLC, through its lawyers William

11 C. Walker, Attorney at Law, and Derek S. Casey of TRIPLETT WOOLF GARRETSON, LLC,

12 demands JUDGMENT denying Plaintiff's Petition, dismissing Plaintiff's claims with prejudice,

13 and granting Defendant recovery of its attorneys' fees, expenses, and costs, insofar as allowed by

14 law, with such other and further relief as the Court deems just and equitable.

15 <div align="center">**<u>PLAINTIFF'S AFFIRMATIVE DEFENSES</u>**</div>

16      Without making any admission that it bears the burden of proof on the items listed below,

17 Defendant MINNESOTA LIMITED, LLC, through its lawyers William C. Walker, Attorney at

18 Law, and Derek S. Casey of TRIPLETT WOOLF GARRETSON, LLC, states the following

19 defenses to the allegations and claims stated in Plaintiff THE HDD COMPANY, INC.'s Petition:

20      1.    Plaintiff's Petition fails to state a claim for which relief may be granted under the

21 Subcontract Agreement or applicable law.

1        2.      HDD's claims are barred in whole or in part by the terms of the Subcontract

2 Agreement.

3        3.      Prior material breach of the Subcontract Agreement.

4        4.      Assumption of risk.

5        5.      Comparative fault.

6        6.      Estoppel.

7        7.      Payment.

8        8.      Setoff.

9        9.      Statute of limitations.

10       10.      Waiver.

11       WHEREFORE, Defendant MINNESOTA LIMITED, LLC, through its lawyers William

12 C. Walker, Attorney at Law, and Derek S. Casey of TRIPLETT WOOLF GARRETSON, LLC,

13 demands JUDGMENT against Plaintiff THE HDD COMPANY, Inc. denying Plaintiff's Petition,

14 dismissing Plaintiff's claims with prejudice, and granting Defendant recovery of its attorneys' fees,

15 expenses, and costs, insofar as allowed by law, with such other and further relief as the Court

16 deems just and equitable.

17      **DEFENDANT MINNESOTA LIMITED, LLC'S COUNTERCLAIM AGAINST**
18                 **PLAINTIFF THE HDD COMPANY, INC.**

19       Defendant MINNESOTA LIMITED, LLC, through its lawyers William C. Walker,

20 Attorney at Law, and Derek S. Casey of TRIPLETT WOOLF GARRETSON, LLC, counterclaims

21 against Plaintiff THE HDD COMPANY, INC., for damages, indemnification, and other remedies

22 for Plaintiff's breaches of contract in an amount in excess of $75,000. In support of its

23 counterclaim, Defendant Minnesota Limited states:

# NATURE OF THE ACTION

1.      This breach of contract and indemnification counterclaim arises from Minnesota Limited, LLC's ("Minnesota Limited") construction of ~31.5 miles of natural gas pipeline (the "Project") for Southern Star Central Gas Pipeline, Inc. ("Southern Star") in Franklin and Anderson counties, Kansas.

2.      The HDD Company, Inc. ("HDD") was a subcontractor of Minnesota Limited that was contracted with to provide horizontal directional drilling, boring, other construction services, and materials for Minnesota Limited and Southern Star Central Gas Pipeline, Inc. on the Project.

3.      HDD breached its agreement with Minnesota Limited by, among other things, causing lengthy delays, refusing to mobilize its drilling rigs as agreed, and damaging pipe during repeated failed installations.  As a result, HDD caused Minnesota Limited to incur millions of dollars in damages for which HDD is responsible for paying.

4.      Accordingly, in September 2020, Minnesota Limited requested in writing that HDD pay $10,366,233.99 for the costs that HDD caused Minnesota Limited to incur and HDD is obligated to pay.

5.      To date, HDD has not paid any of the millions of dollars it owes to Minnesota Limited.  As a result, Minnesota Limited now counterclaims for the over $10,000,000 that HDD owes for breach of contract and indemnification.

# PARTIES

6.      Minnesota Limited is a pipeline transmission contractor that has successfully constructed natural gas, crude oil, refined products, and hydrocarbon pipelines and facilities throughout the United States.  Minnesota Limited is a limited liability company formed under the

1  laws of the State of Minnesota, with its principal place of business located at 18640 200th Street,

2  Big Lake, MN 55309.

3        7.     Upon information and belief, the HDD Company, Inc. is an Oregon Corporation

4  authorized to do business in the state of Kansas, with its principal place of business in Oregon or

5  California.  According to its Petition, HDD Company provides services across the nation.

6  **FACTUAL BACKGROUND**

7        8.     On or about September 17, 2019, Minnesota Limited and Southern Star entered into

8  a written contract (Contract Number 2019-2009, hereafter the "September 17, 2019 contract")

9  wherein Minnesota Limited agreed to provide certain construction services and materials for

10  Southern Star on the Project.

11        9.     Minnesota Limited did in fact provide construction services and materials for

12  Southern Star on the Project across 2020 and into 2021.

13        10.    As part of the September 17, 2019 contract, Minnesota Limited agreed to provide

14  Southern Star certain horizontal directional drilling, boring, materials, and related services on the

15  Project.

16        11.    HDD provided bids to Minnesota Limited to provide horizontal directional drilling,

17  boring, other construction services, and materials on the Project.

18        12.    On or about January 17, 2020, Minnesota Limited and HDD signed Subcontractor

19  Agreement No. SR1916169002 (the "Subcontractor Agreement") by which HDD agreed to

20  provide horizontal directional drilling, boring, other construction services, and materials on the

21  Project for the "full compensation" of $6,185,936.00, subject to the terms and conditions in the

22  Subcontractor Agreement.

1    13.    HDD's January 9, 2020 and January 17, 2020 bid quotes were attached to the

2    Subcontractor Agreement that Minnesota Limited and HDD signed.  However, the Subcontractor

3    Agreement also stated that:

4        Any terms and conditions proposed in Subcontractor's acceptance of or in any
5        acknowledgment, invoice, or other form of Subcontractor that add to, vary from, or
6        conflict with these terms are hereby objected to.  Any such proposed terms shall be
7        void and these terms and conditions (1) shall constitute the complete and exclusive
8        statement of the terms and conditions of the contract between the parties, and (2)
9        may be modified only by written instrument executed by the authorized
10       representative of both parties.

11    14.    HDD agreed that "[a]ll Work will be done on a timely basis[,]" and that "[t]ime is

12    of the essence."

13    15.    In addition, HDD agreed that "Subcontractor, not Contractor, assumes all the risk

14    related to in performing its work under this Agreement[.]"

15    16.    Further, HDD agreed that (1) "all work will be of good quality, free from faults and

16    defects and in conformance with any Purchase Order and attachments thereto, including any

17    specifications therein[;]" and (2) "All Work not so conforming to these standards may be

18    considered defective, and the Subcontractor shall promptly repair and make good, after notice by

19    the Contractor and Owner and without cost to the Contractor and Owner, any damages, defects or

20    faults resulting from imperfect or defective Work done or materials furnished by the

21    Subcontractor."

22    17.    After HDD and Minnesota Limited signed the Subcontractor Agreement, HDD

23    performed horizontal directional drilling, boring, and other related services on the Project.

24    18.    Horizontal directional drilling is labor and equipment intensive.

19.     Horizontal directional drilling is done according to a strict schedule, to permit the crews and equipment performing that work and installing the pipe to proceed in a timely and efficient fashion along the right of way.  When such work is delayed, Minnesota Limited incurs significant costs.

20.     HDD failed to follow the agreed schedule for its drilling, causing delays of over two months on its work on the Project.

21.     After HDD fell behind schedule, it provided a recovery schedule to Minnesota Limited.  HDD also failed to meet its recovery schedule.

22.     Through HDD's fault and delays, Minnesota Limited incurred additional costs for which HDD is obligated to pay.  Such additional costs include additional mat rental costs, additional support costs, and additional material costs.

23.     HDD was to perform horizontal directional drills at three sites according to an agreed schedule.

24.     The three sites for HDD's horizontal directional drilling were Cedar Creek, Pottawatomie Creek, and Flint Hill.

25.     According to HDD's agreed schedule, HDD was to move its drilling rig from the Cedar Creek drilling site upon completion to the Pottawatomie Creek drilling site.

26.     HDD refused to move the drilling rig to Pottawatomie Creek upon completion of the Cedar Creek drill as agreed, which caused Minnesota Limited to incur additional costs for which HDD is obligated to pay.

27. After HDD refused to move the drilling rig to Pottawatomie Creek per the schedule, it agreed to keep the rig on site in the event that the drilling rig in use at the Flint Hill drilling site could not be moved to Pottawatomie Creek.

28. After HDD failed its first drill at Flint Hill, Minnesota Limited asked HDD to honor its agreement to move the drilling rig to Pottawatomie Creek. HDD refused, which caused Minnesota Limited to incur additional costs for which HDD is obligated to pay.

29. At the Flint Hill drilling site, HDD repeatedly failed the horizontal drill. HDD's multiple failed attempts at this drill caused additional work, delays, costs, and damage to the pipe. Minnesota Limited incurred costs for HDD's failed drills for which HDD is obligated to pay.

30. HDD also performed road bores which took over 90 days longer than HDD's agreed schedule. Minnesota Limited incurred additional costs as a result for which HDD is obligated to pay.

31. In the Subcontractor Agreement, HDD agreed that "it is a condition precedent to payment that if Owner withholds payments for that portion of any work performed by Subcontractor, then Minnesota Limited is only obligated to pay Subcontractor after receiving payment from the Owner."

32. Southern Star has not paid Minnesota Limited all of the amounts Southern Star owes for Minnesota Limited's work and costs for the Project.

33. Southern Star is withholding payment to Minnesota Limited for work HDD performed.

34. Accordingly, pursuant to the Subcontractor Agreement, Minnesota Limited is withholding such payments from HDD.

## COUNT I – Breach of Contract

Defendant MINNESOTA LIMITED, LLC, by and through its Counsel, William C. Walker Attorney-at-Law, and Derek S. Casey of TRIPLETT WOOLF GARRETSON, LLC, restates each of the paragraphs 1 through 34 above as though fully set forth herein and further states:

35.     Minnesota Limited entered into a binding and enforceable contract with HDD. Minnesota Limited performed its obligations as agreed with HDD.

36.     HDD breached its agreement with Minnesota Limited by failing to pay Minnesota Limited the amounts due from HDD pursuant to their agreement.

37.     Due to HDD's breaches of the agreement, Minnesota Limited has been harmed and has suffered damages in the amount of at least $10,366,223.99.

38.     In addition, HDD agreed in the Subcontractor Agreement that Minnesota Limited "reserves the right to withhold such sums as may be necessary to pay expenses, including costs and attorney's fees, caused by, or related to, Subcontractor's breach of Agreement."

39.     Minnesota Limited is withholding sums necessary to pay expenses, including costs and attorney's fees, caused by, or related to HDD's breach of the Subcontractor Agreement.

40.     Given HDD's breaches of the Subcontractor Agreement, Minnesota Limited is entitled to the sums necessary to pay expenses, including costs and attorney's fees, caused by or related to HDD's breaches of the Subcontractor Agreement.

41.     HDD has committed breaches of contract, as illustrated above and to be proven at trial.

42.     Minnesota Limited is damaged and will continue to be damaged by HDD's breaches.

WHEREFORE, Defendant MINNESOTA LIMITED, LLC, by and through its Counsel, William C. Walker, Attorney-at-Law, and Derek S. Casey of TRIPLETT WOOLF GARRETSON, LLC, demands JUDGMENT against Plaintiff THE HDD COMPANY, INC. for (A) damages in an amount in excess of $75,000.00 to remedy Plaintiff's breaches of contract; (B) pre-judgment and post-judgment interest; and (C) recovery of its costs, expenses, and attorneys' fees insofar as allowed by law, with such other and further relief as the Court deems just, proper, and equitable.

## COUNT II – Indemnification

Defendant MINNESOTA LIMITED, LLC, by and through its Counsel, William C. Walker Attorney-at-Law, and Derek S. Casey of TRIPLETT WOOLF GARRETSON, LLC, restates each of the paragraphs 1 through 42 above as though fully set forth herein and further states:

43.　　In the Subcontractor Agreement, HDD entered into a valid and enforceable indemnification agreement with Minnesota Limited.

44.　　The Subcontractor Agreement provides that HDD "shall indemnify, defend and hold harmless Contractor as set forth in Section VII." Section VII provides that:

> To the fullest extent permitted by law, the Subcontractor shall indemnify the Owner, Contractor, and the agents and employees of any of them from and against claims, damages, losses and expenses, arising out of or in connection with, or resulting from the negligent performance of the Subcontractors work, the Subcontractor's subcontractors work, or anyone directly or indirectly employed by them but only to the extent caused by acts or omissions by either or any of them. In addition thereto, Subcontractor indemnifies Owner, Contractor and the agents and employees of any of them for expenses including attorney's fees and costs, incurred in responding to and defending against any claim or in enforcing this provision.

45.　　Minnesota Limited has performed the Subcontractor Agreement as set out therein.

46.　　As illustrated above and to be proven at trial, HDD has breached the Subcontractor Agreement.

1  47.   Minnesota Limited faces claims, damages, losses, and expenses caused by HDD's

2  negligent performance of its work.

3  48.   Minnesota Limited has incurred expenses, including attorney's fees and costs, in

4  responding to claims and enforcing the indemnification provision in the Subcontractor Agreement.

5  49.   Accordingly, Minnesota Limited is entitled to indemnification by HDD for claims,

6  damages, losses, expenses, attorneys' fees, and costs as set forth in the Subcontractor Agreement.

7  WHEREFORE, Defendant MINNESOTA LIMITED, LLC, by and through its Counsel,

8  William C. Walker, Attorney-at-Law, and Derek S. Casey of TRIPLETT WOOLF GARRETSON,

9  LLC, demands JUDGMENT against Plaintiff THE HDD COMPANY, INC. for (A)

10  indemnification in an amount in excess of $75,000.00 pursuant to the Subcontractor Agreement;

11  (B) pre-judgment and post-judgment interest; and (C) recovery of its costs, expenses, and

12  attorneys' fees insofar as allowed by law, with such other and further relief as the Court deems

13  just, proper, and equitable.

14  **DEFENDANT MINNESOTA LIMITED, LLC'S CROSS CLAIM AGAINST**
15  **DEFENDANT SOUTHERN STAR CENTRAL GAS PIPELINE, INC.**

16  Defendant MINNESOTA LIMITED, LLC, through its lawyers William C. Walker,

17  Attorney at Law, and Derek S. Casey of TRIPLETT WOOLF GARRETSON, LLC, cross claims

18  against Defendant SOUTHERN STAR CENTRAL GAS PIPELINE, INC., for JUDGMENT for

19  damages, equitable relief, lien foreclosure, and other remedies for Defendant's breaches of contract

20  or, in the alternative, unjust enrichment and promissory estoppel, and otherwise Plaintiff's

21  detrimental reliance regarding the same.   In support of its cross claims, Defendant Minnesota

22  Limited, LLC, states:

# **NATURE OF THE ACTION**

1.   This breach of contract, unjust enrichment, and promissory estoppel/detrimental reliance cross claim arises from Minnesota Limited's construction of ~31.5 miles of natural gas pipeline for Southern Star in Franklin and Anderson counties in 2020 and early 2021.

2.   Minnesota Limited performed millions of dollars of pipeline construction services for Southern Star which remain unpaid.  Although Southern Star agreed to pay for and accepted this work, Southern Star has refused Minnesota Limited's written, detailed requests for payment.

3.   Accordingly, Minnesota Limited is forced to file this suit to recover the millions of dollars owed by Southern Star under their agreements, unjust enrichment, promissory estoppel, detrimental reliance, or as otherwise provided by law.

# **PARTIES**

4.   Minnesota Limited is a pipeline transmission contractor that has successfully constructed natural gas, crude oil, refined products, and hydrocarbon pipelines and facilities throughout the United States.  Minnesota Limited is a limited liability company formed under the laws of the State of Minnesota, with its principal place of business located at 18640 200th Street, Big Lake, MN 55309.

5.   Southern Star is a large natural gas pipeline company with a transmission system spanning 5,800 miles across the Midwest and Mid-Continent regions of the United States. Southern Star is a corporation formed under the laws of the State of Delaware, with its principal place of business located at 4700 Highway 56, Owensboro, Kentucky 42301.

**FACTUAL BACKGROUND**

6.    On or about September 17, 2019, Minnesota Limited entered into a written contract (Contract Number 2019-2009, hereafter the "September 17, 2019 contract") with Southern Star wherein Minnesota Limited agreed to provide construction services to install approximately 31.5 miles of pipeline in Anderson and Franklin Counties, Kansas.  In exchange, Southern Star agreed to pay the lump-sum amount of $50,889,992.00 for the work expressly specified as part of that lump-sum price.  In addition, Southern Star also agreed to pay variable amounts to Minnesota Limited for work, risks, and costs beyond the scope of the lump-sum price.  This construction project was scheduled to run from approximately February 2020 to December 2020.

7.    The September 17, 2019 contract had eight sections: Section I (General Contract), Section II (Scope of Work), Section III (Materials), Section IV (Environmental, Land and Permits), Section V (Drawings), Section VI (Specifications), Section VII (Technical Exhibits), Section VIII (Proposal and Compensation). These sections are primarily form documents drafted by Southern Star.  Section VIII (Proposal and Compensation) also included correspondence between the Parties that among other things, clarified the scope of work for the lump-sum price, allocated risks and costs, and included a Schedule of Unit Prices for lump-sum and non-lump-sum work and costs.

8.    The September 17, 2019 contract required Southern Star pay variable amounts for work and costs beyond the scope of the lump-sum price.  For example, the "Clarifications" section of the contract provides that "[a]nything over 70,000 LF of rock would be charged at the rate included in Section Capital A Item 3(c)2" of the Schedule of Unit Prices.  By further example, the Schedule of Unit Prices ("Section A") excluded many items of work from the lump-sum price, *e.g.*, "Trench in solid rock by blasting as described in the Specifications."

9.    The September 17, 2019 contract also provided that Southern Star would pay Minnesota Limited amounts beyond the lump-sum price for *inter alia* other or changed work directed by Southern Star, as well as additional costs associated with or caused by Southern Star.

10.    In addition, the Parties made other arrangements for payment for Minnesota Limited's work, including but not limited to (a) an amendment in the form of a signed writing for Southern Star to pay Minnesota Limited $1,500,000 for certain work and costs  (Change Order 20); and (b) a promise by Southern Star to make up the balance that Southern Star reduced from Change Order 20 – roughly $2,500,000 – by awarding Minnesota Limited other projects in 2021 and paying that balance as part of those other projects..

11.    In particular, after the Change Order 20 Effective Date of July 10, 2020, Southern Star indicated that – to avoid exceeding its operating budget – it needed to arrange to make payments owed on this project in 2021 and/or via other projects.  This is just one example of Southern Star deviating from the terms of the September 17, 2019 contract.

12.    Minnesota Limited ultimately performed work and incurred additional costs beyond the scope of the lump-sum price for which Southern Star is obligated to pay, but has not paid.  Southern Star directed Minnesota Limited – in writing and orally – to perform work beyond the lump-sum price.   In fact, Southern Star often directed Minnesota Limited to perform work outside of the scope of the lump-sum price immediately or with an exigent deadline, while promising Minnesota Limited that Southern Star would handle the payment for that work later.

13.    Minnesota Limited incurred additional costs associated with or caused by Southern Star.

1    14.    Minnesota Limited's unpaid work and costs sought in this lawsuit arise from *inter*

2    *alia* Southern Star's: (i) failure to provide sufficient water for hydrotesting, (ii) pipe and fitting

3    problems; (iii) impeding Minnesota Limited's performance; (iv) changed site conditions, (v)

4    failure to timely secure and release a necessary FERC land blasting permit, (vi) trenchless piping

5    problems, and (vii) promise to pay Minnesota Limited at least $2,500,000 in 2021.

6    15.    The payments Minnesota Limited seeks are not foreclosed by Change Order 20.

7    16.    Minnesota Limited timely provided Southern Star with detailed, written requests

8    for payment specifying the work, costs, and payments sought, but Southern Star has not paid them.

9    17.    In a November 20, 2020 letter, Southern Star promised that it would "provide a

10   formal response" to each one of Minnesota Limited written requests. Yet over four months have

11   now passed and Southern Star has failed to provide any of its promised "formal response[s]."

12   18.    The September 17, 2019 contract provides that the Parties "shall give good faith

13   consideration to using alternative dispute resolution prior to or in lieu of litigation to resolve

14   disputes arising under or in connection with this Contract."

15   19.    Accordingly, Minnesota Limited has communicated with and met with Southern

16   Star over the past five months in a good faith effort to resolve this dispute in lieu of litigation.

17   20.    Since Southern Star has refused to pay or resolve this dispute in lieu of litigation, it

18   has forced to Minnesota Limited to: (a) timely file liens on Southern Star's pipeline and easements

19   in Franklin and Anderson counties in order to protect Minnesota Limited's claims for unpaid work

20   and costs; and (b) file this lawsuit to recover unpaid work and costs.

1          **Southern Star's Failure to Provide Sufficient Water for Hydrotesting**

2          21.    Pursuant to the September 17, 2019 contract, Minnesota Limited agreed to perform

3   hydrostatic testing using water from the Ottawa Compressor Station Pond.

4          22.    However, the Ottawa Compressor Station Pond actually lacked sufficient water for

5   testing, so Southern Star directed Minnesota Limited to use water from a nearby fire hydrant.

6          23.    The water from the fire hydrant flowed at a slower rate than the pond water.

7          24.    Southern Star's failure to provide sufficient water for hydrotesting caused

8   Minnesota Limited to spend six additional days preparing the pipes for hydrotesting; incur

9   additional costs for hauling the water from the source to the test site; and to incur six days of

10  additional labor costs.

11         25.    Minnesota Limited has incurred at least $294,900.00 in costs arising from Southern

12  Star's failure to provide sufficient water for hydrotesting from the pond and its directive to use

13  water from the fire hydrant.

14         26.    Southern Star agreed to pay this $294,900.00, as requested by Minnesota Limited

15  in writing on September 30, 2020.  However, Southern Star still has not made even this relatively

16  small payment.

17         **Southern Star's Pipe and Fitting Problems**

18         27.    Southern Star's specifications required Minnesota Limited to install a form of pipe

19  known as "light wall" pipe.

20         28.    Minnesota Limited advised Southern Star that light wall pipe was unsuitable for the

21  pipeline route at depths of roughly ten feet or more.

29. Despite these improper conditions, Southern Star directed Minnesota Limited to install the light wall pipe anyway.

30. Southern Star also provided Minnesota Limited with pipe that was improperly handled and stacked. Improper handling and stacking of pipe weaken its structural integrity.

31. Following installation, the Parties discovered that some sections of the buried light wall pipe contained anomalies, including large dents.

32. Southern Star directed Minnesota Limited to conduct 20 "anomaly digs" to address these light wall pipe anomalies, which were caused by Southern Star's improper instructions and improper handling and stacking of the pipe.

33. Minnesota Limited also incurred additional costs due to safety issues and delays caused by leaking valves – unrelated to Minnesota Limited – at Southern Star's Welda Station.

34. Minnesota Limited has incurred at least $908,289.46 in additional costs associated with these anomaly digs and leaky valves for which Southern Star is responsible.

**Southern Star Impeded Minnesota Limited's Work**

35. Throughout the project, Southern Star's uncooperative and combative field staff and management prevented Minnesota Limited from timely performing and forced Minnesota Limited to perform additional work and incur additional costs.

36. For example, in March and April 2020, Southern Star insisted that Minnesota Limited be ready to unload pipe shipments on site even though that pipe had not even arrived at the port hundreds of miles down river. Later, Southern Star knew the pipe was still stuck on barges due to river flooding, yet berated Minnesota Limited about onboarding its pipe team, though no pipe work could be done. The pipes ultimately arrived weeks after Southern Star said they would.

37.     Further, Southern Star's inspectors regularly stopped work for arbitrary and unexplained reasons, and took control of Minnesota Limited's personnel on site. As one example, Southern Star's inspectors moved Minnesota Limited's safety spotters into the line of fire coming from heavy wood-cutting machinery, with no regard for their safety. Thankfully, no one was seriously injured.

38.     Likewise, when Minnesota Limited would try to collaboratively raise safety concerns with Southern Star, these efforts would be ignored, rebuffed or worse. For instance, when Minnesota Limited went to one of Southern Star's lead inspectors to discuss a serious safety incident, that inspector first stormed off and later declared that he had come close "to hitting somebody" over Minnesota Limited's safety concerns.

39.     As another example, in August 2020, Southern Star shut down Minnesota Limited's backfill crew, claiming it was too wet to work. When Minnesota Limited asked for the contract source for stopping its work, Southern Star could not identify one and responded that "If you don't like [the order] you can call [Southern Star's Kentucky headquarters] and get it changed."

40.     Southern Star leadership also publicly threatened a Minnesota Limited project manager that he could "run off any mother **** on this job, including you."

41.     Other examples of such conduct by Southern Star include its (i) unexpected changes in the project scope, (ii) shuffling of personnel on and off the project, (iii) baseless decisions to halt construction even when it was being performed in accordance with the contract, and (iv) unjustified demand that Minnesota Limited terminate one of its employees.

42.     In sum, Southern Star's improper conduct caused Minnesota Limited to incur at least $3,353,647.44 in additional costs.

**Changed Site Conditions**

43.     Portions of the project contained significantly more and much harder rock than the Parties contemplated by the terms of the September 17, 2019 contract.

44.     The rock's increased and unexpected quantity and hardness caused Minnesota Limited to incur additional costs.

45.     The rock's increased quantity and hardness also required the Parties to extend the project schedule, which also caused Minnesota Limited to incur additional costs and additional, unexpected weather delays.

46.     Minnesota Limited incurred at least $11,620,515.37 in additional costs arising from the changed site conditions.

**Southern Star's Failure to Timely Provide a Permit for Land Blasting**

47.     The September 17, 2019 contract contemplated that Minnesota Limited would remove rock from the ditch line (where the pipe would eventually lay) by *inter alia* land blasting.

48.     Minnesota Limited first sought to remove rock via mechanical means, but that proved unsuccessful.

49.     Minnesota Limited repeatedly requested to switch to blasting, but Southern Star refused.    Instead, Southern Star directed Minnesota Limited to continue the unsuccessful mechanical removal.

50.     Despite Minnesota Limited's requests for blasting, Southern Star delayed seeking a blasting permit from the Federal Energy Regulatory Commission ("FERC").

1    51.    After repeated delays, Southern Star finally did seek a blasting permit. But it

2    submitted an insufficient application and had to draft and submit a follow-on variance.  This only

3    caused further delays.

4    52.    While failing to timely secure the permit, Southern Star directed Minnesota Limited

5    to keep crews on site at substantial, additional cost even though no blasting and little mechanical

6    rock removal could be achieved.

7    53.    When Southern Star finally received the blasting permit, it failed to promptly

8    inform Minnesota Limited, causing Minnesota Limited to continue incurring additional and

9    unnecessary costs.

10    54.    Southern Star's delayed authorization of blasting, its delays in handling the blasting

11    permit, and its insistence on unsuccessful mechanical rock removal caused Minnesota Limited to

12    incur $8,586,864.00 of additional costs.

13    **Southern Star's Trenchless Piping Problems**

14    55.    Southern Star designed a pipe for Minnesota Limited to install via trenchless,

15    horizontal drilling near Princeton, Kansas. Southern Star also designed and specified the method

16    of installation, the entry and exit points, and the diameter of the borehole for this pipe installation.

17    56.    Minnesota Limited and its subcontractor relied on Southern Star's designs and

18    specifications to submit their drilling plan, which Minnesota Limited approved.

19    57.    Unfortunately, Southern Star's design and specifications were incorrect and caused

20    significant damage to the pipe, as well as delays, additional work, and additional costs for

21    Minnesota Limited and its subcontractor.

1    58.    Southern Star directed Minnesota Limited and the subcontractor to conduct

2    additional drilling to mitigate the resulting pipe damage.

3    59.    Southern Star directed Minnesota Limited and the subcontractor to extract the

4    damaged pipe, repair it, install additional protection, and reinstall the pipe.

5    60.    Southern Star's incorrect design and specifications as well as its directions extended

6    the project by 59 days.

7    61.    Minnesota Limited has incurred at least $5,079,959.87 in additional costs

8    associated with the additional drilling, extracting the successfully installed pipe, repairing the pipe

9    after extraction, re-hydrotesting, adding protective measures, and re-installing the pipe.

10    **COUNT I - Breach of Contract**

11    MINNESOTA LIMITED, LLC, by and through its Counsel, William C. Walker Attorney

12    at Law, and Derek S. Casey of TRIPLETT WOOLF GARRETSON, LLC, restates each allegation

13    of paragraphs 1 through 61 above as though fully set forth herein and further states:

14    62.    Minnesota Limited entered into a binding and enforceable contract with Southern

15    Star by which Southern Star agreed to pay Minnesota Limited for certain work and costs within

16    the scope of the lump-sum price.  Southern Star also agreed that it would pay Minnesota Limited

17    for other work and costs beyond the scope of the lump-sum price.

18    63.    Minnesota Limited fully performed its obligations as agreed with Southern Star,

19    achieving substantial completion in November 2020.

20    64.    Southern Star has failed to pay Minnesota Limited as agreed for work and costs

21    outside the scope of the lump-sum price from Southern Star's (i) failure to provide sufficient water

22    for hydrotesting, (ii) pipe and fitting problems; (iii) impeding Minnesota Limited's performance;

1    (iv) changed site conditions, (v) failure to timely secure and release necessary FERC land blasting

2    permit, and (vi) trenchless piping problems.

3            65.    Southern Star has also failed to pay Minnesota Limited all outstanding amounts due

4    on the lump-sum price.

5            66.    In addition, Southern Star breached the implied covenants of good faith and fair

6    dealing, such as by impeding Minnesota Limited's timely performance.

7            67.    Moreover, Southern Star has not paid all of the retainage amounts outstanding on

8    the September 17, 2019 contract in violation of K.S.A. 16-1804 entitling Minnesota Limited to

9    recovery interest at 18.0% and its costs, expenses, and attorneys' fees incurred to prosecute this

10   action.

11           68.    Southern Star has committed breaches of contract, as illustrated above and to be

12   proven at trial.

13           69.    Minnesota Limited is damaged and will continue to be damaged by Southern Star's

14   breaches.

15           WHEREFORE, Defendant MINNESOTA LIMITED, LLC, by and through its Counsel,

16   William C. Walker, Attorney at Law, and Derek S. Casey of TRIPLETT WOOLF GARRETSON,

17   LLC, demands JUDGMENT against Defendant SOUTHERN STAR CENTRAL GAS PIPELINE,

18   INC. for (A) damages in an amount in excess of $75,000.00 to remedy Defendants' breaches of

19   contract; (B) pre-judgment and post-judgment interest; (C) recovery of its costs, expenses, and

20   attorneys' fees incurred to prosecute this action insofar as allowed by law; and (D) foreclosure of

21   Minnesota Limited's liens in Franklin County and Anderson County, Kansas, with such other and

22   further relief at the Court deems just, proper, and equitable.

## COUNT II - Unjust Enrichment

MINNESOTA LIMITED, LLC, by and through its Counsel, William C. Walker Attorney-at-Law, and Derek S. Casey of TRIPLETT WOOLF GARRETSON, LLC, restates each allegation of paragraphs 1 through 69 above as though fully set forth herein and further states:

70.     To the extent that no binding contract governs, Southern Star has been unjustly enriched by accepting Minnesota Limited's work arising from Southern Star's: (i) failure to provide sufficient water for hydrotesting, (ii) pipe and fitting problems; (iii) impeding Minnesota Limited's performance; (iv) changed site conditions, (v) failure to timely secure and release necessary FERC land blasting permit, (vi) trenchless piping problems, and (vii) promise to pay Minnesota Limited at least $2,500,000 in 2021.

71.     Southern Star directed Minnesota Limited to perform the work sought herein and Minnesota limited relied on Southern Star's direction in performing that work.

72.     Specifically, Minnesota Limited provided Southern Star with services valued at millions of dollars for the work on this pipeline project.

73.     Minnesota Limited's provision of these services was not conferred officiously, gratuitously, or for any purpose other than in exchange for financial compensation.

74.     Minnesota Limited thus conferred a benefit on Southern Star.

75.     Southern Star had knowledge of and appreciated the benefit it received from Minnesota Limited.

76.     Under the circumstances of Southern Star's acceptance or retention of the benefits Minnesota Limited conferred, it would be inequitable and unjust for Southern Star to retain the benefit without payment of its value.

1    77.    Southern Star thus has money in its hands that, in equity and good conscience, it

2    ought not be allowed to retain.

3    78.    Minnesota Limited is entitled to recover the value of its services performed for

4    Southern Star in an amount to be proven at trial.

5    79.    Minnesota Limited has been and continues to be harmed by Southern Star's

6    conduct.

7    WHEREFORE, Defendant MINNESOTA LIMITED, LLC, by and through its Counsel,

8    William C. Walker, Attorney-at-Law, and Derek S. Casey of TRIPLETT WOOLF GARRETSON,

9    LLC, demands JUDGMENT against Defendant SOUTHERN STAR CENTRAL GAS PIPELINE,

10   INC. for (A) damages in an amount in excess of $75,000.00 to remedy Defendants' unjust

11   enrichment; (B) pre-judgment and post-judgment interest; (C) recovery of its costs, expenses, and

12   attorneys' fees incurred to prosecute this action insofar as allowed by law; and (D) foreclosure of

13   Minnesota Limited's liens in Franklin County and Anderson County, Kansas, with such other and

14   further relief at the Court deems just, proper, and equitable.

15                **COUNT III - Promissory Estoppel and Detrimental Reliance**

16   MINNESOTA LIMITED, LLC, by and through its Counsel, William C. Walker Attorney-

17   at-Law, and Derek S. Casey of TRIPLETT WOOLF GARRETSON, LLC, restates each allegation

18   of paragraphs 1 through 79 above as though fully set forth herein and further states:

19   80.    To the extent no binding contract controls, Minnesota Limited is entitled to recover

20   under the doctrine of promissory estoppel and detrimental reliance.

21   81.    Southern Star directed Minnesota Limited to perform work outside of the scope of

22   the September 17, 2019 contract's lump-sum price and promised to pay Minnesota Limited for

1    that work.  In addition, after the July 10, 2020 Effective Date of Change Order 20 and around the

2    time Change Order 20 was executed, Southern Star promised that it would pay Minnesota Limited

3    at least $2.5 million dollars in 2021 to make Minnesota Limited whole for the full payment amount

4    it had requested prior to executing Change Order 20.

5         82.    Southern Star reasonably expected Minnesota Limited to rely on its promises to

6    pay by among other things performing work directed by Southern Star and signing Change Order

7    20.

8         83.    Minnesota Limited did act in reliance on Southern Star's promises to pay and acted

9    reasonably in reliance on Southern Star's promises by among other things performing work

10   directed by Southern Star and signing Change Order 20.

11        84.    Refusal to enforce Southern Star's promises to pay Minnesota Limited for its work

12   would countenance a substantial injustice.

13        WHEREFORE, Defendant MINNESOTA LIMITED, LLC, by and through its Counsel,

14   William C. Walker, Attorney at Law, and Derek S. Casey of TRIPLETT WOOLF GARRETSON,

15   LLC, demands JUDGMENT against Defendant SOUTHERN STAR CENTRAL GAS PIPELINE,

16   INC. for (A) damages in an amount in excess of $75,000.00 to remedy Defendants' promissory

17   estoppel and otherwise Plaintiff's detrimental reliance regarding the same; (B) pre-judgment and

18   post-judgment interest; (C) recovery of its costs, expenses, and attorneys' fees incurred to

19   prosecute this action insofar as allowed by law; and (D) foreclosure of Minnesota Limited's liens

20   in Franklin County and Anderson County, Kansas, with such other and further relief at the Court

21   deems just, proper, and equitable.

**COUNT IV - Foreclosure of Pipeline and Mechanic's Liens**

MINNESOTA LIMITED, LLC, by and through its Counsel, William C. Walker Attorney-at-Law, and Derek S. Casey of TRIPLETT WOOLF GARRETSON, LLC, restates each allegation of paragraphs 1 through 84 above as though fully set forth herein and further states:

85.     Southern Star owns the following real property, pipeline, easement, and related facilities and fixtures located in Franklin County, Kanas:

The Southern Star Central Gas Pipeline, Inc.'s Ottawa Compressor Station located at 3243 Nebraska Road in Ottawa, Kansas, more particularly described as:

A tract of real property comprising approximately 56.2 acres in the Northwest Quarter (NW/4) of Section 32, Township 16 South, Range 20 East, beginning 1,307 feet east of the Northwest Corner of the Northwest Quarter (NW/4), thence South 2,301', thence West 596', thence South 41', thence West 710', thence North 1,750', thence East 348', thence North 617', thence Northeasterly 37', thence Southeasterly 452', thence East 436', thence North 502', thence East 309' to the Point of Beginning less the Right-of-Way and

A tract of real property comprising approximately 13.3 acres in the Southeast Quarter (SE/4) of the Northeast Quarter (NE/4) and the south 100 feet of the Northeast Quarter (NE/4) of the Northeast Quarter (NE/4) in Section 31, Township 16 South, Range 20 East, east of the Highway Right-of-Way less the right-of-way;

-and-

A 36" pipeline including all associated buildings, appurtenances, materials, supplies, fixtures, appliances, and easement from the Southern Star Central Gas Pipeline, Inc.'s Ottawa Compressor Station located at 3243 Nebraska Road in Ottawa, Kansas, south approximately 15.5 miles to the Anderson County line, on the following parcels of real property:

Sections 14, 11, and 2 in Township 19 South, Range 19 East of the 6th P.M. in Franklin County, Kansas, as shown in the excerpts from the Pipeline Corridor Survey attached as Exhibit A to Petition Exhibit 1 at Pages 1-4;

Sections 35, 26, 25, 24, 13, and 12 in Township 18 South, Range 19 East of the 6th P.M. in Franklin County, Kansas, as shown in the excerpts from the

Pipeline Corridor Survey attached as Exhibit A to Petition Exhibit 1 at Pages 1-8;

Sections 7 and 6 in Township 18 South, Range 20 East of the 6th P.M. in Franklin County, Kansas, as shown in the excerpts from the Pipeline Corridor Survey attached as Exhibit A to Petition Exhibit 1at Pages 8-9;

Sections 31, 30, 19, 18, 7, 8, and 5 in Township 17 South, Range 20 East of the 6th P.M. in Franklin County, Kansas, as shown in the excerpts from the Pipeline Corridor Survey attached as Exhibit A at Pages 9-14; and

Sections 32 and 34 in Township 16 South, Range 20 East of the 6th P.M. in Franklin County, Kansas, as shown in the excerpts from the Pipeline Corridor Survey attached as Exhibit A to Petition Exhibit 1 at Pages 14-15.

86.    Southern Star owns the following real property, pipeline, easement, and related facilities and fixtures located in Anderson County, Kansas:

The Southern Star Central Gas Pipeline, Inc.'s Welda Compressor Station located at 19209 SW Maryland Road in Welda, Kansas, more particularly described as:

A tract of real property comprising approximately 28.8 acres in Southeast Quarter (SE/4) of the Southeast Quarter (SE/4) EXCEPT for the Northeast Quarter (NE/4) of the Southeast Quarter (SE/4) of the Southeast Quarter (SE/4) and EXCEPT for the East 66' of the Northwest Quarter (NW/4) of the Southeast Quarter (SE/4) of the Southeast Quarter (SE/4) in Section 34, Township 21 South, Range 19 East of the 6th P.M. and

A tract of real property comprising approximately 3.5 acres in Section 34, Township 21 South, Range 19 East of the 6th P.M., described as beginning in the Northeast Corner of the Northwest Quarter (NW/4) of Section 34 thence South 753.2 feet to the Point of Beginning, thence South 233 feet, thence West 659.7 feet, thence North 233 feet, thence East 659.9 feet to the Point of Beginning EXCEPT for the roadway located at 19101 Southwest Maryland Road, Welda, Kansas 66091.

-and-

A 36" pipeline including all associated buildings, appurtenances, materials, supplies, fixtures, appliances, and easement from the Southern Star Central Gas Pipeline, Inc.'s Welda Compressor Station located at 19209 SW Maryland Road in Welda, Kansas, north approximately 16.0 miles to the Franklin County line, on the following parcels of real property:

Sections 34, 27, 22, 15, 10, and 3, located in Township 21 South, Range 19 East of the 6th P.M., in Anderson County, Kansas, as shown in the excerpts from the Pipeline Corridor Survey attached as Exhibit A to Petition Exhibit 2 at Pages 1-6;

Sections 34, 27, 22, 15, 10, and 3 located in Township 20 South, Range 19 East of the 6th P.M. in Anderson County, Kansas, as shown in the excerpts from the Pipeline Corridor Survey attached as Exhibit A to Petition Exhibit 2 at Pages 6-11; and

Sections 34, 35, 26, and 23 in Township 19 South, Range 19 east of the 6th P.M. in Anderson County, Kansas, as shown the excerpts from the Pipeline Corridor Survey attached as Exhibit A to Petition Exhibit 2 at Pages 11-14.

87. Southern Star has failed to pay Minnesota Limited for the materials and services provided.

88. As a result of Southern Star's failure to pay amounts owing and due, Minnesota Limited filed a Contractor-Claimant's Lien Statement No. 2021-SL-000005 with the Clerk of the Franklin County Court on March 5, 2021, and Contractor-Claimant's Lien Statement No. 2021-SL-000003 with the Clerk of the Anderson County Court on March 5, 2021. A copy of the Franklin County Lien is provided as Petition Exhibit 1 with a copy of the Anderson County Lien as Petition Exhibit 2.

89. Minnesota Limited's liens constitute valid liens against the real property, pipeline, easement, and related facilities and fixtures described above and are subject to foreclosure.

90. Southern Star may claim an interest in the real property, pipeline, easement, and related facilities and fixtures. Any right, title or interest Southern Star may have or claim to have is junior and subject to Minnesota Limited's liens.

1    91.    The balance owed by Southern Star to Minnesota Limited is $34,520,160.68 plus

2    allowable interest, together with costs of collection and reasonable attorneys' fees insofar as

3    allowed by law.

4        WHEREFORE, Defendant MINNESOTA LIMITED, LLC, by and through its Counsel,

5    William C. Walker, Attorney at Law, and Derek S. Casey of TRIPLETT WOOLF GARRETSON,

6    LLC, demands JUDGMENT against Defendant SOUTHERN STAR CENTRAL GAS PIPELINE,

7    INC. foreclosing Minnesota Limited's liens in Franklin County and Anderson County, Kansas,

8    with such other and further relief at the Court deems just, proper, and equitable.

9                              **PRAYER FOR RELIEF**

10       WHEREFORE, Defendant MINNESOTA LIMITED, LLC, through its lawyers William

11   C. Walker, Attorney at Law, and Derek S. Casey of TRIPLETT WOOLF GARRETSON, LLC,

12   prays this Honorable Court for the following relief and remedies:

13   (1)   JUDGMENT against Plaintiff THE HDD COMPANY, INC. denying Plaintiff's Petition,

14         dismissing Plaintiff's claims with prejudice, and granting Defendant Minnesota Limited,

15         LLC recovery of its attorneys' fees, expenses, and costs, insofar as allowed by law and

16   (2)   JUDGMENT against Plaintiff THE HDD COMPANY, INC. on Defendant Minnesota

17         Limited, LLC's counterclaim and Defendant SOUTHERN STAR CENTRAL GAS

18         PIPELINE, INC., on Defendant Minnesota Limited, LLC's cross claim to include:

19         (A)    Damages in an amount in excess of $75,000.00 to remedy Plaintiff The HDD

20                Company, Inc.'s breach of contract and for indemnification;

21         (B)    Damages in an amount in excess of $75,000.00 to remedy Defendant Southern Star

22                Central Gas Pipeline, Inc.'s breaches of contract or, in the alternative, Minnesota

1         Limited's unjust enrichment and promissory estoppel, and otherwise Minnesota

2         Limited's detrimental reliance regarding the same;

3   (C)    Pre-judgment and post-judgment interest;

4   (D)    Recovery of Minnesota Limited's costs, expenses, and attorneys' fees as provided

5         by the parties' agreements or insofar as allowed by law;

6   (E)    Foreclosure of Minnesota Limited's pipeline and mechanic's liens in Franklin and

7         Anderson County; and

8   (F)    In the event the principal and interest due Minnesota Limited is not paid within ten

9         days after the date of judgment, at the option of Minnesota Limited, an Order of

10        Sale be issued out of this Court directing the Sheriffs of Franklin County, Kansas,

11        and Anderson County, Kansas, to advertise and sell the subject pipeline and real

12        property according to law and to apply the proceeds of said sale as follows:

13      (1)    To the payment of the costs of this action, including the costs of sale,

14      (2)    To the payment of real estate taxes due and unpaid on the property, if any,

15      (3)    To the payment of Minnesota Limited's judgment with interest plus all

16           allowed expenses of foreclosure,

17      (4)    The balance, if any, be paid to the Clerk of the Court pending further order,

18           and

19      (5)    That, upon the sale being confirmed, 1 the Sheriffs of Franklin and

20           Anderson Counties execute and deliver to the purchaser of said pipeline and

21           real estate, a good and sufficient Sheriff's Deed conveying said pipeline and

22           real property to the successful purchaser and all right, claim, title, interest

| | |
|---|---|
| 1 | or lien of Southern Star and those persons claiming under them be forever |
| 2 | barred and extinguished; |
| 3 | With such other and further relief as the Court deems just, proper, and equitable. |
| 4 | **<u>JURY DEMAND</u>** |
| 5 | Minnesota Limited, LLC, demands a trial by jury on all issues so triable. |

**<u>CERTIFICATE OF SERVICE</u>**

I served this document through the notice of electronic filing for parties and attorneys who are filing users in this case.

Respectfully submitted,

William C. Walker, #11978
walkerlaw66032@yahoo.com
ATTORNEY AT LAW
112 West Fifth Avenue
Garnett, Kansas 66032
(785) 448-3747
(785) 448-5529 (Facsimile)

*-and-*

Derek S. Casey, #15215
dscasey@twgfirm.com
TRIPLETT WOOLF GARRETSON, LLC
2959 North Rock Road, Suite 300
Wichita, Kansas 67226
(316) 630-8100
(316) 630-8101 (Facsimile)
www.twgfirm.com

 /s/Derek S. Casey
*Attorneys for Defendant*
*Minnesota Limited, LLC*

IN THE FOURTH JUDICIAL DISTRICT
DISTRICT COURT OF FRANKLIN COUNTY, KANSAS

THE HDD COMPANY, INC., an Oregon
Corporation,

               Plaintiff,

    -vs-

MINNESOTA LIMITED, LLC, *et al.*,

               Defendants.

Case No. FR-2021-CV-000016

## RETURN ON SERVICE OF SUMMONS

I, Derek S. Casey, counsel for Plaintiff MINNESOTA LIMITED, LLC, caused to be served the attached summons (Exhibit A) along with a copy of Defendant Minnesota Limited, LLC's Answer to Plaintiff's Petition, Counterclaim Against Plaintiff, & Cross Claim Against Defendant Southern Star Central Gas Pipeline, Inc. on Defendant SOUTHERN STAR CENTRAL GAS PIPELINE, INC., on March 30, 2021, at 10:59 a.m., by Federal Express Priority Overnight to Defendant's Resident Agent, The Corporation Company, Inc. at 112 S.W. 7th Street, Suite 3C, Topeka, Kansas 66603. A copy of the delivery confirmation is attached to this Return of Service as Exhibit B.

I declare under penalty of perjury that the foregoing is true and correct.

               Respectfully submitted,

               TRIPLETT WOOLF GARRETSON, LLC

               Derek S. Casey, #15215 - dscasey@twgfirm.com
               TRIPLETT WOOLF GARRETSON, LLC
               2959 North Rock Road, Suite 300
               Wichita, Kansas 67226

(316) 630-8100
(316) 630-8101 (Facsimile)
www.twgfirm.com

*Attorneys for Defendant*
*Minnesota Limited, LLC*

## CERTIFICATE OF SERVICE

I served this document through the notice of electronic filing for parties and attorneys who are filing users in this case.

Respectfully submitted,

William C. Walker, #11978 - walkerlaw66032@yahoo.com
ATTORNEY AT LAW
112 West Fifth Avenue
Garnett, Kansas 66032
(785) 448-3747
(785) 448-5529 (Facsimile)

*-and-*

Derek S. Casey, #15215 - dscasey@twgfirm.com
TRIPLETT WOOLF GARRETSON, LLC
2959 North Rock Road, Suite 300
Wichita, Kansas 67226
(316) 630-8100
(316) 630-8101 (Facsimile)

/s/Derek S. Casey
*Attorneys for Defendant*
*Minnesota Limited, LLC*

(TWG18291.001/830318.01)

The HDD Company, Inc.

vs.

Minnesota Limited, LLC, et al et. al.

**SUMMONS**



To the above-named Defendant/Respondent:

> **Southern Star Central Gas Pipeline, Inc.**
> **Resident Agent - The Corporation Company, Inc.**
> **112 SW 7th Street, Suite 3C**
> **Topeka, KS  66603**

You are hereby notified that an action has been commenced against you in this court.  You are required to file your answer or motion under K.S.A. 60-212, and amendments thereto, to the petition with the court and to serve a copy upon:

> Derek Scott Casey
> 2959 North Rock Road
> Suite 300
> Wichita, KS 67226

within 21 days after service of summons on you.

Theresa Monow

Clerk of the District Court
Electronically signed  on 03/29/2021 03:58:04 PM

**Documents to be served with the Summons:**

PLE: Answer - Counter DEFENDANT MINNESOTA LIMITED, LLC   S  ANSWER TO PLAINTIFF   S PETITION, COUNTERCLAIM



March 30, 2021

Dear Customer,

The following is the proof-of-delivery for tracking number: 773297257497



EXHIBIT

B

**Delivery Information:**

| | | | |
|---|---|---|---|
| **Status:** | Delivered | **Delivered To:** | Receptionist/Front Desk |
| **Signed for by:** | J.FORGE | **Delivery Location:** | |
| **Service type:** | FedEx Priority Overnight | | |
| **Special Handling:** | Deliver Weekday | | TOPEKA, KS, |
| | | **Delivery date:** | Mar 30, 2021 10:59 |

**Shipping Information:**

| | | | |
|---|---|---|---|
| **Tracking number:** | 773297257497 | **Ship Date:** | Mar 29, 2021 |
| | | **Weight:** | 1.0 LB/0.45 KG |

| **Recipient:** | **Shipper:** |
|---|---|
| TOPEKA, KS, US, | Wichita, KS, US, |

| **Reference** | 18291-01 |
|---|---|

Signature image is available. In order to view image and detailed information, the shipper or payor account number of the shipment must be provided.

Thank you for choosing FedEx

 Shipment Receipt

## Address Information
**Ship to:**
Select or enter
The Corporation Company, Inc.
112 SE 7th St, Suite 3C

TOPEKA, KS
66603
US
785-233-5517

**Ship from:**
Derek S. Casey
Triplett, Woolf and Garretson

2959 N. Rock Rd.
Suite 300
Wichita, KS
67226
US
3166308100

## Shipment Information:
Tracking no.: 773297257497
Ship date: 03/29/2021
Estimated shipping charges: 23.61 USD

## Package Information
Pricing option: FedEx Standard Rate
Service type: Priority Overnight
Package type: FedEx Envelope
Number of packages: 1
Total weight: 0.50 LBS
Declared Value: 0.00 USD
Special Services:
Pickup/Drop-off: Drop off package at FedEx location

## Billing Information:
Bill transportation to: TWG-345
Your reference: 18291-01
PO no.:
Invoice no.:
Department no.:

**Thank you for shipping online with FedEx ShipManager at fedex.com.**

### Please Note

FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery, misdelivery, or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim. Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental, consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss. Maximum for items of extraordinary value is $1000, e.g., jewelry, precious metals, negotiable instruments and other items listed in our Service Guide. Written claims must be filed within strict time limits; Consult the applicable FedEx Service Guide for details.
The estimated shipping charge may be different than the actual charges for your shipment. Differences may occur based on actual weight, dimensions, and other factors. Consult the applicable FedEx Service Guide or the FedEx Rate Sheets for details on how shipping charges are calculated.

IN THE FOURTH JUDICIAL DISTRICT
DISTRICT COURT OF FRANKLIN COUNTY, KANSAS

| | |
|---|---|
| THE HDD COMPANY, INC., an Oregon Corporation, | |
| Plaintiff, | |
| -vs- | Case No. FR-2021-CV-000016 |
| MINNESOTA LIMITED, LLC, *et al.*, | |
| Defendants. | |

## DEFENDANT MINNESOTA LIMITED, LLC'S
## EXHIBIT 1 TO DEFENDANT MINNESOTA LIMITED, LLC'S
## COUNTERCLAIM AGAINST PLAINTIFF

Plaintiff MINNESOTA LIMITED, LLC, by and through its Counsel, William C. Walker, Attorney-at-Law, and Derek S. Casey of TRIPLETT WOOLF GARRETSON, LLC, submits the attached Exhibit 1 to its Counterclaim Against Plaintiff filed March 26, 2021.

## CERTIFICATE OF SERVICE

I served this document through the notice of electronic filing for parties and attorneys who are filing users in this case.

Respectfully submitted,

William C. Walker, #11978 - walkerlaw66032@yahoo.com
ATTORNEY AT LAW
112 West Fifth Avenue
Garnett, Kansas 66032
(785) 448-3747
(785) 448-5529 (Facsimile)

*-and-*

Derek S. Casey, #15215 - dscasey@twgfirm.com
TRIPLETT WOOLF GARRETSON, LLC

2959 North Rock Road, Suite 300
Wichita, Kansas 67226
(316) 630-8100
(316) 630-8101 (Facsimile)

/s/Derek S. Casey
*Attorneys for Defendant*
*Minnesota Limited, LLC*



PETITION EXHIBIT

1

Minnesota Limited v. Southern Star

ELECTRONICALLY FILED
2021 Mar 05 PM 2:36
CLERK OF THE FRANKLIN COUNTY
CASE NUMBER: FR-2021-SL-000005
PII COMPLIANT

**EXHIBIT**

**1**

## CONTRACTOR-CLAIMANT'S LIEN STATEMENT

<u>NAME OF OWNER OF REAL PROPERTY, GAS PIPELINE, AND EASEMENT OR OWNER'S AGENT</u>:

### SOUTHERN STAR CENTRAL GAS PIPELINE, INC.
4700 HIGHWAY 56
OWENSBORO, KY 42301

### RESIDENT AGENT - THE CORPORATION COMPANY, INC.
112 SW 7TH STREET SUITE 3C
TOPEKA, KS 66603

<u>NAME OF CONTRACTOR-CLAIMANT</u>:

### MINNESOTA LIMITED LLC
P.O. Box 410
18640 200th Street
Big Lake, MN 55309

Contractor-Claimant MINNESOTA LIMITED, LLC, claims a lien upon the following property located in Franklin County, Kansas:

The Southern Star Central Gas Pipeline, Inc.'s Ottawa Compressor Station located at 3243 Nebraska Road in Ottawa, Kansas, more particularly described as:

A tract of real property comprising approximately 56.2 acres in the Northwest Quarter (NW/4) of Section 32, Township 16 South, Range 20 East, beginning 1,307 feet east of the Northwest Corner of the Northwest Quarter (NW/4), thence South 2,301', thence West 596', thence South 41', thence West 710', thence North 1,750', thence East 348', thence North 617', thence Northeasterly 37', thence Southeasterly 452', thence East 436', thence North 502', thence East 309' to the Point of Beginning less the Right-of-Way and

A tract of real property comprising approximately 13.3 acres in the Southeast Quarter (SE/4) of the Northeast Quarter (NE/4) and the south 100 feet of the Northeast Quarter (NE/4) of the Northeast Quarter (NE/4) in Section 31, Township 16 South, Range 20 East, east of the Highway Right-of-Way less the right-of-way;

-and-

A 36" pipeline including all associated buildings, appurtenances, materials, supplies, fixtures, appliances, and easement from the Southern Star Central Gas Pipeline, Inc.'s Ottawa Compressor Station located at 3243 Nebraska Road in Ottawa, Kansas, south approximately 15.5 miles to the Anderson County line, on the following parcels of real property:

Sections 14, 11, and 2 in Township 19 South, Range 19 East of the 6th P.M. in Franklin County, Kansas, as shown in the excerpts from the Pipeline Corridor Survey attached as Exhibit A at Pages 1-4;

Sections 35, 26, 25, 24, 13, and 12 in Township 18 South, Range 19 East of the 6th P.M. in Franklin County, Kansas, as shown in the excerpts from the Pipeline Corridor Survey attached as Exhibit A at Pages 1-8;

Sections 7 and 6 in Township 18 South, Range 20 East of the 6th P.M. in Franklin County, Kansas, as shown in the excerpts from the Pipeline Corridor Survey attached as Exhibit A at Pages 8-9;

Sections 31, 30, 19, 18, 7, 8, and 5 in Township 17 South, Range 20 East of the 6th P.M. in Franklin County, Kansas, as shown in the excerpts from the Pipeline Corridor Survey attached as Exhibit A at Pages 9-14; and

Sections 32 and 34 in Township 16 South, Range 20 East of the 6th P.M. in Franklin County, Kansas, as shown in the excerpts from the Pipeline Corridor Survey attached as Exhibit A at Pages 14-15.

The names of the owners of the real property burdened by the pipeline, facilities, and easement are stated, only as required by K.S.A. 55-209, in the Pipeline Corridor Survey attached as Exhibit A and summarized in Exhibit A-1. No lien is claimed upon the burdened real property identified in Exhibit A or Exhibit A-1.

MINNESOTA LIMITED, LLC, did, under contract with SOUTHERN STAR CENTRAL GAS PIPELINE, LLC, the owner of the real property, pipeline, and easement or the owner's agent, furnish labor, materials, machinery, and supplies used in the improvement of the real property, pipeline, and easement by digging, drilling, completing, and constructing a replacement pipeline and related facilities.

The amount claimed as owing is THIRTY-FOUR MILLION, FIVE-HUNDERD TWENTY-THOUSAND, ONE-HUNDRED SIXTY DOLLARS AND SIXTY-EIGHT CENTS ($34,520,160.68). The labor, materials, and supplies, as nearly as practicable, are described in the statement and invoices attached hereto as Exhibit B.

The labor was last performed and material and supplies were last furnished under the contract on December 31, 2020.

All of the material and supplies were used and labor performed in the construction of improvements to the above described property.

## AFFIDAVIT

STATE OF MINNESOTA    )
                      )  ss:
SHERBURNE COUNTY      )

Christopher Haux, of lawful age, being first duly sworn on oath deposes and states:

That he is the Vice-President of Operations of Contractor-Claimant MINNESOTA LIMITED, LLC, and is authorized to and has executed this CONTRACTOR-CLAIMANTS' LIEN STATEMENT on behalf of MINNESOTA LIMITED, LLC, and is further authorized to make this affidavit to verify the statement on behalf of said CONTRACTOR-CLAIMANT.

That he has read the CONTRACTOR-CLAIMANTS' LIEN STATEMENT, knows the contents hereof, has personal knowledge thereof, and that the statements, allegations, and averments contained therein and the Exhibit attached thereto are true and correct.

MINNESOTA LIMITED, LLC

By:

Christopher Haux
Vice President of Operations

SUBSCRIBED AND SWORN to before me on March 4th, 2021.

- 3 -

_____

NOTARY PUBLIC

My Commission Expires: 1/31/22

AMBER JEAN WOLD
NOTARY PUBLIC
MINNESOTA
My Commission Expires Jan. 31, 2022

## CERTIFICATE OF SERVICE

I served a copy of this CONTRACTOR-CLAIMANT'S LIEN STATEMENT by United

States Mail, First Class, with postage prepaid, and Certified with return-receipt requested, on

March __5__ , 2021, addressed to:

SOUTHERN STAR CENTRAL GAS PIPELINE, INC.
4700 HIGHWAY 56
OWENSBORO, KY 42301

SOUTHERN STAR CENTRAL GAS PIPELINE, INC.
RESIDENT AGENT - THE CORPORATION COMPANY, INC.
112 SW 7TH STREET SUITE 3C
TOPEKA, KS 66603

TRIPLETT WOOLF GARRETSON, LLC

Derek S. Casey, #15425
dscasey@twgfirm.com
2959 North Rock Road, Suite 300
Wichita, KS 67226
(316) 630-8100
(316) 630-8101 (facsimile)
www.twgfirm.com

*Attorneys for Contractor-Claimant*
*Minnesota Limited, LLC*

- 4 -



EXHIBIT A

Page 1

Lien Statement

ANDERSON & FRANKLIN COUNTIES, KANSAS
S23-T19S-R19E & S14-T19S-R19E

CONSTRUCTION ALIGNMENT SHEET

PROPOSED DPA 36" PIPELINE
FROM STA. 780+00 TO STA. 840+00
CONSTRUCTION ALIGNMENT
S23-T19S-R19E & S14-T19S-R19E
ANDERSON & FRANKLIN COUNTIES, KANSAS

SOUTHERN STAR
CENTRAL GAS PIPELINE

SCALE: 1"=200'   DRAWING NO: KAN-346   REV: 0



EXHIBIT A
Page 2
Lien Statement

CONSTRUCTION ALIGNMENT SHEET

PROPOSED DPA 36" PIPELINE
FROM STA. 840+00 TO STA. 900+00
CONSTRUCTION ALIGNMENT
S14-T19S-R19E & S11-T19S-R19E
FRANKLIN COUNTY, KANSAS

SOUTHERN STAR
CENTRAL GAS PIPELINE

SCALE: 1"=200'    DRAWING NO.: KFK-111    REV.: 1



FRANKLIN COUNTY, KANSAS
S11-T19S-R19E & S2-T19S-R19E

EXHIBIT A

Page 3

Lien Statement

CONSTRUCTION ALIGNMENT SHEET
PROPOSED DPA 36" PIPELINE
FROM STA. 900+00 TO STA. 960+00
CONSTRUCTION ALIGNMENT
S11-T19S-R19E & S2-T19S-R19E
FRANKLIN COUNTY, KANSAS

SOUTHERN STAR
CENTRAL GAS PIPELINE

DRAWING NO.
KFK-112

SCALE: 1"=200'     REV. 1



EXHIBIT A

Page 4

Lien Statement

ISSUED FOR CONSTRUCTION

SOUTHERN STAR
CENTRAL GAS PIPELINE

CONSTRUCTION ALIGNMENT SHEET

PROPOSED DPA 36" PIPELINE
FROM STA. 960+00 TO STA. 1020+00
CONSTRUCTION ALIGNMENT
S2–T19S–R19E & S35–T18S–R19E
FRANKLIN COUNTY, KANSAS

| TRACT NO. | 19335 | | 19336 | 19337 |
| OWNERSHIP | TIMOTHY L. SCOTT TRUST | CLOUD ROAD | CONYETTA S. PITTMAN TRUST | RABNUD LLC |
| TAX ID | | | | |

DRAWING NO.
KFK–113

SCALE:
1"=200'

REV.
1



EXHIBIT A

Page 5

Lien Statement

CONSTRUCTION ALIGNMENT SHEET
PROPOSED DPA 36" PIPELINE
FROM STA. 1020+00 TO STA. 1080+00
CONSTRUCTION ALIGNMENT
S35-T18S-R19E, S26-T18S-R19E, S25-T18S-R19E
FRANKLIN COUNTY, KANSAS

SOUTHERN STAR
CENTRAL GAS PIPELINE

SCALE: 1"=200'   DRAWING NO. KFK-114   REV. 1



EXHIBIT A

Page 6

Lien Statement

CONSTRUCTION ALIGNMENT SHEET
PROPOSED DPA 36" PIPELINE
FROM STA. 1080+00 TO STA. 1140+00
CONSTRUCTION ALIGNMENT
S25-T18S-R19E, S24-T18S-R19E, S13-T18S-R19E
FRANKLIN COUNTY, KANSAS

SOUTHERN STAR
CENTRAL GAS PIPELINE

SCALE: 1"=200'    DRAWING NO. KFK-115    REV. 1



EXHIBIT A
Page 7
Lien Statement

FRANKLIN COUNTY, KANSAS
S13-T18S-R19E & S12-T18S-R19E

CONSTRUCTION ALIGNMENT SHEET
PROPOSED DPA 36" PIPELINE
FROM STA. 1140+00 TO STA. 1200+00
CONSTRUCTION ALIGNMENT
S13-T18S-R19E & S12-T18S-R19E
FRANKLIN COUNTY, KANSAS

SOUTHERN STAR
CENTRAL GAS PIPELINE

SCALE: 1"=200'     DRAWING NO.: KFK-116     REV.: 1



EXHIBIT A
Page 8
Lien Statement

CONSTRUCTION ALIGNMENT SHEET
PROPOSED DPA 36" PIPELINE
FROM STA. 1200+00 TO STA. 1260+00
CONSTRUCTION ALIGNMENT
S12-T18S-R19E, S7-T18S-R20E, S6-T18S-R20E
FRANKLIN COUNTY, KANSAS

SOUTHERN STAR
CENTRAL GAS PIPELINE

AP PROJECT: ----

DRAWN BY: CAC    DATE: 10/08/18
CHECKED BY: JPM    DATE:
APPROVED BY: RNM    EPO APPROVAL:

SCALE: 1"=200'    DRAWING NO.: KFK-117    REV.: 0



EXHIBIT A

Page 9

Lien Statement

CONSTRUCTION ALIGNMENT SHEET

PROPOSED DPA 36" PIPELINE
FROM STA. 1260+00 TO STA. 1320+00
CONSTRUCTION ALIGNMENT
S6−T18S−R20E & S31−T17S−R20E
FRANKLIN COUNTY, KANSAS

SOUTHERN STAR
CENTRAL GAS PIPELINE

FRANKLIN COUNTY, KANSAS
S6−T18S−R20E & S31−T17S−R20E



EXHIBIT A

Page 10

Lien Statement

CONSTRUCTION ALIGNMENT SHEET

PROPOSED DPA 36" PIPELINE
FROM STA. 1320+00 TO STA. 1380+00
CONSTRUCTION ALIGNMENT
S31–T17S–R20E & S30–T17S–R20E
FRANKLIN COUNTY, KANSAS

SOUTHERN STAR
CENTRAL GAS PIPELINE

FRANKLIN COUNTY, KANSAS
S31–T17S–R20E & S30–T17S–R20E



EXHIBIT A

Page 11

Lien Statement



EXHIBIT A
Page 12
Lien Statement

CONSTRUCTION ALIGNMENT SHEET
PROPOSED DPA 36" PIPELINE
FROM STA. 1440+00 TO STA. 1500+00
CONSTRUCTION ALIGNMENT
S19-T17S-R20E & S18-T17S-R20E
FRANKLIN COUNTY, KANSAS

SOUTHERN STAR
CENTRAL GAS PIPELINE

DRAWING NO.
KFK-121



**EXHIBIT A**

**Page 13**

Lien Statement

FRANKLIN COUNTY, KANSAS
S18-T17S-R20E & S7-T17S-R20E

PRINTED FOR CONSTRUCTION - LATEST REVISION

SOUTHERN STAR
CENTRAL GAS PIPELINE

CONSTRUCTION ALIGNMENT SHEET

PROPOSED DPA 36" PIPELINE
FROM STA. 1500+00 TO STA. 1560+00
CONSTRUCTION ALIGNMENT
S18-T17S-R20E & S7-T17S-R20E
FRANKLIN COUNTY, KANSAS

| SCALE: | DRAWING NO. | REV. |
|---|---|---|
| 1"=200' | KFK-122 | 1 |



EXHIBIT A

Page 14

Lien Statement



EXHIBIT A

Page 15

Lien Statement

CONSTRUCTION ALIGNMENT SHEET

PROPOSED DPA 36" PIPELINE
FROM STA. 1620+00 TO STA. 1663+26
CONSTRUCTION ALIGNMENT
S5−T17S−R20E & S32−T16S−R20E
FRANKLIN COUNTY, KANSAS

SOUTHERN STAR
CENTRAL GAS PIPELINE

| FRANKLIN COUNTY | | |
|---|---|---|
| TRACT NO. | LANDOWNER | SEC/TWP/RNG |
| 19334 | Daniel John Kipper Living Trust | S14-T19S-R19E |
| 19329 | John E. Lutz, III | S14-T19S-R19E |
| 19390 | Daniel John Kipper Trust | S14-T19S-R19E |
| 19352 | Marguerite A. Steinberger Trust | S11-T19S-R19E |
| 19352-1 | George A. Steinberger Trust | S11-T19S-R19E |
| 19332 | Kolibri LLC | S11-T19S-R19E |
| 19335 | Timothy L. Scott Trust | S2-T19S-R19E |
| 19336 | Conyetta S. Pittman Trust | S35-T18S-R19E |
| 19337 | Rabnub LLC | S35-T18S-R19E |
| 19337-1 | Lester L. & Margie C. Hutchinson, Trust | S26-T18S-R19E |
| 19351 | Calvin L. Rosey | S25-T18S-R19E |
| 19351-2 | Kansas Dept. of Wildlife & Parks | S25-T18S-R19E |
| 19351-1 | Gary G. and Lisa K. Cherney Trust | S25-T18S-R19E |
| 19354 | James G. Destreicher | S25-T18S-R19E |
| 19360 | Ronald E. and Elaine M. Dunbar Trusts | S25-T18S-R19E |
| 19345 | Leo R. Wiederholt, Jr. and Mary L. Weiderholt Trusts | S24-T18S-R19E |
| 19350 | James S. & Dylan M. Eckard | S13-T18S-R19E |
| 19378 | Larry L. & Christine A. Tawney | S13-T18S-R19E |
| 19384 | Robert W. Ralph | S13-T18S-R19E |
| 19384-1 | Elizabeth S. & Logan M. Allen | S13-T18S-R19E |
| 19384-2 | Larry V. & Lori D. Brokus | S13-T18S-R19E |
| 19383 | Joseph E. & Linda L. Tucker | S12-T18S-R19E |
| 19383-1 | Joseph S. Habr | S12-T18S-R19E |
| 19382 | James E. Tawney Trust | S12-T18S-R19E |
| 19377 | Mary Ann Oswald Trust | S7-T18D-R20E |
| 19395 | John A. & Staci R. Newhouse | S6-T18S-R20E |
| 19395-1 | Kathryn S. & David S. Polsley | S6-T18S-R20E |
| 19395-2 | Brian G. Shurtleff | S6-T18S-R20E |
| 19376 | Raymond H. & Karen L. Shumate | S31-T17S-R20E |



Exhibit

A-1

Lien Statement

| FRANKLIN COUNTY | | |
|---|---|---|
| TRACT NO. | LANDOWNER | SEC/TWP/RNG |
| 19375 | Fred F. & Andrianna Fehrenbach Trust | S31-T17S-R20E |
| 19363 | Rantoul Farms, LLC | S31-T17S-R20E |
| 19363-1 | Brady Farm #2 LLC | S31-T17S-R20E |
| 19374 | Fred F. & Andrianna Fehrenbach Trust | S30-T17S-R20E |
| 19389 | Dwayne K. & Rhonda L. Lagalle | S19-T17S-R20E |
| 19373 | John W. & Brenda A. Wray | S19-T17S-R20E |
| 19372 | Robert F. Becker | S19-T17S-R20E |
| 19388 | Deloris M. Gisler Trust | S18-T17S-R20E |
| 19388-1 | William S. Bowers Trust | S18-T17S-R20E |
| 19388-2 | Dale L. & Elaine Dyer | S18-T17S-R20E |
| 19371 | Martin L. & Kathleen A. French | S18-T17S-R20E |
| 19394 | Kathleen A. French | S18-T17S-R20E |
| 19326 | B.G. & Wanda A. Ballinger | S18-T17S-R20E |
| 19327 | John W. & Brenda A. Wray | S7-T17S-R20E |
| 19328 | Roger D. & Cynthia D. Anderson | S7-T17S-R20E |
| 19328-1 | Denis Dale & Regina M. Roecker | S7-T17S-R20E |
| 19238-2 | John E. & Vicki S. Staley | S7-T17S-R20E |
| 19328-5 | Joseph E. & Linda L. Tucker | S7-T17S-R20E |
| 19325 | P. Audean Paul Trust | S8-T17S-R20E |
| 19380 | Oswego Coal Company Inc. | S5-T17S-R20E |
| 19380-1 | Caylor Coal Co. Inc. | S5-T17S-R20E |
| 19380-2 | Flint Hills Nature Trail | S5-T17S-R20E |
| 19362 | Lifemission Church Inc. | S5-T17S-R20E |
| 19324 | Lyle D. & Cheryl K. Black | S5-T17S-R20E |
| 19324-1 | Lyle D. & Cheryl K. Black | S5-T17S-R20E |
| 19324-2 | Gregory L. Singer | S5-T17S-R20E |
| 19370 | Carol Burlington Roberts | S32-T16S-R20E |
| 19323 | Terry M. Barnes | S32-T16S-R20E |
| 19361 | Terry M. Barnes | S32-T16S-R20E |
| 19322-1 | Martha A. McLain Turst (Trust?) | S32-T16S-R20E |
| 0469 | Southern Star Central Gas Pipeline Inc | S32-T16S-R20E |

| Contract Scope | Value Outstanding |
|---|---|
| Cleanup | $ 49,317.75 |
| Welda Compressor Station | $ 33,188.83 |
| Ottawa Compressor Station | $ 33,188.83 |
| RFS502 Tested Emergency | $ 2,650.00 |
| Padding due to Extra Rock | $ 1,059,625.97 |
| Various Out of Scope Impacts | $ 2,797,105.95 |
| Hydrotest Water Supply | $ 294,900.00 |
| Integrity Maintenance Digs | $ 908,289.46 |
| Impeding Forward Progress | $ 3,353,647.44 |
| Out of Scope Rock Issues | $ 10,560,990.40 |
| Permitting Delays | $ 8,586,864.00 |
| Construction Impacts (3) HDD Crossings | $ 6,840,392.05 |
| **Total** | **$ 34,520,160.68** |



Exhibit

B

Lien Statement

IN THE FOURTH JUDICIAL DISTRICT
DISTRICT COURT OF FRANKLIN COUNTY, KANSAS

THE HDD COMPANY, INC., an Oregon
Corporation,

        Plaintiff,

    -vs-

MINNESOTA LIMITED, LLC, *et al.*,

        Defendants.

Case No. FR-2021-CV-000016

## DEFENDANT MINNESOTA LIMITED, LLC'S
## EXHIBIT 2 TO DEFENDANT MINNESOTA LIMITED, LLC'S
## COUNTERCLAIM AGAINST PLAINTIFF

Plaintiff MINNESOTA LIMITED, LLC, by and through its Counsel, William C. Walker,

Attorney-at-Law, and Derek S. Casey of TRIPLETT WOOLF GARRETSON, LLC, submits the

attached Exhibit 2 to its Counterclaim Against Plaintiff filed March 26, 2021.

### CERTIFICATE OF SERVICE

I served this document through the notice of electronic filing for parties and attorneys who

are filing users in this case.

Respectfully submitted,

William C. Walker, #11978 - walkerlaw66032@yahoo.com
ATTORNEY AT LAW
112 West Fifth Avenue
Garnett, Kansas 66032
(785) 448-3747
(785) 448-5529 (Facsimile)

*-and-*

Derek S. Casey, #15215 - dscasey@twgfirm.com
TRIPLETT WOOLF GARRETSON, LLC

2959 North Rock Road, Suite 300
Wichita, Kansas 67226
(316) 630-8100
(316) 630-8101 (Facsimile)

/s/Derek S. Casey
*Attorneys for Defendant*
*Minnesota Limited, LLC*



PETITION EXHIBIT

**2**

Minnesota Limited v. Southern Star

EXHIBIT

**2**

ELECTRONICALLY FILED
2021 Mar 05 PM 2:38
CLERK OF THE ANDERSON COUNTY
CASE NUMBER:  AN-2021-SL-000003
PII COMPLIANT

## CONTRACTOR-CLAIMANT'S LIEN STATEMENT

NAME OF OWNER OF REAL PROPERTY, GAS PIPELINE, AND EASEMENT OR OWNER'S AGENT:

### SOUTHERN STAR CENTRAL GAS PIPELINE, INC.
4700 HIGHWAY 56
OWENSBORO, KY 42301

### RESIDENT AGENT - THE CORPORATION COMPANY, INC.
112 SW 7TH STREET SUITE 3C
TOPEKA, KS 66603

NAME OF CONTRACTOR-CLAIMANT:

### MINNESOTA LIMITED LLC
P.O. Box 410
18640 200th Street
Big Lake, MN 55309

Contractor-Claimant MINNESOTA LIMITED, LLC, claims a lien upon the following property located in Anderson County, Kansas:

The Southern Star Central Gas Pipeline, Inc.'s Welda Compressor Station located at 19209 SW Maryland Road in Welda, Kansas, more particularly described as:

A tract of real property comprising approximately 28.8 acres in Southeast Quarter (SE/4) of the Southeast Quarter (SE/4) EXCEPT for the Northeast Quarter (NE/4) of the Southeast Quarter (SE/4) of the Southeast Quarter (SE/4) and EXCEPT for the East 66' of the Northwest Quarter (NW/4) of the Southeast Quarter (SE/4) of the Southeast Quarter (SE/4) in Section 34, Township 21 South, Range 19 East of the 6th P.M. and

A tract of real property comprising approximately 3.5 acres in Section 34, Township 21 South, Range 19 East of the 6th P.M., described as beginning in the Northeast Corner of the Northwest Quarter (NW/4) of Section 34 thence South 753.2 feet to the Point of Beginning, thence South 233 feet, thence West 659.7 feet, thence North 233 feet, thence East 659.9 feet to the Point of Beginning EXCEPT for the roadway located at 19101 Southwest Maryland Road, Welda, Kansas 66091.

-and-

A 36" pipeline including all associated buildings, appurtenances, materials, supplies, fixtures, appliances, and easement from the Southern Star Central Gas Pipeline, Inc.'s Welda Compressor Station located at 19209 SW Maryland Road in Welda, Kansas, north approximately 16.0 miles to the Franklin County line, on the following parcels of real property:

Sections 34, 27, 22, 15, 10, and 3, located in Township 21 South, Range 19 East of the 6th P.M., in Anderson County, Kansas, as shown in the excerpts from the Pipeline Corridor Survey attached as Exhibit A, Pages 1-6;

Sections 34, 27, 22, 15, 10, and 3 located in Township 20 South, Range 19 East of the 6th P.M. in Anderson County, Kansas, as shown in the excerpts from the Pipeline Corridor Survey attached as Exhibit A at Pages 6-11; and

Sections 34, 35, 26, and 23 in Township 19 South, Range 19 east of the 6th P.M. in Anderson County, Kansas, as shown the excerpts from the Pipeline Corridor Survey attached as Exhibit A at Pages 11-14.

The names of the owners of the real property burdened by the pipeline, facilities, and easement are stated, only as required by K.S.A. 55-209, in the Pipeline Corridor Survey attached as Exhibit A and summarized in Exhibit A-1. No lien is claimed upon the burdened real property identified in Exhibit A or Exhibit A-1.

MINNESOTA LIMITED, LLC, did, under contract with SOUTHERN STAR CENTRAL GAS PIPELINE, LLC, the owner of the real property, pipeline, and easement, or the owner's agent, furnish labor, materials, machinery, and supplies used in the improvement of the real property, pipeline, and easement by digging, drilling, completing, and constructing a replacement pipeline and related facilities.

The amount claimed as owing is THIRTY-FOUR MILLION, FIVE-HUNDERD TWENTY-THOUSAND, ONE-HUNDRED SIXTY DOLLARS AND SIXTY-EIGHT CENTS ($34,520,160.68). The labor, materials, and supplies, as nearly as practicable, are described in the statement and invoices attached hereto as Exhibit B.

The labor was last performed and material and supplies were last furnished under the contract on December 31, 2020.

All of the material and supplies were used and labor performed in the construction of improvements to the above described property.

## AFFIDAVIT

STATE OF MINNESOTA )
                     ) ss:
SHERBURNE COUNTY )

Christopher Haux, of lawful age, being first duly sworn on oath deposes and states:

That he is the Vice-President of Operations of Contractor-Claimant MINNESOTA LIMITED, LLC, and is authorized to and has executed this CONTRACTOR-CLAIMANTS' LIEN STATEMENT on behalf of MINNESOTA LIMITED, LLC, and is further authorized to make this affidavit to verify the statement on behalf of said CONTRACTOR-CLAIMANT.

That he has read the CONTRACTOR-CLAIMANTS' LIEN STATEMENT, knows the contents hereof, has personal knowledge thereof, and that the statements, allegations, and averments contained therein and the Exhibit attached thereto are true and correct.

MINNESOTA LIMITED, LLC

By:_____

Christopher Haux
Vice President of Operations

SUBSCRIBED AND SWORN to before me on March 4th, 2021.

_____
NOTARY PUBLIC

My Commission Expires: 1/31/22

AMBER JEAN WOLD
NOTARY PUBLIC
MINNESOTA
My Commission Expires Jan. 31, 2022

- 3 -

**CERTIFICATE OF SERVICE**

I served a copy of this CONTRACTOR-CLAIMANT'S LIEN STATEMENT by United States Mail, First Class, with postage prepaid, and Certified with return-receipt requested, on March __5__, 2021, addressed to:

SOUTHERN STAR CENTRAL GAS PIPELINE, INC.
4700 HIGHWAY 56
OWENSBORO, KY 42301

SOUTHERN STAR CENTRAL GAS PIPELINE, INC.
RESIDENT AGENT - THE CORPORATION COMPANY, INC.
112 SW 7TH STREET SUITE 3C
TOPEKA, KS 66603

TRIPLETT WOOLF GARRETSON, LLC

Derek S. Casey #15425
dscasey@twgfirm.com
2959 North Rock Road, Suite 300
Wichita, KS 67226
(316) 630-8100
(316) 630-8101 (facsimile)
www.twgfirm.com

*Attorneys for Contractor-Claimant*
*Minnesota Limited, LLC*



EXHIBIT A

Page 1

Lien Statement

CONSTRUCTION ALIGNMENT SHEET
PROPOSED DPA 36" PIPELINE
FROM STA. 0+00 TO STA. 60+00
CONSTRUCTION ALIGNMENT
S34-T21S-R19E & S27-T21S-R19E
ANDERSON COUNTY, KANSAS

SOUTHERN STAR
CENTRAL GAS PIPELINE

SCALE: 1"=200'    DRAWING NO.: KAN-333    REV. 1



EXHIBIT A

Page 2

Lien Statement

CONSTRUCTION ALIGNMENT SHEET

PROPOSED DPA 36" PIPELINE
FROM STA. 60+00 TO STA. 120+00
CONSTRUCTION ALIGNMENT
S27-T21S-R19E & S22-T21S-R19E
ANDERSON COUNTY, KANSAS

SOUTHERN STAR
CENTRAL GAS PIPELINE

| | |
|---|---|
| SCALE: 1"=200' | DRAWING NO. KAN-334 | REV. 0 |



EXHIBIT A

Page 3

Lien Statement

ANDERSON COUNTY, KANSAS
S22-T21S-R19E & S15-T21S-R19E

SOUTHERN STAR
CENTRAL GAS PIPELINE

CONSTRUCTION ALIGNMENT SHEET

PROPOSED DPA 36" PIPELINE
FROM STA. 120+00 TO STA. 180+00
CONSTRUCTION ALIGNMENT
S22-T21S-R19E & S15-T21S-R19E
ANDERSON COUNTY, KANSAS

SCALE: 1"=200'  DRAWING NO.: KAN-335  REV. 1



**EXHIBIT A**

**Page 4**

Lien Statement

ANDERSON COUNTY, KANSAS
S15-121S-R19E & S10-121S-R19E

SOUTHERN STAR
CENTRAL GAS PIPELINE

CONSTRUCTION ALIGNMENT SHEET

PROPOSED DPA 36" PIPELINE
FROM STA. 180+00 TO STA. 240+00
CONSTRUCTION ALIGNMENT
S15-121S-R19E & S10-121S-R19E
ANDERSON COUNTY, KANSAS

SCALE: 1"=200'    DRAWING NO. KAN-336    REV. 0



EXHIBIT A

Page 5

Lien Statement

ANDERSON COUNTY, KANSAS
S10-T21S-R19E & S3-T21S-R19E

DETAIL "D" (TYP.)

DETAIL "E"

NATURAL GROUND

PROPOSED 36"
PIPELINE

| TRACT NO. | 19379 | 19344 | 19381 |
|---|---|---|---|
| OWNERSHIP | G V LAND & CATTLE INC. | THOMAS L. & JANICE I. TUSH | JEFFREY & RITA STOLTZFUS |
| TAX ID | | | |

SOUTHERN STAR
CENTRAL GAS PIPELINE

CONSTRUCTION ALIGNMENT SHEET
PROPOSED DPA 36" PIPELINE
FROM STA. 240+00 TO STA. 300+00
CONSTRUCTION ALIGNMENT
S10-T21S-R19E & S3-T21S-R19E
ANDERSON COUNTY, KANSAS

| SCALE: | DRAWING NO. | REV. |
|---|---|---|
| 1"=200' | KAN-337 | 1 |



EXHIBIT A

Page 6

Lien Statement

ANDERSON COUNTY, KANSAS
S3-T21S-R19E & S34-T20S-R19E

ISSUED FOR CONSTRUCTION

CONSTRUCTION ALIGNMENT SHEET
PROPOSED DPA 36" PIPELINE
FROM STA. 300+00 TO STA. 360+00
CONSTRUCTION ALIGNMENT
S3-T21S-R19E & S34-T20S-R19E
ANDERSON COUNTY, KANSAS

SOUTHERN STAR
CENTRAL GAS PIPELINE

| DRAWN BY: | CAC | DATE: | 10/08/18 |
| CHECKED BY: | JPM | DATE: | |
| APPROVED BY: | RAM | EPG APPROVAL: | |

SCALE: 1"=200"    DRAWING NO.: KAN-338    REV. 1



**EXHIBIT A**

**Page 7**

Lien Statement



EXHIBIT A

Page 8

Lien Statement



EXHIBIT A

Page 9

Lien Statement



EXHIBIT A

Page 10

Lien Statement

CONSTRUCTION ALIGNMENT SHEET

PROPOSED DPA 36" PIPELINE
FROM STA. 540+00 TO STA. 600+00
CONSTRUCTION ALIGNMENT
S15-T20S-R19E, S10-T20S-R19E, S3-T20S-R19E
ANDERSON COUNTY, KANSAS

SOUTHERN STAR
CENTRAL GAS PIPELINE

| SCALE: | DRAWING NO. | REV. |
|---|---|---|
| 1"=200' | KAN-342 | 0 |



EXHIBIT A

Page 11

Lien Statement

CONSTRUCTION ALIGNMENT SHEET

PROPOSED DPA 36" PIPELINE
FROM STA. 600+00 TO STA. 660+00
CONSTRUCTION ALIGNMENT
S3−T20S−R19E & S34−T19S−R19E
ANDERSON COUNTY, KANSAS

SOUTHERN STAR
CENTRAL GAS PIPELINE

SCALE: 1"=200'     DRAWING NO.  KAN−343     REV. 1



EXHIBIT A

Page 12

Lien Statement

CONSTRUCTION ALIGNMENT SHEET
PROPOSED DPA 36" PIPELINE
FROM STA. 660+00 TO STA. 720+00
CONSTRUCTION ALIGNMENT
S34-T19S-R19E, S35-T19S-R19E, S26-T19S-R19E
ANDERSON COUNTY, KANSAS

SOUTHERN STAR
CENTRAL GAS PIPELINE

SCALE: 1"=200'     DRAWING NO. KAN-344     REV. 1



EXHIBIT A

Page 13

Lien Statement



EXHIBIT A

Page 14

Lien Statement

CONSTRUCTION ALIGNMENT SHEET

PROPOSED DPA 36" PIPELINE
FROM STA. 780+00 TO STA. 840+00
CONSTRUCTION ALIGNMENT
S23-T19S-R19E & S14-T19S-R19E
ANDERSON & FRANKLIN COUNTIES, KANSAS

SOUTHERN STAR
CENTRAL GAS PIPELINE

SCALE: 1"=200'     DRAWING NO. KAN-346     REV. 0

| ANDERSON COUNTY | | |
|---|---|---|
| TRACT NO. | LANDOWNER | SEC/TWP/RNG |
| D621 | Southern Star Central Gas Pipeline, Inc. | S34-T21S-R19E |
| D682 | Southern Star Central Gas Pipeline, Inc. | S34-T21S-R19E |
| D698 | Southern Star Central Gas Pipeline, Inc. | S34-T21S-R19E |
| 19342 | Kenny Kellstadt | S34-T21S-R19E |
| 19339 | Colby Ray Brownrigg | S34-T21S-R19E |
| 19343 | Christopher J. Burkert | S34-T21S-R19E |
| 19340 | Richard A. Carr | S27-T21S-R19E |
| 19340-1 | Richard A. Carr | S22-T21S-R19E |
| 19369 | Shirley L. Benjamin | S22-T21S-R19E |
| 19387 | Jerome L. & Janice W. Wohler | S15-T21S-R19E |
| 19341 | Timothy W. Hardman | S15-T21S-R19E |
| 19379 | G V Land & Cattle Inc. | S10-T21S-R19E |
| 19344 | Thomas L. & Janice J. Tush | S3-T21S-R19E |
| 19381 | Jeffrey & Rita Stoltzfus | S3-T21S-R19E |
| 19381-1 | Betty Lybarger Trustee | S34-T20S-R19E |
| 19364 | Daniel J. Miller | S34-T20S-R19E |
| 19396 | David R. & Myra J. Lybarger Trustees | S34-T20S-R19E |
| 19396-1 | Michael R. & Jeanie Schainost Trustee | S34-T20S-R19E |
| 19396-1 | William C. & Darlene Lickteig | S34-T20S-R19E |
| 19367 | Jeffrey E. Manspeaker | S27-T20S-R19E |
| 19368 | Darrell A. Troyer | S27-T20S-R19E |
| 19365 | John David Cubit, et al | S27-T20S-R19E |
| 19386 | John David & Mary P. Cubit, Trustees, & Sharon Elizabeth Blomquist | S27-T20S-R19E |
| 19386-1 | John David & Mary P. Cubit, Trustees | S22-T20S-R19E |
| 19366 | Bryan A. & Donna J. Schmit | S22-T20S-R19E |
| 19364 | Matthew & Jill Murray Trustees | S15-T20S-R19E |
| 19355 | Frank S. Feuerborn et al & Nancy S. Feuerborn Trustee | S15-T20S-R19E |
| 19355-1 | Merle F. & Helen Rockers | S15-T20S-R19E |
| 19357 | Merle F. & Helen Rockers | S10-T20S-R19E |
| 19391-1 | Merle F. & Helen Rockers | S10-T20S-R19E |
| 19391 | Clara C. Rockers Trustees Trus | S10-T20S-R19E |
| 19356 | Merle F. & Helen Rockers | S3-T20S-R19E |
| 19358 | John T. Rayne, Mary & Keith Pickert Co Trustees Patrick Rayne | S34-T19S-R19E |
| 38070 | Rene Bures | S3-T20S-R19E |
| 19349 | Rene Bures | S34-T19S-R19E |
| 19349-1 | Jerome C. & Ramona Hermreck | S35-T19S-R19E |



EXHIBIT

A-1

Lien Statement

| ANDERSON COUNTY | | |
|---|---|---|
| TRACT NO. | LANDOWNER | SEC/TWP/RNG |
| 19348 | Barry I. Rockers Trustee | S35-T19S-R19E |
| 19359 | William J. Graham & Jennifer L. Wilson, et al | S26-T19S-R19E |
| 19359-1 | William J. Graham & Jennifer L. Wilson, et al | S26-T19S-R19E |
| 19353 | Gail E. & Debra C. Kueser | S26-T19S-R19E |
| 19347 | Daniel John Kipper Living Trust | S23-T19S-R19E |
| 19346 | Daniel John Kipper Living Trust | S23-T19S-R19E |

| Contract Scope | Value Outstanding |
|---|---|
| Cleanup | $ 49,317.75 |
| Welda Compressor Station | $ 33,188.83 |
| Ottawa Compressor Station | $ 33,188.83 |
| RFS502 Tested Emergency | $ 2,650.00 |
| Padding due to Extra Rock | $ 1,059,625.97 |
| Various Out of Scope Impacts | $ 2,797,105.95 |
| Hydrotest Water Supply | $ 294,900.00 |
| Integrity Maintenance Digs | $ 908,289.46 |
| Impeding Forward Progress | $ 3,353,647.44 |
| Out of Scope Rock Issues | $ 10,560,990.40 |
| Permitting Delays | $ 8,586,864.00 |
| Construction Impacts (3) HDD Crossings | $ 6,840,392.05 |
| **Total** | **$ 34,520,160.68** |



Exhibit

B

Lien Statement

IN THE FOURTH JUDICIAL DISTRICT
DISTRICT COURT OF FRANKLIN COUNTY, KANSAS

THE HDD COMPANY, INC., an Oregon
Corporation,

          Plaintiff,

    -vs-                      Case No. FR-2021-CV-000016

MINNESOTA LIMITED, LLC, *et al.*,

          Defendants.

## DEFENDANT MINNESOTA LIMITED, LLC'S CORRECTED EXHIBIT 1 TO DEFENDANT'S CROSS CLAIM AGAINST DEFENDANT SOUTHERN STAR CENTRAL GAS PIPELINE, INC.

Defendant MINNESOTA LIMITED, LLC, by and through its Counsel, William C. Walker, Attorney-at-Law, and Derek S. Casey of TRIPLETT WOOLF GARRETSON, LLC, submits the attached Corrected Exhibit 1 to its Cross Claim Against Defendant Southern Star Central Gas Pipeline, Inc. The Exhibit 1 served and filed by Minnesota Limited, LLC on March 30, 2021, was erroneously titled and should be disregarded.

### CERTIFICATE OF SERVICE

I served this document through the notice of electronic filing for parties and attorneys who are filing users in this case and by First Class Mail, postage prepaid, to the following on March 31, 2021:

Southern Star Central Gas Pipeline, Inc
Resident Agent – The Corporation Company, Inc.
112 S.E. 7th Street, Suite 3C
Topeka, Kansas 66603

Respectfully submitted,

William C. Walker, #11978 - walkerlaw66032@yahoo.com
ATTORNEY AT LAW
112 West Fifth Avenue
Garnett, Kansas 66032
(785) 448-3747
(785) 448-5529 (Facsimile)

*-and-*

Derek S. Casey, #15215 - dscasey@twgfirm.com
TRIPLETT WOOLF GARRETSON, LLC
2959 North Rock Road, Suite 300
Wichita, Kansas 67226
(316) 630-8100
(316) 630-8101 (Facsimile)

/s/Derek S. Casey
*Attorneys for Defendant*
*Minnesota Limited, LLC*

(TWG18291.001/830573.v1)



**EXHIBIT**
**1**

## CONTRACTOR-CLAIMANT'S LIEN STATEMENT

NAME OF OWNER OF REAL PROPERTY, GAS PIPELINE, AND EASEMENT OR OWNER'S AGENT:

### SOUTHERN STAR CENTRAL GAS PIPELINE, INC.
4700 HIGHWAY 56
OWENSBORO, KY 42301

### RESIDENT AGENT - THE CORPORATION COMPANY, INC.
112 SW 7TH STREET SUITE 3C
TOPEKA, KS 66603

NAME OF CONTRACTOR-CLAIMANT:

### MINNESOTA LIMITED LLC
P.O. Box 410
18640 200th Street
Big Lake, MN 55309

Contractor-Claimant MINNESOTA LIMITED, LLC, claims a lien upon the following

property located in Franklin County, Kansas:

The Southern Star Central Gas Pipeline, Inc.'s Ottawa Compressor Station located at 3243 Nebraska Road in Ottawa, Kansas, more particularly described as:

A tract of real property comprising approximately 56.2 acres in the Northwest Quarter (NW/4) of Section 32, Township 16 South, Range 20 East, beginning 1,307 feet east of the Northwest Corner of the Northwest Quarter (NW/4), thence South 2,301', thence West 596', thence South 41', thence West 710', thence North 1,750', thence East 348', thence North 617', thence Northeasterly 37', thence Southeasterly 452', thence East 436', thence North 502', thence East 309' to the Point of Beginning less the Right-of-Way and

A tract of real property comprising approximately 13.3 acres in the Southeast Quarter (SE/4) of the Northeast Quarter (NE/4) and the south 100 feet of the Northeast Quarter (NE/4) of the Northeast Quarter (NE/4) in Section 31, Township 16 South, Range 20 East, east of the Highway Right-of-Way less the right-of-way;

-and-

A 36" pipeline including all associated buildings, appurtenances, materials, supplies, fixtures, appliances, and easement from the Southern Star Central Gas Pipeline, Inc.'s Ottawa Compressor Station located at 3243 Nebraska Road in Ottawa, Kansas, south approximately 15.5 miles to the Anderson County line, on the following parcels of real property:

Sections 14, 11, and 2 in Township 19 South, Range 19 East of the 6th P.M. in Franklin County, Kansas, as shown in the excerpts from the Pipeline Corridor Survey attached as Exhibit A at Pages 1-4;

Sections 35, 26, 25, 24, 13, and 12 in Township 18 South, Range 19 East of the 6th P.M. in Franklin County, Kansas, as shown in the excerpts from the Pipeline Corridor Survey attached as Exhibit A at Pages 1-8;

Sections 7 and 6 in Township 18 South, Range 20 East of the 6th P.M. in Franklin County, Kansas, as shown in the excerpts from the Pipeline Corridor Survey attached as Exhibit A at Pages 8-9;

Sections 31, 30, 19, 18, 7, 8, and 5 in Township 17 South, Range 20 East of the 6th P.M. in Franklin County, Kansas, as shown in the excerpts from the Pipeline Corridor Survey attached as Exhibit A at Pages 9-14; and

Sections 32 and 34 in Township 16 South, Range 20 East of the 6th P.M. in Franklin County, Kansas, as shown in the excerpts from the Pipeline Corridor Survey attached as Exhibit A at Pages 14-15.

The names of the owners of the real property burdened by the pipeline, facilities, and easement are stated, only as required by K.S.A. 55-209, in the Pipeline Corridor Survey attached as Exhibit A and summarized in Exhibit A-1. No lien is claimed upon the burdened real property identified in Exhibit A or Exhibit A-1.

MINNESOTA LIMITED, LLC, did, under contract with SOUTHERN STAR CENTRAL GAS PIPELINE, LLC, the owner of the real property, pipeline, and easement or the owner's agent, furnish labor, materials, machinery, and supplies used in the improvement of the real property, pipeline, and easement by digging, drilling, completing, and constructing a replacement pipeline and related facilities.

The amount claimed as owing is THIRTY-FOUR MILLION, FIVE-HUNDERD TWENTY-THOUSAND, ONE-HUNDRED SIXTY DOLLARS AND SIXTY-EIGHT CENTS ($34,520,160.68). The labor, materials, and supplies, as nearly as practicable, are described in the statement and invoices attached hereto as Exhibit B.

The labor was last performed and material and supplies were last furnished under the contract on December 31, 2020.

All of the material and supplies were used and labor performed in the construction of improvements to the above described property.

### AFFIDAVIT

STATE OF MINNESOTA      )
                         )  ss:
SHERBURNE COUNTY        )

Christopher Haux, of lawful age, being first duly sworn on oath deposes and states:

That he is the Vice-President of Operations of Contractor-Claimant MINNESOTA LIMITED, LLC, and is authorized to and has executed this CONTRACTOR-CLAIMANTS' LIEN STATEMENT on behalf of MINNESOTA LIMITED, LLC, and is further authorized to make this affidavit to verify the statement on behalf of said CONTRACTOR-CLAIMANT.

That he has read the CONTRACTOR-CLAIMANTS' LIEN STATEMENT, knows the contents hereof, has personal knowledge thereof, and that the statements, allegations, and averments contained therein and the Exhibit attached thereto are true and correct.

MINNESOTA LIMITED, LLC

By:_____

Christopher Haux
Vice President of Operations

SUBSCRIBED AND SWORN to before me on March 4th, 2021.

- 3 -

_(signature)_

NOTARY PUBLIC

My Commission Expires: 1/31/22

AMBER JEAN WOLD
NOTARY PUBLIC
MINNESOTA
My Commission Expires Jan. 31, 2022

## CERTIFICATE OF SERVICE

I served a copy of this CONTRACTOR-CLAIMANT'S LIEN STATEMENT by United

States Mail, First Class, with postage prepaid, and Certified with return-receipt requested, on

March __5__ , 2021, addressed to:

SOUTHERN STAR CENTRAL GAS PIPELINE, INC.
4700 HIGHWAY 56
OWENSBORO, KY 42301

SOUTHERN STAR CENTRAL GAS PIPELINE, INC.
RESIDENT AGENT - THE CORPORATION COMPANY, INC.
112 SW 7TH STREET SUITE 3C
TOPEKA, KS 66603

TRIPLETT WOOLF GARRETSON, LLC

_(signature)_

Derek S. Casey, #15425
dscasey@twgfirm.com
2959 North Rock Road, Suite 300
Wichita, KS 67226
(316) 630-8100
(316) 630-8101 (facsimile)
www.twgfirm.com

_Attorneys for Contractor-Claimant_
_Minnesota Limited, LLC_

- 4 -



EXHIBIT A

Page 1

Lien Statement

CONSTRUCTION ALIGNMENT SHEET

PROPOSED DPA 36" PIPELINE
FROM STA. 780+00 TO STA. 840+00
CONSTRUCTION ALIGNMENT
S23-T19S-R19E & S14-T19S-R19E
ANDERSON & FRANKLIN COUNTIES, KANSAS

SOUTHERN STAR
CENTRAL GAS PIPELINE

SCALE: 1"=200'    DRAWING NO.: KAN-346    REV.: 0



EXHIBIT A
Page 2
Lien Statement

CONSTRUCTION ALIGNMENT SHEET
PROPOSED DPA 36" PIPELINE
FROM STA. 840+00 TO STA. 900+00
CONSTRUCTION ALIGNMENT
S14-T19S-R19E & S11-T19S-R19E
FRANKLIN COUNTY, KANSAS

SOUTHERN STAR
CENTRAL GAS PIPELINE

FRANKLIN COUNTY, KANSAS
S14-T19S-R19E & S11-T19S-R19E



EXHIBIT A

Page 3

Lien Statement

FRANKLIN COUNTY, KANSAS
S11-T19S-R19E & S2-T19S-R19E

CONSTRUCTION ALIGNMENT SHEET
PROPOSED DPA 36" PIPELINE
FROM STA. 900+00 TO STA. 960+00
CONSTRUCTION ALIGNMENT
S11-T19S-R19E & S2-T19S-R19E
FRANKLIN COUNTY, KANSAS

SOUTHERN STAR
CENTRAL GAS PIPELINE

SCALE: 1"=200'    DRAWING NO.: KFK-112    REV.: 1



EXHIBIT A

Page 4

Lien Statement

ISSUED FOR CONSTRUCTION

SOUTHERN STAR
CENTRAL GAS PIPELINE

CONSTRUCTION ALIGNMENT SHEET

PROPOSED DPA 36" PIPELINE
FROM STA. 960+00 TO STA. 1020+00
CONSTRUCTION ALIGNMENT
S2–T19S–R19E & S35–T18S–R19E
FRANKLIN COUNTY, KANSAS

| | |
|---|---|
| DRAWN BY: CAC | DATE: 10/08/18 |
| CHECKED BY: JFM | DATE: |
| APPROVED BY: RNM | EPO APPROVAL: |

| SCALE: | DRAWING NO: | REV: |
|---|---|---|
| 1"=200' | KFK-113 | 1 |



EXHIBIT A

Page 5

Lien Statement



EXHIBIT A

Page 6

Lien Statement

CONSTRUCTION ALIGNMENT SHEET
PROPOSED DPA 36" PIPELINE
FROM STA. 1080+00 TO STA. 1140+00
CONSTRUCTION ALIGNMENT
S25-T18S-R19E, S24-T18S-R19E, S13-T18S-R19E
FRANKLIN COUNTY, KANSAS

SOUTHERN STAR
CENTRAL GAS PIPELINE

SCALE: 1"=200'    DRAWING NO. KFK-115    REV. 1



EXHIBIT A

Page 7

Lien Statement



EXHIBIT A
Page 8
Lien Statement

CONSTRUCTION ALIGNMENT SHEET
FROM STA. 1200+00 TO STA. 1260+00
CONSTRUCTION ALIGNMENT
S12–T18S–R19E, S7–T18S–R20E, S6–T18S–R20E
FRANKLIN COUNTY, KANSAS

SOUTHERN STAR
CENTRAL GAS PIPELINE

SCALE: 1"=200'     DRAWING NO.: KFK–117     REV.: 0



EXHIBIT A

Page 9

Lien Statement

FRANKLIN COUNTY, KANSAS
S6-T18S-R20E & S31-T17S-R20E

CONSTRUCTION ALIGNMENT SHEET

PROPOSED DPA 36" PIPELINE
FROM STA. 1260+00 TO STA. 1320+00
CONSTRUCTION ALIGNMENT
S6-T18S-R20E & S31-T17S-R20E
FRANKLIN COUNTY, KANSAS

SOUTHERN STAR
CENTRAL GAS PIPELINE



EXHIBIT A

Page 10

Lien Statement

CONSTRUCTION ALIGNMENT SHEET

PROPOSED DPA 36" PIPELINE
FROM STA. 1320+00 TO STA. 1380+00
CONSTRUCTION ALIGNMENT
S31–T17S–R20E & S30–T17S–R20E
FRANKLIN COUNTY, KANSAS

SOUTHERN STAR
CENTRAL GAS PIPELINE

SCALE: 1"=200'  DRAWING NO.: KFK–119  REV.: 1



EXHIBIT A

Page 11

Lien Statement

CONSTRUCTION ALIGNMENT SHEET

PROPOSED DPA 36" PIPELINE
FROM STA. 1380+00 TO STA. 1440+00
CONSTRUCTION ALIGNMENT
S30-T17S-R20E & S19-T17S-R20E
FRANKLIN COUNTY, KANSAS

SOUTHERN STAR
CENTRAL GAS PIPELINE



EXHIBIT A
Page 12
Lien Statement

CONSTRUCTION ALIGNMENT SHEET
PROPOSED DPA 36" PIPELINE
FROM STA. 1440+00 TO STA. 1500+00
CONSTRUCTION ALIGNMENT
S19-T17S-R20E & S18-T17S-R20E
FRANKLIN COUNTY, KANSAS

SOUTHERN STAR
CENTRAL GAS PIPELINE

SCALE: 1"=200'    DRAWING NO.: KFK-121    REV. 1



EXHIBIT A

Page 13

Lien Statement

CONSTRUCTION ALIGNMENT SHEET

PROPOSED DPA 36" PIPELINE
FROM STA. 1500+00 TO STA. 1560+00
CONSTRUCTION ALIGNMENT
S18-T17S-R20E & S7-T17S-R20E
FRANKLIN COUNTY, KANSAS

SOUTHERN STAR
CENTRAL GAS PIPELINE

FRANKLIN COUNTY, KANSAS
S18-T17S-R20E & S7-T17S-R20E



EXHIBIT A

Page 14

Lien Statement



EXHIBIT A

Page 15

Lien Statement

CONSTRUCTION ALIGNMENT SHEET

PROPOSED DPA 36" PIPELINE
FROM STA. 1620+00 TO STA. 1663+26
CONSTRUCTION ALIGNMENT
S5−T17S−R20E & S32−T16S−R20E
FRANKLIN COUNTY, KANSAS

| FRANKLIN COUNTY | | |
|---|---|---|
| TRACT NO. | LANDOWNER | SEC/TWP/RNG |
| 19334 | Daniel John Kipper Living Trust | S14-T19S-R19E |
| 19329 | John E. Lutz, III | S14-T19S-R19E |
| 19390 | Daniel John Kipper Trust | S14-T19S-R19E |
| 19352 | Marguerite A. Steinberger Trust | S11-T19S-R19E |
| 19352-1 | George A. Steinberger Trust | S11-T19S-R19E |
| 19332 | Kolibri LLC | S11-T19S-R19E |
| 19335 | Timothy L. Scott Trust | S2-T19S-R19E |
| 19336 | Conyetta S. Pittman Trust | S35-T18S-R19E |
| 19337 | Rabnub LLC | S35-T18S-R19E |
| 19337-1 | Lester L. & Margie C. Hutchinson, Trust | S26-T18S-R19E |
| 19351 | Calvin L. Rosey | S25-T18S-R19E |
| 19351-2 | Kansas Dept. of Wildlife & Parks | S25-T18S-R19E |
| 19351-1 | Gary G. and Lisa K. Cherney Trust | S25-T18S-R19E |
| 19354 | James G. Destreicher | S25-T18S-R19E |
| 19360 | Ronald E. and Elaine M. Dunbar Trusts | S25-T18S-R19E |
| 19345 | Leo R. Wiederholt, Jr. and Mary L. Weiderholt Trusts | S24-T18S-R19E |
| 19350 | James S. & Dylan M. Eckard | S13-T18S-R19E |
| 19378 | Larry L. & Christine A. Tawney | S13-T18S-R19E |
| 19384 | Robert W. Ralph | S13-T18S-R19E |
| 19384-1 | Elizabeth S. & Logan M. Allen | S13-T18S-R19E |
| 19384-2 | Larry V. & Lori D. Brokus | S13-T18S-R19E |
| 19383 | Joseph E. & Linda L. Tucker | S12-T18S-R19E |
| 19383-1 | Joseph S. Habr | S12-T18S-R19E |
| 19382 | James E. Tawney Trust | S12-T18S-R19E |
| 19377 | Mary Ann Oswald Trust | S7-T18D-R20E |
| 19395 | John A. & Staci R. Newhouse | S6-T18S-R20E |
| 19395-1 | Kathryn S. & David S. Polsley | S6-T18S-R20E |
| 19395-2 | Brian G. Shurtleff | S6-T18S-R20E |
| 19376 | Raymond H. & Karen L. Shumate | S31-T17S-R20E |



Exhibit
A-1
Lien Statement

| FRANKLIN COUNTY | | |
|---|---|---|
| TRACT NO. | LANDOWNER | SEC/TWP/RNG |
| 19375 | Fred F. & Andrianna Fehrenbach Trust | S31-T17S-R20E |
| 19363 | Rantoul Farms, LLC | S31-T17S-R20E |
| 19363-1 | Brady Farm #2 LLC | S31-T17S-R20E |
| 19374 | Fred F. & Andrianna Fehrenbach Trust | S30-T17S-R20E |
| 19389 | Dwayne K. & Rhonda L. Lagalle | S19-T17S-R20E |
| 19373 | John W. & Brenda A. Wray | S19-T17S-R20E |
| 19372 | Robert F. Becker | S19-T17S-R20E |
| 19388 | Deloris M. Gisler Trust | S18-T17S-R20E |
| 19388-1 | William S. Bowers Trust | S18-T17S-R20E |
| 19388-2 | Dale L. & Elaine Dyer | S18-T17S-R20E |
| 19371 | Martin L. & Kathleen A. French | S18-T17S-R20E |
| 19394 | Kathleen A. French | S18-T17S-R20E |
| 19326 | B.G. & Wanda A. Ballinger | S18-T17S-R20E |
| 19327 | John W. & Brenda A. Wray | S7-T17S-R20E |
| 19328 | Roger D. & Cynthia D. Anderson | S7-T17S-R20E |
| 19328-1 | Denis Dale & Regina M. Roecker | S7-T17S-R20E |
| 19238-2 | John E. & Vicki S. Staley | S7-T17S-R20E |
| 19328-5 | Joseph E. & Linda L. Tucker | S7-T17S-R20E |
| 19325 | P. Audean Paul Trust | S8-T17S-R20E |
| 19380 | Oswego Coal Company Inc. | S5-T17S-R20E |
| 19380-1 | Caylor Coal Co. Inc. | S5-T17S-R20E |
| 19380-2 | Flint Hills Nature Trail | S5-T17S-R20E |
| 19362 | Lifemission Church Inc. | S5-T17S-R20E |
| 19324 | Lyle D. & Cheryl K. Black | S5-T17S-R20E |
| 19324-1 | Lyle D. & Cheryl K. Black | S5-T17S-R20E |
| 19324-2 | Gregory L. Singer | S5-T17S-R20E |
| 19370 | Carol Burlington Roberts | S32-T16S-R20E |
| 19323 | Terry M. Barnes | S32-T16S-R20E |
| 19361 | Terry M. Barnes | S32-T16S-R20E |
| 19322-1 | Martha A. McLain Turst (Trust?) | S32-T16S-R20E |
| 0469 | Southern Star Central Gas Pipeline Inc | S32-T16S-R20E |

| Contract Scope | Value Outstanding |
|---|---|
| Cleanup | $ 49,317.75 |
| Welda Compressor Station | $ 33,188.83 |
| Ottawa Compressor Station | $ 33,188.83 |
| RFS502 Tested Emergency | $ 2,650.00 |
| Padding due to Extra Rock | $ 1,059,625.97 |
| Various Out of Scope Impacts | $ 2,797,105.95 |
| Hydrotest Water Supply | $ 294,900.00 |
| Integrity Maintenance Digs | $ 908,289.46 |
| Impeding Forward Progress | $ 3,353,647.44 |
| Out of Scope Rock Issues | $ 10,560,990.40 |
| Permitting Delays | $ 8,586,864.00 |
| Construction Impacts (3) HDD Crossings | $ 6,840,392.05 |
| **Total** | **$ 34,520,160.68** |



Exhibit

B

Lien Statement

IN THE FOURTH JUDICIAL DISTRICT
DISTRICT COURT OF FRANKLIN COUNTY, KANSAS

THE HDD COMPANY, INC., an Oregon
Corporation,

         Plaintiff,

    -vs-                         Case No. FR-2021-CV-000016

MINNESOTA LIMITED, LLC, *et al.*,

         Defendants.

## DEFENDANT MINNESOTA LIMITED, LLC'S CORRECTED EXHIBIT 2 TO DEFENDANT'S CROSS CLAIM AGAINST DEFENDANT SOUTHERN STAR CENTRAL GAS PIPELINE, INC.

    Defendant MINNESOTA LIMITED, LLC, by and through its Counsel, William C. Walker, Attorney-at-Law, and Derek S. Casey of TRIPLETT WOOLF GARRETSON, LLC, submits the attached Corrected Exhibit 2 to its Cross Claim Against Defendant Southern Star Central Gas Pipeline, Inc. The Exhibit 2 served and filed by Minnesota Limited, LLC on March 30, 2021, was erroneously titled and should be disregarded.

### CERTIFICATE OF SERVICE

    I served this document through the notice of electronic filing for parties and attorneys who are filing users in this case and by First Class Mail, postage prepaid, to the following on March 31, 2021:

        Southern Star Central Gas Pipeline, Inc
        Resident Agent – The Corporation Company, Inc.
        112 S.E. 7th Street, Suite 3C
        Topeka, Kansas 66603

Respectfully submitted,

William C. Walker, #11978 - walkerlaw66032@yahoo.com
ATTORNEY AT LAW
112 West Fifth Avenue
Garnett, Kansas 66032
(785) 448-3747
(785) 448-5529 (Facsimile)

*-and-*

Derek S. Casey, #15215 - dscasey@twgfirm.com
TRIPLETT WOOLF GARRETSON, LLC
2959 North Rock Road, Suite 300
Wichita, Kansas 67226
(316) 630-8100
(316) 630-8101 (Facsimile)

/s/Derek S. Casey
*Attorneys for Defendant*
*Minnesota Limited, LLC*

(TWG18291.001/830584.v1)



PETITION EXHIBIT

2

Minnesota Limited v. Southern Star

EXHIBIT

2

ELECTRONICALLY FILED
2021 Mar 05 PM 2:38
CLERK OF THE ANDERSON COUNTY
CASE NUMBER: AN-2021-SL-000003
PII COMPLIANT

## CONTRACTOR-CLAIMANT'S LIEN STATEMENT

NAME OF OWNER OF REAL PROPERTY, GAS PIPELINE, AND EASEMENT OR OWNER'S AGENT:

**SOUTHERN STAR CENTRAL GAS PIPELINE, INC.**
4700 HIGHWAY 56
OWENSBORO, KY 42301

RESIDENT AGENT - THE CORPORATION COMPANY, INC.
112 SW 7TH STREET SUITE 3C
TOPEKA, KS 66603

NAME OF CONTRACTOR-CLAIMANT:

**MINNESOTA LIMITED LLC**
P.O. Box 410
18640 200th Street
Big Lake, MN 55309

Contractor-Claimant MINNESOTA LIMITED, LLC, claims a lien upon the following property located in Anderson County, Kansas:

The Southern Star Central Gas Pipeline, Inc.'s Welda Compressor Station located at 19209 SW Maryland Road in Welda, Kansas, more particularly described as:

A tract of real property comprising approximately 28.8 acres in Southeast Quarter (SE/4) of the Southeast Quarter (SE/4) EXCEPT for the Northeast Quarter (NE/4) of the Southeast Quarter (SE/4) of the Southeast Quarter (SE/4) and EXCEPT for the East 66' of the Northwest Quarter (NW/4) of the Southeast Quarter (SE/4) of the Southeast Quarter (SE/4) in Section 34, Township 21 South, Range 19 East of the 6th P.M. and

A tract of real property comprising approximately 3.5 acres in Section 34, Township 21 South, Range 19 East of the 6th P.M., described as beginning in the Northeast Corner of the Northwest Quarter (NW/4) of Section 34 thence South 753.2 feet to the Point of Beginning, thence South 233 feet, thence West 659.7 feet, thence North 233 feet, thence East 659.9 feet to the Point of Beginning EXCEPT for the roadway located at 19101 Southwest Maryland Road, Welda, Kansas 66091.

-and-

A 36" pipeline including all associated buildings, appurtenances, materials, supplies, fixtures, appliances, and easement from the Southern Star Central Gas Pipeline, Inc.'s Welda Compressor Station located at 19209 SW Maryland Road in Welda, Kansas, north approximately 16.0 miles to the Franklin County line, on the following parcels of real property:

Sections 34, 27, 22, 15, 10, and 3, located in Township 21 South, Range 19 East of the 6th P.M., in Anderson County, Kansas, as shown in the excerpts from the Pipeline Corridor Survey attached as Exhibit A, Pages 1-6;

Sections 34, 27, 22, 15, 10, and 3 located in Township 20 South, Range 19 East of the 6th P.M. in Anderson County, Kansas, as shown in the excerpts from the Pipeline Corridor Survey attached as Exhibit A at Pages 6-11; and

Sections 34, 35, 26, and 23 in Township 19 South, Range 19 east of the 6th P.M. in Anderson County, Kansas, as shown the excerpts from the Pipeline Corridor Survey attached as Exhibit A at Pages 11-14.

The names of the owners of the real property burdened by the pipeline, facilities, and easement are stated, only as required by K.S.A. 55-209, in the Pipeline Corridor Survey attached as Exhibit A and summarized in Exhibit A-1. No lien is claimed upon the burdened real property identified in Exhibit A or Exhibit A-1.

MINNESOTA LIMITED, LLC, did, under contract with SOUTHERN STAR CENTRAL GAS PIPELINE, LLC, the owner of the real property, pipeline, and easement, or the owner's agent, furnish labor, materials, machinery, and supplies used in the improvement of the real property, pipeline, and easement by digging, drilling, completing, and constructing a replacement pipeline and related facilities.

The amount claimed as owing is THIRTY-FOUR MILLION, FIVE-HUNDERD TWENTY-THOUSAND, ONE-HUNDRED SIXTY DOLLARS AND SIXTY-EIGHT CENTS ($34,520,160.68). The labor, materials, and supplies, as nearly as practicable, are described in the statement and invoices attached hereto as Exhibit B.

The labor was last performed and material and supplies were last furnished under the contract on December 31, 2020.

All of the material and supplies were used and labor performed in the construction of improvements to the above described property.

### AFFIDAVIT

STATE OF MINNESOTA )
                        ) ss:
SHERBURNE COUNTY )

Christopher Haux, of lawful age, being first duly sworn on oath deposes and states:

That he is the Vice-President of Operations of Contractor-Claimant MINNESOTA LIMITED, LLC, and is authorized to and has executed this CONTRACTOR-CLAIMANTS' LIEN STATEMENT on behalf of MINNESOTA LIMITED, LLC, and is further authorized to make this affidavit to verify the statement on behalf of said CONTRACTOR-CLAIMANT.

That he has read the CONTRACTOR-CLAIMANTS' LIEN STATEMENT, knows the contents hereof, has personal knowledge thereof, and that the statements, allegations, and averments contained therein and the Exhibit attached thereto are true and correct.

MINNESOTA LIMITED, LLC

By: _____

Christopher Haux
Vice President of Operations

SUBSCRIBED AND SWORN to before me on March 4th, 2021.

_____
NOTARY PUBLIC

AMBER JEAN WOLD
NOTARY PUBLIC
MINNESOTA
My Commission Expires Jan. 31, 2022

My Commission Expires: 1/31/22

- 3 -

**CERTIFICATE OF SERVICE**

I served a copy of this CONTRACTOR-CLAIMANT'S LIEN STATEMENT by United States Mail, First Class, with postage prepaid, and Certified with return-receipt requested, on March __5__, 2021, addressed to:

SOUTHERN STAR CENTRAL GAS PIPELINE, INC.
4700 HIGHWAY 56
OWENSBORO, KY 42301

SOUTHERN STAR CENTRAL GAS PIPELINE, INC.
RESIDENT AGENT - THE CORPORATION COMPANY, INC.
112 SW 7TH STREET SUITE 3C
TOPEKA, KS 66603

TRIPLETT WOOLF GARRETSON, LLC

Derek S. Casey #15125
dscasey@twgfirm.com
2959 North Rock Road, Suite 300
Wichita, KS 67226
(316) 630-8100
(316) 630-8101 (facsimile)
www.twgfirm.com

*Attorneys for Contractor-Claimant
Minnesota Limited, LLC*



EXHIBIT A

Page 1

Lien Statement

CONSTRUCTION ALIGNMENT SHEET

PROPOSED DPA 36" PIPELINE
FROM STA. 0+00 TO STA. 60+00
CONSTRUCTION ALIGNMENT
S34–T21S–R19E & S27–T21S–R19E
ANDERSON COUNTY, KANSAS

SOUTHERN STAR
CENTRAL GAS PIPELINE

SCALE: 1"=200"    DRAWING NO.    KAN-333    REV. 1

ANDERSON COUNTY, KANSAS
S34-T21S-R19E & S27-T21S-R19E



**EXHIBIT A**

**Page 2**

Lien Statement

ANDERSON COUNTY, KANSAS
S27-T21S-R19E & S22-T21S-R19E

CONSTRUCTION ALIGNMENT SHEET
PROPOSED DPA 36" PIPELINE
FROM STA. 60+00 TO STA. 120+00
CONSTRUCTION ALIGNMENT
S27-T21S-R19E & S22-T21S-R19E
ANDERSON COUNTY, KANSAS

SOUTHERN STAR
CENTRAL GAS PIPELINE

SCALE: 1"=200'   DRAWING NO.: KAN-334   REV.: 0



**EXHIBIT A**

**Page 3**

Lien Statement



EXHIBIT A

Page 4

Lien Statement

CONSTRUCTION ALIGNMENT SHEET

PROPOSED DPA 36" PIPELINE
FROM STA. 180+00 TO STA. 240+00
CONSTRUCTION ALIGNMENT
S15-T21S-R19E & S10-T21S-R19E
ANDERSON COUNTY, KANSAS

SOUTHERN STAR
CENTRAL GAS PIPELINE

SCALE: 1"=200'   DRAWING NO.: KAN-336   REV.: 0



EXHIBIT A

Page 5

Lien Statement



EXHIBIT A

Page 6

Lien Statement

CONSTRUCTION ALIGNMENT SHEET

PROPOSED DPA 36" PIPELINE
FROM STA. 300+00 TO STA. 360+00
CONSTRUCTION ALIGNMENT
S3-T21S-R19E & S34-T20S-R19E
ANDERSON COUNTY, KANSAS

ANDERSON COUNTY, KANSAS
S3-T21S-R19E & S34-T20S-R19E

SOUTHERN STAR
CENTRAL GAS PIPELINE

SCALE: 1"=200'    DRAWING NO. KAN-338    REV. 1



**EXHIBIT A**

**Page 7**

Lien Statement



EXHIBIT A

Page 8

Lien Statement



EXHIBIT A

Page 9

Lien Statement

CONSTRUCTION ALIGNMENT SHEET

PROPOSED DPA 36" PIPELINE
FROM STA. 4B0+00 TO STA. 540+00
CONSTRUCTION ALIGNMENT
S15–T20S–R19E
ANDERSON COUNTY, KANSAS

SOUTHERN STAR
CENTRAL GAS PIPELINE

| SCALE | DRAWING NO. | REV. |
|---|---|---|
| 1"=200' | KAN–341 | 0 |



**EXHIBIT A**

**Page 10**

Lien Statement

CONSTRUCTION ALIGNMENT SHEET

PROPOSED DPA 36" PIPELINE
FROM STA. 540+00 TO STA. 600+00
CONSTRUCTION ALIGNMENT
S15–T20S–R19E, S10–T20S–R19E, S3–T20S–R19E
ANDERSON COUNTY, KANSAS

SOUTHERN STAR
CENTRAL GAS PIPELINE

| SCALE: | DRAWING NO. | REV. |
|---|---|---|
| 1"=200' | KAN-342 | 0 |



EXHIBIT A

Page 11

Lien Statement

CONSTRUCTION ALIGNMENT SHEET

PROPOSED DPA 36" PIPELINE
FROM STA. 600+00 TO STA. 660+00
CONSTRUCTION ALIGNMENT
S3-T20S-R19E & S34-T19S-R19E
ANDERSON COUNTY, KANSAS

SOUTHERN STAR
CENTRAL GAS PIPELINE

SCALE: 1"=200'   DRAWING NO.: KAN-343   REV. 1



EXHIBIT A

Page 12

Lien Statement

APPROVED FOR CONSTRUCTION

CONSTRUCTION ALIGNMENT SHEET

PROPOSED DPA 36" PIPELINE
FROM STA. 660+00 TO STA. 720+00
CONSTRUCTION ALIGNMENT
S34-T19S-R19E, S35-T19S-R19E, S26-T19S-R19E
ANDERSON COUNTY, KANSAS

SOUTHERN STAR
CENTRAL GAS PIPELINE

| SCALE: | DRAWING NO. | REV. |
|---|---|---|
| 1"=200' | KAN-344 | 1 |



EXHIBIT A

Page 13

Lien Statement



EXHIBIT A

Page 14

Lien Statement

| ANDERSON COUNTY | | |
|---|---|---|
| TRACT NO. | LANDOWNER | SEC/TWP/RNG |
| D621 | Southern Star Central Gas Pipeline, Inc. | S34-T21S-R19E |
| D682 | Southern Star Central Gas Pipeline, Inc. | S34-T21S-R19E |
| D698 | Southern Star Central Gas Pipeline, Inc. | S34-T21S-R19E |
| 19342 | Kenny Kellstadt | S34-T21S-R19E |
| 19339 | Colby Ray Brownrigg | S34-T21S-R19E |
| 19343 | Christopher J. Burkert | S34-T21S-R19E |
| 19340 | Richard A. Carr | S27-T21S-R19E |
| 19340-1 | Richard A. Carr | S22-T21S-R19E |
| 19369 | Shirley L. Benjamin | S22-T21S-R19E |
| 19387 | Jerome L. & Janice W. Wohler | S15-T21S-R19E |
| 19341 | Timothy W. Hardman | S15-T21S-R19E |
| 19379 | G V Land & Cattle Inc. | S10-T21S-R19E |
| 19344 | Thomas L. & Janice J. Tush | S3-T21S-R19E |
| 19381 | Jeffrey & Rita Stoltzfus | S3-T21S-R19E |
| 19381-1 | Betty Lybarger Trustee | S34-T20S-R19E |
| 19364 | Daniel J. Miller | S34-T20S-R19E |
| 19396 | David R. & Myra J. Lybarger Trustees | S34-T20S-R19E |
| 19396-1 | Michael R. & Jeanie Schainost Trustee | S34-T20S-R19E |
| 19396-1 | William C. & Darlene Lickteig | S34-T20S-R19E |
| 19367 | Jeffrey E. Manspeaker | S27-T20S-R19E |
| 19368 | Darrell A. Troyer | S27-T20S-R19E |
| 19365 | John David Cubit, et al | S27-T20S-R19E |
| 19386 | John David & Mary P. Cubit, Trustees, & Sharon Elizabeth Blomquist | S27-T20S-R19E |
| 19386-1 | John David & Mary P. Cubit, Trustees | S22-T20S-R19E |
| 19366 | Bryan A. & Donna J. Schmit | S22-T20S-R19E |
| 19364 | Matthew & Jill Murray Trustees | S15-T20S-R19E |
| 19355 | Frank S. Feuerborn et al & Nancy S. Feuerborn Trustee | S15-T20S-R19E |
| 19355-1 | Merle F. & Helen Rockers | S15-T20S-R19E |
| 19357 | Merle F. & Helen Rockers | S10-T20S-R19E |
| 19391-1 | Merle F. & Helen Rockers | S10-T20S-R19E |
| 19391 | Clara C. Rockers Trustees Trus | S10-T20S-R19E |
| 19356 | Merle F. & Helen Rockers | S3-T20S-R19E |
| 19358 | John T. Rayne, Mary & Keith Pickert Co Trustees Patrick Rayne | S34-T19S-R19E |
| 38070 | Rene Bures | S3-T20S-R19E |
| 19349 | Rene Bures | S34-T19S-R19E |
| 19349-1 | Jerome C. & Ramona Hermreck | S35-T19S-R19E |



EXHIBIT

A-1

Lien Statement

exhibitsticker.com

| ANDERSON COUNTY | | |
|---|---|---|
| TRACT NO. | LANDOWNER | SEC/TWP/RNG |
| 19348 | Barry I. Rockers Trustee | S35-T19S-R19E |
| 19359 | William J. Graham & Jennifer L. Wilson, et al | S26-T19S-R19E |
| 19359-1 | William J. Graham & Jennifer L. Wilson, et al | S26-T19S-R19E |
| 19353 | Gail E. & Debra C. Kueser | S26-T19S-R19E |
| 19347 | Daniel John Kipper Living Trust | S23-T19S-R19E |
| 19346 | Daniel John Kipper Living Trust | S23-T19S-R19E |

| Contract Scope | Value Outstanding |
|---|---|
| Cleanup | $ 49,317.75 |
| Welda Compressor Station | $ 33,188.83 |
| Ottawa Compressor Station | $ 33,188.83 |
| RFS502 Tested Emergency | $ 2,650.00 |
| Padding due to Extra Rock | $ 1,059,625.97 |
| Various Out of Scope Impacts | $ 2,797,105.95 |
| Hydrotest Water Supply | $ 294,900.00 |
| Integrity Maintenance Digs | $ 908,289.46 |
| Impeding Forward Progress | $ 3,353,647.44 |
| Out of Scope Rock Issues | $ 10,560,990.40 |
| Permitting Delays | $ 8,586,864.00 |
| Construction Impacts (3) HDD Crossings | $ 6,840,392.05 |
| **Total** | **$ 34,520,160.68** |



Exhibit

B

Lien Statement

**IN THE FOURTH JUDICIAL DISTRICT**
**DISTRICT COURT, FRANKLIN COUNTY, KANSAS**

| | | |
|---|---|---|
| THE HDD COMPANY, INC., an Oregon Corporation, | ) ) ) | |
| Plaintiff, | ) ) | Case No. FR-2021-CV-000016 |
| v. | ) ) ) | |
| MINNESOTA LIMITED, LLC, et al., | ) ) | |
| Defendants. | ) ) | |

**ENTRY OF APPEARANCE**

Thomas Hiatt, of the law firm of Spencer Fane LLP, hereby enters his appearance as counsel of record for Defendant Southern Star Central Gas Pipeline, Inc. in the above-captioned case.

Date: April 1, 2021

Respectfully submitted,

SPENCER FANE LLP

/s/ *Thomas Hiatt*
Douglas M. Weems,        KS #14771
David A. Schatz,         KS #20601
Thomas Hiatt,            KS #27105
1000 Walnut St., Suite 1400
Kansas City, MO 64106-2140
Telephone: (816) 474-8100
Facsimile: (816) 474-3216
dweems@spencerfane.com
dschatz@spencerfane.com
thiatt@spencerfane.com

*Attorney for Defendant Southern Star Central*
*Gas Pipeline, Inc.*

1

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on this 1st day of April, 2021 the foregoing was electronically filed with the District Court of Franklin County and served on the parties via the Court's electronic filing system.

/s/ Thomas Hiatt
*Attorney for Defendant*

WA 16407026.1

**IN THE FOURTH JUDICIAL DISTRICT**
**DISTRICT COURT, FRANKLIN COUNTY, KANSAS**

| | | |
|---|---|---|
| THE HDD COMPANY, INC., an Oregon Corporation, | ) ) ) | |
| Plaintiff, | ) ) | Case No. FR-2021-CV-000016 |
| v. | ) ) ) | |
| MINNESOTA LIMITED, LLC, et al., | ) ) | |
| Defendants. | ) ) | |

## ENTRY OF APPEARANCE

Douglas M. Weems, of the law firm of Spencer Fane LLP, hereby enters his appearance as counsel of record for Defendant Southern Star Central Gas Pipeline, Inc. in the above-captioned case.

Date: April 1, 2021

Respectfully submitted,

SPENCER FANE LLP

/s/ *Douglas M. Weems*
Douglas M. Weems,   KS #14771
David A. Schatz,   KS #20601
Thomas Hiatt,   KS #27105
1000 Walnut St., Suite 1400
Kansas City, MO 64106-2140
Telephone: (816) 474-8100
Facsimile: (816) 474-3216
dweems@spencerfane.com
dschatz@spencerfane.com
thiatt@spencerfane.com

*Attorney for Defendant Southern Star Central Gas Pipeline, Inc.*

1

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on this 1st day of April, 2021 the foregoing was electronically filed with the District Court of Franklin County and served on the parties via the Court's electronic filing system.

/s/ Douglas M. Weems
*Attorney for Defendant*

WA 16407026.1

**IN THE FOURTH JUDICIAL DISTRICT**
**DISTRICT COURT, FRANKLIN COUNTY, KANSAS**

| | | |
|---|---|---|
| THE HDD COMPANY, INC., an Oregon Corporation, | ) ) ) | |
| Plaintiff, | ) ) ) | Case No. FR-2021-CV-000016 |
| v. | ) ) | |
| MINNESOTA LIMITED, LLC, et al., | ) ) | |
| Defendants. | ) | |

## ENTRY OF APPEARANCE

David A. Schatz, of the law firm of Spencer Fane LLP, hereby enters his appearance as counsel of record for Defendant Southern Star Central Gas Pipeline, Inc. in the above-captioned case.

Date: April 1, 2021

Respectfully submitted,

SPENCER FANE LLP

/s/ *David A. Schatz*
Douglas M. Weems,       KS #14771
David A. Schatz,       KS #20601
Thomas Hiatt,       KS #27105
1000 Walnut St., Suite 1400
Kansas City, MO 64106-2140
Telephone: (816) 474-8100
Facsimile: (816) 474-3216
dweems@spencerfane.com
dschatz@spencerfane.com
thiatt@spencerfane.com

*Attorney for Defendant Southern Star Central Gas Pipeline, Inc.*

1

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on this 1st day of April, 2021 the foregoing was electronically filed with the District Court of Franklin County and served on the parties via the Court's electronic filing system.

/s/ David A. Schatz
*Attorney for Defendant*

2

IN THE FOURTH JUDICIAL DISTRICT
DISTRICT COURT OF FRANKLIN COUNTY, KANSAS

| | |
|---|---|
| THE HDD COMPANY, INC., an Oregon Corporation,<br><br>       Plaintiff,<br><br>    -vs-<br><br>MINNESOTA LIMITED, LLC, *et al.*,<br><br>       Defendants. | Case No. FR-2021-CV-000016 |

## NOTICE OF SERVICE

Defendant MINNESOTA LIMITED, LLC, through its lawyers William C. Walker, Attorney at Law, and Derek S. Casey of TRIPLETT WOOLF GARRETSON, LLC, notifies the Court and the parties that Defendant served the following discovery requests on Defendant Southern Star Central Gas Pipeline, Inc., on April 1, 2021, by electronic mail to Defendant's counsel Douglas M. Weems at dweems@spencerfane.com, David A. Schatz at dschatz@spencerfane.com, and Thomas Hiatt at thiatt@spencerfane.com:

- Minnesota Limited's First Interrogatories to Southern Star, numbered 1 through 7;

- Minnesota Limited's First Requests for Admission to Southern Star, numbered 1 through 98; and

- Minnesota Limited's First Requests for Production to Southern Star, numbered 1 through 47.

## CERTIFICATE OF SERVICE

I served this document through the notice of electronic filing for parties and attorneys who are filing users in this case.

Respectfully submitted,

William C. Walker, #11978
walkerlaw66032@yahoo.com
ATTORNEY AT LAW
112 West Fifth Avenue
Garnett, Kansas 66032
(785) 448-3747
(785) 448-5529 (Facsimile)

*-and-*

Derek S. Casey, #15215
dscasey@twgfirm.com
TRIPLETT WOOLF GARRETSON, LLC
2959 North Rock Road, Suite 300
Wichita, Kansas 67226
(316) 630-8100
(316) 630-8101 (Facsimile)
www.twgfirm.com

 /s/Derek S. Casey
*Attorneys for Defendant*
*Minnesota Limited, LLC*

(TWG18291.001/831427.01)

IN THE DISTRICT COURT OF FRANKLIN COUNTY, KANSAS

THE HDD COMPANY, INC.,
an Oregon Corporation,

   Plaintiff,

 vs.        Case No. FR-2021-CV-000016

MINNESOTA LIMITED, LLC.,
a Minnesota Corporation, et al

   Defendants.

## ENTRY OF APPEARANCE

 George D. Halper of McAnany, Van Cleave & Phillips, P.A. enters his appearance as counsel of record for Defendant Frontier Farm Credit, FLCA a/k/a Farm Credit Services of America, FLCA d/b/a Frontier Farm Credit, FLCA.

      McANANY, VAN CLEAVE & PHILLIPS, P. A.
      10 East Cambridge Circle Drive, Suite 300
      Kansas City, KS 66103
      (913) 371-3838; FAX: (913) 371-4722
      ghalper@mvplaw.com

      By: /s/ *George D. Halper*
       George D. Halper - #14736
       Attorney for Defendant Frontier Farm Credit, FLCA

## CERTIFICATE OF SERVICE

The undersigned certifies that on April 5, 2021, a copy of this document is being emailed to:

   David B. Raymond
   David.raymond@huschblackwell.com
   Michael J. Kelly
   Mike.kelly@huschblackwell.com
   4801 Main Street, Suite 1000
   Kansas City, MO 64112
   *Attorneys for Plaintiff*

      s/ *George D. Halper*
      Attorney for Frontier Farm Credit



**Court:**          Franklin County

**Case Number:**    FR-2021-CV-000016

**Case Title:**     The HDD Company, Inc.
                    vs.
                     Minnesota Limited, LLC, et al

**Type:**           Clerk's Order Granting Fourteen Day Extension


SO ORDERED.

/s/ Theresa Morrow, Deputy Clerk


Electronically signed on 2021-04-05 13:21:36    page 1 of 2

IN THE DISTRICT COURT OF FRANKLIN COUNTY, KANSAS

THE HDD COMPANY, INC.,
an Oregon Corporation,

       Plaintiff,

vs.                                   Case No. FR-2021-CV-000016

MINNESOTA LIMITED, LLC.,
a Minnesota Corporation, et al

       Defendants.

## CLERK'S ORDER GRANTING FOURTEEN DAY EXTENSION

Pursuant to Kansas Supreme Court Rule No. 113, and upon request of Defendant Frontier Farm Credit, FLCA a/k/a Farm Credit Services of America, FLCA d/b/a Frontier Farm Credit, FLCA, such defendant is hereby granted an additional fourteen (14) days to and including April 21, 2021, in which to answer or otherwise respond to Plaintiff's Petition.

              McANANY, VAN CLEAVE & PHILLIPS, P. A.
              10 East Cambridge Circle Drive, Suite 300
              Kansas City, KS  66103
              (913) 371-3838; FAX: (913) 371-4722
              ghalper@mvplaw.com

              By: /s/  *George D. Halper*
                   George D. Halper - #14736
                   Attorney for Defendant Frontier Farm Credit, FLCA

## CERTIFICATE OF SERVICE

The undersigned certifies that on April 5, 2021, a copy of this document is being emailed to:

      David B. Raymond
      David.raymond@huschblackwell.com
      Michael J. Kelly
      Mike.kelly@huschblackwell.com
      4801 Main Street, Suite 1000
      Kansas City, MO 64112
      *Attorneys for Plaintiff*

                s/ *George D. Halper*
                Attorney for Frontier Farm Credit



**Court:**          Franklin County

**Case Number:**    FR-2021-CV-000016

**Case Title:**     The HDD Company, Inc.
                    vs.
                     Minnesota Limited, LLC, et al

**Type:**           Amended Clerk's Order Granting Fourteen Day
                    Extension

SO ORDERED.

/s/ Theresa Morrow, Deputy Clerk

Electronically signed on 2021-04-05 14:58:07    page 1 of 3

IN THE DISTRICT COURT OF FRANKLIN COUNTY, KANSAS

THE HDD COMPANY, INC.,
an Oregon Corporation,

   Plaintiff,

  vs.        Case No. FR-2021-CV-000016

MINNESOTA LIMITED, LLC.,
a Minnesota Corporation, et al

   Defendants.

## AMENDED CLERK'S ORDER GRANTING FOURTEEN DAY EXTENSION

   Pursuant to Kansas Supreme Court Rule No. 113, and upon request of Defendant Frontier Farm Credit, FLCA a/k/a Farm Credit Services of America, FLCA d/b/a Frontier Farm Credit, FLCA, such defendant is hereby granted an additional fourteen (14) days to and including April 20, 2021, in which to answer or otherwise respond to Plaintiff's Petition.  (This has request has been amended to reflect that the process server reported service on March 16, 2021, although the registered agent reports service on March 17, 2021).

        McANANY, VAN CLEAVE & PHILLIPS, P. A.
        10 East Cambridge Circle Drive, Suite 300
        Kansas City, KS  66103
        (913) 371-3838; FAX: (913) 371-4722
        ghalper@mvplaw.com

        By: /s/  *George D. Halper*
          George D. Halper - #14736
          Attorney for Defendant Frontier Farm Credit, FLCA

## CERTIFICATE OF SERVICE

The undersigned certifies that on April 5, 2021, a copy of this document is being emailed to:

> David B. Raymond
> David.raymond@huschblackwell.com
> Michael J. Kelly
> Mike.kelly@huschblackwell.com
> 4801 Main Street, Suite 1000
> Kansas City, MO 64112
> *Attorneys for Plaintiff*

<div style="text-align: right;">

s/ *George D. Halper*
Attorney for Frontier Farm Credit

</div>

# IN THE DISTRICT COURT OF FRANKLIN COUNTY, KANSAS

THE HDD COMPANY, INC., an Oregon
Corporation

                     Plaintiff,

v.                                               Case No. 2021 CV 16

MINNESOTA LIMITED, LLC., a Minnesota
Corporation, et al.

                     Defendants.

_____/

## REQUEST FOR CLERK'S 14 DAY EXTENTION OF TIME

COMES now Defendants Lyle Black and Cheryl Black, by and through counsel Blaine Finch

of Harris Kelsey, Chtd., and make application for issuance of a Clerk's 14-day extension of the initial

time to plead to the Petition in this action pursuant to the authority vested in the Clerk of the Court

by Supreme Court Rule 113.

                                        Respectfully submitted,

                                        */s/Blaine Finch*
                                        Blaine Finch, #20968
                                        Harris Kelsey, Chartered
                                        101 West Second Street
                                        Ottawa, Kansas 66067
                                        785.242.6400
                                        Fax 242.3058
                                        blaine@harriskelsey.com
                                        Attorney for Defendants

## CERTIFICATE OF SERVICE

I hereby certify that the above Request was delivered to David B. Raymond and Michael J.
Kelly, attorneys for Plaintiff, by emailing a copy of the same, on the 6th day of April, 2021.

David B. Raymond
Email: David.raymond@huschblackwell.com
Attorney for Plaintiff

Michael J. Kelly
Email: mike.kelly@huschblackwell.com
Attorney for Plaintiff

                                              ___/s/ Blaine Finch____
                                              Blaine Finch
                                              Attorney for Defendants

## IN THE DISTRICT COURT OF FRANKLIN COUNTY, KANSAS

THE HDD COMPANY, INC., an Oregon
Corporation

                Plaintiff,

v.                                                    Case No.  2021 CV 16

MINNESOTA LIMITED, LLC., a Minnesota
Corporation, et al.

                Defendants.

_____/

## REQUEST FOR CLERK'S 14 DAY EXTENTION OF TIME

      COMES now Defendant Oswego Coal Company, Inc., by and through counsel Blaine Finch

of Harris Kelsey, Chtd., and makes application for issuance of a Clerk's 14-day extension of the initial

time to plead to the Petition in this action pursuant to the authority vested in the Clerk of the Court

by Supreme Court Rule 113.

                                     Respectfully submitted,

                                      */s/ Blaine Finch*
                                      Blaine Finch, #20968
                                      Harris Kelsey, Chartered
                                      101 West Second Street
                                      Ottawa, Kansas 66067
                                      785.242.6400
                                      Fax 242.3058
                                      blaine@harriskelsey.com
                                      Attorney for Defendant

## CERTIFICATE OF SERVICE

      I hereby certify that the above Request was delivered to David B. Raymond and Michael J.
Kelly, attorneys for Plaintiff, by emailing a copy of the same, on the 6th day of April, 2021.

David B. Raymond
Email: David.raymond@huschblackwell.com
Attorney for Plaintiff

Michael J. Kelly
Email: mike.kelly@huschblackwell.com
Attorney for Plaintiff

                                                       ___/s/ Blaine Finch___
                                                       Blaine Finch
                                                       Attorney for Defendant



**Court:**        Franklin County

**Case Number:**    FR-2021-CV-000016

**Case Title:**     The HDD Company, Inc.
                vs.
                 Minnesota Limited, LLC, et al

**Type:**         14 Day Clerk's Extension_Oswego Coal


SO ORDERED.

*Theresa Morrow*

/s/ Theresa Morrow, Deputy Clerk


Electronically signed on 2021-04-06 15:02:25    page 1 of 2

**IN THE DISTRICT COURT OF FRANKLIN COUNTY, KANSAS**

THE HDD COMPANY, INC., an Oregon
Corporation

                  Plaintiff,

v.                                                      Case No.  2021 CV 16

MINNESOTA LIMITED, LLC., a Minnesota
Corporation, et al.

                  Defendants.

_____/

<u>CLERK'S 14 DAY EXTENSION OF TIME</u>

NOW ON THIS _____ day of _____, 2021, upon the timely application of the

Defendant, Oswego Coal Company, Inc., and pursuant to the authority vested in the Clerk of Court

by Supreme Court Rule 113, the initial time to plead to the petition in this action is hereby extended

14 days from April 7, 2021, to April 21, 2021.

                                  _____

                                  Clerk of District Court

                                  By: _____

                                  Deputy Clerk, Franklin County, Kansas

Submitted by:

<u>*/s/ Blaine Finch*</u>
Blaine Finch, #20968
Harris Kelsey, Chartered
101 West Second Street
Ottawa, Kansas 66067
785.242.6400
Fax 242.3058
blaine@harriskelsey.com
Attorney for Defendant



**Court:**          Franklin County

**Case Number:**    FR-2021-CV-000016

**Case Title:**     The HDD Company, Inc.
                    vs.
                     Minnesota Limited, LLC, et al

**Type:**           14 Day Clerk's Extension_Lyle and Cheryl Black


SO ORDERED.

/s/ Theresa Morrow, Deputy Clerk


Electronically signed on 2021-04-06 15:02:35     page 1 of 2

**IN THE DISTRICT COURT OF FRANKLIN COUNTY, KANSAS**

THE HDD COMPANY, INC., an Oregon
Corporation

                         Plaintiff,

v.                                                     Case No.  2021 CV 16

MINNESOTA LIMITED, LLC., a Minnesota
Corporation, et al.

                         Defendants.
_____/

<u>CLERK'S 14 DAY EXTENSION OF TIME</u>

NOW ON THIS _____ day of _____, 2021, upon the timely application of the Defendants, Lyle Black and Cheryl Black, and pursuant to the authority vested in the Clerk of Court by Supreme Court Rule 113, the initial time to plead to the petition in this action is hereby extended 14 days from April 9, 2021, to April 23, 2021.

                                   _____
                                   Clerk of District Court

                                   By: _____
                                   Deputy Clerk, Franklin County, Kansas

Submitted by:

*/s/ Blaine Finch*_____
Blaine Finch, #20968
Harris Kelsey, Chartered
101 West Second Street
Ottawa, Kansas 66067
785.242.6400
Fax 242.3058
blaine@harriskelsey.com
Attorney for Defendants

## IN THE DISTRICT COURT OF FRANKLIN COUNTY, KANSAS

| | |
|---|---|
| **THE HDD COMPANY, INC.,** | |
| **Plaintiff/Counterclaim Defendant,** | Case No. FR-2021-CV-000016 |
| **v.** | |
| **MINNESOTA LIMITED, LLC.,** *et al.*, | Petition Pursuant to K.S.A. Chapter 60 |
| **Defendants.** | |

## PLAINTIFF'S RESPONSE TO DEFENDANT MINNESOTA LIMITED, LLC'S COUNTERCLAIM AGAINST PLAINTIFF

Plaintiff/Counterclaim Defendant The HDD Company, Inc. ("HDD"), by and through their counsel, Husch Blackwell, hereby provides its Answer and Affirmative Defenses to Defendant/Counterclaim Defendant Minnesota Limited, LLC's ("MNLTD") Counterclaim against Plaintiff and states as follows:

## PLAINTIFF'S RESPONSE TO DEFENDANT MINNESOTA LIMITED, LLC'S COUNTERCLIAM AGAINST PLAINTIFF

1.      The allegations in Paragraph 1 do not constitute a statement of fact to which a response is required. To the extent a response is required, HDD admits that MNLTD alleges its claim arises out of the construction of a natural gas pipeline.

2.      In response to Paragraph 2, HDD admits that it was a subcontractor to MNLTD and states that on January 17, 2020, it entered into the Subcontractor Agreement with MNLTD attached as Exhibit 1 to its Petition. HDD further states that it provided directional drilling services and installation of a 36-inch steel pipeline at specific crossings on the Project.

3.      HDD denies the allegations of Paragraph 3.

4.      HDD admits that MNLTD sent a correspondence to HDD on or about September 2020 but denies the allegations raised in the correspondence, and denies the remaining allegations alleged in Paragraph 4.

5.      HDD denies the allegations of Paragraph 5.

6.     In response to Paragraph 6, HDD admits that MNLTD is a pipeline transmission contractor doing business in many states but is without sufficient information to admit or deny the remaining allegations in Paragraph 6, and therefore denies the remaining allegations.

7.     HDD admits the allegations in Paragraph 7.

## FACTUAL BACKGROUND

8.     HDD admits the allegations in Paragraph 8 and states the contract speaks for itself.

9.     HDD admits that MNLTD provided certain services on the Project but is without sufficient information to admit or deny the remaining allegations in Paragraph 9, and therefore denies the remaining allegations.

10.     HDD admits that MNLTD and Southern Star entered into a contract, which contract speaks for itself, but is without sufficient information to admit or deny the remaining allegations in Paragraph 10, and therefore denies the remaining allegations.

11.     In response to Paragraph 11, HDD states that it provided the quote attached to its Petition within Exhibit 1 on January 9, 2020 for directional drilling services and installation of the 36 inch steel pipeline at specific crossings for the Project, which quote speaks for itself, and denies all other allegations of Paragraph 11 that are inconsistent with the quote.

12.     In response to Paragraph 12, HDD admits that on or about January 17, 2020, HDD entered into the Subcontractor Agreement with MNLTD attached as Exhibit 1 to its Petition, which subcontract speaks for itself and denies any summary or interpretation inconsistent with the subcontract.

13.     In response to Paragraph 13, HDD states that on or about January 17, 2020, HDD entered into the Subcontractor Agreement with MNLTD attached as Exhibit 1 to its Petition, which subcontract speaks for itself, and denies any summary or interpretation inconsistent with the subcontract.

14.     In response to Paragraph 14, HDD states that on or about January 17, 2020, HDD entered into the Subcontractor Agreement with MNLTD attached as Exhibit 1 to its Petition, which subcontract speaks for itself, and denies any summary or interpretation inconsistent with the subcontract.

15.     In response to Paragraph 15, HDD states that on or about January 17, 2020, HDD entered into the Subcontractor Agreement with MNLTD attached as Exhibit 1 to its Petition, which speaks for itself, and denies any summary or interpretation inconsistent with the subcontract.

16.     In response to Paragraph 16, HDD states that on or January 17, 2020, HDD entered into the Subcontractor Agreement with MNLTD attached as Exhibit 1 to its Petition, which speaks for itself, and denies any summary or interpretation inconsistent with the subcontract.

17.     HDD admits the allegations of Paragraph 17.

18.     HDD admits the allegations of Paragraph 18.

19.     In response to the first sentence of Paragraph 19, HDD states that it is a statement of opinion and therefore not a statement of fact to which a response is required.  To the extent a response is required, it is denied.  HDD denies the second sentence of Paragraph 19.

20.     HDD denies the allegations of Paragraph 20.

21.     HDD denies the allegations of Paragraph 21.

22.     HDD denies the allegations of Paragraph 22.

23.     HDD admits the allegations of Paragraph 23.

24.     HDD admits that Cedar Creek, Pottawatomie Creek, and Flint Hill were all directional drilling sites on the Project.

25.     In response to the allegations of Paragraph 25, HDD states that the agreed upon schedules speak for themselves and states that the Subcontract Agreement and HDD's price is based on a "reasonable and mutually agreed-to project schedule," and that the "approved project baseline schedule and all monthly updated must be provided to us on a regular and timely basis to keep us appraised of schedule changes which may impact the timing and efficiency of our work. We will not be liable for any delays caused by others or by factors beyond our reasonable control." The Project schedule was delayed based upon the actions and inactions of MNLTD including, but not limited to, failing to provide adequate site access, improperly stringing the pipe, failing to apply scarguard, extraction and reinstallation of the pipe, and direction for additional work to HDD.

26.     HDD denies the allegations of Paragraph 26.

27.     HDD denies the allegations of Paragraph 27.

28.     HDD denies the allegations of Paragraph 28.

29.     HDD denies the allegations of Paragraph 29.

30.     In response to the allegations of Paragraph 30, HDD states that it performed road bores but denies the remaining allegations of Paragraph 30.  Further, HDD states that a differing site condition was acknowledged by MNLTD causing additional work.

31.     In response to Paragraph 31, HDD states that on or about January 17, 2020, HDD entered into the Subcontractor Agreement with MNLTD attached as Exhibit 1 to its Petition, which speaks for itself, and denies any summary or interpretation inconsistent with the subcontract.

32.     HDD is without sufficient information to admit or deny the allegations of Paragraph 32, and therefore denies same.

33.     HDD is without sufficient information to admit or deny the allegations of Paragraph 33, and therefore denies same.

34.     HDD is without sufficient information to admit or deny the allegations of Paragraph 34, and therefore denies same.

## COUNT I – Breach of Contract

35.     HDD admits the allegations of first sentence of Paragraph 35.  HDD denies the allegations in the second sentence of Paragraph 35.

36.     HDD denies the allegations of Paragraph 36.

37.     HDD denies the allegations of Paragraph 37.

38.     In response to Paragraph 38, HDD states that on or about January 17, 2020, HDD entered into the Subcontractor Agreement with MNLTD attached as Exhibit 1 to its Petition, which speaks for itself, and denies any summary or interpretation inconsistent with the subcontract.

39.     HDD denies the allegations in Paragraph 39.

40.     HDD denies the allegations in Paragraph 40.

41.     HDD denies the allegations of Paragraph 41.

42.     HDD denies the allegations of Paragraph 42.

WHEREFORE, Counterclaim-Defendant The HDD Company, Inc. demands judgment denying Counterclaim-Plaintiff Minnesota Limited, LLC's Petition, dismissing Counterclaim-Plaintiff's claim with prejudice, and granting Counterclaim-Defendant recovery of its attorneys' fees, expenses, and costs, insofar as allowed by law, with such other and further relief as the Court deems just and equitable.

## COUNT II – Indemnification

43.     In response to Paragraph 43, HDD states that on or about January 17, 2020, HDD entered into the Subcontractor Agreement with MNLTD attached as Exhibit 1 to its Petition, which speaks for itself, and denies any summary or interpretation inconsistent with the subcontract.

44.     In response to Paragraph 44, HDD states that on or about January 17, 2020, HDD entered into the Subcontractor Agreement with MNLTD attached as Exhibit 1 to its Petition, which speaks for itself, and denies any summary or interpretation inconsistent with the subcontract.

45.     HDD denies the allegations of Paragraph 45.

46.     HDD denies the allegations of Paragraph 46.

47.     HDD denies the allegations of Paragraph 47.

48.     HDD is without sufficient information to admit or deny the allegations of Paragraph 48 and therefore denies same.

49.     HDD denies the allegations of Paragraph 49.

WHEREFORE, Counterclaim-Defendant The HDD Company, Inc. demands judgment denying Counterclaim-Plaintiff Minnesota Limited LLC's Petition, dismissing Counterclaim-Plaintiff's claim with prejudice, and granting Counterclaim-Defendant recovery of its attorneys' fees, expenses, and costs, insofar as allowed by law, with such other and further relief as the Court deems just and equitable.

## <u>COUNTERCLAIM DEFENDANT'S AFFIRMATIVE DEFENSES</u>

Without making any admission that it bears the burden of proof on the items listed below. Counterclaim-Defendant The HDD Company, Inc. states the following defenses to the allegations and claims stated in Counterclaim-Plaintiff Minnesota Limited, LLC's Counterclaim:

1.     MNLTD's Counterclaim fails to state a claim for which relief may be granted.

2.     MNLTD's claims are barred in whole or in part by the terms of the Subcontract Agreement.

3.     MNLTD's claims are barred in whole or in part by its prior material breach of the Subcontract Agreement.

4.     MNLTD's claims are barred in whole or in part under the doctrine of waiver.

5.     MNLTD's claims are barred in whole or in part as its own actions and/or omissions caused and/or contributed to cause any alleged damages.

6.     MNLTD's claims are barred for failing to meet conditions precedent.

7.     MNLTD's claims are barred in whole or in part for failing to mitigate damages.

8.     MNLTD's own negligence or intentional acts were the sole proximate cause or a proximate cause of any injuries or damages allegedly suffered by MNLTD.  Furthermore, MNLTD's claims and damages are barred by the doctrine of comparative responsibility.  The

contributory negligence or comparative liability of MNLTD the sole proximate cause or a proximate cause of any injuries and damages that MNLTD has suffered or incurred.

9.     MNLTD's claims are barred in whole or in part because the allegations of obligations by HDD under any agreement between HDD and MNLTD were prevented by MNLTD's conduct and remains impracticable due to circumstances beyond HDD's control.

10.    MNLTD has failed to show any damages.

11.    To the extent MNLTD is found to be entitled to damages, HDD is entitled to a setoff for all amounts that are due under the contract and/pr expended by HDD due to MNLTD's breach of contract.

12.    MNLTD's claims are void for MNLTD's failure to comply with the terms and obligations of the Subcontract Agreement.

13.    HDD reserves the right to assert any additional affirmative defenses that may be discovered during the course of additional investigation and discovery, which is ongoing.

## JURY DEMAND

The HDD Company, Inc. demands a trial by jury on all issues so triable.

## CERTIFICATE OF SERVICE

I hereby certify that I served this document through the notice of electronic filing for parties

and attorneys who are filing users in this case.

Respectfully submitted,

HUSCH BLACKWELL, LLP

/s/ *David B. Raymond*
David B. Raymond                    KS #14004
Michael J. Kelly                       KS #25666
4801 Main Street, Suite 1000
Kansas City, Missouri 64112
(816) 983-8000 (Phone)
(816) 983-8080 (FAX)
david.raymond@huschblackwell.com
mike.kelly@huschblackwell.com

**ATTORNEYS FOR
PLAINTIFF/COUNTERCLAIM DEFENDANT**

## CERTIFICATE OF SERVICE

I hereby certify that I served this document through the notice of electronic filing for parties and attorneys who are filing users in this case.

/s/*David B. Raymond*
Attorney for Plaintiff/Counterclaim-Defendant



**Court:**          Franklin County

**Case Number:**    FR-2021-CV-000016

**Case Title:**     The HDD Company, Inc.
                    vs.
                     Minnesota Limited, LLC, et al

**Type:**           Clerk's Extension

SO ORDERED.

/s/ Theresa Morrow, Deputy Clerk

Electronically signed on 2021-04-13 13:10:14    page 1 of 3

THE HDD COMPANY, INC.,         )
                                  )
                Plaintiff,     )
                                  )     Case No. FR-2021-CV-000016
                                  )
v.                                 )
                                  )
MINNESOTA LIMITED, LLC, *et al.*,   )
                                  )
              Defendants.   )

## CLERK'S EXTENSION

Upon application of Defendant Southern Star Central Gas Pipeline, Inc. ("Southern Star"), by and through their undersigned counsel of record and pursuant to Supreme Court Rule 113, Southern Star is granted an additional fourteen (14) days to answer, object, or otherwise respond to Plaintiff's Petition through and including the 3rd day of May, 2021

Dated: April 13, 2021.

                                            _____
                                            Clerk of the District Court

Submitted and approved by:

SPENCER FANE LLP

<u>/s/ *Thomas Hiatt*</u>
Douglas M. Weems,    KS #14771
David A. Schatz,        KS #20601
Thomas Hiatt,            KS #27105
1000 Walnut St., Suite 1400
Kansas City, MO 64106-2140
Telephone: (816) 474-8100
Facsimile: (816) 474-3216
dweems@spencerfane.com
dschatz@spencerfane.com
thiatt@spencerfane.com

*Attorney for Defendant Southern Star Central Gas Pipeline, Inc.*

2